UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN DEFENSE OF ANIMALS          )
                               )
        Plaintiff,             )
                               )
     v.                        )
                               )
THE UNITED STATES DEPARTMENT   )
  OF AGRICULTURE,              )
                               )  Civil Action No. 02-0557 (RWR)
        Defendant,             )
                               )
        and                    )
                               )
LIFE SCIENCES RESEARCH, INC.,  )
                               )
        Intervenor-Defendant.  )
_____)

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant United States Department of Agriculture (USDA),
by its undersigned attorneys, respectfully moves the Court,
pursuant to Rule 56 of the Federal Rules of Civil Procedure,
for summary judgment on the grounds that no genuine issue of
material fact exists and that it is entitled to judgment as a
matter of law.  In support of this motion, the Court is
respectfully referred to the Declaration of Hugh Gilmore,
Program Specialist/Information Analyst, Legislative and Public
Affairs Division, Animal and Plant Health Inspection Service,
USDA; to Defendant's Statement of Material Facts as to Which
There is No Genuine Issue; and to the Memorandum of Points and

-2-

Authorities in Support of Defendant's Motion for Summary

Judgment, all of which are filed herewith.

Respectfully submitted,

_____

ROSCOE C. HOWARD, JR.
(D.C. Bar #246470)
United States Attorney


_____

MARK E. NAGLE
(D.C. Bar #416364)
Assistant United States
  Attorney


Dated:   December 12, 2002         _____

FRANK P. MENNA
Senior Attorney
Office of Information and
  Privacy
United States Department of
  Justice
Flag Building, Suite 570
Washington, D.C.  20530-0001
(202) 514-3642

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN DEFENSE OF ANIMALS           )
                                )
        Plaintiff,              )
                                )
        v.                      )
                                )
THE UNITED STATES DEPARTMENT    )
    OF AGRICULTURE,             )
                                )  Civil Action No. 02-0557 (RWR)
        Defendant,              )
                                )
        and                     )
                                )
LIFE SCIENCES RESEARCH, INC.,   )
                                )
        Intervenor-Defendant.   )
_____)

## DEFENDANT'S STATEMENT OF MATERIAL
## FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rule 7.1(h), defendant United
States Department of Agriculture (USDA) submits the following
statement of material facts as to which there is no genuine
issue:

1.  By letter dated November 20, 2000, plaintiff
submitted a request pursuant to the Freedom of Information Act
(FOIA), 5 U.S.C. § 552 (2000), to defendant USDA seeking
access to records concerning its investigation of Huntingdon
Life Sciences (Huntingdon)[1] for alleged violations of the

_____

[1] Huntingdon Life Sciences is a wholly-owned subsidiary of
intervenor-defendant Life Sciences Research. (See intervenor-
defendant's Mem. of P. & A. in Supp. of Unopposed Mot. for
(continued...)

-2-

Animal Welfare Act, 7 U.S.C. §§ 2131-59 (2000).  (See
Declaration of Hugh Gilmore, Program Specialist/Information
Analyst, Legislative and Public Affairs Division, Animal and
Plant Health Inspection Service, USDA [hereinafter Gilmore
Declaration], filed herewith, ¶ 8 & Ex. A.)

     2.  By letter dated April 13, 2001, defendant USDA
provided plaintiff with a first interim response to its FOIA
request, releasing thirty-one pages in their entireties.  (See
id. ¶ 9 & Ex. B.)  By that letter, defendant USDA further
informed plaintiff that the remainder of its FOIA request
would be placed into defendant USDA's FOIA processing queue.
(See id.)

     3.  By letter dated June 18, 2002, defendant USDA
provided plaintiff with a second interim response to its FOIA
request, releasing 228 pages without excision and 148 pages
with excisions made pursuant to Exemptions 5, 6, and 7(C) of
the FOIA, 5 U.S.C. § 552(b)(5), (6), and (7)(C); defendant
USDA also informed plaintiff that it had withheld 19 pages in
their entireties pursuant to Exemption 5.  (See id. ¶ 11 & Ex.
C.)  By that letter, defendant USDA further informed plaintiff
that because the remaining 2384 pages of responsive records

_____

     ¹(...continued)
Leave to Intervene, filed June 13, 2002, at 1.)

-3-

appeared to contain confidential commercial information

obtained from Huntingdon, those records were being forwarded

to Huntingdon for its views, pursuant to defendant USDA's

predisclosure notification procedures concerning business

information requested under the FOIA.[2]  (See id.)

    4.  Upon the completion of the predisclosure notification

process, defendant USDA provided plaintiff with a final

response to its request, releasing 303 pages without excision

and 602 pages with excisions made pursuant to Exemptions 4, 5,

6, and 7(C) of the FOIA, 5 U.S.C. § 552(b)(4), (5), (6), and

(7)(C); defendant USDA also informed plaintiff that it had

---

[2] The number of records sent to intervenor-defendant
eventually totaled 2468 pages.  This amount is greater than
the 2384 pages referenced in defendant USDA's June 18 letter
due to an error in defendant USDA's page count, as well as the
fact that an additional sixty pages were forwarded to
intervenor-defendant after the June 18 letter was sent.  (See
id. ¶ 11 & Ex. D.)

-4-

withheld 1563 pages in their entireties pursuant to Exemptions

4, 6, and 7(C).  (See id. ¶ 12 & Ex. D.)

Respectfully submitted,

_____

ROSCOE C. HOWARD, JR.
(D.C. Bar #246470)
United States Attorney


_____

MARK E. NAGLE
(D.C. Bar #416364)
Assistant United States
  Attorney


Dated:   December 12, 2002          _____

FRANK P. MENNA
Senior Attorney
Office of Information and
  Privacy
United States Department of
  Justice
Flag Building, Suite 570
Washington, D.C.  20530-0001
(202) 514-3642

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN DEFENSE OF ANIMALS            )
                                 )
    Plaintiff,                   )
                                 )
    v.                           )
                                 )
THE UNITED STATES DEPARTMENT     )
  OF AGRICULTURE,                )
                                 )   Civil Action No. 02-0557 (RWR)
    Defendant,                   )
                                 )
    and                          )
                                 )
LIFE SCIENCES RESEARCH, INC.,    )
                                 )
    Intervenor-Defendant.        )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### Preliminary Statement

Plaintiff commenced this action under the Freedom of
Information Act (FOIA), 5 U.S.C. § 552 (2000), seeking access
to records concerning an investigation by defendant United
States Department of Agriculture (USDA) of Huntingdon Life
Sciences (Huntingdon)[1] for alleged violations of the Animal
Welfare Act (AWA), 7 U.S.C. §§ 2131-59 (2000).  Based upon the
accompanying Declaration of Hugh Gilmore, USDA [hereinafter
Gilmore Declaration], and the entire record herein, and for

_____

[1] Huntingdon Life Sciences is a wholly-owned subsidiary of
intervenor-defendant Life Sciences Research, Inc.  (See
intervenor-defendant's Mem. of P. & A. in Supp. of Unopposed
Mot. for Leave to Intervene at 1.)

-2-

the reasons set forth below, defendant USDA respectfully
submits that there exists no genuine issue of material fact
and that it is entitled to judgment as a matter of law
pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### Factual and Procedural Background

By letter dated November 20, 2000, plaintiff submitted a
FOIA request to defendant USDA seeking access to records
concerning its investigation of Huntingdon Life Sciences for
alleged violations of the AWA.  (See Gilmore Decl. ¶ 8 & Ex.
A.)  Defendant USDA provided plaintiff with the first interim
response to its request by letter dated April 13, 2001, in
which thirty-one pages were released in their entireties.
(See id. ¶ 9 & Ex. B.)  By that letter, defendant USDA further
informed plaintiff that the remainder of its FOIA request
would be placed into defendant USDA's FOIA processing queue.
(See id.)

Plaintiff commenced this action on March 22, 2002, on the
basis that "it had still not yet received a final response to
its November 20, 2000 request" even though "the statutory
deadline for responding to such requests long ago expired."
(Pl.'s Compl. at 3.)  On June 12, 2002, and in accordance with
the Court's Order for Initial Scheduling Conference of May 7,
2002, plaintiff and defendant USDA filed with the Court their

-3-

Joint Report Reflecting Their Proposed Schedule Upon Which
This Case Should Proceed, in which they informed the Court
that the administrative processing of plaintiff's FOIA request
had not yet been completed.  Accordingly, plaintiff and
defendant USDA proposed to the Court that defendant USDA would
complete the processing of plaintiff's request by no later
than August 19, 2002.  In light of the joint report filed by
plaintiff and defendant USDA, the Court by Order dated June
17, 2002, cancelled the initial scheduling conference and
directed plaintiff and defendant USDA to file another joint
status report with the Court by September 18, 2002.

     By letter dated June 18, 2002, defendant USDA provided
plaintiff with the second interim response to its FOIA
request, in which 228 pages were released without excision,
148 pages were released with excisions made pursuant to
Exemptions 5, 6, and 7(C) of the FOIA, 5 U.S.C. § 552(b)(5),
(6), and (7)(C), and 19 pages were withheld in their
entireties pursuant to Exemption 5.  (See Gilmore Decl. ¶ 11 &
Ex. C.)  By that letter, defendant USDA further informed
plaintiff that in accordance with Executive Order 12,600 and
with defendant USDA's predisclosure notification procedures
concerning business information requested under the FOIA, the

-4-

remaining 2384 pages[2] of responsive records were being
forwarded to Huntingdon in order to obtain its views
concerning the releaseability of those records, because the
records appeared to contain confidential commercial
information that would be protected from disclosure pursuant
to Exemption 4 of the FOIA, 5 U.S.C. § 552(b)(4).  (See id.)

     By letter dated August 19, 2002, and as a result of the
completion of the predisclosure notification process,
defendant USDA provided plaintiff with the final response to
its request, in which 303 pages were released without
excision, 602 pages were released with excisions made pursuant
to Exemptions 4, 6, and 7(C) of the FOIA, 5 U.S.C.
§ 552(b)(4), (6), and (7)(C), and 1563 pages were withheld in
their entireties, also pursuant to Exemptions 4, 6, and 7(C).
(See Gilmore Decl. ¶ 12 & Ex. D.)

     In accordance with the Court's Order of June 17, 2002,
and in light of defendant USDA's completion of the processing
of plaintiff's request, the parties[3] filed on September 18,

_____

     [2] The number of records sent to Huntingdon eventually
totaled 2468 pages.  This amount is greater than the 2384
pages referenced in defendant USDA's June 18 letter because of
an error in defendant USDA's initial page count, as well as
the fact that sixty additional pages were forwarded to
Huntingdon after the June 18 letter was sent.  (See id. ¶ 11.)

     [3] By Order dated June 19, 2002, the Court granted
                                             (continued...)

-5-

2002, a Joint Status Report in which plaintiff and defendant
USDA informed the Court that they were not prepared to move
forward with this case because plaintiff had not yet reviewed
all of the records that defendant USDA released to it.
Therefore, the parties proposed to the Court that plaintiff
would complete its review by no later than October 18, 2002;
at that time, plaintiff would inform defendant USDA of what
information was no longer at issue in this case and what
information remained in dispute.  The parties further proposed
that they submit to the Court by November 1, 2002, a proposed
schedule upon which this case should proceed.

In accordance with the Joint Status Report of September
18, plaintiff, by letter dated October 18, 2002, informed
defendant USDA that it no longer sought access to certain
categories of withheld information.[4]  By that letter,
plaintiff also raised concerns about both the completeness and
the withholding of certain information remaining at issue in
this case.  Nevertheless, plaintiff's letter also suggested

---

[3](...continued)
intervenor-defendant's Unopposed Motion for Leave to
Intervene.

[4] The information to which plaintiff no longer seeks
access consists of Huntingdon's Standard Operating Procedures,
animal husbandry records, and all information withheld
pursuant to Exemptions 6 and 7(C).

-6-

that the issues in this case could be further narrowed if those concerns were addressed. Accordingly, on November 1, 2002, the parties filed with the Court a Joint Status Report proposing that their joint report time be carried over until December 13, 2002, in order to allow defendant USDA sufficient time to address plaintiff's concerns. On November 27, 2002, defendant USDA, through counsel, sent a letter to plaintiff's counsel addressing the concerns that were raised in its letter of October 18. As of this date, plaintiff has not responded to defendant USDA's letter.

Thus, this case has not been narrowed further and a significant amount of the withheld information remains in dispute. Accordingly, defendant USDA has moved for summary judgment because it maintains that the information remaining at issue in this case was properly withheld pursuant to Exemptions 4 and 5. For the reasons set forth below, defendant USDA respectfully suggests that there exists no genuine issue of material fact and that it is entitled to judgment as a matter of law pursuant to Rule 56 of the Federal Rules of Civil Procedure.

-7-

## Argument

I.    Defendant USDA Has Properly Withheld Confidential
      Commercial Information And Trade Secrets
      Pursuant To Exemption 4.

Exemption 4 of the FOIA protects from disclosure "trade

secrets and commercial or financial information obtained from

a person [that is] privileged or confidential." 5 U.S.C.

§ 552(b)(4).  This exemption covers two broad categories of

information in federal agency records:  (1) trade secrets; and

(2) information that is commercial or financial that is

obtained from a person and is privileged or confidential.

Defendant USDA respectfully suggests that certain of the

information that it obtained during the investigation of

Huntingdon was properly withheld under both parts of Exemption

4.

A.    Defendant USDA Has Properly Withheld Confidential
      Commercial Information Obtained From a Person
      Pursuant to Exemption 4.

The D.C. Circuit has held that information may be

withheld under the second, and most commonly used, part of

Exemption 4 if it is:  (1) commercial or financial, (2)

obtained from a person, and (3) privileged or confidential.

See, e.g., Nat'l Parks & Conservation Ass'n v. Morton, 498

F.2d 765, 766 (D.C. Cir. 1974).  As is demonstrated below, the

-8-

information withheld under Exemption 4 satisfies all three of
these requirements.

    1.   The information is commercial.[5]

    This Court has held that in the context of Exemption 4,
the term "commercial" should be given its ordinary meaning.
See, e.g., Judicial Watch, Inc. v. Export-Import Bank, 108 F.
Supp. 2d 19, 28 (D.D.C. 2000) (citing Pub. Citizen Health
Research Group v. FDA, 704 F.2d 1289, 1290 (D.C. Cir. 1983),
and Wash. Post Co. v. HHS, 690 F.2d 252, 266 (D.C. Cir.
1982)).  Thus, so long as a submitter has a "commercial
interest" in information requested under the FOIA, that
information will be considered "commercial" under Exemption 4.
Pub. Citizen, 704 F.2d at 1290.

    The information at issue in this case is clearly
commercial.  Huntingdon is a Contract Research Organization
(CRO) that sells scientific research and development services
to pharmaceutical, biotechnology, medical device, and chemical
companies.  (See Gilmore Decl. ¶ 3.)  The withheld information
is the product of hundreds of thousands of dollars worth of
research and development services that Huntingdon's clients
purchased from it.  (See id. ¶ 5.)  Thus, there can be no

---

    [5] Defendant USDA does not maintain that the withheld
information is "financial."

-9-

question that requested information is "commercial," because

Huntingdon and its clients clearly have a commercial interest

in it. See Pub. Citizen, 704 F.2d at 1290 (noting that

medical device manufacturers have a commercial interest in the

scientific testing of their products); Wash. Research Project

v. HEW, 504 F.2d 238, 245 n.6 (D.C. Cir. 1974) (recognizing

that an organization that is "engaged in profit-oriented

research . . . could conceivably be shown to have a commercial

or trade interest in [its] research design").

    2.   The information was obtained from a person.

The term "person" in the context of Exemption 4 applies

to a wide range of entities, including corporations,

associations, and public or private organizations. See, e.g.,

Judicial Watch, 108 F. Supp. 2d at 28; Allnet Communication

Servs. v. FCC, 800 F. Supp. 984, 988 (D.D.C. 1992), aff'd, No.

92-5351 (D.C. Cir. May 27, 1994).

At the time that defendant USDA conducted its

investigation, Huntingdon was a corporation incorporated in

the state of Delaware. (See Gilmore Decl. ¶ 3.)  Defendant

USDA obtained the information at issue in this case from

Huntingdon pursuant to an investigation conducted under the

AWA.  (See id. ¶ 5.)  Thus, the records at issue in this case

were obtained from a person in the context of Exemption 4.

-10-

3.   The information is confidential.

The D.C. Circuit has held that information is "confidential" under Exemption 4 if its release is likely to cause substantial harm to the competitive position of the person from whom it was obtained.[6]   See, e.g., National Parks, 498 F.2d at 770 & n.17.   To demonstrate that a submitter could suffer substantial competitive harm from the release of its information, a showing of actual competitive harm is not required, nor is "a sophisticated economic analysis of the likely effects of disclosure" required.   Pub. Citizen, 704 F.2d at 1291.   Rather, a showing of actual competition and a likelihood of substantial competitive injury to the submitter will suffice.   Id.

It is clear that research facilities operated by companies such as Huntingdon face actual competition.   As Mr. Gilmore attests, there are 1200 USDA-registered research

_____

[6] It is not disputed that the information at issue in this case was submitted involuntarily to defendant USDA pursuant to its investigation of Huntingdon under the AWA.   (See Gilmore Decl. ¶ 5.)   Accord 9 C.F.R. § 2.38(a)-(b) (2002) (USDA regulations requiring research facilities to make available to USDA investigators for examination and copying any information concerning the business of the research facility, and to allow USDA investigators to examine records required to be kept by the AWA and its implementing regulations).   Therefore, the less stringent Exemption 4 standard for withholding information that is "voluntarily" submitted to the Government is inapplicable.   See Critical Mass Energy Project v. NRC, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc).

-11-

facilities, many of which are CROs such as Huntingdon.  (See

Gilmore Decl. ¶ 4.)  Likewise, it is beyond dispute that the

pharmaceutical, biotechnology, medical device, and chemical

companies that are Huntingdon's clients also face actual

competition.  See, e.g., Pub. Citizen Health Research Group v.

NIH, 209 F. Supp. 2d 37, 47 (D.D.C. 2002) ("The pharmaceutical

industry is a highly competitive market where companies

routinely attempt to discover a possible advantage over their

competitors.").

     Furthermore, defendant USDA respectfully suggests that,

for the following reasons, Huntingdon and its clients would be

expected to suffer substantial competitive harm if information

concerning Huntingdon's test designs and methods, as well as

the results of tests conducted using those designs and

methods, were released.

     a.   Information that reveals Huntingdon's test designs
          and methods

     The courts have held that substantial competitive harm

can result from the release of "clinical protocols and

clinical development plans" like those at issue in this case.

Pub. Citizen v. FDA, 997 F. Supp. 56, 65-66 (D.D.C. 1998),

aff'd in pertinent part, 185 F.3d 898 (D.C. Cir. 1999); see

Sokolow v. FDA, No. 1:97-CV-252, slip op. at 7 (E.D. Tex. Feb.

19, 1998) (holding that Exemption 4 protects "study

-12-

methodologies and protocols used by [the submitter] to
evaluate" experimental drugs) (copy attached as Attachment A),
aff'd, 162 F.3d 1160 (5th Cir. 1998) (unpublished table
decision).   Inasmuch as test designs and methods "represent a
substantial investment of time and energy as well as
creativity," Pub. Citizen, 997 F. Supp. at 65, their release
could cause substantial competitive harm because "competitors
could adopt the techniques developed without themselves having
invested in the cost of developing them."   Id. at 66; see
Sokolow, No. 1:97-CV-252, slip op. at 7-8 (holding that
release of study designs and methods could cause competitive
harm because such information "could be used by competitors to
develop [their own] clinical studies or other research"
without incurring "the time, labor, risk, and expense involved
in developing" them).

     As Mr. Gilmore attests, defendant USDA has withheld under
Exemption 4 information that reveal Huntingdon's confidential
study designs and methods.   (See Gilmore Decl. ¶ 15.)
Huntingdon's Standard Operating Procedures[7] and test protocols

_____

     [7] Although plaintiff no longer seeks access to the
Standard Operating Procedures themselves, plaintiff still
seeks access to any information derived from them.
Furthermore, defendant USDA shows below that the release of
information that reveals Huntingdon's confidential Standard
Operating Procedures -- including any information derived from
                                        (continued...)

-13-

(and amendments thereto) are, in essence, the "blueprints" for the research activities that comprise its business; they describe in detail nearly every aspect of the special and unique designs and methods that Huntingdon uses to conduct those activities, including: the configuration of its facilities; the functionality of its research equipment; the selection of test subjects; the procedures used for administering the experimental compounds that it tests; the frequency and the methods by which raw data, observations, and specimens are collected and recorded during the tests; and the methods by which the test data is to be analyzed. (See Gilmore Decl. ¶ 15.) Furthermore, records concerning the suitability and selection of test subjects, internal reviews of Huntingdon's research activities, the dosing charts reflecting the administration of tested compounds, and final test reports were all generated in accordance with, and/or contain detailed discussions of, the confidential designs and methods set forth in the Standard Operating Procedures and test protocols. (See id.)

---

[7](...continued)
them -- could cause Huntingdon to suffer substantial competitive harm. Therefore, inasmuch as virtually all of the information withheld under Exemption 4 was so derived (see id. ¶¶ 15-18), defendant USDA necessarily is proceeding as if the propriety of the withholding of information contained in the Standard Operating Procedures remains at issue in this case.

-14-

Given the particularized nature of these "blueprints" and
records that reveal their implementation, Huntingdon's
competitors could easily use them to replicate the "special
and unique test designs and methods that are the product of
decades of Huntingdon's business evolution." (Gilmore Decl.
¶ 17.) By appropriating these designs and methods for their
own use, competitors could develop and market competing
research services without investing the time, cost, and effort
that is necessary to create them independently. (See id.)
Because those competing services would be developed "at little
or no cost," they likely would be marketed at lower prices.
(Id.) Thus, the release of these designs and methods could
"caus[e] Huntingdon substantial competitive harm through the
erosion of its market share." (Id.) As discussed above, this
is exactly the type of competitive harm that Exemption 4 was
intended to prevent. See, e.g., Pub. Citizen, 185 F.3d at 905
(noting that the release of product testing records --
including test protocols and development plans -- would cause
"substantial harm to [the submitter's] position"); see also,
e.g., Worthington Compressors, Inc. v. Costle, 662 F.2d 45, 51
(D.C. Cir. 1981) (noting that the "potential windfall for
competitors to whom valuable information is released under
FOIA . . . could easily have competitive consequences not

-15-

contemplated as part of FOIA's principal aim of promoting openness in government").

Furthermore, the release of these records could cause Huntingdon to suffer substantial competitive harm by providing its competitors with information from which its profit margins and costs can be deduced. (See Gilmore Decl. ¶ 17.) As this Court has noted, "courts in this circuit have held that [the release of] information that competitors could use to derive a firm's profit margin constitutes serious competitive harm." Pub. Citizen, 209 F. Supp. at 48-49. Likewise, courts have concluded that competitive harm could result from the release of information that would reveal a company's cost structure. See, e.g., Trans-Pac. Policing Agreement v. United States Customs Serv., 177 F.3d 1022, 1026 (D.C. Cir. 1999) (expressing "no doubt" that release of information from which business costs can be derived would cause competitive harm). Such harm could result from competitors' use of the profit margin and cost information to "price [their own] competing products more effectively to capture market share." Pub. Citizen, 209 F. Supp. at 48 n.7; see, e.g., OSHA Data/CIH, Inc. v. United States Dep't of Labor, 220 F.3d 153, 167-68 (3d Cir. 2000) (noting that information from which cost and productivity data could be derived "would give the competitor

-16-

valuable inside information to assist its pricing
strategies").

In this case, the records concerning Huntingdon's designs
and methods contain specific descriptions of Huntingdon's
general business operations, such as:  its research facilities
(including related maintenance and capital improvement plans);
its research equipment (including its configuration and
functionality); its employee training programs; its
information technology systems; and its vendors and
consultants.  (See Gilmore Decl. ¶ 15.)  Moreover, as
discussed above, these records also contain specific
descriptions of the research activities conducted in
Huntingdon's facilities, as well as information concerning the
expertise of the employees who performed that work.  (See id.)

As attested to by Mr. Gilmore, the information contained
in these records reflects overhead, labor, and other expenses
from which Huntingdon's profit margin and costs can be
derived.  (See id. ¶ 17.)  Huntingdon's competitors could use
this information "to price their own competing research
services more competitively, thereby allowing them to unfairly
erode Huntingdon's market share."  (Id.)  As noted above, this
Court has protected information from which a company's profit
margin and costs can be derived in order to prevent this very

-17-

type of competitive harm.  See, e.g., Pub. Citizen, 209 F.
Supp. 2d at 48 n.7 (reasoning that the release of a research
and development company's cost information would cause
competitive harm by enabling competitors to predict the prices
at which the company would be able to market its products).
Therefore, defendant USDA respectfully suggests that it
properly withheld information concerning Huntingdon's test
designs and methods pursuant to Exemption 4.

  b.  Information that reveals the test results

  Courts have long recognized that substantial competitive
harm can be caused not only by the release of designs and
methods used to test experimental compounds, but also by the
results of tests themselves.  See Pub. Citizen, 997 F. Supp.
at 65-66 (concluding that the release of records "contain[ing]
the results of clinical studies . . . that disclose clinical
observations of [test subjects] and related information"
likely would cause substantial competitive harm); Sokolow, No.
1:97-CV-252, slip op. at 7 (protecting under Exemption 4
"detailed descriptions of the pharmacological action of the
investigational drug and the results of laboratory and animal
studies assessing the drug's toxicity"); Citizens' Comm'n on
Human Rights v. FDA, No. 92-CV-5313, 1993 WL 1610471, at **9-
10 (C.D. Cal. 1993) (holding that raw research data generated

-18-

during testing of developmental drug were properly withheld under Exemption 4), aff'd in pertinent part, 43 F.3d 1325 (9th Cir. 1995); Lederle Labs. v. HHS, Civil No. 88-0249, slip op. at 22 (D.D.C. July 14, 1988) (protecting test data and results under Exemption 4 because their disclosure would reveal "critical information about the nature and scope" of the submitter's research, which would grant its competitors "an important competitive edge") (copy attached as Attachment B); see also Heeney v. FDA, 7 Fed. Appx. 770 (9th Cir. 2001) (concluding that information concerning product testing "falls squarely within the exemption provided by § 552(b)(4)").

According to the D.C. Circuit, substantial competitive harm can be caused by the release of product research test results because it would allow competitors to benefit from that data "without incurring the time, labor, risk, and expense involved in developing them independently". Webb v. HHS, 696 F.2d 101, 103 (D.C. Cir. 1982); see Sokolow, No. 1:97-CV-252, slip op. at 7 (noting that investigational drug study results "could be used by competitors to develop . . . research toward a [competing] product"); Pub. Citizen v. FDA, 539 F. Supp. 1320, 1327 (D.D.C. 1982) (recognizing that the release of product test data would cause "substantial competitive injury" because "competitors would be receiving,

-19-

free of charge, the benefits of this costly research and
testing"), aff'd in pertinent part, 704 F.2d 1280 (D.C. Cir.
1983). As the Supreme Court has recognized in a non-FOIA
context, competitors could use such research data to develop
competing products that could be "marketed at relatively low
prices" because they would be produced without "the research,
development, and promotional costs normally associated with
the creation and marketing of an original product." United
States v. Generix Drug Corp., 460 U.S. 453, 455 n.1 (1983);
see also Tri-Bio Labs., Inc. v. United States, 836 F.2d 135,
143 (3d Cir. 1987) (noting that a "'me-too' manufacturer seeks
to enjoy, without remunerating the pioneer manufacturer, the
benefit of the pioneer's substantial investment in research
and testing").

        In this case, defendant USDA has withheld information
concerning the results of Huntingdon's tests on the
proprietary experimental compounds of its clients. (See
Gilmore Decl. ¶ 16.) Such information includes raw test data,
clinical observations, statistical analyses of the test data,
and final conclusions about the physiological and health
effects of the experimental compounds tested. (See id.)

        The release of this information could cause Huntingdon
substantial competitive harm because it would reveal

-20-

information about confidential test methods and procedures.
(See Gilmore Decl. ¶ 19.)  As noted by Mr. Gilmore,
Huntingdon's confidential standard operating procedures and
test protocols establish the methods by which all aspects of
data collection and analysis are to be done -- from the
frequency of the data collection to the statistical models
used to analyze it.  (See id. ¶ 16.)  Thus, in addition to
disclosing the data collected during the test, release of the
test results would also reveal the proprietary designs and
methods used to generate, collect, and analyze that data.
(See id. ¶ 19.)

Moreover, release of the test results would cause
substantial competitive harm to Huntingdon's clients.  As Mr.
Gilmore attests, the withheld records contain detailed
observations about various aspects of the performance of the
experimental compounds that Huntingdon tested on behalf of its
clients.  (See id. ¶ 16.)  Given that such testing is done for
the purpose of product development, competitors could
appropriate these test results to accelerate the production of
their own competing products without incurring the substantial
research and development costs required to do so.  (See id.
¶¶ 5, 19.)  As discussed above, courts have long recognized
the substantial competitive harm that would be caused by an

-21-

unfair appropriation of costly product research and
development data.  See, e.g., Pub. Citizen, 997 F. Supp. at
63-64 (noting that the release of product research test
results "would direct competitors as to which paths to take
based on [the submitter's] reported successes and failures,"
which would enable them to save substantial research and
development costs and to bring their competitive products to
market sooner); Pub. Citizen, 539 F. Supp. at 1327
(recognizing that the release of product test data would cause
"substantial competitive injury" because "competitors would be
receiving, free of charge, the benefits of this costly
research and testing"); Worthington Compressors, 662 F.2d at
51 ("If those competitors are charged only minimal FOIA
retrieval costs for the information, rather than the
considerable costs of private reproduction, they may be
getting quite a bargain [that could] easily have competitive
consequences.").  Therefore, defendant USDA respectfully
suggests that the results of the tests that Huntingdon
conducted on behalf of its clients were properly withheld
under Exemption 4.

     B.   Defendant USDA Properly Withheld Trade Secrets
          Pursuant to Exemption 4.

     In addition to the reasons set forth above, defendant
USDA respectfully suggests that information describing

-22-

Huntingdon's test designs and methods -- which include descriptions of the experimental compounds tested -- were properly withheld under Exemption 4 as trade secrets as well.[8]

Unlike the broad definition used in the Restatement of Torts, the term "trade secret" is defined narrowly under Exemption 4. According to the D.C. Circuit, the only information that may be withheld under Exemption 4 as a "trade secret" is "a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing compounding or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." Pub. Citizen, 704 F.2d at 1288.

1.   Huntingdon's test designs and methods are trade secrets.

Defendant USDA respectfully suggests that Huntingdon's test designs and methods clearly satisfy the D.C. Circuit's narrow definition of "trade secret." First, these test designs and methods are commercially valuable because they were used to develop research services that were sold to Huntingdon's clients for substantial sums of money. (See Gilmore Decl. ¶ 19.) Cf. Wash. Research, 504 F.2d at 245 n.6

---

[8] Defendant USDA does not maintain that information describing the results of the tests conducted using these designs and methods are trade secrets.

-23-

(recognizing that an organization that is "engaged in profit-oriented research . . . could conceivably be shown to have a commercial or trade interest in [its] research design")). Second, these designs and methods are clearly "plans" and "processes," inasmuch as they describe, in great detail, precisely how such research is to be conducted. (See Gilmore Decl. ¶¶ 15, 19.) Third, these test designs and methods are used to conduct tests that are a component of the research and development of drugs, medical devices, and chemicals produced by Huntingdon's clients. (See id. ¶ 5.) Lastly, given that "these special and unique test designs and methods [] are the product of decades of Huntingdon's business evolution, and [] reflect the substantial scientific and technical expertise that its employees have developed over that time," (id. ¶ 19), they are clearly the end product of substantial effort. See Pub. Citizen, 997 F. Supp. at 65 (noting that the development of scientific test designs and methods "represent a substantial investment of time and energy as well as creativity"). Thus, defendant respectfully suggests that it properly withheld information that would reveal the designs and methods used in Huntingdon's tests because they are trade secrets protected from disclosure under Exemption 4.

-24-

2.  The experimental compounds tested by Huntingdon are trade secrets.

These records also contain specific descriptions of experimental compounds that are themselves the trade secrets of Huntingdon's clients.  (<u>See</u> Gilmore Decl. ¶ 20.)  As noted above, these descriptions -- which consists of the chemical formulas of the tested compounds -- are contained in the test protocols and records that discuss their implementation.  (<u>See</u> <u>id.</u> ¶ 15.)  Indeed, at least one such formula is expressly labeled as a "trade secret" in the records.  (<u>See</u> <u>id.</u> ¶ 20.)  These chemical formulas are, by definition, trade secrets under Exemption 4.  See <u>Citizens Comm'n</u>, 1993 WL 1610471, at *7 (concluding that the chemical composition of an experimental compound is a trade secret under Exemption 4); <u>see also, e.g.</u>, <u>Pub. Citizen</u>, 704 F.2d at 1288 (defining a "trade secret" under Exemption 4 as "a secret, commercially valuable plan, <u>formula</u>, process, or device") (emphasis added). Thus, defendant USDA respectfully suggests that descriptions of the experimental compounds of Huntingdon's clients were properly withheld as trade secrets under Exemption 4.  <u>See, e.g.</u>, <u>Bowen v. FDA</u>, 925 F.2d 1225, 1227-28 (9th Cir. 1990) (concluding that trade secret information regarding manufacturing formulas was properly withheld under Exemption 4).

II.  Pursuant to Exemption 5, Defendant Has Properly
     Withheld Information Protected By The
     Deliberative Process And Attorney Work-Product
     Privileges

Exemption 5 of the FOIA protects from mandatory

disclosure "inter-agency or intra-agency memorandums or

letters which would not be available by law to a party . . .

in litigation with the agency."  5 U.S.C. § 552(b)(5).  The

courts have interpreted Exemption 5 as covering all records

that would normally be privileged in civil discovery, see,

e.g., NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975),

including those covered by the deliberative process and

attorney work-product privileges, see, e.g., FTC v. Grolier,

462 U.S. 19, 23 (1983).

In this case, defendant USDA has invoked both of these

privileges to withhold one page in part and nineteen pages in

full under Exemption 5 alone.  (See Gilmore Decl. ¶ 21.)  The

withheld communications consists of (1) "recommendations that

certain charges be filed" against Huntingdon for AWA

violations; (2) "evaluations and opinions of the evidentiary

and legal support for those proposed charges"; and (3) "draft

language for charges that were considered for inclusion in the

complaint."  (Id. ¶ 22.)

A.   The Memoranda Were Properly Withheld Under Exemption
     5 Pursuant to the Deliberative Process Privilege.

The deliberative process privilege protects the
government's internal decisionmaking process by preserving the
confidentiality of opinions, recommendations, and
deliberations underlying government decisions and policies.
See Jordan v. Department of Justice, 591 F.2d 753, 772 (D.C.
Cir. 1978) (en banc).  The purpose of Exemption 5's
deliberative process privilege is to "prevent injury to the
quality of agency decisions," Sears, 421 U.S. at 150-51, by
encouraging agency employees to express their opinions
frankly, without any inhibiting fear of publicity, see Bureau
of Nat'l Affairs, Inc. v. Department of Justice, 742 F.2d
1484, 1497 (D.C. Cir. 1984).  Thus, "[t]he privilege . . .
covers recommendations, draft documents, proposals,
suggestions, and other subjective documents which reflect the
personal opinions of the writer rather than the policy of the
agency."  Coastal States Gas Corp. v. Department of Energy,
617 F.2d 854, 866 (D.C. Cir. 1980).

For information to be withheld properly pursuant to the
deliberative process privilege under Exemption 5, the
communications must be both "predecisional," (i.e.,
"antecedent to the adoption of an agency policy," Jordan, 591
F.2d at 774), and "deliberative" (i.e., "recommend[ing] or

-27-

express[ing] opinions on legal or policy matters," Vaughn v.
Rosen, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975)).  The
memoranda withheld under Exemption 5 in this case satisfy both
of these requirements.

First, this information is clearly predecisional, as
these communications preceded the filing of the AWA complaint
against Huntingdon, which was the final agency decision.  (See
Gilmore Decl. ¶ 23.)  Second, inasmuch as this information
consists of "recommendations that certain charges be filed"
against Huntingdon, "evaluations and opinions of the
evidentiary and legal support for those proposed charges," and
"draft language for charges that were to be included in the
complaint," (id.), it is clearly deliberative.  See, e.g.,
Vaughn, 523 F.2d at 1143-44.  Third, even though some factual
material is discussed in these communications, it is so
"inextricably connected to the deliberative material that
their disclosure would expose USDA's deliberations by
revealing the pertinent facts on which the evaluations and
opinions of the proposed charges were based."  (Gilmore Decl.
¶ 23.)  See, e.g., Tarullo v. DOD, 170 F. Supp. 2d 271, 278
(D. Conn. 2001) ("Although the document does summarize
relevant facts, that summary is so intertwined with . . .
recommendations and opinions . . . that production of a

-28-

redacted version would be incomprehensible, and the very selection of facts could also reveal the nature of those recommendations and opinions.").

Thus, these recommendations, opinions, and drafts fall squarely within the protection afforded by the deliberative process privilege.  See, e.g., Coastal States, 617 F.2d at 866.  Indeed, the release of these communications would have a "chilling effect" on the agency's "frank and uninhibited discussions over the proper course to be taken" in a law enforcement proceeding.  (Gilmore Decl. ¶ 23.)  Thus, their disclosure would undermine the very purpose of the deliberative process privilege, which is to "allow agencies freely . . . to engage in internal debates without fear of public scrutiny."  Missouri ex rel. Shorr v. United States Army Corps of Engr's, 147 F.3d 708, 710 (8th Cir. 1998).  Therefore, defendant USDA respectfully suggests that it has properly invoked the deliberative process privilege to withhold this information under Exemption 5.

    B.    The Information Was Properly Withheld Under
          Exemption 5 Also Pursuant to the Attorney Work-
          Product Privilege.

As noted above, Exemption 5 also incorporates the attorney work-product privilege, which protects material prepared by an attorney in anticipation of litigation or

-29-

trial.  See, e.g., Grolier, 462 U.S. at 24.  Protection of
attorney work product under Federal Rule of Civil Procedure
26(b)(3) has long been recognized as an essential aspect of
the practice of law.  See Hickman v. Taylor, 329 U.S. 495,
510-11 (1947).  The privilege provides "a working attorney
with a 'zone of privacy' within which to think, plan, weigh
facts and evidence, candidly evaluate a client's case, and
prepare legal theories," Coastal States, 617 F.2d at 864.

The protection afforded by the attorney work-product
privilege is expansive, covering factual information contained
in a document prepared by an attorney in anticipation of
litigation, see Martin v. Office of Special Counsel, 819 F.2d
1181, 1187 (D.C. Cir. 1987) ("The work-product privilege
simply does not distinguish between factual and deliberative
material."), and materials prepared by nonattorneys under the
supervision and direction of attorneys, see Durham v. United
States Dep't of Justice, 829 F. Supp. 428, 432-22 (D.D.C.
1993) (protecting material prepared by government personnel
under prosecuting attorney's direction).  Furthermore, the
termination of the litigation for which the records were
created does not vitiate the protection afforded by the
privilege.  See, e.g., Grolier, 462 U.S. at 28.

-30-

In this case, all of the memoranda withheld under
Exemption 5 were prepared in anticipation of the filing of an
administrative complaint against Huntingdon.  (<u>See</u> Gilmore
Decl. ¶ 22.)  These communications were prepared either by a
USDA attorney or by USDA investigators under his supervision
or at his direction.  (<u>See</u> <u>id.</u>)  Furthermore, they consist of
recommendations concerning possible charges to be filed
against Huntingdon, evaluations and opinions of the
evidentiary and legal support for those charges, and draft
language considered for inclusion in the administrative
complaint.  (<u>See</u> <u>id.</u>)

As Mr. Gilmore attests, "the release of this information
would reveal the USDA attorney's thoughts, opinions,
impressions, and evaluations of the relative strengths and
weaknesses of the case against Huntingdon."  (<u>Id.</u>)  Such
memoranda clearly fall within by the "zone of privacy"
provided by the attorney work-product privilege.  <u>Coastal</u>
<u>States</u>, 617 F.2d at 864; <u>see, e.g.</u>, <u>Germosen v. Cox</u>, No. 98
Civ. 1294, 1999 WL 1021559, at *14 (S.D.N.Y. Nov. 9, 1999)
(protecting correspondence between United States Attorney's
Office and Postal Inspection Service regarding investigative
and prosecutive strategy).  Accordingly, these memoranda were

properly withheld under Exemption 5 pursuant to the attorney
work-product privilege as well.

III.   Defendant USDA Conducted an Adequate Search

An agency must conduct an adequate search for records
responsive to a FOIA request.  See, e.g., Campbell v. United
States Dep't of Justice, 164 F.3d 20, 27 (D.C. Cir. 1998).  As
the Court of Appeals for this Circuit has held, an adequate
search is one that is "reasonably calculated to uncover all
relevant documents."  Weisberg v. United States Dep't of
Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983).  The adequacy
of a search is "dependent upon the circumstances of the case,"
Truitt v. Department of State, 897 F.2d 540, 542 (D.C. Cir.
1990), and is measured by "the reasonableness of the
[agency's] effort in light of the specific request," Meeropol
v. Meese, 790 F.2d 942, 956 (D.C. Cir. 1986).  Therefore, an
agency must make "a good faith effort to conduct a search for
the requested records using methods which can reasonably be
expected to produce the information requested."  Oglesby v.
United States Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir.
1990).

To demonstrate the adequacy of its search, the agency
must provide the court with "affidavits of responsible agency
officials which are relatively detailed, non-conclusory, and

-32-

submitted in good faith." <u>Greenberg v. United States Dep't of Treasury</u>, 10 F. Supp. 2d 3, 12-13 (D.D.C. 1998). If the affidavits' description of "what records were searched, by whom, and through what processes," <u>Steinberg v. United States Dep't of Justice</u>, 23 F.3d 548, 552 (D.C. Cir. 1994), establishes that the agency conducted an adequate search, then summary judgment is appropriate. <u>See, e.g.</u>, <u>Oglesby</u>, 920 F.2d at 68; <u>Weisberg</u>, 705 F.2d at 1351.

In this case, searches were conducted within Animal Care and Investigative and Enforcement Services (IES), which are the two USDA components that participated in the Huntingdon investigation. (<u>See</u> Gilmore Decl. ¶ 26.) These components were searched at both the Headquarters and regional office levels. (<u>See</u> <u>id.</u>) Automated and manual searches of those offices were conducted using search terms such as "Huntingdon" and/or its licence number. (<u>See</u> <u>id.</u>) Furthermore, an investigator who worked on the Huntingdon investigation was asked about the possible location of responsive records. (<u>See</u> <u>id.</u>) All records located by these efforts were processed in response to IDA's request. (<u>See</u> <u>id.</u>) Therefore, defendant USDA's search for responsive records in this case was entirely adequate in that it made "a good faith effort . . . using

-33-

methods which can reasonably be expected to produce the

information requested." Oglesby, 920 F.2d at 68.

### Conclusion

For the foregoing reasons, and based on the entire record

herein, it is respectfully requested that Defendant's Motion

for Summary Judgment be granted.

Respectfully submitted,


ROSCOE C. HOWARD, JR.
(D.C. Bar #246470)
United States Attorney


MARK E. NAGLE
(D.C. Bar #416364)
Assistant United States
  Attorney


Dated:   December 12, 2002

FRANK P. MENNA
Senior Attorney
Office of Information and
  Privacy
United States Department of
  Justice
Flag Building, Suite 570
Washington, DC  20530-0001
(202) 514-3642

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN DEFENSE OF ANIMALS          )
                               )
      Plaintiff,               )
                               )
      v.                       )
                               )
THE UNITED STATES DEPARTMENT   )
   OF AGRICULTURE,             )
                               ) Civil Action No. 02-0557 (RWR)
      Defendant,               )
                               )
      and                      )
                               )
LIFE SCIENCES RESEARCH, INC.,  )
                               )
      Intervenor-Defendant.    )
_____)

## ORDER

Upon consideration of Defendant's Motion for Summary
Judgment, of all papers filed with respect thereto, and of the
entire record herein, and it appearing to the Court that the
granting of defendant's motion, pursuant to Rule 56 of the
Federal Rules of Civil Procedure, would be just and proper, it
is by the Court this _____ day of _____ 2003,

      ORDERED that Defendant's Motion for Summary Judgment be,
and it hereby is, granted; and it is further

      ORDERED that this action be, and it hereby is, dismissed.


                              _____
                              UNITED STATES DISTRICT JUDGE

-2-

Copies to:

Katherine A. Meyer, Esq.
Kimberly D. Ockene, Esq.
Meyer & Glitzenstein
1601 Connecticut Ave., NW
Suite 700
Washington, DC  20009

Frank P. Menna
Senior Attorney
Office of Information and
  Privacy
United States Department of
  Justice
Flag Building, Suite 570
Washington, DC  20530

Richard T. Rossier, Esq.
Alex Menendez, Esq.
McLeod, Watkinson & Miller
One Massachusetts Ave., NW
Suite 800
Washington, DC  20001

# ATTACHMENT A

FILE COPY

EOD _2/23/98_

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

FILED-CLERK
U.S. DISTRICT COURT

98 FEB 19 PH 2: 03

TX EASTERN - BEAUMONT

BY Frank Chester

| | | |
|---|---|---|
| MARK TERRY SOKOLOW, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 1:97-CV-252 |
| | § | |
| FOOD AND DRUG | § | |
| ADMINISTRATION, | § | |
| Defendant. | § | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is the Motion for Summary Judgment of Defendant Food and Drug

Administration ("FDA"). Based on the motion and Plaintiff Mark Sokolow's response, the Court

is convinced that the FDA has not improperly withheld any information in response to Sokolow's

request for documents pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").

Instead, the FDA has provided Sokolow with all of the information responsive to his request that

is not exempt from disclosure under FOIA. The information withheld by the government is trade

secret and confidential commercial information that is exempt from disclosure under FOIA, 5

U.S.C. § 552(b)(4). Disclosure of the withheld information would be contrary to the FOIA and in

violation of agency regulations, and could impose substantial competitive harm on the companies

that submitted the information that is responsive to Sokolow's FOIA request. Thus, there are no

genuine issues of material fact, and the FDA is entitled to judgment as a matter of law.

37

## BACKGROUND

On May 5, 1997, Sokolow commenced this action against the FDA, alleging that the agency failed to comply with the FOIA because it did not respond in a timely manner to his request for records. Sokolow's FOIA request sought access to information on the status of premarket approval ("PMA") applications for devices for testing blood sugar levels without piercing the skin and investigational new drug ("IND") applications for drugs to treat Amyotrophic Lateral Sclerosis ("ALS" or "Lou Gehrig's Disease"), Type I diabetes, and post polio syndrome. In addition, Sokolow sought the following: (1) copies of the minutes and agenda of the meeting wherein FDA adopted 21 C.F.R. §§ 312.130 and 814.9, its regulations regarding disclosure of information about and from PMAs and IND applications; (2) copies of reports or evaluations received by FDA discussing the legality of its regulations regarding disclosure of information about and from PMAs and IND applications; (3) copies of any minutes of public meetings in which PMAs for devices that test blood sugar levels were discussed; and (4) agenda for upcoming FDA meetings including the names and addresses of the meetings' secretaries and chairpersons.

## ANALYSIS

## Standards For Summary Judgment In FOIA Cases

Summary judgment is appropriate where "the pleadings . . . together with the declarations . . . show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Wren v. Towe*, 130 F.3d 1154 (5th Cir. 1997). To demonstrate that summary judgment is appropriate in a FOIA case, the agency may

2

rely on declarations to show that its search was reasonable and that any withheld documents properly fall within one or more FOIA exemptions. *Oglesby v. Department of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *Lewis v. IRS*, 823 F.2d 375 (9th Cir. 1987).

The agency's declarations are sufficient for summary judgment if they are clear, specific, and reasonably detailed; if they describe the search and the withheld information in a factual and nonconclusory manner; and if there is no contradictory evidence on the record or evidence of agency bad faith. *Lewis*, 823 F.2d at 378; *Hayden v. NSA*, 608 F.2d 1381, 1378 (1980). If the declarations meet these requirements, "the district court need look no further." *Bowen v. FDA*, 925 F.2d 1225, 1227 (9th Cir. 1991); *Church of Scientology v. Department of the Army*, 611 F.2d 738, 742-43 (9th Cir. 1979).

Declarations submitted by the agency are to be accorded substantial weight and a presumption of expertise. *Hayden*, 608 F.2d at 1387; *Lesar v. Department of Justice*, 636 F.2d 472, 481 (D.C. Cir. 1980). *See also Pharmaceutical Mfrs. Ass'n v. Weinberger*, 411 F. Supp. 576, 578 (D.D.C. 1976) (stating that FDA is well versed in trade secrets and confidential commercial information regarding drug applications and therefore has expertise in making determinations about applying exemptions). A party cannot undermine agency declarations by mere allegations or speculations of "bad faith" or alleged "past agency misconduct." *See Safecard Services v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991); *Goldberg v. Department of State*, 818 F.2d 71, 78-80 (D.C. Cir. 1987); *Hayden*, 608 F.2d at 1387.

In demonstrating the nature of the FOIA search, the agency must show that its search was "reasonable." *Weisberg v. Department of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1990); *Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979). Determining whether the

3

search was reasonable is also "dependent on the circumstances of the case." *Truitt v. Department of State*, 879 F.2d 540, 541, n.11 (D.C. Cir. 1990); *Church of Scientology*, 610 F.2d at 834. An agency meets the standard of a reasonable search when the agency can demonstrate that "it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68.

## FDA's Search For Records Was Reasonable

After reviewing the FDA's declarations regarding the search for responsive documents, the Court is convinced that the search was reasonable. Indeed, it is clear that the FDA performed exhaustive searches for responsive documents. Accordingly, the Court is convinced that the FDA's search for all responsive records was made in good faith, "using methods which [could] be reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 689.

## The Withheld IND Applications Fall Within Exemption 4 Of The FOIA

The FDA withheld records responsive to only one portion of Sokolow's FOIA request, namely, his request for "[t]he summary provided by an applicant of the data and information in the IND applications for any drug or treatment for Type I diabetes, Lou Gehrig's disease, or post polio syndrome from January 1, 1996 to the present date . . . includ[ing] pending IND applications as well as the approved and denied applications." The information FDA withheld, and which Sokolow seeks, falls under the FOIA exemption for trade secret and confidential commercial information. Information must either be trade secret or confidential commercial

4

information to fall within FOIA's fourth exemption from public disclosure, 5 U.S.C. § 552(b)(4). *Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1286 (D.C. Cir. 1983) For either trade secret or commercial information to be exempt from public disclosure under FOIA, the information must have been obtained "from a person" by the agency on which the FOIA request was made. *Gulf & Western Indus. v. United States*, 615 F.2d 527, 529 (D.C. Cir. 1979). Corporations are considered persons under the FOIA. *Id.* Therefore, the information that Sokolow seeks is exempt from disclosure if it is trade secret or confidential commercial information.

For these purposes, "trade secrets" are defined as "a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." *Public Citizen*, 704 F.2d at 1288. In order for information to qualify as trade secret under this definition, it must bear some direct relationship to the "productive process." *Id.*; *see also* 21 C.F.R. § 20.61(a). If information relates to manufacturing methods or processes, it is trade secret and no further inquiry is needed. *Public Citizen*, 704 F.2d at 1286.

Confidential commercial information is also exempt from disclosure under FOIA. For the purposes of FOIA, the term commercial is given its ordinary meaning. *Public Citizen*, 704 F.2d at 1290. In determining whether commercial information is confidential, most courts have applied a two-part test first set forth in *National Parks and Conservation Assoc. v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974). There, the District of Columbia Circuit stated that information is confidential if its disclosure is likely either: "(1) to impair the [g]overnment's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of

5

the person from whom the information was obtained." *Id.* (footnote omitted). This test has been uniformly followed in this and other circuits. *See Calhoun v. Lyng*, 864 F.2d 34, 35 (5th Cir. 1988); *Pacific Architects & Eng'rs, Inc. v. United States Dep't of State*, 906 F.2d at 1345, 1347 (9th Cir. 1990). Furthermore, the *National Parks* test recognizes that Exemption 4 serves to protect the government's interest in acquiring information and the submitter's competitive interest in its information. *Critical Mass Energy Project v. NRC*, 975 F.2d 271, 272 (D.D.C. 1992) (citing *FBI v. Abramson*, 456 U.S. 615, 621 (1982)); *see also Union Oil Co. v. Federal Power Comm'n*, 542 F.2d 1036, 1044 (9th Cir. 1976).

In evaluating substantial competitive harm, a court "need not conduct a sophisticated economic analysis of the likely effects of disclosure." *Public Citizen*, 704 F.2d at 1291. Expert reports and other non-conclusory declarations documenting actual competition and the likelihood of competitive harm that may be caused by disclosure are sufficient. *Id.*; *see also AT&T Info. Sys., Inc. v. General Servs. Admin.*, 627 F. Supp. 1396, 1402 (D.D.C. 1986), *rev'd on other grounds*, 810 F.2d 1233 (D.C. Cir. 1987). Moreover, a submitter "need not 'show actual competitive harm'"; instead, a showing of actual competition and the likelihood of substantial competitive harm is sufficient "to bring commercial information within the realm of confidentiality." *Public Citizen*, 704 F.2d at 1291; *see also Calhoun*, 864 F.2d at 36; *Gulf & Western Indus. v. United States*, 615 F.2d 527, 530 (D.C. Cir. 1980); *AT&T*, 627 F. Supp. at 1402.

The withheld documents that Sokolow seeks in this case were submitted to the FDA as part of various IND applications. As such, they were required to be submitted under the FDA's regulations. *See* 21 C.F.R. Part 312. Accordingly, the submitters of the information must show

6

the actual competition in the pharmaceutical marketplace and the substantial likelihood of competitive harm from disclosure of the information Sokolow seeks.

The documents withheld from Sokolow (i.e., the IND applications submitted to FDA by several different drug companies) are described in the Alton, Brophy, Clay, and Reit Declarations. Each application contains a description of how the drug is manufactured, including, among other things, a description of the drug substance and the final drug product, the general method of preparation and formulation, the analytical methods employed to assure quality and consistency, and the results of stability testing. 21 C.F.R. § 312.23(a)(7). Because this type of information directly relates to the production process, it is the paradigmatic example of trade secret and confidential commercial information. 21 C.F.R. § 20.61(a).

Each IND application also contains information such as pre-clinical and clinical information addressing the safety and effectiveness of individual drugs for use against specific diseases. This includes both detailed descriptions of the pharmacological action of the investigational drug and the results of laboratory and animal studies assessing the drug's toxicity. *See* 21 C.F.R. § 312.23. The withheld IND applications also contain information about the study methodologies and protocols used by the IND sponsors to evaluate their drugs during the clinical trials conducted under the IND. As development of a drug proceeds under an IND, a submitter must update its IND with certain information, including IND safety reports of any adverse experience associated with the use of the drug and annual reports summarizing the progress of the investigation during the previous year. *See* 21 C.F.R. §§ 312.32 and 312.33.

The information contained in IND applications is commercially valuable and could be used by competitors to develop clinical studies or other research toward a competing product.

7

Because every manufacturer of a new drug must obtain separate approval for its product, a manufacturer that desires to market a new drug must incur the time, labor, risk, and expense involved in developing its own individual application. It is essential that the confidential commercial and trade secret information of drug manufacturers be kept confidential so as to facilitate and provide ample incentive for the development of new and advanced pharmaceutical products. The contents of IND applications, therefore, falls within Exemption 4 of the FOIA, because that information meets the definition of confidential commercial and/or trade secret information and its release could cause its submitters to suffer substantial competitive harm.

## CONCLUSION

The data and information withheld by the FDA from the responsive documents contain trade secret and confidential commercial information that Congress has exempted from disclosure under the FOIA. The FDA conducted a reasonable search for responsive documents, released many documents to Sokolow, and withheld the remaining documents containing trade secret or confidential commercial information in accordance with Exemption 4 of the and FDA regulations. Accordingly, the FDA's Motion for Summary Judgment is **GRANTED**.

Signed this _19_ day of February, 1998

UNITED STATES DISTRICT JUDGE

8

# ATTACHMENT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILE COPY

LEDERLE LABORATORIES,          )
                               )
              Plaintiff,       )
                               )
     v.                        )       Civil Action No. 88-0249
                               )
DEPARTMENT OF HEALTH AND       )
HUMAN SERVICES,                )
                               )
              Defendant,       )          ✓ FILED
                               )
     and                       )
                               )        JUL 14 1988
CONNAUGHT LABORATORIES, LTD.,  )
                               )       CLERK, U.S. DISTRICT COURT
        Defendant-Intervenor.  )          DISTRICT OF COLUMBIA
                               )

MEMORANDUM OPINION AND ORDER

In this action brought under the Freedom of Information
Act (FOIA), 5 U.S.C. § 552, plaintiff Lederle Laboratories
(Lederle) seeks access to documents relating to a rulemaking
proceeding now being conducted by defendant Department of
Health and Human Services (HHS).  HHS and defendant-
intervenor Connaught Laboratories, Ltd. (Connaught) have now
filed motions for summary judgment.  For the reasons outlined
below, these motions will be granted.

I.    Background

Until relatively recently, poliomyelitis, more commonly
known as polio, was a disease that afflicted millions of
men, women and (primarily) children around the world.  In the
1950s, however, Dr. Jonas Salk discovered injected polio
virus (IPV), a vaccine consisting of inactive strains of



polio virus that, when placed into the body, produce antibody immunity against the disease. Shortly thereafter, Dr. Albert Sabin developed oral polio vaccine (OPV), a drug that relies on weakened strains of the virus and which eventually became the polio vaccine of choice in this country. The development of these vaccines has been hailed as "a major achievement of modern preventive medicine." Plummer v. Lederle Laboratories, 819 F.2d 349, 351 (2d Cir.), cert. denied, 108 S. Ct. 232 (1987).

The Food and Drug Administration (FDA) is the agency entrusted by Congress with the delicate and important task of licensing OPV for manufacture, distribution and sale within the United States. See 42 U.S.C. § 262(a).[1] In Berkovitz v. United States, 56 U.S.L.W. 4549 (June 13, 1988), the Supreme Court succinctly recounted the OPV regulatory process:

> Under federal law, a manufacturer must receive a
> product license prior to marketing a brand of live
> oral polio vaccine. In order to become eligible
> for such a license, the manufacturer must first
> make a sample of the vaccine product. This product
> begins with the selection of an original virus
> strain. The manufacturer grows a seed virus from
> this strain; the seed virus is then used to produce
> monopools, portions of which are combined to form
> the consumer-level product. Federal regulations
> set forth safety criteria for the original strain,
> the seed virus, and the vaccine monopools. Under
> the regulations, the manufacturer must conduct a
> variety of tests to measure the safety of the
> product at each stage of the manufacturing process.
> Upon completion of the manufacturing process and
> the required testing, the manufacturer is required

---

[1] FDA is a component of defendant HHS.

2

to submit an application for a product license to
[FDA].  In addition to this application, the
manufacturer must submit data from the tests
performed and a sample of the finished product.

Id. at 4551-52 (citations omitted).

FDA first prescribed safety standards for OPV in 1961,
see 26 Fed. Reg. 2,564 (Mar. 25, 1961), and these regulations
have remained relatively unchanged since that time.  Since
1979, plaintiff Lederle has been the sole licensed
manufacturer of OPV in the United States.  In 1982,
Connaught Laboratories, Ltd. (Connaught), a Canadian company
that manufactures and distributes OPV throughout the world,
filed an application with FDA for a license to distribute its
version of OPV in the United States.[2]  Connaught, however,
developed its OPV in accordance with standards promulgated by
the World Health Organization (WHO) that govern OPV
distributed in other countries -- but not the United States.
Its license to manufacture OPV for distribution in the
United States is still pending today.

Fortunately for Connaught, on May 5, 1986 FDA published
a notice of proposed rulemaking that would permit licensing
of OPV in the United States under standards very similar to
those issued by the WHO.  See 51 Fed. Reg. 16,620 (May 5,

---

[2] Connaught already sells its IPV in this country; it is
the only firm currently licensed to do so.

3

1986).[3]  FDA listed two main reasons to support its decision.
The agency first noted that increased scientific knowledge in
recent years had produced a need to update OPV standards; it
pointed out that it had reviewed the WHO regulations and
found them to be "appropriate for assuring the safety and
effectiveness of [OPV] licensed for use in the United
States."  Id.  In addition, the FDA observed that, although
one manufacturer (Lederle) had met OPV demand for many years,
"dependence on a sole source for an essential vaccine leaves
immunization programs vulnerable to any of a variety of
circumstances that may disrupt vaccine supplies from the sole
manufacturer."  Id. at 16,621.  Licensing manufacturers
under WHO standards would, the agency noted, alleviate these
potential disruptions.[4]

On several occasions in 1986 and 1987, Lederle
submitted FOIA requests to FDA that, in one way or another,
sought information relating to the OPV rulemaking proceeding.
In response, FDA released approximately 1000 pages of
documents to Lederle, but it refused to disclose 34

___

[3] FDA assisted the WHO throughout the last two decades
in developing the new standards.  51 Fed. Reg. at 16,620.

[4] Although Lederle has suggested it, there is no
evidence in the record that would indicate that FDA initiated
the rulemaking proceeding at Connaught's request.  Nor is
there any support for Connaught's assertion that Lederle has
filed this action simply to delay the progress of the OPV
rulemaking proceeding.  The Ubertini letter relied on by
Connaught was written almost two years before Lederle
instituted this suit.

4

documents, either in full of in part, under FOIA Exemptions 4 and 5.  <u>See</u> 5 U.S.C. § 552(b)(4) and (5).  Lederle then filed suit in this Court, naming HHS as defendant.  In its complaint, Lederle recites many of the facts set forth above and seeks as relief (1) an order compelling defendant to make available the withheld documents; (2) its costs and attorney's fees; and (3) a finding that FDA officials acted arbitrarily and capriciously in responding to its FOIA requests.  Connaught moved to intervene in this action as a defendant shortly after this action was commenced; in an Opinion and Order dated March 28, 1988, that request was granted.  Defendant has now filed its <u>Vaughn</u> index and both HHS and Connaught have moved for summary judgment.

II.  Discussion

FOIA is a disclosure statute.  Under its provisions, "[a] federal agency must disclose agency records unless they may be withheld pursuant to one of the nine enumerated exemptions."  <u>United States Department of Justice v. Julian</u>, 108 S. Ct. 1606, 1611 (1988).  Because the statute compels disclosure of <u>all</u> relevant information held by the government, <u>see</u> 5 U.S.C. § 552(a)(3), the Supreme Court has made clear that the nine exemptions "must be narrowly construed."  <u>Department of the Air Force v. Rose</u>, 425 U.S. 352, 361 (1976).  In addition, although the agency that has withheld documents from a requestor has the burden of

5

demonstrating the propriety of the exemption it claims, see 5
U.S.C. § 552(a)(4)(B), a court may enter summary judgment

> if the affidavits describe the documents and the
> justifications for nondisclosure with reasonably
> specific detail, demonstrate that the information
> withheld logically falls within the claimed
> exemption, and are not controverted by either
> contrary evidence in the record nor by evidence of
> agency bad faith.

Military Audit Project v. Casey, 656 F.2d 724, 739 (D.C. Cir.
1981); see also King v. United States Department of Justice,
830 F.2d 210, 218-19 (D.C. Cir. 1987).  Mindful of these
guideposts, the Court addresses the parties' contentions.

    A.  Was FDA's Search Adequate?

       The complaint alleges that FDA's document search
did not adequately respond to Lederle's FOIA requests.  In
assessing this challenge, it is important to remember that
FOIA does not demand or require perfect agency searches.
"[T]he issue to be resolved is not whether there might exist
any other documents responsive to the request, but rather
whether the search for those documents was adequate."
Weisberg v. United States Department of Justice, 745 F.2d
1476, 1485 (D.C. Cir. 1984) (emphasis in original).  In this
regard, the agency's affidavits are to be accorded a
"presumption of good faith," Ground Saucer Watch, Inc. v.
CIA, 692 F.2d 770, 771 (D.C. Cir. 1981), and a search will be
found adequate so long as the agency demonstrates that it was
"reasonably calculated to uncover all relevant documents."

Weisberg, 745 F.2d at 1485.  Having carefully scrutinized the
particular circumstances of this search, the Court finds that
FDA's response satisfied these governing principles.

The administrative unit responsible for handling
Lederle's request for documents is the Freedom of Information
Branch of FDA's Center for Drugs and Biologics, and its
efforts in this case are described in the declaration of its
Branch Chief, Mark A. Elengold (Elengold Dec.).  Mr.
Elengold's declaration and its attachments disclose a series
of five requests submitted by Lederle from June 1986 to March
1987.  Because many of Lederle's inquiries were extremely
broad in scope,[5] FDA officials contacted Lederle by
telephone, and on occasion held face-to-face-meetings, in
order to determine the precise contours of the FOIA requests.
The agency then searched for the appropriate materials and
ultimately produced approximately 1000 pages of disclosable
information, while withholding others.  In addition, when
Lederle asked on July 30, 1987 that a more thorough search be
initiated, FDA treated the request as a renewal of Lederle's
earlier filings.  FDA broadened its search, canvassing 50
officials in 35 offices that might possibly have information

---

[5] See, e.g., Elengold Dec. Attachment 1 (seeking "data
and results of neurovirulence testing of Poliovirus Vaccine
Live Oral Monovalent virus pools which have been conducted by
the Office of Biologics Research and Review"); id. Attachment
7 (requesting "all records referring or relating to
neurovirulence testing for any oral polio vaccine
manufactured by any company other than Lederle").

relevant to Lederle's inquiries.  This new search consumed 48 hours of agency time and yielded an additional 26 pages of material to Lederle; eight documents were deemed exempt from disclosure.  In all, defendant has refused to release 34 documents to Lederle.

Lederle's attempts to undercut the adequacy of FDA's search are unpersuasive.  It first points out that defendant has only recently (May 9, 1988) released additional documents responsive to its requests and that the agency's renewed search for documents also produced hundreds of pages that were inserted into the administrative record.  These late developments, Lederle argues, "raise[] a presumption" that FDA's search was inadequate and suggest that the Court should give "little credence" to the declarations submitted thus far.  Opposition at 1, 2.  The relevant caselaw, however, is to the contrary.  In Military Audit Project v. Casey, 656 F.2d 724, 754 (D.C. Cir. 1981), the court of appeals "emphatically reject[ed]" a similar argument.  Such an approach, Judge Wilkey observed, "would work mischief in the future by creating a disincentive for an agency to reappraise its position" and was "based on the perverse theory that a forthcoming agency is less to be trusted than an unyielding agency."  Id.  In fact, the court concluded by noting that release of additional material "suggests to us a stronger, rather than a weaker, basis for the classification of those

8

documents still withheld." Id.  See also Meeropol v. Meese, 790 F.2d 942, 953 (D.C. Cir. 1986) ("It would be unreasonable to expect even the most exhaustive search to uncover every responsive file; what is expected of a law-abiding agency is that it admit and correct error when error is revealed") (emphasis in original).  For the same reasons, the fact that FDA has made additional disclosures of information subsequent to its original response does not vitiate the adequacy of its previous endeavors.

Citing this Court's decision in Hemenway v. Hughes, 601 F. Supp. 1002 (D.D.C. 1985), Lederle also maintains that FDA "read plaintiff's FOIA requests in an unreasonably narrow fashion" because FDA searched for materials that related only to the factual basis, but the not the policy basis, underlying the OPV rulemaking.  This argument must also be rejected.  For one thing, while Lederle's requests were broad in scope, they all sought information on specific types of testing or meetings.  See, e.g., Elengold Dec. Attachment 4 (seeking information with respect to OPV neurovirulence testing of companies other than Lederle).  Moreover, Lederle places heavy reliance on a September 14, 1987 appeal letter which stated that it desired all records concerning the OPV rulemaking, see Opposition Attachment C; it claims that this letter put the agency on notice of the true scope of its claims.  Reliance on this letter is inappropriate because (as

Lederle admits) the appeal by Lederle was withdrawn and replaced with two new appeal letters and because Lederle neither referred to the letter in its complaint nor attached it as an exhibit -- which it did with all of its other FOIA requests.  Finally, Hemenway is clearly inapposite.  In that case, the plaintiff requested a "list" of persons accredited to attend State Department press briefings, their affiliations and their citizenship.  The agency denied the request because the information was not contained within a single document -- despite the fact that the material could easily be culled from several available sources.  The Court ruled that this miserly reading of plaintiff's request was improper.  See 601 F. Supp. at 1005.  Here, by contrast, FDA was confronted with repeated requests for particular categories of information, conducted searches for those materials and disclosed them to Lederle; at this late date, a requestor may not "alter the substance of his request once it has been made."  Id. (citing Miller v. Casey, 730 F.2d 773, 776-77 (D.C. Cir. 1984)).  Because Lederle did not request records on the policy basis of the rulemaking (assuming such records exist), FDA cannot be faulted for not identifying or disclosing them.

The Court therefore concludes that the FDA adequately searched for documents responsive to Lederle's FOIA requests.

B.  Exemption 5 Withholdings

As noted above, HHS withheld documents from Lederle on two bases. One ground relied on was FOIA Exemption 5, which shields from disclosure

> inter-agency or intra-agency memorandums or letters
> which would not be available by law to a party
> other than an agency in litigation with the agency.

5 U.S.C. § 552(b)(5).  Although recently referred to as a "somewhat Delphic provision," Julian, 108 S. Ct. at 1613, the Supreme Court has interpreted Exemption 5 to "exempt those documents, and only those documents, normally privileged in the civil discovery context." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975).  A document may be withheld by virtue of this Exemption only if it would not be "'routinely' or 'normally' disclosed upon a showing of relevance." FTC v. Grolier, Inc., 462 U.S. 19, 26 (1983) (quoting Sears, 421 U.S. at 148-49).

Defendant relies on the deliberative process and attorney-client privileges to justify its Exemption 5 withholdings.  To satisfy the former, defendant must demonstrate that the material is both predecisional (generated before agency action is taken) and deliberative (reflects the give-and-take of the consultative process). Coastal States Gas Corporation v. Department of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).  To qualify under the latter, the records must be "confidential communications between an attorney and his client relating to a legal matter for which

11

the client has sought professional advice." <u>Mead Data</u>
<u>Central, Inc. v. Department of the Air Force</u>, 566 F.2d 242,
252 (D.C. Cir. 1977).  Having considered the reasons for
nondisclosure offered by defendant, and keeping in mind the
legal standards articulated above, the Court finds that
Exemption 5 was properly invoked in this instance.

FDA refused to release all or parts of 12 documents
under Exemption 5, and its justifications for doing so are
contained in the declaration of Paul D. Parkman, M.D.
(Parkman Dec.).[6]  Dr. Parkman's declaration is comprehensive
and detailed, and it suffers from none of the specificity
problems that often inhere in government affidavits submitted
in FOIA cases.  Document 29, for instance, is described as

> a memorandum from an attorney in the Food and Drug
> Division of the HHS Office of the General Counsel,
> to a Consumer Safety Officer in the Division of
> Regulatory Affairs of the Center for Drugs and
> Biologics.  It consists entirely of comments by the
> author on a draft document relating to OPV
> rulemaking issues.  The comments consist entirely
> of changes recommended by the author and questions
> by the author suggesting possible inadequacies,
> problems, or confusing points in the draft.

Parkman Dec. ¶ 19.  To take another example, document 25 is
referred to as

> a draft of a report that was issued by FDA in May
> 1987.  The report was titled "Report on Issues
> Concerning the Proposed Revisions of the Additional
> Standards for Oral Poliovirus Vaccine."  The report
> was issued during the time I was Acting Director of

---

[6] The documents withheld under Exemption 5 are numbers
1, 6, 7, 10, 11, 22-26, 29 and 30.

> the Center for Drugs and Biologics, and I am
> familiar with the process by which the report was
> developed.  This draft is dated March 1987.  It was
> prepared by an employee of the Center and
> circulated within HHS for comment, suggestions, and
> clearance.

Id. ¶ 16.  In addition to this careful recitation of the
nature of each document withheld from plaintiff, the Parkman
Declaration also adequately explains how each document or
excision falls within either the deliberative process or
attorney client privilege.  Thus, one sentence was deleted
from document 7 (a note from one FDA employee to another)
under the deliberative process privilege because

> [t]he only information in this sentence is the date
> by which FDA had originally planned that a final
> OPV rule would be published.  This portion is
> predecisional in that the date was conceived, and
> the statement made, before there had been any final
> decision on the contents of or schedule for a final
> rule, and before there had been any final decision
> on whether there would be a final rule.  It is
> deliberative in that it states the original opinion
> of FDA as to when a final rule should be issued.

Parkman Dec. ¶ 10.  This explication -- as well as those for
other documents (see, e.g., id. ¶¶ 9, 13, 19) -- is a precise
statement of the basis for defendant's refusal to disclose
material to Lederle.  Finally, it should be observed that
defendant has strictly limited its excisions.  In documents
1, 6, 7, 10 and 11, only minor deletions were made of
material (mainly dates of proposed actions) that would
impinge on the agency's deliberative processes.

Lederle resists this impressive showing on two grounds,

13

neither of which has any merit.  It initially contends that
information referring to proposed dates for promulgation of
an OPV rule should be disclosed because those dates are
factual material not within the scope of the deliberative
process privilege.  That argument, however, is squarely
foreclosed by the court of appeals' recent en banc opinion in
Wolfe v. Department of Health and Human Services, 839 F.2d
768 (D.C. Cir. 1988).  In that case, plaintiff sought access
to FDA records that indicated whether the agency had
approved a proposed rule and sent it to the Office of
Management and Budget for further consideration.  The court
in Wolfe, however, held that these documents were protected
by the deliberative process privilege.  Writing for the
majority, Judge Bork began by noting that Exemption 5 was
enacted because "the quality of administrative decision-
making would be seriously undermined if agencies were forced
to operate in a fishbowl," 839 F.2d at 773, and in order to
"encourage the 'frank discussion of legal and policy
issues.'"  Id. (quoting S. Rep. No. 813, 89th Cong., 1st
Sess. 9 (1965)).  Viewing plaintiffs' requests in light of
those policies, Judge Bork noted that releasing the FDA
records would "reveal the timing of the deliberative
process," could "chill discussion at a time when agency
opinions are fluid and tentative," and would "force officials
to punch a public time clock."  839 F.2d at 775, 776, 776.

14

If suggested dates for proposed OPV rulemaking action were disclosable under FOIA in the instant case, FDA employees and officials would be confronted with the same problems articulated by Judge Bork in <u>Wolfe</u>. Accordingly, the agency properly withheld this information.

Lederle does not seriously contest defendant's decision to withhold a number of documents in their entirety. Rather, it asserts that defendant should be required to disclose all reasonable segregable material, such as names of authors and recipients and dates of publication.[7] With its reply brief, however, defendant has submitted a supplemental declaration from Dr. Parkman that provides the segregable information that Lederle seeks. Lederle's argument is therefore moot, and defendant is entitled to summary judgment on its withholdings under Exemption 5.

    C.  Nondisclosure Under Exemption 4

The real nub of this action concerns FDA's refusal to release information under FOIA Exemption 4. <u>See</u> 5 U.S.C. § 552(b)(4). This provision exempts two types of documents. First, an agency may refuse to release "trade secrets," which our court of appeals has described as

> a secret, commercially valuable plan, formula, process or device that is used for the making,

---

[7]  <u>See</u> 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection").

> preparing, compounding, or processing of trade
> commodities and that can be said to be the end
> product of either innovation or substantial effort.

Public Citizen Health Research Group v. FDA, 704 F.2d 1280,

1288 (D.C. Cir. 1983).  In addition, Exemption 4 operates to

protect "commercial . . . information obtained from a person

and . . . confidential."  As the plain language suggests, the

government may satisfy this prong by showing that the

documents are (1) commercial in nature, (2) obtained by a

person and (3) confidential.  Gulf & Western Industries v.

United States, 615 F.2d 527, 529 (D.C. Cir. 1979).  Lederle

does not contend in its opposition that the nondisclosed

material is not commercial or obtained by a person.[8]  Rather,

it argues, as will be seen below, that the information is not

"confidential."  Confidentiality is measured by this

circuit's test set forth in National Parks & Conservation

Association v. Morton, 498 F.2d 765, 770 (D.C. 1974):

> [C]ommercial or financial matter is "confidential"
> for purposes of the exemption if disclosure of the
> information is likely to have either of the
> following effects: (1) to impair the Government's
> ability to obtain necessary information in the
> future; or (2) to cause substantial harm to the
> competitive position of the person from whom the
> information was obtained.

---

[8] A record is considered "commercial" if, using the
ordinary meaning of the term, a company has a "commercial
interest" in it, Public Citizen, 704 F.2d at 1290; a record
is "obtained from a person" if the information within it has
been furnished directly from a person outside of the agency
or has been generated from such information.  Gulf & Western,
615 F.2d at 529-30.

16

Invoking Exemption 4, FDA has withheld two categories of material: information relating to Connaught's production of OPV (documents 2-3, 5, 13-19, 21-22, and 27) and neurovirulence testing data (documents 31-32).[9]  Each is discussed in turn.

1.   Connaught OPV Information.  This group of documents consists mainly of letters from Connaught officials to FDA and internal memoranda between FDA employees.  For the most part, defendant has not withheld documents in their entirety but has instead redacted specific items it believes are not disclosable.  See, e.g., documents 2, 5 and 21.  HHS considers most of this information to be confidential under the second part of the National Parks test because disclosure of it is likely to cause substantial harm to Connaught's competitive position.  Portions of two documents were redacted as trade secrets of Connaught.

The declarations submitted by HHS and Connaught convincingly demonstrate that Exemption 4 was properly invoked.  As these materials indicate, the vaccine industry is highly competitive, with a small number of firms competing for a finite market.  Parkman Dec. ¶ 28; Declaration of J.C.W. Weber (Weber Dec.), submitted with Connaught's Motion for Summary Judgment, ¶ 8.  Development of

---

[9] Portions of document 12, 33 and 34 have also been redacted, but Lederle has no objection to these deletions. Opposition at 27, 35.

17

a polio vaccine, with its numerous testing stages, is a lengthy and costly process. Weber Dec. ¶ 6. Yet release of the information withheld by defendant is likely to cause serious harm to Connaught's competitive position. For example, most of the redacted material concerns comments by FDA or Connaught on requirements that Connaught must complete in order to comply with the OPV license application process. See, e.g., documents 2 and 5. Revelation of this information, however, would indicate how close Connaught is to receiving a license to sell OPV in the United States, thereby allowing competitors to adjust their strategies accordingly. Parkman Dec. ¶ 29. Other documents contain information relating to Connaught's marketing plans (#19), its testing resources and production capacity (##12 and 22), and its proposals for sales and distribution (#21). These matters, which lie at the heart of the commercial development of any product, were generated at considerable expense to Connaught and are not normally released to competitors. Parkman Dec. ¶ 33, 38, 39 and 40. If made public, these materials would permit other OPV manufacturers to preempt Connaught's plans by duplicating the arrangements it has produced without incurring the associated costs. Finally, documents 3 and 27 contain information about the composition of Connaught's OPV product and related aspects of its production process. See Parkman Dec. ¶¶ 31, 41; Weber Dec.

18

¶¶ 48, 59.  These matters are clearly within the scope of the trade secrets prong of Exemption 4.[10]

Lederle does not offer any evidence to contest the harms described above, or the competitive nature of the vaccine industry.  It instead suggests two generic arguments, and several document-specific objections, why disclosure is appropriate.  Lederle first argues that an FDA regulation compels disclosure of much of the withheld material.  The provision, 21 C.F.R. § 601.51, states that information "submitted with or incorporated by reference in" a product license application shall be kept confidential by FDA; Lederle therefore argues that those materials that are "in" the product file -- and only those materials -- may be withheld from it now.  Reliance on this regulation, however, is unavailing for, as defendant points out, HHS has not cited it to withhold documents in this action; the regulation is silent on the disclosability of information not "in" the product license file; and FDA disclosure of confidential information is governed instead by 21 C.F.R. § 20.61, which clearly sanctions withholding of confidential commercial

---

[10] Moreover, the unredacted version of the Weber Declaration, submitted with Connaught's Motion for Summary Judgment in accordance with this Court's Protective Order of May 2, 1988, recounts in great detail a special type of competitive harm that Connaught would suffer should certain documents be revealed.  The nature of this information adds additional (and considerable) force to the declarations filed in the public record.

information and trade secrets.  In addition, Lederle
contends that many of the documents at issue do not contain
exempt information but rather describe lobbying efforts by
Connaught that seek to influence the pending rulemaking
proceeding.  No concrete evidence, however, is advanced by
Lederle to justify its speculation.[11]  Moreover, even if the
documents were submitted to sway FDA's decisionmaking
process, this argument would still be unavailing: Lederle has
not cited any authority that would carve out an exception to
Exemption 4 for lobbying-related materials.[12]  Finally,
Lederle's call for release of lobbying information flies

---

[11] Lederle has produced an unredacted version of
document 13 that it has "obtained independently" of this
action.  See Opposition at 15 and Attachment I.  It claims
that the materials revealed in the unredacted letter show
that lobbying efforts, and not confidential commercial
information, are being withheld from it in this action.  As
HHS explains, however, the contrary is true for, even if
authentic, this information relates to hurdles that Connaught
was required to fulfill in order to obtain its OPV license.
Thus, it pertains to the sorts of confidential commercial
matters discussed above.

[12] Home Box Office v. FCC, 567 F.2d 9 (D.C. Cir.),
cert. denied, 434 U.S. 829 (1977), does not support the
rather unusual proposition that Lederle advances.  That case
involved review under the Administrative Procedure Act of a
rulemaking proceeding in which ex parte contacts were made to
influence administrative officials.  The court of appeals
found the agency's actions to be arbitrary because it
"justifie[d] its actions by reference only to information in
the public file while failing to disclose the substance of
other relevant information that ha[d] been presented to it."
567 F.2d at 54.  This action, by contrast, involves the
disclosability of documents under FOIA, and the Court does
not have before it the propriety of FDA's rulemaking
proceeding (which is, in any event, still pending at this time).

directly in the face of efforts to protect its <u>own</u> confidential commercial information that it has submitted to FDA.  <u>See</u> Parkman Supplemental Declaration, submitted with HHS's Reply Brief, ¶¶ 1-6.

The document-specific objections raised by Lederle are vague, unsupported and unpersuasive.  Lederle suggests, for example, that figures for the number of OPV doses distributed by Connaught throughout the world listed in document 21 are "probably readily available from other sources"; that documents 3 and 27 "do not contain trade secrets"; and that "there is reason to assume" that document 27 contains matters that should be disclosed.  Opposition at 30, 13, 33.  The specific affidavits submitted by HHS and Connaught cannot be overcome by such meager arguments.  Although a full recounting is not required, it is sufficient to observe that each of Lederle's objections has been examined; none has any merit.  <u>See</u> Supplemental Declaration of J.C.W. Weber, submitted with Connaught's Reply Brief (amply refuting much of Lederle's speculation).  Accordingly, defendant has properly refused to release information relating to Connaught's OPV application.

2.  **Neurovirulence Testing Data.**  Neurovirulence is "the capacity of an infectious agent to produce pathologic effects on the central nervous system."  <u>Berkovitz</u>, 56 U.S.L.W. at 4552 n.9.  HHS has withheld two documents that relate to

21

neurovirulence testing.  Document 31 contains OPV neurovirulence test data conducted by Connaught and submitted to FDA during the product approval process.  Document 32 consists of results of testing performed by FDA on OPV samples submitted by Connaught.  <u>See</u> Parkman Dec. ¶¶ 45 and 46.  Release of these documents would produce two adverse effects.  On the one hand, it would reveal critical information about the nature and scope of Connaught's testing, information that would grant other OPV manufacturers an important competitive edge over Connaught.  Parkman Dec. ¶¶ 47.  In addition, because submission of this data is voluntary, disclosure would likely impair FDA's ability to gather neurovirulence results and test samples in the future. <u>Id</u>. ¶¶ 48-50; Weber Unredacted Dec. ¶¶ 36-37.

In rebuttal, Lederle states that document 31 should not be withheld <u>in toto</u>; it seeks segregation of dates of test, identity of agency reviewers and other nonconfidential information.  Release of these matters, however, would allow deduction of the number of lots tested and the times when the results were available (from the number of data sheets and their dates).[13]  Lederle would, in this manner, indirectly

_____

13 In addition, HHS has pointed out that document 31 does not contain the names of FDA employees and that, although document 32 does, release of that information might allow Lederle to deduce the time that tests were conducted. Reply at 15 n.8.  Accordingly, that material need not be released.

obtain that which is directly exempted from disclosure under FOIA.  In addition, Lederle contends that document 32 should be redacted in the same manner as documents 33 and 34 (the deletions of which Lederle does not oppose (see note 9)). That argument compares apples and oranges.  Documents 33 and 34 contain data on vaccines already on the market produced by foreign manufacturers not within FDA's product approval process; those records were released with only the names of the manufacturers deleted.  A similar redaction of document 32 would obviously relate to testing by Connaught, and it would still produce competitive harm to that firm and would impair FDA's data-generation efforts.  The neurovirulence testing data in documents 31 and 32 were correctly withheld.[14]

III.  Conclusion

In sum, defendant has released approximately 1,000 pages of material responsive to Lederle's FOIA requests.  HHS and Connaught have also submitted detailed affidavits that convincingly explain why the remaining 34 documents (or parts thereof) are entitled to be withheld under FOIA Exemptions 4 and 5.  Because Lederle's arguments for disclosure are unpersuasive, summary judgment will be entered against it.

---

[14] Because of this disposition, the Court does not, and need not, address defendant's contention that document 32 is also exempt as confidential research information under Exemption 5.

23

For these reasons, it is

ORDERED that the motions for summary judgment filed by defendant HHS and defendant-intervenor Connaught be and they hereby are granted.

A separate Judgment accompanies this Memorandum Opinion and Order.

July 14, 1988

JOYCE HENS GREEN
United States District Judge

24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LEDERLE LABORATORIES,              )
                                   )
                Plaintiff,         )
                                   )
        v.                         )      Civil Action No. 88-0249
                                   )
DEPARTMENT OF HEALTH AND           )
HUMAN SERVICES,                    )
                                   )
                Defendant,         )
                                   )      FILED
        and                        )
                                   )      JUL 1 4 1988
CONNAUGHT LABORATORIES, LTD,       )
                                   )      CLERK, U.S. DISTRICT COURT
        Defendant-Intervenor.      )      DISTRICT OF COLUMBIA

## JUDGMENT

In consideration of the Memorandum Opinion and Order

issued this date, judgment is entered in favor of defendant,

Department of Health and Human Services, and defendant-

intervenor, Connaught Laboratories, Ltd., and against

plaintiff, Lederle Laboratories.

July 14, 1988

                        JOYCE HENS GREEN
                        United States District Judge

