## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN DEFENSE OF ANIMALS<br><br>   Plaintiff,<br><br>     v.<br><br>THE UNITED STATES DEPARTMENT<br>OF AGRICULTURE,<br><br>   Defendant,<br><br>   and<br><br>LIFE SCIENCES RESEARCH, INC.,<br><br>   Intervenor-Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 02-0557 (RWR)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### DECLARATION OF HUGH GILMORE

I, Hugh Gilmore, hereby declare:

1.      I am a Program Specialist/Information Analyst with the Freedom of Information Act (FOIA) staff in the Legislative and Public Affairs Division (LPA) of the Animal and Plant Health Inspection Service (APHIS) of the United States Department of Agriculture (USDA). I have been a Program Specialist at APHIS since August 2000.

2.      Prior to coming to APHIS, I worked on the FOIA staff at a bureau of the Department of Treasury since 1988. I am also a member of the Massachusetts Bar.

### Factual Background

3.    Huntingdon Life Sciences (Huntingdon) is a Contract Research Organization (CRO) that provides product research and development services to pharmaceutical, biotechnology, medical device, and chemical companies. At the time relevant to this lawsuit, Huntingdon was a corporation incorporated in the state of Delaware.

4.    At the time relevant to this lawsuit, Huntingdon was registered and operating as a research facility as defined by the Animal Welfare Act (AWA), 7 U.S.C. § 2131-59. Such research facilities are regulated by the USDA pursuant to the AWA. See 9 C.F.R. § 1.1 et seq. There are over 1200 registered research facilities in the United States, many of which were CROs such as Huntingdon.

5.    In 1997, APHIS (the USDA component responsible for enforcing the AWA) conducted an investigation of Huntingdon for alleged violations of the AWA. During the course of that investigation, APHIS obtained copies of Huntingdon's records pursuant to 9 C.F.R. § 2.38(a)-(b) (2002). These records concerned Huntingdon's use of test subjects during the course of product testing conducted on behalf of the pharmaceutical, biotechnology, medical device, and chemical companies that are its clients. Huntingdon's clients were charged hundreds of thousands of dollars for the research services reflected in these records.

6.    On March 30, 1998, USDA filed an administrative Complaint against Huntingdon for alleged violations of the AWA.

7.    On April 4, 1998, the administrative Complaint against Huntingdon was settled by the entry of a Consent Decision and Order.

8.    On November 20, 2000, Eliot M. Katz, D.V.M., President of In Defense of Animals (IDA) sent a letter entitled "Freedom of Information Act Request" to Michael Marquis, Assistant

-2-

Director, LPA, APHIS (copy attached as Exhibit A). The request was received at APHIS on November 28, 2000, and assigned control number FOIA 01-86.

9.      A thirty-one page interim response was provided to Ms. Barbara Stagno of IDA by letter dated April 13, 2001, from Kimberly Pacheco, FOIA Officer, LPA, APHIS (copy attached as Exhibit B). This partial response consisted of a Report of Violation in Case no. NJ97020-AW (the case number for the Huntingdon investigation) dated October 9, 1997; a Complaint, AWA Docket No. 98-15, dated March 30, 1998; and a Consent Decision and Order dated April 8, 1998. Ms. Stagno was advised by Ms. Pacheco that this would be a partial response, with the remainder of the responsive records being placed in the regular FOIA processing queue, where there were 18 shelves of records responsive to requests received prior to hers.

10.     On March 22, 2002, IDA filed a Complaint For Declaratory and Injunctive Relief in the United States District Court for the District of Columbia because it had not received a final response to its FOIA request. Shortly thereafter, I was assigned IDA's FOIA request by Lynn Dubose, Supervisory Program Specialist, LPA, APHIS.

11.     By letter dated June 18, 2002, a second interim response was provided to IDA through its counsel, Katherine Meyer (copy attached as Exhibit C). Of the records provided with that response, 228 pages were released in full, 146 pages were released with redactions made pursuant to Exemption 7(C) of the FOIA, 5 U.S.C. 552(b)(7)(C), one page was released with redactions made pursuant to Exemption 5 of the FOIA, 5 U.S.C. 552(b)(5), and 19 pages were withheld in full pursuant to Exemption 5 of the FOIA. This letter further advised IDA that 2384 pages (which upon recount actually totaled 2408, with an additional 60 sent at a later time, for a

-3-

total of 2468) were being forwarded to Huntingdon pursuant to USDA's predisclosure notification procedures concerning business information, which are set forth at 7 CFR § 1.12.

12.      At the completion of the predisclosure notification process, a third response was provided to IDA, through counsel, by letter dated August 19, 2002 (copy attached as Exhibit D). This response contained 303 pages released in full, 602 pages released in part, and 1563 pages withheld in full pursuant to Exemptions 4, 6, and 7(C).

13.      Thus, the administrative processing of IDA's request resulted in the release of 562 pages in full, and 748 pages withheld in part and 1582 pages withheld in full pursuant to Exemptions 4, 5, 6, and 7(C) of the FOIA.

### Information Withheld Under Exemption 4

14.      Generally speaking, the information withheld pursuant to Exemption 4 falls into two broad categories: information that describes the design of and methods used in scientific tests conducted by Huntingdon on behalf of its clients, and information that characterizes the physiological and health effects of the proprietary experimental compounds tested by Huntingdon on behalf of its clients (i.e., the test results). Because it was determined that the release of such information would cause Huntingdon substantial competitive harm, any information falling within these two categories was withheld pursuant to Exemption 4. Moreover, information describing Huntingdon's test designs and methods, which would reveal Huntingdon's special and unique procedures for conducting its tests, were withheld as trade secrets under Exemption 4. Finally, descriptions of the composition of the experimental compounds of Huntingdon's clients were also withheld as trade secrets under Exemption 4. All other reasonably segregable nonexempt information was released to plaintiff.

-4-

15.  **Information describing test designs and methods.** The following information concerning the design of and methods used in scientific tests conducted by Huntingdon on behalf of its clients was withheld pursuant to Exemption 4:

A.  **Standard Operating Procedures** (466 pages withheld in full). Huntingdon's Standard Operating Procedures (SOPs) set forth in explicit detail all of the procedures and methods used in Huntingdon's research, including: the identification, storage, handling, mixing, and method of sampling the experimental compounds to be tested; methods and procedures used in laboratory tests; procedures for observing reactions in test subjects; necropsy and postmortem examinations of test subjects; collection and identification of specimens; and the maintenance and calibration of the Huntingdon's laboratory equipment. Essentially, all of the Huntingdon's business practices are codified in the SOPs. In light of the detailed nature of these commercially sensitive records, it was determined that they contain no reasonably segregable nonexempt information.

B.  **Test Protocols and Protocol Amendments** (467 pages withheld in full). These records describe the designs for and methods used in Huntingdon's laboratory testing of proprietary experimental compounds for its clients. Each protocol describes the objectives for and methods used in the conduct of each of the tests, including: a description of the proprietary experimental compound tested (including their chemical formulas), the name of the client on whose behalf Huntingdon conducted the test; a description of the subjects on which the propriety experimental compound was tested; a description of the experimental design; the dosing level of the compound tested, including the amount and frequency of the dosing; the type and frequency of tests,

-5-

analyses, and measurements made during the test; and a description of the statistical

methods used to analyze the test results. The test protocol amendments reflect alterations

to any element of the testing protocols. In essence, these records are the "blueprints" for

the tests that Huntingdon conducted for its clients, and because of their particularized

descriptions of Huntingdon's test designs and methods, they contain no reasonably

segregable nonexempt information.

C.      **Animal Tracking and Assessment Records** (20 pages released in part, 8 pages

withheld in full). These records contain information regarding the suitability and

selection of test subjects in accordance with the confidential standard operating

procedures and test protocols described above. Information that would not reveal

anything about the standard operating procedures or test protocols was segregated and

released.

D.      **Final Test Reports and Related Records** (125 pages withheld in full). Portions

of these records contain detailed descriptions of the designs and methods used in

Huntingdon's laboratory studies, and essentially recapitulate much of the information

contained in the testing protocols described above. Such information includes: the

objectives and procedures stated in the testing protocol; a description of the experimental

proprietary compound tested; a description of the testing methods used; and a description

of the dosage, dosing regimen, and route of administration. These records were withheld

in full because, in addition to containing information about the confidential test protocols

described above, they contain characterizations of the physiological and health effects of

proprietary experimental compounds tested by Huntingdon which, as discussed below,

-6-

are also exempt from disclosure. Thus, they contain no reasonably segregable nonexempt information.

E.     **Institutional Animal Care and Use Committee (IACUC) Records** (2 pages released in part, 54 pages withheld in full). These records consist of IACUC meeting minutes, memoranda, and inspection reports. They contain  discussions of issues related to the implementation of the confidential standard operating procedures and test protocols described above. They also contain detailed descriptions of Huntingdon's research facilities and equipment (including planned capital improvements thereto), its information technology systems, and its employee training programs. Inasmuch the release of any portions of these records would reveal confidential commercial information about Huntingdon's general business practices and its research operations, they contain no reasonably segregable nonexempt information.

F.     **Dosing Charts** (58 pages withheld in full). These records consist of charts that record the dosing of tested compounds and other substances -- including the amount and frequency of the dosing -- in accordance with the standard operating procedures and test protocols described above. Inasmuch as these charts reveal Huntingdon's test designs and methods for administering the experimental test compounds, they contain no reasonably segregable nonexempt information.

16.     **Information that describes the results of the tests.** Information that characterizes the physiological and health effects of the proprietary experimental compounds tested by Huntingdon were withheld pursuant to Exemption 4 as well. This information, which was generated,

-7-

collected, and analyzed using the confidential designs and methods contained in the standard operating procedures and test protocols described above, consists of:

A.    **Clinical Observation Raw Data Reports** (121 pages withheld in full).  These pages contain raw data from the tests conducted by Huntingdon.  Inasmuch as they contain no information other than raw data, they contain no reasonably segregable nonexempt information.

B.    **Interim Test Reports** (22 pages withheld in full).  These mid-study status reports contain summaries of clinical observations taken during the tests, including:  urinalysis, blood pressure, hematology, clinical chemistry, food and fluid intake, fecal and fluid output, body weight, mortality, and other physical observations taken of the test subjects.  Inasmuch as these records consist entirely of clinical observations that characterize the physiological and health effects of the proprietary experimental compounds tested by Huntingdon, they contain no reasonably segregable nonexempt information.

C.    **Necropsy and Postmortem Examination Reports** (23 pages withheld in full).  These records consist of observations that were taken through necropsy or postmortem examinations of the test subjects, and describe the physiological and health effects of proprietary experimental compounds tested on them.  They contain no reasonably segregable nonexempt information.

D.    **Final Test Reports and Related Records** (125 pages withheld in full).  Portions of these records contain detailed descriptions of the designs and methods used in Huntingdon's laboratory studies, thereby recapitulating much of the information contained in the standard operating procedures and test protocols described above.  These records

-8-

also contain information concerning the results of those tests, inasmuch as they contain

characterizations of the physiological and health effects of proprietary experimental

compounds tested by Huntingdon, including: the stability of the experimental compound

under the conditions of administration; a description of all circumstances that may have

affected the quality or integrity of the data generated by the test; the statistical methods

employed for analyzing the data; and a summary of the data analysis, including a

statement of the conclusions drawn from that analysis. Inasmuch as these records consist

entirely of information describing the test designs, methods, and results, they contain no

reasonably segregable nonexempt information.

E.      **Viability Records** (397 pages released in part, 67 pages withheld in full). These

are charts on which clinical observations of the condition of test subjects taken during

testing are recorded.

      (1)      On the 397 pages of viability records released in part, the above-describe

      confidential commercial information – including clinical observations that would

      reveal the physiological and health effects of the tested compounds – were

      withheld. Observations that did not appear to reveal anything about the test

      results were segregated and released. For example, observations about conditions

      clearly caused by things other than the tested compounds -- such as subjects being

      bitten by other subjects and subjects being injured by getting caught in their cages

      -- were released. Also, observations of symptoms too general to be linked to the

      side effects of the tested compounds were segregated and released.

(2)     However, 67 pages of viability records were withheld in full because, in addition to containing clinical observations about the physiological and health effects of the tested compounds, their very structure reveals the test results. These records consist of charts for recording written clinical observations taken during the test. Within those charts are numerous preprinted columns for recording anticipated side effects specific to the test compounds themselves. Thus, the very structure of these charts reveals the anticipated results of the tests in which they were used. Because nothing of informational value would have remained on these charts after the excision of the clinical observations and the columns that reveal the anticipated results of the tests, they were withheld in full.

F.     **Veterinary Treatment Requests and Logs** (20 pages released in part, 94 pages withheld in full). These records describe treatments requested for and provided to the test subjects. Most of these records concern treatments that were requested and provided to alleviate reactions of side effects caused by the tested compounds, yet some of these records concern treatments that were requested and provided to address conditions apparently not linked to the tests themselves.

(1)     Only those portions containing the above-described confidential business information -- including observations of symptoms and side effects that reveal the physiological and health effects of the tested compounds -- was excised from the 20 pages released in part. The remaining portions of these records were released because they describe symptoms and treatments that do not reveal anything about the physiological and health effects of proprietary experimental compounds.

-10-

Some of these effects were caused by circumstances other than the administration of test compounds -- such as subjects being bitten by other subjects, subjects being injured by getting caught in their cages, or subjects being injured while loose from their cages -- so their release does not reveal anything about the test compounds. In other instances, the side effects and their treatments were described too generally to be linked to the tested compounds. Accordingly, such nonexempt information was segregated and released.

(2)     However, the remaining 94 pages of veterinary records contained no reasonably segregable information. These records provide detailed descriptions of symptoms resulting from the administration of the tested compounds and the treatments provided to alleviate those symptoms. The release of this information would reveal the physiological and health effects of proprietary experimental compounds, i.e., the very information that the tests were designed to generate. Given the detailed nature descriptions of the symptoms and treatments reflected in these records, no nonexempt information could be reasonably segregated and released from them.

G.     **Internal Huntingdon Memoranda** (7 pages withheld in part, 33 pages withheld in full). These memoranda consist of discussions of issues that arose during the course of tests conducted pursuant to the confidential standard operating procedures and test protocols described in above. Inasmuch as these discussions concern the use of test designs and methods in light of observations taken during the tests (all of which are exempt), these memoranda contain no reasonably segregable nonexempt information.

-11-

H.    **Internal USDA Investigatory Memoranda** (27 pages released in part).  These
memoranda discuss the bases for each charge that USDA contemplated bringing against
Huntingdon for violations of the Animal Welfare Act.  Although these records could have
been withheld in their entireties under the deliberative process privilege pursuant to
Exemption 5, only those portions containing the above-described confidential business
information were withheld, pursuant to Exemption 4.

17.    **Release of Information Describing Huntingdon's Test Designs and Methods Would**
**Cause Substantial Competitive Harm.**

A.    The release of information that describes the design of and methods used in tests
conducted by Huntingdon would cause it substantial competitive harm by providing its
competitors with unfair business advantages.  First, these records are the "blueprints" for
Huntingdon's research services; they describe the special and unique test designs and
methods that are the product of decades of Huntingdon's business evolution, and they
reflect the substantial scientific and technical expertise that its employees have developed
over that time.  As discussed above, these records describe in explicit detail nearly every
aspect of Huntingdon's business.  Thus, providing competitors with information revealing
Huntingdon's test designs and methods would allow them to replicate Huntingdon's
research services without investing the same amount of time, effort, and money that
Huntingdon expended in developing them.  Because competitors would be able to
unfairly appropriate the fruits of this substantial investment at little or no cost to
themselves, their competing services would likely be marketed at prices significantly

-12-

below those charged by Huntingdon, thus causing Huntingdon substantial competitive harm through the erosion of its market share.

B.     Second, the release of information concerning Huntingdon's test designs and methods would provide its competitors with an unfair business advantage by revealing its costs and profit margins. As discussed above, these records describe aspects of Huntingdon's business operations -- including its facilities, equipment, employee training programs, and information technology systems -- from which a competitor could derive Huntingdon's overhead costs. Furthermore, given that these records also contain detailed descriptions of every aspect of the research conducted in Huntingdon's facilities, as well as information concerning the expertise of the employees who perform that work, a competitor could derive labor and other costs directly associated with those tests. Huntingdon's competitors could then use this cost information to extrapolate Huntingdon's profit margin on these research services. Thus, the release of these records would provide Huntingdon's competitors with information that could be used to price their own competing research services more competitively, thereby allowing them to unfairly erode Huntingdon's market share. Because of the substantial competitive harm that such a release could cause to Huntingdon, information concerning its test designs and methods was withheld pursuant to Exemption 4.

18.     **Release of Information That Describes the results of Huntingdon's Tests Would Cause Substantial Competitive Harm.**

A.     The release of information that characterizes the physiological and health effects of proprietary experimental compounds tested by Huntingdon (i.e., the test results) would

-13-

cause substantial competitive harm to Huntingdon. This information was collected and analyzed in accordance with methods and procedures established in Huntingdon's standard operating procedures and test protocols, which govern the collection of test data through observations of reactions to the test materials, the collection of specimens from the test subjects, and necropsy and portmortem examinations of the test subjects. The raw test reports, necropsy and postmortem examination reports, final test reports, viability records, and veterinary treatment logs all contain information that was collected or analyzed using those confidential procedures and methods. Thus, the release of these records would reveal not only the test data, but also the confidential methods and procedures used to generate them. As discussed above, the release of information that reveals the Huntingdon's test procedures and methods would cause Huntingdon substantial competitive harm by allowing competitors to appropriate those procedures and methods to develop their own competing research services. Therefore, inasmuch as these records reveal Huntingdon's confidential procedures and methods for collecting and analyzing test data generated by its research services, they were withheld pursuant to Exemption 4.

B.      The release of information that describes the physiological and health effects of the proprietary experimental compounds of Huntingdon's clients would cause substantial competitive harm to those clients. These test results are an important preliminary step in assessing the performance of experimental compounds that may eventually be marketed to the public. Release of this information would allow competitors to identify the compounds that performed well in the tests conducted by Huntingdon, and those that did

-14-

not. As such, this information would give the competitors of Huntingdon's clients a "head start" in developing competing products, because they would be able to focus their own research and development efforts on those compounds that have promise; conversely, competitors would be able to avoid wasting their research and development resources on "dead ends," because these records would identify compounds that did not warrant further investigation because of their poor performance on the tests. Thus, the release of this information would cause substantial competitive harm to Huntingdon's clients because their competitors would be able to expend less time, effort, money, and resources in researching and developing their own competing products. Such competing products likely would be marketed sooner and at lower prices because their producers would not have to recapture the research and development costs that Huntingdon's clients paid for the services that generated the test results at issue in this case. Accordingly, this information was withheld pursuant to Exemption 4 because its release would cause substantial competitive harm.

19.     **Huntingdon's Test Designs and Methods are Trade Secrets Under Exemption 4.** In addition to causing substantial competitive harm, the release of information concerning Huntingdon's test designs and methods would reveal Huntingdon's trade secrets. As noted above, these records contain designs and methods that are essentially the "blueprint" for the research that Huntingdon conducts. These designs and methods are the product of decades of Huntingdon's business evolution, and are the product of the significant expertise that its employees have developed over that time. Moreover, these designs and methods have significant value, in that they were used to conduct research that was sold for hundreds of thousands of dollars to clients

-15-

in the pharmaceutical, biotechnology, medical device, and chemical industries. Therefore, information concerning Huntingdon's test designs and methods were withheld under Exemption 4 because they are trade secrets.

20.     **The Experimental Compounds of Huntingdon's Clients are Trade Secrets Under Exemption 4.** As noted above, the records at issue in this case contain descriptions of the experimental compounds of Huntingdon's clients, including their chemical compositions. In one instance, even the very name of the experimental compound was labeled as a trade secret. As noted above, these experimental compounds are tested for the purpose of determining if they can be developed into products for the consumer market. As such, they were withheld because they are trade secrets within the context of Exemption 4.

### Records Withheld Under Exemption 5

21.     In addition to the records described above, 19 pages of intra-agency memorandums were withheld in full and one page was withheld in part under Exemption 5. These records contain deliberations among APHIS investigators and the Office of General Counsel (OGC) about what charges should be included in the AWA Complaint that was ultimately filed against Huntingdon. Because these records are subject to both the deliberative process and attorney work-product privileges, they were withheld pursuant to Exemption 5.

22.     The attorney work-product protects those records generated by an attorney, or by a nonattorney at the direction of an attorney, in reasonable anticipation of litigation. The records that were withheld under Exemption 5 were generated by an attorney in USDA's OGC and by APHIS investigators at his direction. These records were generated in reasonable anticipation of litigation because they concern the drafting of a Complaint that was ultimately filed in an

-16-

administrative proceeding against Huntingdon. They consist of recommendations that certain charges be filed in that complaint, evaluations and opinions of the evidentiary and legal support for those proposed charges, and draft language for charges that were considered for inclusion in the complaint. Thus, the release of this information would reveal the USDA attorney's thoughts, opinions, impressions, and evaluations of the relative strengths and weaknesses of the case against Huntingdon. Therefore, this information was withheld under Exemption 5 pursuant to the attorney work-product privilege.

23.     The deliberative process privilege protects internal pre-decisional agency deliberations. As described above, the withheld information consists of deliberations among agency personnel about the drafting of the Complaint. This information is pre-decisional because it was generated prior to the final decision, i.e., the filing of the AWA Complaint against Huntingdon. Furthermore, this information is deliberative because it consists of recommendations that certain charges be filed in that complaint, evaluations and opinions of the evidentiary and legal support for those proposed charges, and draft language for charges that were considered for inclusion in the complaint. Release of this information would reveal USDA's frank and uninhibited discussions about the proper course to be taken in the law enforcement action against Huntingdon. Although these communications do contain discussions of facts uncovered during the investigation of Huntingdon, they are so inextricably connected to the deliberative material that their disclosure would expose USDA's deliberations by revealing the pertinent facts on which the evaluations and opinions of the proposed charges were based. Because of the chilling effect that the release of these records would have on internal agency deliberations, they were withheld under Exemption 5 pursuant to the deliberative process privilege.

-17-

## Records Withheld Under Exemptions 7(C)

24.     Records which contained the names and address of private citizens who communicated with USDA about Huntingdon, as well as names and personal information (such as professional qualifications) of Huntingdon's employees, were withheld pursuant to Exemption 7(C). No USDA employee names or personal information was withheld.

25.     This information was compiled pursuant to a law enforcement investigation conducted under the AWA. The private citizens and Huntingdon employees mentioned in these records have a significant privacy interest in not having their names associated with a law enforcement investigation because of the taint that such an association could cause. Furthermore, there is no public interest in the release of this information because its release would not shed any light whatsoever on the operations or activities of the government. Therefore, this information was withheld pursuant to Exemption 7(C).

## The Search for Responsive Records

26.     Three USDA components were involved in the investigation of Huntingdon -- Animal Care, Investigative and Enforcement Services (IES), and the Office of General Counsel. Therefore, searches were conducted in each of those three components.

A.     **Animal Care.** Three offices within Animal Care were involved in the investigation of Huntingdon -- the Animal Care headquarters staff, the Deputy Administrator's Office (located in Animal Care headquarters), and the Animal Care Eastern Regional Office in Raleigh, NC. These three searches yielded responsive records, all of which were copied and forwarded to the APHIS FOIA staff for processing.

-18-

(1)    **Animal Care headquarters staff.** An electronic search of the Animal Care staff's records was conducted using the search term "Huntingdon." This search yielded responsive records.

(2)    **Deputy Administrator's Office.** A manual search for records about Huntingdon was conducted through the files in the Animal Care Deputy Administrator's Office. That search yielded one responsive file.

(3)    **Animal Care Regional Office.** In the Animal Care Regional Office, an electronic search was conducted using Huntingdon's licence number and the state in which it is located. That search yielded one responsive file.

B.    **IES.**    Two offices within IES were involved in the Huntingdon investigation -- IES Headquarters and the IES Regional Office in Raleigh, NC. Only the search of IES Headquarters yielded responsive records, all of which were copied and forwarded to the APHIS FOIA staff for processing.

(1)    **IES Headquarters.** A search of IES Headquarters' electronic filing system using the search term "Huntingdon" yielded one responsive file.

(2)    **IES Regional Office.** At the time that IDA's request was received, the IES Regional Office was not searched because it was not likely that responsive records would have been located there. Once an investigation is closed, all original copies of records collected or generated during that investigation are forwarded to IES Headquarters. The investigation of Huntingdon was closed in 1998. Thus, all original copies of records related to the Huntingdon investigation would have been maintained at IES Headquarters at the time that IDA's request

-19-

was received in 2000. Nevertheless, a search of the IES Regional Office was conducted after IDA filed its lawsuit; also, an investigator who worked on the Huntingdon investigation was asked about the possible location of additional responsive records. However, neither of those efforts yielded any additional responsive records.

Pursuant to 28 U.S.C. 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: 12/11/02

Hugh Gilmore
Program Specialist/Information Analyst
Freedom of Information Act Staff
Legislative and Public Affairs Division
Animal and Plant Health Inspection Service

# EXHIBIT A



## IN DEFENSE OF ANIMALS



(01-86)
11-28-00
12-27-00



November 20, 2000

Michael Marquis
Assistant Director, FOIA Officer
Animal & Plant Health Inspection Service (APHIS)
4700 River Road, Unit #50
Riverdale, MD 20737-1232

## A FREEDOM OF INFORMATION ACT REQUEST

This request for records is made under the Federal Freedom of Information Act, 5 U.S.C., sec. 552, by In Defense of Animals (IDA), a nonprofit organization [IRS Code 501(c)(3) tax-exempt, number 68-0008936] based in Mill Valley, CA, that is dedicated to educating the public about issues involving animals.

This request is directed at obtaining copies of the following documents:

All materials related to APHIS 1996, APHIS 1997 and APHIS 1998 inspections and investigations filed on Huntingdon Life Sciences, Inc., PO Box 2360 Mettlers Road, East Millstone, NJ 08875, (license number: 22-R-0040).

Records requested should include but not be limited to: all papers, photocopies, photographs (including captions and cut lines for the photographs), film, negatives, video recordings, sound recordings, documents, whether stored electronically, on paper, on videotape, in computer memory or otherwise; voluntary correspondence associated with the inspections/investigations; any documents related to obligatory responses; affidavits, interview transcripts, notes (from inspections, investigations, interviews, etc.); e-mails, memos, interoffice memos, official memoranda and incident reports associated with the said inspections/investigations.

If any records or documents pertaining to this request are considered to be exempt from release, please segregate and provide access to non-exempt portions. Justify deletions by reference to exemptions in the Freedom of Information Act.

Requester asks that fees related to processing this request be waived pursuant to Sec. 552 (a) (4) (iii) of the Freedom of Information Act, which provides that: "documents shall be furnished without any charge or at a charge reduced below the fees established under

clause (ii) "reasonable standard charges" if the disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." This request satisfies the cited waiver provision as follows:

1. The subject of all items requested concerns the operations and activities of government; namely, how inspections and investigations of biomedical research facilities are conducted by the USDA; how violations of the federal Animal Welfare Act are documented; whether sanctions and or fines are imposed on violators; what actions are taken if the violators remain non-compliant with federal animal welfare laws and/or consent decrees resulting from such inspections/investigations;

2. Disclosure of the requested information will contribute to public understanding of how the USDA monitors, inspects, investigates, and sanctions a vivisection laboratory; and how laboratory animals are cared for at Huntingdon Life Sciences, Inc.;

3. The requester has no commercial interest in the requested information;

4. The requested information will be broadly disseminated to the public through print and electronic media, via our web site and to our members through newsletters and printed literature by IDA.

Inasmuch as IDA is making this inquiry in the course of carrying out its educational and other charitable public interest activities, we request that all charges for searching and duplicating be waived. Should there be any difficulty with the fee waiver request, either in part or in full, please supply a written response indicating the particular legal basis upon which this decision was made.

All correspondence on this matter, including the sending of documents fulfilling this request should be directed or sent to In Defense of Animals; c/o Dr. Elliot Katz, President, 131 Camino Alto, Suite E, Mill Valley, CA, 94941.

Thank you for your attention to this matter.

Respectfully submitted,

Elliot M. Katz, DVM
President, In Defense of Animals

EXHIBIT B

  

United States
Department of
Agriculture

**CERTIFIED RETURN RECEIPT**

Marketing and
Regulatory
Programs

Animal and
Plant Health
Inspection
Service

April 13, 2001

4700 River Road
Riverdale, MD 20737

Ms. Barbara Stagno
In Defense of Animals
Post Office Box 702
Ardsley, New York 10502

Dear Ms. Stagno:

This is in partial response to Mr. Elliot M. Katz's, November 20, 2000, Freedom of
Information Act (FOIA) request for copies of all 1996, 1997 and 1998 documents concerning
inspections and investigations on Huntingdon Life Sciences, Inc., a licensed research facility
in East Millstone, New Jersey. Mr. Katz's request was received in this office on November
28, 2000, and was assigned log number FOIA-01-86.

On April 3, 2001, I advised you that the FOIA office would send you a copy of the Report of
Violation, a copy of the Complaint, and copy of the Consent Decision and Order against
Huntingdon Life Sciences. The remainder of your request will be placed back in line for
review.

A determination of fees, if any, will be assessed when this request is completed in full and will
be sent to you along with our final response. Please direct any questions you have regarding
your request to Deborah Leilich at Area Code (301) 734-8296.

Sincerely,

Kimberly Pacheco
Freedom of Information Act Officer
Legislative and Public Affairs

Enclosures:
1. 31 Pages
2. Report of Violation: Case Number NJ97020-AW, October 9, 1997
3. Complaint: AWA Docket No. 98-15, March 30, 1998
4. Consent Decision and Order, April 8, 1998

 APHIS - Protecting American Agriculture

An Equal Opportunity Employer

# EXHIBIT C



United States
Department of
Agriculture

Marketing and
Regulatory
Programs

Animal and
Plant Health
Inspection
Service

Legislative and
Public Affairs

Freedom of
Information

4700 River Road
Unit 50
Riverdale, MD
20737-1232

**Certified-Return Receipt**

June 18, 2002

Ms. Katherine A. Meyer
MEYER & GLITZENSTEIN
1601 Connecticut Avenue, NW
Suite 700
Washington, D.C. 20009

Dear Ms. Meyer:

This is in response to your November 20, 2000, Freedom of Information Act request
**FOIA-01-86** which was received on November 28, 2000, for all information concerning
inspections/investigations filed against Huntingdon Life Sciences, Inc. during 1996-1998.
A partial response was furnished by this office on April 13, 2001 containing 31 pages citing
no exemptions or deletions. This response covers the remaining responsive records.

Agency employees conducted a thorough search of their files and located 2779 responsive
documents. Of these responsive documents, 228 pages are being released in full. Another
146 pages of responsive documents are being released in part because information that is
personal in nature such as names and addresses of individuals has been withheld pursuant
to **Exemption 6** of the FOIA, 5 U.S.C. 552 (b)(6). This exemption protects information
from disclosure when its release would cause a clearly unwarranted invasion of personal
privacy.

Another 2384 pages of responsive records are being sent to the submitter of these records to
determine whether they are exempt from release under **Exemption 4** of the FOIA, **5 U.S.C.
552 (b)(4)**. One page is being released in part and the redacted portion of this record is
being sent to the submitter. These records are being sent to the submitter pursuant to 7 CFR
§ 1.12, which states that:

> When in the course of responding to an FOIA request, an agency cannot
> readily determine whether the information obtained from a person is
> privileged or confidential business information, the policy of USDA is to
> obtain and consider the views of the submitter of the information and to
> provide the submitter an opportunity to object to any decision to
> disclose the information.

These records may contain information such as trade secrets and commercial or financial
information which is privileged or confidential, and if so these records could be withheld
from disclosure pursuant to 5 U.S.C. 552 (b) (4). This exemption protects from disclosure
confidential business information, which if released, would cause substantial competitive
harm to the business submitter of the information.



APHIS - Protecting American Agriculture
An Equal Opportunity Employer

Katherine A. Meyer, Esq.
Meyer and Glitzenstein
FOIA 01-86
6/18/02
2

Furthermore, another 19 pages of information has been withheld in full and 1 page has been
withheld in part pursuant to **Exemption 5** of the FOIA, **5 U.S.C. 552(b)(5)**. This exemption
protects from disclosure interagency or intra-agency information that is deliberative and
pre-decisional and attorney work product, which includes documents and other memoranda
prepared by an attorney in contemplation of litigation.

We hope you find this information helpful. Fees have been waived. Please direct any
questions you have regarding your request to Hugh Gilmore at (301) 734-5385 or e-mail:
hugh.gilmore@usda.gov.

Sincerely,

Michael S. Marquis
Assistant Director
Freedom of Information
Legislative and Public Affairs

Enclosures:
376 Pages

# EXHIBIT D



United States
Department of
Agriculture

Marketing and
Regulatory
Programs

Animal and
Plant Health
Inspection
Service

Legislative and
Public Affairs

Freedom of
Information

4700 River Road
Unit 50
Riverdale, MD
20737-1232

**Certified-Return Receipt**

August 19, 2002

Ms. Katherine A. Meyer
MEYER & GLITZENSTEIN
1601 Connecticut Avenue, NW., Suite 700
Washington, D.C. 20009

Dear Ms. Meyer:

This is in further response to the November 20, 2000, Freedom of Information
Act request that we received from your client In Defense of Animals. By that
request, which we received on November 28, 2000, IDA sought all information
concerning USDA inspections/investigations filed against Huntingdon Life
Sciences during 1996-1998. We provided IDA with interim releases by letters
dated April 13, 2001, and June 18, 2002. Because we have now completed the
administrative processing of the remaining 2468 pages responsive to IDA's
request,[1] we are now providing IDA with a third, and final, release.

Enclosed you will find 303 pages released in full. However, we have withheld
602 pages in part and 1563 pages in full because they contain information that is
protected from disclosure under the FOIA pursuant to 5 U.S.C. § 552 (b)(4),
(b)(6), & (b)(7)(C). These provisions concern trade secrets or commercial or
financial information obtained from a person and which is privileged or
confidential, information the disclosure of which would cause a clearly
unwarranted invasion of personal privacy, and information compiled for law
enforcement purposes the release of which could reasonably be expected to
constitute an unwarranted invasion of personal privacy.

---

[1]
Please note that this total number of pages is greater than the total number of remaining pages
referenced in our letter of June 18, 2002. This difference results from the fact that our previous
total did not include the sixty pages of records that USDA obtained from People for the Ethical
Treatment of Animals, as well as from an apparent error in our initial page count.



APHIS - Protecting American Agriculture
An Equal Opportunity Employer

Ms. Katherine A. Meyer                                        2

Please be advised that we are providing you with the best copies available. We are providing these records to IDA at no charge because, as we informed you in our letter of June 18, 2002, we granted IDA's fee waiver request.

Sincerely,

Michael S. Marquis
Assistant Director
Freedom of Information
Legislative and Public Affairs

Enclosures:
905 Pages