UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN DEFENSE OF ANIMALS,                    )
                                          )
    Plaintiff,                            )
                                          )
    v.                                    )    Civ. No.  02-0557 (RWR)
                                          )
UNITED STATES DEPARTMENT OF               )
    AGRICULTURE,                          )
                                          )
    Defendant.                            )

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiff In Defense of

Animals ("IDA") moves for partial summary judgment in this case under the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552, on the grounds that the defendant United States

Department of Agriculture has not met its burden of proof that any of the information at issue

may be withheld from IDA pursuant to Exemption 4 of the FOIA, 5 U.S.C. § 552(b)(4).  In

support of this motion, plaintiff submits the accompanying memorandum of law, Exhibits A -

DD, Plaintiff's Statement of Material Facts As To Which There Is No Genuine Issue, and a

Proposed Order.

Respectfully submitted,

Katherine A. Meyer
(D.C. Bar No. 244301)
Kimberly D. Ockene
(D.C. Bar No. 461191)

Meyer & Glitzenstein

1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202)  588-5206

Attorneys for Plaintiff

Date:   February 21, 2003

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN DEFENSE OF ANIMALS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No.  02-0557 (RWR) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| AGRICULTURE, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF
MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE AND
PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH
<u>THERE IS NO GENUINE ISSUE</u>**

Plaintiff does not dispute any of Defendant's Statement of Material Facts As To Which

There Is No Genuine Issue.  Pursuant to Local Rule 7.1(h), plaintiff hereby submits its own

statement of material facts as to which there is no genuine issue, in support of plaintiff's motion

for partial summary judgment concerning the hundreds of pages of  records that have been

withheld under Exemption 4 of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b).

1.  The United States Department of Agriculture ("USDA") conducted its investigation of

Huntingdon Life Sciences ("Huntingdon") in 1997 to verify the allegations of Animal Welfare

Act violations that were made by People for the Ethical Treatment of Animals.  <u>See</u> USDA

Report of Violations (October 9, 1997), Plaintiff's  Exhibit ("Pl. Ex.") E.

2.  According to the agency's subsequent "Report of Violations," the results of the

USDA's investigation revealed many violations of the AWA by Huntingdon.  Pl. Ex. E at 3-11.

3.  On March 30, 1998, the USDA filed a formal administrative Complaint charging

Huntingdon with violations of the AWA and the agency's regulations and seeking an Order

requiring Huntingdon to "cease and desist from violating the Act and the regulations and standards issued thereunder" and assessing civil penalties against the Company. See Complaint (March 30, 1998), Pl. Ex. F.   The agency issued a press release announcing the results of its investigation and the filing of the Complaint. See Press Release (April 1, 1998), Pl. Ex. G.

4. On April 8, 1998, the USDA entered into a settlement with Huntingdon. See Consent Decision and Order, Pl. Ex. H.

5. On December 15, 1999, the USDA sent a letter to Huntingdon approving Huntingdon's activities as being in compliance with the April 8, 1998 Consent Decision and Order, and stating that "[t]his matter is closed." See Letter to Michael Caulfield from Elizabeth Goldentyer, Eastern Regional Director for Animal Care (December 15, 1999), Pl. Ex. J.

6. On November 20, 2000, plaintiff In Defense of Animals ("IDA") submitted a FOIA request to the USDA for "all records" relating to the agency's investigation of Huntingdon, including, but not limited to paper documents, e-mails, photographs, and video recordings.   IDA FOIA Request, Pl. Ex. L.

7. On April 13, 2001, the USDA sent IDA copies of its  "Report of Violations," the Administrative Complaint, and the Consent Decision.   Gilmore Declaration ¶ 9; Defendant's Exhibit B.

8. By March 22, 2002, the USDA had not provided plaintiff any additional records, and IDA filed this lawsuit. See Complaint.

9. On June 18, 2002, the USDA sent counsel for Huntingdon a letter "to obtain Huntingdon's assistance in determining whether any of that information falls within Exemption 4 of the FOIA, 5 U.S.C. § 552(b)(4), which protects from disclosure 'trade secrets and commercial or financial information obtained from a person and privileged and confidential.'" See Letter to

Alex Menendez from Michael Marquis (June 18, 2002), Pl. Ex. M. The USDA also stated that

"in order for information to be withheld from IDA under Exemption 4, Huntingdon must

demonstrate to us, in a manner that is clear, specific, and non-conclusory, that the release of any

particular information will cause Huntingdon competitive harm or is privileged." Id.

10. On June 18, 2002, the USDA sent a letter to counsel for the plaintiff stating that the

agency had located 2779 pages of responsive records, and that, of those, 228 pages were being

released in full and another 146 pages were being released in part with deletions of personal

information such as names and addresses. The agency further stated that 19 pages of information

were being withheld in full and 1 page in part pursuant to Exemption 5, and that the remaining

2384 pages had been sent to Huntingdon to determine whether they are exempt under Exemption

4. See Letter to Katherine Meyer from Michael Marquis (June 18, 2002), Pl. Ex. N.

11. On August 19, 2002, the USDA notified IDA that it had completed the processing of

the records that had been sent to Huntingdon. With respect to those records, the USDA released

303 pages in full, but withheld 1563 pages in full and another 602 pages in part on the grounds

that they contain information that is protected from disclosure under Exemption 4, or under

Exemptions 6 or 7(C). See Letter to Katherine Meyer from Michael Marquis (August 19, 2002),

Pl. Ex. R.

12. On October 18, 2002, plaintiff's counsel sent counsel for the USDA a letter detailing

IDA's position in the case. See Letter to Frank Menna from Katherine Meyer (October 18,

2002), Pl. Ex. S. She explained that IDA did not seek access to several categories of

information, including (1) any information withheld under Exemptions 6 or 7(C) that "would

identify an individual or any personal information about such individual;" (2) any of

Huntingdon's "Standard Operating Procedures;" and (3) any of the "animal husbandry records"

-3-

that had been withheld. Id. at 3.

13. On November 27, 2002, USDA's counsel provided IDA with a list of 16 categories of information that had been withheld from plaintiff. See Letter to Katherine Meyer from Frank Menna (November 27, 2002), Pl. Ex. T.

14. On December 12, 2002, IDA's counsel provided the agency with a list of the information identified in the USDA's November 27, 2002 letter that could be excluded from IDA's request, including: (1) all of the "test protocols and protocol amendments;" (2) the "animal tracking and assessment records;" and (3) the "dosing charts." Letter to Frank Menna from Katherine Meyer (December 12, 2002), Pl. Ex. U. In addition, IDA's counsel informed the USDA that IDA was not interested in obtaining any information that identifies any of Huntingdon's customers or the products or compounds that were the subject of any of the research projects that were underway when the agency conducted its investigation. See id. at 2-4.

15. Hugh Gilmore, who submitted a declaration in support of the USDA's motion for summary judgment, is not employed by Huntingdon. See Gilmore Declaration. Mr. Gilmore is a government employee and does not work for any animal testing or research facility. Id.

16. According to a New York Times article dated March 24, 1998, "[w]ithin months" of PETA's disclosures in 1997 concerning Huntingdon's practices, "Huntingdon had lost more than half of its clients." New York Times (March 24, 1998), Pl. Ex. W.

17. On June 4, 1997, Procter & Gamble disseminated a news release which stated that the "uncaring and unprofessional attitude and behavior of the lab technicians" at Huntingdon was "unacceptable," and that, accordingly, Procter & Gamble had "suspended further testing at this facility." See Pl. Ex. X.

-4-

18. A company called British Biotech has stated in writing that it has terminated all links with Huntingdon Life Sciences (HLS) and has no ongoing relationship with that organization. See Letter from British Biotech (March 30, 2001), Pl. Ex. Y. A company called the James Black Foundation has stated in writing that it is no longer a customer of HLS, and has no intention of dealing with HLS in the future. Letter from James Black Foundation (September 17, 2001), Pl. Ex. Y.

Respectfully submitted,

Katherine A. Meyer
(D.C. Bar No. 244301)
Kimberly D. Ockene
(D.C. Bar No. 461191)

Meyer & Glitzenstein
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202)  588-5206

Attorneys for Plaintiff

Date:   February 21, 2003

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN DEFENSE OF ANIMALS,                     )
                                           )
      Plaintiff,                           )
                                           )
      v.                                   )        Civ. No.  02-0557 (RWR)
                                           )
UNITED STATES DEPARTMENT OF                )
      AGRICULTURE,                         )
                                           )
      Defendant.                           )

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### Introduction

This is a case under the  Freedom of Information Act ("FOIA"), 5 U.S.C. 552, *as amended*.  Plaintiff In Defense of Animals ("IDA"), a national animal protection organization, seeks access to the closed investigatory files concerning the United States Department of Agriculture's 1997 investigation of a New Jersey laboratory, Huntingdon Life Sciences ("Huntingdon").  On March 30, 1998, the USDA charged Huntingdon with numerous violations of the Animal Welfare Act ("AWA"), 7 U.S.C. §§ 2131 *et seq.*,  including the failure to treat animals suffering extreme pain and the failure to use appropriate methods to prevent and treat injuries in animals.  However, a week later, the USDA entered into a settlement that required Huntingdon to pay to the U.S. Treasury only $10,000.

Although the investigation has been closed for several years, and the "basic purpose" of the FOIA is "to open agency action to the light of public scrutiny," Dep't of Justice v. Reporters Comm. For Freedom of the Press, 489 U.S. 749, 772 (1989), the USDA has refused to disclose hundreds of pages of responsive records, on the grounds that the vast majority of them constitute

the "trade secrets" and "confidential commercial information" of Huntingdon that are protected

by Exemption 4 of the FOIA, and several other documents are covered by both the "deliberative

process" and "attorney work-product" privileges that are protected by Exemption 5.

However, particularly because IDA has substantially narrowed its FOIA request to

exclude all test protocols of Huntingdon's, as well as any information that would reveal the

identities of any customers of Huntingdon's or any of the actual products or compounds that

Huntingdon was testing at the time of the investigation, the USDA simply cannot meet its burden

of proof that all of the information that has been withheld under Exemption 4 is exempt from

disclosure on the grounds that it is likely to cause Huntingdon "substantial competitive injury,"

as required by National Parks and Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir.

1974). Accordingly, summary judgment should be entered for plaintiff with respect to all of this

information.

In addition, the agency has failed to meet its burden of proof that records may be

withheld under Exemption 5, and has failed to provide an index of the withheld information, as

required by Vaughn v. Rosen, 484 F.2d820, 824 (D.C. Cir. 1973), cert. denied, 415 U.S. 977

(1974), that would allow plaintiff or the Court to ascertain whether that Exemption applies to any

of the withheld information under either of the claimed privileges. The USDA has also failed to

locate or adequately account for several other responsive records, including a videotape depicting

Huntingdon's inhumane treatment of animals. Accordingly, plaintiff IDA needs additional

information concerning all of these matters before it can move for summary judgment on these

issues. See Declaration of Barbara Stagno, submitted pursuant to Rule 56(f), Fed.R.Civ.P.,

Plaintiff's Exhibit A.

## BACKGROUND

To place this case in context, and to demonstrate how the USDA has violated all of the basic tenets of FOIA law that apply here, it is necessary to provide the Court with the background of this case and the procedural history to date.

### A.   The Animal Welfare Act

The Animal Welfare Act, *as amended*, 7 U.S.C. §§ 2131 *et seq.*, was enacted in 1985 "to insure that animals intended for use in research facilities or for exhibition purposes . . . are provided humane care and treatment." 7 U.S.C. § 2131(1).  The statute requires the United States Department of Agriculture ("USDA") to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors," including minimum requirements for "procedures to ensure that animal pain and distress are minimized, including adequate veterinary care with the appropriate use of anesthetic, analgesic, tranquilizing drugs, or euthanasia."  7 U.S.C. § 2143(a)(3)(A).

The USDA has promulgated a host of standards and other regulations that apply to facilities covered by the statute, see, e.g., 9 C.F.R. Part 3, and the agency is given broad authority to enforce the statute and to seek both civil and criminal penalties for each violation, as well as injunctive relief to prohibit further violations.  7 U.S.C. § 2149.  However, unlike many environmental statutes which include "citizen suit" provisions that allow individuals acting as "private attorney generals" to bring lawsuits to enforce the statute, only the USDA can enforce the Animal Welfare Act.  Compare, e.g., Endangered Species Act, 16 U.S.C. § 1540(g).

### B.   The USDA's Investigation of Huntingdon

In May, 1997, an animal welfare organization called "People for the Ethical Treatment of Animals" ("PETA") filed a formal Complaint with the Animal and Plant Health Inspection

Service ("APHIS") – the division of the USDA that enforces the AWA – concerning extremely inhumane activities that were taking place at Huntingdon Laboratories in Millstone, New Jersey, a research facility licensed under the statute. See PETA Complaint (May 16, 1997), Plaintiff's Exhibit ("Pl. Ex.") B. At the time, Huntingdon typically performed experiments on animals to test the effects of ingredients used in industrial chemicals and pharmaceutical products. Id.

PETA's Complaint included a detailed account from a Huntingdon employee of the inhumane treatment of primates, dogs, and pigs, including surgery performed on animals who were not properly anesthetized, the failure to provide veterinary care to numerous sick and injured animals, underfed animals, animals kept in unsanitary cages, and rough, callous, and painful handling of animals – all of which the group alleged violated specific provisions of both the AWA and USDA regulations. Id. The group also submitted a videotape taken inside the laboratory that showed insufficiently sedated animals being operated on and callous and painful handling of animals, and it submitted dozens of photographs of alleged violations of the statute. Id.

A 9-minute compilation of the videotape taken inside Huntingdon, which was released to the media on June 4, 1997, is attached as Plaintiff's Exhibit C. See also Declaration of Barbara Stagno, Pl. Ex. A ¶ 9. The videotape shows a Huntingdon technician performing a necropsy on a monkey that is still clearly alive (its heart is still beating), a technician hanging a monkey in the air while performing a lab test, and an employee using a tube to force feed a dog while the animal screams in pain. See Pl. Ex. C; see also Letter to PETA from Dr. Nedim Buyukmihci, Professor of Ophthalmology at the University of California (May 12, 1997), Pl. Ex. D, (explaining that the videotape shows that "[c]learly the animal was not dead," and that "[t]here is little question that this scene depicted incompetence and cruelty in that cutting of the living

-4-

animal continued despite recognition that there was insufficient anesthesia") (emphasis added).

From June 17, 1997 to July 18, 1997, the USDA investigated Huntingdon to verify the allegations of AWA violations.  See APHIS Report of Violations (October 9, 1997), Pl. Ex. E. According to the agency's subsequent "Report of Violations," the results of that investigation revealed rampant violations of the AWA by Huntingdon, including:

-- the failure to "evaluate[] criteria used to determine if animals experience pain/distress;"

-- the "failure to use proper methods of euthanasia;"

-- the "failure to use appropriate methods to prevent, control, diagnose and treat injuries, and to have availability of emergency care;"

-- the "failure to have available appropriate facilities and equipment to provide adequate veterinary care;"

-- the "failure to ensure that procedures involving animals will avoid or minimize discomfort, distress and pain to the animals;"

-- the failure "to ensure that procedures that may cause more than momentary or slight distress to the animals will be performed with appropriate sedatives, analgesics or anesthetics;"

-- the failure to "provide[] any relief through anesthesia or analgesic drugs" to "at least 17 dogs [who] experienced pain and distress;"

-- the "failure to assess daily the animal's health and well being, and to communicate timely and accurate information problems of animal health, behavior, and well being to the attending veterinarian;"

-- the failure to provide any pain relief to a dog suffering "extreme pain," "even though the veterinarian had found the leg to be extremely painful;"

-- the failure to provide any "veterinary services" for a primate who "was recorded to have vomited food for three days;" and

-- the failure to "address treatment of dogs experiencing toxic or adverse effects from the study drugs" and a lack of "justification for not relieving pain, distress or discomfort from the drugs effects."

Id. at 3-11.

On March 30, 1998, the USDA filed a formal administrative Complaint charging Huntingdon with 23 violations of the AWA and the agency's regulations and seeking an Order requiring Huntingdon to "cease and desist from violating the Act and the regulations and standards issued thereunder" and assessing civil penalties against the Company. See Complaint (March 30, 1998), Pl. Ex. F.   The agency issued a press release announcing the results of its investigation and the filing of the Complaint. See Press Release (April 1, 1998), Pl. Ex. G.

However, a week later, on April 8, 1998, the USDA entered into a settlement with Huntingdon. See Consent Decision and Order, Pl. Ex. H.  Huntingdon neither admitted nor denied any violations of the AWA, but agreed to use $20,000 to bring itself into compliance with the existing standards governing the care of primates, to donate $20,000 to an organization that "promotes the development and use of alternatives to animals in research and testing," and to pay $10,000 to the Treasurer of the United States. Id.  The agency issued a press release hailing the settlement as an "innovative" approach to enforcing the AWA. See Press Release (April 14, 1998), Pl. Ex. I.

On December 15, 1999, the USDA sent a letter to Huntingdon approving Huntingdon's activities as being in compliance with the April 8, 1998 Consent Decision and stating that "[t]his matter is closed." See Letter to Michael Caulfield from Elizabeth Goldentyer, Eastern Regional Director for Animal Care (December 15, 1999), Pl. Ex. J. [1]

---

[1]On January 4, 1999, in fulfillment of its obligation under the Consent Decision to donate $20,000 to an organization that "promotes the development and use of alternatives to animals in research and testing," Huntingdon sent a check for $20,000 to Johns Hopkins University to be used for a conference on how to reduce the use of animal testing in "early stage drug development." See Letter to Dr. Zurlo from Michael Caulfield (Jan. 4, 1999), Pl. Ex. K.

### C.    Plaintiff's FOIA Request

On November 20, 2000, in an effort to scrutinize and educate the public about "how the

USDA monitors, inspects, investigates, and sanctions" a research facility that the agency has

found to be in flagrant violation of the Animal Welfare Act, plaintiff IDA submitted a FOIA

request to the agency for "all records" relating to the agency's investigation of Huntingdon,

including, but not limited to paper documents, e-mails, photographs, and video recordings.   IDA

FOIA Request, Pl. Ex. L.   A year and a half later, on April 13, 2001, the USDA sent IDA copies

of its  "Report of Violation," the Administrative Complaint, and the Consent Decision.

However, although the case had been closed for almost a year at that point, the agency did not

release any additional records, including any of the underlying investigatory records that had

formed the basis for the AWA Complaint, or the videotape evidence that had been provided to

the agency, nor did the USDA identify any additional responsive records or assert that such

records were exempt from disclosure under any of the nine Exemptions to the FOIA.   Rather, the

agency simply informed IDA that the remainder of its request would be "placed back in line for

review."  Id.   However, another year went by without the USDA providing any additional

information.  Accordingly, in an effort to compel the USDA to process its request and to release

all non-exempt information, IDA filed this lawsuit on March 22, 2002, and consented to the

intervention of Life Sciences Research, Inc., which owns Huntingdon.

### D.    The Litigation To Date

#### 1.    The USDA Processes Plaintiff's Request.

Pursuant to a joint request by the parties, this Court delayed the initial scheduling

conference in the case until after the government had completed the processing of plaintiff's

request.  On June 18, 2002, the USDA sent counsel for Huntingdon a letter "to obtain

Huntingdon's assistance in determining whether any of that information falls within Exemption 4 of the FOIA, 5 U.S.C. § 552(b)(4), which protects from disclosure 'trade secrets and commercial or financial information obtained from a person and privileged and confidential.'" See Letter to Alex Menendez from Michael Marquis (June 18, 2002), Pl. Ex. M. The USDA further explained that "in order for information to be withheld from IDA under Exemption 4, Huntingdon must demonstrate to us, in a manner that is clear, specific, and non-conclusory, that the release of any particular information will cause Huntingdon competitive harm or is privileged." Id. (emphasis added). The USDA included with the letter "2384 pages of responsive records that contain the submitted information." Id. at 2.

On the same day, the USDA also sent a letter to counsel for the plaintiff stating that the agency had located 2779 pages of responsive records, and that, of those, 228 pages were being released in full and another 146 pages were being released in part with deletions of personal information such as names and addresses. The agency further stated that 19 pages of information were being withheld in full and 1 page in part pursuant to Exemption 5, which pertains to the deliberative process and attorney work-product privileges, and that the remaining 2384 pages had been sent to Huntingdon to determine whether they are exempt under Exemption 4. See Letter to Katherine Meyer from Michael Marquis (June 18, 2002), Pl. Ex. N.

On June 25, 2002, counsel for plaintiff advised counsel for the USDA that the June 18, 2002 letter from the agency had failed to mention the photographs and videotape that had been submitted by PETA with its initial Complaint, and stressed that IDA was extremely interested in obtaining those records or, alternatively, ascertaining the basis on which the agency was refusing to release them. See Declaration of Katherine A. Meyer, Pl. Ex. O, ¶ 2. In response, the USDA's counsel explained that the agency could not find the original photographs, but that it

had included copies of those photographs in the materials sent to Huntingdon for its review.  <u>See</u>

<u>id.</u>  The USDA's counsel also stated that the agency could not find any copy of the videotape,

although he was sure that at one point the agency had both the videotape and the original

photographs.  <u>See id.</u>

On June 28, 2002, the USDA sent to Huntingdon 60 additional pages of records that the

agency had received from PETA "so that Huntington may provide us with its views on their

releasability."  <u>See</u> Letter to Alex Menendez from Michael Marquis (June 28, 2002), Pl. Ex. P.

On July 8, 2002, counsel for the USDA informed counsel for plaintiff that the reason the

agency had not been able to locate the videotape is that this record was "destroyed" by the

agency pursuant to the USDA's disposal manual, which allows the destruction of evidence after

one year if it does not show a violation of the AWA.  <u>See</u> Meyer Decl., Pl. Ex. O, ¶ 3.  Upon

request, he furnished a copy of the "disposal authority" upon which the agency was relying,

which states that "reports of alleged violations from the field" may be destroyed  "1 year after

[the] case is closed" if, upon review at headquarters and/or by the Office of General Counsel,

they disclose "insufficient or no evidence of a violation."  <u>See id.</u>; Disposal Authority, Pl. Ex. Q

at 20 ("PIV 11-1 Humane Treatment").

On August 19, 2002, the USDA notified IDA that it had completed the processing of the

records that had been sent to Huntingdon.  With respect to those records, the USDA released 303

pages in full, but withheld 1563 pages in full and another 602 pages in part on the grounds that

they contain information that is protected from disclosure under Exemption 4, or under

Exemptions 6 or 7(C), which protects an individual's personal privacy.  <u>See</u> Letter to Katherine

Meyer from Michael Marquis (August 19, 2002), Pl. Ex. R.[2]

In response, plaintiff informed the government that, by October 18, 2002, it would review all of the released records and attempt to let the agency know to the best of its ability whether it was willing to narrow its request so that the parties would be in a better position to advise the Court as to the precise records that remained at issue and how the parties would proceed in the litigation. See Joint Status Report (September 18, 2002).

### 2. IDA's Efforts To Narrow The Scope Of Its Request.

On October 18, 2002, on the basis of IDA's review of the materials that the USDA had disclosed, plaintiff's counsel sent counsel for the USDA a letter detailing IDA's position in the case. See Letter to Frank Menna from Katherine Meyer (October 18, 2002), Pl. Ex. S. She explained that IDA did not seek access to several categories of information, including (1) any information withheld under Exemptions 6 or 7(C) that "would identify an individual or any personal information about such individual;" (2) any of Huntingdon's "Standard Operating Procedures;" and (3) any of the "animal husbandry records" that had been withheld. Id. at 3.

IDA's counsel also expressed concern that, "with very few exceptions, none of the released records reveal the actual investigatory material that was collected by the agency and that led the agency to conclude that Huntingdon had committed numerous violations of the AWA." Id. (emphasis added). In addition, she explained that, even with respect to the investigatory records that had been disclosed, the agency had deleted a great deal of information without citing a FOIA Exemption, and that this made it impossible for her to advise IDA as to whether it should

---

[2]The agency noted that the total number of pages is greater than the number referenced in the agency's earlier letter of June 18, 2002 because the previous letter did not include the 60 pages of records that the USDA had obtained from PETA, and because the agency simply miscounted the number of pages at issue. See id.

pursue such information in the litigation. Id. IDA's counsel further explained that, until the

agency provided IDA with a complete list of responsive records that had actually been withheld,

as well as the agency's justification for withholding them, as required under Vaughn v. Rosen,

484 F.2d 820 (D.C. Cir. 1973), IDA would not be in a position to further narrow the categories of

information at issue in the lawsuit. Pl. Ex. S at 6.

     IDA's counsel also included a lengthy discussion of plaintiff's concerns about the

missing photographs and videotape, reiterated that IDA wanted to obtain copies of "all

photographs that PETA submitted, and any other photographs that the agency generated or

collected in the course of its investigation," as well as " a copy of the videotape that was

submitted by PETA to the USDA," id., and pointed out that the Disposal Authority upon which

the agency was relying for its purported destruction of this record did not seem to apply to the

videotape that was submitted by PETA. Id. Nevertheless, explaining that "at this juncture, it is

still not clear to plaintiff that the agency has exhausted all avenues for locating a copy of the

videotape," and that the record also does not "reveal the circumstances under which all copies of

the videotape that were once in the agency's possession were destroyed – if, in fact, this is the

case," IDA's counsel explained that IDA needed more information on this point before it would

be in a position to advise the Court about how it wished to proceed. Id.

     In conclusion, plaintiff's counsel explained that, "without more information about both

the nature of the information that has been withheld and the agency's justifications for such

withholdings, IDA is not in a position to further narrow the scope of information that remains at

issue in this case." Id. She further explained that IDA believed the best way to proceed was for

the USDA to prepare a Vaughn index with respect to all records and portions of records that had

been withheld, stating that "[i]t is very possible that once we have the agency's Vaughn index,

IDA will be willing to narrow the scope of this litigation further." Id. at 8.

On November 1, 2002, the parties filed a Joint Status Report in which they informed the Court that "[i]n light of plaintiff's detailed response" and "both the number and the complexity of the issues raised in plaintiff's response," the USDA "has agreed to provide plaintiff with a written response to plaintiff's October 18 letter upon careful review of its contents, " and that the agency needed until November 27, 2002 "to prepare a detailed written response addressing, to the fullest extent possible, all of the issues raised in plaintiff's letter of October 18." Joint Status Report (Nov. 1, 2002) at 3-4 (emphasis added).  Accordingly, the parties agreed to file another Joint Status Report by December 13, 2002, and they assured the Court that allowing them to proceed with this "cooperative effort" should "put them in a better position to proceed with this case in a fashion that best facilitates its efficient adjudication." Id. (emphasis added).

On November 27, 2002, in response to plaintiff's request that the agency provide IDA with more information about what records had actually been withheld, the USDA's counsel provided IDA with a list of 16 general categories of information that had been withheld from plaintiff, excluding the categories of information that plaintiff had already excluded from its request. See Letter to Katherine Meyer from Frank Menna (November 27, 2002), Pl. Ex. T. The USDA's counsel also provided a description of its search for responsive records. Id. at 5. However, despite plaintiff's detailed concerns about the agency's inability to locate the videotaped evidence, the apparent inapplicability of the Disposal Authority on which the agency relies for "destroying" that record, and the USDA's representation to the Court that it would address "to the fullest extent possible, all of the issues" raised in plaintiff's October 18 letter, the USDA did not even mention the videotape, let alone provide any additional information about why it could not be found or the circumstances under which it may have been destroyed. Id.; see

-12-

<u>also</u> Joint Status Report (November 1, 2002).

Two weeks later, on December 12, 2002, IDA's counsel provided the agency with a detailed list of the information identified in the USDA's November 27 letter that could be excluded from IDA's request: (1) all of the "test protocols and protocol amendments," which, according to the agency's own account represents 467 pages of records; (2) the "animal tracking and assessment records," which covers 28 pages either in whole or in part; and (3) the "dosing charts," which includes 58 pages of records withheld in full. <u>Compare</u> Letter to Frank Menna from Katherine Meyer (December 12, 2002), Pl. Ex. U, <u>with</u> Letter to Katherine Meyer from Frank Menna (November 27, 2002), Pl. Ex. T. In addition, IDA informed the USDA that it also was not interested in obtaining <u>any information that identifies any of Huntingdon's customers or the products or compounds that were the subject of any of the research projects</u> that were underway when the agency conducted its investigation. <u>See</u> Plaintiffs' December 12, 2002 Letter, Pl. Ex. T, at 2-4. IDA's counsel also expressed concern about the agency's failure to address IDA's questions about the missing videotape, and she reiterated that "we continue to need such information in order to resolve this issue." <u>Id.</u> at 4.

However, unbeknownst to plaintiff, rather than wait to obtain IDA's response to the USDA's November 27, 2002 letter – the agency's first and only listing of the categories of information that have been withheld in this case – the government had decided instead to prepare and file a motion for summary judgment with respect to <u>all</u> of the information withheld. Accordingly, on December 12, 2002, the same day that IDA sent its letter withdrawing its request for more than 500 pages of additional records, as well as any information that identifies either a customer of Huntingdon's or a product or compound that the company was testing, the government moved for summary judgment.

-13-

In light of IDA's December 12, 2002 letter to the USDA in which IDA withdrew its request for more than 500 pages of responsive records and also made clear that it did not seek access to any information that identifies a customer, product, or compound, IDA's counsel immediately inquired of Huntingdon's counsel whether this would change Huntingdon's position that all of the information that had been withheld under Exemption 4 is nevertheless still exempt from disclosure. However, Huntingdon refused to change its position, and the government also has not sought to alter its position in any way. See Meyer Declaration, Pl. Ex. O ¶ 4.

## ARGUMENT

### Introduction

Before turning to the specific reasons why the USDA has failed to meet its burden of proof, it is important to review some of the basic tenets of FOIA law that apply here.

The Freedom of Information Act was enacted "to establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." S. Rep. No. 813, 89th Cong., 1st Sess. 3 (1965). See also Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 (1989); Dep't of the Air Force v. Rose, 425 U.S. 352, 360-61 (1976). As the Supreme Court has emphasized on several occasions, "Congress believed that this philosophy, put into practice, would help 'ensure an informed citizenry, vital to the functioning of a democratic society.'" Tax Analysts, 492 U.S. at 142 (emphasis added), quoting NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978). Accordingly, "the basic purpose" of the FOIA is "to open agency action to the light of public scrutiny." Dep't of Justice v. Reporters Comm. For Freedom of the Press, 489 U.S. 749, 772 (1989), quoting Dep't of the Air Force v. Rose, 425 U.S. at 372.

-14-

The Act requires each federal agency to make non-exempt records "promptly available to any person" upon request, 5 U.S.C. § 552(a)(3)(A), and it vests jurisdiction in the district courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld." 5 U.S.C. § 552(a)(4)(B). The agency wishing to withhold a requested record has the burden of proving that the record is exempt, and the Court must decide the matter de novo. Id.; Reporters Committee, 489 U.S. at 755. Moreover, "[c]onsistent with the Act's goal of broad disclosure," all of the exemptions to the Act are to be "narrowly construed." Dep't of the Air Force v. Rose, 425 U.S. at 361. Therefore where an agency fails to meet its burden of proof that an exemption applies to the withheld information, summary judgment should be entered for the requester. Id.; see also, e.g., Public Citizen Health Research Group v. Food & Drug Administration, 185 F.3d 898, 905 (D.C. Cir. 1999) (because the agency's "[c]onclusory and generalized allegations of substantial competitive harm . . . cannot support an agency's decision to withhold requested documents," Court affirms summary judgment for the requester).

Moreover, as the Court of Appeals for this Circuit long ago recognized in the landmark FOIA case, Vaughn v. Rosen, 484 F.2d at 824, because the agency alone knows what responsive records exist and their contents, "[t]his lack of knowledge by the party seeking disclosure seriously distorts the traditional adversary nature of our legal system's form of dispute resolution." Thus, the Court of Appeals held:

> [i]t is vital that some process be formulated that will (1) assure that a party's right to information is not submerged beneath governmental obfuscation and mischaracterization, and (2) permit the court system effectively and efficiently to evaluate the factual nature of disputed information.

484 F.2d at 826 (emphasis added).

-15-

Therefore, in <u>Vaughn</u>, the Court held that an agency must provide the requester with a complete description of each record that has been withheld, together with a detailed justification explaining how each such record is exempt from disclosure under the claimed exemption.  This so-called "<u>Vaughn</u> index" has since become a staple of FOIA litigation; <u>see, e.g.</u>, <u>Lykins v. Dep't of Justice</u>, 725 F.2d 1455, 1463 (D.C. Cir. 1984) (requiring agencies to provide <u>Vaughn</u> index "enables the adversary system to operate by giving the requester as much information as possible, on the basis of which he can present his case to the trial court"); <u>see also</u> <u>Campaign for Responsible Transplantation v. United States Food and Drug Administration</u>, 219 F. Supp.2d. 106, 111 (D.D.C. 2002) (the <u>Vaughn</u> index "must 'afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding'"), <u>quoting</u> <u>King v. Dep't of Justice</u>, 830 F.2d 210, 218 (D.C. Cir. 1987).

Accordingly, the courts have adopted the "<u>Vaughn</u> index" procedure "to correct, however, imperfectly, the asymmetrical distribution of knowledge that characterizes FOIA litigation." <u>King</u>, 830 F.2d at 218.  Therefore, it is a cardinal rule of FOIA law that when an agency seeks to withhold records, it must provide:

> a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and <u>correlating those claims with the particular part of a withheld document to which they apply</u>.

<u>Id.</u> At 219 (emphasis added).

Furthermore, the FOIA specifically requires an agency to disclose all segregable non-exempt information.  5 U.S.C. § 552(b).  As the Court of Appeals has explained, because "[t]he focus in the FOIA is information, not documents," an agency "cannot justify its withholding an entire document simply by showing that it contains some exempt material." <u>Public Citizen Health Research Group v. FDA</u>, 185 F.3d at 907, <u>quoting</u> <u>Schiller v. NLRB</u>, 964 F.2d 1205,

1209 (D.C. Cir. 1992). This "segregability" requirement "applies to all . . . documents and all exemptions in the FOIA." Id. at 1209- 10, quoting Center for Auto Safety v. EPA, 731 F.2d 16, 21 (D.C. Cir. 1984); see also Army Times Pub. Co. v. Department of Air Force, 998 F.2d 1067, 1071 (D.C. Cir. 1993) ("Where non-exempt information exists within a document, 'a district court clearly errs [by allowing] a government[] [agency's] withholding of information under FOIA without making an express finding of segregability'") (citation omitted).

## I. THE USDA HAS FAILED TO MEET ITS BURDEN OF PROOF THAT ANY OF THE INFORMATION THAT REMAINS AT ISSUE MAY BE WITHHELD UNDER EXEMPTION 4.

### Introduction

The USDA contends that the vast majority of information at issue in this case is exempt from disclosure under Exemption 4 of the FOIA, which applies to "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). The only information that the agency appears to assert constitutes "trade secrets" are Huntingdon's "test designs and methods" and the "specific descriptions of experimental compounds." See USDA's Summary Judgment Memorandum ("Gov't Mem.") at 22-24. However, in IDA's letter to the USDA on December 12, 2002, IDA specifically made clear that it does not seek access to any "test protocols and protocol amendments," or the "identities" of any "products or compounds" that were the subject of any of Huntingdon's research projects. See Pl. Ex. U. Accordingly, because none of the information that the USDA appears to have withheld as a "trade secret" is at issue here, plaintiff will not address the government's argument

on this point.[3]

Accordingly, the government's only remaining argument under Exemption 4 is that

hundreds of pages of records have been withheld because they contain "commercial or financial

information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).  As a

threshold matter, plaintiff disputes that any information that constitutes the agency's own

determinations of whether Huntingdon may have violated the Animal Welfare Act or the

USDA's standards governing the humane care and treatment of animals constitutes commercial

or financial information that was "obtained from a person."  See, e.g., Grumman Aircraft

Engineering Corp. v. Renegotiation Board, 425 F.2d 578, 582 (D.C. Cir. 1970) (information

generated by the government is not protected by Exemption 4).  With respect to the information

that was actually obtained from Huntingdon, plaintiff would not dispute that much of that

information appears to be "commercial" within the meaning of Exemption 4.[4]

However, to meet its burden of proof that the information may be withheld under

Exemption 4, the USDA must also prove that it is "privileged or confidential." 5 U.S.C. §

552(b)(4).  Here, the agency asserts that all of the withheld information is "confidential" and,

_____

[3]Because the USDA has not provided an index that complies with the requirements of
Vaughn v. Rosen, supra, plaintiff cannot be sure that the only information that the agency has
withheld as a "trade secret" is in fact information that IDA does not seek.  Accordingly, unless
the government advises the plaintiff and the Court, through a Vaughn index or otherwise, that
this is in fact the only information that the USDA is withholding as "trade secrets," plaintiff will
need to take discovery on this point, and, if turns out that the agency is withholding additional
information as "trade secrets," plaintiff hereby reserves its right to address that assertion.  See
Stagno Decl., Pl. Ex. A ¶ 5.

[4]However, again, without a Vaughn index that describes each record, the information that
has been withheld, and the basis for that withholding, it is impossible for plaintiff to be certain
that all of the information that the agency has withheld under Exemption 4 is in fact
"commercial" information.

-18-

relying on the test set forth in <u>National Parks & Conservation Ass'n v. Morton</u>, 498 F.2d at 770, that disclosure is "likely to cause substantial harm to the competitive position of the person from whom the information was obtained." <u>Id.</u> This requires the USDA to prove that Huntingdon faces "actual competition," and that disclosure of the withheld information is likely to cause the company "substantial competitive injury." <u>Gulf & Western Industries v. United States</u>, 615 F.2d 527, 530 (D.C. Cir. 1979); <u>Public Citizen Health Research Group v. Food and Drug Administration</u>, 704 F.2d 1280, 1291 (D.C. Cir. 1983). However, for the reasons discussed below, the USDA clearly has not met its burden of proof that all of the hundreds of pages of records at issue here are "confidential." Accordingly, this information must be disclosed. <u>See Public Citizen Health Research Group v. FDA</u>, 185 F.3d at 906.

## A. The USDA's Declarant Does Not Have The Requisite "Personal Knowledge" To Support The Agency's Motion For Summary Judgment.

The only proof that was submitted in support of both the government's and Huntingdon's motions for summary judgment was a Declaration by Hugh Gilmore – a "Program Specialist" with the USDA's FOIA staff. <u>See</u> Gilmore Decl. ¶1. According to Mr. Gilmore's Declaration, he has been a member of the USDA's staff since August 2000, and, prior to that, he was "on the FOIA staff at a bureau of the Department of Treasury since 1988." Gilmore Decl. ¶¶ 1-2. However, while Mr. Gilmore may have some experience in processing FOIA requests and may also be competent to testify as to how the USDA processed IDA's request, his declaration provides absolutely no basis for any "personal knowledge" of Huntingdon's business practices, or, for that matter any particular expertise in the field of work that Huntingdon performs.

Therefore, this Declaration – which, again, is the sole support for both the agency's and Huntingdon's contention that disclosure of hundreds of pages of records concerning the USDA's investigation of Huntingdon in 1997 is likely to cause Huntingdon "substantial competitive injury" – simply does not comply with Rule 56(e) of the Federal Rules of Civil Procedure. That Rule provides that affidavits submitted in support of a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Id. (emphasis added); see also, e.g., North Carolina Network for Animals v. U.S. Dep't of Agriculture, 1991 WL 10757 *4 (4th Cir. 1991) (affidavit of FOIA officer and 16 unsworn answers to questionnaire from regulated industry does not satisfy "personal knowledge" requirement of Rule 56(e) in Exemption 4 case); Black Hills Alliance v. U.S. Forest Service, 603 F. Supp. 117, 121-22 (D.S.D. 1984) (agency affidavits concerning competitive injury that will be suffered by submitter does not meet "personal knowledge" requirement of Rule 56(e)); Jameson v. Jameson, 176 F.2d 58, 61 (D.C. Cir. 1949) (personal knowledge requirement is mandatory, affidavits submitted in support of motion for summary judgment must follow "substantially the same form as though the affiant were giving testimony in court"); accord, Washington Post Co. v. Keogh, 365 F.2d 965, 971 (D.C. Cir. 1966).  Accordingly, the Court may not rely on the portions of Mr. Gilmore's Declaration that purport to prove why hundreds of records have been withheld under Exemption 4.

Thus, since this is the only evidence that the government has submitted to meet its burden of proof under Exemption 4, and Huntingdon also relies solely on the government's submission for its own motion for summary judgment, the Court cannot grant summary judgment for either defendant. Id.  Indeed, the USDA's own June 18, 2002 letter to Huntingdon had explained that,

-20-

relying on the test set forth in <u>National Parks & Conservation Ass'n v. Morton</u>, 498 F.2d at 770,

that disclosure is "likely to cause substantial harm to the competitive position of the person from

whom the information was obtained." <u>Id.</u> This requires the USDA to prove that Huntingdon

faces "actual competition," and that disclosure of the withheld information is likely to cause the

company "substantial competitive injury." <u>Gulf & Western Industries v. United States</u>, 615 F.2d

527, 530 (D.C. Cir. 1979); <u>Public Citizen Health Research Group v. Food and Drug</u>

<u>Administration</u>, 704 F.2d 1280, 1291 (D.C. Cir. 1983). However, for the reasons discussed

below, the USDA clearly has not met its burden of proof that all of the hundreds of pages of

records at issue here are "confidential." Accordingly, this information must be disclosed. <u>See</u>

<u>Public Citizen Health Research Group v. FDA</u>, 185 F.3d at 906.

### A. The USDA's Declarant Does Not Have The Requisite "Personal Knowledge" To Support The Agency's Motion For Summary Judgment.

The only proof that was submitted in support of both the government's and Huntingdon's

motions for summary judgment was a Declaration by Hugh Gilmore – a "Program Specialist"

with the USDA's FOIA staff. <u>See</u> Gilmore Decl. ¶1. According to Mr. Gilmore's Declaration,

he has been a member of the USDA's staff since August 2000, and, prior to that, he was "on the

FOIA staff at a bureau of the Department of Treasury since 1988." Gilmore Decl.

¶¶ 1-2. However, while Mr. Gilmore may have some experience in processing FOIA requests

and may also be competent to testify as to how the USDA processed IDA's request, his

declaration provides absolutely no basis for any "personal knowledge" of Huntingdon's business

practices, or, for that matter any particular expertise in the field of work that Huntingdon

performs.

-19-

Therefore, this Declaration — which, again, is the sole support for both the agency's and Huntingdon's contention that disclosure of hundreds of pages of records concerning the USDA's investigation of Huntingdon in 1997 is likely to cause Huntingdon "substantial competitive injury" — simply does not comply with Rule 56(e) of the Federal Rules of Civil Procedure. That Rule provides that affidavits submitted in support of a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Id. (emphasis added); see also, e.g., North Carolina Network for Animals v. U.S. Dep't of Agriculture, 1991 WL 10757 *4 (4th Cir. 1991) (affidavit of FOIA officer and 16 unsworn answers to questionnaire from regulated industry does not satisfy "personal knowledge" requirement of Rule 56(e) in Exemption 4 case); Black Hills Alliance v. U.S. Forest Service, 603 F. Supp. 117, 121-22 (D.S.D. 1984) (agency affidavits concerning competitive injury that will be suffered by submitter does not meet "personal knowledge" requirement of Rule 56(e)); Jameson v. Jameson, 176 F.2d 58, 61 (D.C. Cir. 1949) (personal knowledge requirement is mandatory, affidavits submitted in support of motion for summary judgment must follow "substantially the same form as though the affiant were giving testimony in court"); accord, Washington Post Co. v. Keogh, 365 F.2d 965, 971 (D.C. Cir. 1966). Accordingly, the Court may not rely on the portions of Mr. Gilmore's Declaration that purport to prove why hundreds of records have been withheld under Exemption 4.

Thus, since this is the only evidence that the government has submitted to meet its burden of proof under Exemption 4, and Huntingdon also relies solely on the government's submission for its own motion for summary judgment, the Court cannot grant summary judgment for either defendant. Id. Indeed, the USDA's own June 18, 2002 letter to Huntingdon had explained that,

"in order for information to be withheld from IDA under Exemption 4, Huntingdon must demonstrate to us, in a manner that is clear, specific, and non-conclusory, that the release of any particular information will cause Huntingdon competitive harm or is privileged." Pl. Ex. M (emphasis added). However, because this Court must conduct a *de novo* review of the agency's Exemption claims, the same kind of demonstration must be made to the Court -- i.e., the Court may not rely on the hearsay assertions of an FOIA staff member to determine that Huntingdon faces "actual competition" and that disclosure of all of the information that has been withheld here is likely to cause Huntingdon "substantial competitive injury." See, e.g., North Carolina Network for Animals, *supra*; Black Hills Alliance, *supra*.[5]

Indeed, the Declaration submitted here falls far short of the kind of evidence this Circuit has required in other Exemption 4 cases. See, e.g., Public Citizen Health Research Group v. FDA, 704 F.2d 1280, 1291 (D.C. Cir. 1983) (sustaining government's reliance on Exemption 4 based on submitters' "lengthy expert report and numerous depositions documenting the competitive injury that disclosure would cause"); Public Citizen Heath Research Group v. FDA, 185 F.2d at 904 (drug company presented affidavits detailing both competitive value of information at issue and substantial competitive injury that would result from disclosure); Public Citizen Health Research Group v. NIH, 209 F. Supp.2d 37, 46 (D.D.C. 2002) (noting that the government's affiant is "extraordinarily well-credentialed, particularly in the field of technology

---

[5] Thus, this case is very different from a "reverse FOIA case," where a submitter is challenging the government's decision to disclose information, and the Court must decide only whether the grounds given by the agency for its disclosure decision are "arbitrary or capricious" within the meaning of the APA. See, e.g., Chrysler Corp. v. Brown, 441 U.S. 284 (1979); McDonnell Douglas Corp. v. Dep't of the Air Force, 215 F. Supp.2d 200 (D.D.C. 2002). Rather, here – as in all other FOIA cases brought by a requester to compel the disclosure of agency records – the Court must decide the matter *de novo*, and, accordingly, when the agency moves for summary judgment, it must comply with all of the requirements of Rule 56(e).

transfer").[6]

Therefore, since the government has completely failed to meet its burden of proof that Exemption 4 applies, as required by both Rule 56(e) and the test established in National Parks, IDA is entitled to summary judgment on this point and all of the records that have been withheld on this basis must be promptly disclosed. Public Citizen Health Research Group v. FDA, 185 F.3d at 906 (because the agency failed to sustain its burden of proof the Court affirmed the district court's order requiring the agency to release the information to the requester).[7]

---

[6]Indeed, even the two unreported cases relied on by the government demonstrate that the USDA has fallen far short of its burden of proof. Thus, in Sokolow v. FDA, Civ. No. 1:97-CV-252 (E.D.Tex. 1998) (USDA Attachment A), the court based its conclusion that the investigational new drug applications at issue were exempt from disclosure under Exemption 4 on the basis of numerous affidavits from the sponsors of those applications. See Slip Op. at 7. Similarly, in Lederle Laboratories v. Dep't of Health and Human Services, Civ. No. 88-0249 (D.D.C. 1988), the court based its decision that the agency had met its burden of proof on an affidavit submitted by the manufacturer of the drug at issue which showed that "the vaccine industry is highly competitive" and that disclosure of the requested information to the submitter's competitor "is likely to cause serious harm" to the submitter's competitive position. See Slip Op. at 17-18.

[7]In light of the USDA's extreme intransigence in even responding to IDA's November 20, 2000 FOIA request – requiring the organization to file a lawsuit simply to compel the USDA to process its FOIA request – and the agency's refusal to provide plaintiff with a Vaughn index or even to wait for IDA's response to the agency's first list of categories of information before moving for summary judgment, it would be patently unfair to IDA to reward the government's litigation strategy by allowing it or Huntingdon to submit additional declarations at this point, which would only further delay IDA's ability to obtain the information it has been seeking for 2 ½ years already. See, e.g., Carlton v. Dep't of Interior, Civ. No. 97-2105 (D.D.C. Sept. 3, 1998) (attached as Pl. Ex. AA) (in light of the fact that "seventeen months after Plaintiff's initial FOIA request was made, the government has yet to produce an adequate Vaughn index," and "given FOIA's 'general philosophy of full agency disclosure,'" the agency is ordered to disclose the requested records).

**B.** **Because IDA Does Not Seek Access To The Identities Of Any Customers Or Of Any Compounds Or Products That Were Being Tested, The USDA Cannot Meet Its Burden Of Proof That It Has Released All Segregable Non-Exempt Information.**

Even assuming this Court could entertain the USDA's motion for summary judgment that is unsupported by the evidence required by Rule 56(e), the government simply cannot demonstrate that release of all of the requested information is likely to cause Huntingdon "substantial competitive injury" as required by National Parks. In this regard, it is important to reiterate that, even before the agency moved for summary judgment, IDA made it clear that it does not seek access to any "Standard Operating Procedures," or "animal husbandry records" of Huntingdon's, and, once the agency finally identified the other categories of information at issue, IDA also specified that it does not seek access to any "Test Protocols and Protocol amendments," "Animal Tracking and Assessment Records," or "Dosing Charts." See Pl. Ex. R; Pl. Ex. T. In addition, IDA has also made it absolutely clear that, with respect to all of the remaining categories of information at issue in this case, it does not seek access to the identities of Huntingdon's customers or the identities of either products or compounds that were the subject of any of the research projects that were underway when the agency conducted its investigation. See id. at 2-4.

In light of IDA's willingness to forgo such information, and in view of the agency's statutory obligation to release all segregable non-exempt information, 5 U.S.C. 552(b), the agency cannot possibly meet its burden of proof that disclosure of the hundreds of pages of withheld records would nonetheless cause Huntingdon "substantial competitive injury." In this regard, it is important to stress that, to meet its burden, the agency must prove that all of the remaining information -- without the identities of customers, products, or compounds -- will

-23-

nevertheless injure Huntingdon because of "the affirmative use" of this information "by competitors." Public Health Research Group v. FDA, 704 F.2d at 1291, note 30; accord, CNA Financial Corporation v. Donovan, 830 F.2d 1132, 1153-54 (D.C. Cir. 1987).

As the Court of Appeals for this Circuit has emphasized, "[t]he important point for competitive harm in the FOIA context . . . is that it be limited to harm flowing from the affirmative use of proprietary information by competitors." Public Health Research Group v. FDA, 704 F.2d at 1291, note 30 (emphasis added). Thus, "[c]ompetitive harm should not be taken to mean simply any injury to competitive position, as might flow from customer or employee disgruntlement or from the embarrassing publicity attendant upon public revelations concerning, for example, illegal or unethical payments to government officials or violations of civil rights, environmental or safety laws." Id. (emphasis added); see also CNA Financial Corp., 830 F.2d at 1154 (concerns about "adverse public reaction" to released information are "unrelated" to the policy behind Exemption 4 which pertains only to the "harm flowing from the affirmative use of proprietary information by competitors") (emphasis added); General Electric v. NRC, 750 F.2d 1394, 1402-03 (7th Cir. 1984) ("While General Electric's competitors in the nuclear-reactor business would no doubt be delighted to be able to flag around to their customers a report in which GE criticizes its own reactor design, the competitive harm that attends any embarrassing disclosure is not the sort of thing that triggers exemption 4") (emphasis added).

Therefore, while Huntingdon may be embarrassed to have the USDA disclose evidence of the rampant violations of the Animal Welfare Act that caused the USDA to take the highly unusual step of filing a formal Complaint against the company in 1998, this simply would not be a valid basis for the agency to withhold any of this information under the FOIA. Similarly, while the USDA may not want the public to know how it conducted its investigation of Huntingdon

and what it discovered, or to have a basis for criticizing the settlement that it entered into with

Huntingdon a week after the Complaint was filed, this also would not be a permissible basis

upon which to withhold any of this information, since "the basic purpose" of the FOIA is "to

open agency action to the light of public scrutiny."   Reporters Comm., 489 U.S. at 772

(emphasis added).

      Accordingly, to withhold information under Exemption 4, the agency must prove that

Huntingdon currently faces "actual competition" in the industries to which this 1997 information

relates, and that disclosure of the requested information – even without the identities of

customers, products, and compounds –  will nevertheless be of some "affirmative use" to

Huntingdon's competitors that would likely result in "substantial competitive harm" to

Huntingdon. Gulf & Western Industries, 615 F.2d at 530; Public Citizen Health Research

Group, 704 F.2d at 1291.  Here, the USDA has failed to make this showing with respect to any of

the information at issue.

     **1.**     **The USDA Has Not Proven That Huntingdon Faces**
              **"Actual Competition" With Respect To Any Of The Information**
              **At Issue.**

      The USDA states in its brief that "[i]t is clear that research facilities operated by

companies such as Huntingdon face actual competition." Gov't Mem. at 4 (emphasis added).

However, whether companies "such as Huntingdon" face competition is not the issue here.

Rather, the USDA must prove, with specific and nonconclusory evidence, that Huntingdon itself

currently faces "actual competition." Gulf & Western Industries, 615 F.2d at 530; Public Citizen

Health Research Group v. FDA, 704 F.2d at 1291.  Furthermore, the only support for even the

nebulous statement in the government's brief concerning "companies such as Huntingdon" is

Mr. Gilmore's Declaration. Gov't Mem. at 4. However, that Declaration does not provide any

proof of the competition facing Huntingdon in particular, but states only that there are "over

1200 registered research facilities in the United States," "many" of which "were" research

organizations "[a]t the time relevant to this lawsuit." Gilmore Decl. ¶¶ 3-4.

Of course, "the time relevant to this lawsuit" is now – i.e., the government must prove

that release of the information it collected in 1997-98 would cause Huntingdon substantial

competitive injury if it were released now, in 2003. Thus, for example, if Huntingdon were no

longer in business, was about to declare bankruptcy, or had lost most of its customers in recent

years, the government could have a difficult time proving that the company is facing "actual

competition." In any event, Mr. Gilmore's Declaration does not present any evidence, let alone

prove, that Huntingdon itself is currently facing "actual competition" with respect to the products

to which the information at issue pertains. Accordingly, the agency simply has not met its

burden of proof as to this part of the Nat'l Parks test. See, e.g., Niagara Mohawk Power Corp. v.

U.S. Dep't of Energy, 169 F.3d 16, 18 (D.C. Cir. 1999) ("conclusory" assertions of actual

competition do not satisfy burden of proof under Exemption 4).

### 2. The USDA Has Not Demonstrated That Disclosure Of The Requested Information Is Likely To Cause Huntingdon "Substantial Competitive Injury."

Likewise, the agency has failed to meet its burden of proof that release of every page of

the hundreds of documents that have been withheld is likely to cause Huntingdon "substantial

competitive injury." Nat'l Parks, 498 F.2d at 770; Gulf & Western Industries, 615 F.2d at 530.

Thus, the government states that Huntingdon will suffer such injury by the release of "clinical

protocols and clinical development plans," Gov't Mem. at 11, even though IDA has withdrawn

its request for all of Huntingdon's "test protocols and protocol amendments,"and IDA has also

withdrawn its request for any information that would reveal the identities of any customers,

products, or compounds. See Pl. Ex. U.  Indeed, in view of IDA's substantial narrowing of its

request, it is completely unclear how an as yet unidentified competitor of Huntingdon's would

be able to use any of this information – without knowing to what product or compound it pertains

– to "adopt the technologies developed without themselves having invested in the cost of

developing them," as asserted by the government. Gov't Mem. at 12.

The government also asserts that release of Huntingdon's "Standard Operating

Procedures" will cause the company "substantial competitive injury" even though IDA long ago

made it clear that it does not seek access to any such information. See Pl. Ex. S. In a footnote,

the government acknowledges that IDA has narrowed its request to exclude such information,

but nevertheless asserts that since "virtually all of the information withheld under Exemption 4"

was "derived" from those Standard Operating Procedures, the USDA is "proceeding as if the

propriety of the withholding of information contained in the Standard Operating Procedures

remains at issue in this case." Gov't Mem. at 12-13, note 7 (emphasis added).  However,

because the agency has a statutory obligation to segregate and disclose all non-exempt

information, it simply may not proceed in this way, without providing a "detailed justification"

for its non-segregability. See Johnson v. Executive Office of U.S. Attnys, 310 F.3d 771, 776

(D.C. Cir. 2002) ("[i]n order to demonstrate that all reasonably segregable material has been

released, the agency must provide a 'detailed justification' for its non-segregability"), quoting

Mead Data Cent. V. Dep't of the Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977); Animal Legal

Defense Fund v. Air Force, 44 F. Supp. 2d 295, 301 (D.D.C. 1999) (blanket conclusory

statements that information is exempt from disclosure defy "the well-established precedent that

governs an agency's obligation to segregate non-exempt material"), quoting King, 830 F.2d at

224; Kimberlin v. Dep't of Justice, 139 F.3d 944, 950 (D.C. Cir. 1998).

-27-

Moreover, to understand the breadth of what the USDA is contending here, it is important to stress that the bulk of what IDA seeks is <u>the evidence that the USDA relied on to conclude that Huntingdon was in violation of numerous standards of animal care and treatment under the AWA</u>. Therefore, to the extent that any of the documents at issue reveal, for example, that an animal was being mistreated, that an animal was suffering pain, that Huntingdon's procedures are in violation of the statute, etc., the agency has failed to demonstrate how such information, if disclosed to the public, would be of <u>any</u> use to a competitor of Huntingdon's – simply because it may have been "derived" from Huntingdon's "Standard Operating Procedures," which, IDA has made clear, <u>may be deleted from the records at issue.</u> Indeed, since all of Huntingdon's competitors are required to <u>comply</u> with the AWA to operate a lawful business, it is difficult to see why any such competitors would have any interest in emulating what the USDA obviously determined were Huntingdon's many <u>illegal</u> practices. In any event, because IDA is not seeking access to any of Huntingdon's "Standard Operating Procedures" or "test protocols and amendments," the government's concerns about revealing the "blueprints" for Huntingdon's research activities, Gov't Mem. at 13, are completely unfounded.

Furthermore, since IDA is also not seeking the identities of any of Huntingdon's customers or the compounds or products that it was testing in 1997, the government's completely unsupported assertions that release of the requested information could somehow allow competitors to "develop and market competing research services without investing the time, cost, and effort that is necessary to create them independently," Gov't Mem. at 14, "price their own competing products," <u>id.</u> at 15, ascertain Huntingdon's "profit margin and costs," <u>id.</u> at 16, or "predict the prices at which the company would be able to market its products," <u>id.</u> at 17, simply make no sense whatsoever. Indeed, without knowing <u>what</u> product was being tested, competitors

-28-

would be wasting their time, effort, and money trying to learn <u>anything</u> from the records requested by plaintiff. <u>See, e.g</u>, <u>McDonnell Douglas Corp. v. U.S. Dep't of the Air Force</u>, 215 F. Supp.2d at 208 (upholding agency's refusal to withhold information under Exemption 4 in "reverse FOIA case" because there were too many "variables" that would be needed to deduce sensitive information which "cast serious doubt on the likelihood that any of the disputed information would be likely to cause substantial harm").

Similarly, there simply is no basis for the agency's insistence that records that reveal the "results" of the animal testing being performed by Huntingdon in 1997 – <u>e.g.</u>, "the animal died" or "the animal was in great pain because we forgot to use any anesthesia" – would somehow cause Huntingdon "substantial competitive injury," particularly where the agency is permitted to delete the identity of the substance that was being tested. Therefore, all of the cases relied on by the USDA, Gov't Mem. at 18-19, are completely unhelpful to its position, since every one of those cases involved a request for clinical data <u>concerning a specifically identified drug or other product</u>. Here, however, because the USDA may delete all information that identifies the product, although disclosure of the "test results" may shed light on whether the USDA adequately performed its duties under the AWA, it will not be of any <u>competitive</u> assistance to Huntingdon's competitors.

Therefore, the USDA's completely unsubstantiated concerns that Huntingdon would suffer "substantial  competitive injury" from the release of "information concerning the results of Huntingdon's tests on the proprietary experimental compounds of its clients," Gov't Mem. at 19, simply do not wash. Without information identifying the "experimental compound" or even the "client" for which the research was being conducted, there simply is no way that the mere results of the tests, or the "clinical observations" concerning the condition of the animals, Gov't Mem. at

17, 19, could be of any "affirmative use" to a competitor of Huntingdon's. <u>Public Citizen Health Research Group v. FDA</u>, 704 F.2d at 1291, note 30; <u>CNA Financial</u>, 830 F.2d at 1153-54.

Finally, the USDA asserts -- again, without any supporting proof whatsoever, other than Mr. Gilmore's hearsay Declaration -- that release of "the test results" would also cause substantial competitive injury "to Huntingdon's <u>clients</u>." Gov't Mem. at 20 (emphasis added), <u>citing</u> Gilmore Decl. ¶¶ 5, 19. However, because the government must prove that the disclosure of the information at issue would cause "substantial competitive injury" to "<u>the person from whom it was obtained</u>," <u>Nat'l Parks</u>, 498 F.2d at 770 (emphasis added), it is not clear why the government is making this assertion. In any event, neither the government's brief nor Mr. Gilmore's Declaration mentions a single client of Huntingdon's that would be injured by the release of any of the information at issue here, let alone proves that any such client is likely to suffer "substantial competitive injury" by the release of the requested information. Nor, conspicuously, has the government – or Huntingdon, which is a defendant-intervenor in this action – managed to provide a single declaration or other submission from any such client that would attest to such injury, even though Huntingdon has had since June 18, 2002 to demonstrate to the USDA the applicability of Exemption 4. <u>See</u> Pl. Ex. P; <u>see also</u> <u>Black Hills Alliance</u>, 603 F. Supp. at 121 (noting in Exemption 4 case that "[i]t is significant that Union Carbide itself has not submitted an affidavit addressing these matters").

Moreover, according to at least one published account, many of the companies that were using Huntingdon to test their products in 1997 <u>ceased doing business with Huntingdon</u> in the wake of public disclosures concerning Huntingdon's inhumane treatment of animals. <u>See, e.g.</u> <u>New York Times</u> (March 24, 1998), Pl. Ex. W (reporting that "[w]ithin months" of PETA's disclosures "Huntingdon had lost more than half of its clients"). Indeed, one such former client

-30-

-- Procter & Gamble -- disseminated a Press Release on June 4, 1997, stating that the "uncaring and unprofessional attitude and behavior of the lab technicians" at Huntingdon was "unacceptable," and that, accordingly, Procter & Gamble had "suspended further testing at this facility." See Pl. Ex. X; see also Letter from British Biotech (March 30, 2001), Pl. Ex. Y (stating that British Biotech "has terminated all links with Huntingdon Life Sciences (HLS) and has no ongoing relationship with that organization"); Letter from James Black Foundation (September 17, 2001), Pl. Ex. Y (confirming that it is "no longer a customer of HLS" and has "no intention of dealing with [it] in the future").

Accordingly, since these companies are apparently no longer doing business with Huntingdon, it is difficult to see how release of any of the requested information from 1997 would nonetheless cause them -- or Huntingdon -- "substantial competitive injury," particularly, again, when the USDA may delete from the records all information that identifies the client, or the compound or product being tested. In any event, as the Court of Appeals for this Circuit has held, "such conclusory and generalized allegations of substantial competitive harm . . . cannot support an agency's decision to withhold requested documents." Public Citizen Health Research Group v. FDA, 185 F.3d at 906 (citation omitted). Therefore, since, as demonstrated above, the government has failed to meet its burden of proof that any of the withheld information is exempt from disclosure under Exemption 4, summary judgment with respect to all of this information must be granted to the plaintiff. Id. [8]

---

[8]Mr. Gilmore's Declaration also falls far short of the requirements of Vaughn v. Rosen, *supra*. Therefore, even if this Court declines to grant plaintiff summary judgment at this juncture, at a minimum it should require the USDA to provide a Vaughn index with respect to the hundreds of pages of records that have been withheld under Exemption 4. Thus, for example, Mr. Gilmore does not provide any index of the records that have been withheld under Exemption 4, but instead discusses general categories of information that is contained in those pages and

## II.     THE AGENCY HAS FAILED TO MEET ITS BURDEN OF PROOF THAT RECORDS MAY BE WITHHELD UNDER EXEMPTION 5.

The USDA has also failed to meet its burden of proof with respect to the 19 pages of

intra-agency memorandums in full and one page in part that it is withholding under Exemption 5,

and that it asserts "contain deliberations among APHIS investigators and the Office of General

Counsel (OGC) about what charges should be included in the AWA Complaint that was

ultimately filed against Huntington." Gilmore Decl. ¶ 21.

Exemption 5 applies to internal agency memoranda "which would not be available by law

to a party other than an agency in litigation with the agency," 5 U.S.C. § 552(b)(5), and is

---

provides extremely conclusory statements about why such categories qualify for protection. For
example, he states that the USDA has withheld "information that describes the results of
Huntingdon's tests," Gilmore Decl. ¶ 18, without providing any information concerning how
many different records were withheld on this basis, or any description of each such record or
portion of a record that contains this information or why no segregable portion of any such
record can be disclosed to plaintiff. Id.

He also states that the agency has withheld 54 pages of "meeting minutes, memoranda,
and inspection reports" of Huntingdon's internal Institutional Animal Care and Use Committee
("IACUC") in their entirety under Exemption 4, Gilmore Decl. ¶ 15, but does not provide any
breakdown of which records fall into which category, or provide any additional description of the
records, such as the dates on which they were prepared and for whom, or even the form of these
records, so that plaintiff would be in a better position to demonstrate that the agency has failed to
meet its duty to segregate and disclose all non-exempt information. For example, the dates of the
IACUC meetings, the recipients of the "inspection reports," and the summaries or conclusions of
such reports – e.g., "the animal was not given any treatment for its pain," "the animal was not
anesthetized before it was operated on," "the animal died," or "the employees are not properly
trained to handle these animals in compliance with the AWA" – would not appear to be exempt
from disclosure under the FOIA, yet should also be easily segregable from the records in
question. Similarly, Mr. Gilmore states that the agency has withheld 33 pages of "Internal
Huntingdon Memoranda," Gilmore Decl. at 11, with no indication of how many separate records
have actually been withheld, or the dates, authors, or recipients of those memoranda – none of
which appears to be exempt from disclosure. See also Pl. Ex. V (examples of pages where vast
amounts of information has been deleted with no description of any of these records or an
explanation of what has been deleted and why).

intended to incorporate the government's common law privilege from discovery in litigation.

H.R. Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966); S. Rep. No. 813, 89th Cong., 1st Sess. 29

(1965). The government relies on two such privileges with respect to all of the information that

it has withheld under Exemption 5 – i.e., the "deliberative process" privilege and the "attorney

work-product" privilege. See Gov't Mem. at 26-33.    However, it has failed to demonstrate that

either privilege applies to all of the withheld information.

### A.    The USDA Has Failed To Demonstrate That All Of The Information Is Covered By The "Deliberative Process" Privilege.

The principal purpose of the "deliberative process" privilege is to assure subordinates

within an agency that their recommendations and advice to their superiors concerning policy

matters will not later be subject to public criticism, thus promoting the free flow of ideas. See,

e.g., Jordan v. Department of Justice, 591 F.2d 753, 772-74 (D.C. Cir. 1978) (en banc).  In

keeping with this purpose, the Supreme Court has recognized a distinction between "materials

reflecting deliberative or policy-making processes on the one hand," which may be withheld, and

"purely factual, investigative matters on the other," which may not be withheld. EPA v. Mink,

410 U.S. 73, 89 (1973).  Accordingly, "the privilege applies only to the 'opinion' or

'recommendatory' portion of [a document], not to factual information which is contained in the

document." Coastal States Gas Corp. v. Department of Energy, 617 F.2d 854, 867 (D.C. Cir.

1980).

Here, in light of the agency's own acknowledgment that at least some of these documents

were apparently prepared by "APHIS investigators," Gilmore Decl. ¶ 21, there should be some

factual or investigatory information in the documents that falls outside of this privilege. See, e.g.

EPA v. Mink, 410 U.S. at 89; Tennessean Newspapers, In. V. FHA, 464 F.2d 657 (6th Cir. 1972)

-33-

(appraiser's report may not be withheld under deliberative process privilege); <u>Sterling Drug, Inc.</u> <u>v. Harris</u>, 488 F. Supp. 1019, 1028-29 (S.D.N.Y. 1980) (objective medical analyses of drug tests are not exempt under Exemption 5); <u>Dworman Bldg. Corp. v. GSA</u>, 468 F. Supp. 389 (D.C.N.Y. 1979) (appraiser's report is not exempt); <u>Union of Concerned Scientists v. NRC</u>, 2 Med. L. Rpt. 1458 (D.D.C. 1977) (expert scientific opinion may not be withheld under the deliberative process privilege); <u>Vaughn v. Rosen</u>, 383 F. Supp. 1049, 1053 (D.D.C. 1976) ("factual, investigative, and evaluative portions" of documents which "reflect final objective analyses of agency performance under existing policy" are not protected by the deliberative process privilege), *aff'd*, 523 F.2d 1136 (D.C. Cir. 1975).

Indeed, Mr. Gilmore states that the records "do contain discussions of <u>facts uncovered</u> <u>during the investigation of Huntingdon</u>," but nevertheless asserts that these facts are "so inextricably connected to the deliberative material that their disclosure would expose USDA's deliberations by revealing the pertinent facts on which the evaluations and opinions of the proposed charges were based," and that this would have a "chilling effect" on agency employees. Gilmore Decl. ¶ 23 (emphasis added). However, Mr. Gilmore fails to explain how an investigator's objective report to the agency about what was found during an investigation of a research laboratory is nonetheless "deliberative" in nature, or, for that matter, how disclosure of such purely investigatory material would "chill" the investigators from performing their investigatory duties in the future. Therefore, until the agency provides a much more detailed explanation of why none of this information can be segregated and disclosed, it is not entitled to summary judgment on this point. <u>See</u>, <u>e.g.</u>, <u>Mead Data Cent. v. Dep't of the Air Force</u>, 566 F.2d 242, 261 (D.C. Cir. 1977) ("unless the segregability provision of the FOIA is to be nothing more than a precatory precept, agencies must be required to <u>provide the reasons behind their</u>

-34-

conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts") (emphasis added).

**B.     The USDA Also Has Not Demonstrated That All Of The Withheld Information Is Covered By The Attorney Work-Product Privilege.**

The USDA further contends that every document withheld under this Exemption is also covered by the attorney work-product privilege. Gov't Mem. at 28-30; Gilmore Decl. ¶22. However, it is well established that this privilege does not apply "unless the document was initially prepared in contemplation of litigation, or in the course of preparing for trial." Coastal States Gas Corp., 617 F.2d at 865 (emphasis added), see also Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp., 5 F.3d 1508, 1515 (D.C. Cir. 1993); SafeCard Services, Inc. v. S.E.C., 926 F.2d 1197, 1202 (D.C. Cir. 1991). Therefore, the government "must demonstrate that documents were created 'with a specific claim supported by concrete facts which would likely lead to litigation in mind,' not merely assembled in the ordinary course of business or for other nonlitigation purposes." Linde Thomson Langworthy Kohn & Van Dyke, 5 F.3d at 1515-16 (internal citations omitted) (emphasis added), quoting Coastal States Gas Corp., 617 F.2d at 865.

Thus, it is well established that "[t]he privilege does not shield from discovery documents that were prepared in the regular course of the compiler's business, rather than specifically for litigation, even if it is apparent that a party may soon resort to litigation." Fann v. Giant Food, Inc., 115 F.R.D. 593, 596 (D.D.C. 1987) (citations omitted) (emphasis added). Rather, "[t]he function that the documents serve and the purpose for which the documents were created . . . determine whether the work product doctrine protects documents from discovery." Western Trails, Inc. v. Camp Coast to Coast, 139 F.R.D. 4, 9 (D.D.C. 1991)(emphasis added); Delaney,

Migdail, & Young, Chartered v. IRS, 826 F.2d 124, 127 (D.C. Cir. 1987).

Here, according to Mr. Gilmore's own description of the records, at least some of them were prepared by USDA "investigators." Gilmore Decl. ¶ 21. Therefore, if any of these records were prepared by investigators in the regular course of their duty to investigate Huntingdon and report to their superiors violations of the AWA, such information would certainly not be covered by the attorney-work product privilege. On the other hand, if, in contemplation of assembling a case against Huntingdon, an attorney sent an investigator back to the lab to obtain a particular piece of evidence, such information would likely be protected. Here, however, the agency simply has not provided plaintiff or the Court with even the most basic information concerning the 19 pages of information that have been withheld in their entirety and the one page that was withheld in part under this privilege. Accordingly, without more information, it is impossible for IDA to test the agency's broad assertion that all of this information qualifies for protection. See Stagno Decl., Pl. Ex. A, ¶6.

### C. The Agency Has Failed To Provide A *Vaughn* Index Of The Information That Has Been Withheld.

Mr. Gilmore's Declaration does not even list or identify the documents that have been withheld in full or part under this Exemption, let alone provide a "detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply" as required by Vaughn v. Rosen. See King, 830 F.2d at 218. Therefore, it is absolutely impossible for the plaintiff – or the Court which must conduct a *de novo* review of these matters – to ascertain precisely what has been withheld and why, or to determine whether there are any segregable portions of the documents that must be released.

Thus, as Judge Urbina of this Court recently explained:

> A *Vaughn* index is an affidavit that indexes and specifically describes withheld or redacted documents and explains why each withheld record is exempt from disclosure. The index must "afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding."

Campaign for Responsible Transplantation v. FDA, 219 F. Supp.2d at 111 (emphasis added), quoting King, 830 F2d at 218-19 (internal citation omitted). As Judge Urbina further explained, "the requester and the trial judge must 'be able to derive from the *Vaughn* index a clear explanation of why each document or portion of a document withheld is putatively exempt from disclosure.'" Campaign for Responsible Transplantation, 219 F. Supp.2d at 111 (emphasis added), quoting Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp.2d 19, 34 (D.D.C. 2000); *accord*, The Wilderness Society v. Bureau of Land Management, Civ. No. 01-2210 , 2003 WL 25591, *6 (D.D.C. Jan. 15, 2003).

However, here, the USDA did not provide any index of the records or deleted information at issue, or provide any other specific description of each such record or portion of record that has been withheld. Indeed, because there is no Vaughn index, the agency has not even identified how many separate documents exist, e.g., whether there are two memoranda that have been withheld that total 19 pages, or 19 different documents; the form of the 19 pages that have been withheld in full -- i.e., whether all of these records are actually memoranda, or are in some other form, such as notes to the file, e-mail communications, etc. -- or even which of the released documents contains a partial deletion on this basis.[9]

---

[9]For example, the agency has made substantial deletions from a document that was released to plaintiff that addresses "information obtained during the records review at Huntingdon Life Sciences that may be of interest to the FDA/or EPA." See Pl. Ex. V at 8.

Moreover, regardless of whether the agency is claiming the "deliberative process" or the "attorney-work product" privilege, as explained *supra*, if all of these records are actually "memorandums" as asserted by the agency, then surely the agency can segregate and disclose information contained in these records that reflect the authors, recipients, dates, and subject matter of each such memorandum. In fact, while none of that information appears to qualify for either of the privileges invoked by the agency, it would certainly provide plaintiff and the Court with some basis on which to gauge the correctness of the agency's privilege assertions, e.g., whether the documents were all generated both to provide advice and recommendations from subordinates to superiors concerning policy matters, as required for the deliberative process privilege, Jordan v. Dep't of Justice, 591 F.2d at 772-74, and also for an attorney "in contemplation of litigation," as required for the attorney work-product privilege, Coastal States Gas Corp., 617 F.2d at 865.

In any event, until the USDA provides much more information concerning each of the records that has been withheld under Exemption 5, it certainly is not entitled to summary judgment. Indeed, the Court of Appeals has declared that an agency's Vaughn index must provide much more than the basic elements of "who, what, and when." See, e.g., Coastal States Gas Corp., supra, 617 F.2d at 861 (an agency's Vaughn index is "patently inadequate" where it merely "identifies who wrote the memorandum, to whom it was addressed, its date, and a brief

---

Although the agency has not even identified whether the deleted information has been withheld under Exemption 4 or Exemption 5, contrary to the description contained in Mr. Gilmore's Declaration for all of the material withheld under Exemption 5, this memorandum does not seem to contain "deliberations among APHIS investigators and the Office of General Counsel (OGC) about what charges should be included in the AWA Complaint that was ultimately filed against Huntingdon," particularly since the USDA does not have jurisdiction over matters that fall under the purview of the Food and Drug Administration and Environmental Protection Agency. Id. (emphasis added).

description of the memorandum") (emphasis added). Here, the government has not even

provided these basic details about each of the 20 records or parts of records that have been

withheld under the Exemption, but instead has made sweeping general assertions about all of

those records. However, as the Court of Appeals has emphasized, this Court may not "'accept

conclusory and generalized allegations of [FOIA] exemptions,' but rather [must] require agencies

to offer 'a relatively detailed analysis in manageable segments.'" Oglesby v. Dep't of Army, 79

F.3d 1172, 1178 (D.C. Cir. 1996), quoting Vaughn, 484 F.2d at 826 (emphasis added).

Therefore, until IDA is provided a Vaughn index with respect to these records, or is

otherwise permitted to take discovery to ascertain the nature of all of the withheld documents,

who prepared them, to whom they were disseminated, and their precise subject matter, it is not in

a position to provide further arguments concerning the government's contention that all of this

information may be withheld under Exemption 5. See Stagno Decl., Pl. Ex. A, ¶ 6.[10]

## III.   THE AGENCY HAS FAILED TO CONDUCT AN ADEQUATE SEARCH FOR ALL RESPONSIVE RECORDS.

There is substantial evidence in the record of this case that the USDA has not conducted

an adequate search for all responsive records. To begin with, although the agency admits that it

had the videotape of Huntingdon that was submitted with PETA's original Complaint in May

1997, it has failed to disclose that record. See also Letter to Steve Poss from Kenneth Vail,

Assistant General Counsel (June 13, 1997), Pl. Ex. BB (stating that "[t]his letter will confirm that

---

[10]In the event the Court does not require the agency to provide additional information concerning these records, either by preparation of a Vaughn index or by allowing plaintiff to take discovery, plaintiff would request that, as permitted by the FOIA, 5 U.S.C. § 552(a)(4)(B), the Court conduct an in camera inspection to determine whether the USDA may rely on Exemption 5 to withhold 19 pages in their entirety and one record in part under this Exemption. See, e.g. Spirko v. United States Postal Service, 147 F.3d 992, 996 (D.C. Cir. 1998).

the Department of Agriculture (USDA) received a video tape, a written report and some still

photographs concerning research being conducted on animals at Huntingdon"). In addition,

PETA's Complaint referenced an additional videotape – a British documentary concerning

animal cruelty at Huntingdon's headquarters in Great Britain – which the agency also has not

produced. See Pl. Ex. A at 8. Nor is it at all clear that the agency has produced even

photocopies of all of the photographs that were used in this investigation, including those PETA

submitted with its Complaint. Furthermore, while the agency's own documents mention that it

collected several "affidavits" from PETA employees concerning the group's Complaint, the

agency has failed to produce any of these records as well. See Letter to Steve Poss from Ron

DeHaven (July 29, 1997), Pl. Ex. CC, at 1 (stating that the USDA's investigator "visited PETA

in Norfolk, Virginia, and took affidavits").[11]

Accordingly, the Court cannot possibly determine *de novo* that the agency has conducted

an adequate search for records. See Steinberg v. U.S. Dep't of Justice, 23 F.3d 548, 551 (D.C.

Cir. 1994) (court's review of the adequacy of the search is *de novo*); see also Goland v. Central

Intelligence Agency, 607 F.2d 339, 370 (D.C. Cir. 1978) (the court cannot grant summary

judgment for the government where the record shows that the agency failed to locate records that

were clearly in agency's possession); Ogelsby, 79 F.3d at 1185 (where record shows that the

agency's original search "failed to locate . . . important documents," and the agency fails to

explain how this happened, the court "could not properly conclude" that the search was

"reasonably calculated to uncover all relevant documents"), quoting Truitt v. Dep't of State, 897

---

[11]The photocopies of photographs that the agency has provided are completely
indecipherable. See Attachment to Pl. Ex. B. Accordingly, IDA seeks access to better copies of
these and all other photographs that are responsive to its request.

F.2d 540, 542 (D.C. Cir. 1990); Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982) ("where the

agency's responses raise serious doubts as to the completeness of the search or are for some other

reason unsatisfactory, summary judgment in the government's favor would usually be

inappropriate").

Accordingly, plaintiff needs more information from the agency to probe the basis for its

failure to uncover these additional records, to ascertain whether the USDA has complied with its

statutory duty to identify all responsive records and to disclose all non-exempt information. See

Stagno Dec. ¶ 7.  Indeed, as the Court of Appeals has explained, "if, in the face of well-defined

requests and positive indications of overlooked materials, an agency can so easily avoid

adversary scrutiny of its search techniques, the Act will inevitably become nugatory." Founding

Church of Scientology v. National Security Agency, 610 F.2d 824, 837 (D.C. Cir. 1979).

Moreover, although IDA has made it absolutely clear throughout this litigation that is

would like to obtain a copy of the videotape that was submitted with PETA's Complaint, and

that the "Disposal Authority" on which the government apparently relies for asserting that the

videotape has been "destroyed" does not seem to apply to that record, the agency conspicuously

failed to address this record in its motion for summary judgment.  Rather, Mr. Gilmore simply

describes the general efforts that were made to locate responsive records.  Gilmore Decl. ¶ 26.

However, for several reasons, even that description calls into question whether the agency has

conducted a search that is "reasonably calculated to uncover all relevant documents." Truitt v.

Dep't of State, 897 F.2d at 542.[12]

_____

[12]The Disposal Authority applies to information received by the agency "from the field,"
not from an outside source, such as PETA.  See Pl. Ex. Q.  In addition, since the agency's own
October 9, 1997 "Report of Violation" stated that the agency's investigation of Huntingdon –
which culminated in the agency charging Huntingdon with dozens of violations of the AWA –

First, although the USDA's investigation culminated in the filing of a formal Complaint against Huntingdon by the agency's Office of General Counsel, and the record indicates that this office did in fact have a copy of this record, Pl. Ex. BB, Mr. Gilmore's Declaration does not identify the Office of General Counsel as a repository that was searched.  Second, a letter sent by the USDA to Procter & Gamble on July 29, 1997 stated that copies of all of the materials sent to the agency were also sent to USDA Investigator Ron Carter "at his home."  See  Pl. Ex. CC. However, there also is no indication that this individual was asked to search his home or his files to find any of the requested records.  See also Tax Analysts, 492 U.S. at 145 (an "agency record" subject to the requirements of the FOIA is one that came into the agency's possession in the "legitimate conduct of its official duties").

Third, Mr. Gilmore states that much of the search was conducted only using the search term "Huntindgon."  See Gilmore Decl. ¶ 26.  However, the agency fails to explain how limiting the search in this fashion was "reasonably calculated to uncover all relevant documents." Truitt v. Dep't of State, 897 f.2d at 542; see also Nation Magazine v. United States Customs Service, 71 F.3d 885, 889-90 (D.C. Cir. 1995) (agency's decision to limit search by only searching for records indexed under a person's name was not adequate).  Thus, for example, perhaps the videotape is filed under the name "PETA" or "AWA violations," or "videotape," or some other term.  In any event, without more information about how the agency actually conducted its

---

was based on the "allegations formally submitted to APHIS by the People for the Ethical Treatment of Animals," Pl. Ex. E at 2 (emphasis added), it seems highly unlikely that the video tape could be considered "insufficient or no evidence" of a violation of the AWA.  Pl. Ex. Q.  In any event, according to one of the USDA's own documents, the Huntingdon investigation was not officially "closed" until December 15, 1999.  Pl. Ex. I.  Therefore, even if the Disposal Authority could somehow be read to apply to the videotape, the agency was not authorized to destroy them until December 15, 2000 – almost a month after IDA submitted its FOIA request. See Pl. Ex. Q ( records may be destroyed "within 1 year after case is closed" ).

search and why the videotape and other materials have not been found, neither plaintiff nor the Court is in a position to ascertain that the search was adequate. See Perry v. Block, 684 F.2d 127. Therefore, plaintiff will need discovery on this point as well. See Stagno Decl., Pl. Ex. U ¶¶ 7-8; see also Kronenberg v. U.S. Dep't of Justice, 875 F. Supp. 861 (D.D.C. 1995) (plaintiff allowed to take discovery regarding adequacy of agency's search for responsive records).

Furthermore, because the "Disposal Authority" that was provided to plaintiff does not appear to authorize the destruction of the videotape, and the agency has not submitted a sworn statement that it in fact destroyed all copies of the videotape and explained the circumstances under which it may have destroyed this record, at this juncture plaintiff has every reason to believe that a copy of this record still exists somewhere at the agency, and that it will be found once the agency conducts an adequate search. However, should the agency not be able to locate this record and continue to insist that it has been destroyed, plaintiff may need to amend its Complaint to bring additional claims against the government for violation of the Federal Records Act. See, e.g., Armstrong v. Bush, 924 F.2d 282, 96-97 (D.C. Cir. 1991) (case remanded to district court to establish for the record "either through affidavits or testimony" whether agency had complied with applicable record preservation requirements); also American Friends Service Committee v. Webster, 720 F.2d 29, 65-66 (D.C. Cir. 1983) ( an agency is not permitted to destroy a record once it has been requested under FOIA).

## CONCLUSION

For all of the foregoing reasons, the government's and intervenor-defendant's motions for summary judgment should be denied, plaintiff's motion for partial summary judgment with respect to the records withheld under Exemption 4 should be granted, the government should be required to submit a Vaughn index with respect to the remaining records, and plaintiff should be

-43-

permitted to take discovery concerning the adequacy of the agency's search.

Respectfully submitted,

Katherine A. Meyer
(D.C. Bar No. 244301)
Kimberly D. Ockene
(D.C. Bar No. 461191)

Meyer & Glitzenstein
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202)  588-5206

Attorneys for Plaintiff

Date:   February 21, 2003

-44-