**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN DEFENSE OF ANIMALS ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
|     v. ) | |
| ) | |
| THE UNITED STATES DEPARTMENT ) | |
|   OF AGRICULTURE, ) | |
| ) | Civil Action No. 02-0557 (RWR) |
|     Defendant, ) | |
| ) | |
|     and ) | |
| ) | |
| LIFE SCIENCES RESEARCH, INC., ) | |
| ) | |
|     Intervenor-Defendant. ) | |
| _____) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AND REPLY TO PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Preliminary Statement

Plaintiff commenced this action under the Freedom of
Information Act (FOIA), 5 U.S.C. § 552 (2000), seeking access to
records concerning an investigation by defendant United States
Department of Agriculture (USDA) of Huntingdon Life Sciences
(Huntingdon)[1] for alleged violations of the Animal Welfare Act
(AWA), 7 U.S.C. §§ 2131-59 (2000).  On December 13, 2002,
defendant USDA filed a motion for summary judgment, which was
followed by intervenor-defendant's own motion for summary

_____

[1] Huntingdon Life Sciences is a wholly owned subsidiary of
intervenor-defendant Life Sciences Research, Inc.  (See
intervenor-defendant's Mem. of P. & A. in Supp. of Unopposed Mot.
for Leave to Intervene at 1.)

-2-

judgment on December 20, 2002.  On February 21, 2003, after
receiving two extensions of time from the Court, plaintiff
simultaneously filed a motion for partial summary judgment and
opposed defendant USDA's motion.  Defendant USDA hereby opposes
plaintiff's motion for partial summary judgment and also replies
to plaintiff's opposition to defendant USDA's motion for summary
judgment.  In support of this opposition and reply, the Court is
respectfully referred to the Second Declaration of Hugh Gilmore,
Program Specialist/Information Analyst, Legislative and Public
Affairs Division, Animal and Plant Health Inspection Service
(APHIS), USDA [hereinafter Second Gilmore Declaration]; the
Declaration of Francis Keyser [hereinafter Keyser Declaration],
Investigator, Investigations and Enforcement Services (IES),
APHIS, USDA; and the Declaration of Michael Caulfield, General
Manager of Huntingdon Life Sciences, Inc. [hereinafter Caulfield
Declaration].[2]

---

[2] Plaintiff has claimed that "it would be patently unfair"
for the Court to permit defendant USDA to submit these
declarations on the stated basis that "it would only further
delay [plaintiff's] ability to obtain the information" at issue
in this case.  Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. and
Opp'n to Defs.' Mot. for Summ. J. [hereinafter Pl.'s Mem.] at 22
n.7.  However, defendant USDA respectfully maintains that the
submission of these declarations, in accordance with a schedule
that plaintiff proposed soon after defendant USDA filed its
motion for summary judgment, see Pl.'s Consent Mot. for Extension
of Time for Pl. to Respond to Defs.' Motions For Summ. J. and
Supporting Mem., dated Jan. 22, 2003, would not delay the outcome
of this case at all.  Moreover, much of the "delay" in this case
can be attributed to the multiple enlargements of time that
plaintiff had sought for reasons such as "plaintiff's counsel's
                                              (continued...)

-3-

<u>Argument</u>

<u>Introduction</u>

At the outset, defendant USDA notes that the release of the
vast majority of the records that remain at issue in this case
would not, as plaintiff claims, serve the FOIA's core purpose of
"'<u>open[ing] agency action to the light of public scrutiny</u>.'"
Pl.'s Mem. at 25 (emphasis in original) (quoting <u>United States</u>
<u>Dep't of Justice v. Reporters Comm. for Freedom of the Press</u>, 489
U.S. 749, 772 (1989).  Of the 1012 pages to which plaintiff still
seeks access,[3] only <u>forty-seven</u> were prepared by defendant USDA,
(<u>see</u> Gilmore Decl. ¶¶ 16.H & 21); and of those, only <u>twenty</u>
contain information that actually was generated by defendant

---

[2](...continued)
additional work load," <u>id.</u> at 1, and because "[plaintiff] and its
counsel [had] not yet had an opportunity to review all of the
records that have been disclosed" by defendant USDA, <u>see</u> Joint
Status Report, dated Sept. 18, 2002.  Thus, the submission of
these declarations can hardly be deemed "unfair."

[3] The records to which plaintiff still seeks access are:
Final Test Reports and Related Records (125 pages withheld in
full); Institutional Animal Care and Use Committee (IACUC)
Records (2 pages released in part, 54 pages withheld in full);
Clinical Observation Raw Data Reports (121 pages withheld in
full); Interim Test Reports (22 pages withheld in full); Necropsy
and Postmortem Examination Reports (23 pages withheld in full);
Viability Records (397 pages released in part, 67 pages withheld
in full); Veterinary Treatment Requests and Logs (20 pages
released in part, 94 pages withheld in full); Internal Huntingdon
Memoranda (7 pages released in part, 33 pages withheld in full);
Internal USDA Investigatory Memoranda (27 pages released in
part); and certain intra-USDA memoranda concerning the drafting
of the AWA Complaint against Huntingdon (1 page released in part,
19 pages withheld in full).  (<u>See</u> Gilmore Decl. ¶¶ 15-16, 21.)

-4-

USDA, (see id. ¶ 21).[4]  The remaining 965 pages were prepared by
Huntingdon, and they contain information related to the
commercial product research activities that it conducted on
behalf of its clients.  (See id. ¶¶ 5, 11.)  Thus, it should be
clear that the release of the records at issue in this case would
shed light only on Huntingdon's commercial activities,[5] and would
hardly, as plaintiff claims, reveal to the public "what their
government is up to."  Reporters Comm., 489 U.S. at 773.

    I.  Mr. Gilmore's First Declaration Satisfies Rule
        56(e)'s Personal Knowledge Requirement.

    First, Plaintiff declares that "the Court may not rely on
the portions of Mr. Gilmore's [first] declaration that purport to
prove why hundreds of records have been withheld under Exemption
4" because, it claims, that declaration fails to comport with
Rule 56(e) of the Federal Rules of Civil Procedure.  Pl.'s Mem.
at 20.  Plaintiff contends that Mr. Gilmore's first declaration
fails to meet the Rule's requirements because his testimony
provides "absolutely no basis for any 'personal knowledge' of

_____

    [4] The other twenty-seven pages prepared by USDA were
withheld in part pursuant to Exemption 4 because they contain
reformulations of confidential commercial information that was
generated by and obtained from Huntingdon.  (See Gilmore Decl.
¶ 16.H.)

    [5] Indeed, on its Web site plaintiff goes so far as to assert
that the release of these records would "expose" Huntingdon's
activities, and would provide plaintiff with "evidence" to use
against Huntingdon and other testing facilities.  See "Huntingdon
Life Sciences:  Running for Its Life," at
http://www.vivisectioninfo.org/HLS.html (copy attached as Attach.
A).

-5-

Huntingdon's business practices, or, for that matter any particular expertise in the field of work that Huntingdon performs." Id. at 19.  On that basis, plaintiff contends that "the Court cannot grant summary judgment for either defendant." Id. at 20.  This argument lacks merit because plaintiff's narrow construction of Rule 56(e)'s personal knowledge requirement is entirely inconsistent with how this Court has applied that standard in the context of a FOIA case.

As this Court has held, "[a] declarant in a FOIA case satisfies Rule 56(e)'s personal knowledge requirement when in his declaration, he attests to his personal knowledge of the procedures used in handling a FOIA request and his familiarity with the documents in question." Hall v. United States Dep't of Justice, 63 F. Supp. 2d 14, 16 n.1 (D.D.C. 1999) (internal citations and quotations omitted).  This Court also has recognized that "[p]ersonal knowledge may be inferred from the affidavit itself, by considering the affiant's position and job responsibilities." Center for Auto Safety v. NHTSA, 93 F. Supp. 2d 1, 11 (D.D.C. 2000), rev'd in part & remanded on other grounds, 244 F.3d 144 (D.C. Cir. 2001).

Thus, under this Court's construction of Rule 56(e), it is clear that Mr. Gilmore possesses the requisite personal knowledge.  Mr. Gilmore is a Program Specialist/Information Analyst for defendant USDA, and his first declaration contains an extensive discussion of the information withheld under Exemption

4.  (See Gilmore Decl. ¶¶ 1, 14-20.)  Hence, Mr. Gilmore has
personal knowledge of the procedures used in the handling of
plaintiff's FOIA request and of the documents responsive to it.
See Center for Auto Safety, 93 F. Supp. 2d at 11.  Indeed,
plaintiff itself admits that "Mr. Gilmore may have some
experience in processing FOIA requests and may also be competent
to testify as to how the USDA processed IDA's request."  Pl.'s
Mem. at 19.  Therefore, inasmuch as Mr. Gilmore has demonstrated
his "personal knowledge of the procedures used in handling
[plaintiff's] FOIA request" and "his familiarity with the
documents in question," Hall, 63 F. Supp. 2d at 16 n.1,
plaintiff's novel contention that "the Court may not rely" on his
declaration is wholly without merit.[6]

---

[6] Plaintiff contends that the claimed inadequacy of Mr.
Gilmore's first declaration entitles it to summary judgment with
regard to the information withheld under Exemption 4 and,
therefore, to the disclosure of that information.  See Pl.'s Mem.
at 22.  However, it is clear that even if the Court were to find
that Mr. Gilmore's first declaration did not comport with Rule
56(e), summary judgment for plaintiff would not be appropriate at
this point in the case.  See N.C. Network for Animals, Inc. v.
USDA, No. 90-1443, 1991 WL 10757, at *4 (4th Cir. Feb. 5, 1991)
(remanding Exemption 4 case for rehearing upon finding that
agency's affidavit was inadequate, but "emphasiz[ing] that the
purpose of this rehearing is limited to allowing APHIS an
opportunity to submit affidavits which meet the requirements of
Rule 56(e)").

-7-

II.  Mr. Gilmore's First Declaration Is Sufficiently
     Detailed For Plaintiff And The Court To
     Determine That The Information Still At Issue
     In This Case Was Properly Withheld.

Next, plaintiff claims that Mr. Gilmore's first declaration
is not detailed enough for it or the Court to determine that the
information at issue in this case was properly withheld under
Exemptions 4 and 5.  However, even a cursory reading of Mr.
Gilmore's first declaration would reveal that it actually
contains the very details that plaintiff complains are lacking.
Moreover, on the basis of that declaration alone, plaintiff has
been able to put forth numerous legal arguments challenging
defendant USDA's bases for withholding the information at issue
in this case.  Thus, for the following reasons, defendant USDA
respectfully suggests that plaintiff's claims concerning the
adequacy of Mr. Gilmore's first declaration cannot be sustained.[7]

A.  A Formal Vaughn Index Is Not Necessary
    in This Case.

It appears that plaintiff's claims concerning Mr. Gilmore's
first declaration stem from the fact that it is not a formal
Vaughn index.  See, e.g., Pl.'s Mem. at 18 n.3.  However, a

_____

     [7] Furthermore, plaintiff's suggestion that it is entitled to
summary judgment with respect to the information withheld under
Exemption 4 if the Court determines that Mr. Gilmore's first
declaration does not adequately describe that information, see,
e.g., Pl.'s Mem. at 22, also must be rejected.  See Campaign for
Responsible Transplantation v. FDA, 219 F. Supp. 2d 106, 116
(D.D.C. 2002) ("Rather than rule on the basis of inadequate
Vaughn indices, the court orders FDA to submit new representative
Vaughn indices.").

formal <u>Vaughn</u> index is not absolutely necessary to the resolution
of every FOIA case.  <u>See, e.g.</u>, <u>Maine v. United States Dep't of
the Interior</u>, 124 F. Supp. 2d 728, 737 (D. Me. 2001) ("<u>Vaughn</u>
indices serve as a means to the resolution of a FOIA case rather
than as ends in themselves, and the resolution of a FOIA case
does not necessarily require an agency's submission of a Vaughn
index."), <u>aff'd in pertinent part & vacated in part</u>, 285 F.3d 126
(1st Cir. 2002).

Instead, the "court's primary focus must be on the
substance, rather than the form, of the information supplied by
the government to justify withholding requested information."
<u>Vaughn v. United States</u>, 936 F.2d 862, 867 (6th Cir. 1991).  The
D.C. Circuit has held that an agency's explanation of the bases
for withholding information is adequate if it "contains
sufficient detail to forge the logical connection between the
information [withheld] and the claimed exemption." <u>Oglesby v.
United States Dep't of the Army</u>, 79 F.3d 1172, 1178 (D.C. Cir.
1996) (internal quotes and citation omitted).  Thus, so long as
an agency's submission provides "a FOIA requester [with]
sufficient information to present a full legal argument, there is
no need for a <u>Vaughn</u> index." <u>Minier v. CIA</u>, 88 F.3d 796, 804
(9th Cir. 1996).

In this case, it is clear that Mr. Gilmore's first
declaration contains enough detail for plaintiff and the Court to
assess the propriety of defendant USDA's application of

-9-

Exemptions 4 and 5, in that it not only contains sufficient detail, it also contains the very information that plaintiff claims is lacking.[8]  Furthermore, plaintiff's claim that it "would be in a better position to demonstrate that the agency has failed to meet its duty to segregate and disclose all non-exempt information" if Mr. Gilmore's first declaration contained more detail, Pl.'s Mem. at 31-32 n.8, is belied by the fact that plaintiff has been able to advance numerous legal arguments challenging defendant USDA's bases for withholding the information at issue in this case, see Pl.'s Mem. at 18-36, and

_____

[8] At the other extreme, plaintiff goes so far as to decry Mr. Gilmore's declaration as inadequate because it fails to address information to which plaintiff does not seek access.  For example, Mr. Gilmore stated that the "names and personal information (such as professional qualifications) of Huntingdon employees" were withheld pursuant to Exemption 7(C), 5 U.S.C. § 552(b)(7)(C).  (Gilmore Decl. ¶ 24.) Plaintiff has noted that it does not seek access to any such information, see, e.g., Pl.'s Mem. at 10 & Ex. S, it nevertheless complains that Mr. Gilmore has not explained why the names of Huntingdon employees were not segregated and released.  See id. at 32 n.8 ("Mr. Gilmore states that the agency has withheld 33 pages of 'Internal Huntingdon Memoranda' with no indication of . . . the dates, authors or recipients of those memoranda - none of which appears to be exempt from disclosure.") (emphasis added).

Likewise, plaintiff has "made it clear that it does not seek access to any [of Huntingdon's] 'Standard Operating Procedures,'" Pl.'s Mem. at 23, which defendant USDA withheld in their entireties, (see Gilmore Decl. ¶ 15.A).  Despite this, plaintiff complains that Mr. Gilmore has not provided a "detailed explanation" of why these Standard Operating Procedures contain no reasonably segregable nonexempt information.  Pl.'s Mem. at 27.  It simply strains credulity for plaintiff to assert that Mr. Gilmore's declaration is inadequate because it fails to address information that plaintiff itself freely admits is not at issue in this case.

-10-

which defendant has rebutted below, see infra at 19-30.   Thus,

given that Mr. Gilmore's declaration "provide[s] facts sufficient

to sustain a meaningful adversarial process," NTEU v. United

States Customs Serv., 802 F.2d 525, 527 (D.C. Cir. 1986),

plaintiff's contention that that declaration is insufficient

because it is not a formal Vaughn index simply lacks merit.

>    B.   Mr. Gilmore's Declaration Sufficiently Describes
>         the Information Withheld Pursuant to Exemption 4.

From Mr. Gilmore's description of the Exemption 4

information at issue in this case, it is clear that the

information withheld on that basis is precisely the same type of

information that this and other courts have repeatedly held to be

exempt from disclosure under the FOIA.   See, e.g., Pub. Citizen

Health Research Group v. FDA, 997 F. Supp. 56, 66 (D.D.C. 1998)

(determining that product testing information should be withheld

under Exemption 4), aff'd in pertinent part, 185 F.3d 898 (D.C.

Cir. 1999); Sokolow v. FDA, No. 1:97-CV-252, slip op. at 7 (E.D.

Tex. Feb. 19, 1998) (holding that Exemption 4 protects drug study

methodologies, protocols, and results), aff'd, 162 F.3d 1160 (5th

Cir. 1998) (unpublished table decision); Pub. Citizen Health

Research Group v. FDA, 539 F. Supp. 1320, 1327 (D.D.C. 1982)

(recognizing that the release of product test data would cause

"substantial competitive injury"), aff'd in pertinent part, 704

F.2d 1280 (D.C. Cir. 1983).   Despite this authority, plaintiff

argues that Mr. Gilmore has not sufficiently described the

-11-

records withheld under Exemption 4.  However, for the following
reasons, all of plaintiff's arguments must fail.

First, and despite the fact that it "would not dispute that
much of the withheld information appears to be 'commercial'
within the meaning of Exemption 4," plaintiff claims that the
purported lack of detail in Mr. Gilmore's first declaration makes
it "impossible for plaintiff to be certain that all of the
information that the agency has withheld under Exemption 4 is in
fact 'commercial' information."  Pl.'s Mem. at 18 & n.3.  In
making this claim, plaintiff evidently has overlooked the portion
of Mr. Gilmore's first declaration that specifically explains the
commercial nature of the information withheld under Exemption 4,
and it also has disregarded the Court of Appeals for the District
of Columbia Circuit's expansive definition of "commercial."

Mr. Gilmore attests that the information withheld under
Exemption 4 in this case concerns product tests conducted by
Huntingdon on behalf of the pharmaceutical, biotechnology,
medical device, and chemical companies that are its clients.
(Gilmore Decl. ¶ 5.)  Huntingdon charged its clients hundreds of
thousands of dollars for those research services.  (See id.)
Such information is plainly "commercial" under the D.C. Circuit's
broad definition of the term.  See, e.g., Nat'l Ass'n of Home
Builders v. Norton, 309 F.3d 26, 38 (D.C. Cir. 2002)
("[I]nformation is 'commercial' under [Exemption 4] if, 'in and
of itself,' it serves a 'commercial function' or is of a

-12-

'commercial nature.'" (quoting <u>Am. Airlines, Inc. v. Nat'l</u>
<u>Mediation Bd.</u>, 588 F.2d 863, 870 (2d Cir. 1978))).  Indeed, the
D.C. Circuit has repeatedly recognized the commercial nature of
product research information such as this.  <u>See, e.g.</u>, <u>Pub.</u>
<u>Citizen</u>, 704 F.2d at 1290 (noting commercial nature of
information concerning product testing).  Thus, plaintiff's
argument that Mr. Gilmore's first declaration does not establish
the commercial nature of the information withheld under Exemption
4 must fail.

Second, plaintiff claims that Mr. Gilmore's first
declaration fails to establish that Huntingdon faces "actual
competition" because it provides no proof "of the competition
facing Huntingdon in particular."  Pl.'s Mem. at 25-26.  In
making this argument, plaintiff disregards the fact that Mr.
Gilmore is an official who works for the very federal agency that
regulates the use of animals by Contract Research Organizations
(CROs), including Huntingdon and its competitors.  (<u>See</u> Gilmore
Decl. ¶ 4).  Furthermore, plaintiff's argument on this point has
been mooted by Mr. Caulfield's declaration, which states that
"Huntingdon belongs to a group of about 20 large, global-reaching
CROs" who compete fiercely for work from potential clients.
(Caulfield Decl. ¶¶ 7-8.)  Thus, it is clear that Huntingdon
faces actual competition.

Third, plaintiff claims that Mr. Gilmore's description of
the information concerning the results of Huntingdon's tests --

-13-

which plaintiff asserts is set forth in paragraph 18 of his first
declaration -- is insufficient because that description does not
provide "any information concerning how may different records
were withheld on this basis, or any description of each such
record or portion of a record that contains this information[,]
or why no segregable portion of any such record can be disclosed
to plaintiff."  Pl.'s Mem. at 31-32 n.8.  In making this
argument, plaintiff apparently has overlooked paragraph <u>16</u> of Mr.
Gilmore's first declaration, which is entitled "Information the
describes the results of the tests," and which contains the very
information that plaintiff claims is lacking.  (Gilmore Decl.
¶ 16.)  This paragraph consists of nine sub-paragraphs, each of
which corresponds to a different type of record.  (<u>See</u> <u>id.</u>)
These nine sub-paragraphs each contain descriptions of the
content of each type of record, and the total number of pages of
each type of record.  (<u>See</u> <u>id.</u>)  Moreover, this entire paragraph
explains how defendant USDA has segregated and released the
nonexempt portions of these records, and it also explains why the
records withheld in their entireties contain no reasonably
segregable nonexempt information.  (<u>See</u> <u>id.</u>)

     At bottom, Mr. Gilmore's declaration is sufficiently
detailed for both it and the Court to determine that the product
testing information at issue in this case is "of the same general
type and [has] the same purpose," <u>NTEU</u>, 802 F.2d at 527, as the
product testing information that this and other courts have

-14-

repeatedly held to be properly withheld under Exemption 4.  Thus,
defendant USDA respectfully suggests that plaintiff's claims
concerning the adequacy of Mr. Gilmore's declaration must be
rejected.

    C.  Mr. Gilmore's First Declaration Sufficiently
        Describes the Information Withheld Pursuant to
        Exemption 5.

    Plaintiff next contends that Mr. Gilmore's first declaration
does not provide it or the Court "with even the most basic
information" about the nineteen pages withheld in full and one
page withheld in part under Exemption 5 pursuant to the
deliberative process and attorney work-product privileges.  Pl.'s
Mem. at 36.  Plaintiff argues that it requires additional details
concerning "the nature of all of the withheld documents, who
prepared them, to whom they were disseminated, and their precise
subject matter" in order for it and the Court to determine that
they were properly withheld.  Id. at 39.[9]  Again, as was the case

_____

[9] Plaintiff also complains that Mr. Gilmore's first
declaration does not identify "the form of the 19 pages that have
been withheld in full [under Exemption 5] -- i.e., whether all of
those records are actually memoranda, or are in some other form,
such as notes to the file, e-mail communications, etc." Pl.'s
Mem. at 37.  In so doing, plaintiff appears to be arguing that
only "memoranda" may be withheld under Exemption 5.  Such a
narrow construction of Exemption 5's scope is, however, entirely
at odds with the clearly established principle that Exemption 5
protects all "documents that are normally privileged in the civil
discovery context." NLRB v. Sears, Roebuck & Co., 421 U.S. 132,
149 (1975) (emphasis added).  Indeed, courts have consistently
held that "notes to the file" and "e-mail" may be protected under
Exemption 5.  See, e.g., Conoco Inc. v. United States Dep't of
Justice, 687 F.2d 724, 728 (3d Cir. 1982) ("[C]ourts have found
(continued...)

-15-

above, even a cursory reading of Mr. Gilmore's first declaration
would reveal that it contains the very information that plaintiff
claims is missing.

In fact, paragraph 21 of Mr. Gilmore's first declaration
describes the nature of the records withheld pursuant to
Exemption 5 as "deliberations among APHIS investigators and the
Office of General Counsel (OGC)." (Gilmore Decl. ¶ 22.)  Mr.
Gilmore further states that these records "were generated by an
attorney in USDA's OCG and by APHIS investigators at his
direction."  (Id.)  Moreover, given the context in which these
records were created, it should be quite clear that they were
exchanged "among" the OGC attorney and APHIS investigators who
participated in these deliberations.  (See id.)  Lastly, Mr.
Gilmore clearly describes the precise subject matter of these
records as being the various AWA charges that defendant USDA
considered bringing against Huntingdon, including
"recommendations that certain charges be filed in that complaint,
evaluations and opinions of the evidentiary and legal support for
those proposed charges, and draft language for charges that were
considered for inclusion in the complaint." (Id.)  Thus, Mr.

---

[9](...continued)
agency employee's [sic] handwritten notes directed 'to file' to
be privileged under Exemption Five."); Grand Cent. P'ship, Inc.
v. Cuomo, 166 F.3d 473, 482-83 (2d Cir. 1999) (concluding that e-
mail exchange between agency employees discussing agency's
investigation into requester's alleged wrongdoing was properly
withheld under Exemption 5).

-16-

Gilmore's first declaration certainly contains the very details
about the information withheld under Exemption 5 that plaintiff
claims are lacking.[10]

> 1.  Mr. Gilmore sufficiently explains the applicability
>      of the deliberative process privilege.

With regard to defendant USDA's assertion of the
deliberative process privilege to withhold these records under
Exemption 5, plaintiff complains that "Mr. Gilmore fails to
explain how an investigator's _objective_ report to the agency
about what was found during an investigation of a research
laboratory is nonetheless 'deliberative' in nature, or, for that
matter, how disclosure of such _purely investigatory_ material
would 'chill' the investigators from performing their
_investigatory duties_ in the future."  Pl.'s Mem. at 34 (emphasis
added).  Thus, plaintiff argues, Mr. Gilmore's first declaration
has failed to establish that these records may be withheld
pursuant to the deliberative process privilege.

———————————————

[10] Defendant USDA notes, however, that the one page withheld
in part and two of the pages withheld in full under Exemption 5
do not concern the drafting of the AWA complaint against
Huntingdon, as Mr. Gilmore describes.  Rather, these records
concern a recommendation pertaining to the initiation of the
Huntingdon investigation, and a discussion of an offer from
Huntingdon to Defendant USDA to settle the AWA charges brought as
a result of that investigation.  Although these records continue
to be properly withheld under Exemption 5 pursuant to the
deliberative process privilege, defendant USDA has decided as a
matter of discretion to release them in their entireties.
(Copies attached hereto as Attach. B.)  Therefore, only seventeen
pages withheld in full pursuant to Exemption 5 remain at issue in
this case.

-17-

In so arguing, plaintiff has mistakenly characterized the
records withheld under the deliberative process privilege as
"objective" and "purely investigatory," because it once again has
overlooked information that is plainly evident in Mr. Gilmore's
first declaration.  At no point in his declaration does Mr.
Gilmore describe any of the records withheld pursuant to
Exemption 5 as "objective" or "purely investigatory" material.
Rather, Mr. Gilmore explicitly attests that these records consist
of "recommendations that certain charges be filed in [the
Huntingdon] complaint, evaluations and opinions of the
evidentiary and legal support for those proposed charges, and
draft language for charges that were considered for inclusion in
the complaint."  (Gilmore Decl. ¶ 23.) (emphasis added).  Such
recommendations, opinions, proposals, and drafts may indeed be
withheld under the deliberative process privilege because they
are, by definition, "subjective documents which reflect the
personal opinions of the writer."  Costal States Gas Corp. v.
Department of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980)
(emphasis added).

Furthermore, Mr. Gilmore does not, as plaintiff erroneously
claims, state that the release of this information would "'chill'
the investigators from performing their investigatory duties in
the future."  Pl.'s Mem. at 34 (emphasis added).  Rather, he
avers that it is "USDA's frank and uninhibited discussions about
the proper course to be taken" in law enforcement proceedings

-18-

that would be chilled by the release of this information.

(Gilmore Decl. ¶ 23.) (emphasis added)  This is precisely the

type of harm that the deliberative process privilege, as

incorporated into Exemption 5, is intended to prevent.  See,

e.g., CNA Financial Corp. v. Donovan, 830 F.2d 1132, 1160 (D.C.

Cir. 1987) (declaring that the deliberative process privilege "is

designed to ensure the full measure of agency decisionmaking; by

removing the chilling effect of possible future disclosure,

inhibitions on candid expression are dissolved").

Thus, it appears that plaintiff has mischaracterized the

records withheld under Exemption 5 because it has either

overlooked or disregarded the portions of Mr. Gilmore's

declaration that describe their subjective, deliberative nature.

2.  Mr. Gilmore sufficiently explains the applicability
    of the attorney work-product privilege.

Finally, with regard to Mr. Gilmore's explanation of why

these records are also subject to the attorney work-product

privilege, plaintiff claims that any records generated by APHIS

investigators cannot be withheld on that basis because Mr.

Gilmore has not demonstrated that they were not "prepared by

[those] investigators in the regular course of their duty to

investigate Huntingdon."  Pl.'s Mem. at 36.  This is yet another

example of how plaintiff has overlooked the very information that

it claims is lacking in Mr. Gilmore's declaration.

-19-

In his first declaration, Mr. Gilmore attests that the withheld APHIS investigator records, which were generated under the direction of the OGC attorney, "concern the drafting of a Complaint that was ultimately filed in an administrative proceeding against Huntingdon." (Gilmore Decl. ¶ 22.) As plaintiff itself admits, the filing of this Complaint against Huntingdon was "a highly unusual step." Pl.'s Mem. at 24. Thus, it can hardly be said that the information withheld under Exemption 5, which pertains to the drafting of that "highly unusual" Complaint, was prepared by APHIS investigators "in the regular course of their duty." Id. at 36 (emphasis added).

III. Defendant USDA Properly Withheld Information Under Exemption 4 Because Its Release Likely Would Cause Substantial Competitive Harm.

As noted above, this Court and others have repeatedly upheld the use of Exemption 4 to withhold the very same types of product testing records that are at issue in this case. See, e.g., Heeny v. FDA, No. 99-56269, 2001 WL 371921, at **1-2 (9th Cir. Apr. 12, 2001); Pub. Citizen, 997 F. Supp. at 66; Sokolow, No. 1:97-CV-252, slip op. at 7; Pub. Citizen, 539 F. Supp. at 1327. Despite the substantial weight of this authority, plaintiff presents numerous legal arguments challenging defendant USDA's bases for withholding Huntingdon's product testing information under Exemption 4,[11] and it attempts to distinguish this case from

_____

[11] Plaintiff says that it has not addressed defendant USDA's
(continued...)

-20-

those cited above.  For the following reasons, all of plaintiff's
arguments must fail.

First, plaintiff challenges defendant USDA's withholding of
information under Exemption 4 in that it "disputes that any
information that constitutes the <u>agency's</u> own determinations of
whether Huntingdon may have [committed AWA violations]
constitutes commercial or financial information that was
'obtained from a person.'"  Pl.'s Mem. at 18.  In support of this
argument, plaintiff relies on <u>Grumman Aircraft Eng'g Corp. v.</u>

---

[11](...continued)
argument that information concerning Huntingdon's test designs
and methods were properly withheld under Exemption 4 as trade
secrets because it believes that only information to which it no
longer seeks access -- i.e., Huntingdon's test protocols,
protocol amendments, and the identities of the products tested --
was withheld on that basis.  <u>See</u> Pl.'s Mem. at 17.  Because of
the alleged inadequacy of Mr. Gilmore's declaration, though,
plaintiff claims that it "cannot be sure that the only
information that the agency has withheld as a 'trade secret' is
in fact information that [it] does not seek."  Pl.'s Mem. at 18.
Plaintiff is mistaken on both points, once again because of its
incomplete reading of Mr. Gilmore's declaration.

It is clear from Mr. Gilmore's first declaration that more
than just the test protocols, protocol amendments, and product
identities were withheld as trade secrets.  In the paragraph of
his declaration entitled "Information describing test designs and
methods," Mr. Gilmore describes six different types of records,
only one of which consists of the test protocols and protocol
amendments.  (Gilmore Decl. ¶ 16.)  Mr. Gilmore states that <u>all</u>
of these records, to the extent that they reveal Huntingdon's
confidential test designs and methods, were withheld as trade
secrets under Exemption 4.  (<u>See</u> <u>id.</u> ¶ 20.)  Thus, it is evident
that the withholding of these records as trade secrets under
Exemption 4 has always been part of this case, and defendant USDA
therefore respectfully must reserve its right to rebut any
argument that plaintiff might now seek to belatedly offer on this
point.

Renegotiation Bd., 425 F.2d 578, 582 (D.C. Cir. 1970), in which the D.C. Circuit held that "information generated by the government is not protected by Exemption 4."  Pl.'s Mem. at 18.

As noted above, only 27 of the 992 pages withheld in full or in part pursuant to Exemption 4 in this case were prepared by defendant USDA.  (See Gilmore Decl. ¶ 16.H.)  Furthermore, the information excised from those 27 pages was not "generated" by defendant USDA.  Rather, this information consists of mere reformulations of Huntingdon's confidential commercial information.  (See id.)  This Court has repeatedly held that such agency reformulations of information supplied by submitters may be withheld under Exemption 4.  See, e.g., Pub. Citizen Health Research Group v. NIH, 209 F. Supp. 2d 37, 44 (D.D.C. 2002) ("Documents that contain 'summaries and reformulations of information supplied by a source outside of the government' are protected under exemption 4.") (quoting Judicial Watch, Inc. v. Exp.-Imp. Bank, 108 F. Supp. 2d 19, 28 (D.D.C. 2000).  Thus, plaintiff's reliance on Grumman is misplaced, and its suggestion that USDA reformulations of Huntingdon's confidential commercial information cannot be withheld under Exemption 4 has no merit whatsoever.

Second, and without any foundation whatsoever, plaintiff claims that defendant USDA withheld this information solely because "it may not want the public to know how it conducted its investigation of Huntingdon or what it discovered, or to have a

-22-

basis for criticizing the settlement that it entered into with
Huntingdon a week after the Complaint was filed," and in order to
prevent "embarrassment" to Huntingdon.  Pl.'s Mem. at 24-25.
Thus, plaintiff argues, this information must be released because
only information that would cause competitive harm through its
"affirmative use" by Huntingdon's competitors can be withheld
under Exemption 4.  Id. at 23-24 (citing Pub. [sic] Health
Research Group v. FDA, 704 F.2d at 1291).

        The fallacy of plaintiff's argument is evident from the fact
that information concerning "how [USDA] conducted its
investigation of Huntingdon" and "what it discovered" through
that investigation is contained in the approximately 1300 pages
of records detailing its noncompliance with the AWA that
defendant USDA released in full or in part -- including the AWA
Complaint and Report of Violation (which contains a lengthy
"Explanation of Evidence Providing Violation" of the AWA by
Huntingdon).  See Pl.'s Mem. Exs. E-F.  Likewise, it can hardly
be said that information was withheld in order to prevent
Huntingdon from suffering "embarassment" in light of the release
of those records -- which include 905 pages that Huntingdon
itself acquiesced to the release of in full or in part through
USDA's predisclosure notification procedures.  See Pl.'s Mem. at
8-9 & Ex. R.  Therefore, plaintiff's claims that defendant USDA
has used Exemption 4 to "hide" evidence in an effort to avoid

criticism or shield Huntingdon from embarrassment is simply
unsustainable.

Moreover, defendant USDA has clearly demonstrated that
Huntingdon's competitors would be able to make affirmative use of
the information that has been withheld under Exemption 4 in this
case.  As Mr. Gilmore attests, the information withheld under
Exemption 4 contains explicit descriptions of nearly every single
aspect of Huntingdon's business operations -- including detailed
discussions of Huntingdon's test designs and methods, and of the
use of those designs and methods in actual tests.  (See Gilmore
Decl. ¶¶ 15-16; see also Caulfield Decl. ¶¶ 35-43.)  Mr. Gilmore
explained how this information could be used affirmatively by
Huntingdon's competitors to replicate Huntingdon's proprietary
test designs and methods, and to erode Huntingdon's market share.
(See Gilmore Decl. ¶ 17; see also Caulfield Decl. ¶ 32.r, y.)
Thus, plaintiff's argument that the withheld information cannot
be put to "affirmative use" by competitors is simply baseless.

Third, plaintiff claims that the release of the withheld
information would not cause competitive harm to Huntingdon
because, "since all of Huntingdon's competitors are required to
comply with the AWA to operate a lawful business, it is difficult
to see why any such competitors would have any interest in
emulating" activity that allegedly violated the AWA.  Pl.'s Mem.
at 28.  Thus, due to its professed "difficultly to see this,"

-24-

plaintiff argues that this information cannot be withheld under Exemption 4.  <u>Id.</u>

However, Mr. Caulfield's declaration makes it very clear that the commercial value of the information contained in these records has not been diminished in any way by the AWA charges brought against Huntingdon.  (<u>See</u> Caulfield Decl. ¶¶ 12-31.)  He avers that all of the studies reflected in the records at issue in this case were conducted in accordance with federal Good Laboratory Practice (GLP) regulations, "the core purpose of which is the assurance of data quality, integrity and reproducibility." (<u>Id.</u> ¶ 13.)  Mr. Caulfield further states that "[n]o study conducted at [the Huntingdon laboratory where the AWA investigation took place] has ever been rejected by any regulatory authority" responsible for ensuring compliance with those GLP regulations.  (<u>Id.</u> ¶ 20.)  Given that the commercial value of the information reflecting these studies is largely defined by their acceptance by these regulatory authorities, (<u>see id.</u> ¶ 27), their value was not affected by the AWA charges against Huntingdon, (<u>see id.</u> ¶¶ 30-31).  Thus, plaintiff's wholly unsupported suggestion that the AWA charges against Huntingdon have diminished the commercial value of the information withheld under Exemption 4 must fail.

Fourth, plaintiff argues that the release of the information withheld pursuant to Exemption 4 could not cause Huntingdon or its clients competitive harm if the identities of clients and

tested compounds were excised.  <u>See</u> Pl.'s Mem. at 28.  Deleting
this information, plaintiff claims, would prevent competitors
from unfairly appropriating information that would enable them to
develop their own competing research services or products.  <u>See</u>
<u>id.</u>  Indeed, plaintiff goes so far as to claim that such
excisions would render "completely unhelpful" the substantial
number of court decisions in which the withholding of product
testing information has been upheld.  <u>See id.</u> at 29.  The
excisions that plaintiff suggests, however, would not in fact
prevent the competitive harm that likely would be caused by the
release of the remaining information.

    The release of Huntingdon's test designs, methods, and
results would cause Huntingdon competitive harm not only because
it would reveal <u>what</u> products were tested, but also because it
would reveal <u>how</u> those products were tested.  (<u>See</u> Def.'s Mem. at
11-12; Gilmore Decl. ¶¶ 17-18; Caulfield Decl. ¶ 32.s.)  These
records describe, in detail, every single aspect of Huntingdon's
test activities -- from how tests are designed to how test
results are observed, collected, organized, analyzed, and
reported.  (<u>See</u> <u>id.</u>; Caulfield Decl. ¶¶ 36-43.)  Given this level
of detail, competitors could use these records to develop and
market their own competing research services without investing
any of the time, cost, or effort necessary to create them
independently.  (<u>See</u> <u>id.</u>)  Recognizing that the release of
records such as these would cause competitive harm by permitting

-26-

competitors to replicate the tests reflected in them, courts have
repeatedly held that withholding them under Exemption 4 is
proper.  See, e.g., Pub. Citizen, 997 F. Supp. 65.

Moreover, the release of this information would allow
Huntingdon's competitors to shorten the amount of time needed for
them to design and conduct product testing for potential clients.
(See Caulfield Decl. ¶ 32.r.)  Potential clients have strong
financial incentives to hasten the approval process for their
products -- which includes the type of testing performed by
Huntingdon and its competitors -- because of the competitive
nature of the industries in which they operate.  (See id. ¶ 32.i,
l-n.)  Releasing the withheld information would allow competitors
to replicate Huntingdon's research services without the
substantial investment of time and effort necessary to develop
such services independently.  (See Gilmore Decl. 17; Caulfield
Decl. ¶ 32.y.)  Thus, competitors would be able to make their
competing research services more attractive to potential
customers by using the withheld information to shorten the time
necessary for them to design and conduct tests.  (See id.)

This competitive harm would not be stemmed by simply
redacting the identity of the compound tested, because the
remaining information would still identify the theraputic class
to which that product belongs.  As Mr. Caulfield avers, "[o]ften
small bits of information - such as the fact that a certain
company is testing a compound on a particular type of animal, the

actual evaluations performed, the sequence and timing of
procedures [and] measurements, etc. - reveal . . . insight into
the theraputic class to which a drug candidate belongs."
(Caulfield Decl. ¶ 32.u.)  Mr. Caulfield further attests that the
release of testing information about one product in a particular
theraputic class "would provide valuable competitive intelligence
that could be used to enable a competitor to make key strategic
decisions regarding their own testing development programs for
competitive products within [that] given theraputic class," (Id.
¶ 32.q), and would provide them with a "head-start" in developing
those competing products, (id. ¶ 32.r).  Moreover, this
information would provide Huntingdon's competitors with
information about how to design and conduct tests to determine
the performance of any product within a particular theraputic
class, regardless of the identity of the actual product tested.
(See id. ¶ 32.r-s.)  Therefore, plaintiff's suggestion that this
information would lose its commercial sensitivity if the identity
of the product tested were to be redacted cannot be sustained.
See Heeny, No. 99-56269, 2001 WL 371921, at *2 (recognizing that
withholding only the name and specifications of a tested product,
but disclosing other information about the product's testing,
would still cause competitive harm).

     Indeed, the futility of plaintiff's suggestion is further
illustrated by the fact that it would not prevent the competitive
harm that likely would result from the release of information

whose commercial sensitivity is wholly unrelated to the
identities of Huntingdon's customers and/or their products.  Such
information includes details concerning "Huntingdon's research
facilities and equipment (including capital improvements
thereto), its information technology systems, and its employee
training programs."  (Gilmore Decl. ¶ 15.E. & 17.B; see also
Caulfield Decl. ¶¶ 35-43.)  This Court has long recognized that
the release of information concerning such "testing resources"
would cause competitive harm.  See Lederle Laboratories v. HHS,
No. 88-0249, slip op. at 18-19 & n.10 (D.D.C. July 14, 1988).

The release of the information that reveals the extent of
Huntingdon's testing resources and their use in particular tests
would provide Huntingdon's competitors with quantitative
information on the productivity and efficiency of Huntingdon's
processes and procedures.  (See Caulfield Decl. ¶¶ 35-43.)  As
noted by Messrs. Caulfield and Gilmore, the withheld information
contains details concerning the facilities where Huntingdon's
research is conducted, the equipment used to conduct that
research, the level of training and expertise of the employees
conducting the research, each specific task that those employees
conducted during the research, and the time required to complete
those tasks.  (See id.; Gilmore Decl. ¶¶ 16-17.)  The release of
such information, from which overhead, labor, and other cost
information can be derived, would provide Huntingdon's
competitors with a comprehensive profile of Huntingdon's cost

structure that could be used to price their own competing services more competitively.  (See Caulfield Decl. ¶¶ 35-43.) Again, this is precisely the type of competitive harm that this Court has recognized in repeatedly upholding the use of Exemption 4 to withhold such information.  See, e.g., Pub. Citizen, 209 F. Supp. 2d at 48 n.7 (reasoning that release of research and development company's cost information would cause competitive harm by enabling competitors to predict prices at which the company would be able to market its products).

Fifth, plaintiff claims that Huntingdon's clients would not suffer competitive harm from the release of this information because "these companies are apparently no longer doing business with Huntingdon."  Pl.'s Mem. at 31.  However, the existence or nonexistence of an ongoing relationship between Huntingdon and its clients is simply irrelevant to the question of whether the release of this information would competitively harm those clients.  Indeed, as plaintiff itself correctly points out, the proper inquiry is whether a competitor's affirmative use of the information would cause competitive harm.  See Pl.'s Mem. at 23-24.  Messrs. Gilmore and Caulfield have explained in detail how this information can be put to affirmative use by the competitors of Huntingdon's clients even if the identities of the products tested were redacted.  (See Gilmore Decl. ¶ 18; Caulfield Decl. ¶ 32.s.)  Thus, whether or not those clients have an ongoing relationship to Huntingdon is simply irrelevant.

-30-

In sum, it is clear that the information concerning Huntingdon's test designs and methods, as well as the results of the tests conducted using those designs and methods, is precisely the same type of product testing information that this and other courts have repeatedly concluded may be withheld under Exemption 4.  It is likewise evident that plaintiff's attempts to distinguish this case from those precedents are wholly unavailing.  Thus, defendant USDA submits that it properly withheld this information pursuant to Exemption 4.

IV.  Information Was Properly Withheld Pursuant To Exemption 5.

Plaintiff argues that defendant USDA improperly withheld nineteen pages in full and one page in part under Exemption 5 pursuant to the deliberative process and attorney work-product privileges.[12]  For the following reasons, defendant USDA maintains that these records were properly withheld because they are subject to both privileges.

A.  This Information is Protected by the Deliberative Process Privilege.

Plaintiff claims that any factual material contained in documents prepared by APHIS investigators was improperly withheld under Exemption 5 because such material cannot be subject to the deliberative process privilege.  See Pl.'s Mem. at 33-34. Plaintiff is simply wrong as a matter of both fact and law.

_____

[12] As noted above, only seventeen pages withheld in full under Exemption 5 remain at issue in this case.

-31-

As noted above, the APHIS investigators' contributions to these deliberations were not, as plaintiff mistakenly claims, purely an objective reporting of all of the facts discovered during the Huntingdon investigation.  See, e.g., Pl.'s Mem. at 36.  Rather, they were, as Mr. Gilmore attests, only "the pertinent facts on which the [investigators'] evaluations and opinions of the charges were based."  (Gilmore Decl. ¶ 23 (emphasis added)).  Mr. Gilmore further avers that these facts "are so inextricably connected to the deliberative material" that their release would itself reveal the agency's deliberative process.  (Id.)

This Court has routinely upheld the use of the privilege to withhold purely factual information in contexts such as this.  See, e.g., Heggestad v. United States Dep't of Justice, 182 F. Supp. 2d 1, 12 n.10 (D.D.C. 2000) (protecting facts "selected by authors from a larger body of factual material" because disclosure would reveal authors' deliberative process); Hamilton Sec. Group, Inc. v. HUD, 106 F. Supp. 2d 23, 33 (D.D.C. 2000) (protecting facts in a draft audit report on the grounds that "any factual information that could be [released] would reveal decisions made by the auditor" and thereby chill future agency deliberations); Melius v. Nat'l Indian Gaming Comm'n, No. 98-2210, 1999 U.S. Dist. LEXIS 17537, at *12 (D.D.C. Nov. 3, 1999) (affirming withholding of "fact summaries that show the investigator's deliberation in determining [plaintiff's]

-32-

suitability" for federal employment).  Thus, defendant USDA

respectfully suggests that factual material contained in these

records was properly withheld under Exemption 5 pursuant to the

deliberative process privilege.[13]

> B.   This Information is Also Protected by the
>      Attorney Work-Product Privilege.

 Plaintiff's sole challenge to the withholding of records

under the attorney work-product privilege concerns only those

records that were generated by APHIS investigators,[14] which

plaintiff erroneously claims "were prepared by [them] in the

regular course of their duty to investigate Huntingdon and report

to their superiors violations of the AWA."  Pl.'s Mem. at 36.  As

discussed above, plaintiff has mischaracterized the nature of

these documents because it has ignored the portion of Mr.

Gilmore's first declaration that describes how these records were

generated during the course of deliberations concerning the

drafting of the AWA Complaint against Huntingdon.  (See Gilmore

Decl. ¶ 22.)  Therefore, inasmuch as plaintiff's sole challenge

---

[13] Furthermore, this factual material has also been withheld
pursuant to the attorney work-product privilege.  (See Gilmore
Decl. ¶ 22.)  Thus, even if the Court were to find that this
factual material was not protected by the deliberative process
privilege, it is nonetheless protected under the attorney work-
product privilege.  See, e.g., Martin v. Office of Special
Counsel, 819 F.2d 1181, 1187 (D.C. Cir. 1987) ("The work-product
privilege simply does not distinguish between factual and
deliberative material.").

[14] It does not appear that plaintiff has challenged USDA's
position that the records generated by the OGC attorney are
protected by the attorney work-product privilege.

-33-

to the withholding of these records under the attorney work-
product privilege rests entirely upon a faulty premise, it
clearly has no merit.

    V.  <u>Defendant USDA Has Conducted An Adequate Search.</u>

    Plaintiff claims that defendant USDA has failed to conduct
an adequate search because it did not locate certain responsive
records provided to USDA by People for the Ethical Treatment of
Animals [hereinafter PETA materials] -- most notably a certain
video tape -- that defendant USDA may have possessed at one time.
<u>See</u> Pl.'s Mem. at 39.  Although defendant USDA does not dispute
that it may have possessed such records at one time, the fact
that it could not locate them does not undermine the
reasonableness of its search.

    Plaintiff's bold assertion that "the Court cannot possibly
determine <u>de novo</u> that the agency has conducted an adequate
search for records" because the agency has not accounted for the
PETA materials that it may have possessed at one time, Pl.'s Mem.
at 40, is simply wrong as a matter of law.  As noted by the D.C.
Circuit, "a search is not unreasonable simply because it fails to
produce all relevant material."  <u>Meeropol v. Meese</u>, 790 F.2d 942,
952-53 (D.C. Cir. 1986); <u>see also, e.g.</u>, <u>Nation Magazine v.
United States Customs Serv.</u>, 71 F.3d 885, 892 n.7 (D.C. Cir.
1995) (explaining that "there is no requirement that an agency
[locate] <u>all</u> responsive documents"); <u>Rothschild v. Dep't of
Energy</u>, 6 F. Supp. 2d 38, 40 (D.D.C. 1998) (explaining that

"[p]erfection . . . is not the standard" for judging an agency's
search).  Because "a search need not be perfect" to be adequate,
Meeropol, 792 F.2d at 956, the Court's inquiry should focus on
"whether the search was reasonably calculated to discover
requested records, not whether it actually uncovered every
document extant," Grand Cent. P'ship, 166 F.3d at 489.  Thus,
plaintiff's argument that the Court cannot determine that
defendant USDA's search was adequate lacks any merit whatsoever.
See, e.g., Ethyl Corp. v. EPA, 25 F.3d 1241, 1246 (4th Cir. 1994)
("In judging the adequacy of an agency search for documents the
relevant question is not whether every single potentially
responsive document has been unearthed.").

Moreover, defendant USDA has not, as plaintiff erroneously
claims, asserted that the video tape that plaintiff seeks has
been destroyed, see, e.g., Pl.'s Mem. at 41, a fact which
plaintiff confusingly appears to admit elsewhere, see Pl.'s Mem
at 43 ("[T]he agency has not submitted a sworn statement that it
in fact destroyed all copies of the videotape and explained the
circumstances under which it may have destroyed this record.").[15]

---

[15] Indeed, as Mr. Gilmore attests in his second declaration,
defendant USDA has located no documentary evidence establishing
that the video tape has in fact been destroyed.  (See Second
Gilmore Decl. ¶ 28.)  Nevertheless, the lack of such
documentation has no bearing whatsoever on the Court's inquiry
into the adequacy of defendant USDA's search.  See, e.g., Roberts
v. United States Dep't of Justice, No. 92-1707, 1995 WL 356320,
at *2 (D.D.C. 1993) (rejecting plaintiff's objection that agency
failed to produce evidence that requested records were destroyed
                                                    (continued...)

-35-

Indeed, as defendant USDA's counsel informed plaintiff's

principal counsel in a letter transmitted to her on October 31,

2002:

> [I]t has not yet been determined that the tape in
> question has been destroyed, and it was not [defendant
> USDA's counsel's] intention to indicate that it was.
> Rather [defendant USDA's counsel] merely suggested, as
> a possible explanation for [defendant USDA's] inability
> to locate the tape, that it may have been destroyed.
> Furthermore, [defendant USDA's counsel] provided
> [plaintiff's counsel] with a copy of the record
> retention schedule in order to suggest that the
> possible destruction of the tape under that schedule,
> if it in fact occurred, would have been consistent with
> the facts surrounding [defendant USDA's] investigation
> of Huntingdon Life Sciences.

(Copy attached hereto as Attach. C.)[16]  Thus, plaintiff is simply

mistaken in suggesting that defendant USDA has asserted that this

video tape was in fact destroyed; rather, defendant USDA simply

has maintained that it has conducted a reasonable search for all

records responsive to plaintiff's request.  See Def.'s Mem. at

31-33.

---

[15](...continued)
as "irrelevant to the Court's inquiry.  When an agency cannot
locate a document, FOIA only requires that the agency show that
it has made a reasonable search.  Nothing in the law requires the
agency to document the fate of documents it cannot find.  If a
reasonable search fails to unearth a document, then it makes no
difference whether the document was lost, destroyed, stolen, or
simply overlooked.") (citation omitted).

[16] Because of an administrative error, defendant USDA's
counsel maintains only an electronic copy of this letter, from
which this attachment was printed.  Defendant USDA has included
with this exhibit a copy of the e-mail by which this electronic
copy was transmitted to plaintiff's counsel.

-36-

Indeed, plaintiff itself has stated that "it is not clear
. . . that [defendant USDA] has exhausted all avenues for
locating a copy of the videotape." Pl.'s Mem. Ex. S at 7. Thus,
in its memorandum plaintiff suggests additional "avenues" for
defendant USDA to pursue in an attempt to locate the video tape
and other PETA materials. See Pl.'s Mem. at 42-43. However, as
discussed below, none of the additional measures suggested by
plaintiff would be "reasonably calculated to uncover" those
records. Oglesby v. United States Dep't of the Army, 920 F.2d
57, 68 (D.C. Cir. 1990).

First, plaintiff claims that defendant USDA's Office of the
General Counsel (OGC) should have been searched because "the
record indicates that [OGC] did in fact have a copy" of the video
tape that it seeks. Pl.'s Mem. at 42 & Ex. BB. However, the
exhibit upon which plaintiff relies, a letter from OGC to
Huntingdon's previous counsel, does not "in fact" indicate that
OGC received that video tape; rather, it says that USDA received
the tape. See Pl.'s Mem. Ex. BB. Furthermore, it is clear from
the record attached as plaintiff's Exhibit CC that the video tape
was received by USDA's Animal Care Eastern Regional Office and
then was forwarded to USDA's Investigative and Enforcement
Services (IES), see Pl.'s Mem. Ex. CC, both of which were
searched in response to plaintiff's request, (see Second Gilmore
Decl. ¶¶ 4-17). Thus, there is simply no basis in the record to

-37-

support plaintiff's claim that OGC maintains the video tape that plaintiff seeks.

Indeed, as Mr. Gilmore attests in his second declaration, APHIS would not have forwarded the video tape to the OGC because it was not used as evidence against Huntingdon.  (See Second Gilmore Decl. ¶ 21.)  Moreover, even if the OGC did once have a copy of this video tape, in the ordinary course of business it would have been forwarded to the IES APHIS office shortly after the filing of the Consent Decree in the Huntingdon case.  (See id. ¶ 18.)  Nevertheless, "in an abundance of caution, OGC staff who worked [on the Huntingdon case] searched their individual files, division files, and electronic files" in an effort to locate any records from the Huntingdon investigation.  (Id. ¶ 19.)  As could be expected in light of the foregoing discussion, no PETA materials -- including the video tape that plaintiff seeks -- were located by that search.  (See id. ¶ 20.)

Second, plaintiff claims that USDA's search was inadequate because IES investigator Ron Carter was not "asked to search his home or his files to find any of the requested [PETA] records." Pl.'s Mem. at 42.  While it may be true that Mr. Carter -- who was the lead investigator in the Huntingdon investigation -- may be aware of the location of the PETA materials that plaintiff seeks, he no longer works for defendant USDA.  (See Keyser Decl. ¶ 4.)  This Court has held that "the FOIA does not impose an obligation on defendant to contact former employees to determine

-38-

whether they know of the whereabouts of records that might be
responsive to a FOIA request."  <u>Blanton v. United States Dep't of
Justice</u>, 182 F. Supp. 2d 81, 85 (D.D.C. 2002).  Therefore, the
fact that defendant USDA did not ask former employee Ron Carter
about the location of the PETA materials that plaintiff seeks
does not undermine the adequacy of its search.

Nevertheless, defendant USDA took the additional step of
asking IES Investigator Francis Keyser, who assisted Mr. Carter
on the Huntingdon investigation.  (<u>See</u> Gilmore Decl. ¶ 26; Second
Gilmore Decl. ¶¶ 24-25.)  As Mr. Keyser has now specifically
attested, Mr. Carter personally retained custody of all materials
collected during the Huntingdon investigation.  (<u>See</u> Keyser Decl.
¶ 17.)  Of those materials, only those authenticated items that
substantiated the Huntingdon Report of Violation would have been
forwarded to IES by Mr. Carter.  (<u>See</u> <u>id.</u> ¶¶ 18, 20.)  Any
unauthenticated or extraneous materials collected during the
investigation would have remained with Mr. Carter, who likely
would have disposed of them in accordance with IES's records
retention schedule.  (<u>See</u> <u>id.</u> ¶ 18.)  Mr. Keyser further attests
that IES has not located any records that Mr. Carter turned over
upon his resignation.  (<u>See</u> <u>id.</u> ¶ 22.)

Third, plaintiff claims that defendant USDA's search was
unreasonably narrow because "much of the search was conducted
only using the search term 'Huntingdon.'"  Pl.'s Mem. at 42.
Finding fault with this, plaintiff suggests that other terms,

-39-

such as "PETA," "AWA violations," and "videotape" should have
been used to search for responsive records.  Pl.'s Mem. at 42.

However, the search conducted in this case was not nearly as
restrictive as plaintiff suggests.  Indeed, as Mr. Gilmore
attested in both his first and second declarations, the searches
conducted in this case included multiple manual searches in all
of the offices involved in the Huntingdon investigation.  (See
Gilmore Decl. ¶ 26; Second Gilmore Decl. ¶¶ 9, 14.)  Furthermore,
individuals who participated in the Huntingdon case were asked
about the possible location of any additional responsive records.
(See Gilmore Decl. ¶ 26; Second Gilmore Decl. ¶¶ 23, 25-27;
Keyser Decl. ¶ 22.)

Additionally, the terms that defendant USDA used to conduct
its search -- the subject's name ("Huntingdon") in conjunction
with its APHIS registration number ("22-R-040") or investigation
Program Code ("Animal Care")[17] -- is in fact based upon, and is
consistent with, how APHIS investigatory records actually are
indexed.  (See Second Gilmore Decl. ¶¶ 6-8, 16.)  Therefore, it
is clear that APHIS's records "are not indexed in a manner such
that responsive records could have been located using" the
additional search terms suggested by plaintiff.  Greenberg v.
Dep't of Treasury, 10 F. Supp. 2d 3, 13 (D.D.C. 1998).

---

[17] Defendant USDA notes that Mr. Gilmore's first declaration
described only the use of the term "Huntingdon" in the searches
for responsive records.

-40-

In sum, defendant USDA's search was "reasonably calculated to uncover all relevant documents," <u>Weisberg</u>, 705 F.2d at 1351, and the fact that defendant USDA was unable to locate the PETA Materials that plaintiff seeks should not prevent the Court from drawing that same conclusion.  <u>See, e.g.</u>, <u>Nation Magazine</u>, 71 F.3d at 892 n.7 ("Of course, the failure to turn up this document does not alone render the search inadequate."); <u>Roberts</u>, No. 92-1707, 1995 WL 356320, at *2 ("Nothing in the law requires the agency to document the fate of documents that it cannot find.").

-41-

Conclusion

For the foregoing reasons, defendant USDA respectfully requests that its motion for summary judgment be granted, and that plaintiff's motion for partial summary judgment be denied.

Respectfully submitted,

_____
ROSCOE C. HOWARD, JR.
(D.C. Bar #246470)
United States Attorney


_____
MARK E. NAGLE
(D.C. Bar #416364)
Assistant United States
   Attorney


Dated:  March 21, 2003
_____
FRANK P. MENNA
Senior Attorney
Office of Information and
   Privacy
United States Department of
   Justice
Flag Building, Suite 570
Washington, DC  20530-0001
(202) 514-3642