UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN DEFENSE OF ANIMALS,                    )
                                          )
    Plaintiff,                            )
                                          )
v.                                        )      Civ. No.  02-0557 (RWR)
                                          )
UNITED STATES DEPARTMENT OF               )
    AGRICULTURE,                          )
                                          )
    Defendant.                            )

### PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION
### TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

#### Introduction

In this case under the Freedom of Information Act ("FOIA"), plaintiff In Defense of Animals

("IDA") seeks access to the closed investigatory records of the United States Department of

Agriculture ("USDA") concerning its 1997 investigation of Huntingdon Life Sciences

("Huntingdon").  IDA seeks access to such information to shed light on how the USDA administers

the Animal Welfare Act ("AWA"), and to scrutinize the basis on which the USDA settled the case

only a week after filing its Complaint against Huntingdon.  See Plaintiff's Summary Judgment

Memorandum ("Pl. SJ Mem.") at 1, 7.[1]

As IDA further explained, IDA is not interested in obtaining any information that would

identify any individuals who work for Huntingdon, nor is it interested in obtaining any of

Huntingdon's "Standard Operating Procedures," "test protocols and protocol amendments," "dosing

charts," or "animal tracking and assessment records."  See Pl. SJ Mem. at 13; see also Plaintiff's

---

[1] Indeed, in its latest brief to the Court, the USDA has now disclosed a document that it
previously withheld in its entirety under Exemption 5 of the FOIA, which contains Huntingdon's
initial settlement proposal to the government -- which, with extremely minor exceptions, was
subsequently adopted by the agency in toto.  Compare Informational Memorandum For the
Assistant Secretary, Government's Attachment B, with Consent Decision and Order, Plaintiff's
Exhibit H.

Statement of Material Facts (hereinafter "Pl. SMF") at ¶¶ 12, 14.  In addition, IDA has also made it

absolutely clear that the USDA may delete from all of the remaining records at issue any information

"that identifies any of Huntingdon's customers or the products or compounds that were the subject

of any of the research projects that were underway when the agency conducted its investigation." Pl.

SMF ¶ 14 (emphasis added).[2]

Although neither the government nor Huntingdon disputed any of these material facts as to

what is not at issue in this case, they nevertheless continue to insist – in both their briefs and their

declarations – that IDA is attempting to obtain access to Huntingdon's valuable "Standard Operating

Procedures," "test designs and methods," "confidential methods and procedures," "identities of

Huntingdon's customers," and "proprietary test chemical information."  See, e.g., Government

Summary Judgment Memorandum ("Gov't SJ Mem.") at 11-17, 22-25; Gov't Opp. at 23, 25-26, 30;

Gilmore Declaration at ¶¶ 17-18; Caulfield Decl. at ¶¶ 35-43, 39a.  However, since the record

demonstrates that this simply is not true, and since the agency has a statutory obligation to segregate

and disclose to IDA all non-exempt information that IDA does wish to obtain, the USDA simply

cannot be granted summary judgment based on its continued insistence that plaintiff seeks access to

_____

[2]Thus, Huntingdon's sensational charge that IDA is somehow using this FOIA case to
"destroy" Huntingdon is completely baseless, and is further belied by IDA's well established use
of FOIA to assist federal agencies in enforcing the Animal Welfare Act and other laws that
govern animal research.  See Declaration of Eric Kleiman ("Kleiman Decl."), Plaintiff's Exhibit
("Pl. Ex.") EE, ¶¶ 4-7.  Indeed, Huntingdon's scandalous, erroneous, and completely immaterial
allegations should be wholly disregarded by the Court.  IDA has never promoted or encouraged
any violent activities against Huntingdon, and the tactics employed by a completely different
group can in no way be attributed to IDA, simply because both groups opposed Huntingdon's
mistreatment of animals.  Indeed, IDA severed its relationship with Joseph Bateman, the teenager
mentioned in Huntingdon's brief, soon after he made the insensitive and completely
unauthorized remarks that are quoted by Huntingdon, and  the district court order to which
Huntingdon refers was entered into voluntarily by IDA, which agreed not to engage in any
residential protests of Huntingdon, but did not give up its First Amendment right to engage in
otherwise lawful protests of Huntingdon's animal research facility.

-2-

records it does not want.

More fundamentally, as discussed below, consistent with the basic Rules of Civil Procedure, the Local Rules of this Court, and well established tenets of FOIA law, the USDA has simply failed to meet its burden of proof in this case.  Accordingly, IDA is entitled to prevail on its motion for partial summary judgment with respect to all of the records and information withheld under Exemption 4.  Public Citizen Health Research Group v. Food and Drug Administration, 185 F.3d 898, 905 (D.C. Cir. 1999).  As IDA has also explained, and as further demonstrated below, IDA is also entitled to a Vaughn index and/or discovery concerning the agency's Exemption 5 claims, and it needs discovery to further demonstrate that the agency has failed to produce all responsive records.

## ARGUMENT

## I.   BECAUSE THE USDA HAS FAILED TO CARRY ITS BURDEN OF PROOF THAT INFORMATION IS EXEMPT FROM DISCLOSURE UNDER EXEMPTION 4, PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY JUDGMENT.

### Introduction

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the moving party is not entitled to summary judgment unless it demonstrates to the Court that "there is no genuine issue as to any material fact" that is necessary to meet its burden of proof that it is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  In this Circuit, to make this necessary demonstration, under Local Rule 7.1h, "[e]ach motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is not genuine issue."  (Emphasis added); see also Waterhouse v. District of Columbia, 298 F.3d 989, 991 n.2 (D.C. Cir. 2002).  As the Court of Appeals has explained, this procedure "isolates the facts that the parties assert are material, distinguishes disputed from undisputed fact, and identifies the pertinent parts of the record."  Gardels v. CIA, 637 F.2d 770, 773 (D.C. Cir. 1980).

Thus, as the Court of Appeals has further explained, "a district court should not be obliged" to sift through the record "in order to make his own analysis and determination of what may, or may not, be a genuine issue of material disputed fact." Twist v. Meese, 854 F.2d 1421, 1425 (D.C. Cir. 1988). Instead, "a district court may legitimately look to and rely upon counsel to identify the pertinent parts of the record, to isolate the facts that are deemed to be material, and to distinguish those facts which are disputed from those that are undisputed." Id.; see also Jackson v. Finnegan, Henderson, Fabrabow, Garrett& Dunner, 101 F.3d 145, 153 (D.C. Cir. 1996) ( "[i]n plain terms, [the rule] places the burden on the parties to focus the court's attention on the salient factual issues in what otherwise may amount to a mountain of exhibits and other materials"); Jones v. Billington, 12 F. Supp.2d 1, 3 (D.D.C. 1997) ("the Circuit has liberated the lower courts from any duty to rummage independently through the voluminous records that often accompany summary judgment motions"). Accordingly, as Judge Urbina of this Court recently observed, "the D.C. Circuit has repeatedly upheld district court rulings that hold parties to strict compliance with this rule." Robertson v. American Airlines, 239 F. Supp.2d 5, 8 (D.D.C. 2002), citing Burke v. Gould, 286 F.3d 513, 517 (D.D. Cir. 2002); Gardels; see also Jackson,101 F.3d at 151 (failure to comply with this requirement "may be fatal to the delinquent party's position"), citing Gardels.

### The USDA Failed To Prove The Facts Needed To Support Its Exemption 4 Claims.

Here, the USDA – which bears the burden of proof in this case – moved for summary judgment with respect to hundreds of pages of records in their entirety, and portions of hundreds of additional records, on the grounds that all of this information is exempt from disclosure under Exemption 4 as either "trade secrets" or "confidential commercial information," within the meaning of National Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974). See Gov't SJ Mem. at 7-25; Declaration of Hugh Gilmore at 6-16.   However, in support of its motion, the

-4-

government filed a Statement of Material Facts that only addressed the administrative processing of

IDA's request.  <u>See</u> Defendant's Statement of Material Facts As To Which There Is No Genuine

Issue (December 12, 2002). Thus, <u>that Statement contains absolutely no facts that would demonstrate</u>

<u>that the USDA is entitled to judgment as a matter of law concerning its Exemption 4 claim.</u>  <u>Id.</u> [3]

    In response to the USDA's motion, IDA explained that the agency had failed to demonstrate

that it is entitled to summary judgment because it only submitted a declaration from its FOIA officer,

who has absolutely no "personal knowledge" of Huntingdon's practices or the competitive value of

any of the information at issue, as required by Rule 56(e) and the standards that apply to

demonstrating the applicability of Exemption 4.  <u>See</u> Pl. SJ Mem. at 19-22. Accordingly, IDA also

moved for partial summary judgment with respect to all of the records that have been withheld under

Exemption 4, and it submitted its own Statement of Material Facts in support of <u>that</u> motion, which

demonstrated that Mr. Gilmore is not employed by Huntingdon or any other animal testing or

research facility.  <u>See</u> Pl. SMF ¶ 15.

    In their response – which is both their reply to plaintiff's opposition to their motions for

summary judgment <u>and</u> their opposition to plaintiff's motion for partial summary judgment – the

USDA and Huntingdon rely on an entirely <u>new</u> declaration from an officer of Huntingdon – Michael

Caulfield. However, neither the government nor Huntingdon submitted any supplemental Statement

of Material Facts in support of their motions for summary judgment based on any of the averments

of fact contained in Mr. Caulfield's declaration.

    Accordingly, it could not be clearer that, under both Rule 56(c) and Local Rule 7.1(h), the

USDA has failed to carry its burden of proof -- in either its opening brief or its reply brief – that any

---

[3] Huntingdon, which intervened in this action with IDA's consent, also filed a motion for summary judgment that simply incorporated by reference the government's motion and memorandum.  <u>See</u> Intervenor Life Science Research, Inc's Motion For Summary Judgment (December 20, 2002).

of the information at issue in this case is exempt from disclosure under Exemption 4. Accordingly,

IDA's motion for partial summary judgment on this issue should be granted. See Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986) (a moving party is "entitled to judgment as a matter of law" against

"a party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case and on which that party will bear the burden of proof at trial"); Public Citizen v.

FDA, 185 F.3d at 905 (ordering the disclosure of the IND file for which the agency failed to meet

its burden under Exemption 4); Carlton v. Dep't of Interior, Civ. No. 97-2105 (D.D.C. Sept. 3, 1998),

Pl. Ex. AA.[4]

## II.     THE USDA IS NOT ENTITLED TO SUMMARY JUDGMENT.

For the same reason – i.e., its failure to include in its Statement of Material Facts those facts

that support its Exemption claims, as well as the facts that it contends demonstrate that it conducted

an adequate search – the USDA is also not entitled to summary judgment. See Anderson, 477 U.S.

at 247 (moving party must demonstrate that there are "no genuine issue as to any material fact" that

they are required to prove in order to prevail as a matter of law); Waterhouse, 298 F.3d at 991; Twist,

854 F.2d at 1424; Gardels 637 F.2d at 773.   In addition, as demonstrated below, there are numerous

disputes about the records at issue, the government's justification for withholding them, and the

agency's efforts to locate all responsive records, which also preclude entry of summary judgment for

the government.

---

[4]Nor can the defendants possibly rely on the declarations of either Mr. Gilmore or Mr.
Caulfield to fulfill the role of the requisite Statement of Material Facts, since neither meets the
requirements of the Local Rule, they both discuss in great detail records and information that are
simply not at issue in this case, see infra at 12, and they also both include a mix of both factual
issues and legal arguments. See e.g., Robertson, 239 F. Supp.2d at 7 ("[m]erely incorporating
entire affidavits and other materials without reference to the particular facts recited therein is not
sufficient"), citing Gardels, 637 F.2d at 773; see also Robertson at 8-9 (memorandum that
expands 30 pages and "liberally mixes fact with argument" cannot substitute for required
Statement of Material Facts).

**A.      The USDA Has Failed To Provide An Index
Of The Records As Required By Vaughn v. Rosen.**

The USDA has failed to provide even an <u>index</u> of the records and portions of records that have been withheld, let alone to justify the withholding of each such record and portion of a record as required by <u>Vaughn</u>. <u>See</u> Pl. SJ Mem. at 31, 36-39. In response, the government admits that Mr. Gilmore's declaration "is not a formal <u>Vaughn</u> index," Gov't SJ Opp. at 7, but asserts that "a formal <u>Vaughn</u> index is not absolutely necessary to the resolution of every FOIA case." Gov't SJ Opp. at 8. However, the only case the government cites from <u>this</u> Circuit, <u>Ogelsby v. U.S. Dep't of Army</u>, 79 F.3d 1172 (D.C. Cir. 1996), is completely at odds with the government's position, since not only were extensive <u>Vaughn</u> indices submitted in that case, but the Court's discussion of the <u>Vaughn</u> requirements in <u>Ogelsby</u> highlights the deficiencies that exist in the Gilmore Declaration submitted here.

Thus, in <u>Ogelsby</u>, the Court explained that "<u>Vaughn</u> and its progeny require that an agency itemize *each* document and explain the connection between the information withheld and the exemption claimed." 79 F.3d at 1180 (emphasis in original). Here, however, the USDA has presented no such index of the records at issue -- <u>i.e.</u>, the Gilmore Declaration does not identify any of the documents by number or any other identifier that would allow IDA to address "each document," or portion of the hundreds of documents that have been withheld here, or that would permit this Court to conduct the requisite *de novo* review of the agency's exemption claims. <u>See</u> <u>Ogelsby</u>, 79 F.3d at 1179 (the agency's affidavit must "contain[] sufficient detail to allow a reviewing court to assess the applicability of the claimed exemptions to the undisclosed information"); <u>see also</u> <u>id.</u> (the agency's declaration "described each of nineteen separate documents [the] Army had identified as responsive to Ogelsby's request," by Number – <u>e.g.</u>, "Document 3," etc., and "detailed

the justifications for any unreleased portions" of <u>each such document</u> ).[5]

For example, Mr. Gilmore states that the agency has withheld 125 pages of "Final Test Reports and Related Records," Gilmore Decl. at 6, but fails to state how many of these are "related records" or to explain <u>how</u> such records are "related" and why all of the contents of each such "related" record is exempt from disclosure. In addition, since IDA has informed the agency that it does not seek access to any "test protocols and protocol amendments," <u>see</u> <u>supra</u> at 2, it is not at all clear why any records that "contain <u>detailed descriptions of the designs and methods</u> used in Huntingdon's laboratory studies," including what Mr. Gilmore describes as "<u>confidential test protocols</u>,"nevertheless remain at issue in this case. <u>See</u> Gilmore Decl. at 6 (emphasis added).

Similarly, because there is no <u>Vaughn</u> index, there also is no way for plaintiff – or the Court – to address any of the government's assertions with respect to the hundreds of documents that have been withheld in part. Although IDA is able to locate samples of <u>some</u> of these records based on Mr. Gilmore's general descriptions, because the government has not indexed the documents in any way – <u>i.e.</u>, by page number of other identifying mark – IDA is unable to locate each of the records within the hundreds of pages of records that the agency has provided to the plaintiff, and to correlate the

---

[5]Indeed, because the agency has failed to produce a <u>Vaughn</u> index, the complete universe, as well as total number, of documents that remain at issue is not even clear. Thus, for example, in its November 27, 2002 letter to plaintiff, the government's lawyer identified 16 different <u>categories</u> of information that remained at issue, and provided the number of pages that qualified under each such category. <u>See</u> Pl. Ex. T. In response, IDA notified the government that it could exclude from the records three of those categories, <u>i.e.</u>, all of the "test protocols and protocol amendments;" "animal tracking and assessment records;" and all of the "dosing charts" – leaving 13 categories still at issue. <u>See</u> Plaintiff's Letter (December 12, 2002), Pl. Ex. U. Yet, Mr. Gilmore's Declaration does not appear to address two of the categories that were included in the government's November 27, 2002 letter that were <u>not</u> withdrawn by plaintiff, including (1) "Communications Between Huntingdon and its Clients;" and (2)"Miscellaneous Records." It is not clear whether this is because all of the records listed in those particular categories are subsumed by <u>other</u> categories that are listed in Mr. Gilmore's Declaration, or whether there is some other explanation for the difference in the two lists. <u>See</u> <u>also</u> Kleiman Decl. ¶ 13.

deleted portions of those records with the agency's exemption claims.  See Kleiman Decl. ¶ 14.

Accordingly, it is impossible for plaintiff to ascertain which portions of which particular records the

government has withheld, and the basis for each such deletion.[6]

Therefore, whether the USDA wants to call it a "formal" Vaughn index or not is beside the

point.  The fact remains that, in this Circuit, to provide the plaintiff with some adversarial basis for

contesting the agency's exemption claims, and to allow the Court to perform the necessary *de novo*

review of those claims, at an absolute minimum, the agency must produce an affidavit that includes

what the Court of Appeals has determined are the "three indispensable elements of a Vaughn index:"

(1) the declaration must be a complete "index" of the records and portions of records that are at issue;

(2) the index "must adequately describe each withheld document or portion from a released

document;" and 3) the index "must state the exemption claimed for each deletion or withheld

document, and explain why the exemption is relevant" to each deletion.  Founding Church of

Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979) (emphasis added).

### B.    Mr. Caulfield's Declaration Is Entirely Too Conclusory To Satisfy The Government's Burden of Proof Under Exemption 4.

In its opening brief, IDA demonstrated that Mr. Gilmore lacks the requisite personal

knowledge under Rule 56(e) to grant summary judgment to the USDA on the agency's Exemption

---

[6]For example, in its motion for summary judgment, the government only identified two categories of information as constituting "trade secrets" under Exemption 4 – i.e. (1) "Huntingdon's test designs and methods," and (2) "[t]he experimental compounds tested by Huntingdon." Gov't SJ Mem. at 22-24.  However, since IDA had withdrawn its request for any such information, it explained that there was no need for it to address the government's "trade secrets" argument. Pl. SJ Mem. at 17-18.  Yet, now, in its reply brief, the government asserts that six different types of records are all exempt in their entirety "to the extent that they reveal Huntingdon's confidential test designs and methods." Gov't Opp. at 20, n.11 (emphasis added). However, without a Vaughn index, plaintiff is unable to ascertain which information the government contends "reveals," but does not directly identify, such information, or how those records nevertheless "reveal" this information.  See Kleiman Decl. ¶ 15.

4 claims.  See Pl. SJ Mem. at 19-23.  In response, clearly recognizing that plaintiff is correct on this

point, the government now relies on a new declaration from Michael Caulfield, an officer of

Huntingdon.  However, for several reasons, the defendants are also not entitled to summary judgment

on the basis of the belated declaration of Mr. Caulfield.[7]

First, although Mr. Caulfield repeats many times that disclosure of the requested information

will result in "competitive harm" to Huntingdon, nowhere in his 33-page declaration, does he state

that such harm is likely to be "substantial," as required to sustain the government's burden of proof

in this case.  See National Parks, 498 F.2d at 770 (emphasis added).

Second, apparently in an effort to impress the Court with what Huntingdon believes is its

strongest case, Mr. Caulfield -- like the government -- continues to address many categories of

information that simply are not at issue here.  Thus, for example, although IDA has made it

absolutely clear that it does not seek access to any "standard operating procedures" ("SOPs") or "test

protocols and protocol amendments," much of Mr. Caulfield's declaration largely focuses on the

---

[7]Although the government continues to insist that Mr. Gilmore has the requisite "personal
knowledge" that is required by Rule 56(e), Gov't Opp. at 5-6, neither of the cases it cites for this
proposition is helpful to its cause.  Thus, Hall v. United States Dep't of Justice, 63 F. Supp.2d 14
(D.D.C. 1999), simply held that an FBI agent and FBI attorney had the requisite "personal
knowledge" to verify that the records at issue there were compiled by the FBI "for a law
enforcement purpose," "relate to a confidential source,"and discussed persons who were "in fact
still alive" – all of which the FBI was required to prove to meet its burden of proof that the FOIA
law enforcement exemptions it relied on applied to the withheld records.  See id at 16; see also 5
U.S.C. § 552(b)(7)(C), (D).  However, in sharp contrast to what the government must prove here,
to demonstrate the applicability of Exemption 4, all of those matters fell directly within the
purview of the FBI officials who submitted the declarations.  In Center for Auto Safety v.
National Highway Traffic Administration, 93 F. Supp.2d 1 (D.D.C. 2000), the court held that
engineers who worked for the automobile manufacturers had the requisite "personal knowledge"
to testify about certain airbag information that had been submitted to the government by the
automobile manufacturers, because of "their positions and job responsibilities." Id. at 12.  Here,
however, because Mr. Gilmore has no "position" or "job responsibilities" within the USDA other
than the handling of FOIA requests, he clearly lacks the requisite personal knowledge to prove
that Huntingdon will suffer "substantial competitive injury" if the records at issue are disclosed.

competitive harm that it will suffer if the Court orders the disclosure of "test protocols and protocol amendments," "test designs and methods," "references to its SOPs," "unique Huntingdon procedures," and "specific details on study designs." See, e.g. Caulfield Decl. at ¶¶ 22, 24, 31, 32, 32q-r, 39, 40a, 41a, 42a-d, 43f; see also Caulfield Decl. ¶¶ 35l, 36l (disclosure will allow competitors "to unfairly replicate Huntingdon's SOPs"). In addition, although IDA has also made it clear that the agency may delete from the records "any information that identifies any of Huntingdon's customers or the products or compounds that were the subject of any of the research projects that were underway when the agency conducted its investigation," see Pl. Ex. U; Pl. SMF ¶ 14, Mr. Caulfield nevertheless insists that disclosure of the requested information will harm the company competitively because it will result in the disclosure of "the identity of Huntingdon's customers," as well as "proprietary test chemical information." Caulfield Decl. at ¶¶ 39a, 36a, 41a, 43f (emphasis added).

Therefore, although IDA certainly does not concede that any of the information that it has withdrawn from its request is necessarily exempt under Exemption 4, Mr. Caulfield – like the USDA – simply fails to understand that, under the FOIA, the agency has a mandatory duty to disclose all segregable non-exempt information from the requested records. See Pl. SJ Mem. at 16-17; Schiller v. NLRB, 964 F.2d 1205, 1209 (D.C. Cir. 1992) (an agency "cannot justify its withholding an entire document simply by showing that it contains some exempt material").

Third, Mr. Caulfield's declaration is filled with the very kind of "[c]onclusory and generalized allegations of substantial competitive harm" that the Court of Appeals has repeatedly held "cannot support an agency's decision to withhold requested documents" under Exemption 4. See e.g., Public Citizen Health Research Group v. FDA, 704 F.2d 1280, 1291 (D.C. Cir. 1983); Public Citizen v. FDA, 185 F.3d 898, 906 (D.C. Cir. 1999). Indeed, in Public Citizen, id., which

involved a request for access to Investigational New Drug Applications ('INDs') that had actually been submitted by a drug company to the Food and Drug Administration for approval, the Court of Appeals rejected as wholly insufficient an affidavit that is strikingly similar in kind to Mr. Caulfield's. Thus, the Court explained:

> The affidavit of Schering's Dr. Ronald J. Garutti contains only conclusory assertions that disclosure would cause substantial competitive harm. For example, the affiant states that disclosure "would reveal substantial basic research" as well as "disease models . . . that have been developed by Schering at great expense," and that "[t]oxicology data . . . have significant value beyond the compound under investigation . . . [and would be applicable] to any drug product any of whose metabolites were identical or similar to those of IND 18113 . . . [and] other drugs [of] similar chemical type. Dr. Garutti attests that the clinical protocols also "have applicability beyond the specific drug being tested" and that disclosure "would have substantial commercial value to any company attempting to develop cardiovascular therapies generally."

185 F.3d at 906 (emphasis added)

Indeed, if anything, those assertions of competitive harm – which the Court of Appeals held failed to satisfy the government's burden – were actually far more detailed than the ones provided by Mr. Caulfield, since, in Public Citizen, the agency at least provided proof that the company had actually submitted a new drug application for approval by the agency. In addition, the name of the sponsor of that drug was identified, and the fact that the compound was intended as a "cardiovascular therapy." Id. Here, however, in sharp contrast, Mr. Caulfield has not provided any information demonstrating that any of the research that was the subject of the USDA's 1997 investigation relates to any drug or other product for which a sponsor has ever sought or obtained regulatory approval. Nor, in light of IDA's exclusion of any information that identifies either a customer of Huntingdon's or any of the compounds or products it was testing when the agency conducted its investigation, would any of that information be revealed by disclosure of the remaining information.

Moreover, like the affidavit that was rejected in <u>Public Citizen</u>, Mr. Caulfield's declaration

is extremely conclusory, and simply repeats – over and over again – the same boilerplate explanations

of general competitive harm. Thus, for example, with respect to all but one category of records, Mr.

Caulfield states that:

> [a]llowing Huntingdon's competitors access to this information wold cause
> Huntingdon competitive harm by <u>easily allowing them to use these records
> to replicate Huntingdon's procedures</u>, which are the result of decades of
> business evolution . . . [that] Access by Huntingdon's competitors to highly
> confidential, quantitative information on the productivity and efficiency of
> Huntingdon's processes and procedures <u>would provide them with fundamental
> and critical business intelligence</u>," [and that] "this information would enable
> competitors to <u>copy the detailed configuration of Huntingdon's confidential
> business practices, to measure and improve their own productivity performance,
> without any requirement that Huntingdon be compensated in any way.</u>

<u>See</u> Caulfield Decl. ¶ 35h, i, k; ¶ 36h, i, k; ¶37h, i, k; ¶38h, i, k; ¶39h, i, k; ¶40h, i, k; ¶41h, i, k;

¶ 42f, g, i (emphasis added).[8]

The USDA's reliance on such boilerplate assertions of competitive harm makes a complete

mockery of both the adversarial process that is required in FOIA cases, as well as this Court's duty

to conduct a meaningful *de novo* review of the agency's withholding and to "narrowly construe" the

exemptions claimed by the agency. <u>Dep't of the Air Force v. Rose</u>, 425 U.S. 352, 361 (1976). The

government's belief that it can nevertheless meet its burden of proof simply by asserting that the

kinds of records and portions of records that have been withheld here are the same "types" of

---

[8]Indeed, Mr. Caulfield even uses identical descriptions of records and portions of records
that fall within several <u>different</u> categories of records at issue in this case. For example, with
respect to all of the records that are being withheld as "clinical observation raw data reports,"
"necropsy and postmortem examination reports,"and "viability records," Mr. Caulfield states that
"[t]hese records contain information on specific dosages administered to test subjects, unique
animal identities, pharmacological responses of test subjects to experimental compounds . . . ."
<u>See</u> Caulfield Decl. ¶35a; ¶ 36a; ¶37a; <u>see also</u> Caulfield Decl. ¶ 38a (describing "veterinary
treatment requests and logs" as "records [that] contain information on pharmacologic responses
of test subjects to experimental test compounds").

information that this Circuit has upheld in other Exemption 4 cases, Gov't Opp. at 8, 13-14, 19, 25, only highlights the government's complete lack of understanding of its burden of proof.

For example, the government relies heavily on the district court opinion in Public Citizen Health Research Group v. FDA, 997 F. Supp. 56 (D.D.C. 1998), affirmed in part, 185 F.3d 898, in which the court held that pre-clinical animal studies contained in an IND file were exempt from disclosure. However, not only did the declarations submitted in that case provide detailed information concerning the kind of drug that was being tested, detailed descriptions of the information that was contained in the IND, and a detailed account of "the context" in which the FDA had put a regulatory "hold" on that particular IND, 997 F. Supp. at 65, but, in sharp contrast to the declaration provided here, the court also observed that the drug company had "copiously cross-matched each of its allegations of competitive commercial harm with each document summarized in its Vaughn index." Id. (emphasis added); see also id. at 63 ("Schering has also supplied detailed *Vaughn* indices identifying each contested document and the reason for non-disclosure, and these *Vaughn* indices are extensively cross-referenced in the Miller Declaration") (emphasis added).

Here however, Mr. Caulfield's declaration does not remotely come close to providing either the same level of specificity of competitive harm that was provided in Public Citizen, including, for example, whether any of those products to which the 1997 research data relate were ever even submitted to a regulatory agency for approval, or, for that matter, whether any of this information is at all pertinent to any current research at all. Furthermore, it certainly does not "copiously cross-match" each allegation of competitive harm with "each document" at issue, 997 F. Supp. at 65, since, as discussed *supra* at 7-9, neither Huntingdon nor the USDA provided any index of the records at

issue.[9]

Nor, other than the self-serving statement that "often small bits of information . . . reveal valuable trade secrets to competitors," Caulfield Decl. ¶ 32u, have either the government or Huntingdon provided any cogent explanation as to how the release of any of this material could be of any "affirmative" competitive use by a competitor, when the government may delete all references to both the products being tested and the companies for which they were tested. See Pl. SJ Mem. at 28-29; see also Public Citizen Health Research Group v. FDA, 539 F. Supp. 1320, 1327 (D.D.C. 1982) (it is "hard to conceive of how substantial competitive injury would result from [the] release" of commercial information that is "void of specific information on particular companies" ).[10]

## C.   The Government's Conclusory Assertions Of Competitive Harm Are Disputed.

At an absolute minimum, the Court must allow IDA to engage in some adversarial testing of the defendants' sweeping assertions of competitive harm, by permitting IDA not only to obtain a Vaughn index from the agency, but also to take discovery concerning those assertions. See Vaughn, 484 F.2d at 828 (adversarial testing is required where government relies on "conclusory justification[s]"); see also Rule 56(f), Fed. R.Civ. P.; Stagno Decl. ¶¶ 4-5; Kleiman Decl. ¶¶ 13-15.

---

[9]Indeed, as discussed *supra*, on appeal the Court of Appeals in Public Citizen ruled that one of the declarations relied on by the drug companies – which, like Mr. Caulfield's contained only "conclusory assertions" of competitive harm – did not justify the government's withholding of the information under Exemption 4. Accordingly, it reversed the district court on this point and required the immediate release of that information. See 185 F.3d at 905.

[10]The sole case relied on by the government, an unpublished decision from the Ninth Circuit, Heeny v. FDA, 2001 WL 371921 (9th Cir. 2001), is completely unhelpful to the government, since not only did it involve "design, testing, and materials specifications" -- none of which is at issue here -- but the court held that the disclosure of such information could cause the drug company "substantial competitive injury" "in the context of the FDA finding that it was not 'substantially equivalent to devices already on the market.'" Id., at *1 (emphasis added). Here, however, the USDA has not provided any information that is even remotely comparable concerning the regulatory status of the specific information at issue.

For example, the government is withholding 54 pages and portions of two additional pages of records generated by Huntingdon's "Institutional Animal Care and Use Committee" ("IACUC"), including "IACUC meeting minutes, memoranda, and inspection reports." See Gilmore Decl. ¶ 15E. However, although the agency contends that every single word of this material consists of "detailed descriptions of Huntingdon's research facilities and equipment (including planned capital improvements thereto), its information technology systems, and its employee training programs," and Mr. Caulfield claims that these records also contain highly valuable "trade secrets," Caulfield Decl. ¶43e, these descriptions simply do not comport with either the function of the IACUC or the contents of similar IACUC documents that have been disclosed by the USDA in the past.

Thus, the Animal Welfare Act requires each facility conducting research on animals to establish an IACUC, which is an oversight committee made up of private citizens whose members are to "represent society's concerns regarding the welfare of animal subjects used as such facility." 7 U.S.C. 2143(b)(1) (emphasis added). Indeed, each IACUC must contain at least one public member who is "unaffiliated" with the research facility and who is intended "to provide representation for general community interests in the proper care and treatment of animals." 7 U.S.C. 2143(b)(1). The IACUC inspects the laboratory semi-annually to "ensure compliance with the provisions" of the AWA "to minimize pain and distress to animals." 7 U.S.C. 2143(b)(4)-(5) (emphasis added); see also generally Animal Legal Defense Fund v. Espy, 23 F.3d 496, 503 (D.C. Cir. 1994). Thus, as explained by the attached declaration of Eric Kleiman, Pl. Ex. EE, and as further demonstrated by the examples attached to his declaration, IACUC records typically reflect the Committee's observations and reports about whether the facility is in compliance with the Animal Welfare Act. See Kleiman Decl. ¶8 and Attachment 1 (IACUC Minutes stating that the purpose of the meeting "is to address the USDA's concerns that the [IACUC] is not completing a full review

of protocols," and that the "non-scientific member is not sufficiently distanced from the company")
(emphasis added); (IACUC Minutes stating that "[o]ne finding on the inspection was . . . expired
medication," which "was a facility wide issue"); (IACUC Protocol Evaluation Form including a
completed questionnaire concerning the facility's compliance with AWA requirements).

Indeed, while such information would be of little competitive value to one of Huntingdon's
competitors, see Pl. SJ Mem. at 24-25, it is extremely important to the public debate concerning the
USDA's enforcement of this statute. See Kleiman Decl. ¶8; see also  ALDF v. Espy, 23 F.2d at 503
(explaining that IACUCs are designated by Congress as "the intended representatives of the public
interest in animal welfare") (emphasis added).[11]

In its response, the government makes the remarkable assertion that "the commercial value"
of the information at issue is not "diminished in any way by the AWA charges brought against
Huntingdon" because all of Huntingdon's studies are conducted in compliance with federal "Good
Laboratory Practice (GLP) regulations."  Gov't Opp. at 24; see also Caulfield Decl. ¶ 12 ("[t]he
quality and integrity of the test procedures and the test results in the records at issue were not affected
by the conduct that was the subject of USDA's investigation and subsequent complaint") (emphasis
added).

However, not only have neither the USDA nor Huntingdon provided any evidence whatsoever
to demonstrate the validity of this completely self-serving assertion, but the notion that violations of
the AWA do not in any way "affect" either the "quality and integrity" of these animal tests simply
makes no sense. Thus, clearly humane treatment of the subjects of the studies – including ensuring
that the animals remain otherwise healthy and do not die prematurely – "affects" the integrity of the

---

[11]Moreover, here, many of the charges brought against Huntingdon by the USDA
included violations of the AWA by the IACUC itself. See USDA Complaint, Pl. Ex. F.
Therefore, clearly, at least some of these records either address or reflect those violations.

resulting data.  See, e.g., ALDF v. Espy, 23 F.3d at 504 (exclusion of animals from the protection

of the AWA "adversely affected" research "because the ill treatment of experimental animals"

resulted in "the loss of 'hundreds of data points' when[] animal subjects were deprived of food,

water, a clean cage or a temperate environment") (Williams, J., concurring in part); see also

Memorandum to Elizabeth Goldentyer from Mary Geib (August 22, 1997), Pl. Ex. FF (stating that,

although the studies "were to be conducted in compliance with Good Laboratory Practice

Regulations," documents nevertheless "raised concerns regarding the quality and reliability of the

test results from this facility") (emphasis added); Kleiman Decl. ¶9 (AWA violations also often

constitute violations of the GLP regulations).

Therefore, as all of the above examples amply demonstrate, there are numerous disputes about

the conclusory assertions of competitive harm that have been asserted by Huntingdon and the USDA.

Accordingly, should the Court decline to grant summary judgment for plaintiff at this juncture,

plaintiff will need to take discovery on these matters. Kleiman Decl. ¶¶ 8-12. [12]

---

[12]As Mr. Kleiman also explains, many of the methods and procedures used to perform
toxicology studies on animals are standardized within the industry. Kleiman Decl. ¶¶10-12.
Indeed, Huntingdon itself routinely publishes its own scientific papers that contain many such
methods and procedures. See id. ¶10. Accordingly, should the Court deny plaintiff's motion for
partial summary judgment, plaintiff should be allowed to take discovery concerning the basis for
Huntingdon's completely unsubstantiated contention that the particular methods and procedures
used in the 1997 studies at issue here are somehow "unique" and extremely commercially
sensitive, and, in addition, why, if this is so, it does not appear that Huntingdon has applied for or
obtained any patents for any such methods or procedures. See Kleiman Decl. ¶¶ 10-11; see also
35 U.S.C. § 101 (patents may be obtained for "any new and useful process, machine,
manufacture, or composition of matter, or any new and useful improvement thereof") (emphasis
added). Similarly, plaintiff needs discovery to ascertain the basis for the USDA's assertion that
67 "viability records" in their entirety and portions of an additional 397 such records may be
withheld under Exemption 4, when those records contain such clinical observations about the
animals such as "head stuck in feeder hole," "left arm stuck in bottom of cage," 3rd digit right
hand moderately swollen," and "animal is bleeding profusely." See, e.g. Kleiman Decl. ¶ 12,
Attachment 3a-b.

**D.** **The Government Has Failed To Meet Its Burden Of Proof**
**That Records May Be Withheld Under Exemption 5.**

In its opening brief, IDA demonstrated that the USDA had failed to meet its burden of proof

that all of the 19 pages withheld in full, and a portion of an additional record could be withheld under

Exemption 5 on the grounds that all such information is covered by both the deliberative process

privilege and the attorney work-product privilege, and IDA explained that it needed a <u>Vaughn</u> index

of those documents and/or discovery to provide further arguments to the Court as to why the

government could not continue to withhold all of this information. <u>See</u> Pl. SJ Mem. at 32-39.  In

response, the government has now disclosed a two-page record that it originally withheld in full, and

the portions of one additional record that it had withheld in part under this Exemption. <u>See</u> Gov't

Opp. at 16 n.10; Gov't Attachment B.   However, these newly released documents only bolster

plaintiff's contention that the government has applied this Exemption far too broadly -- both to

withhold information that it contends is covered by the attorney work-product privilege and the

deliberative process privilege.

**1.** **The Government's Reliance On The Attorney Work-Product Privilege**.

Although Mr. Gilmore swore under penalty of perjury that both of these records were

protected under the attorney work-product privilege because they – like all of the other records

withheld under Exemption 5 – "contain deliberations among APHIS investigators and the Office of

General Counsel (OGC) about what charges should be included in the AWA Complaint that was

ultimately filed against Huntingdon," Gilmore Decl.  ¶ 21, this simply is not true – as the government

now concedes in a footnote to its opposition brief. <u>See</u> Gov't Opp. at 16, n.10.  Indeed, neither

document meets this description – at all.

Thus, the first document is a memorandum to the Acting Deputy Administrator of Animal Care from the Eastern Regional Director of Animal Care which explains that Huntingdon is "under investigation . . . [for] allegations of animal abuse, failure to provide veterinary care, unnecessary duplication of research and falsification of records." See "Priority Case Request" (May 27, 1997), Gov't Attachment B (attached here as Pl. Ex. GG). The document further states that the USDA's Eastern Regional Office "recommend[s] that this case be considered high priority because:

> this research facility uses dogs and nonhuman primates in invasive research, the complaint alleges animal suffering and death, and we anticipate media and animal protection group interest in this case.

Id. (emphasis added). Thus, contrary to Mr. Gilmore's sworn declaration, this document says nothing about "what charges should be included in the AWA Complaint that was ultimately filed against Huntingdon." Gilmore Decl. ¶ 21. Nor, contrary to Mr. Gilmore's declaration, does the document contain any deliberations "among APHIS investigators and the Office of General Counsel." Id. Rather, it is a request from the head of the Regional Office to the Acting Deputy Administrator of the USDA's national office to give the investigation "high priority" because of the gravity of the charges and strong public interest in the matter.[13]

The second document that the USDA has now disclosed – and which it originally withheld in full under the attorney work-product privilege – is a two-page memorandum from the Acting Deputy Administrator "Through" the Administrator which recounts a settlement offer that Huntingdon made shortly after the USDA filed its Complaint against the company. See

---

[13]Although in its opposition brief the government states that only a portion of this record was originally withheld from plaintiff, Gov't Opp. at 16, n.10, plaintiff and its counsel have been unable to locate this particular document among the hundreds of pages that have been provided to IDA. Whether this is because this record was never actually provided to IDA, or, as explained supra, because there is no index of the records at issue in this case that would allow plaintiff to locate the record, this only further demonstrates the need for a Vaughn index here.

"Informational Memorandum for the Assistant Secretary" (undated), Gov't Attachment B (attached here as Pl. Ex. HH); see also Gov't Opp. at 16, n.10 (describing the document as "a discussion of an offer from Huntingdon to Defendant USDA to settle the AWA charges") (emphasis added). Also contrary to Mr. Gilmore's declaration, this record neither contains "deliberations . . . about what charges should be included in the AWA Complaint" against Huntingdon, nor any deliberations whatsoever "among APHIS investigators and the Office of General Counsel." Gilmore Decl. ¶ 21.

Therefore, it could not be clearer that Mr. Gilmore's sworn descriptions of these two documents is patently incorrect. While the government tries to bury this rather salient concession in a footnote to its brief, Gov't Opp. at 16 n.10, these blatant misrepresentations about what is contained in these two documents calls into serious question the veracity of Mr. Gilmore's descriptions with respect to all of the remaining documents at issue. See, e.g. American Broadcasting Cos. v. U.S. Information Agency, 599 F. Supp. 765, 767 (D.D.C. 1984) (discussing the importance of permitting FOIA plaintiffs to take discovery where the government's affidavits "are inaccurate or incomplete").

In any event, since, as plaintiff has explained, Pl. SJ Mem. at 35-36, the attorney work-product privilege does not apply to records that were prepared in the "ordinary course of business or for nonlitigation purposes," and therefore does not apply to documents that were compiled by USDA investigators to memorialize or report on the results of their investigations, the privilege does not appear to apply to the other seventeen records that have been withheld on this basis, certainly not in their entirety, since, according to Mr. Gilmore's own description, all of these records concern deliberations of "APHIS investigators." See Gilmore Decl. ¶ 21 (emphasis added); see also, e.g., Linde Thompson Langworthy Kohn Van Dyke v. Resolution Trust Corp., 5 F.3d 1508, 1515-16 (D.C. Cir. 1993) (the attorney work-product privilege does not apply to records that were "merely

assembled in the ordinary course of business or for nonlitigation purposes") (emphasis added).
Accordingly, particularly in light of the government's latest revelations concerning its completely
erroneous descriptions of other records withheld under this privilege, plaintiff needs a complete
Vaughn index of these records and/or discovery on this matter. See Stagno Decl. ¶6; Kleiman Decl.
¶16.

### 2.    The Government's Deliberative Process Claims

The newly released documents also demonstrate the complete unreliability of the
government's assertion that all 17 of the remaining documents that have been withheld under
Exemption 5 are also exempt – in their entirety – because they are covered by the "deliberative
process privilege." See Gilmore Decl. ¶ 21. Thus, although the USDA has now released these two
records, it nevertheless insists that they both "continue to be properly withheld under Exemption 5,"
and that the agency is simply releasing them "as a matter of discretion."  Gov't Opp. at 16 n.10.

However, contrary to Mr. Gilmore's sworn declaration, neither document is deliberative
because it "consists of recommendations that certain charges be filed in [the] complaint" against
Huntingdon, "evaluations and opinions of the evidentiary and legal support for those proposed
charges, and draft language for charges that were considered for inclusion in the complaint." Gilmore
Decl. ¶ 23 (emphasis added).  On the contrary, neither document discusses any of the "charges" to
be filed against Huntingdon whatsoever.  Rather, one document asks that the investigation of
Huntingdon be afforded  "high priority," and the other recounts a settlement offer made by
Huntingdon. See Pl. Exhs. GG-HH. In addition, as the Court can readily discern simply by looking
at these records, they contain a substantial amount of purely factual information that is easily
segregable from the remainder of the document. Hence, under EPA v. Mink, 410 U.S. 73, 89 (1973)
and its progeny, even if portions of these documents did somehow qualify as "deliberative" within

the meaning of this particular privilege, none of this factual information may be withheld. See Pl. SJ Mem. at 33-34. [14]

The second document, Pl. Ex. HH – i.e., the memorandum that recounts Huntingdon's settlement offer *verbatim* – also bears no resemblance whatsoever to the documents described in Mr. Gilmore's Declaration as those concerning "the drafting of the Complaint" against Huntingdon. Gilmore Decl. ¶ 23. Indeed, because, according to the government's own belated – but more truthful – description of this document as a "discussion of an offer from Huntingdon to Defendant USDA to settle the AWA charges," Gov't Opp. at 16, n.10, this document cannot be withheld under Exemption 5, since it contains a settlement offer that originated from a party outside the government. See 5 U.S.C. 552(b)(5) (the exemption only pertains to "intra" or "inter" agency communications); see also County of Madison, N.Y. v. Dep't of Justice, 641 F.2d 1036 (1st Cir. 1981) (Exemption 5 does not apply to settlement negotiations with private parties). In addition, like the other document discussed above, this record contains a great deal of factual information that simply may not be withheld under FOIA, including a title, the authors and recipients, a subject line, a discussion of the nature of the investigation of Huntingdon, the charges in PETA's complaint, a list of evidence that accompanied that complaint, and the contents of the agency's public Complaint against Huntingdon.

---

[14]Indeed, the entire first-third of the document entitled "Priority Case Request," Pl. Ex. GG, including the subject lines, date, and recipient can clearly be segregated from the rest of the document, as can the bottom portion of the document, including the "Thank you" line, the name and title of the author, the identify of the officials to whom copies of the memo were sent, and the hand-written notation that states "Case went to Ron Carter" and that it was "Hand Delivered." In addition, most of the middle portion of the document also contains purely factual information: i.e., that "Huntingdon Life Sciences" is "in East Millstone, NJ;" that it is "under investigation by IES related to a complaint filed by PETA;" and that "[t]he complaint contains allegations of animal abuse, failure to provide veterinary care, unnecessary duplication of research and falsification of records." Similarly, the statements that "this research facility uses dogs and nonhuman primates in invasive research;" that "the complaint alleges animal suffering and death;" and that "we anticipate media and animal protection group interest in this case," are all factual statements.

Therefore, despite the agency's insistence that this document continues to be exempt from disclosure under Exemption 5, Gov't Opp. at 16, by no stretch of the imagination is this record – or any others like it that the agency is continuing to withhold – exempt under the "deliberative process privilege." EPA v. Mink. Accordingly, plaintiff needs a Vaughn index and/or discovery concerning all of the other records that have been withheld under this privilege. See Stagno Decl. ¶6 ; Kleiman Decl. ¶16.

**E.    There Remain Unanswered Questions Concerning The Government's Failure To Locate Responsive Records.**

As plaintiff explained in its opening brief, Pl. SJ Mem. at 39-40, it is undisputed that the agency at one time had several additional records that have not been accounted for in this litigation -- including a videotape of alleged animal abuse that was taken inside Huntingdon and was attached as an exhibit to PETA's original complaint to the USDA, a second videotape concerning a documentary about animal cruelty at Huntingdon's headquarters in Great Britain, some photographic exhibits, and certain "affidavits" of witnesses that were also compiled by the agency. Thus, IDA explained its needs to take discovery to ascertain whether the agency has performed its statutory obligation to conduct an adequate search for all responsive records. See Pl. SJ Mem. at 41, 43; Stagno Decl. ¶¶ 7-8.

In response, the agency now implies that it "may" not ever have actually possessed a copy of the videotape that was taken at Huntingdon, Gov't Opp. at 33 – although it does not directly deny that it once had this document, as well as the other video, photos, and affidavits that plaintiff seeks, and the record clearly establishes that the agency did in fact have all of these materials in the not so distant past. See Pl. SJ Mem. at 39-42. However, remarkably, the agency also now asserts that the chief investigator in this case – Ron Carter – "personally retained custody of all materials collected during the Huntingdon investigation" – and that, because Mr. Carter is no longer working at the

-24-

agency, the USDA need not make any additional efforts to find out what he did with these materials. Gov't Opp. at 38 (emphasis added). However, the assertion that the chief investigator in a law enforcement investigation "personally" maintained copies of the investigatory records – as opposed to doing so in the regular course of his employment – and hence, that he could keep such investigatory records "in his car" or his "hotel room," and apparently dispose of them at will, see Declaration of Francis Keyser, ¶ 17, raises more questions than it answers with respect to the adequacy of the agency's search for responsive records here. See also Dep't of Justice v. Tax Analysts, 492 U.S. 136, 145 (1989) (a document is an "agency record" subject to FOIA if it came "into the agency's possession in the legitimate conduct of its official duties"). Accordingly, plaintiff should be permitted to take discovery on this matter as well. See Stagno Decl. ¶7; Kleiman Decl. ¶17.[15]

## CONCLUSION

For the foregoing reasons, as well as those set forth in plaintiffs' memorandum in support of its motion for partial summary judgment and in opposition to defendants' motions for summary judgment, defendants' motions should be denied, plaintiff should be granted summary judgment with respect to all of the records that have been withheld under Exemption 4, the government should be required to provide IDA with a Vaughn index, and plaintiff should be permitted to take discovery.

---

[15]In addition, because, according to the agency's own internal memorandum and Plaintiff's undisputed Statement of Material Fact ¶ 5, this case was not "closed" until December 15, 1999 -- a little over 3 years ago -- and the agency itself admits that Mr. Carter "may be aware of the location of the PETA materials that plaintiff seeks," Gov't Opp. at 37, the government's reliance on Blanton v. United States Dep't of Justice, 182 F. Supp. 2d 81, 85 (D.D.C. 2002), is misplaced, since there the court held only that it would be "unreasonable" to require the FBI to ask its retired agents about a document that had been in the possession of the agency 40 years, particularly given "the prospect that some of these retired agents may be difficult to contact or deceased," id. at 86  – a concern that does not appear to apply here.

Respectfully submitted,

Katherine A. Meyer
(D.C. Bar No. 244301)
Kimberly D. Ockene
(D.C. Bar No. 461191)

Meyer & Glitzenstein
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202)  588-5206

Attorneys for Plaintiff

Date:   May 2, 2003