UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN DEFENSE OF ANIMALS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES DEPARTMENT | ) |
| OF AGRICULTURE, | ) |
| | ) Civil Action No. 02-0557 (RWR) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| LIFE SCIENCES RESEARCH, INC., | ) |
| | ) |
| Intervenor-Defendant. | ) |
| | ) |

## DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

Defendant United States Department of Agriculture (USDA), by
its undersigned attorneys, respectfully moves the Court, pursuant
to Rule 56 of the Federal Rules of Civil Procedure, for summary
judgment on the grounds that no genuine issue of material fact
exists and that it is entitled to judgment as a matter of law.
In support of this motion, the Court is respectfully referred to
the Declaration of Lesia M. Banks, Assistant Director, Freedom of
Information Staff, Legislative and Public Affairs Division,
Animal and Plant Health Inspection Service, USDA; to Defendant's
Supplemental Statement of Material Facts as to Which There is No
Genuine Issue; to the Memorandum of Points and Authorities in
Support of Defendant's Renewed Motion for Summary Judgment, and

-2-

to Defendant's Second <u>Vaughn</u> Index, all of which are filed

herewith, as well as to the entire record herein.

Respectfully submitted,

_____

KENNETH L. WAINSTEIN
(D.C. Bar #451058)
United States Attorney

_____

R. CRAIG LAWRENCE
(D.C. Bar #171538)
Assistant United States
  Attorney

_____

Dated:  August 3, 2005           ANNE D. WORK
                                 (D.C. Bar #376314)
                                 Attorney-Advisor
                                 Office of Information and
                                   Privacy
                                 United States Department of
                                   Justice
                                 Flag Building, Suite 570
                                 Washington, D.C.  20530-0001
                                 (202) 616-5494

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN DEFENSE OF ANIMALS,           )
                                 )
      Plaintiff,                 )
                                 )
      v.                         )
                                 )
THE UNITED STATES DEPARTMENT     )
   OF AGRICULTURE,               )
                                 ) Civil Action No. 02-0557 (RWR)
      Defendant,                 )
                                 )
      and                        )
                                 )
LIFE SCIENCES RESEARCH, INC.,    )
                                 )
      Intervenor-Defendant.      )
─────────────────────────────────)

DEFENDANT'S SUPPLEMENTAL STATEMENT OF MATERIAL
FACTS AS TO WHICH THERE IS NO GENUINE ISSUE,
PURSUANT TO LOCAL RULE 7(h)

     Pursuant to Local Civil Rule 7(h), defendant United States
Department of Agriculture (USDA) submits the following
supplemental statement of material facts as to which there is no
genuine issue:

     1.  Incorporated by reference herein is Defendant's
Statement of Material Facts as to Which There is No Genuine
Issue, Pursuant to Local Rule 7(h), filed December 12, 2002.[1]

─────────────────────

     [1] The first and second declarations of Hugh Gilmore
[hereinafter First Gilmore Decl. and Second Gilmore Decl.] filed
December 12, 2002, and March 21, 2003, respectively; the
Declaration of Michael Caulfield, [hereinafter Caulfield Decl.],
General Manager of Huntingdon Life Sciences, Inc. filed March 21,
2003; and the Declaration of Francis Keyser, Investigator,
Investigations and Enforcement Services division of the Animal
and Plant Health Inspection Service, USDA, filed March 21, 2003,
                                              (continued...)

-2-

2.  The records remaining at issue consist of three

categories:

I)  Final Test Reports and Related Records (124 pages withheld in

full), Clinical Observation Raw Data Reports (121 pages withheld

in full), and Interim Test Reports (twenty-two pages withheld in

full);

II)  Necropsy and Postmortem Examination Reports (twenty-three

pages withheld in full), Viability Records (397 pages released in

part and fifty-eight pages withheld in full), and Veterinary

Treatment Request and Logs (twenty pages released in part and

ninety-four page withheld in full), including, in addition,

observations sheets (twenty-eight pages withheld in full) and

miscellaneous records (seven pages released in part) pertaining

to animal cages; and

III)  Institutional Animal Care and Use Committee (IACUC) Records

(fifty-six pages released in part), Internal Huntingdon Memoranda

(seven pages released in part and thirty-three pages withheld in

full), and Internal USDA Investigatory Memoranda (twenty-seven

pages released in part).  (See Declaration of Lesia M. Banks,

Assistant Director, Freedom of Information Staff, Legislative and

Public Affairs Division, Animal and Plant Health Inspection

Service, USDA [hereinafter Banks Decl.] ¶¶ 3-6, filed herewith.)

---

[1](...continued)
provide a full chronology of the administrative processing of the
records requested by plaintiff.

-3-

3.  In sum, 503 pages were withheld in full and 514 pages were withheld in part, pursuant to Exemption 4 of the Freedom of Information Act, 5 U.S.C. § 552 (b)(4), (2000 & West Supp. II 2002), for a total of 1017 pages at issue.  (See Banks Decl. ¶¶ 3-6.)

4.  The records at issue were created by Huntingdon Life Sciences (Huntingdon), a wholly-owned subsidiary of intervenor-defendant Life Science Research, Inc. as part of its business of product testing conducted on behalf of the pharmaceutical, biotechnology, medical, and chemical companies that are its clients.  (See First Gilmore Decl. ¶ 5.)

5.  Defendant obtained these records when it conducted an investigation of Huntingdon for alleged violations of the Animal Welfare Act (AWA), 7 U.S.C. §§ 2131-59.  (See id. ¶ 4.)

6.  Defendant protected records described as "Final Test Reports and Related Records" that consist of 124 pages withheld in full; these records provide detailed descriptions of the designs and methods used in Huntingdon's studies, including the "stability of the experimental compound under the conditions of administration," descriptions of "all circumstances that may have affected the quality or integrity of the data generated by the test," statistical methods for analyzing the data, descriptions of dosages and descriptions of the experimental compounds, as well as Huntingdon's summaries of the data.  (Banks Decl. ¶ 4A.)

-4-

In addition, defendant protected information in this category
that reveals the procedures used for administering the
experimental compounds, the configuration of Huntingdon's
facilities, the type and design of Huntingdon's equipment, the
physiological and health effects of the experimental compounds
being tested, the pharmacological responses of test subjects, and
Huntingdon's data collection methods, including its unique
computerized statistical methods employed in analyzing data. (See
First Gilmore Decl. ¶¶ 15-16; see also Caulfield Decl. ¶¶ 35, 40-
41.)  For a document-by-document description of the records at
issue, see Bates Stamps LSR0029-LSR1974 as delineated on the
second Vaughn Index, filed herewith.  (See Banks Decl. ¶ 4A.)

     7.  Defendant protected records described as "Clinical
Observation Raw Data Reports" that consist of 121 pages withheld
in full that contain "no information other than raw data" from
the tests conducted by Huntingdon.  (Id. ¶ 5A.)  For a document-
by-document description of the records at issue, see Bates Stamps
LSR1294-LSR2126 as delineated on the second Vaughn Index.  (See
id.)

     8.  Defendant protected records described as "Interim Tests
Reports" that consist of twenty-two pages withheld in full and
contain "summaries of clinical observation taken during the
tests" and include details such as urinalysis, blood pressure,
hematology, clinical chemistry, and food and fluid intake.  (Id.

-5-

¶ 5B.) For a document-by-document description of the records at issue, see Bates Stamps LSR1706-LSR1910 as delineated on the second Vaughn Index.  (See id.)

9.   Defendant protected records described as "Necropsy and Postmortem Examination Reports" that consist of twenty-three pages that were withheld in full and that contain observations that were taken during examinations of the bodies of dead animals.  (See id. ¶ 5C.)  These records describe the "physiological and health effects of proprietary experimental compounds" on the test subjects, including information on "specific dosages administered to test subjects," the type of equipment used in the collection of the data, "the sequence and timing of events, the number of staff assigned to certain tasks, and the time required for task completion."  (id.; see also Caulfield Decl. ¶ 36.)  For a document-by-document description of the records at issue, see Bates Stamps LSR1313-LSR2130 as delineated on the second Vaughn Index.  (See Banks Decl. ¶ 5C.)

10.   Defendant protected records described as "Viability Records" that consist of 397 pages released in part and fifty-eight pages withheld in full.  (See Banks Decl. ¶ 5D.)  These records are "charts on which clinical observations of the condition of test subjects taken during testing are recorded" and contain detailed environmental conditions, specifics about the research area, and quantitative information about productivity

-6-

and efficiency at Huntingdon.  (Id.; see also Caulfield Decl. ¶ 37.)  For a document-by-document description of the records at issue, see Bates Stamps LSR0142-LSR2373 for those pages released in part and Bates Stamps LSR0317-LSR1100 for those pages withheld in full as delineated on the second Vaughn Index.  (See Banks Decl. ¶ 5D.)

11.  Defendant protected, pursuant to Exemption 4, records described as "Veterinary Treatment Requests and Logs," consisting of twenty pages released in part and ninety-four pages withheld in full.  (See id. ¶ 5E.)  These records contain descriptions of "treatments requested for and provided to the test subjects" related to treatments provided to "alleviate reactions of side effects caused by the tested compounds."  (Id.)  Those parts of the records related to treatments that address conditions not linked to the tests were released.  (See id.; see also First Gilmore Decl. ¶ 16.)  For a document-by-document description of the records at issue, see Bates Stamps LSR0140-LSR2376 for those pages released in part and Bates Stamps LSR0226-LSR2381 for those pages withheld in full as delineated on the second Vaughn Index. (See Banks Decl. ¶ 5E.)  Also included in this group are observation sheets that consist of twenty-eight pages withheld in full that "relate to physical observation of animals in the studies [as] required by the Standard Operating procedures for the particular study."  (Id. ¶ 5H.)  For a document-by-document

-7-

description of the records at issue, see Bates Stamps LSR0313-LSR2165 as delineated on the second <u>Vaughn</u> index.  (<u>See</u> <u>id.</u>)
Additionally, this group includes seven pages released in part
that consist of miscellaneous records that contain "study number
and amounts projected and spent by Huntingdon on primate cages."
(<u>Id.</u> ¶ 6.)  For a document-by-document description of the records
at issue, see Bates Stamps LSR0228-LSR0472 as delineated on the
second <u>Vaughn</u> index.  (<u>See</u> <u>id.</u>)

12.  Defendant protected records described as IACUC records
that consist of fifty-six pages released in part.  (<u>See</u> <u>id.</u>
¶ 4B.)  The pages contain notes from IACUC meetings, memoranda
related to the discussions occurring during these meetings, and
inspection reports that were discussed at the meetings.  (<u>See</u>
<u>id.</u>)  The issues discussed in these records include detailed
descriptions of Huntingdon's research facilities and equipment,
information technology systems, employee training programs, and
implementation of testing procedures.  (<u>See</u> <u>id.</u>)  For a document-
by-document description of the records at issue, see Bates Stamps
LSR2102-LSR2231 as delineated on the second <u>Vaughn</u> Index.  (<u>See</u>
<u>id.</u>)

13.  Defendant protected records described as "Internal
Huntingdon Memoranda" that consist of seven pages released in
part and thirty-three pages withheld in full.  (<u>See</u> <u>id.</u> ¶ 5F.)
These records consist of Huntingdon's "discussions of issues that

-8-

arose during the course of tests," and concern the use of test designs and methods in light of observations taken during the tests.  (<u>Id.</u>)  For a document-by-document description of the records at issue, see Bates Stamps LSR0139-LSR2062 as delineated on the second <u>Vaughn</u> Index.  (<u>See</u> <u>id.</u>)

14.  Defendant protected records described as "Internal USDA Investigatory Memoranda" that consist of twenty-seven pages released in part and contain discussions of the "bases for each charge that USDA contemplated bringing against Huntingdon for violations of the Animal Welfare Act."  (<u>See</u> <u>id.</u> ¶ 5G.)  For a document-by-document description of the records at issue, see Bates Stamps LSR0001-2272 as delineated on the second <u>Vaughn</u> Index.  (<u>See</u> <u>id.</u>)

15.  Defendant has reviewed each page of the responsive records and has released all reasonably segregable, nonexempt information to plaintiff.  Defendant considered carefully the pages it withheld in full to determine if any portions could be segregated and released.  (<u>See</u> First Gilmore Decl. ¶¶ 16-18; Banks Decl. ¶¶ 4B, 5D, 5E.)  Defendant has determined that it is not possible to segregate any information from those pages

-9-

without disclosing information that is protected under Exemption
4.

                                  Respectfully submitted,


                                    _____

                                    KENNETH L. WAINSTEIN
                                    (D.C. Bar #451058)
                                    United States Attorney


                                    _____

                                    R. CRAIG LAWRENCE
                                    (D.C. Bar #171538)
                                    Assistant United States
                                      Attorney




                                    _____

Dated:  August 3, 2005           ANNE D. WORK
                                    (D.C. Bar #376314)
                                    Attorney-Advisor
                                    Office of Information and
                                      Privacy
                                    United States Department of
                                      Justice
                                    Flag Building, Suite 570
                                    Washington, DC  20530-0001
                                    (202) 616-5494

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN DEFENSE OF ANIMALS,              )
                                    )
    Plaintiff,               )
                                    )
    v.                       )
                                    )
THE UNITED STATES DEPARTMENT        )
  OF AGRICULTURE,                   )
                                    )  Civil Action No. 02-0557 (RWR)
    Defendant,               )
                                    )
    and                      )
                                    )
LIFE SCIENCES RESEARCH, INC.,       )
                                    )
    Intervenor-Defendant.    )
                                    )

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

Preliminary Statement

Plaintiff commenced this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (2000 & West Supp. II 2002), seeking access to records concerning an investigation by defendant United States Department of Agriculture (USDA) of Huntingdon Life Sciences (Huntingdon), a wholly-owned subsidiary of intervenor-defendant Life Sciences Research, Inc.,[1] for alleged violations of the Animal Welfare Act (AWA), 7 U.S.C. §§ 2131-59 (2000).  In support of its renewed motion for summary judgment, defendant has filed herewith the

_____

    [1] See intervenor-defendant's Memorandum of Points and Authorities in Support of Unopposed Motion for Leave to Intervene, filed June 13, 2002, at 1.

-2-

Declaration of Lesia M. Banks, Assistant Director, Freedom of

Information Staff, Legislative and Public Affairs Division,

Animal and Plant Health Inspection Service, USDA [hereinafter

Banks Decl.], which explains further the bases upon which the

remaining records at issue were withheld.  Based upon the

accompanying Banks Declaration, the entire record herein, and

for the reasons set forth below, defendant USDA respectfully

submits that there exists no genuine issue of material fact and

that it is entitled to judgment as a matter of law pursuant to

Rule 56 of the Federal Rules of Civil Procedure.

<u>Factual and Procedural Background</u>

By letter dated November 20, 2000, plaintiff submitted a

FOIA request to defendant USDA seeking access to records

concerning its investigation of Huntingdon for alleged

violations of the AWA.[2]  (<u>See</u> First Gilmore Decl. ¶ 8.)

Plaintiff commenced this action on March 22, 2002.  (<u>See</u>

<u>id.</u> ¶ 10.)  On December 12, 2002, defendant filed a motion for

---

[2] The first and second declarations of Hugh Gilmore
[hereinafter First Gilmore Decl. and Second Gilmore Decl.] filed
December 12, 2002, and March 21, 2003, respectively; the
Declaration of Michael Caulfield, [hereinafter Caulfield Decl.],
General Manager of Huntingdon, filed March 21, 2003; and the
Declaration of Francis Keyser, Investigator, Investigations and
Enforcement Services Division of the Animal and Plant Health
Inspection Service, USDA, filed March 21, 2003, provide a full
chronology of the administrative processing of the records
requested by plaintiff and contain an explanation and
justification for defendant's prior invocation of Exemption 4 of
the FOIA, 5 U.S.C. § 552(b)(4).  The Banks Declaration further
sets forth defendant's bases for invoking Exemption 4.

-3-

summary judgment; plaintiff thereafter filed a cross-motion for
summary judgment; and by Order dated September 28, 2004, this
Court found that defendant had conducted an adequate search, but
"failed to provide a specific index with which to judge the
validity" of the claimed exemptions, thereby providing
"insufficient evidence" for the Court to conduct a
"segregability analysis"; thus, the Court ordered defendant to
produce a supplemental Vaughn Index.  (Mem. Op. & Order, filed
September 28, 2004, at 2, 32-34.)  In addition, the Court
ordered the parties to confer and submit a joint status report.
(See id. at 34.)

     In accordance with that Order, the parties filed a joint
status report on October 28, 2004, in which defendant agreed to
provide plaintiff with a second Vaughn Index by December 22,
2004.  Defendant provided plaintiff with such an index on
December 22, 2004.[3]  Thereafter, the parties filed a series of
five joint status reports in 2005.[4]  In these reports, the
parties agreed that records containing the following were no

---

[3] This second Vaughn Index was not filed with the Court
initially; rather, a copy was provided to plaintiff on December
22, 2004, by electronic mail.  In addition, a paper copy was
mailed on the same day.  A copy of this second Vaughn Index is
being filed with the Court herewith.

[4] The parties filed joint status reports on February 11,
March 11 [hereinafter Second Joint Status Rep.], April 30
[hereinafter Third Joint Status Rep.], May 13, and June 15, 2005
[hereinafter Fifth Joint Status Rep.].

-4-

longer at issue:  information withheld pursuant to Exemptions 5,

6, and 7(C) of the FOIA, 5 U.S.C. § 552(b)(5), (6), (7)(C);

information concerning "standard operation procedures";

information concerning test protocols and protocol amendments;

information identifying Huntingdon's clients and customers; and

information identifying the formulas, compounds, or products

that were the subject of Huntingdon's research projects.  (See

Second Joint Status Rep. at 2; Third Joint Status Rep. at 2;

Fifth Joint Status Rep. at 1-2.)  Furthermore, as confirmed by

this Court, the parties had agreed earlier that the following

areas were not in dispute:  trade secret protection under

Exemption 4 of the FOIA, 5 U.S.C. § 552 (b)(4), for drug

products, drug compounds, and test protocols and protocol

amendments.  (See Mem. Op. & Order at 28.)  In addition,

plaintiff did not dispute that the information withheld under

Exemption 4 was "commercial" and "obtained from a person."

(Id.)  Therefore, only defendant's invocation of the

"confidential" element of Exemption 4 for the following three

categories of records remains at issue in this case:

I) Final Test Reports and Related Records (124 pages withheld in

full), Clinical Observation Raw Data Reports (121 pages withheld

in full), and Interim Test Reports (twenty-two pages withheld in

full);

-5-

II)  Necropsy and Postmortem Examination Reports (twenty-three pages withheld in full), Viability Records (397 pages released in part and fifty-eight pages withheld in full), Veterinary Treatment Request and Logs (twenty pages released in part and ninety-four pages withheld in full), including, in addition, observation sheets (twenty-eight pages withheld in full) and miscellaneous records pertaining to animal cages (seven pages released in part); and

III) Institutional Animal Care and Use Committee (IACUC) Records (fifty-six pages released in part), Internal Huntingdon Memoranda (seven pages released in part and thirty-three pages withheld in full), and Internal USDA Investigatory Memoranda (twenty-seven pages released in part).  (<u>See</u> Banks Decl. ¶¶ 4-6.)  Of these records, 503 pages were withheld in full and 514 pages were released in part, for a total of 1017 pages at issue.

Defendant hereby renews its motion for summary judgment for these records on the ground that the information was properly withheld pursuant to Exemption 4.  For the reasons set forth below, defendant respectfully suggests that there exists no genuine issue of material fact and that it is entitled to judgment as a matter of law pursuant to Rule 56 of the Federal Rules of Civil Procedure.

-6-

## Argument

### Defendant Has Properly Withheld Confidential
### Commercial Information Pursuant To Exemption 4

Exemption 4 of the FOIA protects from disclosure "commercial or financial information obtained from a person [that is] privileged or confidential."  5 U.S.C. § 552(b)(4). As established above, plaintiff does not dispute that the information at issue is "commercial" and "obtained from a person."  (Mem. Op. & Order at 28.)  Thus, the only remaining issue is whether the information is "confidential."  As is demonstrated below, the information withheld under Exemption 4 readily satisfies the "confidential" requirement because its disclosure would likely cause Huntingdon substantial competitive harm.

The D.C. Circuit has held that information is "confidential" under Exemption 4 if its release is likely to cause substantial harm to the competitive position of the person from whom it was obtained.  See, e.g., National Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 & n.17 (D.C. Cir. 1974).  It is not disputed that the information at issue in this case was submitted involuntarily to defendant USDA pursuant to its investigation of Huntingdon under the AWA.  (See First Gilmore Decl. ¶ 5.)  Accord 9 C.F.R. § 2.38(a)-(b) (2002) (USDA regulations requiring research facilities to make available to USDA investigators for examination and copying any information

-7-

concerning the business of the research facility, and to allow
USDA investigators to examine records required to be kept by the
AWA and its implementing regulations).  Therefore, the less
stringent Exemption 4 standard for withholding information that
is "voluntarily" submitted to the Government is inapplicable and
the competitive harm test is the proper standard in this case.
See Critical Mass Energy Project v. NRC, 975 F.2d 871, 879 (D.C.
Cir. 1992) (en banc).

A showing of actual competitive harm is not required, nor
is "a sophisticated economic analysis of the likely effects of
disclosure" required.  Pub. Citizen Health Research Group v.
FDA, 704 F.2d 1289, 1291 (D.C. Cir. 1983).  Rather, as the Court
has already recognized in this case, a showing of actual
competition and a likelihood of substantial competitive injury
to the submitter will suffice.  See Mem. Op. & Order at 29;
accord Gulf & W. Indus. v. United States, 615 F.2d 527, 530
(D.C. Cir. 1979).

In the present case, Huntingdon is a Contract Research
Organization (CRO) that sells scientific research and
development services to its clients, pharmaceutical,
biotechnology, medical device, and chemical companies and, as
such, faces actual competition from over 1200 other USDA-
registered research facilities.  (See First Gilmore Decl. ¶¶ 15-
17; see also Caulfield Decl. ¶¶ 8, 12-31, 35-43.)  The

-8-

pharmaceutical industry is known to be "a highly competitive
market where companies routinely attempt to discover a possible
advantage over their competitors."  Pub. Citizen Health Research
Group v. NIH, 209 F. Supp. 2d 37, 47 (D.D.C. 2002.)  Indeed, Mr.
Caulfield uses the word "fierce" to describe the competition
among the twenty large, global-reaching research organizations
such as Huntingdon.  (Caulfield Decl. ¶ 8.)

     Huntingdon designs its own tests and develops its own
testing methods and uses these in conducting research on
proprietary experimental compounds; it sells the results of its
efforts to its clients.  (See First Gilmore Decl. ¶ 3.)
Huntingdon's clients are charged hundreds of thousands of
dollars for these research and development services.  (See id.
¶ 5.)  "Extensive use of CROs by companies in the
pharmaceutical, biotechnology, medical device, and chemicals
industries has become standard practice."  (Caulfield Decl.
¶ 6.)

     As Mr. Gilmore attests, not only does Huntingdon face
competition, its clients, those companies relying on CROs, also
face serious competitors.  (See First Gilmore Decl. ¶ 18.)  It
is well known that developing new drugs is highly competitive
and that the companies routinely attempt to discover any
advantage over competitors.  See Pub. Citizen, 209 F. Supp. at
47.  Mr. Caulfield attests that developing a new medicine can

-9-

take over ten years and hundreds of millions of dollars and that
"competing companies are working on similar compounds intended
to treat the same medical condition in a race to the finish
line." (Caulfield Decl. ¶ 32.)  Mr. Caulfield further attests
that "competition to find new and better cures for disease"
requires that Huntingdon and its clients maintain "strict
confidentiality" in order to protect Huntingdon's extensive
testing and development process.  (Id. ¶¶ 32, 33.)

Release of information about proprietary experimental tests
could cause harm to Huntingdon's clients by allowing competitors
of those clients a head start in developing competitive products
because the competitors would be able to focus their own
research and development effort on those compounds that have
promise. (See id.)  Mr. Caulfield attests that the first company
to market a new drug often reaps a substantial advantage because
the time required to test a new drug is a key factor in a
company's financial success.  (See id.)

   I.   Information that reveals testing, including
        Huntingdon's Final Test Reports and Related
        Records, Clinical Observation Raw Data
        Reports, and Interim Test Reports

In this case, defendant USDA has withheld information
concerning Huntingdon's tests of proprietary experimental

-10-

compounds.  (See Banks Decl. ¶ 3; First Gilmore Decl. ¶ 16; see also Caulfield Decl. ¶¶ 35, 40-41.)[5]

Ms. Banks describes the first of the three groups in this category, "Final Test Reports and Related Records," as consisting of 124 pages withheld in full that contain detailed descriptions of the designs and methods used in Huntingdon's studies, including the "stability of the experimental compound under the conditions of administration," descriptions of "all circumstances that may have affected the quality or integrity of the data generated by the test," statistical methods for analyzing the data, descriptions of the dosages and descriptions of the experimental compounds, as well as Huntingdon's summaries of the data.  (Banks Decl. ¶ 4A.)  In addition, this category contains information that reveals the procedures used for administering the experimental compounds, the configuration of Huntingdon's facilities, and the type and design of the equipment.  (See First Gilmore Decl. ¶ 15.)  As such, this information reveals the physiological and health effects of the experimental compounds being tested, the pharmacological responses of test subjects, and Huntingdon's data collection methods, including its unique computerized statistical methods

_____

[5] Plaintiff does not dispute that the compounds or drug products being tested are trade secrets and, as such, are not at issue.  (See Mem. Op. & Order at 28).

-11-

employed in analyzing data.  (See id. ¶ 16; see also Caulfield

Decl. ¶¶ 35, 40-41.)[6]

Ms. Banks attests that the records described in the second

group of this category, "Clinical Observation Raw Data Reports,"

consist of 121 pages withheld in full that contain "no

information other than raw data" from the tests conducted by

Huntingdon.  (Banks Decl. ¶ 5A.)[7]

The records in the third group in this category, "Interim

Tests Reports," consist of twenty-two pages withheld in full and

contain "summaries of clinical observation taken during the

tests" and include details such as urinalysis, blood pressure,

hematology, clinical chemistry, and food and fluid intake.  (Id.

¶ 5B.)[8]

A) Competitive Harm

Courts have long recognized that substantial competitive

harm can be caused by release of information such as that

contained in Category I.  For example, the results of the tests

of proprietary experimental compounds themselves have been

_____

[6] For a document-by-document description of the records at
issue in this group, see Bates Stamps LSR0029-LSR1974 delineated
on the second Vaughn Index.  (See Banks Decl. ¶ 4A.)

[7] For a document-by-document description of the records at
issue in this group, see Bates Stamps LSR1294-2126 as delineated
on the second Vaughn Index.  (See id.)

[8] For a document-by-document description of the records at
issue in this group, see Bates Stamps LSR1706-1910 as delineated
on the second Vaughn Index.  (See id.)

-12-

protected.  See Pub. Citizen, 997 F. Supp. at 65-66 (concluding

that the release of records "contain[ing] the results of

clinical studies . . . that disclose clinical observations of

[test subjects] and related information" likely would cause

substantial competitive harm); Citizens' Comm'n on Human Rights

v. FDA, No. 92-CV-5313, 1993 WL 1610471, at **9-10 (C.D. Cal.

1993) (holding that raw research data generated during testing

of developmental drug were properly withheld under Exemption 4),

aff'd in pertinent part, 43 F.3d 1325 (9th Cir. 1995); see also

Heeney v. FDA, 7 Fed. Appx. 770 (9th Cir. 2001) (concluding that

information concerning product testing "falls squarely within

the exemption provided by § 552(b)(4)").

Furthermore, as recognized by the D.C. Circuit, substantial

competitive harm can be caused by the release of product

research test results because it would allow competitors to

benefit from that data "without incurring the time, labor, risk,

and expense involved in developing them independently".  Webb v.

HHS, 696 F.2d 101, 103 (D.C. Cir. 1982); see Pub. Citizen v.

FDA, 539 F. Supp. 1320, 1327 (D.D.C. 1982) (recognizing that the

release of product test data would cause "substantial

competitive injury" because "competitors would be receiving,

free of charge, the benefits of this costly research and

testing"), aff'd in pertinent part, 704 F.2d 1280 (D.C. Cir.

1983).  Thus, it is clear that allowing competitors access to

-13-

information that they would otherwise have to spend considerable funds to develop on their own would be an unfair advantage, causing competitive harm to Huntingdon and its clients.

The Supreme Court recognized this competitive harm in a non-FOIA context in which competitors attempted to use research data to develop competing products that could be "marketed at relatively low prices" because they would be produced without "the research, development, and promotional costs normally associated with the creation and marketing of an original product." United States v. Generix Drug Corp., 460 U.S. 453, 455 n.1 (1983); see also Tri-Bio Labs., Inc. v. United States, 836 F.2d 135, 143 (3d Cir. 1987) (noting that a "'me-too' manufacturer seeks to enjoy, without remunerating the pioneer manufacturer, the benefit of the pioneer's substantial investment in research and testing").

Thus, it is well established that release of this type of information could likely cause Huntingdon substantial competitive harm because it would allow competitors to gain "valuable insight" into Huntingdon's data and would provide competitors with "fundamental and critical business intelligence," allowing the competitors to "replicate Huntingdon's procedures" without investing the time, effort, or money that Huntingdon expended in the development of its tests. (See Caulfield Decl. ¶¶ 35, 40-41; see also First Gilmore Decl.

-14-

¶ 18.)  In fact, Ms. Banks calls these records "blueprints" for
Huntingdon's research services.  (See Banks Decl. ¶ 7.)
Furthermore, as stated by Mr. Gilmore, release of the test
results would also reveal the proprietary designs and methods
used to generate, collect, and analyze that data, allowing
competing businesses to market their services at a lower price,
thus eroding Huntingdon's market share.  (See First Gilmore
Decl. ¶ 18; see also Banks Decl. ¶ 7.)

     Moreover, release of the test results, whether in final,
interim, or "raw" data form, would cause substantial competitive
harm not just to Huntingdon, but to Huntingdon's clients.  These
test results are an important preliminary step in assessing the
performance of proprietary experimental compounds, and as such,
the withheld records contain detailed observations about various
aspects of the performance of the experimental compounds that
Huntingdon tested on behalf of its clients.  (See Banks Decl.
¶ 8B.)  Given that such testing is done for the purpose of
product development, competitors could appropriate these test
results to accelerate the production of their own competing
products without incurring the substantial research and
development costs required to do so.  (See id.)

     As discussed above, courts have long recognized the
substantial competitive harm that would be caused by an unfair
appropriation of costly product research and development data.

-15-

See, e.g., Pub. Citizen, 997 F. Supp. at 63-64 (noting that the
release of product research test results "would direct
competitors as to which paths to take based on [the submitter's]
reported successes and failures," which would enable them to
save substantial research and development costs and to bring
their competitive products to market sooner); Pub. Citizen, 539
F. Supp. at 1327 (recognizing that the release of product test
data would cause "substantial competitive injury" because
"competitors would be receiving, free of charge, the benefits of
this costly research and testing").  Indeed, as the D.C. Circuit
observed:

> Because competition in business turns on the relative costs
> and opportunities faced by members of the same industry,
> there is a potential windfall for competitors to whom
> valuable information is released under FOIA.  If those
> competitors are charged only minimal FOIA retrieval costs
> for the information, rather than the considerable costs of
> private reproduction, they may be getting quite a bargain.
> Such bargains could easily have competitive consequences
> not contemplated as part of FOIA's principal aim of
> promoting openness in government.

Worthington Compressors, Inc. v. Costle, 662 F.2d 45, 51 (D.C.
Cir. 1981).

### B) Segregation

Under the FOIA statute, all reasonable, segregable,
nonexempt information must be disclosed.  See 5 U.S.C. § 552(b)
(sentence immediately following exemptions).  In fact, the
standard in the D.C. Circuit for segregating material is well
established:  an agency cannot justify withholding an entire

-16-

page simply because it contains some exempt material.  See
Schiller v. NLRB, 964 F.2d 1205, 1209 (D.C. Cir. 1992)
(explaining that since 1974, "the segregability requirement has
been the law of the land"); Mead Data Cent., Inc. v. United
States Dept' of the Air Force, 566 F.2d 242, 260 (D.C. Cir.
1977) (stating that an agency cannot justify withholding an
entire document just because it contains some exempt material).

     Mindful of this standard, defendant conducted a line-by-
line review of each record in the category and considered
carefully the pages it withheld in full concerning Huntingdon's
testing and determined that this information, in addition to
revealing the tests themselves, would reveal Huntingdon's costs
and profits margins, its facilities, equipment, information
technology systems, and the expertise of the employees who
perform the work, as well as Huntingdon's confidential methods
and procedures used in the test.  (See First Gilmore Decl.
¶ 17.)  Mr. Gilmore attests that release of this information
would result in substantial competitive harm by allowing
competitors to "appropriate those procedures and methods to
develop their own competing research services."  (Id. ¶ 18.)

     In addition, the test results include information such as
statistical methods employed for analyzing the data; conclusions
drawn from the analysis; and details on dosages, including
descriptions of the dosing regimen, the route of administrating

-17-

the various dosages, and the stability of the dosages of the proprietary experimental compounds.  (<u>See</u> Banks Decl. ¶ 4.) Thus, Ms. Banks attests that these records contain no reasonably segregable nonexempt information.  (<u>See</u> <u>id.</u> ¶¶ 4A, 5A, 5B.)

The interim test reports are mid-study status reports containing clinical observations of the various animals.  (<u>See</u> <u>id.</u> ¶ 5B.)  These reports include details such as blood pressure, "fecal and fluid output, food and fluid intake, body weight of the animals," and hematology.  (<u>Id.</u>)  These clinical observations and recordings characterize the "physiological and health effects of the proprietary experimental compounds tested by Huntingdon," and after a careful review, Ms. Banks attests that these interim reports contain no reasonably segregable nonexempt information.  (<u>Id.</u>)

The raw data reports, containing only data that has not been analyzed or summarized, were withheld in full after a thorough review.  (<u>See</u> <u>id.</u> ¶ 5A.)  Mr. Caulfield attests that this raw data "would be of great value to its [Huntingdon's] competitors, in that it would allow them to easily derive important competitive information" and to benefit from Huntingdon's efforts.  (Caulfield Decl. ¶ 35.)

Therefore, defendant USDA respectfully suggests that the results of the tests, including clinical observation raw data reports, interim reports, and final test reports, that

-18-

Huntingdon conducted on behalf of its clients, were properly

withheld under Exemption 4.

    II.  Information that reveals Huntingdon's
         Necropsy and Postmortem Examination
         Reports, Viability Records, and Veterinary
         Treatment Requests and Logs

    The second category of records at issue concern information

that would reveal animal species, pharmacological responses of

test subjects, detailed environmental conditions, specifics

about the research area in the which studies were conducted, and

procedures employed in providing veterinary care and treatment

to subjects. (See Caulfield Decl. ¶¶ 36-38.)

    The first group of records in this category, "Necropsy and

Postmortem Examination Reports," consist of twenty-three pages

withheld in full and contain observations that were taken during

examinations of the bodies of dead animals.  (See Banks Decl.

¶ 5C.)  These records describe the "physiological and health

effects of proprietary experimental compounds" on the test

subjects.  (Id.)  Mr. Caulfield attests that these records

"contain information on specific dosages administered to test

subjects," the type of equipment used in the collection of the

data, "the sequence and timing of events, the number of staff

assigned to certain tasks, and the time required for task

completion."  (Caulfield Decl. ¶ 36.)  Further, the records

-19-

identify by name the specific procedure or activity involved and detail the specifications for collecting data.  (See id.)[9]

Also included in this group are observation sheets that consist of twenty-eight pages withheld in full that "relate to physical observation of animals in the studies [as] required by the Standard Operating [P]rocedures for the particular study." (Id. ¶ 5H.)[10]  Additionally, this group includes seven pages released in part that consists of miscellaneous records that contain "study number and amounts projected and spent by Huntingdon on primate cages," revealing Huntingdon's equipment and configuration of its work area.  (Id. ¶ 6; see also Caulfield Decl. ¶¶ 36-38.)[11]

The records in the second group in this category, "Viability Records," consist of 397 pages released in part and fifty-eight pages withheld in full.  (See Banks Decl. ¶ 5D.) Ms. Banks attests that these records are "charts on which clinical observations of the condition of test subjects taken during testing are recorded."  (Id.)  Mr. Caulfield attests that

---

[9]  For a document-by-document description of the records at issue in this group, see Bates Stamps LSR1313-LSR2130 as delineated on the second Vaughn Index.  (See Banks Decl. ¶ 5C.)

[10]  For a document-by-document description of the records at issue in this group, see Bates Stamps LSR0313-LSR2165 as delineated on the second Vaughn index.  (See id.)

[11]  For a document-by-document description of the records at issue in this group, see Bates Stamps LSR0228-LSR0472 as delineated on the second Vaughn index.  (See id.)

-20-

viability records also contain "detailed environmental
conditions and specifics about the research area" and that they
contain quantitative information about productivity and
efficiency at Huntingdon. (Caulfield Decl. ¶ 37.)[12]

    The records in the third group in the category, "Veterinary
Treatment Requests and Logs," consist of twenty pages released
in part and ninety-four pages withheld in full and contain
descriptions of "treatments requested for and provided to the
test subjects."  (Id. ¶ 5E.)  Most of the records contain
information related to treatments provided to "alleviate
reactions of side effects caused by the tested compounds."
(Id.)  Those portions of the records that contain information
related to treatments that address conditions not linked to the
tests were released.  (See id.; see also First Gilmore Decl.
¶ 16.)[13]

### A) Competitive Harm

    As with the Category I records, release of the withheld
information in Category II would allow competitors of Huntingdon

───────────────

    [12]  For a document-by-document description of records in at
issue this group, see Bates Stamps LSR0142-LSR2372 for those
pages released in part and LSR0317-1100 for those pages withheld
in full as delineated on the second Vaughn Index.  (See Banks
Decl. ¶ 5D.)

    [13]  For a document-by-document description of the records at
issue in this group, see Bates Stamps LSR 0140-2376 for those
pages released in part and LSR0223-2381 for those pages withheld
in full as delineated on the second Vaughn Index.  (See id.)

-21-

to benefit from the time and effort it has expended on compound

testing, to the corresponding detriment of Huntingdon.  Courts

have long recognized that release of confidential reports and

records such as the postmortem examination reports and viability

records that comprise a portion of the records located within

Category II can result in competitive harm, explaining that

eliminating the time and effort required to bring a product to

market is but one of the numerous types of competitive injury

recognized by Exemption 4.  See SMS Data Prods. Group, Inc. v.

United States Dep't of the Air Force, No. 88-0481, 1989 WL

201031, at *3 (D.D.C. Mar. 31, 1989) (stating that allowing

competitors to have access to information that "they would have

had to spend considerable funds to develop on their own" results

in competitive harm).  Information concerning pharmacological

responses, for example, would reveal the results of and

responses from particular dosages of specific proprietary

experimental compounds, showing the benefits or side effects of

each dosage of the compounds, thus helping competitors to

advance their research through use of this information.  (See

First Gilmore Decl. ¶ 17.)  The courts have recognized that

release of such information "would direct competitors as to

which paths to take" based on the reported success and failures.

Pub. Citizen, 997 F. Supp. at 63-64.  This in turn would enable

the competitors to save substantial research and development

-22-

costs and bring their competitive products to the market sooner
by allowing competitors to receive "free of charge, the benefits
of this costly research and testing." Pub. Citizen, 539 F.
Supp. at 1327.  Courts have approved the withholding of this
type of information because "it would be costly for competitors
to figure out [this data] through their own efforts." Pub.
Citizen Health Research Group v. FDA, No. 99-0177, 2000 U.S.
Dist. LEXIS 4108, at **11-12 (D.D.C. Jan. 19, 2000.)
Further, those portions containing detailed descriptions of
symptoms resulting from the administration of the tested
compounds and the treatment provided to alleviate those symptoms
were withheld because these details would be of great value to
competitors.  (See Caulfield Decl. ¶ 36.)  Mr. Caulfield attests
that a competitor could use these detailed description of
symptoms to under-price their services in pivotal "head-to-head
competition with Huntingdon for awards of individual studies or
programs" by easily deriving information, by replicating
Huntingdon's procedures, or by copying the details, all without
expending the time, effort, or money that Huntingdon has
expended on development and testing.  (Id.; see also First
Gilmore Decl. ¶ 16.)

Similarly, the veterinary treatment records identify by
name the specific procedures and provide details such as the
specifics of sequence and timing of treatments and the number of

-23-

staff members assigned to certain tasks.  (See Caulfield Dec.

¶ 37.)  Further, the records distinguish between veterinary care

for reactions to the proprietary experimental compounds and

ordinary veterinary care, permitting competitors to use this

information to "measure and improve their own productivity" by

replicating Huntingdon efforts, thereby benefitting from work

done by Huntingdon without exerting similar efforts of their

own.  (See id.; see also Banks Decl. ¶ 5E.)

B) Segregation

For this second category, as in the first category,

defendant conducted a line-by-line review of each record in

order to segregate all nonexempt information.  (See Banks Decl.

¶¶ 5C, 5E; First Gilmore Decl. ¶ 16.)

In fact, Ms. Banks attests specifically that only those

portions of veterinary treatment request and logs containing

confidential business information were excised and the

"remaining portions of these records were released because they

describe symptoms and treatments that do not reveal anything

about the physiological and health effects of proprietary

experimental compounds."  (See Banks Decl. ¶ 5E; see also First

Gilmore Decl. ¶ 16.)

Also, defendant was able to segregate and release portions

of 397 pages of viability records.  (See First Gilmore Decl.

¶ 16.)  Mr. Gilmore states that defendant released observations

-24-

that did not reveal anything about test results; for example, reports about subject animals being bitten by other subject animals or being injured by getting caught in their own cages were released.  (See id.)

Regarding the fifty-eight pages of viability records withheld in full, Mr. Gilmore attests that these records are "charts [with] numerous preprinted columns for recording anticipated side effects specific to the test compounds themselves.  Thus, the very structure of these charts reveals the anticipated results of the tests in which they were used." (Id.)  These records were withheld in full because "nothing of informational value would have remained on these charts after the excision of the clinical observations and the columns that reveal the anticipated results of the tests."  (Id.)

Ms. Banks attests that the twenty-three pages of necropsy and postmortem examination reports "contain no reasonably segregable nonexempt information.  (See Banks Decl. ¶ 5C.)  Mr. Caulfield declared that these records were withheld because the details in them "closely mirror the specifics contained in the Huntingdon SOPs" (Standard Operating Procedures), and would provide Huntingdon's competitors with a "comprehensive profile" of Huntingdon's procedures.  (Caulfield Decl. ¶ 36.)

Therefore, defendant USDA respectfully suggests that the necropsy and postmortem examination reports, viability records,

-25-

and veterinary treatment requests and logs were properly
withheld under Exemption 4 and that all meaningful, nonexempt
information was segregated and released.

> III. Information from Institutional Animal Care
> And Use Committee (IACUC) Records, Internal
> Huntingdon Memoranda, and Internal USDA
> Investigatory Memoranda

The third category of records at issue concern numerous
references to Huntingdon's "development of study designs and
methods," to program reviews including discussions of "facility
inspection reports," and to evaluations of its "unique training
programs."  (Caulfield Decl. ¶¶ 42-43.)

The first group of records in this category, IACUC records,
consists of fifty-six pages released in part and contains
information from IACUC meetings.  (See Banks Decl. ¶ 4B.)  The
pages contain notes from IACUC meetings, memoranda related to
the discussions occurring during those meetings, and inspection
reports that were discussed at the meetings.  (See id.)  The
issues discussed in these records include detailed descriptions
of Huntingdon's research facilities and equipment, its
information technology systems, its employee training programs,
and its implementation of testing procedures.  (See id.)  Mr.
Caulfield attests that these records contain numerous details
about Huntington's facility configuration and "specific details

-26-

about confidential research programs placed at Huntingdon by its clients."  (Caulfield Decl. ¶ 43.)[14]

The records in the second group in this category, "Internal Huntingdon Memoranda," consist of seven pages released in part and thirty-three pages withheld in full.  (See id. ¶ 5F.)  Ms. Banks attests that these records consist of Huntingdon's "discussions of issues that arose during the course of tests," and concern the use of test designs and methods in light of observations taken during the tests.  (Id.)[15]

The records in the third group in this category, "Internal USDA Investigatory Memoranda," consist of twenty-seven pages released in part and contain discussions of the "bases for each charge that USDA contemplated bringing against Huntingdon for violations of the Animal Welfare Act."  (Id. ¶ 5G.)[16]

A)  Competitive Harm

As with the first two categories, release of the proprietary information in category three would cause harm in that this information could be used by competitors to duplicate

---

[14]  For a document-by-document description of the records in this group, see LSR2102-2231 as delineated on the second Vaughn Index.  (See Banks Decl. ¶ 4B.)

[15]  For a document-by-document description of the records at issue in this group, see Bates Stamps LSR0139-2062 as delineated on the second Vaughn Index.  (See id.)

[16]  For a document-by-document description of records at issue in this group, see Bates Stamps LSR0001-2272 as delineated on the second Vaughn Index.  (See id.)

-27-

Huntingdon's efforts; for example, competitors could copy
"Huntingdon's unique training programs" or its technology
systems and thus reduce their business expenses and thereby
obtain an "unfair business advantage." (Caulfield Decl. ¶ 43.)
It is well established that Exemption 4 protects information
such as data describing a company's workforce, unannounced and
future products, proprietary technical information, and research
data used to support a pharmaceutical drug's safety and
effectiveness.  See, e.g., Westinghouse Elec. Corp. v.
Schlesinger, 392 F. Supp. 1246, 1249 (E.D. Va. 1974), aff'd,
542 F.2d 1190 (4th Cir. 1976); SMS, 1989 WL 201031, at *4;
Citizen Comm'n, 1993 WL 1610471, at **9-10.  Release of such
confidential business information could cause competitive harm
by permitting competitors to benefit without incurring the usual
costs associated with product research and development.  See
Webb, 696 F.2d at 103.

As described in this case, release of information in this
category would cause Huntingdon and its clients competitive harm
by providing its competitors with an unfair advantage in that
they could "craft their own development programs" by using this
data. (Caulfield Decl. ¶ 44.)  Indeed, Mr. Gilmore states that
release of this information would permit Huntingdon's
competitors to get a "head start" in developing products by
enabling them to "expend less time, effort, money, and resources

-28-

in researching and developing their own competing products,"
allowing them to market their products sooner and at a lower
price.  (First Gilmore Decl. ¶ 18.)

As for the IACUC and internal memoranda, Mr. Caulfield
attests that these documents contain "descriptive and specific
information on confidential research programs performed by
Huntingdon" as well as "numerous references to the development
of study designs and methods, and discussion of the
pharmacologic effect of experimental test compounds."
(Caulfield Decl. ¶¶ 42-44.)  It is clear that release of this
information would permit competitors to gain "insight into
Huntingdon's operations," thereby unfairly replicating
Huntingdon's efforts without incurring any expense.  (See id.)

Portions of records such as Huntingdon's candid and
detailed discussions of the inspection reports, as well as the
internal USDA investigatory records, were withheld because these
records contain numerous references to proprietary experimental
compounds, the release of which could cause competitive harm by
permitting Huntingdon's competitors to replicate Huntingdon's
research services without expending their own funds.  (See id.;
see also Banks Decl. ¶¶ 7-8.)  Indeed, Mr. Caulfield attests
that the "specificity and type of details" in these records,
including details on the sequence of events, the numbers of
staff assigned to certain tasks, and the time required for task

-29-

completion, would be of "great value to its competitors" by providing them with "fundamental and critical business intelligence," thereby permitting the competitors to benefit from Huntingdon's "decades of business" without such an corresponding effort.  (Caulfield Decl. ¶ 42.)

B)  <u>Segregation</u>

Defendant re-reviewed all fifty-six pages of the IACUC documents in order to segregate and release any information that would not reveal "confidential commercial information about Huntingdon's general business practices and its research operations."  (<u>Id.</u> ¶ 4B.)  By letter dated June 15, 2005, defendant provided plaintiff with excised copies of the fifty-six pages.  (<u>See id.</u>)  Ms. Banks attests that the excised information "would reveal confidential commercial information."  (<u>Id.</u>)

Defendant carefully reviewed internal Huntingdon memoranda and determined that seven pages could be released in part; the remaining thirty-three "contain no reasonably segregable nonexempt information."  (<u>Id.</u> ¶ 5G.)  The information withheld pertains to test design and methods, confidential communications between Huntingdon and its clients, and candid discussions of Huntingdon's business practices.  (<u>See id.</u>; <u>see also</u> Caulfield Decl. ¶ 42.)

-30-

Regarding internal USDA memoranda, including "correspondence" as well as "observation sheets" discussed in the correspondence, Ms. Banks states that these records were segregated so that "only those portions containing the above-described confidential business information were withheld pursuant to Exemption 4."  ( Banks Decl. ¶ 5H.)

Therefore, defendant USDA respectfully suggests that the IACUC records, internal Huntingdon memoranda, and internal USDA investigatory memoranda were properly withheld under Exemption 4 and that all nonexempt information was segregated and released.

-31-

<u>Conclusion</u>

For the foregoing reasons, and based on the entire record herein, it is respectfully requested that Defendant's Renewed Motion for Summary Judgment be granted.

Respectfully submitted,

_____

KENNETH L. WAINSTEIN
(D.C. Bar #451058)
United States Attorney

_____

R. CRAIG LAWRENCE
(D.C. Bar #171538)
Assistant United States
   Attorney

_____

Dated: August 3, 2005      ANNE D. WORK
(D.D. Bar #376314)
Attorney-Advisor
Office of Information and
   Privacy
United States Department of
   Justice
Flag Building, Suite 570
Washington, DC  20530-0001
(202) 616-5494