

**U.S. Department of Agriculture**



**Office of Inspector General**
**Western Region**

# Audit Report

## APHIS Animal Care Program
## Inspection and Enforcement Activities

**Report No. 33002-3-SF**
**September 2005**

Plaintiff's Exhibit GG

# *Executive Summary*

**Results In Brief**

Animal care and use in the United States is a controversial topic with varying points of view from the public, animal rights groups, breeders, research laboratories, and others. In 1966, the Secretary of Agriculture was given the statutory authority to enforce the Animal Welfare Act (AWA), which set minimum standards of care and treatment for certain warm-blooded animals[1] bred for commercial sale, used in research, transported commercially, or exhibited to the public.

This report presents the results of our audit of the Animal and Plant Health Inspection Service's (APHIS) Animal Care (AC) unit, which has the responsibility of inspecting all facilities covered under the AWA and following up on complaints of abuse and noncompliance. We also reviewed AC's coordination with the Investigative and Enforcement Services (IES) staff, which provides support to AC in cases where serious violations have been found. In addition, we evaluated the effectiveness of the Institutional Animal Care and Use Committees (IACUCs)—the self-monitoring committees at the research facilities responsible for ensuring compliance with the AWA.

We found that most AC employees are highly committed to enforcing the AWA through their inspections and are making significant efforts to educate research facilities and others on the humane handling of regulated animals. However, we identified several ways in which AC should improve its inspection and enforcement practices to ensure that animals receive humane care and treatment and that public safety is not compromised.

- *Due to a lack of clear National guidance, AC's Eastern Region is not aggressively pursuing enforcement actions against violators of the AWA.*[2] We found that regional management significantly reduced its referrals of suspected violators to IES from an average of 209 cases in fiscal years (FYs) 2002-2003 to 82 cases in FY 2004. During this same period, regional management declined to take action against 126 of 475 violators that had been referred to IES.[3] In contrast, the Western Region declined action against 18 of 439 violators.

---

[1] Regulated animals are any live or dead dog, cat, monkey (nonhuman primate mammal), guinea pig, hamster, rabbit, or such other warmblooded animal. It excludes birds, rats of the genus *Rattus*, mice of the genus *Mus*, bred for use in research; horses not used for research; and other farm animals such as livestock and poultry under certain circumstances.
[2] The data in this section, which we compiled from IES records, may include some Horse Protection Act cases, for which AC is also responsible.
[3] IES estimates that these cases cost APHIS at least $291,000 to investigate.

from 463 to 600 facilities. Most VMOs believe there are still problems with the search for alternative research, veterinary care, review of painful procedures, and the researchers' use of animals.

- *AC's Licensing and Registration Information System (LARIS) does not effectively track violations and prioritize inspection activities.* The LARIS database records AC inspections and archives violation histories for all breeders, exhibitors, research facilities, and others. We determined that the system generates unreliable and inaccurate information, limiting its usefulness to AC inspectors and supervisors.

- *FMD and IES did not follow the law and internal control procedures in their processing and collection of penalties.* APHIS' Financial Management Division (FMD) did not transfer 81 of 121 delinquent AC receivables totaling $398,354 to the U.S. Department of Treasury for collection as required by the Debt Collection Improvement Act of 1996 (see exhibit A). In addition, IES did not comply with APHIS' internal cash controls to secure the collection of fines.

**Recommendations In Brief**

To ensure consistent treatment of violators, we recommend that AC incorporate specific guidance in AC's operating manual that addresses referrals and enforcement actions. We also recommend that AC review all cases where the regions decline to take enforcement actions against violators.

To increase the effectiveness of stipulated fines, we recommend that APHIS eliminate the automatic 75-percent discount for repeat violators or direct violations,[7] calculate fines based on the number of animals affected per violation, and seek legislative change to increase fines up to $10,000 for research facilities.

AC needs to emphasize the need for more detailed reviews of protocols, including those where animals are not present at the facility during the inspection. AC also needs to require research facilities to identify annually the number of protocols in their annual reports, and require the VMOs to verify the number of animals used in research.

To reduce the number of violations, AC needs to modify regulations to require IACUCs to conduct more frequent reviews of facilities identified as repeat violators (3 or more consecutive years with violations). We also recommend that AC require IACUCs to implement policies to fully train committee members on protocol review, facility inspections, and the AWA.

---

[7] Direct violations have a high potential to adversely affect the health and well-being of the animal.

## *Abbreviations Used in This Report*

| | |
|---|---|
| AC | Animal Care |
| ACL | Audit Command Language (software) |
| APHIS | Animal and Plant Health Inspection Service |
| AWA | Animal Welfare Act |
| OCFO | Office of the Chief Financial Officer |
| ER | Eastern Region |
| FMD | Financial Management Division |
| FY | Fiscal Year |
| IACUC | Institutional Animal Care and Use Committee |
| IES | Investigative and Enforcement Services |
| LARIS | Licensing and Registration Information System |
| OGC | Office of the General Counsel |
| OIG | Office of Inspector General |
| RBIS | Risk-Based Inspection System |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| VMO | Veterinary Medical Officer |
| WR | Western Region |

                                            Recommendation 17 .................................................................. 32

Finding 7       IES and FMD Delayed Processing Court Orders for AC ..................................... 33

                                            Recommendation 18 .................................................................. 34

Finding 8       FMD Did Not Transfer Delinquent Receivables for Collection ........................... 35

                                            Recommendation 19 .................................................................. 36

                                          Recommendation 20 .................................................................. 36

**Scope and Methodology** .......................................................................................... 37

**Exhibit A – Summary of Monetary Results** ........................................................... 40
**Exhibit B – Sites Visited** ........................................................................................ 41
**Exhibit C – Research Facilities – Top 50 Violators** ............................................... 42
**Exhibit D – Stipulation Worksheet** ........................................................................ 44
**Exhibit E – Agency Response** ................................................................................. 45

In FY 2004, the 100 VMOs/inspectors nationwide were responsible for inspecting over 8,800 facilities. In addition, some inspectors travel hundreds of miles from one facility to the next. Given the limited number of inspectors and the large number of facilities, AC created a risk-based inspection system (RBIS) in February 1998 to better focus AC's inspection strategy. Under this system, not all facilities are inspected annually. Some facilities meeting the criteria for low frequency intervals are subject to inspection once every 2 years, while others determined to require high frequency inspections are inspected at least 3 times annually.

### Inspection and Enforcement Process

All facilities that use, sell, or transport animals covered by the AWA for regulated activities must be licensed or registered with APHIS. The VMOs and inspectors conduct unannounced inspections of these facilities. If an inspection reveals deficiencies in meeting the AWA standards, the inspector instructs the facility to correct the problems within a given timeframe.

Minor violations (e.g., incomplete records or lost identification tags) may be settled with an official notice of warning, while more serious cases (e.g., animal deaths due to negligence and lack of veterinary care) may be referred to APHIS' Investigative and Enforcement Services (IES) staff, which provides support to all APHIS programs. IES field personnel conduct comprehensive investigations, track unresolved cases, and coordinate investigative efforts within APHIS and with other Federal and State agencies. IES National Office staff reviews the completed investigative reports and recommends an appropriate action to the AC regional office, which determines the enforcement action based on the gravity of the violation, the violator's prior history, and the size of the business.

Some cases may be resolved at the agency level through agreements (stipulations) with the violator or through formal administrative action before an administrative law judge. Stipulated agreements allow alleged violators to pay a discounted fine, have their license suspended, or both. Cases that warrant formal prosecution undergo Office of the General Counsel (OGC) review for legal sufficiency prior to issuance of a formal administrative complaint. Formal action may result in license suspensions or revocations, cease-and-desist orders, civil penalties, or combinations of these penalties through administrative proceedings.

### Institutional Animal Care and Use Committees

To comply with AWA standards, research facilities that use warm-blooded animals for research or instructional purposes must establish an Institutional Animal Care and Use Committee (IACUC). Committee members are appointed by the research facilities, and the committee must be composed of

# *Findings and Recommendations*

## *Section 1    Inspection and Enforcement Activities*

While most Animal Care (AC) employees are committed to enforcing the Animal Welfare Act (AWA) and educating research facilities and businesses on the humane handling of animals, improved inspection and enforcement procedures would enhance public confidence that regulated animals receive humane care and treatment.

Of particular concern, AC management in the Eastern Region is not aggressively pursuing enforcement actions against violators of the AWA. The Eastern Region significantly reduced its referrals of suspected violators to the Investigative and Enforcement Services (IES) unit—from an average of 209 cases in fiscal years (FYs) 2002-2003 to 82 cases in FY 2004. When the region did refer cases to IES, management declined to take enforcement action against 126 of 475 violators (27 percent).

When violators are assessed stipulated fines, the fines are usually minimal and not always effective in preventing subsequent violations. Under current APHIS policy, AC gives an automatic 75-percent discount to almost all violators as a means of amicably reaching an agreement on the amount of the fines and avoiding court.

Finally, we noted that some VMOs when inspecting research facilities do not verify the number of animals used in medical research or adequately review the facilities' protocols and other records.

**Finding 1**

## The Eastern Region Is Not Aggressively Pursuing Enforcement Actions Against Violators of the AWA

During FYs 2002-2004, AC's Eastern Region significantly reduced its referrals to the IES unit and declined to take enforcement action in 27 percent[8] of the cases where violations were cited. This occurred because the National Office did not provide clear direction concerning referrals and enforcement actions. Without established procedures that demonstrate how to apply general AC policy to specific cases, regional managers are left to implement AC guidelines as they deem appropriate. As a result, the regions are inconsistent in their treatment of violators; the percentage of repeat violators is higher in the Eastern Region than in the Western Region; and

---

[8] These numbers do not include cases where IES found no violations or had insufficient evidence to pursue enforcement action; however, the data may include some Horse Protection Act cases, which fall under AC's jurisdiction.

supervisor are in the best position to know whether a case should be referred to investigations."

The Eastern Region's decision to reduce the number of referrals appears to be arbitrary, even though cases should be reviewed based on their own merits. For example, in March 2004 a VMO recommended that AC management refer to IES a licensee whose primate had severely bitten a 4-year-old boy on the head and face. The wounds required over 100 stitches. Although this licensee had a history of past violations, IES has no record of a referral from AC.

The IES Eastern Regional Director also said, "The excessive focus on education has been very de-motivating to both inspectors and investigators who want the suspects investigated." One VMO told us, "Education is only part of compliance. Those willing to get educated are not usually the problem facilities. Too much emphasis is placed on education at the expense of enforcement." Due to regional management's position on referrals and enforcement, the VMOs believe they are now losing credibility with the facilities, and their morale is low. Over 53 percent of the Eastern Region VMOs—licensed veterinarians—we interviewed believe that the region does not support their work or does not enforce the AWA as aggressively as it should.[12]

The Western Regional Director for AC stated, "AC's mission is to achieve compliance through inspections and education. However, if education does not have the desired impact on the violators' activities, then enforcement is the best way to achieve compliance. It punishes the violator and is a deterrent to others.  In the Western Region, we do not decline any cases if there is evidence of violations in the investigation report. At a minimum, we would issue a formal warning."

### Failure To Take Enforcement Actions

To determine how the AC regions enforced the AWA, we reviewed IES' Final Action Report for FYs 2002-2004. Eastern Region enforcement guidelines state that sanctions are necessary to dissuade violators from committing the same violations. However, we noted that during this period the Eastern Region issued only 38 stipulated fines to violators for a total of $88,001, while the Western Region issued 143 stipulated fines for $187,060.

In addition, the Eastern Region declined to pursue action against 126 of 475 violators (27 percent). In contrast, the Western Region declined action on 18 of 439 violators (4 percent). We reviewed the cases for 45 of the 126 violators to determine if the Eastern Region declined to take action for

---

[12] In comparison, 100 percent of the VMOs in the Western Region believed the region supported their work (although one expressed some concerns about occasional differences of opinion concerning enforcement actions against research facilities).

reviewed the top 50 repeat violators in the nation and found that despite the Eastern Region's emphasis on education to achieve compliance, 88 percent of the violators were located in the Eastern Region. (See exhibit C for a complete list of the top 50 violators. Table 1 shows that the Eastern Region has a proportionately higher rate of repeat violators than the Western Region.)

**Table 1:  Research Facilities – Top 50 Violators in FYs 2002-2004**

| Region | Average No. of Research Facilities | % Research Facilities | No. of Repeat Violators | % Repeat Violators |
|--------|------------------------------------|-----------------------|-------------------------|--------------------|
| Eastern | 650 | 60% | 44 | 88% |
| Western | 450 | 40% | 6 | 12% |
| Total | 1,100 | 100% | 50 | 100% |

Although AC can temporarily revoke licenses for breeders and exhibitors, this is not the case with research facilities. The AWA[14] does not authorize "the Secretary, during inspection, to interrupt the conduct of actual research or experimentation…" Therefore, it is more critical for AC to take enforcement actions against research facilities that are repeat violators. If facilities believe there is no consequence for violating the AWA, then credibility becomes an issue. Considering the number of repeat violators— those that continue to violate year after year—enforcement should be used as a deterrent.

**Clearer National Direction Needed**

The problems described above occurred because the National Office delegated enforcement responsibility to the regions but failed to provide them with clearly defined direction concerning investigative referrals and enforcement actions. The regions rely on the policy manuals[15] to conduct inspections. However, the manuals do not establish detailed procedures for enforcement. Without established procedures that demonstrate how to effectively and consistently apply general AC policy to specific cases, regional managers are left to implement AC guidelines as they deem appropriate.

The former Assistant Deputy Administrator told us, "In the past, the AC National Office was much more involved with enforcement and investigations. Now, all responsibility has been turned over to the regions, which opens the door for inconsistency. Cases can be dropped at the regional level and never receive National Office attention. When we had more oversight at the National Office, we had more consistency."

---

[14] 7 U.S.C. 2143(a)(6)(A)(iii) dated March 25, 2004.
[15] AC's Policy Manual, Dealer Inspection Guide, and Research Facility Inspection Guide.

| Finding 2 | **Amount of Stipulated Fines Was Not Always a Deterrent to Violators** |
|---|---|

APHIS' stipulated fines assessed against violators of the AWA are usually minimal. Under current policy, APHIS gives an automatic 75-percent discount to almost all violators—including research facilities—as a means of amicably reaching an agreement on the amount of the fines and avoiding court. As a result, violators now consider the monetary stipulation as a normal cost of conducting business rather than as a deterrent for violating the AWA.

The AWA[16] authorizes APHIS to impose civil penalties of up to $2,750 per violation. Although these stipulated fines are one of the few tools APHIS can use against violators, the AWA authorizes APHIS to reduce the fines depending upon the circumstances (e.g., the person's good faith or history of previous violations).

APHIS officials told us that they offer an automatic 75-percent discount on stipulated fines as an incentive for violators to settle the cases to avoid attorney and court costs. However, for repeat violators or direct violations,[17] APHIS should offer no discount because of the serious nature of the offenses. For example, in FY 2002, a zoo in Texas was offered a discounted stipulation totaling $5,600 (the original fine was $22,500) for violations that led to the death of a rhinoceros and a separate incident that resulted in the death of five gorillas from chlorine gas.

In addition, an OGC official told us that discounted fines can be problematic if the violator declines the stipulation and the case is forwarded to OGC for processing. If there is a significant difference between APHIS' stipulation offer and OGC's recommended fine, it may be difficult to justify the higher amount.

In addition to giving the discount, we found that APHIS offered other concessions, making the fines basically meaningless.

- *Using Part of Fine to Improve Facility*. An exhibitor failed to construct an adequate bear pen, which resulted in a bear biting a volunteer worker. In addition, the exhibitor was cited for 2 other serious violations, 13 moderate violations, and 1 minor violation.

---

[16] 7 U.S.C. 2149(a) and 2149(b) dated March 25, 2004. The penalty was adjusted for inflation to $2,750 in June 2000.
[17] Direct violations have a high potential to adversely affect the health and well-being of the animal.

- In FY 2003, at a university in New York, researchers experimented on a female dog without realizing the animal was pregnant. The dog then gave birth to eight puppies, which the researchers improperly euthanized with expired medication and without any sedative to relieve the pain. Although the facility had $6.7 billion[20] in assets, APHIS offered it a discounted stipulation totaling $2,000 (the original fine was $7,150).

The Western Regional Director for AC agreed that the difference in fines between a small exhibitor and a research facility is negligible. Also, an OGC official agreed that the maximum fine set by the AWA may be low for research facilities. For exhibitors and breeders, AC can revoke licenses in addition to issuing fines. However, because research facilities only register with AC (i.e., there are no licenses to revoke), there is a definite need for higher fines to enforce the AWA.

During FYs 2002 through 2004, 2 of the top 50 research facility violators paid monetary fines totaling $11,400 combined. These same facilities were later cited for violations during AC inspections. APHIS needs to reconsider its stipulation policy by assessing larger fines against research facilities with significant assets. To accomplish this, APHIS needs to seek legislative change to increase fines for these facilities.

APHIS should also calculate fines by taking into account the number of animals affected by each violation. Currently, APHIS bases fines solely on the number of violations. According to IES, most investigations involve violations that affect multiple animals. In addition, an OGC official told us that the AWA does not preclude APHIS from charging fines on a violation per animal basis. For example, if two animals are affected under one violation, APHIS could fine the facility on two counts.

**Recommendation 3**

Eliminate the automatic 75-percent discount when calculating fines for repeat violators or direct violations.

**Agency Response.** The automatic 75 percent reduction in civil penalties has been eliminated when it involves repeat violators or direct violations. The Penalty Assessment Work Group, formed in August 2004 by the AC/IES Management Teams, met in August 2005 to determine new guidelines for assessing penalties. Penalties assessed are based on such factors as history of violations, severity of violations, and willingness to work toward compliance once a violation has been noted.

---

[20] 2000 Consolidated Financial Statements.

Regulations[21] require research facilities to report annually "the common names and the numbers of animals upon which research, teaching, testing, or experimentation was conducted…."

In addition, AC's Research Facility Inspection Guide[22] (inspection guide) states that VMOs "are responsible for conducting a thorough inspection of IACUC-approved protocols and changes to protocols, the IACUC's monitoring of protocol activity, and the protocol approval process." VMOs may decide to review all protocols or select a representative sample. To determine if the procedures outlined in the protocols are being followed, VMOs can ask the IACUCs,[23] the self-monitoring oversight committees at each facility, how they track the number of animals approved versus the number actually used by the principal researcher. The VMOs can then verify this by reviewing computer files, acquisition and disposition records, dead animal records, and inventory cards.[24]

We accompanied 11 VMOs and their supervisors to 16 research facilities in California, Maryland, and New York. At each facility, we (1) reviewed the IACUC's activities by reading the meeting minutes, (2) observed some VMOs selecting sample protocols for inspection, (3) verified the number of animals used in research and reported by the facility, and (4) with assistance from the VMOs, reviewed some protocols to determine if the facilities provided complete explanations for using animals in the "with pain, no drugs" experiments.

We also surveyed 30 of the 65 VMOs to obtain their views about the effectiveness of the AC program and to determine if the IACUCs adequately reviewed the protocols, avoided unnecessary duplication of experimentation, conducted an adequate search for alternative methods,[25] etc. Based on these interviews and our site visits, we believe that the VMOs are highly committed to enforcing the AWA through their inspections and are making significant efforts to educate the facilities on the humane handling of animals. However, we found that some improvements are needed in two areas:

### Verification of the Number of Animals Reported by Facilities

We found that 13 of 16 research facilities that we visited misreported the number of animals used in research. We selected these 16 facilities because they were cited for violations of the AWA in the past 3 years; 15 conducted research involving pain or distress to the animals without drugs for relief. Although the AWA requires research facilities to report annually the number

---

[21] 9 CFR 2.36 (b)(5-8), dated January 1, 2002.
[22] Dated April 2001.
[23] Institutional Animal Care and Use Committee.
[24] Research Facility Inspection Guide, Chapter 6.3, page 6, dated April 2001.
[25] Alternative methods that incorporate the replacement, reduction, or refinement of animals used in research and that minimize animal pain and distress.

us that the selection process was based on "good faith" and that they relied on the facilities to provide them with accurate records.

Other VMOs were more thorough in assessing the IACUCs' protocol approval process. These VMOs reviewed all of the IACUC's written meeting minutes, which document discussions of each protocol and the basis for approving them. They also reviewed the researchers' notes and medical records to ensure that they were provided all pertinent protocols.

- *Limited Sampling of Protocols.* Two VMOs informed us that they only review protocols for animals that are present at the facility during their inspections. Because of this limited sampling, they may not uncover problems with the other protocols, such as failure to conduct an adequate search for alternatives or to document that the experiment did not duplicate previous research. Without reviewing a representative sample of protocols, it is unclear how these inspectors could assess an IACUC's protocol approval process.

- *Review of Other Records.* One of the VMOs mentioned above also did not review guinea pig disposition records that disclosed unexpected animal deaths—some due to drug overdose, others with no explanation. According to facility staff, the overdoses were caused by the miscalibration of the device used to inject a drug. By not reviewing the records, the inspector did not know there was a problem with the equipment or whether the problem was fixed.

  Regulations currently require the maintenance of acquisition and disposition records for dogs and cats; those records are not required for other regulated species. However, if records are available for the other species, we believe that inspectors should review them, at least on a sample basis, to determine if there have been any unusual animal deaths.

To ensure that inspectors verify the number of animals used in medical research, adequately sample the facilities' protocols, and review other available records, AC should revise its inspection guide. The guide should require the verification of the number of animals reported in the annual reports and emphasize the need for more detailed reviews of protocols and other available animal records. APHIS should also require the research facilities to identify annually the number of protocols under each of the pain/no pain categories in their annual reports.

**Recommendation 6**

Revise the Research Facility Inspection Guide to require VMOs to verify the number of animals reported in the research facilities' annual reports.

**OIG Position.** We agree with APHIS' corrective action. To achieve management decision, APHIS needs to revise the Research Facility Inspection Guide to require the VMOs/inspectors to use the list of proposed activities as the universe from which to select their sample protocols, in the event the proposed regulatory changes are not incorporated in the rules.

**IACUC Monitoring of Research Facilities**

In FY 2000, APHIS conducted a survey of 40 VMOs and their 9 supervisors to assess their opinions on the effectiveness of the IACUCs. In general, VMOs concurred that IACUCs need to improve the search for alternatives, the review of painful procedures, and monitoring the researchers' use of animals to ensure compliance with approved protocols and standard operating procedures. The survey concluded that "IACUCs seem to be doing well at functions related to setting up the administrative structure and developing the process but not as well at monitoring and follow through."

In FY 2004, we re-surveyed 30 VMOs and their supervisors to determine if the IACUCs improved their performance. Although most VMOs believed that the IACUCs improved in certain areas, VMOs still found a total of 6,801 violations at these facilities from FYs 2002-2004. The VMOs believe there are still problems with the search for alternatives, veterinary care, review of painful procedures, and the researchers' use of animals. Using AC's database, we compiled and analyzed the data for all inspections conducted at research facilities from FYs 2002-2004. Table 2 shows the most frequent violations cited by the VMOs.

**Table 2:  The Most Frequent Violations at Research Facilities – FYs 2002-2004**

| Regulation Violated by Research Facility | No. of Violators (A) | No. of Violations (B) | % Facilities With Violations (A)/1,100* |
|---|---|---|---|
| **Search for Alternatives.** Researchers considered alternatives to painful procedures and documented the availability of the alternatives (9 CFR 2.31(d)(1)(ii)). | 322 | 391 | 29% |
| **Reporting.** IACUC submitted reports of its evaluations of animal facilities to the institutional official (9 CFR 2.31(c)(3)). | 281 | 329 | 26% |
| **Veterinary Care.** Research facility maintained adequate veterinary care that includes appropriate methods and availability (9 CFR 2.33(b)(2)). | 202 | 277 | 18% |
| **Protocols.** Protocols contained a complete description of the proposed use of animals (9 CFR 2.31(e)(3)). | 188 | 256 | 17% |
| **Housekeeping.** Research facilities met standards of care regarding housekeeping for rabbits (9 CFR 3.56(c)). | 102 | 157 | 9% |
| * The average number of research facilities during FYs 2002-2004 was 1,100. | | | |

informed us that some institutional officials were not supportive of IACUC activities and APHIS regulations, resulting in significant issues with animal care at the facilities. In one example, the research facility ignored the VMO's reports of violations and did not take corrective action for several years. In cases of negligence of fiduciary duty, APHIS should seek an OGC opinion to determine if institutional officials can be held personally liable.

## Inaccuracies in Annual Reports

We also found that the majority of research facilities we reviewed misreported the numbers of animals used in research. Some facilities did not follow APHIS guidelines for completing their annual reports, while other facilities are not using the numbers of animals supported by their records. As a result, APHIS is misinformed about the true number of animals used annually in research facilities throughout the nation (as noted in finding 3).

Regulations[29] state, "The annual report shall state the common names and the numbers of animals upon which teaching, research, experiments or tests were conducted..." AC Policy[30] as well as the instructions attached to the template annual report state that animals used in multi-year studies will be counted once each year.

We visited 16 registered research facilities that were cited for violations in the past 3 years.[31] After comparing the most current annual report submitted by each facility to the supporting documents on hand, we found that 13 of the 16 research facilities misreported the numbers of animals used in their research. Of these facilities, nine had underreported, three had overreported, and we could not determine the actual number of animals used in the remaining facility. Some facilities agreed to resubmit an amended annual report.

Although research facilities must be registered, APHIS has no authority to revoke the registration of a noncompliant research facility. Even administrative law judges may find it difficult to terminate or refuse to renew registrations in cases where serious or repeat violations occur because USDA does not have the authority to interrupt the conduct of research.

We concluded that IACUCs need to improve their monitoring of researchers for compliance with the protocols (e.g., the search for alternatives, review of painful procedures, unnecessary duplication of research), in following up on the correction of deficiencies, veterinary care, and in reporting accurate annual reports to APHIS. This is imperative because although AC can temporarily revoke licenses for breeders and exhibitors, this is not the case

---

[29] 9 CFR 2.36 (b) (5-8), dated January 1, 2002.
[30] Animal Care Policy 17, dated March 17, 1999.
[31] Fifteen facilities conducted research involving pain or distress to animals without the use of drugs for relief.

## Recommendation 11

Instruct research facilities to ensure that the numbers of animals reported in the annual report are accurate.

**Agency Response.** As noted in our reply to Recommendation #6, we agree this is important information. The RFIG will be amended to instruct inspectors to verify the accuracy of the numbers of animals reported. The Manual Team will be responsible for updating the Research Facility Inspection Guides and inserting the three clarifications listed in the response to Recommendations 6, 7, 8, and 11. The Guide can be updated, printed, and distributed by May 1, 2006. In the interim, the Animal Care Management Team will distribute an instruction memo to the VMOs with the clarifications they need to use immediately. Policy #17 will be amended to further assist research facilities in this endeavor.

**OIG Position.** We agree with APHIS' corrective action. To achieve management decision, APHIS needs to provide us with a copy of the revised Policy #17.

## Recommendation 12

Seek an OGC opinion to determine if institutional officials can be held personally liable in cases of negligence of fiduciary duty.

**Agency Response.** The following verbatim response was obtained from the Office of General Counsel on September 6, 2005:

"Under section 2139 of the Animal Welfare Act (AWA), 'the act, omission, or failure of any person acting for or employed by a research facility...within the scope of his employment or office, shall be deemed the act, omission, or failure of such research facility,...as well as of such person.' Section 2139 applies to alleged violations of the AWA or regulations by any person that is engaging in AWA regulated activities. Under the AWA, APHIS only has jurisdiction over persons who are engaging in regulated activities as dealers, research facilities, exhibitors, carriers, and intermediate handlers. Employees of dealers, research facilities, exhibitors, carriers, and intermediate handlers are not liable for any violations committed by their employers, unless the employee is also engaging in AWA regulated activities. Accordingly, section 2139 does not apply to institutional officials who oversee regulated activities of a research facility, but are not engaged in AWA regulated activities themselves. In cases where an institutional official is charged by the research facility with oversight of regulated activities and does not fulfill that duty adequately, the research facility, and not the individual, is responsible for any violations of the AWA or the regulations that may occur."

*Section 3     LARIS System*

**Finding 5**                    **Information From LARIS Is Not Always Accurate**

AC's Licensing and Registration Information System (LARIS) lacks certain key features that prevent it from effectively tracking violations and prioritizing inspection activities. According to the former Assistant Deputy Administrator, who was responsible for the implementation of LARIS, the system was never fully tested when it was first implemented in 1994 and it has not undergone continued computer maintenance. As a result, the system generates unreliable and inaccurate information, limiting its usefulness to AC inspectors and supervisors.

Departmental Manual 3200-001[33] states that, "agencies will…provide for maintenance in the operation phase [of an application system]" which includes running, changing, or repairing the system as necessary to ensure that the system still meets user and security requirements.

APHIS acknowledges LARIS as one of its mission-critical systems and has continued to use and support the system for the past 10 years; however, OIG's 1995 audit of APHIS' enforcement of the AWA found that information contained in LARIS was generally unreliable and inaccurate. LARIS did not effectively track violations and prioritize inspections. It also did not correctly show the extent of the violations disclosed by the inspections.

LARIS is a database used by AC personnel to record licensing and registration of all breeders, exhibitors, and other facilities and to document their inspection and violation histories. A subsystem of LARIS, the Risk-Based Inspection System (RBIS), calculates the minimum number of inspections that are needed annually based on a continual risk assessment of each facility's violation history. After reviewing several reports, we determined that LARIS does not always track inspections correctly and contains inaccurate data.

- *Misclassifies Attempted Inspections.*[34] RBIS erroneously treats "attempted" inspections as "completed" inspections. To compensate for this, most inspectors use their own *ad hoc* systems (e.g., spreadsheets, notes, calendars) to track inspections.

- *Unable to Track Re-inspections.* RBIS does not track the dates for upcoming "re-inspections," the required inspections that follow-up on

[33] "Management Application Systems Life Cycle Management," Chapters 2.4(A) and 2.6(C)(2), dated March 3, 1988.
[34] An attempted inspection occurs when an authorized person from the facility is not available to accompany the inspector and no inspection is conducted.

- *Discrepancies Between LARIS Reports.* When the VMOs and inspectors conduct site visits, they prepare inspection reports and enter them directly into LARIS. However, the number of violations recorded in the inspection reports does not always match the information listed in LARIS' Violation History Report, which should summarize all violations. For example, one facility was cited for 11 AWA code violations in the inspection report, while 88 violations were recorded in the history report. AC was unable to provide us with a definitive explanation for the difference.

We interviewed 30 of the 65 VMOs[37] to determine if the LARIS and RBIS systems served their needs in performing their duties. Of these, 29 VMOs expressed dissatisfaction with the systems. VMOs commented that the systems are slow, cumbersome, and not user friendly and that the information is inaccurate. In response, AC's computer specialist explained that "some of the 'bugs' [in LARIS] are technical, and some are just code that is not working as intended."

We learned that AC contracted a computer programmer and formed a task force of inspectors and staff to create a new database by September 2005. In addition to addressing the flaws we identified with LARIS, plans for the new system include being more user friendly when querying inspection reports, correcting inaccurate data in reports, improving the users' ability to retrieve information, and complying with the electronic Freedom of Information Act requirements. However, to avoid the problems we identified with LARIS, AC needs to ensure that the new system is properly tested and maintained.

## Recommendation 13

Implement temporary measures to address attempted inspections and re-inspections until the new system is operational.

**Agency Response.** We understand the basis for this recommendation and agree with its intent; however, the new system, OACIS (On-line Animal Care Information System) is scheduled to be operational in March 2006. We do not believe the implementation of temporary measures that would take some weeks to develop and implement and would then be in place for 6 months or less is either cost effective or an efficient use of scarce resources.

**OIG Position.** We are unable to accept APHIS' management decision on this recommendation. Although many inspectors may be aware of LARIS' limitation in tracking re-inspections and attempted inspections, there may be others (especially new inspectors) who are not aware of the limitation. The agency should send a memorandum or e-mail to its VMOs/inspectors,

---

[37] The 65 VMOs include AC supervisors from both regions.

**Section 4     *Cash Collection Process at IES and FMD***

There are two types of monetary assessments for violators of the AWA—the stipulated fine and the court-ordered penalty. IES may issue a stipulation, depending on the nature of the violation. More serious cases are sent to an administrative law judge who can suspend or revoke the violator's USDA license and impose a court-ordered penalty.

During our review, the IES National Office was responsible for collecting stipulated fines. If the payments became past due, IES forwarded the fines to APHIS' Financial Management Division (FMD) in Minneapolis, which has agency-wide debt collection responsibilities. FMD also collects court-ordered penalties.

We found that IES and FMD did not follow internal controls when processing and collecting fines and penalties. Penalties that are intended to deter violations of the AWA become less effective unless APHIS correctly processes and promptly collects fines.

**Finding 6**          **IES Did Not Follow Internal Control Procedures for Cash Collections**

The IES National Office did not implement several basic controls over its cash collections, which totaled $1.8 million[38] during FYs 2003 and 2004. The Deputy Director was unfamiliar with the requirements of APHIS' Accounting and Budget Manual (Manual) and, therefore, failed to implement certain internal controls. As a result, collections were not deposited timely, increasing their risk of being lost or stolen.

In addition to its investigative responsibilities, the IES National Office collected stipulated fines for all APHIS programs. Initially, we reviewed cash collections and deposits for the AC program for FYs 2003 and 2004. After we noted some problems with internal controls, we expanded our review to include IES collections for all APHIS programs to determine if the problems were systemic. We found the following:

- IES Did Not Log Collections Upon Receipt. Although the collection clerk opened the mail and made deposits, she did not maintain collection logs. A complete accounting of all collections cannot be assured without proper controls.

---

[38] This amount consists of fines from all APHIS programs as of July 2004.

manual. The IES Director told us he plans to transfer the collection function to FMD, which has agency-wide debt collection responsibilities.

**Recommendation 16**

Instruct IES to provide a plan and timeframe for transferring collections to FMD.

**Agency Response.** Beginning in October 2004, IES transferred the collection activity for APHIS issued civil penalty stipulations to FMD. IES' stipulation letter to the alleged violator requests that he or she send payment directly to the APHIS Lockbox in St. Louis, Missouri. FMD processes the payments and updates the IES case management tracking system with the collection data.

**OIG Position.** We accept APHIS' management decision on this recommendation. For final action, APHIS needs to forward to OCFO a sample copy of IES' stipulation letter showing that payments are now sent to the APHIS lockbox in St. Louis, Missouri.

**Recommendation 17**

Until collections are delegated to FMD, instruct IES to implement internal controls over its cash collections in accordance with APHIS' Budget and Accounting Manual.

**Agency Response.** Beginning in October 2004, IES instituted a number of internal controls to ensure integrity in the civil penalty collection process. While over 90 percent of the civil penalty payments go directly to FMD, IES still receives a small number of checks for civil penalties assessed at the ports of entry and mailed in after the traveler has left the port, as well as checks received by the Office of General Counsel for cases resolved by the USDA administrative law judges. IES has instituted controls in accordance with the APHIS Budget and Accounting Manual.

**OIG Position.** We accept APHIS' management decision on this recommendation. For final action, APHIS needs to provide a copy of IES' new internal controls to OCFO.



Figure 8:  Delays in Establishing Receivables

Penalties are intended to deter unlawful practices of the AWA.  If APHIS takes up to 10 months to process court-ordered penalties, the probability of collection is reduced and the penalties become less effective.  To prevent this, APHIS needs to streamline the process for establishing receivables.

## Recommendation 18

Implement a plan that would expedite the process for establishing receivables of court-ordered fines.

**Agency Response.** As of December 2004, IES instituted procedures to expedite the processing of Administrative Law Judge (ALJ) orders to FMD for processing as follows:

IES sends all ALJ orders (Consent Decisions, Decision and Orders) to FMD every Friday. A cover sheet is attached to each docket showing: docket number, case number, violator, civil penalty, person sending, phone number, and date. This specifies the amount to be collected and alleviates the need for FMD to interpret the court order. A copy of the order and cover sheet are filed with the case. IES maintains a spreadsheet with the information from the cover sheet as well as a copy of the cover sheet for tracking purposes.

**OIG Position.** We accept APHIS' management decision on this recommendation. For final action, APHIS needs to provide its new procedures to OCFO.

In addition, FMD management told us that it did not have access to pertinent information such as the violators' tax identification numbers, which are needed in order to transfer the delinquent receivables. However, the LARIS database contains tax identification numbers for licensees and registrants, and FMD should have been able to obtain this information from AC.

## Recommendation 19

Establish a timeframe to transfer the $398,354 in receivables over 180 days to Treasury for collection.

**Agency Response.** FMD was not required to transfer 14 of the 81 delinquent AC receivables totaling $134,192.82 to Treasury for collection. The remaining 67 receivables, totaling $264,161.18, have been reviewed and appropriate steps have been taken including referring debts to Treasury Cross Servicing (CS), writing off the debts, or collections on payment plans with many leading to debts paid in full.

Debts that had been previously referred to Treasury Offset Program (TOP) have been forwarded to CS and will be removed from TOP as soon as CS submits the debt to TOP.

**OIG Position.** We agree with APHIS' corrective action.  To achieve management decision, the agency needs to provide us with a list of the 14 receivables and explain the reasons why it did not transfer them to Treasury.

## Recommendation 20

Establish a formal system to share pertinent information such as tax identification numbers between AC and APHIS' debt collection unit.

**Agency Response.** FMD has developed a process for obtaining tax identification numbers for stipulations and dockets, which are received without this information from IES. Modifications have been made to the IES tracking system to allow FMD more access to violator data including the tax identification numbers. An IES staff member has been designated as a contact person to assist FMD with questions on documents received and its tracking system. FMD also extended its research abilities by using Choicepoint AutotrackXP data beginning in May 2005 to research tax identification numbers.

**OIG Position.** We accept APHIS' management decision on this recommendation. For final action, APHIS needs to provide a copy of its new procedure to OCFO.

---

In the Eastern Region, the data identified 809 individuals with completed or closed investigations. Of these, IES determined that 475 violated the AWA, which required the region to decide whether to take enforcement action. AC declined to take action against 126. At IES, we reviewed 45 of these to determine the Eastern Region's reasons for closing the cases without taking enforcement action.[46]

In the Western Region, the data identified 572 individuals with completed or closed investigations. Of these, IES determined that 439 violated the AWA, which required the region to decide whether to take enforcement action. AC declined to take action against 18.

- *Reviewed Files for Discounts Offered by AC.* Also at IES, we reviewed the files for 76 of 181 registrants and licensees that agreed to pay stipulated fines to determine the amount of the discounts offered by AC. We then used ACL to identify violations or repeat violations subsequent to the issuance of the stipulation.

- *Visited 16 Research Facilities.* The States of California and New York have the most registered research facilities in the Nation.[47] For these States, we judgmentally selected research facilities that were cited for violations during each FY between 2002 and 2004, and that conducted research "with pain, no drugs for relief." In addition, we selected one facility in Maryland due to its proximity to the APHIS National Office and because it had been a repeat violator of the AWA. We visited these facilities to assess the IACUCs' protocol processes and to validate the number of animals reported on their most current annual report.

- *Analyzed Reports From LARIS.* During our initial fieldwork, we learned that AC was developing a new database to replace LARIS. Because of this, we limited our review of LARIS to issues that came to our attention through interviews with AC employees and through our own review of the LARIS reports that we obtained from the AC's National and regional offices.

- *Reviewed the Cash Collection Process for Fines Levied Against Violators.* We reviewed internal controls at both IES and FMD, which collect court penalties and stipulated fines. At IES, we reviewed all deposit logs for AC-related collections. Because IES did not have adequate internal controls in place, we expanded our scope to include cash deposits for Plant Protection and Quarantine and Veterinary Services to determine the impact of the problem. Also at IES, we reviewed files for all 18 court decisions and orders requiring collections

---

[46] We were only able to review 20 IES investigation files and 25 correspondence records because of its 1-year file retention policy. Only files that were investigated and declined with no action in FY 2004 were available.
[47] For FY 2002-2004, the number of active research facilities averaged 1,100.

# Exhibit D – *Stipulation Worksheet*

ANIMAL CARE PENALTY WORKSHEET

| If the violator has: | And the Business assets are: | And the level of violation is: | The fine for one count is: | Times the number of counts: | The total is: |
|---|---|---|---|---|---|
| No previous history | Less than $25,000 | Minor | $110x____ | | |
| | | Moderate | $275x____ | | |
| | | Serious | $1100x___ | | |
| | $25,000 - $100,000 | Minor | $275x____ | | |
| | | Moderate | $550x____ | | |
| | | Serious | $1650- 2750x____ | | |
| | More than $100,000 | Minor | $275x____ | | |
| | | Moderate | $825x____ | | |
| | | Serious | $1650-2750x___ | | |
| Previous history of a Stipulation or multiple APHIS 7060s in last five years | Less than $25,000 | Minor | $275x____ | | |
| | | Moderate | $550x____ | | |
| | | Serious | $1650-2750x____ | | |
| | $25,000 - $100,000 | Minor | $275x____ | | |
| | | Moderate | $825x____ | | |
| | | Serious | $1650-2750x___ | | |
| | More than $100,000 | Minor | $550x____ | | |
| | | Moderate | $1100x___ | | |
| | | Serious | $2750x___ | | |
| Previous history of a Consent Decision or Decision and Order in last five years | Less than $25,000 | Minor | $275x____ | | |
| | | Moderate | $1100x___ | | |
| | | Serious | $1650x___ | | |
| | $25,000 - $100,000 | Minor | $550x____ | | |
| | | Moderate | $1650x___ | | |
| | | Serious | $2750x___ | | |
| | More than $100,000 | Minor | $550x____ | | |
| | | Moderate | $1650x___ | | |
| | | Serious | $2750x___ | | |
| STIPULATION (TOTAL X 25%) | | | TOTAL FORMAL PENALTY | | |

Revised:  6/16/00

# Exhibit E – Agency Response

APHIS Response to OIG Report 33002-0003-SF                Page 2

IES will maintain in its tracking system the reason for "denied/declined."

**Recommendation #3:** Eliminate the automatic 75 percent discount when calculating fines for repeat violators or direct violations.

**APHIS Response:** The automatic 75 percent reduction in civil penalties has been eliminated when it involves repeat violators or direct violations. The Penalty Assessment Work Group, formed in August 2004 by the AC/IES Management Teams, met in August 2005 to determine new guidelines for assessing penalties. Penalties assessed are based on such factors as history of violations, severity of violations, and willingness to work toward compliance once a violation has been noted.

**Recommendation #4:** Seek legislative change to increase fines up to $10,000 for research facilities.

**APHIS Response:** A legislative change will need to be initiated by the Secretary of Agriculture.

**Recommendation #5:** Calculate fines based on the number of animals affected per violation, as appropriate.

**APHIS Response:** The Penalty Assessment Work Group, which met in August 2005 to review and update penalty assessments, developed new internal guidelines that IES will use to determine when calculating fines on a per animal basis.

**Recommendation #6:** Revise the Research Facility Inspection Guide (RFIG) to require VMOs to verify the number of animals reported in the research facilities' annual reports.

**APHIS Response:** We agree this is important information. The appropriate sections of the RFIG will be updated by November 30, 2005. We will also revise Policy #17 to further assist research facilities in completing reports properly. The draft revision to Policy #17 will be completed by October 1, 2005.

**Recommendation #7:** Emphasize the need to adequately sample protocols, including those where animals are not present at the facility during the inspection. Also, emphasize the need to review disposition records, if available, for regulated animals other than dogs or cats.

# Exhibit E – Agency Response

APHIS Response to OIG Report 33002-0003-SF                    Page 4

**Recommendation #11**:  Instruct research facilities to implement controls to ensure that the number of animals reported in the annual report is accurate.

**APHIS Response**:  As noted in our reply to Recommendation #6, we agree this is important information.  The RFIG will be amended to instruct inspectors to verify the accuracy of the numbers of animals reported.  The Manual Team will be responsible for updating the Research Facility Inspection Guides and inserting the three clarifications listed in the response to Recommendations 6,7,8, and 11.  The Guide can be updated, printed, and distributed by May 1, 2006.  In the interim, the Animal Care Management Team will distribute an instruction memo to the VMOs with the clarifications they need to use immediately.  Policy #17 will be amended to further assist research facilities in this endeavor.

**Recommendation #12**:  Seek an OGC opinion to determine if institutional officials can be held personally liable in cases of negligence of fiduciary duty.

**APHIS Response**:  The following verbatim response was obtained from the Office of General Counsel on September 6, 2005:  Under section 2139 of the Animal Welfare Act (AWA), "the act, omission, or failure of any person acting for or employed by a research facility ... within the scope of his employment or office, shall be deemed the act, omission, or failure of such research facility, ... as well as of such person."  Section 2139 applies to alleged violations of the AWA or regulations by any person that is engaging in AWA regulated activities.  Under the AWA, APHIS only has jurisdiction over persons who are engaging in regulated activities as dealers, research facilities, exhibitors, carriers, and intermediate handlers.  Employees of dealers, research facilities, exhibitors, carriers, and intermediate handlers are not liable for any violations committed by their employers, unless the employee is also engaging in AWA regulated activities.  Accordingly, section 2139 does not apply to institutional officials who oversee regulated activities of a research facility, but are not engaged in AWA regulated activities themselves.  In cases where an institutional official is charged by the research facility with oversight of regulated activities and does not fulfill that duty adequately, the research facility, and not the individual, is responsible for any violations of the AWA or the regulations that may occur.

**Recommendation #13**:  Implement temporary measures to address attempted inspections and re-inspections until the new system (OACIS) is operational.

**APHIS Response**:  We understand the basis for this recommendation and agree with its intent; however, the new system, OACIS (On-line Animal Care Information System) is scheduled to be operational in March 2006.  We do not believe the implementation of temporary measures that would take some weeks to develop and implement and would then be in place for 6 months or less is either cost effective or an efficient use of scarce resources.

# Exhibit E – *Agency Response*

APHIS Response to OIG Report 33002-0003-SF                          Page 6

number of checks for civil penalties assessed at the ports of entry and mailed in after the traveler has left the port, as well as checks received by the Office of General Counsel for cases resolved by the USDA administrative law judges. IES has instituted the following controls in accordance with the APHIS Budget and Accounting Manual:

The IES Program Support Assistant (PSA) responsible for opening the mail enters all checks into an electronic Check Log. Checks are entered into a log with the case number or serial number, violator, check number, amount, date received, and who received it. The PSA gives the checks to the IES Document Control Team (DCT) for processing and submission on a daily basis.

The DCT processes the checks and forwards them to the APHIS Lockbox in St. Louis. DCT enters the check data (case number or serial number, violator, check number, amount, date received, date sent to St Louis, initials of person processing, and date check was returned to violator (if necessary). A copy of the check and any supporting documentation (i.e., settlement agreement, PPQ 591, or processing form from port) is made and filed in the case file. A cover sheet is attached to each check that shows case and/or docket number, violator name, check number, check amount, and tax identification number. It is also signed and dated by the sender. A copy of the cover sheet is also made for the case file. All checks are mailed by certified mail. All checks are processed within 24 hours of receipt. If IES cannot process the check in 24 hours, the reason is annotated on the log.

FMD processes the checks received at the APHIS Lockbox and updates the IES Tracking System with the amount received. Once FMD records the full payment as collected, DCT closes the case in the tracking system.

IES has instituted a system where three different groups (PSA, DCT, and FMD) record the payment information at three different points in the process (upon receipt in the mail, upon submission to the lockbox and after deposit and entry into the tracking system). Any discrepancies between these three records are traced and resolved immediately.

**Recommendation #18:** Implement a plan that would expedite the process for establishing receivables of court-ordered fines.

**APHIS Response:** As of December 2004, IES instituted procedures to expedite the processing of Administrative Law Judge (ALJ) orders to FMD for processing as follows:

IES sends all ALJ orders (Consent Decisions, Decision and Orders) to FMD every Friday. A cover sheet is attached to each docket showing: docket number, case number, violator, civil penalty, person sending, phone number, and date. This