UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN DEFENSE OF ANIMALS,           )
                                 )
        Plaintiff,               )
                                 )
        v.                       )
                                 )
THE UNITED STATES DEPARTMENT     )
   OF AGRICULTURE,               )
                                 ) Civil Action No. 02-0557 (RWR)
        Defendant,               )
                                 )
        and                      )
                                 )
LIFE SCIENCES RESEARCH, INC.,    )
                                 )
        Intervenor-Defendant.    )
_____)

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MEMORANDUM IN
SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

        Plaintiff commenced this action on March 22, 2002, pursuant

to the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (2000 &

Supp. II 2002), seeking access to certain records concerning an

investigation by defendant United States Department of

Agriculture (USDA) of Huntingdon Life Sciences (Huntingdon), a

wholly-owned subsidiary of intervenor-defendant Life Sciences

Research, Inc. for alleged violations of the Animal Welfare Act

(AWA), 7 U.S.C. §§ 2131-59 (2000).

        On December 12, 2002, defendant moved for summary judgment

on the basis that defendant properly withheld certain agency

records from plaintiff; plaintiff thereafter filed a cross-motion

for summary judgment; and by Order dated September 28, 2004, the

-2-

Court ordered defendant to produce a supplemental <u>Vaughn</u> Index,
which defendant did on December 22, 2004.  On August 3, 2005,
after a series of joint status reports, defendant filed
Defendant's Renewed Motion for Summary Judgment and on
October 28, 2005, plaintiff filed Plaintiff's Renewed Motion for
Summary Judgment.

Defendant now submits this opposition.  For the reasons set
forth below, and on the basis of the entire record herein,
defendant respectfully suggests that plaintiff's arguments are
without legal merit and that defendant is entitled to summary
judgment as a matter of law.

<u>Argument</u>

Plaintiff makes several arguments in its renewed motion for
summary judgment; these arguments can be grouped into three
categories:  1) that defendant refuses to appreciate the fact
that only certain information is at issue and thus has failed to
segregate and release the particular items of information that
are at issue, 2) that the declaration from Lesia Banks "is not
based on any personal knowledge of Huntingdon's competitive
status," and 3) that the Court should conduct an in camera
inspection.  (Plaintiff's Memorandum in Support of its Cross-
Motion for Summary Judgment and in Opposition to Defendant's
Renewed Motion for Summary Judgment at 4-6, 12, filed October 28,
2005 [hereafter Pl.'s Mem.].)  As a final point, plaintiff claims

-3-

that there are additional records not discussed by USDA that contain "communications" between Huntingdon and USDA and between Huntingdon and its clients that plaintiff contends are subject to its request.  (See Pl.'s Mem. at 22.)  As is demonstrated below, each of these arguments is without merit.

## I.   Information at Issue

Concerning plaintiff's contention regarding the items of information that are at issue, defendant is well aware that the parties have agreed that certain information is not at issue. (See Memorandum of Points and Authority in Support of Defendant's Renewed Motion for Summary Judgment at 4-5, filed Aug. 3, 2005 [hereinafter Def.'s Mem.].)  Nevertheless, plaintiff restates that three areas remain in dispute:  "bare test results, observations of the effects on animals, and the bases for the agency's decision to charge Huntingdon with numerous violations of the AWA."  (Pl.'s Mem. at 5.)  However, these are short-hand descriptions of the identical categories that defendant used in its renewed motion for summary judgment to describe the records at issue; in fact, plaintiff reuses defendant's full categories in its recitation of the three categories in its own memorandum. (Compare Def.'s Mem. at 10, 19, 27 with Pl.'s Mem. at 14, 16, 19.)  Thus, there is no actual dispute as to what records are at issue.

-4-

In arguing for the release of this information, plaintiff
continues to repeat the same theme:  Because plaintiff is not
seeking certain information, all other information, i.e., the
information it wants, should be released to it in full.  (See
Pl.'s Mem. at 2-4.)  While it is well established and has been
agreed by both parties that plaintiff is not seeking certain
information, it does not follow that release of the remaining
information is warranted.  Indeed, the remaining information has
been reviewed thoroughly in order to segregate for release any
portions of it; any portions not released have been properly
withheld, pursuant to Exemption 4 of the FOIA, 5 U.S.C.
§ 552(b)(4), because disclosure is likely to cause substantial
competitive harm to Huntingdon.[1]  (See Mem. Op. & Order, filed
Sept. 28, 2004, at 28.)  Further, because this information was
submitted involuntarily by Huntingdon to USDA (see Declaration of
Hugh Gilmore [hereinafter First Gilmore Decl.], filed Dec. 12,
2002, ¶ 5), the proper Exemption 4 standard for withholding
information is the "National Parks test" as opposed to the less
stringent Exemption 4 standard for withholding information that
is "voluntarily" submitted to the Government.  Compare Nat'l
Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 & n.17

---

[1] As confirmed by the Court, the parties had agreed earlier
that the following elements of Exemption 4 were not in dispute:
trade secrets, "commercial," and "obtained from a person,"
leaving only defendant's invocation of the "confidential" element
of Exemption 4 at issue.  (See Mem. Op. & Order at 28.)

-5-

(D.C. Cir. 1974) <u>with</u> <u>Critical Mass Energy Project v. NRC</u>, 975
F.2d 871, 879 (D.C. Cir. 1992) (en banc).

> A.  Final Test Reports and Related Records,
>     Clinical Observations Raw Data Reports,
>     <u>and Interim Test Reports</u>

Regarding the first category at issue, plaintiff states that
it does not want the name of the substance or compound being
tested, but that it wants the "raw data" from the tests and the
"physiological and health effects" of the experimental compounds
being tested.  (Pl.'s Mem. at 14-15.)  What plaintiff fails to
appreciate, however, is that release of test results would
provide plaintiff with proprietary information such as
Huntingdon's statistical methods employed for analyzing the data;
the conclusion drawn from the analysis; and details about
dosages, dosing regimen, how various dosages are administered,
and the stability of the proprietary experimental compounds.
(<u>See</u> Declaration of Lesia Banks [hereinafter Banks Decl.], filed
Aug. 3, 2005, ¶ 4.)

Also as to this "raw data" category, plaintiff contends that
defendant should release its clinical observations, interim test
reports, and final test reports.  (Pl.'s Mem. at 14-16.)  Just as
"raw" data would reveal proprietary information, disclosure of
this information would reveal proprietary information such as the
configuration of Huntingdon's facilities, its equipment, its
information technology systems, expertise of its employees, and

-6-

Huntingdon's confidential methods and procedures used in its testing of experimental proprietary compounds for which its customers have paid hundreds of thousands of dollars.  (See First Gilmore Decl. ¶¶ 5, 17; Declaration of Michael Caulfield [hereinafter Caulfield Decl.], filed Mar. 21, 2003, ¶¶ 35, 40-41.)  In addition, other proprietary information such as details of the dosages and the stability of the dosages would be revealed.  (See Banks Decl. ¶ 4.)  It is disingenuous for plaintiff to argue that just because it does not want the name of the compound being tested, it is entitled to all other information concerning the testing of the compound, given that release of "all-but-the-name" information would reveal proprietary information that is protectible.  (See First Gilmore Decl. ¶¶ 15, 18; Caulfield Decl. ¶¶ 35, 40-41.)  Indeed, Ms. Banks makes clear that testing material and testing results are blueprints for Huntingdon's research services.  (See Banks Decl. ¶ 7.)

It is well established that release of records containing the results of clinical studies, release of records containing clinical observations of test subjects, and release of raw research data generated during testing would likely cause substantial competitive harm.  See, e.g., Pub. Citizen Health Research Group v. FDA, 997 F. Supp. 56, 65-66 (D.D.C. 1998) (concluding that release of "results of clinical studies . . .

that disclose clinical observations of [test studies] and related information" likely would cause substantial competitive harm); Citizens Comm'n on Human Rights v. FDA, No. 92-CV-5313, 1993 WL 1610471, at **9-10 (C.D. Cal. 1993) (finding that raw research data generated during testing of developmental drug was properly withheld under Exemption 4), aff'd in pertinent part, 43 F.3d 1325 (9th Cir. 1995); see also United States v. Generix Drug Corp., 460 U.S. 453, 455 n.1 (1983) (recognizing competitive harm in competitors acquiring research data done by others, because product could be marketed without "research, developmental, and promotional costs normally associated with the creation and marketing of an original product") (non-FOIA case); Heeney v. FDA, 7 Fed. Appx. 770 (9th Cir. 2001) (stating that information concerning product testing "falls squarely within the exemption provided by § 552(b)(4)"); Tri-Bio Labs., Inc. v. United States, 836 F.2d 135, 143 (3d Cir. 1987) (noting that a "'me-too' manufacturer seeks to enjoy, without remunerating the pioneer manufacturer, the benefit of the pioneer's substantial investment in research and testing"); Pub. Citizen v. FDA, 539 F. Supp. 1320, 1327 (D.D.C. 1982) (recognizing that release of product testing data would cause substantial competitive injury), aff'd in pertinent part, 704 F.2d 1280 (D.C. Cir. 1983).

Because a release of "raw data" is a release of much more than a release of random numbers, defendant conducted a line-by-

-8-

line review to determine if any of this information could be segregated for release without revealing proprietary information, and it concluded that it could not.  (<u>See</u> First Gilmore Decl. ¶ 17; Banks Decl. ¶ 4.)  Nevertheless, plaintiff continues to contend that the release of "raw data" would not reveal any proprietary information to Huntingdon's competitors and would not in any way be useful to those competitors, even though this same information would be useful to plaintiff.  (Pl.'s Mem. at 3.) This position is without merit and contrary to long established law.

>    B.   Necropsy and Postmortem Examination
>         Reports, Viability Records and Veterinary
>         <u>Treatment Requests and Logs</u>

The same holds true for other information plaintiff seeks -- for example, "observations on the effects of animals," which is a portion of the second category entitled "Necropsy and Postmortem Examination Reports, Viability Records and Veterinary Treatment Requests and Logs."  (Pl.'s Mem. at 5, 16.)  The twenty-three pages in the necropsy and postmortem examination reports group were withheld in full after defendant conducted a line-by-line review to determine if any of the information could be segregated for release to plaintiff; defendant described these records as containing information on specific dosages administrated to test subjects, the type of equipment used, the sequence and timing of events, the number of staff assigned to certain tasks, the time

-9-

required for task completion, and details for collecting data.
(See Banks Decl. ¶¶ 5C, 5E; First Gilmore Decl. ¶ 16; Caulfield
Decl. ¶ 36.)  Thus, the pages that plaintiff contends must be
released because they are not proprietary and contain only the
"'physicological and health effects' experienced by the animals"
(Pl.'s Mem. at 16-17) contain, in fact, information of a
proprietary nature.  (See Caulfield Decl. ¶ 36.)  Furthermore,
these records contain no reasonably segregable, nonexempt
information; release of these details closely mirror the
specifics contained in the Huntingdon's Standard Operating
Procedures and the release would provide competitors with a
comprehensive profile of Huntington's procedures.  (See Caulfield
Decl. ¶ 36; Banks Decl. ¶ 5C.)

Indeed, courts have long recognized that release of
postmortem examination reports is competitively harmful.  See SMS
Data Prods. Group, Inc. v. United States Dep't of the Air Force,
No. 88-0481, 1989 WL 201031, at *3 (D.D.C. Mar. 31, 1989)
(discussing numerous types of competitive injury and finding that
allowing competitors to have access to information that they
would have to spend considerable funds to develop "on their own"
results in competitive harm); see also Pub. Citizen, 997 F. Supp.
at 63-64 (noting competitive harm in information that directs
competitors as to which paths to take); Pub. Citizen, 539 F.

Supp. at 1327 (finding competitive harm when competitors benefit from work done by others).

Regarding the other records in this category, release of this information also would reveal proprietary information about Huntingdon.  For example, "viability records" consist of 397 pages released in part and fifty-eight pages withheld in full. (See Banks Decl. ¶ 5D.)  While plaintiff contends that without the name of the compound or the name of Huntingdon's customer, no harm could possibly come from a full release of the requested information, defendant conducted a line-by-line review and determined that these records detail testing conditions and contain specific research information of a proprietary nature. (See Banks Decl. ¶¶ 5C-D; Caulfield Decl. ¶ 37.)  In fact, the fifty-eight pages of viability records withheld in full are charts with preprinted columns, the very structure of which reveals the anticipated results; these records were withheld in full because "nothing of informational value would have remained after proprietary information was redacted."  (First Gilmore Decl. ¶ 16.)

Thus, release of viability records would reveal the results of and responses to particular dosages of specific compounds, thereby allowing competitors to benefit from work done by others. (See First Gilmore Decl. ¶ 17.)  It is well established that records that permit competitors to so benefit are protectible.

-11-

<u>See</u> <u>Pub. Citizen</u>, 997 F. Supp. at 63-64 (protecting information that would direct competitors as to which paths to take based on reported successes and failures); <u>Pub. Citizen</u>, 539 F. Supp. at 1327 (protecting information that would allow competitors to receive "free of charge, the benefits of this costly research").

Plaintiff furthers argues the twenty pages released in part and the ninety-four pages withheld in full concerning veterinary treatments should be released in full because plaintiff fails to understand how "side effects" could possibly cause Huntingdon competitive harm.  (<u>See</u> Pl.'s Mem. at 17.)  However, defendant has specified that only the portions of the records containing information related to treatments provided to "alleviate reactions of side effects caused by the tested compounds" were withheld, while treatments that address conditions not linked to the tests were released.  (Caulfield Decl. ¶ 5E; <u>see also</u> First Gilmore Decl. ¶ 16.)  Records reflecting veterinary care for reactions to the proprietary compounds were withheld because such information would permit Huntingdon's competitors to replicate Huntingdon's efforts, thereby benefitting from Huntingdon's expense and work.  (<u>See</u> Caulfield Decl. ¶ 37; Banks Decl. ¶ 5E.) Contrary to plaintiff's assertions, such details are valuable to competitors -- just as they appear to be to plaintiff, given the persistence of its arguments for them.  (<u>Id.</u>)

-12-

C.  Institutional Animal Care and Use
    Committee (IACUC) Records, Internal
    Huntingdon Memoranda, and Internal USDA
    Investigatory Memoranda

Likewise, for the third category of records, plaintiff

argues that committee meeting records could not contain

proprietary information once certain select information it does

not want, i.e., test designs is redacted.  (See Pl.'s Mem. at 19-

22.)  Again, plaintiff states that it "does not seek any

information that would reveal 'specific details' about test

methods or designs, nor does it seek information that would

identify either a product being test [sic] or a Huntingdon

client."  (Pl.'s Mem. at 19.)  However, defendant has specified

that it has released in part fifty-six pages of IACUC meeting

records and that the remaining withheld portions of these pages

all contain discussions of inspection reports, detailed

descriptions of Huntingdon's research facilities, its equipment,

its technology systems; indeed, as Mr. Caulfield has attested,

the withheld portions contain "specific details about

confidential research programs placed at Huntingdon by its

clients."  (Caulfied Decl. ¶ 43; see also Banks Decl. ¶ 4B.)

Thus, notwithstanding what plaintiff does not seek here,

defendant has detailed how release of this proprietary material

would cause Huntingdon competitive harm by permitting competitors

to copy its work and thereby reduce their business expenses.

(See Caulfield Decl. ¶ 43.)  Further, it is well established that

-13-

records describing research data used to support a pharmaceutical drug's safety and effectiveness as well as product research and development are protecible.  See Westinghouse Elec. Corp. v. Schlesinger, 392 F. Supp. 1246, 1249 (E.D. Va. 1974), aff'd, 542 F.2d 1190 (4th Cir. 1976); see also Webb v. HHS, 696 F.2d 101, 103 (D.C. Cir. 1982); Citizen Comm'n, 1993 WL 1610471, at **9-10; SMS, 1989 WL 201031, at *4.

In this regard, of the forty pages of internal Huntingdon memoranda, defendant released seven pages in part and withheld thirty-three pages in full.  The withheld information consists of Huntingdon's discussions of test designs and issues arising during the testing procedures.  (See Banks Decl. ¶ 5F; Caulfield Decl. ¶¶ 42-44.)  Again, plaintiff stresses that it "does not want information that reveals Huntingdon's 'test designs and methods.'"  (Pl.'s Mem. at 20.)  Plaintiff then contends, inexplicably, that Huntingdon's discussion of test designs, test procedures, and test methods would not reveal the test design or test methods.  (Id.)  Defendant is at a loss to comprehend plaintiff's distinctions; surely, discussing a test design and issues arising from the testing procedures would inevitably reveal the test design and testing procedures themselves.

Regarding the twenty-seven pages of internal USDA memoranda that defendant released in part, only those portions that contain references to proprietary information were withheld.  (See

Caulfield Decl. ¶ 42; Banks Decl. ¶¶ 7-8.)  Defendant's expert
has attested that the "specificity and type of details" in these
records would be of great value to competitors.  (See Caulfield
Decl. ¶ 42.)  These records contain "numerous references to the
development of study designs and methods, and discussion of the
pharmacologic effect of experimental test compounds" used by
Huntingdon.  (Id.)  The details withheld describe the sequence
and timing of events, the numbers of staff, the time required to
complete the tasks, references to Huntingdon's Standard Operating
Procedures, names of and communications with Huntingdon's
customers, and information about Huntingdon's business practices.
(Id.)  As is the case above, any and all of this information
would be of benefit to Huntingdon's competitors, allowing them to
unfairly replicate Huntingdon's procedures.  (Id.)

    Nevertheless, plaintiff contends that all information other
than the name of the test method, compound, and customer should
be released.  (See Pl.'s Mem. at 21.)  However, it is clear that
the information that defendant has withheld would reveal this
very information, i.e., the test method, the compound being
tested, and customer; indeed, its release would reveal much more,
for it would reveal Huntingdon's confidential business
information.  (See Caulfield Decl. ¶ 42; Banks Decl. ¶ 5H.)

    Thus, just because plaintiff has "narrowed" its request by
stating that it does not want certain information, that simply

does not make all other information releasable.  Defendant
conducted thorough and line-by-line reviews of the documents and
concluded that the information that has been withheld would cause
competitive harm to Huntingdon regardless of what plaintiff does
not seek.

     D.  <u>Segregation of Documents Within the Categories</u>

For all three categories, plaintiff's contention that
because it does not want certain information, all other
information should be released, is essentially a segregation
argument.  (<u>See</u> Pl.'s Mem. 2-4, 9, 11.)  Defendant has taken the
following steps to ensure that all releasable information has
been released and that only information that would cause
Huntingdon competitive harm has been withheld, i.e., that it has
segregated information properly and that it has described its
segregation process clearly:

1) Mindful of the standard in the D.C. Circuit for
segregating material,[2] defendant conducted a line-by-line review
of each record.  (<u>See</u> First Gilmore Decl. ¶¶ 16-17; Banks Decl.
¶¶ 5C, 5E.)

---

[2] <u>See, e.g.</u>, <u>Schiller v. NLRB</u>, 964 F.2d 1205, 1209 (D.C.
Cir. 1992) (stating that since 1974, the "segregability
requirement has been the law of the land"); <u>Mead Data Cent., Inc.
v. United States Dep't of the Air Force</u>, 566 F.2d 242, 260 (D.C.
Cir. 1977) (agency cannot justify withholding an entire page
simply because it contains some exempt material).

-16-

2) Defendant provided plaintiff with a supplemental Vaughn
Index on December 22, 2004, and again with its Renewed Motion for
Summary Judgment filed on August 3, 2005.

3) Defendant attests that only portions containing
proprietary information were withheld and then describes the
types of this proprietary information; for example, defendant
describes the withheld information as pertaining to Huntingdon's
facilities, its technology systems, the details of dosages and
Huntingdon's dosing regimen, study number and amounts projected
and spent on cages, and information that pertains to test design
and methods.  (See, e.g., First Gilmore Decl. ¶ 17; Banks Decl.
¶¶ 4, 5G; Caulfield Decl. ¶ 42.)

Thus, plaintiff's contention that defendant did not
segregate and release material is refuted by the fact that
defendant did conduct a thorough review and did in fact provide
plaintiff with releaseable portions of all the records at issue.
(See Banks Decl. ¶¶ 5C, 5E; First Gilmore Decl. ¶ 16.)
Plaintiff's position is without merit and contrary to the facts
as described in defendant's declarations and Vaughn Index.

II.  Declaration

The second argument made by plaintiff is a complaint that
the declaration submitted by Lesia Banks was submitted without
"any personal knowledge of Huntingdon's competitive status or how
release of the actual information requested by plaintiff would

-17-

cause Huntingdon, or anyone else, 'substantial competitive injury' as required by Rule 56(e) of the Federal Rules of Civil Procedure and <u>National Parks</u>."  (Pl.'s Mem. at 12.)[3]  This contention is without merit because it is well established that "personal knowledge" may be based upon knowledge acquired through official duties.  <u>See, e.g.</u>, <u>Laborers' Int'l Union of N. Am. v. United States Dep't of Justice</u>, 578 F. Supp. 52, 56-57 (D.D.C. 1983) (affiant competent to make observations based upon review of documents and general familiarity).  In this case, Ms. Banks is the Assistant Director in the Legislative and Public Affairs Division of the Animal and Plant Health Inspection Service of the USDA who, as part of her official duties, reviews for disclosure responses to FOIA requests.  (<u>See</u> Banks Decl. ¶ 1.)  Ms. Banks has many years of experience in the field.  (<u>See</u> <u>id.</u>)  And Ms. Banks attests that she makes "the statements herein on the basis of personal knowledge, as well as on information acquired by me in the course of performing my official duties."  (<u>Id.</u> ¶ 2.)

It is well established that employees who are in a supervisory position may rely upon information provided by staff members.  <u>See</u> <u>SafeCard Servs. v. SEC</u>, 926 F.2d 1197, 1201 (D.C.

_____

[3] This argument is identical to the one made by plaintiff in its earlier filing in which plaintiff contended that Mr. Gilmore lacked the requisite "'personal knowledge' that is required by Rule 56(e)."  (Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment, filed May 2, 2003, at 10.)

-18-

Cir. 1991) (employee "in charge" was the most appropriate person to provide comprehensive affidavit); <u>Meeropol v. Meese</u>, 790 F.2d 942, 951 (D.C. Cir. 1986) (affirming reliance upon affidavit of agency employee responsible for supervision although employee necessarily relied upon information provided by staff members).

Furthermore, defendant conducted a process of "submitter notice" in this case as required by Executive Order 12,600; this mechanism provides for mandatory notification to submitters of confidential commercial information whenever an agency determines that it may be required to disclose such information.  <u>See</u> Exec. Order 12,600, 3 C.F.R. 235 (1988), <u>reprinted in</u> 5 U.S.C. § 552 note (2000).  This consultation process provides the decision-makers at government agencies with additional information upon which to make Exemption 4 decisions; thus, Ms. Banks has yet more information from Huntingdon on hand as a result of her position. (<u>See</u> <u>id.</u>)

In addition, as part of this litigation, Life Sciences Research, Inc., the "parent" company of Huntingdon, intervened. (<u>See</u> Intervenor-Defendant's Unopposed Motion to Intervene, filed June 13, 2002, at 1.)  On March 21, 2003, intervenor-defendant filed its own motion for summary judgment, and while much of its supporting memorandum describes the illegal and assaultive actions of the group In Defense of Animals, it also addresses Exemption 4 and competitive harm in detail.  (<u>See</u> Intervenor Life

-19-

Sciences Research, Inc.'s Memorandum in Opposition to In Defense
of Animals' Motion for Partial Summary Judgment and Reply to In
Defense of Animals' Opposition to Defendant's and Intervenor's
Motion for Summary Judgment, filed Mar. 21, 2003, at 1-16.)

     Moreover, defendant, in addition to Ms. Banks' declaration,
continues to support its position with declarations from Messrs.
Caulfied, Gilmore, and Keyser, all of whom have years of
experience in and knowledge of USDA procedures and requirements
as well as knowledge of the industry.  (See Caulfield Decl. ¶¶ 1-
4; Gilmore Decl. ¶¶ 1-2; Declaration of Francis Keyser, filed
Mar. 21, 2003, ¶¶ 1-2.)  Indeed, Mr. Caulfield, the General
Manager of Huntingdon, provides a detailed description of the
competitive harm that would befall Huntingdon by a release to
competitors of its proprietary information.  (See Caulfield Decl.
¶¶ 1, 32-44.)  Therefore, plaintiff's claim that Ms. Banks does
not have "personal" knowledge is contrary to the state of the law
and must fail.

                    III.  In Camera Inspection

     Regarding plaintiff's suggestion that the Court review the
documents in camera (see Pl.'s Mem. at 6, 20.), while the FOIA
authorizes in camera examination of records, its use is a matter
firmly committed to the discretion of the trial court judge.  See
NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 224 (1978) (in
camera review is discretionary); Parsons v. Freedom of Info. Act

Officer, No. 96-4128, 1997 WL 461320, at *1 (6th Cir. Aug. 12,
1997) (district court has discretion to conduct in camera review,
but it is not favored as long as agency has provided adequate
factual basis); Armstrong v. Executive Office of the President,
97 F.3d 575, 579 (D.C. Cir. 1996) (finding that district court
did not abuse its discretion when it undertook in camera review
of one document, but not of another similar document).

In fact, in camera review is most likely to be ordered when
there is actual evidence of bad faith on the part of the agency
or if agency affidavits are insufficient.  See Rugiero v. United
States Dep't of Justice, 257 F.3d 534, 547 (6th Cir. 2001); Lesar
v. United States Dep't of Justice, 636 F.2d 472, 489 (D.C. Cir.
1980) (in camera review proper only if agency affidavits are
insufficient); Hayden v. NSA, 608 F.2d 1381, 1386 (D.C. Cir.
1979) (in camera review is a "last resort").

In this case, defendant will of course provide the Court
with any documents it wishes to view in camera; however,
defendant respectfully notes that its declarations are neither
conclusory nor written in bad faith.  Indeed, defendant's
declarations explain in detail the types of information withheld,
e.g., regarding plaintiff's contention that "raw data" could be
released without causing any competitive harm, Mr. Caulfield
attests that "Huntingdon's detailed study designs could easily be
derived from the study reports, raw data and other documentation

-21-

reflecting their execution on a product within a particular
therapeutic class, regardless of whether or not actual testing
protocols or the identity of the product tested is available."
(Caulfield Decl. ¶ 32s.)  Again, for example, regarding IACUC
records, both Messrs. Caulfield and Gilmore attest that these
minutes contain numerous details about "facility inspection
reports, program reviews," facility configuration, and
"confidential research programs placed at Huntingdon by its
clients" (Caulfield Decl. ¶ 43b-c) as well as "discussion of
issues related to the implementation of the confidential standard
operating procedures and test protocols," Huntingdon's research
"facilities and equipment (including planned capital
improvements)."  (First Gilmore Decl. 15E.)  Ms. Banks attests
that IACUC records "consist of IACUC meeting minutes, memoranda,
and inspection reports.  They contain discussions of issues
related to the implementation of the confidential standard
operating procedures and test protocols."  (Banks. Decl. ¶ 4B.)
Ms. Banks further attests that the "Vaughn Index indicates that
these pages were withheld in full.  However, in a letter dated
June 15, 2005, APHIS sent, with redactions, all 58 pages of the
IACUC records" to plaintiff.  (Id.)

     Thus, as is evident from the record, this is not one of the
exceptional cases requiring the Court to conduct an in camera

-22-

inspection.  Defendant's declarations and <u>Vaughn</u> Index clearly
identify the records withheld and justify the withholdings made.
(<u>See generally</u> First Gilmore Decl.; Caulfield Decl.; Banks Decl.)
Nothing in plaintiff's myriad of related arguments and claims is
so unusual or meritorious as to justify an in camera inspection
here.

## IV.  <u>Additional Records</u>

Plaintiff's final challenge consists of two sentences
claiming that defendant has not addressed some twenty-nine pages
described by plaintiff as sixteen pages of "Communication from
Huntingdon to USDA" and thirteen pages of "Communications Between
Huntingdon and Its Clients."  (Pl.'s Mem. at 22.)  Plaintiff does
not, however, provide any means to identify these pages.  (<u>Id.</u>)
Defendant "Bates stamped" all records and described them by
number in the supplemental <u>Vaughn</u> Index provided to plaintiff by
defendant on December 22, 2004; this <u>Vaughn</u> Index was also
attached to defendant's Renewed Motion for Summary Judgment,
providing a ready reference for plaintiff to use as a means to
identify these pages.  Indeed, when one looks at the <u>Vaughn</u>
Index, it is readily apparent that communications from Huntingdon
to USDA and between Huntingdon and its clients were addressed;
for example, in the <u>Vaughn</u> Index, number LSR0006 is described as
"Communications from Huntingdon to USDA" and further described as
a letter, released in part, from Huntingdon to Joseph A. Walker,

D.V.M., USDA, dated November 11, 1996, discussing procedures used in various Huntingdon studies.  (See Def.'s Supplemental Vaughn Index.)  The only information withheld from plaintiff in this letter consists of "study numbers, study methodologies as discussed in the standard operating procedure for a study, animal reaction to the drug being studied, and animals [sic] number." (Def.'s Supplemental Vaughn Index.)  In her declaration, Ms. Banks cites to "Bates Stamps LSR0001-LSR2272" in the category "Internal USDA Investigatory Memoranda."  (Banks Decl. ¶ 5G.)  If this is one of the documents that plaintiff claims was not addressed, it has been addressed in Ms. Banks' declaration, in the supplemental Vaughn Index, and in defendant's Memorandum of Points and Authorities in Support of Defendant's Renewed Motion for Summary Judgment.  (See Banks Decl. ¶ 5G; Def.'s Vaughn Index; Def.'s Mem. at 28-29.)

Again, in the category used by both plaintiff and defendant, "Internal Huntingdon Memorandum," Mr. Caulfield attests that these records contain references to Huntingdon's "confidential communications with [its] clients."  (Caulfield Decl. ¶ 42.) Looking at the Vaughn Index, the record that is Bates-stamped number LSR0173 is described as a letter from Alan H. Staple, President, Huntingdon, to a Huntingdon client dated June 10, 1997; this letter is further described as containing confidential business information regarding issues sponsored by the client.

-24-

(<u>See</u> Defendant's Supplemental <u>Vaughn</u> Index.)  Further, regarding

"Communications from Huntingdon to USDA," Mr. Caulfield attests

that "USDA itself relied almost exclusively on Huntingdon's own

records in drawing the conclusions reported in its 1998

complaint" and adds that federal agencies use "data, such as that

which is generated by Huntingdon" in their decision-making

processes about animal testing as well as the documentation of

the various experimental compounds.  (Caulfield Decl. ¶¶ 28, 32.)

Thus, plaintiff's claim that some of the documents at issue were

addressed is without merit.

<u>Conclusion</u>

For the foregoing reasons, and based upon the entire record

herein, defendant respectfully requests that its renewed motion

for summary judgment be granted and that plaintiff's renewed

motion for summary judgment be denied.

                              Respectfully submitted,


                              _____
                              KENNETH L. WAINSTEIN
                              (D.C. Bar #451058)
                              United States Attorney


                              _____
                              R. CRAIG LAWRENCE
                              (D.C. Bar #171538)
                              Assistant United States
                                Attorney


Dated:  November 30, 2005     _____
                              ANNE D. WORK
                              (D.C. Bar #376314)
                              Attorney-Advisor
                              Office of Information and
                                Privacy
                              United States Department of
                                Justice
                              Flag Building, Suite 570
                              Washington, D.C.  20530-0001
                              (202) 616-5494