UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


**IN DEFENSE OF ANIMALS,**            )
                                      )
              **Plaintiff,**          )  Civil Action
                                      )  No. 02-557
         **v.**                       )
                                      )  December 9, 2008
**UNITED STATES DEPARTMENT OF**       )  2:05 P.M.
**AGRICULTURE, et al.,**              )
                                      )  Washington, D.C.
              **Defendants.**         )
                                      )


*TRANSCRIPT OF PRETRIAL CONFERENCE PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT JUDGE*


APPEARANCES:

   For the Plaintiff:       **Eric Robert Glitzenstein, Esq.**
                            MEYER GLITZENSTEIN & CRYSTAL
                            1601 Connecticut Avenue, NW
                            Washington , DC 20009
                            (202) 588-5206
                            Email: Eric@meyerglitz.com

                            **Delcianna J. Winders, Esq.**
                            MEYER GLITZENSTEIN & CRYSTAL
                            1601 Connecticut Avenue, NW
                            Suite 700
                            Washington , DC 20009
                            (202) 588-5206
                            Fax: (202) 288-5049
                            Email: Dwinders@meyerglitz.com


   For the Defendants:      **Richard T. Rossier, Esq.**
                            McLEOD, WATKINSON & MILLER
                            One Massachusetts Avenue, NW
                            Suite 800
                            Washington , DC 20001-1401
                            (202) 842-2345
                            Email: Rrossier@mwmlaw.com

```
APPEARANCES: (Cont.)      Elisabeth T. Kidder, Esq.
                          McLEOD, WATKINSON & MILLER
                          One Massachusetts Avenue, NW
                          Suite 800
                          Washington , DC 20001-1401
                          (202) 842-2345
                          Email: Lkiddler@mwmlaw.com

                          Richard T. Rossier, Esq.
                          McLEOD, WATKINSON & MILLER
                          One Massachusetts Avenue, NW
                          Suite 800
                          Washington , DC 20001-1401
                          (202) 842-2345
                          Email: Rrossier@mwmlaw.com


Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6509, U.S. Courthouse
                          Washington, D.C. 20001
                          202.326.0566
                          scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

1    <u>**AFTERNOON SESSION, DECEMBER 9, 2008**</u>

2    (2:35 p.m.)

3        THE COURT:  Okay.  We've called the case of In Defense of

4    Animals versus the United States Department of Agriculture.

5    Counsel for the plaintiff, the defendant, and the intervening

6    defendant are present and in court.  We've discussed off the

7    record for a brief while several matters.  There is a *pro hac*

8    *vice* in motion pending.  That's Motion Number 97.  And we either

9    have already granted it by amended order or planned to do that.

10        But, Ms. Kidder, welcome, and we're happy to have you with

11    us.  There's also a plaintiff's unopposed motion to amend the

12    pretrial statement.  That's Docket Number 98.  That motion is

13    granted.

14        The other motion that's pending -- well, let me put on the

15    record what we have covered.  I mentioned that the motion,

16    unopposed motion to amend the pretrial statement reflected that

17    LSR had an objection to the admission of two of the exhibits that

18    were added to the plaintiff's exhibit list, namely Number 27 and

19    Number 28.  Counsel for LSR was explaining to me the basis for

20    the objection.  I'll have him summarize that again and then call

21    upon the plaintiff's counsel for any response.

22        MR. ROSSIER:  Thank you, Your Honor.

23        And again, there was no objection to the late filed

24    motion, and the late addition, and nothing on authenticity, so it

25    only went to admissibility of two documents.  One is a press

1    release, a one-page press release from USDA, and the other is a

2    very lengthy complaint with pictures and so forth from PETA

3    initiating the investigation of Life Sciences that essentially

4    was the -- one of the early events that led to the FOIA dispute

5    that's before the Court.

6          On Page 6 of the joint pretrial statement filed in late

7    November, Item 12 is on May 16, 1997, People For the Ethical

8    Treatment of Animals, PETA, filed a formal complaint against HLS,

9    which is Huntingdon Life Sciences, with the USDA for alleged

10   violation of the Animal Welfare Act.

11         That's a stipulation that's already of record.  Our

12   position simply on the PETA complaint and the various allegations

13   set forth therein, and in the press release, is that they are

14   irrelevant to the issues before the Court.

15         They don't make any of the issues before the Court more or

16   less likely to be true or untrue and, therefore, they're

17   irrelevant.  I think, consistent with your rulings at the end of

18   last month with regard to other matters, our exhibits that were

19   deemed irrelevant relating to -- let's call them motive.  I think

20   these documents, yes, probably are somehow background documents,

21   but I don't think they're relevant, and the key matters necessary

22   to decide this case are in the stipulation and in the other

23   exhibits that are not objected to.

24         THE COURT:  All right.

25         MR. GLITZENSTEIN:  Thank you, Your Honor.

```
 1        I think it might be useful, since the only objection I

 2   heard to these documents was relevance objection, and I would

 3   note that the government, which is, of course, ultimately the

 4   entity that is putting forth the agency's position as to whether

 5   these materials can be withheld, has stipulated to the

 6   admissibility of the documents as to one particular issue, and I

 7   think a brief background will be helpful in understanding -- I

 8   don't want to speak for the government, perhaps, why that's the

 9   case.

10        As Your Honor knows from this long case, there are two

11   ways in which one can establish an exemption for withholding.

12   And they differ based upon whether the documents at issue were

13   submitted voluntarily to the agency or involuntarily to the

14   agency.  If there's a voluntary submission, then the D.C.'s

15   Circuit's en banc ruling in the critical mass case provides the

16   appropriate standard.  And it is a much lower standard and easier

17   to satisfy standard than when the documents were submitted to the

18   agency involuntarily, in which case, the national park's test

19   applies.

20        And that, in fact, is the test that Your Honor and Judge

21   Oberdorfer have been assuming was the pertinent test throughout

22   this lengthy case, and it's the one that requires the withholder

23   of the information to demonstrate that, in fact, release of the

24   documents would result in substantial competitive injury.  And,

25   of course, that's the test Your Honor just applied in your most
```

1    recent ruling on our motion to exclude a witness and some

2    documents.

3         And in a footnote in that opinion, Your Honor noted that

4    the government has never argued throughout this entire case that

5    the voluntary submission test applies.  And, indeed, if you go

6    back and look at all the prior summary judgment motions that were

7    filed, the government acknowledged point blank that these were

8    involuntarily submitted documents because they were submitted in

9    response to a law enforcement investigation.

10        And, in fact, intervenor, in both of the summary judgment

11   motions previously filed, submitted one-page statements agreeing,

12   in their entirety, with the government's submissions.

13        So up until we received the pretrial statement, we assumed

14   that -- and I think legitimately assumed that there was no issue

15   in this case about whether these were involuntarily or

16   voluntarily submitted documents, and in turn would be more

17   stringent or less stringent exemption for analysis would come

18   into play.

19        Nevertheless, when we reviewed intervenor defendant's

20   statement of defenses, and this is at Page 4 through 5 of the

21   joint pretrial statement, for the first time we learned that

22   intervenor apparently plans, notwithstanding its prior position

23   otherwise, to take the position, as you will see in the second

24   sentence under C, that these were voluntarily provided documents.

25        Now, it is going to be our overarching position on this

1    that it's way too late in the game to introduce this issue into

2    the case.  Whether you look at it as law of the case or as a

3    waiver, we don't believe that issue should be properly presented

4    to the Court, and we are obviously going to make that argument in

5    our pretrial brief in our proposed findings and on law and facts.

6         But we're not at the point of Your Honor making a decision

7    on that yet, so in the meantime, we feel we have to now, at

8    least, put before the Court the materials which we think would

9    frankly put the nail in the coffin of any conceivable argument

10   that these are voluntarily submitted documents.

11        And that is why when intervenor's counsel refers to a late

12   filed submission, it was late filed, Your Honor, because this is

13   the first time we learned that there was some possible argument

14   about the voluntary nature of the documents, and we said we

15   better make sure the Court, if it's going to entertain this new

16   argument, can see how this entire investigation came into play

17   and how these materials were submitted.  And the two documents at

18   issue are squarely relevant to that question, are these

19   voluntarily or involuntarily submitted documents?

20        Because what they are are the documents which explain how

21   it is that USDA came to do an investigation, confirmed beyond any

22   question whatsoever that it was a law enforcement investigation,

23   and a serious one at that.  And, of course, the legal position

24   would be that when you're doing a law enforcement investigation

25   that is resolved as such, all the case law says those are

```
 1   involuntarily submitted materials.

 2          In fact, the USDA complaint, which is referred to by

 3   Mr. Rossier, says point blank that the PETA complaint was what

 4   triggered the USDA investigation.  And so if you look back at the

 5   PETA complaint, it has many, many serious allegations of Animal

 6   Welfare Act violations.

 7          Now, let me be clear, Your Honor.  We are not submitting

 8   that document or any of them for the truth of what's in them.

 9   We're not submitting them in order to prove to Your Honor that,

10   in fact, these allegations occurred.  That's not our purpose.

11   Our purpose is simply to ensure that you have a full

12   understanding of the serious allegations that were being made

13   that resulted in the USDA doing an investigation and, therefore,

14   requiring the submission of these materials in the course of

15   doing that and resolving that investigation.

16          The other document is -- I'm sorry, Your Honor.  I didn't

17   mean to cut you off.

18          THE COURT:  Isn't what matters that the USDA indeed --

19   indeed begin a law enforcement investigation against HLS and not

20   how it chose to do that?

21          MR. GLITZENSTEIN:  I think that's certainly most

22   dispositive but, of course, the relevance standard is any fact

23   which in any way tends to help establish a principle one way or

24   the other is relevant.  And I think that by virtue of that

25   document you referred to, referring back to the PETA allegations,
```

1    and regarding those allegations are serious enough to require the

2    government itself to step in and do an investigation, it did not

3    simply give these the back of the hand, I think it does help to

4    set the stage for the circumstances under which these documents

5    were delivered to the government.

6         THE COURT:  But you're arguing, as I understand it, that

7    the purpose for offering these documents is to show that the

8    documents were provided involuntarily, not voluntarily.  Is that

9    the nub of your argument?

10        MR. GLITZENSTEIN:  I think that is clearly the most

11   relevant aspect of the documents, yes.

12        THE COURT:  All right.  So that whatever PETA said, before

13   any investigation by USDA occurred, frankly doesn't help answer

14   the question, were these documents provided voluntarily or

15   involuntarily?

16        What helps answer the question about whether the documents

17   were provided voluntarily or involuntarily, I suppose, is some

18   showing that there was, indeed, a law enforcement investigation

19   that triggered -- I don't know if it was a subpoena or

20   administrative subpoena or request for documents or what have

21   you, but some official law enforcement action that triggered a

22   requirement for the recipient of the subpoena or a request to

23   turn over documents.

24        The PETA -- I haven't read the PETA complaint, but the

25   existence of a PETA complaint doesn't show that.  It shows PETA

1    making allegations.  It sounds as if whatever USDA came out with

2    shows this is a law enforcement investigation.  Tell me why I'm

3    wrong about that.

4         MR. GLITZENSTEIN:  I think that's right, Your Honor.  And

5    sort of, I think, a one backup position I would have is that,

6    perhaps, it might make sense, and since this is a relevance

7    objection, that we see how the trial unfolds and we may, in fact,

8    decide that it's unnecessary to rely on the document.

9         But let me give you an answer that, I think, would suggest

10   one way in which it could turn out to have some additional

11   probative value.

12        The USDA materials, although I think they reflect a

13   serious law enforcement investigation, do not go into any kind of

14   detail as to what resulted in USDA taking what's a rather unusual

15   step of conducting a law enforcement investigation.  And I think

16   it differs somewhat, or arguably could, based upon the

17   intervenor's argument on this issue, which we don't know.  We're

18   sort of flying blind because they've never briefed how they're

19   going to argue the involuntary versus voluntary issue.

20        I think as Your Honor articulated, it makes a lot of

21   sense, but we don't know exactly how intervenor is going to

22   approach it.  But one can imagine a scenario in which an industry

23   intervenor could take the position that if something is simply a

24   slap on the wrist, not a serious problem, well, we voluntarily

25   cooperated because it was simply something we wanted to get

1   behind us.

2        And on the other hand, if what's underlying the agency's

3   decision to proceed with an investigation are very serious,

4   arguably serious allegations going to the heart of the statute

5   that the agency is supposed to enforce, one can imagine a

6   stronger argument rejecting that position, that no, you cannot

7   characterize this as involuntary in any way.

8        Now, I will acknowledge that given Your Honor's

9   articulation, we will take the position that whenever the USDA

10  initiates an enforcement investigation --

11       THE COURT REPORTER:  Slow down, Counsel.

12       MR. GLITZENSTEIN:  Whenever the USDA initiates an

13  enforcement investigation, that's it.  Those are involuntarily

14  submitted documents.  I don't want to mislead the Court about

15  that.  That will be our legal position.

16       But we're flying blind here a little bit because we don't

17  know, and maybe intervenor can enlighten us, how they're planning

18  on arguing this position.  I can imagine arguments under which

19  having these materials will provide some probative value in

20  reenforcing the seriousness of the charges that were made and

21  hence why this company really was not in a position to

22  voluntarily release documents.

23       THE COURT:  Well, can you tell me, as a matter of fact,

24  what was it that USDA served upon the intervenor defendant that

25  caused the production of the documents?  Was there some

1   administrative subpoena, was it some other kind of subpoena, was

2   it a request for information that called for voluntary

3   compliance?  What was it that triggered the production?

4        MR. GLITZENSTEIN:  Well, as I understand it -- and perhaps

5   USDA's attorney can provide more detail about this.  As I

6   understand it, a formal complaint was filed along with a notice

7   of violations.  And as explained by the government in the papers

8   it has previously filed in the case, once that is done under the

9   regulations that apply to USDA investigations, the government can

10  make a request for documents which the company shall provide.

11       So, in exactly what form that took, whether that was done

12  through a particular subpoena, I don't think any of that's in the

13  record, but to this point, that has been sufficient for the

14  government to come in and say, this was not a voluntary

15  submission.

16       THE COURT:  All right.  You're saying that the request for

17  documents is something that's authorized by statute that says

18  "the company shall" or "recipient shall provide," so there's a

19  statutory mandate behind some request made by USDA?

20       MR. GLITZENSTEIN:  There is a statute -- an overall

21  statutory mandate, but more particularly, there is a regulation,

22  which has been cited in the papers.

23       THE COURT:  Okay.  All right.

24       MR. GLITZENSTEIN:  Which says point blank that when there

25  is this kind of investigation, the USDA may request, and the

1    recipient of the USDA's request shall provide these kinds of

2    materials.

3         THE COURT:  Under pain of what?

4         MR. GLITZENSTEIN:  I'm not sure it's specified in the

5    regulation, but I'm assuming that under pain of various kinds of

6    law enforcement -- you know, various kinds of penalties.

7         So I don't think there's any question that this was, you

8    know, a legitimate investigation.  And again, I'm being

9    absolutely upfront in saying that our position will be that's the

10   beginning and the end of it.  But without knowing exactly what

11   the intervenor's argument is going to be, I think we're trying to

12   be as safe as we can be in rebutting what their position on this

13   issue is.

14        And, Your Honor, if I can just briefly talk about the

15   other document in issue because we talked about the PETA

16   complaint.

17        THE COURT:  Well, I thought that's what we were talking

18   about.

19        MR. GLITZENSTEIN:  There are two documents.  There's the

20   PETA complaint and there's a USDA press release.

21        THE COURT:  Right.  So you're now going to talk about the

22   USDA press release?

23        MR. GLITZENSTEIN:  If I could just make sure that -- I

24   don't know if we -- to have a full sense of what the two

25   documents are because they're related.

1        THE COURT:  Okay, go ahead.

2        MR. GLITZENSTEIN:  And the reason they're related is

3   because the PETA document is the one that the USDA itself said

4   triggered this investigation.  The press release is the document

5   which the USDA put out after it settled the enforcement

6   investigation and was announcing its settlement of the

7   enforcement investigation, and does so in terms which, again, we

8   think make quite clear that this was clearly regarded by USDA as

9   a formal enforcement investigation involving charges that had to

10  be pursued, and they believed they reached a satisfactory

11  settlement of those charges.

12        But again, we're not saying that either of these

13  documents, you know, is the document which demonstrates that this

14  is an involuntary submission, but we do believe that combined

15  with the other documents, they help to provide the Court with a

16  sense as to how this all happened and the circumstances under

17  which the documents were delivered and certainly meet what we

18  believe as the minimal relevance standard.

19        My ultimate pitch would be, perhaps we could see how the

20  trial unfolds, and if we -- depending upon how much of an issue

21  these intervenors ultimately turn it into, we can decide whether

22  we need to actually, you know, proffer these documents.  If we

23  decide we don't, then Your Honor would never have to rule on

24  them.  If you do, you might have a better context within the

25  trial itself as to what role they play or don't play.  So that's

1    one avenue that we think would be a viable one.

2        THE COURT:  Okay.  Let me hear from you about 27.  I'm not

3    sure you addressed that one.  And if you did, it was too subtle

4    for me.

5        MR. ROSSIER:  Yeah, it was subtle, I agree.  I notice

6    relevance is our objection and it certainly is and that's our

7    core objection.  Certainly with regard to -- and it's a very

8    thick document, the PETA complaint with pictures and so forth.

9    That's the one we've been talking about and focusing in

10   primarily.  Clearly that's hearsay, and he says it's not for the

11   truth of the matter asserted, but the matter asserted that that

12   investigation or that complaint was filed with the USDA, that's

13   already stipulated to.  So it's all the wealth of data and the

14   pictures and so forth that is hearsay, but also the probative

15   prejudice test would suggest that that be ruled out anyway.

16       So, all those three arguments -- I must say I do agree

17   with my colleague at the bar in the final point, which is,

18   perhaps, at least on the complaint, and I would suggest maybe on

19   both disputed issues, if they want to put them in during the

20   trial, maybe we can revisit it then.  I have no objection to

21   deferring.

22       But I did want to explain that we had a particular problem

23   with the lengthy and prejudicial PETA complaint and the

24   underlying core facts.  They're already there and the stipulation

25   in there and other exhibits.  The actual resolution, the

1    administrative resolution of the USDA complaint against Life

2    Sciences, that's a stipulated exhibit.

3         So, the press release is something that, you know, you put

4    on top of that and maybe summarizes that in some sense, but if

5    you have the underlying formal government action, then I don't

6    understand why you even need it.  I certainly don't see what the

7    relevance is.  It, too, is hearsay.  But we already have the core

8    document, that is the consent judgment at USDA resolving the

9    complaint.

10        THE COURT:  Well, then answer the core of the explanation

11   for offering these documents, which is the potential argument by

12   your client that the information was voluntarily provided, as

13   opposed to involuntarily provided.

14        MR. ROSSIER:  And my colleague was right on that, and we

15   certainly will argue that they were voluntarily provided.  We

16   start with a large volume of documents that were the subject of

17   this case that has now been dwindled down to about 500.  Yes,

18   under the Animal Welfare Act, there are mandated documents that

19   we, as a licensed laboratory, must turn over.

20        THE COURT:  In response to what?

21        MR. ROSSIER:  To the USDA.  In response to the USDA's

22   request.  That's a very limited class of documents.  None of the

23   500 in dispute here.  So, if you go to the Animal Welfare Act --

24        THE COURT:  Now, you said none of the 500 in dispute.  I

25   thought we had a thousand plus in dispute; 500 isn't the same.

1   What are we talking about?

2       MR. ROSSIER:  Well, I have our exhibit that we've just

3   worked out the final terms of today that identifies all -- am I

4   not right that it's 500?

5       THE COURT:  I know there were some that were withheld in

6   its entirety and some withheld in part.  Does the 500 refer to

7   one of those categories?

8       MR. ROSSIER:  Okay.  So it's -- yeah, the 500 is this

9   exhibit we've been working on.  Let's see if I have it here.

10      I'm sorry.  There's two columns, yeah.  It's a total of a

11  thousand.  500 withheld in part, 500 withheld in full, a total of

12  a thousand.  I misspoke.  But yes, we are arguing that these

13  documents are --

14      THE COURT:  These means what, which?

15      MR. ROSSIER:  The total documents that are remaining at

16  issue in the case, the contested documents.

17      THE COURT:  The thousand?

18      MR. ROSSIER:  The thousand --

19      THE COURT:  Okay.

20      MR. ROSSIER:  -- were voluntarily provided.

21      This case presents the intersection between two federal

22  statutes, FOIA and the Animal Welfare Act.  Both indicate a

23  congressional intent to preserve confidential information.  That

24  is exactly what's left in this case.

25      Yes, we turned over, as we were required by law to do,

1    some documents to USDA.  That's very clear in the statute.  The

2    rest were voluntarily provided pursuant to that investigation.

3         THE COURT:  Can you remind me of that issue or argument

4    that was raised earlier in this case or any filings or hearings?

5         MR. ROSSIER:  This case has been -- we've had two summary

6    judgment motions.  We were focusing on undisputed facts, and our

7    legal position was we could satisfy the harder critical mass

8    test, and that's what we went forward with on summary judgment.

9         We never thought we could get a summary judgment on

10   voluntary, so we did not pursue a voluntary argument.  We pursued

11   we can satisfy the harder test.  Here at trial, we will put on

12   our evidence and that will show, in our opinion, when the statute

13   is fairly red side by side the Animal Welfare Act with FOIA, that

14   this information is voluntary, voluntarily provided.

15        THE COURT:  Can you help me with understanding in response

16   to what this thousand pages of information was voluntarily turned

17   over?  Was there some prompting from USDA, some request from

18   USDA?

19        MR. ROSSIER:  Absolutely.

20        THE COURT:  Was it unprompted completely?  Was it simply

21   unrequested voluntarily --

22        MR. ROSSIER:  These documents -- I'm sorry, Your Honor.

23   These documents were definitely requested.  My understanding is

24   that there was no formal subpoena, but an inspector showed up and

25   had access to and looked through documents and requested various

1    documents.  Included in that request were the statutorily

2    mandated documents and additional documents.  The statutorily

3    mandated documents were not voluntary, they were mandatory.  The

4    critical mass test fully applies to that.

5        With regard to everything else, it was voluntary.

6        THE COURT:  So, the inspector who showed up made an oral

7    request to be able to take copies of certain documents the

8    inspector eyeballed, but your position is the inspector had no

9    regulatory or statutory authority to demand copies of those

10   documents.

11       Said otherwise, your client had the right to refuse to

12   turn over the documents requested by that inspector who was on

13   site pursuant to this officially launched investigation.

14       MR. ROSSIER:  I would put it this way, Your Honor, and I

15   hope this is responsive.  There is an issue of unexercised

16   administrative power.  Did they have the power to issue a

17   subpoena to do something much more mandatory in nature with

18   regard to this investigation, yes.  But this was unexercised.

19   They never did that.  Thus, our argument is that it was -- they

20   came, they inspected, they requested informally documents beyond

21   those that were mandatory under the Animal Welfare Act, and those

22   were provided in response to an informal request.

23       THE COURT:  If they were to have exercised the unexercised

24   power, how would they have done that?  What would the

25   manifestation have been?  What would it have assumed or looked

1   like?

2        MR. ROSSIER:  My understanding is -- and I can get more

3   detail later.  But I understand that there are basically two

4   ways.  Number one, they could have gone to court and seek a

5   subpoena.  They could also do an administrative demand, a formal

6   administrative demand for documents.  Neither of those steps were

7   exercised, is my understanding.

8        THE COURT:  Go ahead.

9        MR. ROSSIER:  And then with regard to the timing, Your

10  Honor, again, we're finally at a point of trial in this case.  We

11  did request the opportunity to brief prior to the start of trial,

12  and hopefully we will be permitted to do so.  But I would also,

13  on the timing, just cite a fairly recent decision from this

14  court, from Judge Lamberth, Delta Limited versus U.S. Customs and

15  Border Protection Bureau, 393 F. Supp. 2d 15, with regard to the

16  timing of the issue.  In that case, it was a post-trial motion

17  that, for the first time, raised the issue of voluntariness, and

18  Judge Lamberth said that was appropriate.

19       I think certainly pretrial, we are raising it, we put the

20  other side on notice, we plan to brief it, and submit on the

21  issue of voluntary.  So with regard to the summary judgment

22  motions and what has gone on in the past, I do not believe that

23  those preclude us from making this argument now.

24       THE COURT:  Just FYI, my question about whether this had

25  been raised previously was not necessarily to challenge the

1    timing or to challenge the failure to do it or to challenge any

2    or suggest any lateness of the hour.  I was simply asking to see

3    if I either missed something or if there's something I should go

4    back and take a look at, that's all.

5         MR. ROSSIER:  Appreciate it.

6         THE COURT:  All right.

7         MR. GLITZENSTEIN:  Your Honor, can I briefly respond?

8         THE COURT:  Yeah.

9         MR. GLITZENSTEIN:  Because I think we have a bit of a

10   misunderstanding.  This is not a situation in which the issue

11   simply was never addressed.  It was addressed, and both the

12   government and intervenor specifically disclaimed making the

13   argument.  And this is exactly why, in Your Honor's ruling

14   recently, this is Docket Entry 92, you said that "The government

15   is not making the argument that disclosure would impair the

16   government's ability to obtain necessary information in the

17   future," quote, because the information was held under exemption,

18   the form was submitted involuntarily to the USDA.

19        Your Honor didn't pull that out of thin air.  You came up

20   with that because that is the position that the government

21   expressly took when it filed summary judgment papers and

22   submitted a declaration from its own employee saying these were

23   documents we, the USDA, obtained involuntarily from intervenor in

24   the course of a law enforcement investigation and citing the

25   regulation, therefore, there is no issue about that.

1          Now, it would be one thing if the government had simply

2    said that and intervenor was studiously silent on that point.

3    They weren't.  They filed a summary judgment motion of their own

4    which adopted in its entirety, not once, but twice, the

5    government's position.  And, therefore, up until we filed the

6    pretrial statements in -- I think we're talking about coming up

7    on seven years of litigation in this case.  This is why there has

8    never been an issue about this point, not simply because nobody

9    bothered to mention it, but because both the government and the

10   intervenor expressly waived making any such argument.

11         So, again, our legal position, which we'll, of course,

12   advance to the Court in the appropriate fashion, is that this

13   argument has been waived.  But what I would say as for what's

14   relevant right now as to these two documents, the fact that we're

15   dealing with -- I think it's fair to characterize it as a moving

16   target in this case.  We thought this trial was about one thing,

17   competitive injury, and frankly so did the Court, I believe.  I

18   don't want to speak for the Court, but that is -- all the

19   opinions address competitive injury and the critical -- the

20   national park's test, not the critical mass case.

21         None of the briefs and the opinions address that.  Now

22   that we know for the first time, a couple of weeks before trial,

23   that we have a different issue that's going to be advanced, I

24   think Your Honor quite frankly should err on the side of letting

25   us put in the evidence that we think is going to be important in

1   responding to that issue to the extent Your Honor decides it is

2   properly in the case.  And I realize that Your Honor may not want

3   to make that decision at this particular moment, but I think it

4   does suggest at the very least the plaintiff should be able to

5   respond in kind whether we believe these documents will help

6   reinforce this position.

7       And the other thing I would say is, in terms of the

8   circumstances under which the documents were delivered, we think

9   we have the basic documents which show this was an enforcement

10  investigation.

11      But Your Honor's questions about exactly how did these

12  documents come to be provided and exactly what authority was

13  invoked and who got them and how, that has never been in this

14  case because it never was an issue before.  We've taken no

15  discovery on that.  We didn't believe there was any need to,

16  since we had a disclaimer of any such argument.

17      So I think we're at a sort of an awkward position on the

18  eve of trial going in.  Nothing that intervenor's counsel has

19  said suggested one waives the ordinary civil procedure rules

20  about notifying the other side during a discovery process as to

21  what issues will be brought to the floor.  And quite frankly,

22  we -- depending upon what the government's position is, and maybe

23  we need to hear from the USDA counsel, we could conceivably be in

24  the position of trying to subpoena a USDA employee to explain for

25  the first time exactly how it got these documents.

1        Well, we don't think that's ultimately going to be

2   necessary.  We hope we can convince the Court that the

3   circumstances are such that we don't have to go down that road.

4   But the notion that after a discovery process, after the Court's

5   made these rulings, summary judgment motions have made these

6   statements, you know, suddenly we have got a new issue in the

7   case, strikes us as a little bit strange, and in terms of what's

8   before us right now, I think it does, at least, suggest that we

9   should be able to use the documents which bear on the

10  investigation and exactly how it came into being.

11       THE COURT:  All right.  Let me invite your response to the

12  assertion that your prior briefs adopted the notion that these

13  documents were all turned over involuntarily.

14       MR. ROSSIER:  We did adopt the government's briefing in

15  the summary judgment matters, in the two summary judgment

16  motions.  Again, I don't think that that adoption precludes us

17  from making this argument here.  Yes, we argued the harder test

18  under critical mass, and thought we could satisfy it on the basis

19  of undisputed fact.

20       However, the record shows that both of those motions you

21  have -- many years ago, partially granted and partially denied,

22  and then Judge Oberdorfer in 2007 denied.  So we are now here

23  before the Court without any summary judgment and going forward

24  to trial.  We have agreed with the USDA on its legal position

25  with regard to summary judgment.  We remain free to articulate

1    our arguments, and frankly where we may disagree is whether it is

2    voluntary or not.  We should not be precluded, in my opinion,

3    from articulating that and taking that position at this trial.

4    Nothing that we said in the summary judgment motions preclude us

5    from taking that position now.

6        Again, we didn't anticipate that it would be an undisputed

7    fact, so no, it could not be part of a summary judgment motion.

8    That motion was denied.  So now we are moving forward to trial.

9    To the extent our position agrees or disagrees with the USDA's,

10   we are obviously a separate party and we may be in the position

11   essentially of a reverse FOIA type of a case here, where, you

12   know -- and I'll let the USDA attorney speak, but whether or not

13   they disagreed with us is, you know, a matter that he can

14   address.

15       THE COURT:  All right.  Well, I guess I need to satisfy

16   myself by going back to look at those pleadings.  If, indeed,

17   Life Sciences adopted the position taken by the USDA on a clear

18   issue about the involuntariness of the production of the

19   documents at any point during the briefing, it seems to me that

20   that's a position that Life Sciences has staked out and should be

21   held to.  I'll go back and look.

22       But on the off chance that it isn't all that clear, I'm

23   going to allow the plaintiffs to move into evidence, if they want

24   to, the -- Item 27, the press release -- now, I should ask first,

25   what does it actually say?  Does it say something that will be

1    probative of the issue that the documents were involuntarily

2    turned over?  Does it say something about we've made demands that

3    they had to respond to by turning over documents?

4         MR. GLITZENSTEIN:  Your Honor, I think it --

5         THE COURT:  I guess my short question is, how does it

6    prove the involuntariness?

7         MR. GLITZENSTEIN:  I think it proves it by -- it basically

8    summarizes and frankly puts in some more candid terms the nature

9    of the investigation that was done and the settlement that was

10   reached, I think is a fair way of characterizing it.  The

11   settlement itself is, as these things tend to be, a pretty dry

12   and legalistic document.  The press release which, as the name

13   suggests, was put out to advise the public at large what

14   happened, and it's entitled Huntingdon Life Sciences settles with

15   the USDA for $50,000, we think, leaves no doubt that this entire

16   proceeding was regarded by USDA as a traditional enforcement

17   proceeding, and that there was nothing voluntary about any

18   element of it.

19        THE COURT:  Well, what language in it helps show that this

20   was an involuntary production of documents?

21        MR. GLITZENSTEIN:  It talks about various requirements

22   that were imposed upon Huntingdon as a consequence of the

23   investigation and the proceeding.

24        And maybe I should just back up for a second, Your Honor.

25   I think if you look at the case law on this issue -- and again,

1    we're all at a bit of a disadvantage because none of us have

2    briefed any of this case law to this point.  But the case law

3    says that when you're looking at the voluntary/involuntary

4    question, you don't only look at the precise way in which a

5    particular document went to the agency; that is, what subpoena or

6    what document request went to that agency that day, you look at

7    the nature of the proceeding.  That is one way in which you

8    establish whether or not it was an involuntarily submitted

9    material.

10        And so if the entire proceeding is, by its nature, an

11   enforcement proceeding, then you proceed with a presumption, and

12   we think the case law bears this out, that anything provided to

13   the agency pursuant to that proceeding -- and I'll just use an

14   analogy, Your Honor.  If the U.S. attorney's office initiates an

15   investigation, a criminal investigation, and in the course of

16   that criminal investigation is seeking information, and the

17   target or the subjects know that there's an investigation going

18   on on any particular day, you may not have some written

19   confirmation that we want document X, but I think most people

20   would recognize that in that context, the quality provision

21   information voluntary would be not exactly the phrase that's

22   used.  And this is what the Exemption 4 cases --

23        THE COURT:  I don't think you want to go there.

24        MR. GLITZENSTEIN:  Okay.  Okay.  I won't go there, Your

25   Honor.

1          THE COURT:  Okay.

2          MR. GLITZENSTEIN:  It's certainly a subject that you know

3    more about than I do.  But I think -- what I'm just trying to

4    make a point is that the case law, I think, under Exemption 4, it

5    says you look at the circumstances in their totality to get a

6    sense as to whether or not this is regarded as something that is

7    pure.

8          Let me give you an example of purely voluntary

9    submissions.  Clinical mass itself.  The Nuclear Regulatory

10   Commission was working with a trade organization that represented

11   nuclear power plants, and there was a joint desire to figure out

12   ways of making the power plant safer, and so there was an

13   agreement between the NRC and the companies to share documents

14   and information.  There was nothing even remotely enforcement

15   related to it.  Everybody acknowledged that these companies were

16   in compliance with the Atomic Energy Act.  The question is, what

17   can we do beyond compliance to make our company and our industry

18   even safer?  And the Court stressed that there is no element of

19   enforcement in any of this.

20         So we believe that the case law shows that you look, yes,

21   how did that particular document get there, but you also look at

22   the nature of the proceeding as a whole.  And we think to go back

23   to your original question, this press release leaves absolutely

24   no doubt that the entire proceeding under which these documents

25   were delivered was at its core of enforcement proceeding and the

1    company had no realistic option but to provide these documents to

2    the agency.

3          THE COURT:  That's what I would like to hear.  Tell me the

4    language in the press release that leaves no doubt that this was

5    an involuntary enforcement proceeding.  I assume from the USDA

6    complaint that makes it very clear what's going forward.  There's

7    no objection to that, so I won't inquire about that.  But what in

8    the USDA press release makes it absolutely clear that this is an

9    involuntary -- what language in it?

10         MR. GLITZENSTEIN:  Here's what I would refer to Your

11   Honor, just as some examples.  First paragraph, Department of

12   Agriculture and Huntingdon Life Sciences have agreed to a consent

13   decision and order regarding violations of the Animal Welfare

14   Act.  It's a pretty good indication that we're talking about a

15   law enforcement proceeding.

16         It goes back to talk about what the settlement requires.

17   Settlement requires that Huntingdon hire an AFIS -- that's an

18   acronym which stands for a USDA agency -- approved consultant to

19   review Huntingdon's records and protocols and submit a report to

20   AFIS.  So it specifically talks about document submissions, some

21   of which are at issue in this case and required by that

22   settlement agreement.

23         It goes on to talk about some of the other kinds of

24   materials at issue here, which, to understand this paragraph,

25   there's something called an Institutional Animal Care and Use

Committee that I -- that you may have seen in the documents, which is an entity that's set up to oversee complaints with the Animal Welfare Act. And some of the core documents at issue in this case are documents generated by this entity whose acronym, unfortunately, is an IACUC, and we'll probably be using that next week.

THE COURT: Why don't you.

MR. GLITZENSTEIN: IACUC is sort of the common way it's referred to. And this press release refers to obligations imposed because of concerns about the IACUC that was functioning at Huntingdon Life Sciences and says, quote, "also requires Huntingdon" -- I'm sorry. "This case is also a reminder of the vital role played by Institutional Animal Care and Use Committees." These committees are internal review groups required by law to examine laboratory animal protocols and ensure that animal care and use programs comply with the Animal Welfare Act. And again, that's a direct reference to some of the documents that are at issue in this case. The IACUC records that were looked at by USDA in the course of doing this investigation in coming up with this settlement.

So, again, I'm not going to pretend that this document is the be-all and end-all on this point. But again, given the, you know, fairly low relevance standard, we think it helps to respond to the argument that I heard, just made, that somehow a lot of these documents, notwithstanding the existence of this

1   enforcement proceeding, were actually voluntarily provided.

2          And if I could just say one other thing, Your Honor, and I

3   don't know whether this would help or not, but we could easily

4   file a one-page statement of the references to the record that I

5   was referring to before, so Your Honor doesn't have to go back

6   and look through six years of filings to see what I'm talking

7   about --

8          THE COURT:  Your references to the adoption of the

9   involuntariness?

10         MR. GLITZENSTEIN:  That's correct, Your Honor.

11         THE COURT:  All right.  That would be helpful, actually.

12         MR. GLITZENSTEIN:  I just do that as a notice of filing

13   and indicate which passages we're referring to.

14         THE COURT:  All right.

15         MR. GLITZENSTEIN:  And I think that either you'll agree

16   with us or disagree, but I think it will help convey what it is

17   we're talking about.

18         THE COURT:  All right.  Here's what I'm going to do.  It

19   sounds as if the LSR has already staked out a position that this

20   was an involuntarily produced set of documents.  I'll certainly

21   welcome whatever filing you have.  In the event, however, that

22   there is some open question about that, since the pretrial

23   statement contains a reference on Page 4 by the intervenor

24   defendant that there was a voluntariness about this, I'm going to

25   reserve ruling on the admissibility of Plaintiff's Exhibit 27 in

1    the event that somehow the voluntariness issue becomes ripe

2    again, and there is some need to argue that more evidence is

3    helpful to put to rest the question about voluntariness versus

4    involuntariness.

5        I'm not at the moment persuaded that the language you

6    cited in Exhibit 27, standing alone, helps to show the

7    involuntariness that you are alleging, but I'm going to reserve

8    ruling on that.  It seems to me that Item 25 may alone do it, but

9    I'll reserve ruling on 27.

10       With respect to 28, I'm going to sustain the objection to

11   28 without prejudice in the event, for some reason, that things

12   go differently, issues open up more widely, particularly behind

13   this voluntariness dispute, or something else occurs during the

14   trial that has not arisen to date that would make 28 probative of

15   the question of voluntariness or involuntariness, I'll be happy

16   to hear you if you want to reargue it.

17       I'm not persuaded that it tends to show the probative --

18   the probative is not probative at the moment of whether the USDA

19   complained and the proceedings that followed it and the document

20   requests or demands that followed that were involuntary.

21       All right.  Any other explanation needed on the rulings on

22   those two exhibits?

23       MR. GLITZENSTEIN:  No.

24       THE COURT:  Now, if there's not, the only remaining motion

25   is document -- Docket Entry 91.  It's the motion brought by the

1    plaintiff to exclude the testimony of Michael Caulfield.  IDA

2    argues that Caulfield's testimony should be excluded on the

3    grounds that Life Sciences Research violated the representation

4    it made at the June 13th, 2008 post-discovery status conference

5    about which witnesses it would call, and that Caulfield's

6    proffered testimony on the likely -- likelihood of substantial

7    competitive harm constitutes expert testimony and Caulfield was

8    not timely identified as an expert witness.

9         To the extent that the plaintiff contends that Life

10   Sciences Research has violated its representation about whom it

11   would call to testify, the estimates that I solicited about

12   witnesses and the case length at the June status conference were

13   obtained for the purpose of scheduling.  I did not suggest then

14   that the parties would be bound to their estimated number of

15   witnesses.  And at the -- and as the June 20th, 2008 order makes

16   plain, the parties were expected to finalize their witness

17   schedules in the joint pretrial statement.

18        And you could not call to trial any witness not listed in

19   the pretrial statement, so I will not exclude Caulfield's

20   testimony on the basis that LSR did not identify him as a

21   potential witness at the June status conference.

22        But the plaintiffs also argue that LSR did not timely

23   inform In Defense of Animals that it planned to call Caulfield as

24   a lay witness under Rule 26(a)(3).  Under that rule, unless the

25   Court orders otherwise, witnesses must be disclosed at least 30

1   days before trial.

2          LSR contends that it informed In Defense of Animals that

3   it plans to call Caulfield, that's C-A-U-L-F-I-E-L-D, as a

4   witness in a meeting held on August 19th, 2008.  Plaintiff

5   contends that they did not receive notice until November 17th,

6   2008.

7          Now, despite this disagreement in LSR's October 9th, 2008

8   opposition to the plaintiff's motion to exclude Caulfield's

9   declaration as a trial exhibit, LSR argued that it was premature

10  to exclude Caulfield's declaration because witness lists had not

11  yet been finalized.  And if LSR intended to use the declaration,

12  it would call Caulfield to testify.

13         So, as a result of that statement, the plaintiff has

14  clearly been on notice that Caulfield might be called as, at

15  least, a lay witness for more than 30 days.

16         So, to the extent that Caulfield will testify to relevant

17  facts of which he has personal knowledge, his testimony will be

18  admitted.  But on the issue of relevancy, it appears that one

19  issue to which Caulfield is expected to testify is the efforts of

20  animal rights groups to put Life Sciences, HLS, out of business.

21  For the reasons that I explained in my earlier November 21st,

22  2008 memorandum opinion, I will exclude that kind of testimony as

23  irrelevant.

24         Now, on Caulfield's opinion testimony, Rule 701 --

25  Evidence Rule 701 and the accompanying note distinguished between

1    lay and witness -- or lay and expert testimony.  And it's

2    possible for the same witness to provide both kinds of testimony.

3         Under Federal Rule of Civil Procedure 26(a)(2), a party

4    intending to present expert testimony at trial has to disclose

5    the identity of its expert witness and provide the opposing party

6    with an expert report containing all the disclosures that are

7    listed in detail in, you know, the Rule 26(a)(2)(B) at the time

8    specified by the Court or at least 90 days before trial.

9         Now, the disclosures include a complete statement of all

10   opinions the witness will express and the basis and reasons for

11   them, exhibits that would be used to support those opinions, the

12   witness's qualifications, his prior publications and so on.

13        Now, under the January 3rd scheduling order, the

14   defendants were required to submit their expert witness

15   designations and expert reports by January 28th, 2008.

16        Now, under Federal Rule -- Federal Rule of Civil Procedure

17   37(c)(1), "If a party fails to provide the identity of an expert

18   witness or the information required by Rule 26(a), the party is

19   not allowed to use that witness's expert testimony at trial

20   unless the failure to disclose under Rule 26(a) was substantially

21   justified or is harmless."

22        Now, the triable issue in this case has been clear, at

23   least since August 14th of last year, 2007, when Judge Oberdorfer

24   denied the parties' cross motions for summary judgment, and that

25   issue really was not changed since then.  So there's no

1   substantial justification for LSR's failure to determine and

2   disclose the need for any expert testimony from Caulfield by the

3   January 28th, 2008 deadline.

4        Also, LSR's failure to designate Caulfield as an expert

5   witness is not harmless because it does not appear that the

6   plaintiff has received timely any expert report from Caulfield

7   that bears all of the required disclosures under the rule.  And I

8   think it would be unreasonable to ask the plaintiff to rebut an

9   expert opinion at this late date without the plaintiff having

10  timely received all of the disclosures about that opinion or

11  those opinions to which IDA was entitled that are important to

12  meeting that opinion.

13       So Caulfield's opinion testimony will be admissible only

14  to the extent it constitutes lay opinion testimony and does not

15  cross over into matters reserved for expert testimony.

16       Under Rule 701, a lay witness may testify to those

17  opinions or inferences which are rationally based on a perception

18  of a witness, helpful to a clear understanding of the witness's

19  testimony or the determination of a fact in issue, and not based

20  on scientific, technical or other specialized knowledge.

21       By contrast, expert testimony is an opinion formed based

22  on the witness's scientific, technical or other specialized

23  knowledge.

24       The critical difference between lay opinion and expert

25  opinion is whether the opinion involves specialized knowledge

1    beyond the cannon of a layman.  In other words, when the opinion

2    can be formed only by a process of reasoning which can be

3    mastered only by specialists in the field, then that opinion

4    rises to the level of expert testimony, and that's reflected in

5    the Lightfoot opinion reported at 377 Fed. Supp. 2d, 81 at the

6    jump cite of 33, decided in this district in 2005; also reflected

7    in the advisory committee notes of Rule 701.

8         Now, as an example, an officer of a business has been

9    allowed to offer a lay opinion about certain aspects of the

10   business like projected profits if such an opinion is based upon

11   particularized knowledge arising from day-to-day participation in

12   the business.

13        An example of that was reported in the Tampa Bay

14   Shipbuilding & Repair case that was reported at 320 Fed. 3d 1213

15   with a jump cite at 1218.  That was decided in 2003 by the

16   11th Circuit.

17        Now, by contrast, testimony about custom practice or

18   standards of care in an industry has to be provided by a witness

19   qualified as an expert because such an opinion comes from the

20   witness's specialized knowledge and is not based on the witness's

21   day-to-day perceptions.

22        Example of that is reported in the Saye case, S-A-Y-E,

23   reported at 478 Fed. Supp. 2d 248 with a jump cite at 272.

24   That's a District of Connecticut opinion reported in 2007.

25        Another example is the Harms case, H-A-R-M-S, reported at

1    155 Fed. Supp. 2d 891 with a jump cite at Pages 903 and 904.

2    That's issued out of the Chicago District Court in 2001.  I

3    should say Northern District of Illinois.  They may have a couple

4    of divisions there.

5         Now, the joint pretrial statement says that Caulfield

6    proposes to offer the following opinion testimony:  Maintaining

7    clients' confidentiality and the confidentiality of research

8    results as essential components of HLS's future business

9    viability is important.  Based on the facts relevant to HLS's

10   business practice, substantial competitive harm will result from

11   disclosure.  Based on his experience in the contract research

12   organization industry, disclosure of test procedures will call --

13   cause competitive harm.  Disclosing the products being tested

14   would cause competitive harm to HLS and its clients.  And the

15   disclosure of raw data reports, examination reports, viability

16   records, treatment requests and logs, protocols, final reports,

17   interim reports, memoranda, committee records, USDA investigatory

18   memoranda, and other records would cause competitive harm, and he

19   would say why.

20        Now, Caulfield's opinion testimony about maintaining

21   clients' confidentiality and the confidentiality of research --

22   research results as essential components of HLS's future business

23   viability seems admissible as a lay opinion by an officer of a

24   business.

25        For the remainder of Caulfield's proposed opinions, it's

1    unclear from the brief descriptions contained in the pretrial

2    statement whether those opinions are formed based on

3    particularized knowledge gathered from Caulfield's day-to-day

4    experience as an officer that is understandable by a layman, or

5    if such opinions are based on specialized knowledge about the

6    contract research organization industry and the animal research

7    business that can be mastered only by specialists in these

8    fields.

9         It appears that at least some of Caulfield's opinions may

10   cross the line from lay opinion into expert opinion that may be

11   offered only by witnesses properly designated as experts.

12        For example, to the extent Caulfield seeks to explain how

13   disclosure of test procedures, the nature of products tested, and

14   other specific reports and records would cause competitive harm,

15   such opinions, it seems, would constitute expert opinion if they

16   are based on specialized knowledge of research methods that can

17   be developed only by specialization in the industry.

18        But ultimately, I don't have enough information before me

19   now.  I certainly don't have his full testimony to say

20   definitively which of Caulfield's remaining opinions are going to

21   be admissible as lay opinions, and which ones must be excluded as

22   expert testimony that has not been, you know, timely disclosed.

23        So Caulfield will be permitted to offer opinion testimony

24   at trial, but I will exclude or disregard any opinion testimony

25   that, based on the distinction I just explained, would cross the

1    line from lay opinion testimony into expert opinion testimony.

2         So, plaintiff's motion, Ms. Romero, that's at Docket 91,

3    is granted in part and denied in part.  Caulfield's proposed

4    testimony on the efforts of animal rights groups is excluded as

5    irrelevant.

6         Caulfield's opinion testimony is excluded to the extent

7    that he intends to offer expert opinion testimony because he's

8    not been properly designated as an expert witness.

9         The other thing we took up before we went on the record,

10   and I want to just close with, is that I do want to ask the

11   parties to think about now the proposed findings of fact and

12   conclusions of law that I will expect you all to file.  I was

13   mentioning that we do have over a thousand documents at issue.

14   It's really not going to be helpful to us or to me to have you

15   file proposed findings of law that set forth a standard, and then

16   with respect to the factual finding, say, "Well, it's clear that

17   these thousand documents meet the standard we're arguing and,

18   therefore, either they're properly withheld or they need to be

19   disclosed."

20        I certainly hope we'll be able to get from you something

21   that doesn't require you to go line by line, document by document

22   for a thousand documents, but there are a lot of documents.  I

23   don't know whether you'll be able to achieve some assessment or

24   analysis that will group some according to certain categories or

25   themes to make the -- to allow us to reach some kind of efficient

1   and effective ruling for you, but it can't simply be here's

2   the -- here's the proper standard, all the documents fit this,

3   rule this way.  That's, I think, going to be a problem if we had

4   that kind of approach.

5        So I urge you in reporting in your pretrial statement that

6   you did want to submit proposed findings and conclusions, I will

7   welcome those and expect those, but please think through what's

8   going to be most helpful and productive and efficient for

9   achieving a ruling, and a reasoned ruling, in drafting those

10  findings with respect to specificity involving each of those or

11  as many of those thousand-plus documents individually as

12  possible.

13       I recognize that because it's really the government that's

14  the only one -- and perhaps, to some extent, the intervening

15  defendant is maybe depending on the documents that is going to

16  know fully all of the text that's contained in the document.

17  Some of that burden is going to be born, perhaps, more by the

18  defendant or intervening defendants.  I may be hearing from you

19  all some requests for special submissions that, you know, might

20  be in the first instance, ex parte.  I hope we don't have to do

21  that.  But I simply want to get you all thinking about the best

22  way to make submissions of proposed findings and conclusions that

23  will be able, fairly and comprehensively, to address all the

24  thousand-plus documents.

25       Now, that's what I wanted to take up with you all.

1  Anything else that you want to take up with me?

2       MR. GLITZENSTEIN:  Yes, Your Honor.  I could use a couple

3  of minutes.

4       THE COURT:  Yeah.

5       MR. GLITZENSTEIN:  Quite quickly.  On your last point, I

6  think that our approach is going to be to try to submit to

7  Your Honor a rather detailed proposed remedial lawyer that will

8  do exactly what Your Honor has suggested.

9       As Your Honor knows, the core issue in this case is, I

10 think, is segregability;, that is, segregating out that which can

11 be disclosed, and keeping secret that which we said we're not

12 interested in.  And so we're going to take a crack, I think, at

13 tying that into the documents and providing Your Honor a

14 blueprint -- I mean, for example, the thousand pages includes

15 many hundreds of pages.  That's something called viability

16 reports.

17      And if you actually wind up looking at those, you'll see

18 that there are many documents which look very much the same, and

19 the same kind of information has been deleted from each of them.

20 So I think, actually, the exercise, as we go through this

21 proceeding, may become a little bit clearer than thinking that

22 you have a thousand completely discreet individualized kinds of

23 records.  So we're going to try to do that.

24      But along those lines, Your Honor, one request that we

25 were going to make is -- and see if the -- if the other side has

1    any objection to this -- is bringing to the Court perhaps two

2    sets of the unredacted documents, both the ones that have been

3    withheld in full that we haven't seen any part of, as well as the

4    ones withheld in part, and, obviously, we won't see those.

5         But one approach that we have contemplated that we think

6    may be of assistance, especially if we're going to have two

7    witnesses now on the stand from the intervenor, is there may be

8    an opportunity, without our asking exactly what's in the

9    document, to have Your Honor reading along while the witness is

10   looking at the document and seeing whether, frankly, the

11   witness's characterization comports with Your Honor's own view.

12        And, you know, again, this is a strange world where  we're

13   doing a trial and only one side knows exactly what's at issue.

14   And we haven't entirely thought through exactly how this might

15   work.  But I think at this point we're simply making a request

16   that two sets of the unredacted documents to this should be

17   available so that we can explore.

18        And especially with Mr. Caulfield coming in, we haven't

19   fully, obviously, digested how we're going to deal with that, but

20   then we think that might add some value to the Court, and perhaps

21   even more so than an in-camera submission like the one that Judge

22   Oberdorfer did, and that you might do as you alluded to just by

23   looking at the documents without any sort of instruction as to

24   what it is you're looking at.

25        So just to keep that option open, we are going to request

1    that and see if there is any objection to having those documents

2    available.  And then we can decide, when we get here, whether or

3    not there's a purpose that they would serve.

4        THE COURT:  Well, your proposals to have a set for me to

5    look at and have a set for --

6        MR. GLITZENSTEIN:  The witness.

7        THE COURT:  -- the intervenor defendant witness to look

8    at?

9        MR. GLITZENSTEIN:  Correct, Your Honor.

10       THE COURT:  And this would be during the testimony of

11   either the expert or Mr. Caulfield?

12       MR. GLITZENSTEIN:  That's correct, Your Honor.

13       THE COURT:  And tell me how that would play out with you

14   not being able to know what's in the content of the document.

15       MR. GLITZENSTEIN:  Well, I'll give you one example.  We've

16   got some of these documents where, you know, literally, page

17   after page after page, if a document has been withheld in full.

18   Given the description in the Vaughn index, we can fathom how some

19   elements of those documents may contain identification of drugs

20   or trade secrets or the like.

21       But given the kind of documents they are and what we do

22   understand about how they -- the role they play, it seems rather

23   unlikely to us that a witness could sit there and look at those

24   particular documents and say there's not any segregable

25   information that goes, for example, to animal treatment or animal

1    responses that can be provided without disclosing some

2    competitively important information.

3         And so having those documents available to you, if we were

4    to go through an exercise with a witness, you know, might provide

5    some useful indication as to how the witnesses have approached

6    themselves the segregability issue, which we think is going to be

7    crucial to the outcome of this case.

8         THE COURT:  I guess what I'm asking is, is this going to

9    happen on direct examination of LSR's witness?  Is this supposed

10   to happen on cross-examination by you of LSR's witness?

11        MR. GLITZENSTEIN:  I think -- I'm assuming that LSR's

12   witnesses on direct examination will be making broad statements

13   about the confidentiality and the competitive value of the

14   records.  So I'm presuming that we would be doing this on

15   cross-examination.

16        THE COURT:  And you would say, all right, I want you to

17   turn to Page 1 of LSR's Exhibit No. X -- No. X, No. 1, which you

18   have described as being a viability report.  Isn't it true that

19   part of that can be segregated out and some of it can be turned

20   over?  Is that how your cross would go?

21        MR. GLITZENSTEIN:  In effect.

22        THE COURT:  And how would you be able to pursue that kind

23   of cross not knowing what -- what's in the document or what's

24   been blacked out?

25        MR. GLITZENSTEIN:  Well, Your Honor, again, I think we're

1    obviously in the process of refining our approach to this.

2         THE COURT:  All right.

3         MR. GLITZENSTEIN:  So it may be more particularized than

4    that in terms of the kind of documents.  And then, for example,

5    if a document that's been described as a viability report or one

6    of these IACUC documents.  We talked about the general types of

7    materials in those documents, have the witness look at it, and

8    say yes, these are the kinds of materials that are here and have

9    been withheld, and then try to explore whether or not the witness

10   really is taking the position that there's not a single scrap of

11   information that could legitimately be disclosed without causing

12   competitive injury to the company.

13        Again, I -- we've been thinking along these lines.  I

14   think we just wanted to have the opportunity to do it if we think

15   we can do it in a way that would be useful to the Court.  And,

16   you know, we may decide that it's just not logistically possible.

17   But the only core question we're making at this point is simply

18   to have the option available to us depending upon how the

19   testimony goes, and seeing whether or not there may be a way that

20   it would make sense, at least with certain categories of the

21   documents.

22        THE COURT:  All right.  Well, that's something, I guess,

23   that has to be thought through a little bit more, but I invite

24   you to discuss that with counsel and see if there's something

25   that you all can work out if you all think that that might be

1    something that can help out in the end.

2         MR. GLITZENSTEIN:  Right.  What I just wanted to sort of

3    do is make the request that those documents be available and see

4    if there's any objection to that.

5         THE COURT:  All right.

6         MR. GLITZENSTEIN:  And then we can talk further about how

7    it would be accomplished.

8         THE COURT:  All right.  Well, I'm inviting you all to

9    discuss that at your leisure, and perhaps that can be worked out.

10        Was there something else you wanted to raise?

11        MR. GLITZENSTEIN:  There is one other question, Your

12   Honor, about, you know, Mr. Caulfield.

13        THE COURT:  Yes.

14        MR. GLITZENSTEIN:  You referred to the October filing,

15   which we frankly had read as primarily referring to a USDA

16   employee who might testify, but I'm not going to ask Your Honor,

17   obviously, to reexplore all of that either with regard to the

18   October filing.  That filing was made long after the discovery

19   process closed.  We have never deposed Mr. Caulfield.  And I

20   think Your Honor's questions about figuring out which of

21   Mr. Caulfield's testimony would be lay and which would be expert.

22   And the difficulty of that suggests to us that there would be a

23   value in giving us an opportunity, if he's going to testify, to

24   depose him before next week.

25        And -- well, we would -- at any point, obviously, we would

1    have had to ask that the discovery process be reopened for this

2    purpose.  But again, the focus of our deposition would be exactly

3    what Your Honor articulated, which is, where do these opinions

4    come from.

5         I mean, at this point we're going into a proceeding with

6    one witness who -- we have virtually no understanding as to how

7    he's going to advance these positions.  We have a declaration

8    from 2003, much of which is boilerplate.  Beyond that, we simply

9    don't know.  And it obviously, you know, puts us in a difficult

10   position.

11        So our request would be that the other side make

12   Mr. Caulfield available.  We would obviously make this as

13   efficient as possible.  I think it could take no more than, you

14   know, two or three hours, but make him available for a deposition

15   where we could go into precisely those kinds of questions and

16   then, you know, have some basis when we are listening to his

17   testimony for exploring those issues further.

18        THE COURT:  Did you want to comment?

19        MR. ROSSIER:  Yes, Your Honor.  We would certainly oppose

20   that motion and oppose the deposition of Mr. Caulfield at this

21   late date.  They have been on notice for a significant amount of

22   time.  Again, going way back in 2003, his declaration was put in.

23   Obviously, a key part of the whole case since 2003.

24        Moreover, we thought, and I frankly thought, in June that

25   we would stipulate to all the summary judgment record, all the --

1    all the affidavits, Gilmore's two affidavits and so forth.  That

2    was objected to hearsay and so forth.  They have the right to

3    object, it didn't come in.  But now they want to put the burden

4    on us and our witness a week before trial to depose him.  I think

5    that's unjustified.  They've had plenty of notice.  If they

6    wanted to depose Mr. Caulfield, certainly they have a right to

7    object to his declaration, but that declaration has been around

8    since 2003.  And so, therefore, we would certainly oppose the

9    burden on us in terms of our trial preparation to take time out

10   from that to have a deposition at this late date.

11        THE COURT:  Excuse me.  Was there some other comment that

12   you had thought of making at the time --

13        MR. ROSSIER:  Yes.

14        THE COURT:  -- closing counsel was up here?

15        MR. ROSSIER:  Yes, I do.  I wanted to report a little good

16   news.  We had achieved agreement on a three-page chart that

17   doesn't fully respond to Your Honor's point about the summary of

18   the 1,000 pages, but gets in that direction and say -- I mean, at

19   an appropriate time, the Court will have this.  I assume right at

20   the beginning of the trial or whenever you would like us to

21   submit this.  But just this morning, we worked out that.  So that

22   is a little bit of good news.

23        And that final point is just an administrative one.  We've

24   been anticipating, both of us, filing a trial brief no more than

25   20 pages.  We had suggested five days before trial.  I just

1    talked to counsel right before this hearing.

2         And if it was okay with Your Honor --

3         THE COURT:  We are five days before trial, five business

4    days.

5         MR. ROSSIER:  Well, we're five calendar days.  So we're

6    trying to -- just if you would -- if we could -- we would suggest

7    either Thursday or Friday.  But whatever is appropriate for the

8    Court in terms of that submission, we could make that.  And I

9    just wanted to raise that issue and see if the Court had a

10   preference as to when those legal memoranda got filed.

11        THE COURT:  Sure.  If you can file trial briefs on

12   Thursday that you want to file, they would be welcome.  I would

13   welcome them.

14        MR. ROSSIER:  Thank you, Your Honor.

15        THE COURT:  All right.  Anything else?

16        MR. GLITZENSTEIN:  Just on the deposition issue.

17        THE COURT:  All right.

18        MR. GLITZENSTEIN:  I don't know if Your Honor has resolved

19   that one.

20        I think the fact that you just granted our motion in part

21   and denied it in part means that, for the first time, we've

22   gotten some indication from the Court as to where Mr. Caulfield

23   can testify and where he can't.  And part of Your Honor's ruling

24   was that some of this looks like it might be expert testimony

25   that would be impermissible because we never got a report.  We

1    never were able to depose on an expert report.

2           And the truth of the matter is, up until we sat down and

3    talked -- when we were preparing the pretrial statement, whether

4    we should have gleaned from some other communication or not, we

5    simply didn't know that Mr. Caulfield was offering any kind of

6    testimony.  And we certainly didn't have any description as to

7    even what the categories of testimony would be.  So we think

8    we're now put in a -- in a position, without arguing exactly how

9    we got to this position, where we're going in with a witness that

10   we haven't had a chance to depose.

11          Maybe it's -- part of it is because of the process the

12   Court set up for expert witnesses and our assumption that any

13   witness who was going to testify on the competitive injury issue

14   would have been properly identified pursuant to that very formal

15   process, and it didn't -- it simply didn't happen for

16   Mr. Caulfield.

17          But it's hard to see, given the balance of the interest at

18   stake, at making Mr. Caulfield available for a couple-hour

19   deposition so that we don't go into hearing testimony from a

20   witness, one of two witnesses, who we simply have not heard what

21   he has to say, and even going to the questions that Your Honor

22   had posed, which, frankly, were going to be hard-pressed to

23   explore without hearing his deposition before he testifies for

24   the first time in open court.

25          So we're willing to, you know, suggest a very tight time

1  limit if it would make life easier and more sensible, but we

2  think on balance, given the circumstances of having us go in and

3  have one of these witnesses without a deposition would be

4  severely prejudicial to our side.

5       THE COURT:  All right.  I'm going to deny the request to

6  reopen discovery to permit the plaintiff to take a deposition of

7  Mr. Caulfield partially for the reasons I mentioned before.  One

8  of the remedies that I've put in place, I think, is adequate.

9  And that is that Mr. Caulfield will not be allowed to introduce

10  any expert testimony in the trial.  Now, frankly, it's a nonjury

11  case.  It's coming to me.

12       If somehow some expert stuff tends to slip in over without

13  an objection being made, we'll be able to cleanse the record

14  eventually with the proper submissions of proposed findings and

15  conclusions and, you know, I'll be able to sift through what can

16  and cannot be considered in reaching whatever conclusions I have

17  made.  And he, otherwise, I guess, is in the same position as

18  having been some witness named as a trial witness 30 days in

19  advance under the schedule set up.

20       It sounds, frankly, as if the information contained in the

21  2003 declaration compared with the kinds of information sought to

22  be elicited that's reflected in the pretrial statement is not all

23  that far off.  So I'm not persuaded that my rulings would produce

24  unfair prejudice to the plaintiff.

25       So that's the ruling on that.  Anything else I should take

1   up?

2          MR. ROSSIER:  No, Your Honor.

3          THE COURT:  All right.  If not, thank you very much.  I'll

4   look for your filings on Thursday and we'll see you back for

5   trial on -- is it Tuesday?

6          MR. GLITZENSTEIN:  Tuesday morning.

7          MR. ROSSIER:  Tuesday.

8          THE COURT:  All right.  Thank you.  Thank you.

9          (Proceedings adjourned at 3:50 p.m.)

10

11                    **C E R T I F I C A T E**

12

13              I, Scott L. Wallace, RDR-CRR, certify that
        the foregoing is a correct transcript from the record of
14      proceedings in the above-entitled matter.

15
        ----------------------------          ----------------
16      **Scott L. Wallace, RDR, CRR**              **Date**
            **Official Court Reporter**
17

18

19

20

21

22

23

24

25