```
 1                     UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2   -------------------------X
     IN DEFENSE OF ANIMALS,          Docket No. 02-557 (RWR)
 3             Plaintiff,

 4        v.

     THE UNITED STATES DEPARTMENT    Washington, D.C.
 5   OF AGRICULTURE,                 December 16, 2008
               Defendant,            9:20 a.m.
 6
          v.
 7
     LIFE SCIENCES RESEARCH, INC.,
 8             Intervenor-Defendant,
     -------------------------X
 9
                         BENCH TRIAL
10          BEFORE THE HONORABLE RICHARD W. ROBERTS
                 UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12   For the Plaintiff:    MEYER GLITZENSTEIN & CRYSTAL
                           By:  Mr. Eric Robert Glitzenstein
13                              Ms. Delcianna J. Winders
                           1601 Connecticut Avenue, N.W.
14                         Washington, D.C.  20009
                           202.588.5206
15                         eric@meyerglitz.com
                           dwinders@meyerglitz.com
16
     For the Defendant:    UNITED STATES DEPARTMENT OF JUSTICE
17                         By:  Mr. Allan Blutstein
                           1425 New York Avenue, N.W.
18                         Suite 11050
                           Washington, D.C.  20530
19                         202.514.1009

20                         allan.l.blutstein@usdoj.gov

21   For Intervenor-  :    MCLEOD, WATKINSON & MILLER
      Defendant             By:  Mr. Richard T. Rossier
22                              Ms. Elisabeth T. Kidder
                           One Massachusetts Avenue, N.W.
23                         Suite 800
                           Washington, D.C. 20001
24                         202.842.2345
                           rrossier@mwmlaw.com
25                         lkidder@mwmlaw.com
```

```
1    Court Reporter:          Catalina Kerr, RPR
                              U.S. District Courthouse
2                             Room 6716
                              Washington, D.C.  20001
3                             202.354.3258

4    Proceedings recorded by mechanical stenography, transcript

5    produced by computer.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          C O N T E N T S

2    OPENING STATEMENT BY MR. ROSSIER....................... 7

3    OPENING STATEMENT BY MR. BLUTSTEIN.................... 11

4    OPENING STATEMENT BY MR. GLITZENSTEIN................. 11

5    COURT REPORTER'S CERTIFICATE......................... 205

6    <u>WITNESS:</u>                <u>DIRECT</u>  <u>CROSS</u>   <u>REDIRECT</u>  <u>RECROSS</u>

7    **Michael Caulfield**
       By Mr. Rossier          20                194
8      By Mr. Glitzenstein             85

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              P-R-O-C-E-E-D-I-N-G-S

2         (9:20 A.M.; OPEN COURT.)

3         THE DEPUTY CLERK:  Your Honor, we have Civil Action

4  02-557, In Defense of Animals versus the Department of

5  Agriculture, et al.  I'll ask that counsel please approach the

6  lecturn and identify yourself.  And for the Plaintiff.

7         MR. GLITZENSTEIN:  Good morning.

8         THE COURT:  Actually, give me a second.  Can you

9  hear this?  Give me one second.

10         (PAUSE.)

11         MR. GLITZENSTEIN:  Good morning, Your Honor, Eric

12  Glitzenstein and Delcianna Winders on behalf of the Plaintiff.

13         THE COURT:  Good morning.

14         MR. ROSSIER:  Good morning, Your Honor.  I am

15  Richard Rossier, and I have with me Elisabeth Kidder on behalf

16  of Intervenor-Defendant, Life Sciences Research.

17         THE COURT:  Good morning.

18         MR. BLUTSTEIN:  Good morning.  Allan Blutstein on

19  behalf of the United States Department of Agriculture.

20         THE COURT:  Good morning.

21         MR. BLUTSTEIN:  Good morning.

22         THE COURT:  All right.  We've gotten last night's

23  motion to continue the trial and the opposition as well.  That

24  motion will be denied.  We've actually enough time, I think,

25  for Intervenor-Defendants to be able to surface this
```

1   voluntariness issue over the course of the litigation and to

2   have the parties address it, so I'll continue with our

3   scheduled trial.

4        Unless there are any other developments, I'll invite

5   the Defendants and Defendant-Intervenor to begin your case.

6        MR. ROSSIER:  Your Honor, I have one preliminary

7   matter, and it's a point of clarification with regard to

8   yesterday's ruling, and I understand the Court's ruling on

9   voluntariness.  We have also submitted in our trial brief the

10  issue of espionage, which is not factual voluntariness but the

11  espionage issue that leads to a test, that is, a voluntary

12  test, and I just was wanting to clarify in my own mind before

13  opening statement whether I am precluded from getting into the

14  espionage issue by the ruling from yesterday.

15       THE COURT:  If the espionage evidence is probative

16  of the voluntariness issue and nothing else, it seems to me

17  that ought to be covered by the preclusion order.  I would

18  suggest, though, that in the proffer that I've asked you-all

19  to file by the end of the day, it doesn't have to be by close

20  of business.  You have through, I guess, 11:59 p.m.

21       MR. ROSSIER:  Yes, sir.

22       THE COURT:  But I just wanted to make sure that you

23  have an opportunity to put on the record fully what that

24  evidence would have been had I let you get it in, but I wanted

25  to get it in now, not later.

1          So, if your proffer of the espionage evidence is

2   probative solely of the voluntariness issue, then my answer is

3   yes, it is covered by that ruling.

4          MR. ROSSIER:  Okay.

5          THE COURT:  Is this on, by the way?  Can you hear?

6   I'm sorry.  Okay.  Go ahead.

7          MR. ROSSIER:  It's very distinct from saying that

8   our compliance with the request for documents from the USDA

9   was voluntary in fact.  It was simply because the espionage

10   started this whole sequence of events.  It was an espionage at

11   the facility of the Intervenor that leads, under Judge Hogan's

12   ruling in the Government accountability project, to the

13   application of the voluntariness test, not because it was

14   truly voluntarily provided but because the espionage started

15   the whole process.

16          And so, it's very distinct from voluntariness

17   evidence, and I would certainly urge the Court for us to be

18   able to put that evidence on.  It's short and very focused,

19   and it just, frankly, starts the whole sequence of events,

20   and, you know, the Court can obviously accept or reject the

21   fundamental argument, but it is distinct from saying our

22   compliance with the USDA request for information was

23   voluntary.

24          THE COURT:  Understood.  My comment about the

25   probativeness, whether it's probative of voluntariness, goes

1    not just to -- excuse me -- whether the production itself was

2    voluntary but also whether the voluntariness test is the

3    appropriate test to use either -- under whatever theory you're

4    advancing it.

5              MR. ROSSIER:  I am.  Thank you, Your Honor.

6              THE COURT:  The same principle, I think, would

7    apply; namely, that this issue about the appropriate test to

8    apply, either because of the genesis of the investigation or

9    because of the actual nature of the disclosure, whichever one

10   it is, has to do with the broader issue of voluntariness that

11   had not been fronted and raised in a timely fashion, so I hope

12   that's a more clearer or fuller explanation.

13             MR. ROSSIER:  Thank you, Your Honor.

14             THE COURT:  All right.

15             MR. ROSSIER:  Now, will the Court entertain opening

16   statement?

17             THE COURT:  If you wish, I'll hear you.

18             MR. ROSSIER:  And I would suggest, just because the

19   burden is on this side, that I present opening, and I believe

20   the Government will follow with a short opening and so forth,

21   if that's agreeable with counsel.  Thank you.

22             All right.  Your Honor, good morning.  We are at the

23   date of trial in this FOIA case which presents the fundamental

24   issue of whether the documents that have been excluded from

25   production excluding -- excluded from production to the

1   Plaintiff, either in full or in part, has been appropriately

2   excluded under Exemption 4 of FOIA.

3            Our evidence will show, Your Honor, that we

4   satisfied the standard of likelihood of substantial

5   competitive harm.  We'll present two witnesses.  We will

6   present Michael Caulfield, an employee of Huntington Life

7   Sciences for approximately 12 years who has detailed

8   information and knowledge about the operations of Huntington,

9   how it does business, its client base and how important

10  confidentiality is to the operation of that business

11  enterprise.

12           We will also present an expert witness, Dr. Robert

13  Szot, who's an expert toxicologist with also expertise in the

14  areas of the pharmaceutical industry and early-stage drug

15  development.

16           He will testify generally about what happens during

17  these early-staged drug tests, what's involved with them, the

18  whole concept of contract research organizations of which my

19  client, Huntington Life Science, is one; the competition that

20  exists in the contract research organization industry; and the

21  importance of confidentiality to the operation of that

22  industry.

23           Both witnesses will make the fundamental point that

24  organizations in this industry sell two principal things.  No.

25  1, they sell the ability to do competent early-stage drug

1    testing research in full compliance with applicable federal

2    rules for such laboratory work and they sell confidentiality.

3         This industry is focused on pre-patent testing,

4    typically for toxicity of substances and potential

5    pharmaceuticals that the companies that hire my client will

6    ultimately seek to have patented.  So, they want to keep their

7    competition from having this information, from seeing the

8    protocols, preliminary test results and so forth.

9         The evidence will show that in order to bring a new

10   pharmaceutical to the public, there has to be proof of

11   efficacy and safety.  On the issue of safety, the toxicology

12   testing of the early-stage drug regime is crucial, and if that

13   is not done in a confidential environment where pharmaceutical

14   competitors can have access to the data, it totally undercuts

15   the whole point of the enterprise and what they have hired my

16   client to do.

17        So, our evidence will show that that is the nature

18   of the industry and that's why the confidentiality is so

19   important.

20        Mr. Caulfield, our first witness, has been working

21   for Huntington Life Science since February of 1996.  He's

22   familiar with numerous clients and studies and contracts for

23   research and will testify that virtually every contract with

24   Huntington clients requires confidentiality.  His extensive

25   factual background at Huntington and extensive knowledge of

1    Huntington clients will provide for his lay opinion that if

2    the disputed documents are released to Plaintiffs, Huntington

3    is likely to suffer substantial competitive harm.

4         Dr. Robert Szot will also testify that he has

5    extensive background in toxicology, the pharmaceutical

6    industry and early-stage drug testing.  His evidence will show

7    that the substantial importance that the pharmaceutical

8    industry and others that contract with contract research

9    organizations put on the confidentiality of the data, the

10   processes and the protocols of their studies, suggest that if

11   the disputed documents are released to Plaintiff, that

12   Huntington would suffer -- likely suffer substantial

13   competitive harm.

14        So, in closing, Your Honor, our evidence will show

15   that in this competitive contract research organization

16   environment, the confidentiality of the data and the ability

17   of competitors of the clients of my client -- of the clients

18   of my client to look at the documents that would be released

19   if the remaining documents are released, could lead to

20   substantial competitive injury not only to my client but to my

21   client's clients.  Thank you very much.

22        THE COURT:  All right.  Thank you.  Will you have an

23   opening statement?

24        MR. GLITZENSTEIN:  Very briefly, Your Honor.  I

25   think that Government counsel goes next.

1              THE COURT:  Oh, sorry.  Go ahead.

2              MR. BLUTSTEIN:  May it please the Court, Counsel,

3    good morning.  Plaintiff has recently suggested that the

4    United States Department of Agriculture is no longer

5    attempting to defend the withholdings in this FOIA case.  On

6    behalf of USDA, allow me to say that that suggestion is

7    entirely untrue.  The Government fully expects that the clear

8    and credible testimony of today's witnesses will demonstrate

9    that the Defendant's burden of proof in this case has been

10   met.  Thank you, Your Honor.

11             THE COURT:  All right.  Thank you.

12             MR. GLITZENSTEIN:  Your Honor, this case is and has

13   always been, at least since Your Honor's September 2004 ruling

14   on the cross-motions for summary judgment at that time, about

15   segregability.  The question is whether or not in the

16   nearly -- or in the more than 1,000 pages of documents

17   withheld in full or in part there is segregable information

18   that can be disclosed to the Plaintiff.

19             We're talking about more than 500 documents withheld

20   in full, another 500 documents withheld in part, many of them

21   effectively withheld in full when you look at them, and that

22   is something that we're going to try to get into a bit as we

23   proceed.

24             In your September 2004 ruling, you said that of the

25   description of the documents in dispute, quote, All suffer

1  from a deficient description which does not allow a review of

2  better disclosure of those documents or portions thereof that

3  will cause Huntington substantial competitive harm.

4       Continued over on page 30 through 31, going through

5  the categories of documents, and indicating that the

6  Government had a fundamental burden to establish that they

7  would -- there was no segregable information that could be

8  disclosed to Plaintiff without causing substantial competitive

9  injury, and then in the absence of such a showing, the

10  Government could not satisfy its burden of proof under the

11  statute.

12       Accordingly, the Court ordered the Government to

13  produce a Vaughn index that would address, among other things,

14  the segregability requirement.  Your Honor specifically

15  indicated that that Vaughn index should correlate particular

16  portions of the withheld documents to an exemption claim.

17       Following Your Honor's ruling, as you know, Judge

18  Oberdorfer, an extremely experienced and esteemed member of

19  this court, took his time to do an expensive in-camera review

20  of a number of the materials withheld, particularly focusing

21  on what I will refer to, with Your Honor's permission, as the

22  IACUC documents.  This is the acronym that we referred to the

23  other day, referring to the committee that is put together by

24  research organizations to oversee compliance with the Animal

25  Welfare Act.

1          THE COURT:  Why don't you spell out the acronym.

2          MR. GLITZENSTEIN:  And the acronym is spelled

3     I-A-C-U-C.

4          And Judge Oberdorfer, in his August 2007 ruling over

5     on page 4, made a finding that the Government's 182-page

6     Vaughn index, which was subsequently filed after this court's

7     ruling, did not include any segregability analysis at all, in

8     apparent disregard for Your Honor's 2004 ruling.

9          Judge Oberdorfer went ahead and analyzed a number of

10    the arguments, and I think it's fair to say, expressed rather

11    substantial skepticism about the withholding at issue and in

12    fact said specifically that his own review of the sampling of

13    the documents has done little to instill in -- confidence in

14    the Government's claim of exemption for most of the contested

15    information.

16         Now, they went on to say that he believed that

17    notwithstanding that view, there should be a proceeding at

18    which the Government and Defendant-Intervenor could try to

19    establish that there indeed will be substantial competitive

20    harm resulting from the release of the documents.  But at the

21    same time he provided a strong admonition, which I do not

22    believe he would have done unless he thought it was called

23    for, and what he said was, at the bottom of page 12 to the top

24    of page 13, (reading)  Although the law precludes summary

25    judgment in this case, that does not mean that the Court is or

1  should be blind to the voluminous material submitted and

2  reviewed.  When opposing parties tell two different stories,

3  one of which is blatantly contradicted by the record so that

4  no reasonable jury could believe it, a court should not adopt

5  the version of the facts for purposes of ruling on a motion

6  for summary judgment.

7          (Reading)  While Defendant's view of the facts does

8  not rise to the level of blatantly contradicting the record,

9  it comes mighty close.

10          And he went on to say that a re-release of documents

11  that had been made following the Vaughn index preparation

12  indicated that in fact the Vaughn index inaccurately described

13  the documents at issue in the case.

14          I would respectfully submit to Your Honor that in a

15  situation like this, not only does the Government have the

16  burden it ordinarily has in a FOIA case, but I think, having

17  gone through this exercise by Judge Oberdorfer, their burden

18  should be particularly high.  When a court -- a member of this

19  court has looked at documents, expressed skepticism about

20  whether the agency has in fact been entirely forthcoming, I

21  think that a high level of skepticism, as we proceed through

22  this trial, is indeed appropriate.

23          And it's especially appropriate in light of two

24  salient facts, neither of which was mentioned by

25  Defendant-Intervenor's counsel or the Government, for that

1    matter.  One is the age of the documents.

2         We are talking about data which is all at least 11

3    or 12 years old.  These were studies that were done in the

4    1996 to 1997 time frame, and so when Your Honor hears

5    testimony concerning the value of research and the result of

6    that research, please keep in mind, because it will be an

7    important aspect of these issues as we explore them, as to how

8    data that old, all of it in its entirety that has been

9    withheld, can in fact result in substantial competitive injury

10   at all, let alone establishing the much more stringent test

11   that is laid down by the *National Parks* case.

12        The second highly salient fact not mentioned either

13   by the Government or by Defendant-Intervenor's counsel is what

14   Plaintiff has agreed to forego in this case.  What we regard

15   as an effort over the course of many years to reach a

16   resolution of this case without getting to this point, which

17   is certainly an interesting one but I think was probably an

18   avoidable one, Plaintiff had indicated a willingness to

19   forfeit documents such as test compounds, protocols, standard

20   operating procedures, identities of customers, identities of

21   any individual named in the documents and information that

22   could, in looking at these documents, stand out as the kind of

23   thing that would be regarded indeed as proprietary commercial

24   information, so what remains at issue are the documents which

25   underlie the USDA's charges that there was significant

1   violations of the Animal Welfare Act and regulations.

2          And so I also urge Your Honor, as I'm sure you will,

3   to keep in mind what Plaintiff has been willing and has said

4   for years it has been willing to do without as we proceed

5   through this trial.

6          In terms of the two witnesses, obviously, we will

7   see what they have to say.  What I would say at this stage,

8   Your Honor, is that if their testimony is consistent with that

9   which they put forth previously, they will have to acknowledge

10  that there is no way they can take the position that all of

11  these documents can be withheld in their entirety without

12  causing substantial competitive injury.

13         The best that they can do, which is not enough under

14  the case law, is to speculate that there is a possibility of

15  injury with release of some of the information, a possibility

16  which is greatly mitigated, I believe they will have to

17  concede, both by the age of the documents and by what

18  Plaintiff has been -- has indicated is willing to forego.

19         The final point that I would make, Your Honor,

20  relates to the precedential nature of this proceeding, and I

21  think I had previously referred Your Honor, and some of our

22  case law refers to it, to the *Green* decision by Judge Richey,

23  which was a case in which he held a trial for the purposes of

24  evaluating whether or not the competitive injury prong had

25  been met.  And in that case, similar to this one, the

1   defendants put on witnesses, the plaintiffs relied primarily,

2   I actually believe it's fair to say, exclusively on

3   documentary submissions and cross-examination, and at the end

4   of that proceeding, Judge Richey concluded that the burden of

5   proof simply had not been satisfied with regard to the vast

6   majority of the materials withheld and he proceeded to craft a

7   remedial order that attempted to protect that which was

8   genuinely subject to a exemption claim while requiring the

9   release of that which he was convinced was not.

10          And along those lines, taking to heart what Your

11  Honor said at the pretrial conference, one of the other things

12  that Plaintiff, at least, is going to attempt quite earnestly

13  to do in this case is not leave Your Honor with an all or

14  nothing disposition.  I don't think it's called for in this

15  proceeding.  That has always focused on segregability.

16          Rather, what we will attempt to do is provide Your

17  Honor with a sensible blueprint in which 12-year-old data that

18  bears upon USDA's performance of its duties and the underlying

19  evidence as to the Animal Welfare violations can be disclosed

20  while withholding anything that arguably would meet the

21  critical mass test and we will try to elucidate that during

22  the course of the proceeding.

23          And then, as Your Honor requested in our proposed

24  findings and conclusions, or before, should Your Honor ask us

25  to do so, submit a very detailed remedial order that we would

1   suggest would basically accomplish the objective of seeing to

2   it that the FOIA, Freedom of Information Act, purpose is

3   satisfied without any real risk of Exemption 4 material being

4   disclosed.  Thank you, Your Honor.

5            THE COURT:  All right.  Thank you.  You may proceed.

6            MR. ROSSIER:  Thank you.  Your Honor, Defendants

7   would like to call their first witness, Michael Caulfield.

8            THE DEPUTY CLERK:  Good morning, sir.  Please raise

9   your right hand.

10            (WITNESS SWORN BY THE DEPUTY CLERK.)

11            MR. GLITZENSTEIN:  Your Honor, just one point of

12   procedure, and that is, whether we're invoking the rule of

13   witnesses.  I think the remaining witness is in the courtroom,

14   and I don't know what Your Honor's usual practice on that is.

15            THE COURT:  Well, when the parties ask for it, we

16   hear the comments and then rule.

17            MR. ROSSIER:  I think he's an expert witness, Your

18   Honor.  I think, as a consideration to him, I think he is --

19   it wouldn't be a problem for him to hear the testimony.  If

20   the Court is so inclined, obviously, he is prepared to step

21   outside.

22            MR. GLITZENSTEIN:  Unless -- I think the test is

23   whether or not Defendant will regard it as crucial to his

24   testimony for him to be in the courtroom.  If they don't

25   believe it is, then I think our preference would be that he

1    not stay in the courtroom, but I don't know what Your Honor's

2    usual practice is.  We're willing to defer to the Court on

3    that.

4            THE COURT:  What's your response?

5            MR. ROSSIER:  Well, Your Honor, I think it would be

6    helpful for him to hear the testimony.  I certainly would say

7    that.  And I don't think it would, you know, prejudice his

8    testimony in any way, so I would request that he be permitted

9    to stay.

10           THE COURT:  I guess the question is:  Is this

11   testimony going to impart comment at all upon any facts that

12   are presented by this lay witness and is that going to be

13   important to his testimony or necessary?

14           MR. ROSSIER:  That is -- I mean, he's very familiar

15   with this industry, so it's not necessary.  I wouldn't

16   represent that it's necessary that he hear Mr. Caulfield to be

17   able to give the opinions he does.

18           He may -- we may ask him to comment and elaborate on

19   matters that Mr. Caulfield testifies, so I think it would be

20   helpful to have him hear the testimony, but I wouldn't say

21   that his expert opinion is based upon what Mr. Caulfield is

22   going to say.

23           THE COURT:  Well, I guess that really gets to the

24   nub of the question.  If it's going to be helpful to maybe

25   have him listen and comment upon what Mr. Caulfield says,

1   that's one thing.  If, on the other hand, you're going to need

2   to have him hear what Mr. Caulfield says in order for him to

3   offer some opinion within the realm of his expertise, that's

4   another.

5          MR. ROSSIER:  Right.  Your Honor --

6          THE COURT:  I'm not sure which I'm hearing.

7          MR. ROSSIER:  I will not represent the latter.  That

8   is not our position.  He does not have to be here to be able

9   to testify, but I do think it would be helpful, so I'm not

10  saying the latter statement.

11         THE COURT:  Anything further?

12         MR. GLITZENSTEIN:  No, Your Honor.

13         THE COURT:  I think we should invoke the Rule then.

14         MR. ROSSIER:  All right.  Mr. Szot, if you could

15  step outside, please.  Thank you.

16              (DR. ROBERT SZOT LEAVES COURTROOM.)

17                     MICHAEL CAULFIELD,

18  having been duly sworn, testified as follows:

19                     DIRECT EXAMINATION

20  BY MR. ROSSIER:

21  Q    All right.  Good morning, Mr. Caulfield.  Can you state

22  your name for the record.

23  A    Michael Caulfield.

24  Q    And where do you reside?

25  A    In New Jersey.

1    Q    And where do you work?

2    A    At Huntington Life Sciences.

3    Q    Where is Huntington Life Sciences located, sir?

4    A    It's based in East Millstone, New Jersey.

5    Q    All right.  And what is the relationship between

6  Huntington Life Sciences and Life Science Research, Inc., the

7  Intervenor in this case?

8    A    LSR or Life Science Research, Inc. is essentially a

9  holding company.  It's our corporate parent.  Huntington Life

10  Sciences is the operating unit of LSR.

11   Q    All right.  And what is your current title with

12  Huntington Life Sciences?

13   A    I'm the general manager.

14   Q    And how long have you been the general manager?

15   A    For almost seven years.

16   Q    And what are your duties as general manager?

17   A    I have overall oversight of Huntington's U.S. operation

18  in New Jersey.

19   Q    All right.  And what kinds of things does that overall

20  oversight entail?

21   A    Acquisition of new customers, ensuring that the

22  operations are conducted in conformance with client

23  expectations, federal regulations and general management of

24  the day-to-day operations of the entire facility, frankly.

25   Q    All right.  And prior to you becoming general manager at

1    Huntington Life Science, what was your prior position?

2    A    I was the vice president of operations.

3    Q    And what period of time were you in that job?

4    A    From July of 1999 until February of 2002.

5    Q    And as vice president of operations, what were your

6    duties?

7    A    I had responsibility for toxicology operations, the

8    conduct of our toxicology business, for our information

9    technologies group, for our analytical services group, our

10   quality assurance unit.  I believe that's it.  And our

11   facilities group as well, excuse me.

12   Q    All right.  And I believe you testified you started that

13   position in July of 1999?

14   A    That's correct.

15   Q    Is that correct?

16   A    That's correct.

17   Q    And prior to July of 1999, what was your job title at

18   Huntington?

19   A    I was director of quality assurance.

20   Q    And what period of time were you?

21   A    That was from February of 1996 until July of 1999.

22   Q    All right.  So, did you start at Huntington in February

23   of 1996?

24   A    I did, yes.

25   Q    Can you generally describe for the Court what the

1  business of Huntington Life Science is?

2  A   We are in an industry sector called contract research or

3  contract research organization, which I'll refer to as a CRO.

4  We conduct, as the name states, contracted research generally

5  for the pharmaceutical industry to generate data geared toward

6  submission to the FDA for approval of new chemical entities.

7  Q   All right.  And what is the client base for Huntington

8  Life Science?

9  A   The majority of our customers are either pharmaceutical

10  companies, large and small, and companies I now refer to as

11  biotech companies that are generally smaller companies that

12  are oriented towards drugs that are derived from biologics or

13  biological products.

14  Q   All right.  And can you tell me the typical type of

15  function Huntington is asked to perform for its clients?

16  A   The majority of our business is called "Pre-clinical

17  Safety Assessment" or "Toxicology," largely relying on animal

18  tests to determine whether a drug is safe enough to proceed

19  into clinical trials, which is testing on human beings.

20  Q   All right.  And who hires you to perform these

21  pre-clinical safety assessments?

22  A   Our customers in the pharmaceutical and biotech sector.

23  Q   All right.  Do you have -- currently, how big is your

24  customer list?  How many customers do you have generally?

25  A   Literally hundreds.

1   Q    Okay.  Do you have a standard form of agreement that you

2   have with your customers?

3   A    We do indeed.

4   Q    And can you describe that for the Court.

5   A    The standard to the extent that there are variations on a

6   theme.  The common agreement is called the Master Services

7   Agreement that contains several aspects related to conduct of

8   studies, confidentiality and the like.  We've got -- for some

9   of our smaller clients that don't have lawyers and don't

10  require master services agreement, we will generally enter

11  into a confidentiality agreement with them prior to even

12  superficial discussions about the attributes of their drug and

13  what its intended use is.

14  Q    All right.  And the confidentiality aspect, do most of

15  the Huntington clients have a confidentiality agreement with

16  Huntington?

17  A    I'd say they all do.

18  Q    All right.  And is that typically on Huntington's form or

19  on the client's form or is there a combination?

20  A    It varies.  For our smaller customers, again, generally

21  they'll rely on us to provide them with our standard form

22  where they may actually propose some revisions.  For our

23  larger customers for whom confidentiality agreements are more

24  part and parcel of their operation, we generally either adopt

25  their form with some modifications or negotiate in terms of

1  what formal action we employ for the conduct of that study or

2  series of studies.

3  Q   All right.  And are you generally familiar with the

4  confidentiality aspects of the agreements with the clients or

5  the confidentiality provision of broader agreements with the

6  clients?

7  A   Yes, I think so.

8  Q   Can you testify as to the general time period for the

9  confidentiality in those agreements?

10 A   It varies, but the standard, the average, I'd say, is

11 about 20 years.

12 Q   All right.  Let's focus, let's take a little step back

13 and focus on the industry as a whole.  How many competitors

14 are there of Huntington Life Sciences, in your opinion?

15 A   Literally dozens.

16 Q   All right.

17 A   Upwards perhaps even of more than a hundred contract

18 research organizations of various different types.

19 Q   And is that competition on a domestic U.S.A. basis or a

20 worldwide basis?

21 A   It's both, actually.  There are global, I'll call them,

22 CROs of which Huntington is one.  There are companies like

23 ours that provide a full range of services that enable drug

24 companies to employ what we call a one-stop shopping.  We can

25 do all the research services that they require to get a drug

1    in demand.

2           There are smaller companies that don't have quite

3    the same range of services that we do, and they are what I

4    call sort of niche businesses that have a specialty in one

5    particular discipline.

6    Q    All right.  And the -- in terms of Huntington Life

7    Sciences, you had indicated an international aspect to the

8    business.  Are there multiple locations for Huntington Life

9    Sciences' operations?

10   A    We've got three laboratories.  The one in New Jersey, I

11   mentioned previously, and we've got two laboratories in

12   England.

13   Q    In England.  Okay.  Do you know, in general terms, either

14   for the New Jersey operation or the whole Huntington Life

15   Sciences operation, how many employees are employed?

16   A    About 1600.

17   Q    All right.  Are you -- do you -- are you familiar with

18   whether any of the client base for Huntington are involved in

19   the patent process?

20   A    I'd say essentially they all are.

21   Q    And what is your understanding of what that involvement

22   is as well as Huntington's role in that?

23   A    Well, my general understanding is that patents will be

24   granted for 20 years from the point that the filing was

25   initially made, and when that is made varies from customer to

1   customer.  In some instances, a patent will be applied for

2   after some development has been undertaken.  In some cases,

3   patent will be applied for prior to the discovery process.

4   Q   All right.  And are you familiar with the term

5   "early-stage drug testing"?

6   A   I am.

7   Q   And what does that term mean to you?

8   A   It's got a couple of other names as well.  Some will call

9   it "pre-clinical safety assessment," which is the lion's share

10  of what we do, and that is to generate data that's preparatory

11  to an FDA decision on whether or not they will allow clinical

12  trials in humans to proceed.

13      Some will call it "non-clinical safety assessment"

14  as well to account for the fact that as clinical trials are

15  actually granted, other longer-term studies in animals will be

16  running in parallel as well, so it's called regulatory

17  toxicology.  It's all early stages is just about everything up

18  to the commencement of clinical trials in human beings

19  generally.

20  Q   All right.  And are you governed by any sort of special

21  regulatory protocols or requirements --

22  A   We are.

23  Q   -- as in animal testing laboratory?

24  A   We are.  The two major sets of regulations that we're

25  beholden to are the FDA Good Laboratory Practices Regulations,

1    which came into existence in 1979 and the Federal Animal

2    Welfare Act, which is administered by the U.S. Department of

3    Agriculture as well.

4    Q   All right.  And focusing on the Animal Welfare Act, can

5    you describe generally what kind of protocols and requirements

6    that law imposes on Huntington Life Sciences?

7    A   The Animal Welfare Act, or what I'll call the AWA, has

8    standards for environmental conditions that animals need to be

9    held in with regard to temperature, sanitation requirements,

10   cage size, the types and frequency of observations that need

11   to be made.  It has a statutory requirement for the

12   maintenance of what's called an Institutional Animal Care and

13   Use Committee, or IACUC, as we had referred to earlier, and

14   some specific parameters in terms of the types of people that

15   need to be on the IACUC as well.

16   Q   All right.  And as a -- are you licensed under the Animal

17   Welfare Act?

18   A   We are what's called a registered research facility,

19   yeah.

20   Q   All right.  And who provides that registration?

21   A   That's the component of the USDA called the Animal Plant

22   and Health Inspection Service, or APHIS.

23   Q   All right.  And how long has, to your knowledge, has

24   Huntington been licensed by APHIS?

25   A   Decades.

1  Q   Okay.  And in connection with that licensing or

2  registration, are there periodic inspections by APHIS?

3  A   We get inspected at least once a year.  Sometimes the

4  inspections are more frequent.

5  Q   Okay.  Now, focusing on, I think you called the IACUC

6  Committee for Institutional Animal Care and Use Committee,

7  what specific task does that committee have, to your

8  knowledge?

9  A   A couple of statutory requirements.  One very important

10  one is that they review at HLS every single protocol or test

11  design, I'll call it, to ensure that it conforms with all of

12  the particulars with regard to -- to paying remediation,

13  justifications of a study, justifications of a particular

14  species, the requirement that we, as a business that uses

15  animals for research purposes, are endeavoring to employ

16  what's called the Three R's, reduction, refinement,

17  replacement, and that our scientists are actually exploring

18  all opportunities to avoid using animals if in fact that's

19  possible.

20          The IACUC is also required to do facility

21  inspections to ensure that all those housekeeping

22  environmental standards I referred to earlier are being

23  maintained sufficiently, and they're charged with doing what's

24  called a semiannual program review to ensure that the entire

25  universe of requirements that are captured in the Animal

1    Welfare Act with regard to training and other aspects are in

2    conformance with the law as well.

3    Q    All right.  And in terms of the makeup of the committee,

4    who sits on the committee?  Are those all internal Huntington

5    personnel?

6    A    No, they're not.  We are required, again, by the AWA to

7    have one outside member that's unaffiliated with our lab who

8    is, I believe the law calls it, is responsible for

9    representing community interests.

10   Q    All right.  And what happens -- or have you been party to

11   or witness what happens during an APHIS inspection of your

12   facility?

13   A    I have, yes.

14   Q    And can you tell the Court generally what happens during

15   one of those inspections?

16   A    Well, they appear unannounced usually on a Monday morning

17   and they set right out to the laboratory to look at all of the

18   regulated animals.  I will just sort of digress a little bit

19   and say that the Animal Welfare Act does not cover rodents.

20        All other species that we conduct research on are

21   covered, so the USDA will set out to our laboratory and look

22   at the health of our animals.  They'll attempt to ensure that

23   all of those environmental requirements are being complied

24   with.  Normally, that will take the better part of a day, at

25   which point they generally spend the rest of the time in a

 1  conference room either interviewing staff, or for any of the

 2  studies that interests them, will ask us to pull protocols and

 3  standard operating procedures and the like to ensure that the

 4  IACUC had done the requisite review and that all the

 5  documentation and other requirements are in order.

 6      They will also assess IACUC functionality by going

 7  to meeting minutes and the semi-annual reports and general

 8  inspections I mentioned take place earlier.

 9  Q   All right.  And is there a particular or standard length

10  of time that these unannounced inspections from APHIS take

11  place?

12      THE COURT:  Can you just put on the record the

13  spelling of that acronym APHIS?

14      MR. ROSSIER:  I'm sorry, IACUC is --

15      THE COURT:  We've got that one.  APHIS.

16      MR. ROSSIER:  I'm sorry, APHIS.  A-P-H-I-S, APHIS.

17  A   I'm sorry, what was the question?

18  Q   (BY MR. ROSSIER)  Can you -- based on your experience, you

19  know, witnessing those inspections, the typical unannounced

20  APHIS inspection, how long does it take?

21  A   Generally, anywhere from one-and-a-half to three days.

22  Q   All right.  And is there a person from APHIS who

23  typically conducts that inspection?

24  A   Generally, it's someone called a "veterinary medical

25  officer" who is a veterinarian by training who has received

1   additional training in Animal Welfare Act compliance

2   procedures from USDA.

3   Q   All right.  And do those typical APHIS inspections

4   include requests for and you providing copies of documents?

5   A   No, not generally.

6   Q   What had --

7   A   I'm sorry.  Requests for, yes; copying of documents, no.

8   Q   All right.  And so they request documents but they don't

9   take copies of them with them?

10  A   They generally conduct a review on original documents.

11  Q   All right.  Has there ever been an occasion where the

12  APHIS inspector not only requested to review the documents but

13  actually took documents?

14  A   Yes, there has.

15  Q   And when did that occur?

16  A   In June of 1997, after a routine inspection that we

17  received in April of 1997, we were visited in the wake of a

18  submission to the USDA, a complaint by People for Ethical

19  Treatment of Animals, or PETA.  USDA intimated to us that they

20  were going to come back and do a reinspection to make sure

21  everything was in order, and at that inspection they did

22  request that we actually make photocopies of documents for

23  them.

24  Q   All right.  And you say that second inspection in '97

25  took place in June?

1    A    It was June, yes.

2    Q    And was it with the same personnel?

3    A    Well, it was the usual VMO, or veterinary medical

4    officer, that was there as she had been just a couple of

5    months prior in the inspection in April that I mentioned took

6    place previously, and there was one other individual who

7    represented IES, or the Investigative and Enforcement Services

8    arm of the USDA, or APHIS.

9    Q    All right.  And how long were those two individuals there

10   in June of '97?

11   A    About a week.

12   Q    All right.  And were you familiar with what they were

13   looking at, the documents they were asking for and so forth?

14   A    Well, I was familiar with them.  Although we had not seen

15   this complaint that PETA had filed with the USDA, we knew

16   about it, we discussed it, and although we didn't get into

17   extensive conversation about it, it was pretty clear to me at

18   the time that they were following this complaint and using it

19   as a guide in terms of what documents they requested and what

20   procedures they wanted to actually witness.

21        MR. GLITZENSTEIN:  Your Honor, I object to the

22   extent that this appears to be going into the area that I

23   believe Your Honor ruled.  It was not advanced, and I don't

24   see what other purpose this serves other than to help

25   Defendant establish its argument that these documents were

1    obtained in a way that would be considered out of the norm,

2    and therefore the involuntary argument; otherwise, I'm not

3    sure what the relevance of the testimony is.

4             THE COURT:  Well, I thought you would be complaining

5    about potential speculation in your objection.  I'll allow

6    this to come in and take it for what it's worth.

7             MR. GLITZENSTEIN:  Thank you, Your Honor.

8             MR. ROSSIER:  It's just by way of general

9    background.  Thank you, Your Honor.

10   Q    (BY MR. ROSSIER)  And I just -- I wanted to step back a

11   second now and just focus on security.  What types of security

12   do you have at Huntington Life Science?

13   A    It's pretty extensive, and I think it's emblematic of the

14   industry that we're in.  We have state-of-the-art and various

15   kinds of physical security that runs the gamut from digital

16   closed-circuit cameras both inside and outside the facility.

17   We've got buried infrared intruder detection.

18             COURT REPORTER:  Slow down, please.  Buried

19   infrared...

20   A    Sorry about that.  We've got buried infrared cable

21   intruder detection.  We've got motion sensors on our building.

22   We've got conventional burglar alarms outside our building.

23   We've got cart access throughout various laboratories inside

24   of our building that enable us to only allow access to certain

25   individuals who are on sort of a need-to-visit basis.

1       We provide on-site document shredding so that we're

2   not throwing any confidential materials in the garbage.  We

3   escort all of our customers through our facility when they

4   visit us.  We have coded client identities on all of our door

5   cards that identify a study that's undertaken in that room and

6   client codes on all of our data forms and the like so that

7   other customers, in fact even our employees don't have

8   knowledge, for the most part, of whose customers they are

9   working on, studies they're working on.

10          MR. ROSSIER:  All right.  And Your Honor, I just

11  look for guidance here.  At this point I'm not going into the

12  surreptitious aspects of the predicate to this APHIS

13  inspection.  I understand that's been ruled out, but I think

14  by way of factual background and general background it might

15  be helpful to put this inspection in June from APHIS in

16  context of what happened immediately prior with my disclosure

17  that I'm just providing general background, and I'm not going

18  for the prohibited argument.

19          THE COURT:  That doesn't really tell me what you're

20  going to be asking and what are you going to be soliciting.

21          MR. ROSSIER:  There was a security breach.  There

22  was a security breach prior to this June APHIS investigation

23  that was on a different order, and just to sort of connect the

24  dots, I thought it might, you know, just as a way of general

25  background, have the witness just indicate that there was a

1   security breach and not -- you know, just touch on that and

2   indicate that that happened, led to the filing of the PETA

3   complaint and then we'll move on.  It's just by way of general

4   background.

5           THE COURT:  But the purpose is to show that it led

6   to the filing of the PETA complaint?

7           MR. ROSSIER:  Yes.

8           THE COURT:  And what's the relevance of that with

9   respect to the burden that you carry?

10          MR. ROSSIER:  Again, it's more of just general

11  background, factual predicate that they took the documents in

12  June.  It was -- just led up to that unusual document copying

13  situation just as a matter of fact, not as a purpose of

14  argument.

15          MR. GLITZENSTEIN:  I'm not sure what "general

16  background" means.  It's not relevant to establishing a

17  position, so from what I've heard, it does sound like he's

18  going into this area, but, Your Honor, with the caveat that

19  obviously we would be permitted to cross-examine on anything

20  which is said, to the extent we think that's relevant to our

21  position.

22          And Your Honor has already said that Intervenor can

23  make a proffer on this point, so with the understanding that

24  that's all it is, I think we would have no objection to it

25  proceeding, as long as it's kept to a very cursory line of

1    questioning.

2            THE COURT:  I'll give you limited leeway, but I am

3    skeptical about its relevance.

4            MR. ROSSIER:  All right.  Thank you, Your Honor.

5    Q   (BY MR. ROSSIER)  Prior to this June 1997 APHIS inspection

6    that you testified about, had there been a security breach?

7    A   Yes.

8    Q   And do you know approximately when that security breach

9    took place?

10   A   I do.  It was between September of 1996 and April of

11   1997.

12   Q   And do you know who that person was?  Was it an employee

13   of Huntington Life Science?

14   A   It was.

15   Q   All right.

16           MR. ROSSIER:  The Court's indulgence, if I could,

17   for a moment.

18           (PAUSE.)

19           MR. ROSSIER:  Your Honor, may I approach the

20   witness?

21           THE COURT:  Yes.

22           MR. ROSSIER:  I am handing the witness what has been

23   premarked.  I believe the Court has a copy of this as well,

24   Defendant's Exhibit 5-A.

25   Q   (BY MR. ROSSIER)  And Mr. Caulfield, if you could take a

1  moment and look at Exhibit 5-A -- Defendant's Exhibit 5-A and if

2  you could, ask you if you could identify that for the record,

3  sir.

4  A   Yes.  This is a package of confidentiality agreements and

5  master services agreement in which confidentiality language

6  has been inserted that apply to the studies that were cited in

7  a complaint that the USDA filed against HLS in 1998.

8  Q   All right.  And the -- I see various redactions or black

9  markings.  Do you know why that was done?

10  A   Not expressly.  I see names and addresses and the like.

11  I didn't make these redactions, so I'm not 100 percent sure,

12  just skimming through this very superficially, what all these

13  redactions represent.

14  Q   All right.  And if you could take a look at these

15  documents, and my question is whether you recognize these

16  documents as the kind of confidentiality agreements that

17  Huntington Life Sciences enters into with its clients.

18  A   Yes, I do.

19  Q   All right.  And could you testify as to whether these are

20  typical or not typical of the kind of confidentiality

21  agreements that Huntington Life Science enters into with its

22  clients.

23  A   I'd say yes, they are typical.

24  Q   All right.  Thank you.

25       MR. ROSSIER:  May I approach the witness, Your

1    Honor?

2         THE COURT:  Yes.

3    Q    (BY MR. ROSSIER)  I hand you what has been previously

4    marked as Defendant's Exhibit 9 and ask if you can identify

5    that for the record.

6    A    Yes.  It is a two-page document entitled "USDA

7    Information At Issue," contains various categories that

8    represent the documents that are at issue in this case.

9    Q    All right.  And did there come a point in time when you

10   became aware of a FOIA request filed with the USDA by an

11   organization known as In Defense of Animals?

12   A    Yes, that was in 2002, sometime in the spring, I believe.

13   Q    And how did you become aware of that?

14   A    We were approached by the USDA who indicated that this

15   request had actually been filed, I guess, some two years

16   prior.

17   Q    Okay.  And what was the nature of that notice?

18   A    I believe we received a letter, although I can't state

19   definitively.  I don't have perfect recall as to whether it

20   was a letter or cell phone conversation.

21   Q    All right.  And did you actually play any sort of role in

22   connection with that matter?

23   A    Yes.  They asked us to help them understand what the --

24   what the confidential nature of these documents actually were

25   and whether there were any documents that we'd feel

1    comfortable releasing.

2    Q   All right.  And in connection with that, were you shown

3    any documents by USDA?

4    A   Well, we received -- and I can't remember whether it was

5    at that juncture or not -- the full compendium of documents

6    that they had actually removed from our facility in 1997.

7    Q   All right.  And with regard to those documents that were

8    removed from the facility, you had just testified about a

9    June 1997 visit.  Was that the only visit where the USDA

10   removed documents from your facility?

11   A   No.  We, as I mentioned previously, were told that we

12   were going to be reinspected in June of 1997 on the heels of

13   the regular inspection that concluded April of that year.  And

14   in the midst of the inspection, when we thought it was still

15   ongoing, when they had not completed what they set out to do,

16   we received a call from the USDA indicating that they weren't

17   going to be back for some indeterminate period of time.  When

18   they called us back, they said they were going to return and

19   conduct what was more of a formal investigation, which they

20   did in the beginning of July of 1997.

21   Q   All right.  And focusing on this July 1997 investigation,

22   how long did that take place, generally?

23   A   About two weeks.

24   Q   All right.  And how many personnel from USDA were

25   involved?

1   A   Something of the order of six or seven, I believe.

2   Q   All right.  And were you personally involved in that?

3   A   I was.

4   Q   And what activities were you asked to undertake?

5   A   Well, it was similar to what had been undertaken prior to

6   that in June in that they were -- asked us to provide them

7   with documentation on specific studies for specific clients on

8   particular animals.

9        Again, there was a strong inference that they were

10  following the complaint that PETA had filed to justify whether

11  it had any veracity to it.  They visited animal facilities and

12  watched procedures being undertaken.  They reviewed standard

13  operating procedures and IACUC records again, and during this

14  particular inspection, they actually conducted a couple of

15  interviews with technical staff.

16  Q   All right.  And were they -- do you know the volume of

17  documents that were copied and taken by USDA on that occasion?

18  A   It was very voluminous, hundreds of documents.

19  Q   All right.  And I believe your testimony was in the

20  earlier visit, in the June visit, they also took documents?

21  A   They did, yes.

22  Q   Do you have any -- can you generally summarize how many?

23  A   Reston was the case in July but still a significant

24  number of hundreds and hundreds of pages of documents.

25  Q   All right.  Now, since you were initially notified by

1   APHIS or USDA of the pendency of the FOIA request and the

2   request was made for you to take a look at documents and

3   determine confidentiality and so forth, have you had

4   continuing involvement with APHIS?

5            THE COURT:  Can I interrupt you just a moment?  I

6   thought I heard your answer with regard to the volume of

7   documents, referred to less than the number that had been take

8   in July.  Did you mean less than the number that had been

9   taken in June?  I thought you were talking about --

10            THE WITNESS:  There were more documents actually out

11   of our facility in July than there was in June.  Is that

12   clear?

13            THE COURT:  Is the -- is your latest testimony now

14   about the July visit, the July reinspection, or about a June

15   inspection?

16            THE WITNESS:  The July, what became an

17   investigation, where more documents were taken from our

18   facility.  A larger volume of documents were taken in July

19   than was the case in June.

20            THE COURT:  All right.

21            THE WITNESS:  Okay.

22   Q   (BY MR. ROSSIER)  And again, just to frame the time

23   frames, in the June visit, it was approximately how many days

24   compared to the July visit?

25   A   The June visit was approximately a week.  The July visit

 1   was approximately two weeks.

 2   Q   All right.  And with regard to that investigation, were

 3   there any other visits, any other documents produced to USDA

 4   at the USDA's request?

 5   A   Beyond the categories that I mentioned previously, there

 6   were study records, there were protocols, there were reports,

 7   there were IACUC records.  The entire universe of records that

 8   are categorized in this document that you handed me comprises

 9   what USDA took out of our facility during the course of both

10   of those visits.

11   Q   All right.  But just to try to make sure we have the

12   whole surface covered, my question is, okay, you mentioned

13   about the June visit and you mentioned about the July

14   inspection.

15        After the July inspection, after those inspectors

16   left, were there any other inspections or requests from USDA

17   to actually produce documents in connection with the

18   investigation?

19   A   From the USDA by us?

20   Q   Yes.

21   A   None that I can recollect.

22   Q   All right.  Now, you made reference to it, and I've

23   handed you what's been marked as Defendant's Exhibit 9.  I

24   will represent to the Court this is as a joint exhibit that

25   both sides have worked on and essentially agreed to in terms

 1   of the general summary of the documents that are at issue in

 2   this litigation.

 3           And Mr. Caulfield, if I could direct your attention

 4   to the various line items of Exhibit 9, and I believe you

 5   already testified to this, but I just -- for my clarification,

 6   do you understand or have general familiarity with all of the

 7   documents that remain in dispute in this case?

 8   A    Yes, I do.

 9   Q    And do you know their origin?

10   A    I do.

11   Q    What is their origin?

12   A    Their origin is that they were originally derived from

13   the original documents from studies or the internal

14   documentation from our facility.  These are the documents that

15   were removed by the USDA from our facility in 1997.

16   Q    In either during the June visit or the July visit,

17   correct?

18   A    Exactly, yes.

19   Q    All right.  Now, focusing on the first line item,

20   Institutional Animal Care and Use Committee records, and on

21   the far right I see 56 pages withheld in part.  Are you

22   generally familiar with those documents?

23   A    Generally, yes.

24   Q    All right.  And what is your understanding of what those

25   documents are?

1  A   These are, as indicated in this second column, IACUC

2  minutes, memoranda, inspection reports, that's it.

3  Q   All right.  And do you have a understanding as to whether

4  these -- at least the withheld parts of these documents,

5  whether those are confidential in nature?

6  A   Yes.

7          MR. GLITZENSTEIN:  I object to the extent that I am

8  not sure what the question is.  Your Honor has ruled that he's

9  not able to offer expert testimony.  Confidential is obviously

10  a loaded word which encompasses potentially a competitive

11  injury prediction.

12          If the question is whether or not he and his company

13  regards them as confidential, I don't think I have a problem

14  with that, but if he's being asked to basically offer some

15  kind of opinion, I think we need to know the basis of that and

16  whether that steps over the line into expert testimony.

17          THE COURT:  The objection will be sustained, but

18  I'll let you lay a proper foundation for a proper answer if

19  you want to pursue that.

20          MR. ROSSIER:  All right.

21  Q   (BY MR. ROSSIER)  Does your company take a position with

22  regard to the confidentiality of documents that it maintains at

23  its location?

24  A   We do.

25  Q   And what is that position?

1   A    Well, as specified in the confidentiality agreements that

2   I've got in front of me here, is all information that is

3   derived from the studies that we are contracted to conduct by

4   our clients, whether it be data, inventions or other

5   information, including any specimens, microscope slides or

6   again anything that derives from those studies, that's

7   considered confidential.

8   Q    All right.  And focusing not on an opinion as to whether

9   you think they're confidential for legal purposes, but rather,

10  from your company's own point of view, asserting

11  confidentiality, does your company assert confidentiality with

12  respect to the redacted portions of the documents identified

13  under that first line item?

14  A    Yes, we do.

15  Q    All right.  Focusing on the second line item, under the

16  heading "Veterinary Treatment Requests and Logs," are you

17  generally familiar with those -- those documents generally

18  described under that category?

19  A    Yes, I am.

20  Q    And what are -- what is your understanding of those

21  documents, what those documents are?

22  A    Well, Veterinary Treatment Requests and Logs are

23  documentation of a specific effect that was seen in an animal,

24  whether it be drug related or different, a description of the

25  effect, a veterinary diagnosis, a recommended treatment and in

1   some cases follow-up observations and additional treatments.

2   Q   All right.  And you'll see on this exhibit that there are

3   94 pages withheld in full and 20 pages withheld in part.

4   A   Yes.

5   Q   You see that?

6   A   Yes.

7   Q   Are you generally familiar with both the documents

8   withheld in full as well as the 20 withheld in part?

9   A   Yes, I am.

10  Q   All right.  And is it your company's assertion, as a

11  matter of company policy, that those documents are

12  confidential?

13  A   To the extent that they characterize the effects of a

14  test substance on an animal species, the answer is yes.

15  Q   All right.  And the next line item says, "Clinical

16  Observation Raw Data Reports"; do you see that?

17  A   I do.

18  Q   And can you read into the record the description of --

19  set forth under the description?

20  A   Each such record is a chart that contains clinical

21  observations for one animal in the study over a specified

22  interval of time.

23  Q   And are you familiar with the 121 pages that have been

24  withheld in full under that description?

25  A   Yes, I am.

1    Q    And does your company assert confidentiality with regard

2    to those documents?

3    A    Yes, we do.

4    Q    And can you generally describe what those documents are?

5    A    They are data that are derived from detailed clinical

6    observations that are made generally on a weekly basis of

7    animals that are on active tests.

8    Q    Okay.  And can you -- can you describe what a clinical

9    observation is in your business?

10   A    It's not dissimilar to the type of detailed observation

11   you actually get in a doctor's office.  Animals are

12   essentially taken out of their case, palpated and examined for

13   any type of masses, make a gross assessment of heart rate,

14   respiration rate, body temperature, ocular response to light

15   stimuli, sometimes there are other more extensive evaluations

16   taken at that time, but generally an exam that will last

17   anywhere from five minutes to some instances 15 minutes or

18   more, depending on the circumstances.  It's a detailed

19   physical observation, essentially.

20   Q    All right.  And why are those observations conducted and

21   recorded?

22   A    To be able to determine whether or not there is any

23   effect on animal species at a given dose level to the drugs

24   that they've been dosed with.

25   Q    All right.  And with regard to the Veterinary Treatment

1   Requests and Logs that is the prior line item, why is that

2   information maintained by Huntington?

3   A   To enable us also to ensure that we've got adequate

4   documentation that veterinary treatment was performed, but

5   also as a corollary to the clinical observations and some of

6   the other observations that are geared to document test

7   effects.

8   Q   All right.  And let's step back a moment from these two

9   categories of documents and can you relate this to the general

10  toxicology studies that are under way at Huntington?

11  A   Yes.

12  Q   Please do.

13  A   And in what sense?

14  Q   Are these part and parcel of those toxicology studies, or

15  what relationship do they have to those?

16  A   They are.  We consider all of this to be raw data, is the

17  phrase that we use in the industry, and you know, the full

18  profile of raw data is what's used by our toxicologists to

19  generate reports that are submitted to the client and

20  subsequently to the FDA so that the agency can actually make

21  decisions based on efficacy and safety as to whether or not

22  they will approve the commencement of clinical trials in

23  humans.

24          All of this information supports that.  It's all raw

25  data.  It's all, you know, in terms of the confidentiality

1  agreements and all other agreements, it's the property of our

2  clients.

3  Q   All right.  Move on to the next line item, if you would.

4  Type of record that's identified as necro -- necrops -- I

5  can't even say it.

6  A   Necropsy.

7  Q   Necropsy and Postmortem Examination Reports, and it's

8  noted on the right-hand column, 23 pages withheld in full.

9  Can you read into the record the description set forth under

10  the description?

11  A   Sure.  It says, (reading)  Contains information related

12  to the animal at the time of death, including the methods of

13  sacrifice for the animal or type of death of the animal and

14  observations about the animal at the time of death.

15  Q   All right.  And what role do these kind of reports play

16  in the toxicity testing that you do at Huntington?

17  A   Well, they do a couple of things, is that they enable us

18  to ascertain any, what we call, gross microscopic effects that

19  a drug may have actually had on an animal which are in some

20  case and in many cases not evident through the detailed weekly

21  physical exams.

22       We will actually, what we call in the industry,

23  harvest and remove organs and weigh them so we can ascertain

24  whether or not there is any differences in organ weight, for

25  example, in a dose test group relative to the control group

1    that's receiving a placebo.  The observations that are gleaned

2    through a necropsy are also very important in terms of

3    correlating those observations, observations that may be found

4    by our pathologists, once slide production of these tissues

5    are actually conducted and microscopic evaluations can be

6    made.

7    Q   All right.  And who is the owner of these reports and

8    that information?

9    A   These records and all of the specimens that are held as

10   well, along with the raw data are the property of our

11   customers.

12   Q   All right.  And what is Huntington's position, as a

13   corporate policy, with regard to whether or not this data is

14   confidential?

15   A   It is.  That's our view.

16   Q   All right.  Moving next to Viability Records, and if you

17   note on that column that says 58 pages withheld in full, 397

18   pages withheld in part, and can you read into the record the

19   descriptions set forth on Exhibit 9 for that item?

20   A   It says, (reading)  Tables containing the viability

21   records for animals in a study on the effects of a drug on an

22   animal.

23   Q   All right.  And do you have familiarity with those

24   documents both withheld in full and withheld in part?

25   A   I do.

1    Q   All right.  And can you generally describe what those

2    documents are and what relationship they have to your

3    toxicology studies?

4    A   They're also considered raw data.  They're also

5    reflective of the effect of a drug, and the viability

6    procedure is generally a twice-a-day visitation to an animal

7    room by a technician or team of technicians.

8            It's a much more cursory assessment than the weekly

9    detailed physical examination.  It's meant as a means of

10   identifying the status of the animal in terms of gross

11   effects.  Viability records generally will precipitate any

12   veterinary requests which might subsequently be generated, but

13   again, it's a much more cursory superficial twice-a-day as

14   opposed to once-a-week assessment of a drug's effect on

15   animals.

16   Q   All right.  And with regard to those volume of pages

17   withheld in part, can you generally describe what kind of

18   information is being withheld and what kind is being

19   permitted?

20   A   The information that was withheld relates to effects that

21   seem to have derived from introduction, excuse me, of the drug

22   substance.  The information that was released relates to

23   effects that were precipitated by either cage accidents or

24   animals having escaped into an animal room or similar.  Those

25   effects, again, that were the result of nondrug-related

 1  effects.

 2  Q   All right.  And is it your -- Huntington's position that

 3  the parts of the documents that have been not released and the

 4  58 pages that have not been released at all are confidential

 5  from a company policy point-of-view?

 6  A   Yes.

 7  Q   All right.  Turning to the second page of exhibit --

 8  Defendant's Exhibit 9.  Type of record is indicated as

 9  Miscellaneous Records Pertaining to Animal Cages.  And can you

10  read the description of the record, sir.

11  A   (Reading)  Purchase requisition, in quotes, and purchase

12  forms for purchasing animal cages used in drug testing and

13  related forms.

14  Q   All right.  And I see that the exhibit indicates six

15  pages were withheld in part.  Are you familiar with those six

16  pages?

17  A   I am, yes.

18  Q   And are you familiar with -- can you just generally

19  describe what part of those six pages was withheld and why?

20  A   Well, the sections that were withheld relate to a

21  proprietary design that was of our own creation at HLS.  That

22  represented a new design for primate caging that we felt was

23  novel and not, at the time, currently employed by any of our

24  competitors.  Design schematics and drawings of the like are

25  the aspects that in my recollection were withheld.

1   Q   All right.  And is your company's position that those

2   documents are confidential and should not be released?

3   A   Yes, it is.  The portions that were withheld are, sure.

4   Q   Right, those portions.  Thank you.  Then the next item

5   that's listed is Internal USDA Investigatory Memoranda, 27

6   pages withheld in part; do you see that?

7   A   I do.

8   Q   And can you read into the record the description of those

9   documents.

10  A   Sure.  It says, (reading)  Discussions of the bases for

11  each charge that USDA contemplated bringing against Huntington

12  for violations of Animal Welfare Act and summaries of Animal

13  Welfare Act violations found by USDA for a study of the

14  effects of a drug on an animal.

15  Q   All right.  And the 27 pages withheld in part, are you

16  familiar with the parts that were withheld?

17  A   I believe so, yes.

18  Q   And can you generally describe what was withheld and why.

19  A   Well, these are, as the type of record indicates, USDA

20  records.  They are not Huntington records, per se, but the

21  parts that were withheld are essentially a USDA discussion of

22  a variety of toxic effects that were either derived from our

23  study records or they had seen during their on-site

24  visitations to our laboratory in 1997.

25  Q   All right.  And is it your company's position that that

 1   information contained on that USDA memoranda is confidential?

 2   A   It is.

 3   Q   All right.  The next line item on Exhibit 9 is Interim

 4   Test Reports.  Do you see that?

 5   A   I do.

 6   Q   And do you see that 22 pages were withheld in full?

 7   A   Yes.

 8   Q   And can you read into the record the description set

 9   forth there.

10   A   It says, (reading)  Forms containing tables on the

11   individual weekly observations for test animals and status

12   reports that contain summaries of clinical observations taken

13   during the tests, including urinalysis, blood pressure,

14   hematology and clinical chemistry, food and fluid intake,

15   fecal and fluid output, body weight and mortality.

16   Q   All right.  And does Huntington Life Sciences have

17   confidentiality with regard to those 22 pages?

18   A   We certainly do.

19   Q   What role do those interim test reports play in the

20   toxicology studies that you generally described?

21   A   These are related to the category following, and they're

22   essentially our product.  These are the only things that we

23   produce as a business, are reports to our customers, and they

24   contain the full range of assessments, evaluations and

25   analysis on the toxic profile of a given compound.  They

1  contain individual data for respective animals, group effects,

2  statistical evaluations and a section called Materials and

3  Methods, which generally specifies the methods that we've

4  employed, the equipment that we used, the statistical regimens

5  that we undertook, the software that generated and reported

6  the data that's contained within that report and any other

7  specifics of the study that the client might deem relevant.

8  Q   All right.  And you mentioned the client in the reporting

9  you do to the client.  In terms of these 22 interim test

10  reports, are these copies of reports you've actually given to

11  clients?

12  A   They are, yes.

13  Q   All right.  Moving on to the next line item, Final Test

14  Reports and Related Records, 124 pages withheld in full.

15        Can you read the description of those items into the

16  record, please.

17  A   It says, (reading)  The records describe and discuss

18  animal test results, information on the animals used in the

19  study, daily observations on the animals used in the study,

20  treatment of individual animals in the study, such as the time

21  and the date of the treatment and observations on the

22  treatment, and information on compliance with the Animal

23  Welfare Act.

24  Q   All right.  And again, would Huntington -- has

25  Huntington, as corporate policy, asserted confidentiality with

1   regard to those documents?

2   A   We would.

3   Q   All right.  Are those documents similar to the prior line

4   item documents that are produced for the client and actual

5   copies of documents you have produced to the client?

6   A   They are very similar.  This is the state of the final

7   report.  Our study protocols sometimes specify that we issue

8   reports to our customers in phase as the study is ongoing.

9   Q   All right.  Moving on to the next line item, it says,

10  "Internal Huntington Memoranda," indicating 34 pages withheld

11  in full, six pages withheld in part.  Can you read the

12  description of that line item into record.

13  A   It says, (reading)  Discussions of issues arising during

14  the course of study, including descriptions of observation and

15  treatment of animals in the study.

16  Q   All right.  And are you generally familiar with those 34

17  pages withheld in full and the six pages withheld in part?

18  A   Generally, yes.

19  Q   And does Huntington assert confidentiality, as corporate

20  policy, with regard to those items?

21  A   We do.

22  Q   All right.  And what relationship do these items both

23  withheld in part and the full documents withheld in whole have

24  to the toxology studies that you've testified about?

25  A   Well, the documents withheld in part and the components

1 that were withheld from the remaining six pages contain

2 discussions either with internal Huntington scientists or in

3 some instances with our customers on the effects of the test

4 compound that were seen in our studies.

5  Q    All right.  And then moving on to the final line item, it

6 says, "Observation Sheets," 28 pages withheld in full.  Can

7 you read the description of those items into the record,

8 please.

9  A    It says, (reading)  Charts containing basic information

10 for animals in a study on the effects of a drug on an animal,

11 i.e., observations of animals in the study over a specified

12 interval of time, including body weight and amount of food

13 eaten by the animal.  The chart also contains the animal

14 number and the time and date the observations were taken.

15  Q    All right.  And are you familiar with those 28 pages that

16 have been withheld in full?

17  A    I am.

18  Q    And does Huntington, as a corporate policy, assert

19 confidentiality on those observation sheets?

20  A    Yes, we do.

21  Q    All right.  And what role do those observation sheets

22 have in the toxology studies that you've been testifying

23 about?

24  A    As I specified, it's just more of the data that we're

25 obligated to contain -- maintain, rather, by our study

1    protocols, and in the instances specified here, it's body

2    weight data and what we call food consumption data to

3    demonstrate whether a particular drug has an effect on

4    appetence.

5    Q    All right.  And looking through the whole of Exhibit 9

6    and using your terminology of data, study data, how many of

7    those line items contain study data from your way of thinking?

8    A    All of the line items, except for the miscellaneous

9    records pertaining to animal cages, and that information is

10   our property.  They're the proprietary designs for monkey

11   cages that we constructed back in the late '90s.  That belongs

12   to us.  Our customers would not claim ownership of that

13   information.

14          The IACUC records, or the Institutional Animal Care

15   and Use Committee records are not strictly raw data in that

16   they don't comprise the property of our customers.  The

17   redacted sections, according to my recollection, are minutes

18   discussing, or program reviews discussing either particular

19   protocols, and I mentioned previously that IACUC was charged

20   with reviewing protocols, we do discuss them in our minutes,

21   the effects of drugs and veterinary response to those effects

22   that it is their agreement to actually oversee and any other

23   study-related aspects or SOP-related aspects that could have

24   an impact on a client's program.

25          So, the IACUC records again are not strictly our

1  client's property but there are discussions within them that

2  relate to the effects of a drug that are also illustrated

3  without -- within the raw data that are in all of the other

4  categories.

5  Q   All right.  You've been at Huntington, am I right, around

6  12 years?

7  A   That's right.

8  Q   All right.  And during your 12 years at Huntington in

9  your various positions, have you ever been involved in or

10  heard of a client of Huntington releasing Huntington from its

11  confidentiality obligation?

12  A   No.

13  Q   Have you ever been involved in any sort of discussions at

14  Huntington as to whether it would -- you know, whether that

15  topic was appropriate, you know, the release from the

16  confidential obligation was a subject that either a client had

17  initiated in the conversation with Huntington or Huntington

18  had initiated with a conference with a client?

19  A   No, I can't imagine it'd happen.

20          MR. GLITZENSTEIN:  Objection, calls for hearsay.  I

21  think the question was whether he has ever heard of any

22  conversation that took place.  So, if the question is whether

23  he has had that conversation, that's one thing, but if he's

24  asking whether he's ever heard of non-witnesses having a

25  conversation, I object to that.

1          THE COURT:  I'll overrule the objection but direct

2    that the question be asked in a noncompound fashion.

3          MR. ROSSIER:  Yes, sir.

4    Q    (BY MR. ROSSIER)  Are you aware of any conversations at

5    Huntington where the issue of release or waiver of the

6    confidentiality obligation of Huntington has been discussed?

7    A    Maybe I can answer it this way, and if I'm out of bounds,

8    please let me know, but in the seven years I've been general

9    manager, those type of decisions would need to have come

10   through me, and in my seven years in this job, that has not

11   happened.

12   Q    All right.  Now, during your 12 years at Huntington, have

13   you ever received any communication from any client, without

14   revealing the identity of the client, where any concern was

15   expressed about a failure of Huntington to uphold its

16   confidentiality obligation?

17   A    Yes, we have.

18   Q    And can you generally describe that?

19   A    Well, it was again related to the infiltration by PETA in

20   1997, and in the beginning of May of '97 we were approached by

21   telephone by a customer very late in the day indicating that

22   they wanted to come see us.  This was a customer that was

23   based in New Jersey.

24          So, they visited us about 6:00 or 7:00 o'clock in

25   the evening and they had with them some literature that had

1    recently been distributed by PETA referencing them and some of

2    the specific elements describing a study that had been

3    conducted at a contract research organization which at that

4    point had not been identified, indicated that it was pretty

5    irrefutable that a study that this client had placed with us

6    was what was being referenced in this literature.

7    Q    What was the attitude or point of view of that client?

8    A    They were extremely concerned.

9              MR. GLITZENSTEIN:  I object on hearsay grounds.

10             THE COURT:  Overruled.

11   Q    (BY MR. ROSSIER)  What was the attitude of that client?

12             THE COURT:  You can ask what the --

13   Q    (BY MR. ROSSIER)  I'm sorry, not attitude.  What did that

14   client express about that situation?

15   A    They were very --

16             THE COURT:  Hold on.  You can ask under 803 about a

17   reaction, appearance, or you know, but not verbal response.  I

18   mean, are you trying to ask about appearance of surprise or

19   things of that nature?

20             MR. ROSSIER:  I'm asking about the emotional

21   reaction, yes.

22             THE COURT:  You can ask that.

23   Q    (BY MR. ROSSIER)  I am looking for the emotional reaction

24   of the client to that situation.

25   A    They were clearly disturbed and quite distraught and had

1   not at this point had much information in terms of where this

2   was all going.  It would appear as though there was an

3   infiltration of some type at our laboratory, and basically

4   they just wanted to understand, in discussions with us,

5   whether we had any intimations that that may had occurred, and

6   quite frankly, what we were going to do about it.

7   Q   All right.  And does that client continue to be a client

8   of Huntington?

9   A   No.

10   Q   Since you have been employed at Huntington for

11   approximately 12 years, are there any other incidents of a

12   confidentiality breach that you are aware of?

13   A   Beyond the PETA infiltration?

14   Q   Beyond the one that you've described.

15   A   Maybe you can re-ask the question.

16   Q   I'm just covering the waterfront.  Other than the one

17   you've just focused on, are you aware of any other

18   confidentiality breach that had been brought to your attention

19   while you've been at Huntington for the 12 years, other than

20   the one you've just described?

21   A   No.

22   Q   Okay.  All right.  I would ask you to return to Exhibit

23   5-A that you have in front of you and ask if you can turn to

24   page 14, I believe it is, of that exhibit, Defendant's 5-A.

25   A   Okay.

1  Q   And I believe you've already testified that this is a

2  document that you obtained from Huntington files that relates

3  to confidentiality of a client of Huntington.

4  A   Yes, it is.

5  Q   All right.  With regard to page 14, do you see the

6  language that begins "HLS shall treat"?

7  A   Yes, I do.

8  Q   Near the bottom of the page, and there is some redacting,

9  but if you could read that paragraph into the record, please.

10  A   Okay.  As you mentioned, some of it is redacted, so it's

11  okay if I just use the word "blank" for those redacted

12  sections?

13  Q   Yes, sir.

14  A   It says, (reading)  HLS shall treat blank information as

15  confidential and shall not, without blank prior written

16  permission, disclose such to a third party or use such for any

17  purpose other than the studies contemplated by this agreement.

18       (Reading)  The obligation of confidentiality and

19  nonuse arising from this agreement will expire 20 years from

20  the date hereof.  Further, HLS --

21       COURT REPORTER:  You need to slow down.  Further,

22  HLS...

23  A   Okay.  (Reading) ...  Agrees to return all samples and

24  any unused quantities of the test substance at the end of the

25  studies to blank unless otherwise specified by blank.

1              (Reading)  HLS may not use blank name in any

2    advertisement or promotional material without blank express

3    written consent.

4    Q   All right.  Thank you.  What do you understand that

5    provision to mean?

6    A   Is that all of the results of the studies, the data, the

7    specimens, any reports or other information that's derived

8    from the study is deemed confidential and shall not be

9    disclosed by us to anyone.

10   Q   All right.  If you could turn to page 23 of the same

11   exhibit, Exhibit 5-A, and if you look at the Section 7

12   highlighted, or underlined Section 7 is "Confidential

13   Information," and can you read the beginning paragraph -- or

14   beginning sentence of that paragraph up to the word "except,"

15   and again, this is redacted and there are blanks, but if you

16   could just say "blank" where it's redacted.

17   A   (Reading)  Blank LSR may be granted access to

18   confidential information as hereinafter defined.  Blank LSR

19   hereby acknowledges that all confidential information

20   constitutes a valuable trade secret and is the sole and

21   exclusive property of blank.

22             (Reading)  Blank LSR shall disclose confidential

23   information only to those of its employees (a) to whom such

24   disclosure is necessary to accomplish the purposes of this

25   agreement, and (b) who are bound to duties of confidentiality

1    appropriate to blank LSR's obligation hereunder.

2         (Reading)  Expect as specifically agreed to in

3    writing between the parties, neither blank LSR nor any of

4    blank LSR's employees shall, at any time during the terms of

5    this agreement or thereafter, directly or indirectly,

6    communicate or disclose to any person not specifically

7    authorized by blank or use for its own or his own account or

8    business information any confidential information.

9         (Reading)  The term "confidential information" as

10   used herein means any information disclosed to blank LSR or

11   known by blank LSR directly or indirectly as a consequence of

12   or through its engagement hereunder not generally known in the

13   industry in which blank is or may become engaged and which in

14   any way relates to blank products, processes and services

15   including, but not limited to, information relating to

16   research, development, inventions, discoveries, concepts,

17   ideas, whether patentable or not, accounting, manufacturing,

18   purchasing, engineering, marketing, merchandising, and

19   selling.

20        (Reading)  Upon termination of this agreement or at

21   the time or -- I'm sorry -- or at the request of blank during

22   the term hereof, blank LSR shall promptly deliver to blank all

23   copies of confidential information in its possession or under

24   its direct or indirect control.

25   Q   All right.  Thank you.  So having read that provision,

1    what does that provision mean to you?

2    A    Pretty all-inclusive, is that any information that we

3    gleaned either from our customers for the purposes of

4    conducting a study or that were derived from the study or any

5    variant thereof is strictly confidential and shall not be

6    disclosed in any way.

7    Q    All right.  Now, based on your 12 years experience in

8    Huntington and your involvement with clients and with the

9    confidentiality agreements generally, those provisions, those

10   two provisions I just asked you to read out of 5-A, are they

11   typical or not typical?

12   A    They are typical.

13   Q    And why are they in these agreements?

14   A    Because the drugs that were given essentially to conduct

15   the research that we do generally don't enjoy any patent

16   protection whatsoever, and our customers are extremely nervous

17   that either the results of these tests or the drug itself will

18   somehow be accessible to their competitors.

19   Q    All right.  Based on your 12 years of experience at

20   Huntington, based on your knowledge of confidentiality

21   agreements and your knowledge of your client's desires and

22   wishes, over those 12 years, do you have a lay opinion as to

23   whether Huntington could operate and do the business it does

24   without assuring its clients of confidentiality for that

25   information?

1    A    It would be impossible to operate under those

2   circumstances.

3    Q    All right.  Turning back to Exhibit 9 if you could,

4   please, sir.  With regard to those confidentiality agreements

5   you just focused on and the provisions you read and indicate

6   are typical, in reviewing all those categories of information,

7   are there any categories of the information on Exhibit 9 --

8   Defendant's Exhibit 9, that are not covered by those

9   confidentiality agreements, in your opinion?

10    A    Again, the miscellaneous records pertaining to animal

11   cages and portions of the Institutional Animal Care and Use

12   Committee records, those portions being the ones that do not

13   discuss in any way protocols or effects of drugs that are

14   derived from the conduct of that protocol.

15    Q    All right.  Other than that particular item, are all the

16   other -- is all the other data and information in the withheld

17   records covered by a confidentiality agreement at Huntington,

18   in your opinion?

19    A    They are.  All these other records actually are defined

20   as raw data in the FDA Good Laboratory Practice Regulations,

21   their very discreet definition, and these conform with that.

22    Q    All right.  Let me turn to a new topic now, and that is

23   reverse engineering.

24          THE COURT:  I'm sorry.  I didn't want to cut you off

25   but we are about a minute away from our midmorning break

1    anyway, so since I heard you doing a transition, I thought

2    we'd take our 10-minutes break.  Let me ask you-all to be back

3    at 11:00.

4              MR. ROSSIER:  Thank you, Your Honor.

5              THE DEPUTY CLERK:  All rise.  This honorable court

6    stands in recess until 11:00 a.m.

7              (A BRIEF RECESS WAS TAKEN.)

8              MR. ROSSIER:  All right.  Thank you for retaking the

9    stand, Mr. Caulfield.

10             And is it appropriate to proceed, Your Honor?

11             THE COURT:  Yes, you may.

12             MR. ROSSIER:  Thank you, Your Honor.

13   Q    (BY MR. ROSSIER)  I'm going to get to reverse engineering,

14   but during the break I thought of a couple of additional

15   questions, so before I get there, let me go back and hit a

16   couple other items.

17             I think you testified to that the typical

18   confidentiality agreement at Huntington is for a term of

19   approximately 20 years or so?

20   A    That's correct.

21   Q    Do you know why that is?

22   A    Well, for a number of reasons.  The drug approval process

23   is very, very long.  The most recent statistics I heard quoted

24   are on average 12 years to get a drug through all the early

25   development that -- where our business is situated, through

1    clinical trials and the like, so it's a very, very long period

2    of time.   General patent protection lasts for 20 years.

3          Even after a drug is on the market, we've got

4    obligations that are ensconced in our protocols that obligate

5    us to actually maintain all of the records, the specimens, the

6    microscope slides, reserve samples of the test chemical in a

7    highly secured archive.   That's part and parcel of our

8    business.   It's a requirement that's contained in the GLP

9    regulations for additional time periods that vary from

10   anywhere between five and another 20 years.

11         So, the reason that the FDA maintains this in their

12   regulations, even beyond the approval and marketing of a drug,

13   is for the possible instances, as had been seen with, for

14   example, Vioxin, over the course of the last few years where a

15   drug can actually exhibit effects in the general population

16   that were not picked up in clinical trials.

17         So, the FDA wants to safeguard the data to actually

18   go back through that clinical data for clues or for

19   information that might be crafted to require a drug company to

20   do existing clinical trials while relabeling of their compound

21   or removal of their compound from the marketplace, if only

22   temporarily, is undertaken.

23   Q   All right.   And I believe as part of what you just

24   mentioned, you talked about the typical time period for drug

25   testing?

1    A    Yeah.

2    Q    What is your familiarity with that?  Do you have

3    familiarity with that from your 12 years at Huntington?

4    A    Well, yeah.  I mean, we speak with our clients quite

5    frequently in terms of what their timelines are to get a

6    development program moving, because for them, you know, the

7    clock is ticking.

8         We've got a 20-year patent.  As I testified earlier,

9    it's variable in terms of when they'll actually file for that

10   patent, that's their decision, but as soon as they get their

11   drug approved, and that's pre-clinical, clinical, they've got

12   whatever time is left to actually recoup their R&D costs that

13   they paid the laboratories like ours.  Does that answer your

14   question?

15   Q    Yes, it does.  And you used the term "pre-clinical" and

16   "clinical."  What's the difference between pre-clinical

17   testing and clinical testing?

18   A    To put it very simply, pre-clinical is testing that's

19   done in animals to develop a profile of safety data that

20   enables the FDA to ascertain whether it's advisable to move

21   forward in terms of testing the drug effect in human beings.

22   Q    All right.  And what's clinical testing?

23   A    Clinical testing, there are three phases of clinical

24   trials.  Phase 1 is with a small handful of healthy

25   volunteers, people that don't have the condition that the drug

1    was designed to give.

2         Once Phase 1 is completed, Phase 2 will be a larger

3    trial of human beings which will have the disease state, and

4    Phase 2 is geared to continue to assess the safety

5    characteristics of this drug while ascertaining efficacy or

6    the effectiveness of the drug in ameliorating whatever the

7    condition is.

8         Phase 3 are much larger trials, thousands of people,

9    sometimes at worldwide locations, which are still geared to

10   collect some level of safety data, it's usually done by

11   doctors, but generally it's to assess the efficacy or

12   effectiveness of this drug in a large much more diverse

13   population of human beings.

14   Q   All right.  And those three phases are all clinical, and

15   clinical means with humans, right?

16   A   Yes.

17   Q   Pre-clinical means with animals or --

18   A   In general terms, that's correct, yes.

19   Q   And in Huntington's business and other CROs are either

20   predominantly or exclusively with animals, i.e., pre-clinical

21   testing; is that true?

22   A   There are clinical CROs as well that do nothing but

23   manage, construct and monitor clinical trials.  We're not in

24   that space.  We are nested within the pre-clinical CRO

25   industry band, if you will.

 1   Q    Okay.  And focusing on that industry band, how many

 2   players are in the pre-clinical CRO field?

 3   A    There are dozens.

 4   Q    Dozens of those?

 5   A    Yes.

 6   Q    And where do you fit in terms of size relative to those

 7   pre-clinical CROs?

 8   A    We are one of a smaller number of global CROs that have

 9   full service capabilities.

10   Q    All right.  Now, in your role -- in various roles,

11   currently general manager at Huntington, but over the whole 12

12   years, have you become at all familiar with the

13   confidentiality practices of other CROs in the industry?

14   A    Well, I don't know that I'm intimately familiar with

15   their contracts and approach, but I do know that it's part and

16   parcel of what clients ask us to demonstrate and engage in

17   with them before we'll actually be allowed to speak with them

18   about the attributes of their compound and the scope of their

19   program.

20   Q    All right.  Thank you.  Now, I'm going to go to reverse

21   engineering.  Have you heard that term "reverse engineering"?

22   A    Yes, I have.

23   Q    And what does it mean to you?

24   A    Well, in the context of these proceedings, reverse

25   engineering, as it relates to the documents that are on this

1   Defendant's Exhibit 9, is the ability to reverse engineer the

2   documents that drive how these forms are constructed and how

3   data are collected, the data being standard operating

4   procedures.  I think it's important to state that standard

5   operating procedures, or SOPs, are also a requirement of the

6   Federal Good Laboratory Practice Regulations and they are very

7   specific and particular in terms of what these SOPs need to

8   contain in order to ensure the quality and integrity of the

9   data.  That's what the regulation actually states.

10          And SOPs will drive how they are collected, how

11  forms are actually used, a sequence of events, the particular

12  lexicon of terminology and clinical observation calls that we

13  will make, the number of technical staff that will be employed

14  to execute a particular procedure, the review mechanisms that

15  are -- that are constructed so all of the information that is

16  contained on this form, the sequence with which it's recorded,

17  the mechanism by which it's reviewed are specified in detail

18  in the SOP, so to answer your question, reverse engineering in

19  the context of these proceedings is the ability to use the

20  orientation and configuration of these forms to back engineer

21  the SOP itself.

22   Q   Okay.  And the SOPs that you're talking about, SOP short

23  for standard operating procedures, who develops these SOPs

24  you're talking about?

25   A   We do.

1    Q    All right.  We, Huntington?

2    A    We, Huntington.

3    Q    All right.  And do you share those with anyone outside of

4    Huntington?

5    A    Occasionally, our clients will actually ask to see them.

6    I mentioned that the USDA will ask to see them, the FDA will

7    ask to see them.  We are disinclined to make copies of these

8    SOPs, and you know, try not to or try to minimize the extent

9    to which any of the agencies will take away copies.  We do not

10   share them with any of our competitors or any other third

11   parties.

12   Q    All right.  And are the SOPs unique to each drug or each

13   toxicity study you are undertaking or are they more general?

14   A    They're not.  They're more general.

15   Q    All right.  And based on the documents that are set forth

16   in the description of the documents that are set forth on

17   Exhibit 9, do you have any understanding as to whether any of

18   that raw data or any of the information being withheld is

19   subject to being reverse engineered?

20            MR. GLITZENSTEIN:  Your Honor, again, I object to

21   the extent it calls for his providing testimony as an expert.

22   I think, under Your Honor's ruling on this issue, any opinion

23   that relies upon specialized knowledge in the field becomes

24   expert testimony.  Providing an opinion as to what can be

25   reversed engineered seems to be the classic specialized

1 knowledge.  I don't think the average layperson can venture an

2 opinion on that, so I think this is a -- perhaps a subtle way

3 but nonetheless a way of getting a expert opinion without

4 calling it such.

5 　　　　　MR. ROSSIER:  If I could respond briefly, Your

6 Honor.  I would refer to the case of *Tampa Bay Shipbuilding*

7 that Your Honor cited a week ago to us, and a witness is being

8 able to testify as a lay witness based on particularized

9 knowledge, Your Honor, from years of experience within a

10 field.

11 　　　　　He's got 12 years of experience in this field.  His

12 company does this toxicity studies, the development of the

13 standard operating procedures and part and parcel of what

14 Huntington does, so this question, not based on an expertise

15 gained at a school or college, but based on his familiarity

16 for 12 years in this business is the factual predicate that we

17 submit for him to provide a lay opinion on that question.

18 　　　　　THE COURT:  Well, let me just ask:  Are you -- you

19 started with a very broad category regarding raw data.  On

20 that Exhibit 9, I think you had I don't know how many line

21 items that the witness said involved raw data in many of those

22 instances.  Are you starting now with the general -- proposing

23 then to evolve down into specifics?

24 　　　　　MR. ROSSIER:  Yes, sir.

25 　　　　　THE COURT:  I'll permit it.

1          MR. ROSSIER:  Thank you.

2    A   I'm sorry.  Could you ask the question now.

3    Q   (BY MR. ROSSIER)  I'm not sure I can remember, but I think

4    it went along these lines.

5          Based on your familiarity with the standard

6    operating procedure -- procedures, SOPs that had been

7    developed at Huntington, can you look at Exhibit 9 and

8    determine if there is any of the information that's been

9    withheld in part or withheld in full that would be susceptible

10   to a reverse engineering of Huntington's standard operating

11   procedures?

12   A   Everything except miscellaneous records pertaining to

13   animal cages, internal Huntington memorandum, and I would say

14   that having made an exclusion previously, that the

15   functionality of the Institutional Animal Care and Use

16   Committee is to an extent driven by SOPs.

17         We do have an IACUC SOP that drive certain aspects

18   of their functionality beyond the required particulars of the

19   Animal Welfare Act, so everything except miscellaneous records

20   pertaining to animal cages and sort of a partial to IACUC

21   records.  Everything else is driven by SOP and is subject to

22   reverse engineering.

23   Q   All right.  So focusing -- Well, let me ask then the

24   broad question.  What is your basis for that conclusion?

25   A   Well, having written or approved or authorized

1    Huntington's SOPs and having fielded regulatory inspections by

2    the FDA that ascertains whether or not your SOPs are

3    sufficiently detailed and managed to drive your business, it's

4    part and parcel of what we do.  It's the lifeblood of the

5    business.  Everything is ensconced in SOPs that goes into how

6    that data are collected, the elemental fundamentals of that

7    science or that it's reproducible and that you should be able

8    to derive that exact same report, that exact same result from

9    different technician demographics, if you will.

10           You can take a new set of technicians on the

11   identical study, employ the same SOP and get the same result.

12   They're geared to eliminate bias and scientific undertakings

13   that we do.

14   Q   All right.  I will just ask you just for my benefit, you

15   tend to talk fast, if you could just slow down a little bit.

16   I think the court reporter would appreciate it as well, but

17   appreciate the answer, but if you could just try to slow down

18   a little bit.

19           Now, I want to take you through those line items on

20   Exhibit 9 that you've identified that this reverse engineering

21   was possible for SOPs, and I understand you've indicated that

22   generally the IACUC records, the first line item might not be

23   so, but the veterinary treatment requests and logs, how in

24   your opinion could that be reverse engineered to provide

25   information about your SOP.

1        MR. GLITZENSTEIN:  Your Honor --

2        THE COURT:  Sustained.

3        MR. GLITZENSTEIN:  -- I object.

4   A   Again, the --

5        THE COURT:  No, sustained.

6   Q   (BY MR. ROSSIER)  Sustained means you can't answer.

7        MR. ROSSIER:  And, Your Honor, if I can just

8   inquire, is that -- the basis for that is that only the lay

9   witness can give the broad opinion, or I'm just...

10        THE COURT:  I think you've crossed the line into

11   trying to elicit expert opinion.

12        MR. ROSSIER:  Okay.  Thank you, Your Honor.

13   Q   (BY MR. ROSSIER)  All right.  Now, let me talk briefly

14   with you about Dr. Szot.

15        Did you play a role in retaining Dr. Szot as an

16   expert witness in this case?

17   A   Yes, I did.

18   Q   What was that role, sir?

19   A   Well, I actually interviewed several potential expert

20   witnesses and selected Dr. Szot.  And the initial pool of

21   candidates, if you will, was derived as a result of

22   conversations I had with some of our senior scientific staff.

23   I asked them to help me identify an independent consultant

24   ideally with broad experience primarily in the pharmaceutical

25   industry and somebody who had practical knowledge and

```
 1   experience in the qualification and placement process between

 2   pharmaceutical or biotech companies and contract research

 3   organizations, one of the criteria that are important to drug

 4   companies in selecting a CRO.

 5   Q   All right.  And you identified Dr. Szot and I understand

 6   others more than just Dr. Szot; is that true?

 7   A   Yes.

 8   Q   All right.  And then I assume you just take us through

 9   that process.  You had conversations with those people?

10   A   I did, I did.  I sent an e-mail to a small number of

11   individuals who were recommended to me by some of the folks on

12   my staff and received affirmative responses from several of

13   them, conducted telephone interviews, asked the final two, if

14   you will, that really appealed to me by virtue of their

15   experience and the like, to write an expert report.

16        Of those two, Dr. Szot and -- sorry -- proceeded the

17   construction of an expert report, was the only one of those

18   two who actually visited Huntington Life Sciences.  Once I

19   reviewed the expert reports, I selected Dr. Szot amongst the

20   final two candidates, if you will.

21   Q   All right.  And with regard to Dr. Szot and retaining him

22   for expert testimony in this case, did you enter into an

23   employment agreement or some sort of agreement with regard to

24   paying him a fee?

25   A   We entered into an agreement, yes.
```

1    Q    And do you recall what the fee is for Dr. Szot?  And if

2    you don't...

3    A    Not specifically.  In general parameters I can give you,

4    but I can't remember the exact number.

5    Q    What do you recall?

6    A    He's getting something like $375 an hour for trial

7    proceedings as we are going through today.  For construction

8    of the report, I think it was some lesser but similar number.

9    Q    All right.  And did you play any role in reviewing the

10   report or commenting on the report that he produced?

11   A    Well, I reviewed it, yeah.  I made very little comment

12   thinking that we wanted his opinion, not mine.

13   Q    All right.  And prior to him preparing that report, I

14   think you mentioned that he had visited Huntington?

15   A    He did.

16   Q    And tell us a little bit about that visit and what you

17   provided to him.

18   A    Well, I just gave him some background on where this all

19   started from way back in, I guess, the inspection, slash,

20   investigation which was undertaken by USDA in '97, a little

21   bit of the history in terms of what precipitated that, the

22   current litigation, where we had gotten to between 2002 and

23   just about a year ago, I guess, now.

24        I had the documents available to him, I had a full

25   set of the unredacted documents that I maintain at HLS.  I

1   gave him a copy of the phone index.  I gave him some of the

2   confidentiality agreements that are in front of me here to

3   take a look at to -- just to get a sense as to whether or not

4   these were emblematic of the types of documents that he has

5   seen in the past, and he had some concerns, based on his

6   understanding of the -- I guess the affiliations or the

7   approach of some of the groups out there who are --

8   characterize themself as animal protection groups about

9   whether there is --

10          MR. GLITZENSTEIN:  Your Honor, I object.  I don't

11  think this is relevant to any issue in the case, Dr. Szot's

12  concerns about affiliations of animal organizations.

13          MR. ROSSIER:  It's just background, Your Honor.  We

14  can move on.

15          THE COURT:  What's your next question?

16  Q   (BY MR. ROSSIER)  And when you say confidentiality

17  agreements, Exhibit 5-A, does that reflect the confidentiality

18  agreements you provided Dr. Szot with, this meeting at your

19  office?

20  A   This is the pack.  I can't remember whether I gave him

21  this whole pack, but if it was a subset of this pack, it would

22  have derived from these documents here, yeah.

23  Q   All right.  Thank you.  Now I would like to ask you some

24  general, essentially summary questions.  My first one is,

25  based on your experience as an employee and general manager of

1    Huntington since 1996, do you have an opinion as to whether

2    releasing partially and fully withheld documents that remain

3    at issue in this case is likely to cause competitive harm to

4    Huntington and/or to the companies who place this research

5    with Huntington?

6            MR. GLITZENSTEIN:  Again, I object to the extent it

7    asks for expert testimony.  It hasn't been qualified in terms

8    of what he's basing his opinion on.  If he's basing his

9    opinion on general experience with the industry, I think for

10   the same reasons that Your Honor wouldn't let him offer an

11   opinion on reverse engineering, offering a overall opinion on

12   competitive injury seems like it's crossing the line unless

13   he's qualified as to his intention.

14           THE COURT:  Well, it does seem as if the question is

15   calling for some kind of an opinion regarding a legal

16   conclusion that we have to reach or that I have to reach, but

17   you certainly, I think, advanced him in the papers, as I

18   understood it, as someone who would be able to offer some view

19   about the importance of confidentiality and what impact any of

20   this might have on confidentiality, so I'll permit you to go

21   in that direction that you had said in your papers would be

22   the direction which you're going.  This question is not it.

23           MR. ROSSIER:  All right.  Let me rephrase the

24   question.

25   Q    (BY MR. ROSSIER)  Focusing on the impact with regard to

1    Huntington's confidentiality -- confidentiality obligations to

2    its clients, as you've testified about this morning, do you have

3    an opinion as to whether the release of the disputed documents,

4    either in part or in whole, that remain at issue in this case

5    would have an impact on the client's perceptions of those

6    confidentiality obligations?

7    A    I do, yes.

8    Q    And what is that opinion?

9    A    I think it would have a devastating effect on our ability

10   to continue to acquire business from those customers and in

11   fact other customers who would, in its wake, have concerns

12   about our ability to maintain that confidentiality going

13   forward.

14   Q    Can you explain your basis for that conclusion?

15   A    Because of the agreements that we have in place, the

16   overall importance of confidentiality in maintaining

17   relationships with customers who are providing us with drugs

18   that don't enjoy patent protection and with my assessment of

19   the reaction from industry during a previous potential

20   disclosure in the wake of the PETA activities.

21   Q    All right.  Thank you.

22            MR. ROSSIER:  Your Honor, if I could just have a

23   moment.

24            THE COURT:  Yes.

25            (PAUSE.)

1    Q   (BY MR. ROSSIER)  All right.  You have testified about

2    your confidentiality based concerns about the release of the

3    withheld documents in part or in whole.  Do you have any other

4    concerns about release of those documents?

5    A   That's my primary concern.

6    Q   All right.  Thank you.

7              MR. ROSSIER:  No further questions.

8              THE COURT:  All right.  Well, I guess I should ask

9    Mr. Blutstein; am I pronouncing your name right?  I'm sorry.

10             MR. BLUTSTEIN:  Yes.  And no questions for the

11   Government.

12             THE COURT:  All right.

13             MR. GLITZENSTEIN:  Thank you, Your Honor.

14                        CROSS-EXAMINATION

15   BY MR. GLITZENSTEIN:

16   Q   Good morning, Mr. Caulfield.

17   A   Good morning.

18   Q   Mr. Caulfield, starting with your discussion with

19   Dr. Szot, it's the case, is it not, that you met with him for

20   about three or four hours, and he reviewed materials for about

21   three or four hours before deciding to become an expert

22   witness in this case?

23   A   Yes, that's correct.

24   Q   And it's the case, is it not, that he actually did not

25   look at all of the documents at issue before becoming an

1  expert in this case?

2  A   I don't believe he looked at every single page, no.

3  Q   And in fact, it's the case, is it not, that he only

4  looked at a small percentage of the documents before becoming

5  an expert in the case, correct?

6  A   My understanding is he looked at representative samples

7  from all of the categories in question, yes.

8  Q   And he determined they were representative based upon the

9  Vaughn index, correct?

10  A   That's my understanding, yes.

11  Q   Mr. Caulfield, talking first about your background, you

12  were the director of quality assurance and regulatory affairs

13  during the USDA investigation, correct?

14  A   That's correct.

15  Q   And in your position at that time, I think you said you

16  were responsible for overall seeing the programmatic

17  operations, including compliance with the Animal Welfare Act;

18  is that correct?

19  A   That wasn't strictly part of my job until such time as

20  the PETA infiltration was made known to us and the subsequent

21  USDA investigation commenced.  Formerly, from when I started

22  at HLS in February of 1996 until around the springtime of

23  1997, my responsibilities revolved expressly around compliance

24  with the FDA Good Laboratory Practice regulations.

25  Q   But at a certain point you became responsible for

1    compliance with the Animal Welfare Act, including the

2    functioning of the IACUC; is that correct?

3    A    After the PETA infiltration and -- my initial

4    responsibilities started with the management of the USDA

5    inspection in June of 1997 and a subsequent investigation the

6    following month.

7    Q    So you became intimately familiar with the investigation

8    and your company's response to it at that time?

9    A    Yes.

10   Q    And you also became extremely involved in USDA's request

11   for and your company's response to the records at issue?

12   A    Yes.

13   Q    And so you would describe yourself as quite familiar with

14   the records?

15   A    I'm familiar with the records.

16   Q    Very familiar?

17   A    Well, there's lots of records.

18   Q    Were you involved in determining, on behalf of Huntington

19   Life Science, what records should be withheld from your

20   standpoint, the company's standpoint and what should be

21   released?

22   A    Yes, I was.

23   Q    And you're responsible for discussing that with the USDA?

24   A    Yes.

25   Q    And describe how that decision was made in those

1    discussions between your company and USDA.

2    A    The USDA made some proposed redactions, and I don't have

3    perfect recall in terms of how the subsequent conversations

4    actually unfolded, but my primary concern at the time was that

5    we not release records that were reflective of the effects of

6    drugs or any of the particulars of -- that were under the

7    auspices of the confidentiality agreement.

8         We tried to ensure that there weren't what we

9    determined were drug effects being released.

10   Q    And so it's your understanding that the withholdings that

11   were made at that time were based upon that concern; is that

12   correct?

13   A    Generally, yes.

14   Q    And is it your testimony that the ultimate release of

15   materials and withholding of materials essentially reflects a

16   joint understanding between your company and USDA as to what

17   should be disclosed and what should not?

18   A    Yes, I think that's a fair conclusion.

19   Q    And is it your testimony that the Vaughn index that was

20   prepared reflects that joint understanding as well?

21   A    I had little or no involvement in the Vaughn index and I

22   have not studied it.  It's a voluminous document, something

23   like 190 pages, so I don't feel that I've got sufficient

24   expertise to answer that question to be affirmative, quite

25   frankly.  It's primarily a USDA generated document.

1   Q   Are you aware that the exhibit that was identified as

2   Defendant's Exhibit 9, in terms of its description of the

3   withheld materials, comes from the Vaughn index?

4   A   Well, I wasn't aware of that until now, but in looking at

5   it, I can see that that -- that's likely true.

6   Q   And is it your understanding that the preparation of the

7   Vaughn index was at least USDA's effort to incorporate its

8   understanding with Huntington?

9           THE COURT:  Let me just ask you this.  How is Vaughn

10  spelled, for the record?

11          MR. GLITZENSTEIN:  I'm sorry.  It's spelled,

12  V-a-u-g-h-n.

13  A   I'm sorry, Counsel, can you repeat the question.

14  Q   (BY MR. GLITZENSTEIN)  Is it your understanding that the

15  Vaughn index was at least USDA's effort to reflect its meeting

16  of the mind with Huntington as to what should be released and

17  what should be withheld?

18  A   I'm not so sure I agree with that.  I realize that the

19  Vaughn index was prepared as something of a means of

20  describing the documents in a general way, but whether or not

21  it reflected the consensus between USDA and Huntington, I'm

22  not real comfortable answering "yes" to that question.

23  Q   Are you aware of any other document generated by USDA or

24  Huntington or anyone else filed in this case or otherwise

25  which purports to describe on a document-by-document basis

1   what is at issue in the case?

2   A   No.

3   Q   So, based upon what you know, that would remain the best

4   description of -- at least from the standpoint of USDA, as to

5   what is remaining at issue in this case, correct?

6   A   Yes, I guess so.

7   Q   You said you're familiar with the documents and in terms

8   of what's been released and what's been withheld; is that

9   correct?

10  A   Past familiarity with them.  I'm very familiar with the

11  categories of documents.  I have not looked at the documents

12  themselves for some significant period of time, but generally,

13  yes, I'd say "yes" to that question.

14  Q   You say you have not looked at them in a significant

15  period of time.  When was the last time you looked at them?

16  A   Well, in total, it's been probably some number of years,

17  frankly.  I looked at certain documents more specifically over

18  the course of the last several months in preparation for this

19  case.

20  Q   Okay.  But in preparation for your testimony, you have

21  not actually looked at all of the documents; is that correct?

22  A   No, that's correct.

23  Q   I didn't hear you.

24  A   That's correct.

25  Q   And does your familiarity with the documents extend to

1  understanding what has been released when with regard to those
2  documents?
3  A    You're speaking with regard to the 2002 release, I
4  presume.
5  Q    Let me be more precise, if I can.
6  A    Yes.
7  Q    Are you aware that there have been various stages at
8  which documents were disclosed in response to the Freedom of
9  Information Act request and this lawsuit?
10  A    My recollection is that there was one disclosure in 2002.
11  Any subsequent disclosure, I can't speak to.
12  Q    Okay.  But you are aware that over the course of time,
13  some additional materials have been disclosed beyond what was
14  initially released; is that correct?
15  A    That's not my recollection that that's true, but I'll
16  take your word for it.
17  Q    You have no reason to doubt that, do you?
18  A    No, not really.
19  Q    Let me ask you about your position on the confidentiality
20  agreements if I could.  You talked about the importance of
21  confidentiality.
22  A    Yes.
23  Q    Is it not the case that all of the confidentiality
24  agreements that you referred to specifically recognized the
25  possibility of documents being disclosed for reasons beyond

1  Huntington's control?

2  A    Some of them do, yeah.

3  Q    And in fact, if we turn to what has been accepted as

4  Plaintiff's Exhibit 5 -- I'm sorry, Defendant's Exhibit 5, and

5  you would go to the -- I think it's the first confidentiality

6  agreement that you were asked about.

7         MR. GLITZENSTEIN:  Which, for the record, Your

8  Honor, is a October 16, 1996 agreement.

9         THE COURT:  Are you referring to Exhibit 5-A?

10        MR. GLITZENSTEIN:  Exhibit 5-A.  I'm sorry, Your

11 Honor.

12        THE COURT:  All right.

13 Q    (BY MR. GLITZENSTEIN)  And you referred to, I believe,

14 the provision 7 -- or paragraph 7 on page 6, which is

15 "Disclosure, Confidentiality and Use," and you quoted from

16 that page in terms of the general obligation.

17        But down at the bottom of the page, could you read,

18 starting with where it says, "The obligations of this

19 paragraph," up through what's designated as "1."

20 A    This is page 6, you're saying?

21 Q    Yes, at the bottom of page 6.

22        THE COURT:  These paragraphs -- subparagraphs are

23 lettered.  Is there a lettered paragraph?

24        MR. GLITZENSTEIN:  Your Honor, there is a 7 b., and

25 I'm asking him, the witness --

1           THE WITNESS:  You're not on the bottom page --

2    pagination.  I guess you are using the one that's above that.

3    There is a pagination on the bottom.

4           MR. GLITZENSTEIN:  Actually, it's 6 of the

5    confidentiality agreement, but it's also been designated by

6    Defendant as page 7.  As I understand it, Defendant today used

7    separate pagination of all these confidentiality agreements,

8    which is in the lower right-hand corner.  Each of them is also

9    separately numbered, so for simplicity sake, why don't we

10   refer to the pagination all the way in the right-hand corner,

11   so page 7.

12          THE WITNESS:  Yes.  Which section, please?

13   Q   (BY MR. GLITZENSTEIN)  And then if you could focus on

14   what's under 7 b. which begins with "The Obligations," and read

15   through number "1."

16   A   (Reading)  Such confidential information is or becomes

17   part of the public domain through no fault of contractor or,

18   such...

19   Q   Actually, I was asking you to start with the obligations

20   provision.

21   A   Okay.  (Reading)  The obligations of this paragraph, 7(a)

22   and 7(b) shall survive the termination of this agreement until

23   the earliest of the following should occur.

24          (Reading)  1, Such confidential information is or

25   becomes part of the public domain, through no fault of

1  contractor, or 2, Such confidential information is received by

2  contractor from a third party who is in lawful possession of

3  such and who by such disclosure, to the best of the

4  contractor's knowledge, is not breaching any obligation owing

5  to blank.

6  Q    That's fine.  And if you could look over at page 15 --

7  actually, it's pages 14 through 15, and on page 14 you

8  referred to the paragraph which addresses confidentiality, and

9  at the bottom it says, "The foregoing restrictions on

10 disclosure and use shall not apply to," and it's blanked out.

11 But then if you could look over at page 15, there's a little

12 Roman numeral (iv), and if you could read that, just that

13 phrase there.

14 A    (Reading)  Is required by applicable law, regulations or

15 legal process to be disclosed.

16 Q    So, it is the case, is it not, that these confidentiality

17 agreements specifically contemplate that under certain

18 circumstances materials may be subject to disclosure,

19 including by operation of law?

20 A    That's what the agreements state, yes.

21 Q    Okay.  And that would include, would it not, a

22 determination by the Court that the Freedom of Information Act

23 required disclosure of certain materials, would it not?

24 A    I don't think I'm professionally qualified to make that

25 view, but that would be the intention that our customers would

1  not be able to sue us in the case of such disclosure.

2  Q   And they wouldn't be able to sue you because it wouldn't

3  be a violation of the confidentiality agreement, correct?

4  A   Correct.

5  Q   And I think you testified that in your -- your

6  understanding is that these confidentiality agreements are

7  representative of general confidentiality agreements that are

8  used by your company and throughout the industry, correct?

9  A   Used by my company, yes.  Throughout the industry, I

10  would qualify.

11  Q   To the extent that you know, they're similar?

12  A   Yes.

13  Q   Okay.  And so it would therefore be a fair inference

14  that, as a general matter, confidentiality agreements would

15  make allowance for documents or materials that have to be

16  disclosed through operation of law, correct?

17  A   I'm not sure all of ours have got that proviso in there,

18  but I have seen it in the instance of these documents and

19  would not be unusual.

20  Q   I think you testified that these particular ones were

21  regarded as representative, did you not?

22  A   They are generally representative, yes.

23  Q   And in fact, in this particular case, there have been

24  prior disclosures of some of the documents at issue as a

25  result of operation of law, correct?

1    A    The one that I recall, I'll testify in the affirmative

2    to, yes, but any subsequent disclosures could use some help

3    jogging my memory.

4    Q    Well, is it not the case that we're arguing about some

5    documents that remain at issue but even many of those

6    documents have been disclosed in part, correct?

7    A    Yes.

8    Q    Okay.  So there already has been a release of documents

9    that relate to various studies in one form or another,

10   correct?

11   A    Yes.

12   Q    If you look over at page 18 of the same exhibit, third

13   paragraph down, it begins, "HLS shall be the owner of any

14   animals," and it says, quote, HLS shall be the owner of any

15   animals used in the testing and therefore agrees to comply

16   with the Animal Welfare Act or Animal Scientific Procedures

17   Act, as applicable, close quote.

18            Do you see that statement?

19   A    Yes.

20   Q    Okay.  And again, assuming that these are representative,

21   is it not generally the case that Huntington agrees to be

22   principally responsible for compliance with the Animal Welfare

23   Act?

24   A    Yes, that's correct.

25   Q    And that's the commitment that it makes to the customer,

1   correct?

2   A    Yes.

3   Q    And so if that provision is violated, that's also

4   something that would be of great concern to customers, would

5   it not?

6   A    Yes.

7   Q    And that's something that customers would take into

8   consideration in determining whether to proceed with relying

9   upon Huntington to do its work?

10   A    That's one of the considerations, yes.

11   Q    And in terms of companies that learned about the -- the

12   investigation conducted by USDA in this case and companies

13   that may have had discussions that you referred to before with

14   Huntington, some of those discussions may have been focused

15   upon whether or not there were in fact Animal Welfare Act

16   violations, correct?

17   A    We have had those discussions, yes.

18   Q    Now, you submitted a declaration in this case in March of

19   2003; is that correct?

20   A    Yes, I did.

21   Q    And when you signed that declaration, do you believe that

22   you were stating under oath that which was true and correct?

23   A    Yes.

24   Q    And you stand by the statements you made in that

25   declaration?

```
 1    A    I do.

 2    Q    Now, it's your view, is it not, that as early as 1998,

 3    USDA divulged information that was considered to be

 4    confidential information of the company?

 5    A    Not to my recollection.

 6              MR. GLITZENSTEIN:  Your Honor, may I approach the

 7    witness?

 8              THE COURT:  Yes.

 9              MR. GLITZENSTEIN:  I can give you a copy of

10    Mr. Caulfield's declaration.  I am not submitting it as a

11    exhibit.

12              MR. ROSSIER:  Is it in the exhibits?

13              MR. GLITZENSTEIN:  No, it's not.

14    Q    (BY MR. GLITZENSTEIN)  Mr. Caulfield, if you could look at

15    page 33 of your declaration at paragraph 44C, and there's a --

16    if you find that, there's a statement there that says,

17    (reading)  Given the 1998 USDA release of the identities of

18    several Huntington studies, disclosure of these records will

19    make available to competitors of Huntington's customers that

20    sponsor these studies information on the toxicity of

21    proprietary experimental compounds.

22              Do you see that?

23    A    I do.

24    Q    Okay.  Now, you regarded the USDA's disclosure of

25    Huntington's studies as itself a violation of confidentiality,
```

1   did you not?

2   A    Well, the USDA -- what I meant by that is the USDA

3   disclosed identities by number, not by the identity of the

4   customer.   The USDA complaint contains Study No. X, Y, Z, for

5   example, without designating exactly who sponsored that study.

6              The PETA disclosure identified the names of

7   customers without linking them to those particular study

8   numbers necessarily.

9   Q    But it's your view, is it not, based on this paragraph,

10  that what USDA released would help competitors learn important

11  information about what studies were being conducted?

12  A    What I meant to say is the small number of studies

13  represented by study number that was in the USDA complaint

14  could be linked to the client identity that were contained in

15  the PETA materials.   That was the intent in that particular

16  paragraph.

17  Q    So, however it would happen, it's your view that

18  information was divulged in 1998 that would be of value to

19  competitors, correct?

20  A    Yeah, could be.

21  Q    And that's something that your customers would be

22  concerned about, correct?

23  A    Yes.

24  Q    So, once again, there already has been some breach of

25  confidentiality in this case, correct?

1    A    I'm not so sure that those study identities constitute

2    confidentiality in terms of the particulars of the complaint.

3    I haven't reviewed the complaint recently, but I don't recall

4    there being any test effect or test substance results in that

5    complaint.

6    Q    I just don't understand.  I think you just testified that

7    along with the PETA material that was already out there,

8    USDA's release would be of concern in terms of protecting

9    confidentiality; is that not correct?

10   A    To the extent that those study numbers could be linked

11   with particular customers.  It wasn't an absolute one-to-one

12   relationship by any means, but it could occur, yes.

13   Q    But in terms of your customers' general concern with

14   confidentiality, that concern, at least to some degree, would

15   presumably have come into play at that time, correct?  And I

16   think that was your testimony earlier.

17   A    Yes, could have.

18           MR. GLITZENSTEIN:  May I approach the witness, Your

19   Honor?

20           THE COURT:  Yes.

21   Q    (BY MR. GLITZENSTEIN)  Mr. Caulfield, I've asked you to

22   look at Plaintiff's Exhibit No. 18, which is in this volume.

23           MR. GLITZENSTEIN:  And Your Honor, this was in a

24   Volume 2 of Plaintiff's exhibits volume, and this one is

25   marked 2 through 18.

1   Q     (BY MR. GLITZENSTEIN)   Do you know what that document is?

2             And I should say that this is one of the exhibits

3   that we stipulated to the admissibility of.

4   A   I don't know.  I have not seen this before.

5   Q   Okay.  Does it appear to be an SEC filing by Huntington?

6   A   Yes, generally it does.

7   Q   And these are filings that are required to be made as --

8   Do you have an understanding what the purpose of these filings

9   is?

10  A   I do, yes.

11  Q   What is it?

12  A   We're obligated, as a public company, to file four times

13  a year financial results and other required information.

14  Q   Are you involved at all in any way in making these

15  submissions?

16  A   No.

17  Q   Do you have any reason to believe that they're

18  inaccurate?

19  A   I don't, no.

20  Q   If you could take a look at what I believe is --

21  unfortunately, they're not separately paginated, but I believe

22  it's the sixth page of this document, and there is a paragraph

23  about two-thirds of the way down that says, "Orders and

24  Backlog," if you see that.

25  A   I do.

1    Q    Okay.  And that refers to (reading)  The gradual return

2    of client confidence following the refinancing in September of

3    1998 gained momentum in 1999.  This was reflected in the

4    growth of orders which increased by 17 percent from the

5    previous year.  The company's pharmaceutical business showed a

6    particularly strong recovery, with orders increasing by

7    36 percent from the 1998 levels.

8              Do you see that?

9    A    I do.

10   Q    Okay.  So, in the immediate aftermath of the

11   investigation and USDA's involvement, there was actually a

12   particularly strong showing by the pharmaceutical component of

13   the company, correct?

14   A    Can you repeat the question, please.

15   Q    Yeah.  In the aftermath of USDA's investigation and

16   involvement, there was, according to this, a particularly

17   strong recovery of the company with orders increasing by

18   36 percent from the 1998 levels, correct?

19   A    I'm not so sure it says, "In the immediate aftermath of

20   the USDA activity."  I think I would point back to the

21   immediate aftermath of the PETA infiltration of 1997.

22   Q    In any event, by 1998, the pharmaceutical business was,

23   according to this description, doing flourishingly, correct?

24   A    We started to achieve growth again after this period, and

25   I think it's being attributed as well to the new corporate

1   management that was inserted at this time as well.

2   Q    Now, if -- if you turn back to page 2 of the same

3   document and look three paragraphs up from the bottom.  There

4   is a paragraph that reads, quote, During 1998 poor trading

5   results put a heavy strain on cash resources, utilizing

6   Huntington's available facilities.  Given the medium to

7   long-term element of many of Huntington's activities and the

8   reluctance of clients to place new work until Huntington's

9   finances were stabilized, Huntington required a substantial

10  injection of finance to both initially restore confidence and

11  then to fund operations during the period until Huntington

12  returned to profitability, close quote.

13              Do you see that paragraph?

14  A    I do.

15  Q    Okay.  The paragraph seems to suggest that during this

16  time frame there was a financial issue relating to

17  investments.  Is that a correct reading of that?

18  A    Yes.

19  Q    Okay.  Do you have any knowledge of that?

20  A    I do.

21  Q    Can you describe what was going on at that point?

22  A    It was attributed to a number of factors.

23              MR. ROSSIER:  What is the relevance?

24              MR. GLITZENSTEIN:  Let me explain the relevance,

25  Your Honor.  One of the positions that Plaintiffs are going to

1  be putting forth is that there are a host of reasons why

2  customers do or don't use a particular research organization,

3  many of which are far -- so far more significant than

4  disclosure of a particular scrap of information.

5       The notion that the release of these documents would

6  result in substantial competitive injury is simply baseless,

7  and so that is why I am trying to get at this to discuss the

8  broader factors that go into customer use of Huntington, which

9  is ultimately what Intervenor's position is based upon.

10      THE COURT:  Well, hadn't you been trying to draw

11 some distinction between the issue of competitive injury

12 that's relevant to my determination versus any kind of harm to

13 reputation, other kinds of harm to a company that have no

14 relevance to the determination I have to make?

15      MR. GLITZENSTEIN:  Your Honor, let me be clear about

16 this because I'm glad you brought that up.  It's ultimately

17 going to be our legal position that this concern with

18 confidentiality in and of itself is not an Exemption 4

19 withholding under *National Parks*.  That will be our legal

20 position, that a mere desire to abide by a confidentiality

21 agreement is not what you have to prove in order to meet the

22 *National Parks* test.

23      So, let me be absolutely clear about that.  On the

24 other hand, Intervenor's argument, and as far as I can

25 discern, perhaps their principal argument, is that that is a

1    viable showing under Exemption 4, and so obviously Your Honor

2    has not ruled on that legal question yet, and so I think what

3    we're trying to do is have a two-tiered argument.

4           One is it doesn't matter under *National Parks*.

5    Merely violating a confidentiality agreement doesn't do it,

6    but in any event, even if it did, and Your Honor can disagree

7    with us on that, that the mere violation of these agreements

8    as a basis for customer dissatisfaction is simply not borne

9    out by the available evidence, given all the other factors

10   that go into customer decision-making.

11          THE COURT:  Well, I guess the problem is, you are

12   now -- if I heard you correctly, you are getting into

13   questions about the financing, about other particular

14   financial strains on the company that aren't linked, as best I

15   can tell, to any allegation about release of confidential

16   information it might have had an impact on the company.

17          MR. GLITZENSTEIN:  Right.

18          THE COURT:  You are generally exploring now, if I

19   understand it, what other things can have an impact upon the

20   company's finances or business.

21          MR. GLITZENSTEIN:  It's a little -- I am trying to

22   be a little more particular than this, and Your Honor,

23   frankly, I was going to move on from this point after this,

24   but it's a little more particular than that.

25          What we're trying to say is there are many other

1    factors that go into a customer's -- potential customer's

2    decision as to whether or not to hire Huntington.  Their

3    position is that if there is this release of documents in this

4    case, customers will simply dry up.  We heard from

5    Mr. Caulfield, it will be devastating.

6        And what we're simply trying to get at with this is

7    that there are in fact a whole range of factors, and maybe I

8    could just ask my question better than I have.  There are a

9    range of factors that go into a customer's decision about

10   whether to use a particular research organization ranging from

11   financial viability through a number of other factors.

12       And that was the only point I was trying to make is

13   that this paragraph refers to customers using or not using

14   Huntington based upon financial concerns, not necessarily

15   related to anything in this case but simply that that is one

16   of the things that customers make their decisions based upon.

17       MR. ROSSIER:  I don't want to belabor the point.  I

18   renew my relevance objection.  I'm not aware of a comparative

19   case, more harmful than X, Y, or Z.  I think this is just

20   irrelevant.

21       THE COURT:  Well, you said you were about to move on

22   to something else.  I'll let you put one more question in this

23   area, though.  I'm not going to give you a lot more leeway

24   beyond it.

25       MR. GLITZENSTEIN:  I appreciate that, Your Honor.

1           THE COURT:  All right.

2     Q    (BY MR. GLITZENSTEIN)   The only question I would then ask

3   is, is it not the case that a research organization and

4   particularly Huntington's financial status is one of the factors

5   that a customer would look at in deciding whether to hire

6   Huntington for a particular study?

7     A    Yeah, I'd say that's a consideration as well.

8     Q    Now, you said, when you were testifying about the

9   documents being obtained from Huntington by USDA, that on

10   several occasions, and I think you referred to two or three,

11   USDA actually took documents from Huntington and made copies

12   of those; is that correct?

13    A    It is.

14    Q    Now, is it your understanding that they only took

15   documents that they thought were actually relevant to their

16   investigation?

17    A    That was my understanding, yes.

18    Q    They would not have taken documents that they thought had

19   nothing to do with the potential law enforcement violations,

20   correct?

21    A    I don't know that to be true.

22    Q    But in your dealing with the USDA, they did not -- is it

23   not the case that they led you to believe that they were

24   copying documents that they thought might be relevant to their

25   AWA investigation?

1   A   Yes.

2   Q   And talking for the moment about IACUC materials.  I

3   think, if I understood your testimony correctly, that in your

4   view, the IACUC is an important vehicle for overseeing

5   compliance with the Animal Welfare Act; is that correct?

6   A   Yes.

7   Q   And in fact, one of the purposes of the IACUC is to

8   ensure that the animals are treated in a manner that's

9   consistent with the AWA and the regulations, correct?

10  A   It is.

11          MR. GLITZENSTEIN:  May I approach the witness, Your

12  Honor?

13          THE COURT:  Yes.  Which binder have you handed him?

14          MR. GLITZENSTEIN:  Your Honor, right now we're in

15  Plaintiff's Exhibit 1, which is the first -- there is one

16  binder which is devoted to Plaintiff's Exhibit No. 1.

17          And for the record, Your Honor, this binder consists

18  of all of the documents withheld in part that are at issue in

19  the case.

20          And if you could initially look at -- turn back to

21  the other volume for a moment and look at what's been marked

22  as Plaintiff's Exhibit 3.

23          And Your Honor, this -- unfortunately, we're going

24  to have to go back and forth between these two a bit, and

25  Plaintiff's Exhibit 3, for the record, is the Vaughn index as

1   to which the parties have already stipulated.

2   Q    (BY MR. GLITZENSTEIN)  If you could look over on

3   Plaintiff's Exhibit 3, to page 148 of that document.

4           MR. ROSSIER:  Talking about the page numbers at the

5   top of Exhibit 3?

6           MR. GLITZENSTEIN:  I'm sorry.  I'm actually talking

7   about -- yes, that's correct.

8           MR. ROSSIER:  Thank you.

9           THE COURT:  They're all the same, though.

10          MR. GLITZENSTEIN:  It would appear to be the same.

11  Q    (BY MR. GLITZENSTEIN)  And just so we understand what

12  we're dealing with, over on the left-hand side of this document,

13  there is an LSR number.  Do you see that, Mr. Caulfield?

14  A    I do.

15  Q    And that LSR number is a reference to the documents as

16  paginated for the purposes of the Freedom of Information Act

17  case; is that correct?

18  A    As far as I'm aware, yes.

19  Q    And then there's a description of the kind of record it

20  is; you see that?

21  A    Right, yeah.

22  Q    And then a more particularized description, and then a

23  WIP.  Is it your understanding that "WIP" means "withheld in

24  part"?

25  A    Yes.

1    Q    And then there is a reference to exemption claims (b)(4)

2    and (b)(7)(C) on the ones on this page, and just to be clear,

3    it's your understanding, is it not, that the only exemption

4    claims left at issue are the (b)(4) claims, correct?

5    A    Yes, I believe so.

6    Q    And anything that relates to (b)(7)(C), which is a

7    personal privacy exemption, is not in issue for our purposes,

8    correct?

9    A    Right, yes.

10   Q    And then there's a description of the redaction that's

11   been made, correct?

12   A    Yes.

13   Q    Okay.  Now, if you flip over to page 149, just for

14   purposes of comparison, in that column, which on this page is

15   WIP at the bottom, there's a "WIF," correct?

16   A    Yes.

17   Q    All right.  And that stands for "withheld in full,"

18   correct?

19   A    Yes.

20   Q    Now, according to this Vaughn index prepared in

21   August 2005, if you look at the bottom two entries on the

22   Vaughn index, those refer to Institutional Animal Care and Use

23   Committee records, correct?

24           THE COURT:  On which page are you in now?

25           MR. GLITZENSTEIN:  Sorry, page 148, Your Honor.  The

1  bottom -- the two entries at the bottom, which is where it

2  begins a discussion of the IACUC records.

3  Q   (BY MR. GLITZENSTEIN)  And if you continue over after

4  that, there continues to be a discussion of IACUC records for a

5  number of pages up until you get to page 157, and all of those

6  are described in the left as being IACUC records, correct?

7  A   Yes.

8  Q   Okay.  Now, according to this Vaughn index, initially and

9  according to this index, only two IACUC records were

10 originally produced in part, is that correct, all the other

11 ones were withheld in full?

12 A   I've got lots of pages here.  I'll take your word for it.

13 Yes, it looks to be the case.

14 Q   Now, since this Vaughn index was prepared, there has been

15 an additional disclosure of some of these IACUC records,

16 correct?

17 A   I believe that's true.

18 Q   Okay.  And are you aware that these were among the

19 documents that Judge Oberdorfer reviewed in-camera?

20 A   I'm not aware of which documents he reviewed other than a

21 general category, but...

22 Q   You don't have any basis to disagree that Judge

23 Oberdorfer reviewed the IACUC records in-camera, correct?

24 A   That's my understanding.

25 Q   Now, let's look at the ones that have now been released

1   in part.

2             If you could turn back to the first volume, which is

3   all the documents, and turn to Exhibit 1-A and go to LSR252.

4   You see that document?

5   A   I do.

6   Q   Okay.  And that is, just to make sure we're on the same

7   page, January 1997 facility inspection?

8   A   Right, yeah.

9   Q   Okay.  And that document reflects, does it not, an

10  inspection of the physical facility?

11  A   Yes, it does.

12  Q   Okay.  And has reference to things like paint chipping

13  and noise coming from ventilation system, light out, those

14  sorts of things, right?

15  A   Yes.

16  Q   Basic physical description, correct?

17  A   Yes.

18  Q   Okay.  Can you look back at the Vaughn index, and the

19  page I'd be asking you to focus on, at page 149 of the Vaughn

20  index and see the reference to LSR252 on that page?

21  A   Yes, I see it.

22  Q   Okay.  And look over at the description of why it's been

23  withheld.  And first of all, this indicates that this document

24  was originally withheld in full, right?

25  A   Yes.

1   Q    Okay.  If you look over at the description of why it was

2   withheld in full, can you read what it says there?

3   A    (Reading)  This record includes discussions of issues

4   related to the implementation of the confidential operating

5   procedures and test protocols of the studies conducted by HLS.

6   Q    Okay.  In fact, there is no discussion of issues related

7   to implementation of the confidential standard operating

8   procedures and test protocols in this document, is there?

9   A    No, it wouldn't appear to be the case.

10  Q    Okay.  Let's turn to page 253.  If you could, take a look

11  at that document.

12  A    Okay.

13  Q    That's also a facility inspection, correct?

14  A    It is.

15  Q    And if you could look at the description in the Vaughn

16  index for 253, could you read what that says.

17  A    Yes.  It is (reading)  This record includes discussion of

18  issues related to --

19          COURT REPORTER:  Slow down. Related to...

20  A    Sorry.  (Reading)  Related to the implementation of the

21  confidential standard operating procedures and test protocols

22  for the studies conducted by HLS.  Sorry.

23  Q    (BY MR. GLITZENSTEIN)  And once again, that's an

24  inaccurate description of this document, right?

25  A    Yes.

1    Q    And before I proceed, if you could look down at the

2    right-hand corner of this document, there's a little sticker

3    that says "Government Exhibit 16."  Do you see that?

4    A    I do.

5    Q    And then there's a page reference, says page 9 of 66?

6    A    Yes.

7    Q    And then under that, it's very hard to read, but I think

8    it has a reference to an APHIS form number.  Do you see that?

9    A    Barely.

10   Q    Is it your understanding that this is a Government

11   exhibit sticker that was attached to the Government exhibits

12   to the formal complaint that was notice of violations that was

13   submitted by USDA in this case?

14   A    I have no knowledge of what this was related to.  I see

15   that it's a Government exhibit.  What the correlation is, I

16   really couldn't say.

17   Q    Do you have any reason to disagree with that

18   characterization?

19   A    I don't, no.

20   Q    Assuming that characterization is correct, these were

21   documents that in fact were used by USDA to support the notice

22   of violations, correct?

23   A    I don't have any foundation to agree with that.

24   Q    But you have no basis to disagree with it?

25   A    None of these issues were ever surfaced during any of our

1  discussions with USDA, so if that constitutes a foundation to

2  disagree, I'd say that yes, I do.

3        MR. GLITZENSTEIN:  Your Honor, I thought we would

4  have agreement on this, so if I could take a moment to try --

5  unless we can get some concurrence from the Government

6  attorney.

7        THE COURT:  If you want to confer with counsel, go

8  ahead.

9        (PAUSE.)

10       MR. GLITZENSTEIN:  Your Honor, I think our side bar

11  resulted, as I understand it, in a tentative agreement that we

12  will accept that representation for the purpose of

13  questioning, and I'll proceed on that basis with the

14  understanding.  And I think, as I go forward, it will become

15  actually clearer exactly what these documents are.

16       THE COURT:  Well, when you say that that

17  representation means --

18       MR. GLITZENSTEIN:  And the representation is that

19  these Government exhibit numbers were not numbers that were

20  put on for purposes of the Freedom of Information Act case.

21  They were exhibit numbers that were attached to the notice of

22  violations that was filed in the case.  It actually -- maybe

23  what I could just do is, since it would be of value to be

24  clear about this, let me just refer to that document and that

25  may help clear up where that exhibit label came from, if I

1    could, Your Honor.

2            THE COURT:  You said refer to that document, which

3    document?

4            MR. GLITZENSTEIN:  What I was going to do is bring

5    into play the notice of violations itself, which is a separate

6    document, and if you bear with me for one second, Your Honor.

7            THE COURT:  Well, can we confirm that the

8    stipulation that you've just described is accurate?

9            MR. ROSSIER:  My -- the Government can speak for

10   itself.  My position is simply that this witness doesn't know,

11   and so if he doesn't know, he doesn't know.  The Government

12   can speak for whatever it can stipulate to the sticker and so

13   forth or not.

14           What I indicated is we could try to work out in

15   terms of whatever counsel needed in terms of, you know,

16   clarifying an issue that this witness is unable to clarify.

17           THE COURT:  Let me invite you up to the microphone.

18   I want to make sure it's all recorded.

19           MR. BLUTSTEIN:  I have no reason to disbelieve

20   Plaintiff's representation, but I would like a -- to consult

21   with my client perhaps during the break.

22           THE COURT:  All right.

23           MR. BLUTSTEIN:  If that's okay.  Thank you, Your

24   Honor.

25           MR. GLITZENSTEIN:  Well, to facilitate that, Your

1    Honor, because a number of my questions do depend upon that

2    being the case, that in fact these documents were relied upon

3    by USDA as part of its investigation, let me ask the witness

4    to turn to another exhibit, which unfortunately is in another

5    binder if I can approach the witness, Your Honor.

6              THE COURT:  Yes.

7              THE WITNESS:  I'm still going to need this other

8    exhibit?

9              MR. GLITZENSTEIN:  Yeah.

10             THE WITNESS:  Okay.

11             MR. GLITZENSTEIN:  And Your Honor, this is in the

12   third binder, which is labeled by Plaintiff, 19 through 29.

13             THE COURT:  And will there be two binders that will

14   be the subject of your questions at this point, or just one?

15             MR. GLITZENSTEIN:  I'm hoping it will only be two,

16   Your Honor.

17             THE COURT:  Which two?

18             MR. GLITZENSTEIN:  At this point it will be this one

19   and the document we were just looking at, Exhibit 1-A, so it

20   would be those two binders.

21             And then after this to sort of confirm what this

22   document is, then I would go back to the other two, which

23   would be the Vaughn index and the -- and the documents

24   themselves.

25   Q    (BY MR. GLITZENSTEIN)  Mr. Caulfield, if you can take a

1  look at what's been marked as Plaintiff's Exhibit 26.

2  A   Okay.

3  Q   And are you familiar with this document?

4  A   Yes, I saw this for the first time many years after it

5  was generated in 2002, I believe.

6         MR. GLITZENSTEIN:  Your Honor, this is one of the

7  other documents the parties have stipulated to admissibility

8  of.

9         THE COURT:  Mr. Caulfield, if it helps you at all,

10  you can feel free to use this space on the counter there if

11  you want to rest a book up there.

12         THE WITNESS:  Thank you very much.

13         THE COURT:  Yeah.

14  Q   (BY MR. GLITZENSTEIN)  And could you describe your

15  understanding of this document?

16  A   Well, as I said, we never saw this document until we

17  received our own Freedom of Information request, and it is

18  quite simply "Report of Violations."  It appears to be an

19  internal USDA document summarizing the violations that

20  eventually went into the 1998 complaint that they filed

21  against HLS.

22  Q   And so this document, based upon what you just stated, is

23  a document that itemizes USDA's allegations of Animal Welfare

24  Act violations, correct?

25  A   I believe that's correct, yes.

1   Q   And during the time frame that we've been referring to,

2   back in the 1997-'98 time frame?

3   A   Yes.

4   Q   And just so we understand how this document reads, is it

5   a fair characterization that it itemizes various Animal

6   Welfare Act violations based upon references to particular

7   studies and also by reference to particular Code of Federal --

8   Code of Federal Regulation violations?

9   A   It itemizes particular studies based on their number

10  alone, yeah.

11  Q   Okay.  And if you see those references under each of

12  them, there are a number of items that set forth the USDA's

13  assertion of violations, correct?

14  A   Yes.

15  Q   And if you could take a look at page 4.

16          MR. ROSSIER:  I would like to object on relevance.

17  Counsel, could you help us where you're going here with regard

18  to the issues in the case?

19          MR. GLITZENSTEIN:  There are actually two aspects

20  to it, Your Honor.  One is that all the documents we're

21  talking about were in fact documents relied upon by USDA as

22  part of its formal filing of charges, and one of our positions

23  in this case is that the actual motive is not to protect the

24  company from competitive injury but in fact to prevent public

25  disclosure of as many of these underlying documents as

1    possible, and I think that there's a pattern of that.

2         And the second aspect of it, which I think is

3    important --

4         THE COURT:  Well, before you move to a second

5    aspect, is consideration by me of either Huntington's motive

6    or the USDA's motive going to help me make some ultimate

7    determination about what is or is not properly exempted under

8    Exemption 4?

9         MR. GLITZENSTEIN:  I think it will, Your Honor, and

10   I guess what I would ask is a bit of leeway because I think

11   what we're going to try to establish is that incidents that

12   are referred to in this report of violations and described in

13   some detail here in fact correlate directly with some of the

14   documents that are at issue, and it's difficult to understand

15   why they were disclosed except that there was an effort to

16   prevent the public from getting access to information needed

17   to understand the Animal Welfare Act investigation.

18        And so, again, that's the purpose we're using it

19   for, to show that there are documents that directly relate to

20   what has been disclosed that simply cannot be understood as to

21   anything except an intention to minimize public access.  It

22   certainly cannot be understood by reference to any competitive

23   injury.

24        And again, that would become -- I think that will

25   become clearer as I refer to particular documents.

1          THE COURT:  Well, I guess I go back to my question.

2    So what?  So what if they had some reason to not disclose

3    something?  Am I to determine that?  Is that going to be

4    relevant to my objective determination about whether an

5    exemption or a redaction comports with or doesn't comport with

6    Exemption 4?

7          MR. GLITZENSTEIN:  Well, I think it does in two

8    ways, Your Honor.  One is, I think when you look at some of

9    the particular documents, and correlated with what has been

10   disclosed as to certain incidents, it would be very difficult

11   to understand how a competitive injury argument could be made

12   with regard to those particular documents, and I'm using those

13   as illustrative.  And again, I think this will become clearer

14   if I -- if I basically use particular documents to show you

15   what I'm talking about.

16         THE COURT:  Well, suppose that there is a proper

17   correlation but the proffered reason is a wrong reason or a

18   terrible motive.  If it's a proper correlation, it's a proper

19   correlation.

20         On the other hand, suppose the correlation is

21   improper but it's a pure motive?  Who cares about the pure

22   motive if it's something that, you know -- so that's what I'm

23   not quite getting.

24         MR. GLITZENSTEIN:  Right.  Well, I say that motive,

25   I think, does go to some degree to the potential bias of the

1  witness, but putting that to one side, I guess what I'm

2  suggesting is that if in fact you see what has been disclosed,

3  and I'm just using this document in order to establish a basis

4  for what has been withheld, you will see that you cannot draw

5  any inference as to competitive injury based upon what has

6  been disclosed and what has been withheld, and I can give you

7  a particular example of what I'm talking about.

8        The reported violation described several particular

9  incidents of animal mistreatment.

10        THE COURT:  You're talking about exhibit --

11  Plaintiff's Exhibit 26?

12        MR. GLITZENSTEIN:  Talking about Plaintiff's Exhibit

13  26.

14        THE COURT:  Let's get one ground rule first.  I know

15  you're interested and anxious to get your case on.  When I am

16  speaking, you may not start speaking on top of my words.  It

17  makes it absolutely impossible for the court reporter to

18  transcribe two voices at the same time.  It may be

19  counter-intuitive, but I demand that you let me finish what

20  I'm saying before you start speaking.  I will give you the

21  same courtesy.

22        MR. GLITZENSTEIN:  Yes, I apologize, Your Honor.

23        THE COURT:  You just did it again.  Okay.

24  Understand what I'm saying.  There is an instinct and I

25  understand it.  I was a litigator for a long time.  You

1  absolutely must in this trial, even though there is no jury,

2  resist that instinct.  Go ahead.

3          MR. GLITZENSTEIN:  And I do apologize, Your Honor.

4          THE COURT:  Thank you.

5          MR. GLITZENSTEIN:  The example I was going to give

6  was a reference on page 9 of this report to a incident in

7  which primates were deprived of water, and it's described in

8  some detail in the report and it refers -- and the reason why

9  I was trying to get, Your Honor, at these exhibit numbers and

10 pages is if you see the reference in the document to

11 veterinary care and Exhibit 5 and certain pages, there are

12 other documents that have been withheld in this case which

13 correlate specifically with those references, and in fact, so

14 specifically that it would appear that the description has to

15 almost be the same description as what is in this document

16 that has been publicly disclosed.

17         And it then becomes, frankly, almost unfathomable

18 that one could assert that substantial competitive injury

19 would result when the public already knows about this

20 allegation of animal mistreatment, and then looks at other

21 documents that were relied upon apparently by USDA as part of

22 making this allegation, and to say they're releasing any of

23 those documents would cause competitive injury in the light of

24 what's in this document, we would submit simply doesn't make

25 any sense.

1          And it also goes, I think, to the confidentiality

2     point, which is there is an assertion that any breach of

3     confidentiality will somehow result in the customer base

4     drying up.  But when you look at what's in here --

5          THE COURT:  Now "here," you're talking about page 9

6     of Exhibit No. 26?

7          MR. GLITZENSTEIN:  I'm talking about that as an

8     example, Your Honor.  I've got several other examples that we

9     can provide, but one can do a very particularized analysis of

10    a relationship between what's in here and what's just been

11    disseminated to the public, what the public already knows and

12    that which has been withheld, which obviously directly relates

13    to these allegations.

14         And again, I think the most direct response to Your

15    Honor's question is that it would seem to us that establishing

16    competitive injury for these kinds of documents would be

17    farfetched when this material has already been discussed in

18    this kind of detail in the notice of violations.

19         THE COURT:  Perhaps to jump aside or forward or

20    backwards, I'm not sure, is there an argument that some of the

21    information that's contained in this example you've shown me,

22    has otherwise been the subject of a Exemption 4 with

23    redaction?

24         MR. GLITZENSTEIN:  Yes, Your Honor.

25         THE COURT:  Anything else on your argument?

1    MR. GLITZENSTEIN:  No, Your Honor.

2    THE COURT:  All right.  Go ahead.  Come up to the

3  mic.

4    MR. ROSSIER:  Thank you.  Our position would simply

5  be this, on relevance.  We understand anything relating to

6  confidentiality and I understand counsel just addressed that,

7  so our objection is not onto attacking a confidentiality

8  related issue.

9    This case is about likelihood of substantial

10  competitive harm.  My understanding is no one's motive is at

11  issue.  Certainly we have been precluded from suggesting

12  alternative motives for Plaintiff.  I think, out of a sense of

13  fairness, if motive evidence is to come in into this case,

14  motive as to USDA, motive as to my client, it's only fair that

15  we have motive evidence against Plaintiff.

16    THE COURT:  Which would be what?

17    MR. ROSSIER:  Which is that it's the excluded --

18  some of the excluded evidence with regard to their goal of

19  putting my client out of business, and they claim that this is

20  for reviewing the USDA's appropriate oversight under Animal

21  Welfare and seeing if it did its job, that's what they've

22  said.

23    Our position is the real motive is to provide

24  evidence that will breach the confidentiality to facilitate

25  putting them out of business.  So if motive evidence comes in,

1    I think sauce for the goose is sauce for the gander.

2         THE COURT:  We've probably gone through two or three

3    different issues in one exchange, but let's try to refocus on

4    frankly what your question was that drew the objection, and

5    then I think I'll be able to start from there.

6         COURT REPORTER:  Just a minute.  Let me change

7    paper.

8         (PAUSE.)

9         THE COURT:  I look now at the clock, it's about

10   12:27.  I was going to break for lunch at 12:30 anyway.  Would

11   that be a useful time to do that, or did you want to put at

12   least some more argument up here?

13        MR. GLITZENSTEIN:  I think it would be useful time,

14   Your Honor, and actually, I guess my suggestion would be that

15   I proceed with questioning, and when we get to particular

16   documents, I think I can then be more clear about why use of

17   this document and these exhibit numbers will relate to what I

18   think Intervenor's counsel, putting motive to one side, agreed

19   could be a reasonable inquiry, which is breach of

20   confidentiality and whether there really is a breach of

21   confidentiality in light of what has already been disclosed,

22   which is certainly part of the rationale that we have for

23   using the documents in this fashion.

24        So, I would take a crack at that, and that might

25   help avoid any of these questions about motive and opening up

1   that can of worms.

2            THE COURT:  All right.  Why don't we go ahead then,

3   take that break for lunch.  By the way, I'm looking at the

4   clock that's at the rear of the courtroom.  It appears not to

5   exactly be in sync with the clock that's on the wall.  We've

6   had less confidence in the accuracy of that wall clock than we

7   have had in the free-standing battery operated clock by the

8   exit, so when I'm making reference to time, I'm actually

9   looking at the clock at the door.

10           So, we'll go ahead and I'll ask everyone to be back

11  at 1:30.

12           MR. GLITZENSTEIN:  Thank you, Your Honor.

13           MR. ROSSIER:  Thank you.

14           THE DEPUTY CLERK:  All rise.

15           (A LUNCH BREAK WAS TAKEN.)

16           THE COURT:  All right, counsel.  We'll resume.

17           MR. GLITZENSTEIN:  Thank you, Your Honor.

18           Your Honor, as a housekeeping matter, Government

19  counsel, and can correct me if I'm mistaken about this, but

20  has indicated that the Government can indeed confirm that

21  these exhibit numbers are exhibits for the USDA investigation

22  that was done and not any exhibit numbers that were put on for

23  the purposes of the FOIA case.

24           And along those lines, Your Honor, again, just so

25  we're clear, we've been talking about Plaintiff's Exhibit

1   No. 26, which is the report of violations.  If you see at the

2   end of that document, pages 13 and 14 is a list of exhibits

3   and there are exhibits that correlate to each of the

4   allegations of AWA violations that are referred to in the

5   Report of Violations.

6          So, Exhibit 2, 2-A and 2-B are documents that were

7   exhibits for their discussion of Protocol Study No. 3093.

8   Exhibit 3 are documents relative to their allegations about

9   Protocol 3278 for dogs, et cetera, et cetera.  So the exhibit

10  numbers, I think we now have an acknowledgment from the

11  Government, are in fact the exhibit numbers that are referred

12  to in the notice of violations.

13         THE COURT:  Okay.  When you're referring to exhibit

14  numbers, you're making reference to Plaintiff's Exhibit 1-A

15  and the documents that appear behind that tab that bear

16  photocopies of Government exhibit numbers in the bottom

17  right-hand corner?

18         MR. GLITZENSTEIN:  That's correct, Your Honor.

19         With that, Your Honor, I'll resume the examination

20  of Mr. Caulfield with the Court's permission.

21         THE COURT:  All right.

22  Q   (BY MR. GLITZENSTEIN)  Good afternoon, Mr. Caulfield.

23  A   Good afternoon.

24  Q   What is your understanding of the material that Plaintiff

25  has indicated it has no objection to being deleted from all of

1   the documents?

2   A   I'm sorry, can you re-ask or rephrase the question.

3   Q   Let me ask a predicate question.  Do you have an

4   understanding that Plaintiff has agreed to the deletion of

5   certain information from the documents?

6   A   Yes, I believe so.

7   Q   Okay.  And what is your understanding of what Plaintiff

8   has agreed to delete?

9   A   I'm sure I don't have full recollection, but some of the

10  things that I believe are correct relates to identity of

11  individuals, identity of particular test material names, study

12  designs.  I'm sure the list is longer.  I just can't recall

13  what the specifics are.

14  Q   Well, you spent a lot of time talking about standard

15  operating procedures.

16  A   That as well.

17  Q   Do you recall that Plaintiff has agreed to have all

18  standard operating procedures deleted from the documents?

19  A   Agreed, yes.

20  Q   Okay.  And you talked about identity of customers, and is

21  it also your understanding that Plaintiff has agreed to have

22  all customer identities deleted?

23  A   Yes.

24  Q   And compound identities?

25  A   Yes.

1    Q    Okay.  And compound identities means, just so we're clear

2    about this, the materials that actually are being tested on

3    behalf of a company, correct?

4    A    Yes.

5    Q    Mr. Caulfield, if we could return to the Vaughn index

6    that we were referring to a little bit earlier, again, that's

7    Exhibit 3, Plaintiff's Exhibit 3, and I think, if I'm not

8    mistaken, you have agreed that -- that for several of the

9    pages we were talking about, which I believe were pages 252 in

10   Plaintiff's Exhibit No. 1-A and 253 I think is what we had

11   gotten up to, that although the Vaughn index indicates that

12   there are discussions of issues related to the implementation

13   of the confidential standard operating procedures and test

14   protocols for the studies conducted by HLS, in fact, there was

15   no such discussion in these documents; is that correct?

16   A    Yes, I believe that's what I stated.

17   Q    Now, can you take a quick look at the Vaughn index as it

18   runs up through page 265.  I'm sorry, as it runs up through

19   what's referred to as LSR265 on page 151 of the Vaughn index

20   and correlate it with the same set of documents that's in

21   Exhibit 1-A as identified on the bottom of the page and see if

22   you'll agree with me that the same problem afflicts all of

23   those pages as well.

24        And by the same problem, I mean there are references

25   to disclosure of confidential standard operating procedures

1    and test protocols when in fact there is no such information

2    on the pages through LSR265.

3    A    Yes, I agree that's consistent with the previous

4    instance.

5    Q    Right.  So again, in those instances, the Vaughn index is

6    simply inaccurate; is that correct?

7    A    That comment would appear to be inaccurate, that box in

8    the far right-hand side, yes.

9    Q    Now, if you look at those pages that you just glanced at,

10   it is the case, is it not, that there continues to be some

11   information deleted from these documents, correct?

12   A    Yes.

13   Q    And under the --

14        THE COURT:  The record is really going to need to

15   reflect what you mean by "these documents."

16        MR. GLITZENSTEIN:  I'm sorry, Your Honor.

17   Q    (BY MR. GLITZENSTEIN)  The ones that I was asking you to

18   focus on, Mr. Caulfield, and I apologize for not being clear

19   enough, if you could again focus on the set of documents between

20   LSR252 and 265.

21   A    You talking about the documents themselves?

22   Q    In 1-A, that's correct, not the description of the Vaughn

23   index but the documents themselves.

24   A    Can you give me that number reference, please.

25   Q    Yeah, 252 through 265.

1   A    Okay.

2   Q    And I think this is actually particularly clear if we

3   look at 254, 255, 256.  There is a strip of black that goes

4   over the documents and an indication of (b)(4), if you see

5   that.

6   A    I do.

7   Q    And is it your understanding that that indicates that

8   there continues to be a withholding of information from those

9   documents on (b)(4) grounds?

10   A    That's what the page indicates, yes.

11   Q    Is there anything specifically in the Vaughn index, as

12   far as you know, that indicates why that column is being

13   withheld?

14   A    It's exactly the same language that applied to the

15   previous instances.

16   Q    So the answer would be "no," correct?

17   A    Correct.

18   Q    Are you aware of any other USDA or any other document

19   which indicates why that particular part of the document is

20   being withheld?

21   A    Not specifically, no.

22   Q    One of the two columns that is on the left-hand side of

23   those documents, if you're following along with me, one says

24   "room number" and one says "animals" next to it.  Do you see

25   that?

1    A    I do.

2    Q    Does "animals" indicate the number of animals that were

3    being used for a particular -- or housed in a particular

4    facility?

5    A    No.

6    Q    Excuse me?

7    A    No.  Will you ask the -- re-ask the question, please.

8    Q    Yeah.  Does that column indicate anything -- let me ask

9    it this way.

10            Does that column provide any information about the

11   animals that were in that particular facility at the time of

12   that inspection?

13   A    Yes, it does.

14   Q    And the date of this document is January 1997, correct?

15   A    This is document 254 I'm looking at now.

16   Q    Look at 254, please, yes.

17   A    Yes, that's correct.

18   Q    Now, if we could look back at Exhibit 16 for a moment,

19   which is the Report of Violations.

20   A    Okay.

21   Q    I'm sorry, not Exhibit 16.  Exhibit --

22            MR. ROSSIER:  26.

23   Q    (BY MR. GLITZENSTEIN)  26.  And if you could look at page

24   3 of that document.

25   A    Got it.

1    Q    And if you see under March 26, 1997, April 7, 1997, about

2    one-third of the way down the page.

3    A    Yes.

4    Q    And again, it's your understanding that these -- this

5    itemizes the AWA violations that USDA was alleging, correct?

6    A    Yes.

7    Q    And the first one down reads, (reading)  Institutional

8    Animal Care and Use Committee, IACUC, animal care inspection

9    report for 3/26/97 and 4/7/97, Exhibit 1-A, IACUC Semiannual

10   Review, Exhibit 16, pages 1 through 21, and response letters,

11   Exhibit 1-B, from HLS to REAC-Animal Care, indicate the

12   IACUC's failure to identify departures from the Animal Welfare

13   Act regulations and standards approved by the IACUC for animal

14   activities.

15           Do you see that?

16   A    I do.

17   Q    And refers to Exhibit 16, pages 1 through 21; do you see

18   that?

19   A    Yes, I do.

20   Q    Okay.  And if you look at LSR254, the one we were just

21   talking about, the sticker on that one is Government's

22   Exhibit 16, page 10 of 66; is that correct?

23           THE COURT:  You really need to make sure you refer

24   to that by Plaintiff's Exhibit 1-A.

25           MR. GLITZENSTEIN:  I'm sorry, Your Honor.

1    Q    (BY MR. GLITZENSTEIN)   Again.   That's in Plaintiff's

2    Exhibit 1-A, which is the IACUC records, and I'm talking about

3    LSR254 and the bottom right-hand corner refers to Government

4    Exhibit 16, page 10 of 66; is that correct?

5    A    Yes.

6    Q    Okay.   I apologize for all these cross-references.   I'm

7    trying to work our way through it, Mr. Caulfield.   I

8    appreciate your patience.

9         Now, if you could take a look at what's in Exhibit

10   1-A referred to as Plaintiff's Exhibit -- I mean, excuse me,

11   as to LSR245.

12        THE COURT:   May I ask you to clarify?   I don't

13   know -- once you identified what documents you wanted to ask

14   him about with regard to Plaintiff's Exhibit 1-A at page 254,

15   what the question was and what the answer was, what are you

16   asking him about that and what was the answer?

17        MR. GLITZENSTEIN:   I was just asking him to agree

18   that the reference in the report of violations to a particular

19   document, exhibit number, that USDA relied upon for that

20   assertion of violations covers this particular exhibit

21   reference.

22        THE COURT:   All right.

23        MR. ROSSIER:   Let me object to that.   I believe this

24   witness is not aware of that.   You may have got a confirmation

25   of that, but I don't think there is any foundation that this

1   witness knows anything about those exhibit stickers and

2   whether they accurately refer to the particular document or

3   not, so I'd object on foundation.

4           THE COURT:  Okay.  So the record is clear, why don't

5   you walk through that again.  You can get what you want, but

6   walk through it again.

7   Q    (BY MR. GLITZENSTEIN)  Again, all I was asking,

8   Mr. Caulfield, you to confirm, is it based upon your visual

9   observation of the documents and your familiarity with the

10  documents which you testified to this morning that LSR254 bears

11  a sticker, which is Government's 16, and has a page reference,

12  page 10, which is within the same page reference in the report

13  of violations document that we just referred to; is that

14  correct?

15  A    Those three factors are correct, yes.

16  Q    Now, if you could take a look back at LSR245 in

17  Plaintiff's Exhibit 1-A.  This is the very first page in that

18  set of documents.

19          THE COURT:  I hate to interrupt you, but I thought I

20  heard you ask him if the page reference at the bottom of the

21  sticker on Government's Exhibit 1-A at page 254 corresponds to

22  the page reference you asked him about in -- sorry --

23  Plaintiff's Exhibit 26, which has a third of the way down the

24  page the March 26, 1997 and April 7, 1997 dates.

25          MR. GLITZENSTEIN:  Correct, Your Honor.

```
 1            THE COURT:  All right.  And the page reference at

 2   the bottom of Government's -- I'm sorry -- Plaintiff's

 3   Exhibit 1-A at page 254 on Government's exhibit sticker 16

 4   says, "page 10 of 66"?

 5            MR. GLITZENSTEIN:  That's correct, Your Honor.

 6            THE COURT:  Were you asking him to compare how that

 7   page reference compares with Plaintiff's Exhibit 26 at page 3?

 8            MR. GLITZENSTEIN:  Yes, Your Honor.  And this is

 9   simply again to get a confirmation, and I understand this

10   witness cannot say anymore about it but just to get a

11   confirmation that the exhibit reference in here, which is

12   relied upon by the USDA for its report of violations on this

13   particular violation covers or encompasses that particular

14   exhibit from which information has been withheld.

15            THE COURT:  Well, when I was asking you about

16   Plaintiff's Exhibit 1-A at page LSR254, referring to the copy

17   of the Government Exhibit 16 sticker, making reference to page

18   10 of 66, the page of Plaintiff's Exhibit 26, which is the

19   report of violation that you then asked the witness about was

20   page numbered 3.  It was not page number 10 of 66.  That's

21   what confuses me.

22            MR. GLITZENSTEIN:  I'm sorry, Your Honor.  I

23   understand that because we've got all these different page

24   references, I'm probably getting confused.  I apologize for

25   that, but the exhibit I was trying to cross-reference to was
```

1    page 3 of Plaintiff's Exhibit 26.

2          THE COURT:  So then what is the predicate question

3    when you're asking him to make some correlation between

4    Plaintiff's Exhibit 1-A at page 254 and information on a

5    Government exhibit sticker and Plaintiff's Exhibit 26?

6          MR. GLITZENSTEIN:  At this point, Your Honor, and I

7    think I will explore the relationship a little bit further on

8    some other documents, is simply to get confirmation of what

9    was confusing us before, in light of the Government's

10   acknowledgment that in fact these exhibit numbers, as to some

11   of the documents that have been withheld that are at issue in

12   the case, are the same documents that are referred to in the

13   report of violations and are within exhibits that were relied

14   upon by the Government in its allegations of Animal Welfare

15   Act violations.

16         And so we have -- we continue to have information

17   withheld from documents that in fact were relied upon by the

18   Government in its -- as exhibits in its Animal Welfare Act

19   investigation.

20         But that's the only thing I was trying to establish

21   at this point, and then I think that going to beyond that, if

22   I could have permission of the Court, I think it will become a

23   little bit clearer as I proceed.

24         MR. ROSSIER:  Your Honor, if I could note my

25   foundation objection.  My understanding is this witness can

1    tell you that that number of your LSR254, that that has the

2    exhibit sticker that says whatever it says.  I don't know that

3    he can and I don't think he has knowledge to connect that back

4    up with Exhibit 26, which is what I understood you to be

5    trying to do, so that's my foundation objection that this

6    particular witness doesn't know that that document is

7    connected.

8         If he does, he obviously can testify, but I don't

9    believe there is a knowledge basis for him connecting LSR254

10   to Exhibit 26.  That's my objection.

11        MR. GLITZENSTEIN:  And with the Court's permission,

12   if I can proceed, I think that if I have more substantive

13   questions along those lines, I think it will become clearer as

14   we go along.  I'm not relying on the witness for anything

15   other than a recognition of what was on the documents, since

16   he says he's familiar with the documents and was in the court

17   testifying about what the documents reflect.

18        THE COURT:  Well, that isn't what you were asking

19   him to do and that's not what he did with respect to these two

20   pages and these two exhibits.  That's why I'm going through

21   this.

22        The main conflict, frankly, is where there's

23   reference to page 10 of 66, you haven't pointed out to any

24   page 10.  There is no page 10 that you've pointed to.

25        MR. GLITZENSTEIN:  Your Honor, what I was referring

1    to is on LSR254, the sticker in the right-hand corner, which

2    says page -- Government Exhibit 16.

3              THE COURT:  Right.

4              MR. GLITZENSTEIN:  At page 10 of 66.

5              THE COURT:  Right.

6              MR. GLITZENSTEIN:  So, and again, I think we have

7    the Government's acknowledgment that these exhibit references

8    are indeed to the exhibits that are in the -- referenced in

9    the report of violations.  So, that's all I was trying to get

10   the witness to acknowledge or recognize and was simply that

11   sort of physical fact.

12             THE COURT:  Well, the Government's stipulation may

13   well be all you need, but this witness is not able to say that

14   what you're looking at on page -- on Government Exhibit 26

15   page 3 is page 10 of 66 that's referred to in Government's

16   Exhibit -- sorry -- Plaintiff's Exhibit 1-A at LSR page 254

17   because it's not -- you want him to say that on page 10 of 66

18   you will find reference to this Exhibit 16.  On page

19   Plaintiff's Exhibit 26 where it makes reference to Exhibit 16,

20   that reference is on page 3 of Plaintiff's Exhibit 26, not

21   page 10 of Plaintiff's Exhibit 26, so there is not a

22   correspondence between that Government sticker and Plaintiff's

23   Exhibit 1-A that you're making reference to and Plaintiff's

24   Exhibit 26 on page 3.

25             MR. GLITZENSTEIN:  Right.

1          THE COURT:  Now, it may be that you just don't need

2     to ask this witness that question.  There won't be any

3     argument later on about whether those two things correspond to

4     each other given whatever the Government just stipulated to,

5     but this witness hasn't established what you are looking to

6     have him establish as to the correspondence between these two

7     documents.  It has not been done.

8          You may have gotten him to acknowledge that

9     Plaintiff's Exhibit 1-A, page LSR254 contains a Government

10    exhibit sticker that is numbered 16 and that on Plaintiff's

11    Exhibit 26, page 3 there is reference to an Exhibit 16, that's

12    about as far as you've gone and as far as it looks like he can

13    go, because the specific page references that you're trying to

14    correlate do not correlate.

15         I don't mean to make a big deal out of it, but I

16    don't want the record to reflect what you summarized it

17    reflected.  It does not reflect that he has made a

18    correspondence between the Government exhibit sticker on

19    Plaintiff's Exhibit 1-A and this page 3 of the report of

20    violation, Plaintiff's Exhibit 26.  That's all.

21         MR. GLITZENSTEIN:  I appreciate that, Your Honor.  I

22    really don't want to belabor this point, but I just wanted to

23    make absolutely clear, I think Your Honor already understands

24    me, but just so the record is clear, the reference to Exhibit

25    16 included the parenthetical on that page 3, pages 1 through

1    21, and all I was trying to say was that the page 10 is within

2    that range, but I appreciate Your Honor's determination that's

3    all that the witness cannot say more than that they bear the

4    same information, so I'll -- I, of course, will proceed in

5    light of that, Your Honor.

6    Q    (BY MR. GLITZENSTEIN)  Mr. Caulfield, if you could look

7    back at document LSR245, which is the first document, the first

8    page in Plaintiff's Exhibit 1-A.

9    A    Got it.

10   Q    And it is captioned across the top, "Meeting of the

11   Huntington Life Sciences Institutional Animal Care and Use

12   Committee."  Do you see that document?

13   A    I do, yes.

14   Q    Okay.  Now, if you also at the same time could turn to

15   the Vaughn index description, and again that's in Plaintiff's

16   Exhibit 3 for that particular record, and that is on page 149

17   of the Vaughn index, if you see that.

18   A    I do.

19   Q    Okay.  And once again, this Vaughn index indicates that

20   this was a document that was withheld in full, correct?

21   A    Yes.

22   Q    And could you read the description of the withholding for

23   that particular document.

24   A    It says, (reading)  This record includes discussions of

25   issues relating to the implementation of the confidential

1    standard operating procedures and test protocols for the

2    studies conducted by HLS and the names of HLS employees.

3    Q    Okay.  And that description says nothing about whether

4    particular portions could be disclosed without violating

5    confidentiality or revealing test protocols, does it?

6    A    I'm sorry, can you ask the question once again.

7    Q    Yes.  The description you just read does not address at

8    all the question about whether particular portions of the

9    document can be disclosed without revealing confidential

10   standard operating procedures or test protocols, does it?

11   A    No.  No, it doesn't.

12   Q    And if you look at LSR245, some of which has now been

13   disclosed, I would ask you to focus, for example, on Agenda

14   Item II B where it says, "Review of Facility Inspection," and

15   says, quote, The results of the inspection held today are

16   attached.  The facility was found to be acceptable with minor

17   deficiencies.

18          Do you see that?

19   A    I do.

20   Q    And to be clear, that was an inspection that the IACUC

21   did of the facility with regard to potential Animal Welfare

22   Act issues?

23   A    Yes.

24   Q    Okay.  Now, that particular phrase, which has now been

25   disclosed, has nothing to do with revealing confidential

1    standard operating procedures or test protocols, does it?

2    A    You're talking about Agenda Item II B, right?

3    Q    Just looking at that one, yes.

4    A    No, it doesn't.

5    Q    So the description in the Vaughn index was at least

6    overbroad; isn't that correct?

7    A    I don't think I'm qualified to answer that question,

8    quite frankly.

9    Q    Okay.  If you could turn to the next page in Plaintiff's

10   Exhibit 1-A, LSR246.

11   A    Got it.

12   Q    And at the bottom of that page, paragraph 7 where it

13   says, "Adequate Veterinary Care."

14   A    Yes.

15   Q    And then there's a phrase that says, (reading)  The IACUC

16   felt that our current veterinary practices provided for

17   adequate veterinary care.

18            Do you see that?

19   A    I do.

20   Q    And that statement has nothing to do with confidential

21   standard operating procedures or test protocols for studies,

22   does it?

23   A    No, it doesn't.

24   Q    Okay.  If you could now look over at what hopefully is

25   marked in everybody's Exhibit 1-A with an orange sticker,

1   which is also LSR2133 and titled "Memorandum."

2   A   Okay.

3   Q   Just to be clear, this is what's marked with an orange

4   sticker inside Plaintiff's Exhibit 1-A.

5   A   My orange sticker is LSR2235.  My book goes from 2129 to

6   2235.

7   Q   There should be an orange sticker inside Exhibit 1-A.

8   You see that?

9           THE COURT:  On the top of the page.

10          THE WITNESS:  Just a moment.

11  Q   (BY MR. GLITZENSTEIN)  It's in the same 1-A before we get

12  to 1-B.

13  A   No.  Forgive me, I'm getting a bit confused.  1-A is

14  which one of these books?

15  Q   1-A is the Plaintiff's Exhibit 1, which is one entire

16  volume of Plaintiff's Exhibit 1.

17  A   Yes.

18          MR. ROSSIER:  Counsel, there are sort of two --

19  Q   (BY MR. GLITZENSTEIN)  If you go to very beginning of the

20  document of the book, we go to the very beginning of the book,

21  which is the set of documents that we had been -- and hopefully,

22  if you go to the orange sticker, it will be LSR2133.

23          MR. ROSSIER:  Counsel, you might want to say "light

24  orange."  There is two colored orange stickers in my book.

25  Q   (BY MR. GLITZENSTEIN)  Yes, light orange.

1    A    Got it.

2    Q    Okay.  And this memorandum, which goes from 2133 to 2134,

3    is, if you look at 2134, a September 18th, 1996 IACUC

4    Committee document; is that correct?

5    A    Yes, it is.

6    Q    And in this memorandum, everything has been deleted; is

7    that correct?

8    A    Yes, everything except the dates and the section that

9    specifies for Huntington Life Sciences Institutional Animal

10   Care and Use Committee.

11   Q    Okay.  Now, if you look over at the Vaughn index

12   description of this document, which is on page 155 of the

13   Vaughn index, at the bottom.

14   A    Yes.

15   Q    Can you read the description in there.

16   A    Yes, this is in relation to LSR2133.  It says, (reading)

17   The memorandum includes discussions of issues related to

18   implementation of the confidential standard operating

19   procedures and test protocols for the studies conducted by HLS

20   and the names of HLS employees.  This memorandum includes the

21   study number, the names and initials of HLS employees and a

22   description of observation and treatment of animals in the

23   study.

24   Q    All right.  So that's essentially the same description

25   that we were discussing with regard to the prior IACUC

1  documents, correct?

2  A   I didn't say that it's identical language, but it is

3  similar.

4  Q   And does that particular description address at all

5  whether there is segregable information that could be provided

6  without revealing standard operating procedures or test

7  protocols?

8  A   Other than it's indicating "withheld in full," I'd say

9  no.

10  Q   Do you know when the last time you looked at this

11  particular document might be?

12  A   I am reasonably familiar with the content of this

13  document.  I can't say specifically when I last looked at it.

14  Q   Okay.  If you'll look over at -- proceed over to

15  LSR139 -- excuse me -- 2139, which is a couple of pages over.

16  Do you see that?

17  A   Yes, I have it.

18  Q   And that proceeds over to 2140, correct?

19  A   It does.

20  Q   And this is dated a November 19, 1996 document from the

21  IACUC file?

22  A   That's right.

23  Q   And once again, every single word of substance has been

24  deleted from this document, correct?

25  A   That's correct.

1  Q   And again, if you look over at the Vaughn index, which is

2  on page 156 that correlates to this document, it's four

3  columns down.  Is it not the case that it's essentially the

4  same boilerplate description as we've been discussing?

5  A   Yes.

6  Q   And once again, it does not indicate in any way, shape or

7  form that there is no segregable information that could be

8  disclosed; is that correct?

9  A   Not specifically, no.

10 Q   Okay.  If you proceed two more pages over till we get to

11 LSR2231.

12 A   Okay.

13 Q   And if you'll look about three quarters of the way down,

14 you'll see a column D -- II D for "Primate Enrichment,"

15 correct?

16 A   I see it.

17 Q   Now, just so we're clear, one of the AWA obligations, to

18 the extent that you can provide any information about this, is

19 in fact to provide sufficient psychological enrichment for

20 primates, correct?

21 A   That's correct, yes.

22         THE COURT:  Help me identify where that 2231 is.  Is

23 that 1-A?

24         MR. GLITZENSTEIN:  I'm sorry, Your Honor.  That is

25 in 1-A, and it's actually two pages from the back of 1-A.

1      THE COURT:  All right.  Thank you.

2  Q    (BY MR. GLITZENSTEIN)  And so psychological enrichment of

3  primates is in fact one of the obligations for funding to any

4  other organization doing research on primates, correct?

5  A    Yes.

6  Q    And so this item II D that was deleted, it's reasonable

7  to infer was addressing the primate enrichment that would or

8  would not be provided for primates at Huntington, correct?

9  A    I wouldn't agree to that, no.

10 Q    Okay.  It's discussing the primate enrichment obligation

11 in some fashion, right?

12 A    Yes.

13 Q    Okay.  If you look over at the Vaughn index description

14 on page 157 of this document, which is at the top of that page

15 157, and again this is -- all the Vaughn indexes are in

16 Plaintiff's Exhibit 3.  Do you see the description over at

17 LSR2231?

18 A    I do.

19 Q    And could you read the description.

20 A    The description is the last column, I presume.  I don't

21 see the header on this page.

22 Q    Excuse me, the description for LSR2231.

23 A    Yes.

24 Q    Which is the top of the page, the description meaning the

25 why the record is being withheld.

1    A    (Reading)  The record includes discussions of issues

2    related to the implementation of the confidential standard

3    operating procedures and test protocols -- sorry.  Let me

4    start over.

5              (Reading)  This record includes discussions of

6    issues related to the implementation of the confidential

7    standard operating procedures and test protocols for the

8    studies conducted by HLS and the names of HLS employees.

9    Q    There's nothing in that description which specifically

10   explains why the primate enrichment paragraph is withheld, is

11   there?

12   A    I don't agree with that.  Our primate enrichment plan

13   actually is codified in an SOP.

14   Q    But what I'm asking you is whether there's anything in

15   the description in that Vaughn index which specifically

16   explains why that particular paragraph is being withheld.

17   A    Well, to the extent that a discussion of issues related

18   to the implementation of confidential standard operating

19   procedures and to the extent that primate enrichment is

20   covered by confidential standard operating procedure, unless I

21   misunderstand the question, I don't think I can make an

22   affirmative response in that regard.

23   Q    Okay.  It's the case, is it not, that one of the

24   allegations of Animal Welfare Act violations that was made by

25   USDA involved Huntington's failure to provide for

1   psychological enrichment of primates?

2   A   I don't remember the specific reference, quite frankly.

3   Q   But if that's in the report of violations, you'd have no

4   reason to doubt that it released an allegation that was made?

5   A   If it's listed as an allegation, then I certainly would

6   agree, yes.

7   Q   Okay.  If I could ask you to take a look at what's behind

8   Plaintiff's Exhibit 1-E.

9   A   Okay.

10  Q   That's in the same set of documents towards the end.

11  A   I got that.

12  Q   And just for the record, these are the documents that you

13  referred to previously, released and once were held in part,

14  that are USDA investigatory memoranda, correct?  And if you

15  need to take a moment to look through them.

16  A   Please.

17          (PAUSE.)

18  A   Yes, that's correct.

19  Q   (BY MR. GLITZENSTEIN)  And just so we understand, these in

20  fact are documents that were created by USDA in the course of

21  his investigation, correct?

22  A   That's right, yes.

23  Q   And if you look at the first page of those documents,

24  which is marked as LSR0001 in the second to last paragraph,

25  you see a -- this part of it is deleted, but then the rest of

1    it says, (reading)  Study was terminated by the sponsor before

2    the surgical procedure to fracture the foreleg of the dogs was

3    conducted.  However, dogs were accepted for the study that

4    should have been considered unsuitable for study and were

5    dosed with the test material.  The dogs were found by the

6    veterinarian to have foot problems, have a fearful disposition

7    and not to be in the weight range specified in the study

8    protocol.

9              Do you see that?

10   A    I do.

11   Q    Okay.  Now, that would seem to indicate that at least one

12   of the studies that these documents relate to was terminated,

13   at least as of the time that this memo was prepared, correct?

14   A    Actually, it was significantly prior to the generation of

15   this memo.  Well, that's my response.

16   Q    And this memo, just for the record, is dated

17   August 22nd, 1997; is that correct?

18   A    It is.

19   Q    So the study, you say, was terminated substantially prior

20   to August 1997?

21   A    That's correct.  Just to be clear, the reference is a

22   retrospective one in this memo to some data that were reviewed

23   prior to the date specified in the memo.

24   Q    Okay.  So the data could have been reviewed and were

25   reviewed in an earlier period of time, correct?

1   A   Yes.

2   Q   In any event, at least of the time of this memo, that

3   study had been terminated, correct?

4   A   Yes.

5   Q   And "terminated" means without completing the animal

6   testing protocol or preparing any of the FDA submissions that

7   would result in ultimate FDA approval, correct?

8   A   That's right.

9   Q   And if you see at the bottom of that page, there's a

10   statement that says, quote, These documents raise concerns

11   regarding the quality and reliability of the test results from

12   this facility, close quote.

13        Do you see that?

14   A   Yes.

15   Q   Okay.  And let me ask you, are you familiar with this

16   particular document?

17   A   I am.

18   Q   Okay.  And the concerns that are being referred to in

19   this document, in fact, are concerns regarding not only

20   U.S. -- excuse me -- Animal Welfare Act compliance but

21   potential concerns that might be relevant to Food & Drug

22   Administration or another regulatory agency's review, correct?

23   A   That was the author's contention, I believe, yes.

24   Q   And is it your understanding that this is one of the

25   documents that was released in response to the Freedom of

1   Information Act request?

2    A    I believe it was, yeah.

3    Q    If I could ask you to look at the next page of that

4   document, LSR0002, and if you'll see the second from the

5   bottom of that page there is a paragraph which reads,

6   (reading)  The IACUC approved the study protocol as not

7   involving any procedures that are expected to cause more than

8   momentary pain or distress to animals.

9            (Reading)  During Week 4 of dosing, the animals

10  began experiencing pain and distress from having an

11  anaphylactic response to the vehicle, not the test substance.

12  The IACUC was informed and dogs were to be treated with

13  epinephrine and diphehydra-  -- maybe you can help me with

14  that one.

15   A    Diphehydramine.

16   Q    (Reading)  The treatment was to ameliorate the

17  anaphylactic response.

18            Could I ask you a couple of questions about that

19  statement.

20            MR. ROSSIER:  Object here, Your Honor.  I'm not sure

21  what the relevance is.  This is part of the release issues,

22  and I'm focusing on the redacted, and I don't -- I'm not

23  following why this is relevant to the likelihood of

24  substantial competitive harm in this case.  I don't think

25  we're litigating the underlying Animal Welfare Act issue.

1    MR. GLITZENSTEIN:  Well, I was momentarily going to

2  get to what has been redacted, Your Honor, which relates

3  directly to that paragraph, and I've also got some questions

4  about some of the references in that paragraph because it goes

5  to the nature of information that can be disclosed and whether

6  it would actually be relied upon by anyone as actual

7  confidential information.

8    But I can go directly to the confidential nature of

9  the information that relates directly to that paragraph, and

10  then I think my questions will become clearer if the Court

11  will bear with me for a moment.

12    THE COURT:  Do that.  We'll take a short break.

13    (A BRIEF RECESS WAS TAKEN.)

14    THE COURT:  All right.

15  Q   (BY MR. GLITZENSTEIN)  Mr. Caulfield, if you look past

16  the first three pages in Plaintiff's Exhibit 1-E, then you get

17  to, I think it's -- first one is LSR311, correct, you see

18  that?

19  A   After the first three pages, I have a really awful

20  photocopy.  It's almost --

21  Q   Right.  That's exactly what I was going to ask you to

22  look at.  Unfortunately, I think all of these pages are

23  difficult to read.  They're in the form that we received them.

24  And they all refer to the top to AWA violations, and if you

25  just take a second to leaf through these pages, it's the case,

 1   is it not, that there are heavy deletions from all of these

 2   pages or for most of the pages of these particular documents?

 3          MR. ROSSIER:  Excuse me, Counsel, when you say

 4   "these pages," are you talking about --

 5          MR. GLITZENSTEIN:  I'm talking about -- what I'm

 6   particularly talking about are starting at LSR311.  These are

 7   all the pages that are difficult to read, up through the end

 8   of that section.

 9          THE COURT:  Up to the end of Exhibit 1-E?

10          MR. GLITZENSTEIN:  Exhibit 1-E.  That's correct,

11   Your Honor.

12   A   I'm sorry, what's the question?

13   Q   (BY MR. GLITZENSTEIN)  And the question is whether it's

14   fair to characterize these documents as having been heavily

15   redacted.

16   A   Well, some are and some aren't.

17   Q   And all of them across the top do have the phrase "AWA

18   Violations"; is that correct?

19   A   It is.

20   Q   And they also all refer to particular study numbers; is

21   that correct?

22   A   Yes.

23   Q   And they also all refer -- or at least most of them refer

24   to particular kinds of animals that were the subject of those

25   studies?

1    A    Yes.

2    Q    Now, if you can go to what's marked --

3         THE COURT:  Hold on one second.  I think it stopped

4    again, didn't it?

5         COURT REPORTER:  Yes.

6         THE COURT:  Let me power down.

7         (A BRIEF RECESS WAS TAKEN.)

8         THE COURT:  This is working now.  Okay.

9    Q    (BY MR. GLITZENSTEIN)  Mr. Caulfield, if you could turn

10   to what is marked with a green sticker in that same section,

11   Plaintiff's Exhibit 1-E, and this is LSR1704.

12   A    Okay.

13   Q    And continuing on to 1705.

14   A    Right.

15   Q    And it's hard to read on the first page, but on the

16   continued page, these are materials relating to Study No.

17   3314; is that correct?

18   A    It is.

19   Q    And in these two pages, at least based upon what we can

20   read, there appear to be several distinct violations of code

21   provisions that are referred to over the course of the two

22   pages; is that correct?

23   A    There are three in the two pages that I can see that are

24   visible.

25   Q    Just so that we're clear, if the one on the top is hard

1  to read but has a reference to a code provision and then there

2  is a reference to an IACUC 2.31(e)(4) near the bottom of 1704,

3  and then over on LSR1705 there is a IACUC 231(d)(1), little

4  ii, and then another IACUC provision under that; is that

5  correct?

6  A   I'm going to have to take your word with regard to the

7  first one.  I have no reason to disbelieve you, but I just

8  can't make it out on the first page, the top one.

9  Q   Now, the bulk of the information on the first page at the

10 beginning is deleted; is that correct?

11 A   Yeah, about two-thirds.

12 Q   Now, if we look over at the notice of violations

13 document, which again is Plaintiff's Exhibit 26, over at page

14 9 through 10, if you can take a look at that, that also has a

15 reference to Study No. 3314, correct?

16 A   Yes.

17 Q   And also, just to be clear, just from knowing the study

18 number, one wouldn't know anything about what substance was

19 being tested or what the -- what the consumer of the

20 information was, correct?

21 A   One meaning what?  A customer certainly would.

22 Q   Just in looking over at the study number.  I think your

23 testimony earlier was that study numbers had been disclosed

24 but not identities of customers by USDA or substances being

25 tested.

1    A    But these are unique numbers and our customers would be

2    able to identify these numbers.

3    Q    So the customers themselves would know the numbers?

4    A    Yes, indeed.

5    Q    If you look over at the substance of what's in 3314 in

6    the notice of violations, there are four different violations

7    of 9 CFR and various parts listed, correct?

8    A    Yes.

9         MR. ROSSIER:  Counsel, if I could just object.  It's

10   report of violations, not notice of violations, for what it's

11   worth.

12        MR. GLITZENSTEIN:  I apologize, Your Honor.

13   Q    (BY MR. GLITZENSTEIN)  If you look down near the bottom of

14   page 9 on the report of violations, there are references to

15   particular IACUC section numbers, and to the extent that you can

16   read what is on the bottom of page 1704, is it not correct that,

17   for example, the 2.31(e)(4) description is almost word for word

18   the IACUC 2.31(e)(4) description in the report of violation?

19        THE COURT:  Well, I'm not sure I understand what

20   you're asking him.  You're asking him about page 9 of the

21   report of violations, and is that language identical to what?

22        MR. GLITZENSTEIN:  To what is at the second to last

23   paragraph in LSR1704, which also has a reference to IACUC

24   2.31(e)(4).  And maybe I can make it clearer.

25   Q    (BY MR. GLITZENSTEIN)  Both of those references, again

1  referring to the same protocol Study No. 3314, refer to the

2  failure of the study proposal to include a description of

3  procedures designed to assure that discomfort and distress would

4  be limited to that which is unavoidable for the conduct of

5  scientifically valuable research, correct?

6  A    Yes, those two sections in those two respective documents

7  are identical.

8  Q    Okay.  And if you engage in the same comparison with

9  respect to the paragraph at the bottom of page 9 of the report

10  of violation referencing a 2.31(d)(1), little ii, violation

11  and compare that to the same reference on the next page of the

12  LSR document we've been looking at, LSR1705, it is also the

13  case that that is almost a verbatim description, right?

14  A    I'm sorry, give me the first reference again, would you,

15  please.

16  Q    In the two documents, page 9 of --

17  A    Okay.

18  Q    The report of violation to 2.31(d)(1)(ii) and then the

19  same section that is referred to on LSR1705, and just to make

20  it clearer, is it not the case that both of those sections

21  refer to the failure of the IACUC director to consider

22  alternatives to procedures that may cause more than momentary

23  or slight pain or distress to the animals and to provide a

24  written narrative description of the methods and sources used

25  to determine that alternatives were not available?

1    A    Those two sections are identical.

2    Q    Now, if you look at the top of the page 9 of the report

3    of violations, under "Veterinary Care," on that page that has

4    been disclosed, I'll just read the beginning of it just so

5    we're clear about what it is we're referring to.

6              THE COURT:  What are you reading from?

7              MR. GLITZENSTEIN:  This is where it begins

8    "Veterinary Care" on page 9, Your Honor, of the Exhibit 26

9    Report of Violation, and the reference is to a violation of

10   2.31(b)(3).

11   Q    (BY MR. GLITZENSTEIN)  And it says that (reading)

12   Documents in Study 3314 show that four primates, Nos. 6328m,

13   6333f, 6332m and 6335f were deprived of water during the 16-hour

14   urine collection, Exhibit 5, pages 12, 36, 84, 85, 96, indicates

15   the water deprivation/urine collection started November 14th,

16   1996 at 1300 and stopped on November 15th, 1996 at 0710.

17             (Reading)  The attending vet was not notified of the

18   animal observations or consulted about the appropriateness of

19   a 16-hour water deprivation procedure that was occurring

20   mostly during the night when the facility would be closed.

21   The morning observations recorded either lethargic or

22   decreased activity in all four primates.  As the pilot study

23   progressed, all four primates were documented to have emesis,

24   decreased activity and have a hunched appearance.

25             And it goes on to describe that particular event,

1   which was the focus of this USDA allegation.

2          Do you see that paragraph?

3   A   I do, yeah.

4   Q   Based upon the similarity of the other paragraphs and the

5   reference to Protocol Study No. 3314, is it not a fair

6   inference that the deleted information on LSR1704 refers to

7   the same basic set of events?

8   A   I'm not sure I'd agree with that.

9   Q   You have any basis for disagreeing with it?

10  A   Well, fair inference, I just don't feel comfortable

11  making an inference.

12  Q   If the judge were to look at that document in-camera,

13  would you be surprised to see that it had the same discussion

14  of that incident based upon how these documents were set up?

15  A   Not particularly, no.

16         MR. GLITZENSTEIN:  For the record, Your Honor, as

17  you may recall, we had suggested at the pretrial conference

18  that a full set of the documents be brought to court, and our

19  suggestion was that it might facilitate the Court's review,

20  particularly in the case which has its unusual features like

21  this one, and the Government and Intervenor refused to accede

22  to that request, frankly, for reasons I'm not entirely clear

23  about.  I'm not sure they've ever been explained to me.

24         We did believe that it would be helpful for the

25  Court to have them, but that was not something that we could

1    get a concurrence on, so I'll proceed having sort of made that

2    statement because that had come up at the pretrial conference.

3    Q    (BY MR. GLITZENSTEIN)   If, in fact, the Court were to look

4    at this document, and that is LSR1704, and indeed it does

5    describe essentially the same event as is discussed in the

6    report of violation, then there really would be no significant

7    interest in confidentiality relating to this material, correct?

8    A    As characterized on page 9 of the other document?

9    Q    Correct.

10   A    I'm sorry, rephrase the question, please.

11   Q    If, in fact, what is referred to on page 9 of the report

12   of violation is describing the same water deprivation

13   procedure that the USDA referred to as a potential violation

14   of the Animal Welfare Act Regulation, if that incident and set

15   of circumstances is also reflected in LSR1704.

16   A    Right.

17   Q    Then there would be no significant incremental violation

18   of confidentiality, would there, if that information were

19   disclosed?

20   A    That assumes that the effects that are actually specified

21   on the violations report are reflective of the water

22   deprivation as opposed to some form of drug effect.

23   Q    But the report of violation is already in the public

24   domain, is it not?

25   A    It is.  It is.

1    Q    My question is whether there would be -- is it not the

2    case that there would be no significant incremental

3    infringement upon confidentiality if a substantially similar

4    description is released in another document?

5    A    I guess you could say that, yes.

6    Q    Now, if you turn back to a few pages from what we were

7    just referring to.

8              MR. GLITZENSTEIN:  And, Your Honor, I'm turning back

9    now to LSR1289, which is another one of the AWA violations in

10   Plaintiff's Exhibit 1-E, and what I would ask you to do is go

11   from the page with the green sticker and turn back four pages.

12   Q    (BY MR. GLITZENSTEIN)  And the one I'm referring to again

13   is LSR1289.  At the top it says, "Study 3278, Dogs."  Do you see

14   that?

15   A    I do, yes.

16   Q    And there is a paragraph that says, "Veterinary Care,

17   2.33(b)(2&3)," and then it proceeds to say, (reading)  Failure

18   to use appropriate methods to prevent, control, diagnose and

19   treat diseased -- diseases and injuries.  Failure to have a

20   mechanism of direct and frequent communication of the daily

21   observation of all animals to assess their health and

22   well-being so that timely and accurate information on problems

23   of animal health behavior and well-being is conveyed to the

24   attending veterinarian.

25              Do you see that?

1   A   I do.

2   Q   Okay.  And after that, for the next four pages to the end

3   of this document, and that is up through LSR1293, almost the

4   entirety of this document is blacked out, correct?

5   A   Yes.

6   Q   And once again, this is referring to a alleged violation

7   that occurred in the 1997/1998 time frame, correct?

8   A   It's the 1996/1997 time frame.

9   Q   I stand corrected.  1996/1997 time frame.  And if this

10  material is the material that is discussed in this particular

11  document in fact is discussed in the report of violation --

12  excuse me -- the report of violations, then as you indicated

13  earlier with regard to the other document, there would be a

14  less significant concern with confidentiality, correct?

15          MR. ROSSIER:  I'm going to object here, Your Honor.

16  It calls for speculation that's based on an assumption.  I

17  think it calls for speculation.

18          MR. GLITZENSTEIN:  I'll move on, Your Honor.

19  Q   (BY MR. GLITZENSTEIN)  Take a look back at the Vaughn

20  index reference that correlates with this document, which is

21  over on page 159 and continues on through page 160 of the Vaughn

22  index, which is again Plaintiff's Exhibit 3, and look at the

23  references to LSR1289 through 1293.

24  A   Okay.

25  Q   And all of those references contain the same boilerplate

1    language about the rationale for withholding; is that correct?

2    A    They do.

3    Q    And they don't address at all, do they, whether any of

4    the description within that document could be disclosed or

5    could be segregated out from standard operating procedures or

6    protocols or that kind of information?

7    A    No, they don't.

8    Q    Could I ask you to look at what is Plaintiff's

9    Exhibit 1-C.

10            MR. GLITZENSTEIN:  Which, for the record, Your

11   Honor, are the viability reports or viability records.

12   Q    (BY MR. GLITZENSTEIN)  And I believe you, in your

13   testimony this morning, referred to these as providing a

14   cursory assessment of animal condition; is that correct?

15   A    More cursory than the weekly clinical observations.

16   Q    And if we look at the way these documents are set up,

17   they have animal numbers along the left-hand side, for the

18   most part; is that correct?

19   A    Yes.

20            THE COURT:  Before you get too far -- forgive me for

21   interrupting.  Before you get too far into this new line of

22   questions, perhaps we should take our 10-minute midafternoon

23   break.

24            MR. GLITZENSTEIN:  That's fine.

25            THE COURT:  All right.  We'll be back in 10 minutes.

1          THE DEPUTY CLERK:  All rise.

2          (A BRIEF RECESS WAS TAKEN.)

3          MR. GLITZENSTEIN:  Thank you, Your Honor.

4    Q    (BY MR. GLITZENSTEIN)  As we proceed, Mr. Caulfield, just

5    to make sure we're clear about one point, I think you indicated

6    that it has not been for a number of years that you've looked

7    at or familiarized yourself with many of the documents at

8    issue; is that correct?

9    A    With the entire body of the documents, yes.

10   Q    The entire body of the documents.  So you have not looked

11   at the entire body of documents personally, recently, in order

12   to determine whether or not some could be disclosed or some

13   could be separated out from other material you would regard as

14   more confidential, correct?

15   A    Certainly not for that purpose, no.

16   Q    On the viability reports, I believe you described those

17   as again a cursory assessment or more cursory than the weekly

18   documents; is that correct?

19   A    It is.

20   Q    And we were looking at the document itself, and I think

21   you indicated that along the left-hand column is an animal

22   number; is that correct?

23   A    It is, yeah.

24   Q    And that number correlates to a particular animal that

25   was used in a study; is that right?

1    A    Indeed, yes.

2    Q    And then going along the documents, there are various

3    columns just giving examples.  Vomit activity, respiration,

4    those are, is it fair to assume, columns that would be used to

5    record the condition of a particular animal at a particular

6    time?

7    A    Yes.

8    Q    And then finally there is a "other observations" column;

9    is that correct?

10   A    Yes.

11   Q    Is it fair to assume that other observations column would

12   be any other observation relevant to the condition of the

13   animal that doesn't fit within one of the predetermined

14   columns?

15   A    More an elaboration on a code that would have been

16   entered into that box, yes.

17            THE COURT:  Could you tell me what by exhibit number

18   page you're looking at.

19            MR. GLITZENSTEIN:  Yes, Your Honor.  This is all

20   Exhibit 1-C, and this is the -- the good news is that this is

21   the bulk of the documents, and the other good news is that I

22   don't think it will -- since they are all exact -- pretty much

23   the same, we should be able to get through it fairly quickly.

24            THE COURT:  I had turned to 1-C, and the first page

25   I see is page 142, but I couldn't find any vomit activity.  It

1    looks like it's on one of the documents after that, is it?

2            MR. GLITZENSTEIN:  Yeah, yeah.  I'm sorry, Your

3    Honor, the first couple of pages are of particular -- maybe I

4    just could ask Mr. Caulfield if he could clarify this.

5    Q    (BY MR. GLITZENSTEIN)  Mr. Caulfield, the first --

6            THE COURT:  Just direct me to a particular LSR page

7    and I'll be fine.

8            MR. GLITZENSTEIN:  All right.  Your Honor, at this

9    point I was asking some general questions about the documents,

10   but I think, to be clearer, the first 10 pages or so are set

11   up a little differently than the rest of the documents in the

12   section.

13   Q    (BY MR. GLITZENSTEIN)  Correct, Mr. Caulfield?

14   A    Yes, that's correct.

15   Q    But they all serve the same basic function?

16   A    There are some differences.

17   Q    Let me ask you about the one that appears throughout most

18   of the documents.

19           MR. GLITZENSTEIN:  Your Honor, this is -- we've

20   marked it with a yellow sticker, LSR1667.

21   Q    (BY MR. GLITZENSTEIN)  If you could turn to that,

22   Mr. Caulfield.

23   A    Yes, I have it.

24           MR. GLITZENSTEIN:  Your Honor, by the way, I

25   apologize for some of these documents.  They are pointing to

1  different directions.  What we tried to do is get the LSR

2  number and the "VR" number at least fairly uniform and they

3  were put on different places on the form, so we tried to put

4  the LSR number down in the lower right-hand corner for ease of

5  reference.

6  Q    (BY MR. GLITZENSTEIN)  Mr. Caulfield, if you see on that

7  document at the yellow tab, or yellow sticker, LSR1667, under

8  "other observations," there's a statement that says, "Out of

9  cage, return to cage," and then there is another phrase I can't

10  read.

11  A    "I.D. verified."

12  Q    Excuse me?

13  A    "I.D. verified."

14  Q    To verify that particular animal?

15  A    Yes.

16  Q    And then on the next page, LSR1668, there is again a

17  reference to an "escaped animal identified, returned to cage."

18  A    Yes, I see that.

19  Q    But the other observations on that page are deleted; is

20  that correct?

21  A    Yes.

22  Q    And then again on the next page, LSR1669, "animal found

23  loose in room, recapture, I.D. verified and returned to cage."

24  A    I see it, yes.

25  Q    Okay.  And it's the case, is it not, that there are a

1    number of documents in which the information was provided in

2    response to the request relating to animals who escaped from

3    cages and that were returned to cages; is that correct?

4    A    That and were otherwise injured, yeah.

5    Q    Otherwise injured as a result of their cages, right?

6    A    Primarily, yes.

7    Q    And it is the case, is it not, that one of the violations

8    that USDA asserted was the primates being able to escape from

9    their cages and potentially getting injured as a consequence

10   of that; is that correct?

11   A    It is, yes.

12   Q    And in fact, if we look over at page 4 of the report of

13   violations, at the bottom of that page where it says, "Primary

14   Enclosures," the statement reads, (reading)  Study No. 3093,

15   Exhibit 2, pages 52 through 100, are viability records that

16   documents 30 occasions where primates were loose in the room,

17   five of which were injured.  Primary enclosures must contain

18   primates securely and prevent accidental opening of the

19   enclosure, including opening by the animal.

20           Correct?

21   A    That's correct.

22   Q    And again, looking over at the documents we were just

23   looking at, these are referred to as Government Exhibit 2 and

24   have page references under Government Exhibit 2, correct?

25   A    They do, yes.

1    Q   They do, in fact, refer to animals being removed from the

2   cages or released from the cages, correct?

3    A   The ones that we looked at did, yes.

4    Q   Okay.  But again, the other observations have been

5   deleted; is that correct?

6           MR. ROSSIER:  Counsel, what page are you referring

7   to?

8           MR. GLITZENSTEIN:  Well, actually I was just

9   referring to the particular pages I was talking about.

10           But I'll move on, Your Honor.  I think it's

11   something I can make clearer.

12    Q   (BY MR. GLITZENSTEIN)  Now, if you look back,

13   Mr. Caulfield, at an earlier document.

14           MR. GLITZENSTEIN:  And, Your Honor, this is the one

15   marked hopefully in everybody's book with a purple sticker and

16   it says on the right-hand side going up, LSR1453.

17           THE WITNESS:  Okay.

18    Q   (BY MR. GLITZENSTEIN)  And if you look at the bottom

19   right-hand corner, there is a Government Exhibit marker 2-B.

20   Do you see that?

21    A   I do.

22    Q   Okay.  And all of the observations, just leafing through,

23   if you can go, oh, 10 pages or so, all the observation data on

24   these pages have been deleted; is that correct?

25    A   Yes.

1    Q    And if you look over at the --

2              THE COURT:  You talking about observations on

3    LSR1453?

4              MR. GLITZENSTEIN:  Right.  And I was asking him

5    to -- just to be clear, so we know exactly which document is

6    on the record.

7    Q    (BY MR. GLITZENSTEIN)  If we could go from LSR1453 up

8    through LSR1462, is it not the case, Mr. Caulfield, that they

9    all have other observation deletions?

10   A    Yes.

11   Q    And they all have that notation, Government Exhibit 2-B,

12   down at the bottom?

13   A    They do.

14   Q    Okay.  And if you look over at the report of violation,

15   bottom of page 4, at the paragraph above the one I was just

16   referring to on "Primary Enclosures," that paragraph reads,

17   (reading)  Attending veterinarian and adequate veterinary

18   care, Study No. 3093, Exhibit 2, 2a, 2b, shows failure to use

19   appropriate methods to prevent, control, diagnose and treat

20   injuries and to have availability of emergency care.

21             Correct?

22   A    Yes, I see that.

23   Q    Now, in terms of observations of animals, since

24   observation was included in here about animals escaping from

25   cages, it is the case, is it not, that there could be other

1    observations of an animal's condition that have absolutely

2    nothing to do with the drug being tested?

3    A    Well, looking at the data that we just looked at, I don't

4    think I can make that conclusion.

5    Q    But, again, since people put into some of the documents

6    animals escaping from cages, we can say with certainty, can we

7    not, that this "other observation" section is not limited to

8    observations based upon the drug taken by the animal?

9    A    That's correct, yes.

10   Q    And in fact, if there were an observation that an animal

11   were sick or injured for some completely unrelated reason,

12   that could be in the "other observations" section, right?

13   A    Could be, yeah.

14   Q    Okay.  And if the observations related to animals being

15   mistreated in some fashion, that could also be in the "other

16   observations" section, correct?

17   A    I'm not sure I understand what you mean by "mistreated."

18   Q    If any of the allegations in the USDA notice of

19   violations resulted in -- assuming they were correct, and

20   resulted in the animal experiencing some kind of pain or

21   discomfort or injury, that could be recorded in the "other

22   observations" section, right?

23   A    Assuming they were correct, yes.

24            MR. ROSSIER:  Objection, it was report of

25   violations, not notice.

1          THE COURT:  I didn't hear you.

2          MR. ROSSIER:  It's the report of violations, not

3   notice of violations, Exhibit 26.

4          THE COURT:  Okay.

5          MR. GLITZENSTEIN:  I stand corrected, Your Honor.

6   Q   (BY MR. GLITZENSTEIN)  And do you recall the document that

7   we were discussing a moment ago -- just make sure that I'm

8   getting this phraseology correct.

9          MR. GLITZENSTEIN:  And it's the document, Your

10  Honor, 1-E, Plaintiff's Exhibit 1-E, LSR0002, and referring to

11  animals experiencing pain and distress from having an

12  anaphylactic -- and perhaps I should spell that.  It's

13  a-n-a-p-h-y-l-a-c-t-i-c response.

14  Q   (BY MR. GLITZENSTEIN)  Do you recall that, Mr. Caulfield?

15  A   I do, yeah.

16  Q   And just for the record, an anaphylactic response is

17  simply an allergic response, correct?

18  A   Yeah, basically that's it.

19  Q   And so it could be an allergic response to anything,

20  right?

21  A   Well, that's not what I think is being referred to in

22  this instance.

23  Q   Well, in this instance it refers to, on page LSR0002, in

24  response to the vehicle, not the test substance, right?

25  A   That's correct.

1  Q   Okay.  And so test substance is the substance you're

2  actually testing for a customer, right?

3  A   Yes.

4  Q   Okay.  And a vehicle is simply the mechanism that you're

5  using to administer that test substance, right?

6  A   Well, sometimes, and I can't say whether it is or isn't

7  true in this case, the vehicle is also a proprietary compound

8  provided by the sponsor, which is a carrier for the test

9  material.  That's fairly common.

10       So a vehicle doesn't necessarily cover the

11  connotation that's it's saline or water or something that's

12  commercially available.

13  Q   But it could?

14  A   It could, sure.

15  Q   And those are common vehicles for administering test

16  substances, right?

17  A   Saline and water?

18  Q   Right.

19  A   Yeah, but that wasn't the case in this instance, as I

20  recall.

21  Q   I thought you said a moment ago you couldn't recall in

22  this instance?

23  A   Well, I'm not completely sure, but I know there were some

24  vehicles throughout the course of the studies reviewed in this

25  investigation that weren't standard vehicles like saline and

1  water.

2  Q   Okay.  If an animal were lethargic, that's something that

3  could be recorded and expanded upon in the "other observation"

4  section, correct?

5  A   Yes, I believe so.

6  Q   And that would be an animal lethargic for any reason at

7  all, correct?

8  A   Yes.

9  Q   And even with regard to test substances, it's the case,

10  is it not, that some symptomatic responses to test substances

11  could be extremely common to a variety of conditions that an

12  animal could be suffering, right?

13  A   I'm not sure I understand the question.

14  Q   Well, let me give you an example.  Let's say an animal's

15  blood pressure is going up or down.

16  A   Right.

17  Q   That could be a response to a test substance or it could

18  be a response to environmental stimuli, correct?

19  A   Yes, I presume that's correct.  I'm not particularly

20  qualified to answer that question.  We're getting into

21  something that's outside the area of my expertise, but that

22  sounds plausible.

23  Q   And to give another example, an animal's liver function

24  is something that's frequently checked, correct?

25  A   Yes.

1   Q    Referred to as liver values often?

2   A    Generally derived from blood collection, yeah.

3   Q    Okay.  And again, liver values can go up or down based

4   upon a variety of effects on an animal, correct?

5   A    Again, this is outside the sphere of my expertise.

6   Q    But based upon your familiarity with documents, it is the

7   case, is it not, that all observations have been deleted from

8   these documents, other than those relating to animals escaping

9   their cages or getting injured in connection with their cages?

10  A    That's my understanding, yes.

11  Q    Mr. Caulfield, I'd ask you to turn back to the report of

12  violation, Plaintiff's Exhibit 26, and go back to page 29, and

13  this is the paragraph, "Veterinary Care," again.

14          THE COURT:  What page?

15          MR. ROSSIER:  Did you say it's page 29?

16          MR. GLITZENSTEIN:  I'm sorry, Your Honor, page 9 in

17  Exhibit 26.

18          THE WITNESS:  Okay.  I have it.

19  Q    (BY MR. GLITZENSTEIN)  And this again is the paragraph we

20  referred to a bit ago about the water deprivation --

21  A    Right.

22  Q    -- of the primates, as you may recall.

23  A    Yes, I do.

24  Q    And what I'd ask you to focus on, in particular, is the

25  reference to the primate numbers being 6328m, 6333f, 6332m,

1    and 6335f.

2    A    Yes, I see it.

3    Q    You see that?

4    A    I do.

5    Q    And referring to water deprivation on November 14th, '96

6    and stopping on November 15th and then the animal's

7    condition thereafter.  You see that?

8    A    Yes, I do.

9    Q    Okay.  If you could look over at what is marked with a

10   blue sticker in Plaintiff's Exhibit 1-C, and this is LSR1719,

11   if you look over at the animal number on the left-hand side of

12   that document, those are the same animal numbers that are

13   referred to in the report of violation at page 9, correct?

14   A    Yes.

15   Q    So those are the same primates that are being discussed

16   at page 9 of the report of violation, right?

17   A    Yes.

18   Q    And if you look down at the date of this document, which

19   is included, it's November 18th, 1996, correct?

20   A    It is, yeah.

21   Q    And so that's a couple of days after the water

22   deprivation referred to in this document, right?

23   A    It is, yeah.

24   Q    Okay.  And in fact, under the "activity" section, there

25   is a reference to "l-e-t-h."  Is it reasonable to assume that

1    that refers to lethargic?

2    A   Yes, it is.

3    Q   Okay.  However, the "other observation" sections of this

4    document have been deleted, correct?

5    A   Correct.

6    Q   And if you turn a couple of pages over to LSR1784 -- I'm

7    sorry, excuse me.  I mean LSR1789, which is a number of pages

8    over.

9    A   Okay.

10   Q   And again, 6332m on the left-hand side is one of the

11   primates at issue that's -- excuse me -- one of primates

12   that's discussed on page 9 of the report of violations.

13   A   Yes.

14   Q   And once again, the "other observations" section has been

15   deleted?

16   A   It has.

17   Q   Okay.  And do you see on the right-hand corner it says,

18   "Government Exhibit 5, page 84"?

19   A   I do.

20   Q   And do you see that that same page number is referred to

21   on page 9 of the report of violations in the third sentence?

22   A   Yes.

23   Q   And Mr. Caulfield, if you look over at the descriptions

24   of the viability records, beginning at page 51 at the bottom.

25   A   I'm sorry, where we looking now?

1   Q   We are now in the Vaughn index, I'm sorry.  Plaintiff's

2   Exhibit 3 at the bottom of page 51.  And this begins the

3   Vaughn index description of the viability records.  This

4   indicates that many of these viability records have been

5   withheld in full, correct?

6   A   Yes.

7   Q   They give no indication on the face, at least, of these

8   descriptions as to whether there is any segregable information

9   that can be disclosed; is that correct?

10   A   It is.

11   Q   Are you aware of any other USDA document which discusses

12   whether there is any segregable information in those viability

13   reports that can be disclosed?

14   A   No.

15   Q   Let me ask you about what is in Plaintiff's Exhibit 1-D,

16   which was described as "Miscellaneous Records," and I think

17   you referred to it in this morning's testimony as information

18   about cages.

19   A   Okay.

20   Q   And I think you said that at the time of these documents'

21   preparation, Huntington had a particular approach to cages

22   that had not been parallelled by competitors.  Is that a

23   correct characterization of your testimony?

24   A   Yes.

25   Q   And the timing of these documents is in the -- again the

1    1998 time frame?

2    A    Yes.

3    Q    Okay.  And during that intervening time, have changes

4    been made by competitors, as far as you know, in how they

5    approach cage issues?

6    A    Some of them.

7    Q    And so the concerns that one would have in 1998 would not

8    necessarily be exactly the same as in the year 2008, correct?

9    A    It would be with regard to some of the stylizations that

10   we made, sure would.

11   Q    Let me ask you about that because you referred to removal

12   of information about particular cage sizes, but it appears

13   from at least some of these documents that cage size

14   information has been disclosed, correct?

15   A    To the extent that I can read these documents, yeah, that

16   appears to be the case.

17   Q    Now, however, on page LSR0471, which is the second to

18   last page in that section.

19   A    Okay.

20   Q    It says, (reading)  It was agreed with the USDA that we

21   would spend, and then what's blanked out is some, something,

22   on primate caging oriented towards paired housing.

23          Do you see that?

24   A    I do.

25          THE COURT:  I'm sorry, I don't have that page.  What

1   exhibit?  What page?

2          MR. GLITZENSTEIN:  This is -- Your Honor, this is

3   in -- to make sure we're in the right section, this is in

4   Plaintiff's 1-D.

5          THE COURT:  "D" as in David?

6          MR. ROSSIER:  I thought "B."

7          MR. GLITZENSTEIN:  No, I'm sorry.  It's the second

8   to last page in that section.

9   Q   (BY MR. GLITZENSTEIN)  Mr. Caulfield, you'll see that

10  under a phrase "Benefits," there's a statement, (reading)  It

11  was agreed with the USDA that we would spend, and then an

12  amount is blacked out, on primate caging oriented towards

13  paired housing.

14         Do you see that?

15  A   I do.

16  Q   Now, what Huntington would spend on paired housing in

17  1998 would not be considered to be something whose disclosure

18  would violate the confidentiality of any of your customers, is

19  it?

20  A   No, I think it's more commercial information than

21  anything.

22  Q   So, by commercial information, you mean you just --

23  Huntington simply regards it as commercial information, right?

24  A   Yes.

25  Q   Okay.

1   A   I don't think our clients would care what we spent on

2   caging.

3   Q   They wouldn't care?

4   A   No.

5   Q   Okay.  This is particularly in 1998, right?

6   A   Or today.

7   Q   Or today.  And in fact, it would be a stretch, would it

8   not, to say that revealing what Huntington spent on primate

9   cages in order to satisfy the USDA in July 1998 would cause

10  competitive injury if it were disclosed in the year 2008?

11  A   It would not.

12  Q   It would not, correct?

13  A   Correct.

14  Q   So given that answer, it's entirely possible, is it not,

15  that there is other information in some of these documents

16  whose release in the year 2008 would not result in substantial

17  competitive injury, right?

18  A   I'm not sure I'd want to make that speculation.

19  Q   But you don't know that that's not the case, do you?

20  A   I don't know.

21  Q   Let's talk for a moment about the documents that

22  Plaintiff's 1-B --

23          MR. GLITZENSTEIN:  As in boy, Your Honor.

24  Q   (BY MR. GLITZENSTEIN)  And these, Mr. Caulfield, are the

25  requests for veterinary services; is that correct?

1    A   Yes, they are.

2    Q   And just to be clear, these are the documents which

3    reflect requests for veterinary services for any reason,

4    right?

5    A   Yes.

6    Q   Including reasons that have absolutely nothing to do with

7    drug administration, right?

8    A   That's correct, yes.

9    Q   And if you look at the first couple of pages in that

10   section, LSR140, LSR141, again, the observation section has

11   been deleted from those pages, correct?

12   A   Yes, that's correct.

13   Q   Okay.  And we're talking again about two documents here

14   that are dated July 1997; is that correct?

15   A   It is, yes.

16   Q   And if one looks over at the composite chart that we've

17   agreed to, which I think has been identified as Defendant's

18   Exhibit 9.

19            MR. ROSSIER:  Correct.

20            MR. GLITZENSTEIN:  And for the record, Your Honor,

21   Plaintiff has no objections to the admissibility of that

22   document.

23   Q   (BY MR. GLITZENSTEIN)  If you look at the first page, to

24   veterinary treatment requests and logs, it indicates that 94

25   pages have been withheld in full; is that correct?

1    A   Yes, it is.

2    Q   When is the last time that you personally looked at all

3    94 pages of those documents?

4    A   It would be a few years back.

5    Q   A few years back.  So you haven't looked at those pages

6    in particular to assure yourself that there is nothing in

7    there that in the year 2008 could be released without causing

8    any particular confidentiality problem, right?

9    A   Can I just qualify my answer a little bit.  I actually

10   looked at a subset of these 94 pages yesterday.

11   Q   Okay.  But you haven't looked at all 94 pages?

12   A   Not all 94.

13   Q   And once again, these have been withheld in full with no

14   information from them being disclosed whatsoever; is that

15   correct?

16   A   That's my understanding, yes.

17   Q   And any -- therefore, any of the observations in those

18   forms have been not disclosed to the public in response to the

19   request here, correct?

20   A   You're referring to the 94 pages?

21   Q   Right.

22   A   That's correct.

23   Q   Okay.  And that would include observations that have

24   nothing to do with the administration of the drug, right?

25   A   No, I don't think that's true.  They have nothing to do?

1   Please rephrase.

2   Q   I say the observations -- again, I think you indicated a

3   moment ago these involve requests for veterinary services that

4   could have nothing to do with the drug test that's going on,

5   right?

6   A   In the broadest sense, that's what the form is for.

7   Q   Right.  So a request for veterinary service could be an

8   animal simply becoming sick, right?

9   A   Yes.

10  Q   It could be an animal, for example, these primates who

11  are suffering from water deprivation, right?

12  A   I'm not sure it's been definitively determined that these

13  primates were suffering from water deprivation.

14  Q   Well, I'm just using examples.  I'm saying that one

15  request for vet, it could be for any reason related to the

16  animal's condition, right?

17  A   Yes.

18  Q   And can you sit here and testify today that none of the

19  observation information in the 94 pages of vet materials that

20  have been withheld relate to animal conditions that have

21  nothing to do with the drug administration?

22  A   I can testify that the subset of the documents that I

23  reviewed yesterday for that express purpose did not contain

24  any observations that didn't -- Let me rephrase that.

25          The documents -- a subset of the documents I

1  referred to yesterday that were withheld in full contained

2  effects that seemed to me to be the result of the introduction

3  of a drug substance only.

4  Q   Okay.  And how large was that subset?

5  A   30 pages.

6  Q   Okay.  So less than a third you looked at?

7  A   Yes.

8  Q   Okay.  You're not aware of any other review done of the

9  full 94 pages to look at whether anything could be segregated

10  out and released?

11  A   Not within the last couple of years, no.

12  Q   Okay.  Even with regard to effects that could be drug

13  related, once again, I think your testimony is that there were

14  some effects that could relate to a large variety of drugs or

15  potential responses, correct?

16  A   I'm not sure I understand the question.

17  Q   Again, let's say you have a drug related effect, which is

18  an increase or decrease in blood pressure.

19  A   Right.

20  Q   Okay.  That wouldn't tell you much about that particular

21  drug, would it?

22  A   Well, again, this is outside the boundaries of my

23  expertise.

24  Q   Okay.  I understand.  Now, the other documents that were

25  withheld in full, and again I think we're talking about -- or

1    at least including the 22 pages of interim test reports, the

2    124 pages of the final test reports and related records, 34

3    pages of the Huntington memoranda, 28 pages of observation

4    sheets, you haven't looked at all of those documents recently,

5    have you?

6    A    No.

7    Q    And again, those all relate to studies that may have been

8    going on in the 1997/1996 time frame?

9    A    That's correct.

10   Q    And I think you testified that it takes about 10 years, I

11   think you said actually 12 years to bring a drug to market, on

12   average, after animal testing; is that correct?

13   A    It's not after animal testing.  It's the entire process.

14   Q    The entire process.  Okay.  So, once something is already

15   in animal testing, or some time of that period has already

16   been gone by, right?

17   A    Animal testing generally comes to just the very beginning

18   phases of that cycle.

19   Q    But even before animal testing, there has to be some

20   other steps in terms of protocol development, making sure

21   you've got the right kind of operating procedures in place and

22   that sort of thing, right?

23   A    Generally, but that process doesn't take necessarily all

24   that long.

25   Q    Now, do you recall in your declaration you gave an

1   average of I think you said over 10 years?

2   A   Yes.

3   Q   Wouldn't you say that's roughly the same as what you just

4   testified to this morning?

5   A   Yeah.  The strictures have become even more encompassing

6   from the FDA over the course of the last several years, and in

7   fact, there's more testing requirements now than there were

8   when I actually wrote that deposition -- that declaration,

9   excuse me.

10  Q   But even if you use the 12-year figure, if we talk about

11  animal testing that took place in the 1996/'97 time frame, any

12  of those substances they would be getting on the market, if we

13  use the average, would be on the market now or about to get on

14  the market, correct?

15  A   Yes.

16  Q   And it's also the case that many of them never did get on

17  the market and would not get on the market, correct?

18  A   Yes, that's a possibility.

19  Q   Because the reality is that many drugs which are tested

20  never do make it to FDA approval or commercial viability,

21  correct?

22  A   Yes.

23  Q   Once something is submitted to the FDA for approval, at

24  least a certain amount of data relating to that drug is then

25  available to the public, right?

1   A    Not generally.  Not generally.

2   Q    Data sufficient to at least support a safety and health

3   determination is made available to the public.

4   A    It's only the report that are the results of the data.

5   I'm differentiating between data and reports, so forgive me.

6   That's just an industry habit, but the reports are what's

7   submitted to the FDA generally, yes, which contain

8   summarizations of the data.

9   Q    And that includes discussions of the animal testing data?

10  A    Yes.

11  Q    And indeed human health testing data at that point,

12  right?

13  A    Yes, but whether that's available to the public, I'm not

14  really sure.

15  Q    But at least enough has to be available to win FDA

16  approval?

17  A    That's correct, yes.

18  Q    It's the case, is it not, that at least as a general

19  rule, the older the data, the less likely there could be a

20  concern about confidentiality?

21  A    Well, I'm not standing in the client's shoes, so I really

22  can't say that.  I can think of several instances where data

23  that were generated for a particular drug that's an analogue

24  of a different drug could actually have provided some useful

25  information that might be beneficial to the customer, but we,

1   as the conducting CRO, are not in a position to actually make

2   that determination one way or another, quite frankly.

3   Q   You say "could have"?

4   A   Yeah, sure.

5   Q   But again as a generalization -- as a generalization, the

6   older the data and the more various products are on the market

7   relating to a particular class of drug and that sort of thing,

8   the less likely it is to have significant commercial value,

9   correct?

10          MR. ROSSIER:  Objection, that's already asked and

11   answered.

12          THE COURT:  I couldn't hear you.

13          MR. ROSSIER:  Objection, asked and answered.  I

14   thought that was the same question twice.

15          MR. GLITZENSTEIN:  I think he actually didn't answer

16   my question the first time, which is why I asked it again.

17          THE WITNESS:  So ask it one more time, please, if

18   you wouldn't mind.

19   Q   (BY MR. GLITZENSTEIN)  As a general matter -- again, I

20   understand you said there could be some instances where this is

21   not the case -- but as a general matter, the older the data, the

22   less likely it is to have significant commercial value, correct?

23   A   As I testified earlier, you know, there is still a

24   possibility, as we've seen somewhat frequently of late, that

25   effects could actually be seen well after a drug is approved

1    where animal data might retrospectively be more useful than

2    would otherwise be the case.

3           So, I can't say definitively that even if a drug is

4    on sale for four or five or seven years that there isn't going

5    to be some event that might galvanize interest by the FDA and

6    other regulatory bodies in that data.  That's why the

7    archiving requirements are in place.  That's why we're asked

8    to keep these data, in some instances, for 10 years or more

9    beyond the approval of a new drug application by the FDA.

10          So, I don't want to make a generalized statement

11   like that, given those facts.

12    Q   Right.  But just to make sure I understood, your

13   testimony is it's a possibility, correct?

14    A   Well, sure, it's a possibility.

15    Q   Okay.

16          MR. GLITZENSTEIN:  Can I just take one second, Your

17   Honor?

18          THE COURT:  Yes.

19          (PAUSE.)

20          MR. GLITZENSTEIN:  I have nothing further, Your

21   Honor.

22          THE COURT:  Anything else?

23          MR. ROSSIER:  Yes, very brief redirect, if I could,

24   please, Your Honor.

25          THE COURT:  Just for my benefit, are there going to

1   be particular binders that I should be looking at before you

2   start?

3                MR. ROSSIER:  I will try to do one at a time but no

4   promises.  My first binder -- my first binder would be

5   Defendant -- excuse me -- Plaintiff's, the black ones, binder

6   covering Exhibits 19 through 29.  19 through 29, and

7   specifically a document that was referred to extensively

8   during Plaintiff's cross, and that is Plaintiff's Exhibit 26.

9                        REDIRECT EXAMINATION

10  BY MR. ROSSIER:

11   Q   And I would ask the witness to please refer to the first

12  page of that exhibit, and if you could, again, with regard to

13  what's been said before, it's a report of violation, not a

14  notice of violation, and if you could read into the record

15  under that title page what it states where it says, "For

16  Official Use Only," that phrase, and then what is set forth

17  below.

18   A   It says, (reading)  This document and its contents are

19  not to be distributed outside your agency, nor duplicated

20  without prior consent from USDA, APHIS, Investigative and

21  Enforcement Services.

22   Q   All right.  And what is your best recollection of the

23  first time you saw this document?

24   A   When we received materials from the USDA in response to a

25  FOIA request, and my best recollection is sometime in 2002.

1    Q    All right.  And do you recall whether you played any role

2    in its release to the Plaintiff?

3    A    I don't believe so.

4    Q    And I would ask you to refer to the prior document in the

5    same binder, Plaintiff's Exhibit 25, and ask if you can

6    identify that for the record.

7    A    25.

8    Q    The prior, yeah, right before 26.

9    A    Yes, this is the complaint that the USDA filed against

10   Huntington Life Sciences in April of 1998.

11   Q    And when is the first time you saw that document?

12   A    On or about April of 1998.

13   Q    All right.  So if any document would constitute a notice

14   to your company of these issues, between 26 and 25, which

15   would it be?

16   A    It would be 25, certainly.

17   Q    All right.  And do you know -- well, looking through

18   Exhibit 25, do you see any exhibits attached to 25?

19   A    No, I don't.

20   Q    And just based on your recollection, I'm not going to ask

21   you to take the time to look through the exhibit, do you

22   recall when you first received Exhibit 25 from the USDA on or

23   about March 30th of 1998, whether there were exhibits

24   attached?

25   A    No, there weren't.

1   Q   All right.

2           THE COURT:  You said March.  Did you mean March?

3           MR. ROSSIER:  I see March.  I see a received stamp

4   March 30th 1998.

5           THE WITNESS:  It was late March, early April.

6   Q   (BY MR. ROSSIER)  Okay.  April.  And your testimony is

7   you received it in April, or your best recollection of when

8   you received it?

9   A   Around or about.  I don't remember an exact date.

10  Q   Thank you.

11          MR. ROSSIER:  If I could make a notation for the

12  record here in terms of my client's involvement in the release

13  of Exhibit 26, the report of violations.

14          I have a copy of a pleading in this case, Document

15  18 filed on 2/21/2003, executed by Katherine Meyer of Meyer

16  Glitzenstein, and paragraph 7 of that document states, and I

17  quote, On April 13, 2001, the USDA sent IDA copies of its

18  report of violations, the administrative complaint and the

19  consent decision, and that cites the Gilmore declaration,

20  paragraph 9 in Defendant's Exhibit B.  And I just --

21  Q   (BY MR. ROSSIER)  Is that consistent with your

22  recollection of when you first had access to it?

23  A   Yes, I believe it is.

24  Q   All right.

25          MR. ROSSIER:  Court's indulgence for a moment.  I

1    know I had a whole list of questions.  Oh, here they are.

2    Thank you.

3    Q    (BY MR. ROSSIER)  All right.  I'm going to make reference

4    to Plaintiff's 1-C now, and I believe that's in the first black

5    binder, 1-C.

6            Mr. Caulfield, do you have Plaintiff's Exhibit 1-C

7    in front of you?

8    A    I do.

9    Q    All right.  And I would direct your attention to the

10   purple tab, and I believe you had testified about some of

11   these documents, and I believe these fall under the category

12   of "Viability Records"; is that your recollection?

13   A    Yes.

14   Q    All right.  And I think you were asked questions

15   generally with regard to these documents as to why under

16   "other observations," certain observations were redacted and

17   others weren't, and I believe you testified about generally

18   the ones that were not -- were cage related other

19   observations.  Is that your recollection of your testimony?

20           MR. GLITZENSTEIN:  Your Honor, I believe these are

21   leading questions.  Leading questions, Your Honor.

22           THE COURT:  After transition.  Go ahead.

23           MR. ROSSIER:  Thank you.

24   Q    (BY MR. ROSSIER)  Do you recall that testimony?

25   A    Yes, I do.

1    Q    All right.  My question is, with regard to what you

2    recall about the redactions themselves under "other comments,"

3    do you recall the basis for any of those redactions --

4    A    I do.

5    Q    -- under "other comments?"

6    A    I do.

7    Q    And what is your recollection of that?

8    A    They were apparent to me, who is not a toxicologist, to

9    be related to a possible drug effect as opposed to an

10   accidental injury.

11   Q    Possible drug effect?

12   A    Yes.

13   Q    All right.  I believe you also were asked some questions

14   focusing on Defendant's Exhibit 5-A, which I believe you've

15   testified to generally were a selection of representative

16   confidentiality agreements of your organization.  Is that --

17   you recall that testimony?

18   A    Yes, I do.

19   Q    And I believe counsel for Plaintiff cited you to various

20   sections talking about if they're outside of your control,

21   they became public whether there would be a -- your violation

22   of your confidentiality obligation under the agreement.  Do

23   you recall those questions?

24   A    I do, yes.

25   Q    All right.  Do you have -- do you think there would be an

1  impact on your clients, without regard to whether they could

2  sue you under the confidentiality agreement, as to whether

3  they would have a concern if nevertheless that information was

4  released publicly?

5  A   Yes, I do.  I think these documents would protect us from

6  a lawsuit in those instances, but it wouldn't protect them

7  from abrogating their relationship with us for some period of

8  time or forever, for that matter, based on experience.

9  Q   All right.

10          MR. ROSSIER:  And excuse me just a moment, Your

11  Honor.

12          (PAUSE.)

13          MR. ROSSIER:  All right.  Just to speed things up,

14  Your Honor.  We have Plaintiff's Exhibit 1 that is organized

15  in a certain way that is -- has the various LSR numbers in

16  various organizational places.  We have in -- essentially the

17  same exhibit in Defendant's Exhibit 1; however, it is

18  numerical with regard to the LSR numbers, so what I would like

19  to do is focus on the LSR numbers from the Defendant's

20  complaint, but it was based on questioning that happened with

21  the Defendant's complaint, with your permission, with the

22  questioning that happened with the Plaintiff's complaint.  Am

23  I making myself at all clear?  Probably not.

24          THE COURT:  We'll get there.  Just put a question.

25          MR. ROSSIER:  Okay.  Does the witness have a copy?

1    Okay.  May I approach the witness, Your Honor?

2            THE COURT:  Yes.  You may want to take away some

3    binders that he will not need.  Give him some space.

4    Q    (BY MR. ROSSIER)  All right.  I have placed there in

5    front of you what's been marked as Defendant's Exhibit No. 1,

6    which is the entire binder.  Do you see that, sir?

7    A    I do.

8    Q    And I have placed in front of you LSR1704 of that binder,

9    which is in numerical order, so as you go through the

10   document, it's more than halfway through.

11           And I believe in Plaintiff's Exhibit 1 you were

12   asked some questions on cross-examination with regard to this

13   document.

14   A    Right.

15   Q    Do you recall those questions and that testimony?

16   A    I don't recall the specific questions, but --

17   Q    But you were asked questions about this page?

18   A    Yes.

19   Q    All right.  And if you could turn to LSR1704 and read the

20   last sentence that begins "also" -- begins "also" after the

21   redacted material.  It says "also" I guess three lines from

22   the bottom?

23   A    (Reading)  Also the material safety data sheet from the

24   sponsor indicated that the anticipated symptoms of exposure

25   following the drug ingestion are, and then it's redacted.

```
1    Q    All right.  And do you know whether the redacted

2    information is confidential?

3    A    I believe it is.

4    Q    And why would Huntington and the client who sponsored

5    this study not want the, quote, anticipated symptoms of

6    exposure following drug ingestion, close quote, released to

7    the public, if you know?

8    A    Well, I can't say specifically why that is, but we would

9    feel beholden to our confidentiality agreement not to release

10   that.

11   Q    All right.  On the same -- in the same document, if you

12   could turn to LSR261.

13   A    Okay.

14   Q    All right.  And if you look at 261 in the documents in

15   that range, do you recall you were asked some questions on

16   cross --

17   A    I do.

18   Q    -- about those documents?

19   A    Yes.

20   Q    All right.  If you could look at LSR261, why would

21   Huntington not want the type of information that is redacted

22   regarding room numbers and animals from being released?

23   A    Well, without really remembering what is underneath the

24   black box in this instance, I don't have a lot of recall about

25   what these records are.  I'm not sure I want to actually make
```

1   a comment.

2   Q   Okay.  All right.  And if you have -- do you still have

3   Defendant's, or excuse me, Plaintiff's Exhibit No. 3 in front

4   of you?

5   A   No, I don't.

6   Q   I am bringing you back a book.  And I have now placed in

7   front of you Defendant's Exhibit No. 3, and do you recall that

8   you were questioned on cross with regard to that document?

9   A   I do.

10  Q   All right.  Were you responsible for the preparation of

11  that document?

12  A   I was not.

13  Q   Do you know if there have been any subsequent disclosures

14  to the Plaintiff by the Defendants after that document was

15  created?

16  A   I frankly can't remember the sequence of all of the

17  disclosures and where this is juxtaposed, no.

18  Q   All right.

19          MR. ROSSIER:  Court's indulgence for a moment, Your

20  Honor.

21          THE COURT:  Yes.

22          (PAUSE.)

23          MR. ROSSIER:  No further questions, Your Honor.

24          THE COURT:  All right.  Thank you.  You may be

25  excused.  Let me ask counsel to clear off the binders from the

1    witness stand, and you may call your next witness.

2            MR. ROSSIER:  All right.  The Defendants would call

3    Dr. Robert Szot.

4            THE COURT:  Let me just ask you one question.  It's

5    4:15.  Do you-all still anticipate concluding your case

6    tomorrow?

7            MR. ROSSIER:  Yes, sir.

8            MR. GLITZENSTEIN:  Yes, Your Honor.  I mean,

9    assuming that Dr. Szot takes even a good portion of the day, I

10   see no reason why we wouldn't be able to complete it tomorrow.

11           THE COURT:  All right.  I was asking only because if

12   there is some reason you want to start him tomorrow instead of

13   now, I'll hear you.  I am ready to go forward now, but this is

14   an opportunity.  I don't know if you want to start now.

15           MR. ROSSIER:  Thank you, Your Honor.  I appreciate

16   that.  My very considered opinion is he will be shorter than

17   Mr. Caulfield.  For that reason, with the Court's indulgence,

18   I suggest we start with Dr. Szot tomorrow morning.

19           MR. GLITZENSTEIN:  We have no problem with that,

20   Your Honor.

21           THE COURT:  All right.  Now, but tomorrow is it.  I

22   mean, we can't go beyond tomorrow, so I don't want you to blow

23   a chance to get it all in today.

24           MR. ROSSIER:  Understood.

25           THE COURT:  We can start tomorrow.

1          MR. GLITZENSTEIN:  I guess the only thing I would

2    say is I'm relying upon the representation of counsel.

3    Obviously, our cross-examination may last, you know, some

4    period of time, so I think if Dr. Szot, as today, were to

5    finish by, you know, use up the morning, then I don't think we

6    would have any problem with finishing tomorrow.

7          If you want to offer into, you know, we're going to

8    close of the afternoon, then obviously we would have a

9    difficulty, so that's the only caveat I would have.

10          THE COURT:  How long you expect the direct to be?

11          MR. ROSSIER:  I fully expect that I'll finish with

12   my direct certainly by noontime.  Are we starting at

13   9:15 tomorrow?

14          THE COURT:  Yes.

15          MR. ROSSIER:  From 9:15 to noontime.

16          THE COURT:  That's longer than the direct of

17   Mr. Caulfield.

18          MR. ROSSIER:  Correct.  Like I said, I'm sure I'm

19   going to finish -- I'm very confident I will finish by

20   noontime.

21          MR. GLITZENSTEIN:  I think if that happens, we

22   should be fine, Your Honor.

23          THE COURT:  Because your cross was twice as long as

24   the direct of Mr. Caulfield.

25          MR. GLITZENSTEIN:  That's true, Your Honor, and I

1  suspect that -- I think one of the things that was happening

2  is we were using Mr. Caulfield to focus on the particular

3  documents.  I think it should be a lot more efficient, we hope

4  tomorrow, in getting in opinions as opposed to looking through

5  all the documents, so with any luck, it will be a more

6  efficient process.

7          THE COURT:  All right.  We'll see you tomorrow at

8  9:15.

9          MR. ROSSIER:  Thank you, Your Honor.

10          (PROCEEDINGS END AT 4:15 P.M.)

11                          *-*-*-*-*

12

13                  **CERTIFICATE OF REPORTER**

14          I, Catalina Kerr, certify that the foregoing is a

15  correct transcript from the record of proceedings in the

16  above-entitled matter.

17

18

19

20

21  _____   _____

22  Catalina Kerr                      Date

23

24

25