```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2       --------------------------X
        IN DEFENSE OF ANIMALS,          Docket No. 02-557 (RWR)
3                    Plaintiff,

4            v.

5       THE UNITED STATES DEPARTMENT    Washington, D.C.
        OF AGRICULTURE,                 December 17, 2008
6                    Defendant,         9:23 a.m.

7            v.

8       LIFE SCIENCES RESEARCH, INC.,
                    Intervenor-Defendant,
9       --------------------------X

10                         BENCH TRIAL
             BEFORE THE HONORABLE RICHARD W. ROBERTS
11                 UNITED STATES DISTRICT JUDGE

12      APPEARANCES:
        For the Plaintiff:    MEYER GLITZENSTEIN & CRYSTAL
13                            By:  Mr. Eric Robert Glitzenstein
                                   Ms. Delcianna J. Winders
14                            1601 Connecticut Avenue, N.W.
                              Washington, D.C.  20009
15                            202.588.5206
                              eric@meyerglitz.com
16                            dwinders@meyerglitz.com

17      For the Defendant:    UNITED STATES DEPARTMENT OF JUSTICE
                              By:  Mr. Allan Blutstein
18                            1425 New York Avenue, N.W.
                              Suite 11050
19                            Washington, D.C.  20530
                              202.514.1009
20                            allan.l.blutstein@usdoj.gov

21      For Intervenor-  :    MCLEOD, WATKINSON & MILLER
         Defendant              By:  Mr. Richard T. Rossier
22                                   Ms. Elisabeth T. Kidder
                              One Massachusetts Avenue, N.W.
23                            Suite 800
                              Washington, D.C. 20001
24                            202.842.2345
                              rrossier@mwmlaw.com
25                            lkidder@mwmlaw.com
```

```
1   Court Reporter:          Catalina Kerr, RPR
                             U.S. District Courthouse
2                            Room 6716
                             Washington, D.C.  20001
3                            202.354.3258

4   Proceedings recorded by mechanical stenography, transcript

5   produced by computer.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C O N T E N T S

2    CLOSING STATEMENT BY MR. ROSSIER...................... 149

3    CLOSING STATEMENT BY MR. GLITZENSTEIN................. 165

4    CLOSING STATEMENT BY MR. ROSSIER...................... 183

5    COURT REPORTER'S CERTIFICATE......................... 193

6    WITNESS:                DIRECT   CROSS   REDIRECT   RECROSS

7    **Dr. Robert Szot**
       By Mr. Rossier            4,21                138
8      By Mr. Glitzenstein              18(VD),63

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2            (9:23 A.M.; OPEN COURT.)

 3            THE COURT:  All right.  Good morning.  We are still

 4    trying to figure out the courtroom deputy staffing

 5    circumstance, but we'll go ahead and call the case of In

 6    Defense of Animals versus USDA, Civil Action 02-557, and as

 7    soon as you give me a moment to turn this on, we'll allow you

 8    to call your witness.

 9            COURT REPORTER:  I turned on the microphone system.

10    It's all going.

11            THE COURT:  Oh, good.

12            All right.  Counsel, you can call your next witness.

13            MR. ROSSIER:  Your Honor, Defendant-Intervenor would

14    like to call to the stand, Dr. Robert Szot.  Dr. Szot.

15            THE COURT:  Please raise your right hand.

16            (WITNESS SWORN BY THE COURT.)

17                         DR. ROBERT SZOT,

18    having been duly sworn, testified as follows:

19                       DIRECT EXAMINATION

20    BY MR. ROSSIER:

21    Q    Good morning, Dr. Szot.

22    A    Good morning.

23    Q    Could you please state your full name for the record,

24    sir.

25    A    My name is Robert Szot.
```

1    Q    And could you spell your last name for the court

2    reporter.

3    A    S-z-o-t.

4    Q    All right.  And where do you reside, sir?

5    A    2 Rolling Lane, Flemington, New Jersey.

6    Q    All right.  And could you briefly describe for the Court

7    your educational background.

8    A    I received a bachelor of arts degree from Rutgers

9    University in 1960, a master of science degree from Long

10   Island University in 1963.  Both of these degrees I majored in

11   biology.

12        At that point I went to work for a company called

13   E.R. Squibb & Sons.  It's a pharmaceutical company and worked

14   in their toxicology department, and then returned to school

15   and received a doctor of science in hygiene in the field of

16   toxicology degree from Harvard School of Public Health, and

17   that was in 1970.

18   Q    All right.  And have you received any certification, sir,

19   in the field of toxicology?

20   A    Yes.  I'm board certified by the American Board of

21   Toxicology since 1980.  Every five years that certification is

22   renewed, and I have renewed it in the last -- next renewal

23   comes in 2010.

24   Q    All right.  And can you just talk briefly about what is

25   involved in the certification process.

1    A    The certification process involves a level of experience

2    that one must have.  I've forgotten the number of years one

3    has to work within the field of toxicology, and then there is

4    an examination that one must take, and that examination is

5    repeated each five year -- at each five-year interval.

6    Q    All right.  And are you a member of any honor societies

7    such as Phi Sigma Society or the Society of Sigma Xi?

8    A    At Long Island University, I was elected to Phi Sigma in

9    the graduate course, and at Harvard School of Public Health,

10   Sigma Xi; may be reversed, one or the other.

11   Q    And how about committees.  Are you on any member

12   committees for any organizations in the field of toxicology?

13   A    In the American College of Toxicology, I was a counselor

14   for a couple of years.  I was a member of their membership

15   committee.  I was a member of the Pharmaceutical Manufacturers

16   Research Association, drug safety committee.  What else?  I

17   guess that was it.

18   Q    All righty.  And let's talk a little bit about your work

19   experience, and let's go back to what you said already just so

20   we're clear.

21        Before you went to the Harvard School of Public

22   Health and got your doctorate in science and toxicology in

23   1970, I think you worked for a pharmaceutical company; is that

24   right?

25   A    I worked for E.R. Squibb & Sons in toxicology, and that's

1   what -- where I gained my interest in that field.

2   Q   Okay.  And how long were you at Squibb?

3   A   Approximately five years.  I conducted toxicology studies

4   in large animals, primarily dogs.

5   Q   All right.  And was that what you would call hands-on

6   experience?

7   A   It was hands-on experience more closer to the technical

8   level experience than as a manager.

9   Q   All right.  And then following your graduation from the

10  Harvard School of Public Health in 1970, where did you work?

11  A   I went to work for --

12  Q   Burroughs Wellcom?

13  A   Yes, Burroughs Wellcom.  Excuse me.

14  Q   No problem.

15  A   I had -- my mentor when I was getting my master's degree

16  had been from Burroughs Wellcom, and I was impressed and I

17  decided to work for them.  They had offered me a position

18  there, and there also was in the toxicology department.

19          THE COURT:  Let me ask you to spell the name of that

20  employer, for the record.

21          THE WITNESS:  Burroughs Wellcom?

22          THE COURT:  Yes.

23          THE WITNESS:  B-u-r-r-o-u-g-h-s, W-e-l-l-c-o-m.

24  Q   (BY MR. ROSSIER)  All right.  And those are two words.

25  All right.  And so your total time at Burroughs Wellcom was

1    approximately how long?

2    A    About seven years.

3    Q    All right.  And then when you left Burroughs Wellcom,

4    where did you go?

5    A    I joined Schering-Plough in Lafayette, New Jersey.

6    Q    I can help you with the spelling, unless you think you

7    can spell it.

8    A    Schering-Plough, S-c-h-e-r-i-n-g dash P-l-o-u-g-h.

9    Q    So Schering-Plough Research Institute in Lafayette?

10   A    Yes.

11   Q    Lafayette, New Jersey, and how long were you there, sir?

12   A    11 years.

13   Q    All right.  And do you recall what positions you held and

14   the type of duties?

15   A    I joined them as an associate director and left there as

16   a director of toxicology.

17   Q    All right.  And the kind of duties, what kind of things

18   you did there?

19   A    At Schering, I was responsible for their toxicology

20   efforts and drug safety evaluation.  That included managing

21   about five groups of Ph.d's, DVM level scientists that

22   conducted toxicology studies.  Part of the time I was also

23   responsible for the clinical laboratory as well.

24   Q    All right.  And you used the term "DVM level scientist."

25   What does that mean?

1    A    Doctor of veterinary medicine.

2    Q    Doctor of veterinary medicine.  Okay.  Thank you.

3         And then after you left Schering-Plough, where did

4    you go?

5    A    I joined Pfizer in Groton, Connecticut.

6    Q    What is Pfizer?

7    A    Pfizer is a pharmaceutical company, a very major

8    pharmaceutical company.

9    Q    And what did you do at Pfizer?

10   A    I was an associate there where I had provided expertise

11   to younger toxicologists that were coming through, and then to

12   the general management on matters pertaining to toxicology.

13   Q    All right.  And following your time at Pfizer, where did

14   you go?

15   A    I came back to New Jersey and joined the R.W. Johnson

16   Pharmaceutical Research Institute, which is a -- the research

17   arm, essentially, of Johnson & Johnson, and there I was given

18   responsibility for two facilities, one in Raritan, New Jersey

19   and the other in Spring House, Pennsylvania.  Both facilities

20   conducted toxicology studies in a variety of species and did

21   other activities as well.

22   Q    All right.  And how long were you at Johnson & Johnson

23   Pharmaceutical Research?

24   A    I was there for approximately five years from which I

25   retired from that position.

 1   Q    All right.  So if you start with your experience at

 2   Squibb, you go through Burroughs Wellcom, Schering-Plough,

 3   Pfizer, Johnson & Johnson, approximately how many years?

 4   A    Well, more than 30.

 5   Q    And were those all pharmaceutical companies?

 6   A    Pardon?

 7   Q    Are all those pharmaceutical companies?

 8   A    Yes.

 9   Q    All right.  Following your retirement, I think did you

10   say --

11   A    May I correct something?

12   Q    Go ahead.

13   A    In the pharmaceutical companies, working for them, that

14   was more than 25 years.  When I said more than 30, I was also

15   including my experience as a consultant.

16   Q    Yes.  So you ended your situation with Johnson & Johnson,

17   is that in 1996?

18   A    Yes.

19   Q    And what did you do after that?

20   A    I did what I wanted to do for a long period of time, and

21   that was to start a consulting business and became -- offered

22   my capabilities as a consultant to the pharmaceutical industry

23   in general.

24   Q    All right.  And do you have either a corporate name or a

25   trade name?

1    A    I don't have a specific -- well, there is a specific

2    name, Pharmaceutical Industry Consultants, and that came about

3    when I found other individuals in the similar position and

4    organized them loosely to help each other in developing

5    business and working on projects in our specific areas.  These

6    included an individual in pharmacokineticist, an individual in

7    quality assurance and a pathologist.

8    Q    All right.  Thank you.

9            MR. ROSSIER:  May I approach the witness, Your

10   Honor?

11           THE COURT:  Yes.

12   Q    (BY MR. ROSSIER)  I would like to hand you what's been

13   premarked as Defendant's Exhibit 5-B.  I have a copy here that

14   would be convenient for the Court if the Court is so inclined.

15           And, sir, I would ask you to take a look at

16   Defendant's Exhibit 5-B and ask you if you can identify that

17   for the record.

18   A    This is my curriculum vitae.

19   Q    All right.  And I see at the top under the words

20   "Curriculum Vitae," in parentheticals, January 2008.  Does

21   that mean something?

22   A    It's a -- the most recent curriculum vitae that I had put

23   together.

24   Q    That's when you put this together?

25   A    Yes.  It's also current.  Nothing has changed.

1    Q   All right.  And I believe if you look at the first page,

2    we've covered most of the information on that page.  I'd ask

3    you to turn to the second page under "Presentations and

4    Lectures" and review that and can you generally say all of

5    those presentations and lectures listed are in the area of

6    toxicology?

7    A   Yes.  Toxicology encompasses a large area of science and

8    other things like electronic data collection systems, things

9    such as that, and I believe the presentations and lectures

10   reflect that.

11   Q   All righty.  And then -- so there's a lengthy list of

12   presentations and lectures, and that's followed by an even

13   longer list of publications, and again my same question with

14   regard to those items listed under "Publications," are those

15   all or virtually all in the area of toxicology?

16   A   Essentially they are.  There is one in pharmacokinetics,

17   which is essential to toxicology.  Pharmacokinetics is the

18   science of determining what level of compound exists in the

19   body and how it's exposed by the body, how it's metabolized,

20   that type of thing.  That information is very critical in

21   determining the toxicity of a particular compound.

22   Q   And then, finally, we have "Poster Presentations and

23   Abstracts," and again, with regard to that list of

24   presentations and abstracts, the same question, are those all

25   or virtually all in the area of toxicology?

1    A    Yes.  These are all in the area of toxicology.

2    Q    All right.

3          THE COURT:  Can I just ask, what does "poster" mean,

4    poster presentations?

5          THE WITNESS:  At certain meetings, rather, it used

6    to be that it was a stand-up presentation early on in

7    toxicology.  Then toxicology became popular, you might say,

8    and there weren't that many toxicologists, so when we met, we

9    were each able to present our information on a stand-up

10   session at a podium, that type of thing, and then get

11   questions.

12         Recently, the number of toxicologists is expanded.

13   There are over 4,000 members in the Society of Toxicology.

14   All of them are active doing different types of work, and it's

15   impossible to have a meeting where everyone could stand up for

16   20 minutes and give a presentation.  So part of the

17   presentations are done as a lecture -- stand-up lecture, but

18   most of them get assigned to posters where you have a large

19   bulletin board and you put together a design results of the

20   studies that you are conducting or you have conducted or

21   whatever you want to say, somewhat similar to those posters

22   that you have in the hallway over here, but obviously more

23   detailed, more oriented towards science with data, that type

24   of thing.

25   Q    (BY MR. ROSSIER)  Thank you.  And I noted, I think I

 1   jumped over on page 1 of your resume, but you are a member of

 2   the Society of Toxicology; is that correct, sir?

 3   A   I'm a member of the Society of Toxicology, the American

 4   College of Toxicology, the Environmental Mutagen Society which

 5   is also a part of toxicology, as well as the New York Academy

 6   of Science and the American Association for Advancement of

 7   Science.  The latter two are more general scientific type

 8   societies and the others are more specifically related to

 9   toxicology.

10   Q   All right, sir.  And do you know what I mean when I say

11   CRO?

12   A   Yes.

13   Q   And what does CRO mean to you?

14   A   Contract Research Organization.

15   Q   And how long have you had any sort of involvement with

16   CROs?

17   A   I'd say since 1970.  Since I joined Burroughs Wellcom, I

18   had been involved periodically with different CROs.

19   Q   All right.  And in your current job, your consulting job,

20   do you work for or with respect to CROs at all?

21   A   Yes.  As a consultant, one of the types of things that

22   I'm asked to do is to identify CROs to conduct specific types

23   of toxicology studies.  What this -- this would generally come

24   about when a company asks me to design a toxicology program on

25   a new drug or a new chemical that would allow them to register

1   the compound with the Food & Drug Administration so they could

2   initiate trials in humans, clinical trials, and then if these

3   are successful, to conduct continuous studies, non-clinical

4   studies.  These are in laboratory animals so that they could

5   have enough information to convince the FDA of the safety of

6   the drug and they would gain approval for marketing.

7           I'm sorry.  I got lost in your --

8   Q   No, no, that's good.  That's exactly what I was looking

9   for.  Thank you.

10          And in terms of your current job, I think you were

11  addressing that you do some consulting work with regard to

12  identifying CROs?

13  A   Yes.  In putting these programs together, not

14  infrequently I would be asked to identify specific CROs that

15  would be able to conduct the program or at least some of the

16  studies that are initiated in this program.

17          I have, by principle, do not identify

18  specific compound -- a specific company, but I will probably

19  present information on several companies.  Sometimes they --

20  the company that I'm working for would ask for, well, we want

21  four, an example of what you think would be best, go to them,

22  find out what they can do, what the costs are, that type of

23  thing, and I would provide this information to them.

24  Q   All right.  And in terms of your current consulting job,

25  do you also prepare regulatory submissions?

1    A    Yes.

2    Q    And how about evaluate the relevance of pre-clinical data

3    to human use?

4    A    That is a critical part of being a toxicologist, looking

5    at the information, determining its importance relative to

6    human use, its importance relative to other compounds in that

7    class.  Essentially that's it.

8    Q    All right.  And as a consultant, how would you identify

9    your own client base?  Who are your clients?

10   A    My clients are both large pharmaceutical companies,

11   medium-sized pharmaceutical companies as well as small

12   companies, some as small as perhaps five individuals that have

13   no laboratories, per se, but have an idea and they need a CRO

14   to really execute the information or gain the information they

15   need to register their product through that CRO.

16   Q    All right.  And in terms of your current consulting

17   occupation, do you ever have occasion to visit CROs or

18   essentially interview CROs that you might have under

19   consideration for certain situations?

20   A    Yes.  One of the functions as a consultant is to monitor

21   studies.  Sometimes a client has already initiated a study at

22   a company.  They may want someone to -- from the outside, a

23   third party to come in and look at that study to determine how

24   well it's being conducted, to look at the observations and

25   measurements that have been collected to be sure that they

1   agree with the information they're receiving from the study

2   director at the CRO, or simply to go look at a company,

3   determine are they qualified to do their -- the job that they

4   need, are they going to do well in what needs to be done with

5   that particular compound.

6   Q   All right.  And with regard to your experience in the

7   pharmaceutical industry and as well as in your recent activity

8   as a consultant, can you identify some of the contract

9   research organizations you've been involved with?

10  A   I've been involved with about 12.  Huntington Life

11  Sciences is one, Kovan Will Laboratories, W-i-l-l. There is a

12  organization called Charles River Laboratories, which is an

13  umbrella organization for about four or five other companies

14  such as Mason Research Institute in Massachusetts, Redfield

15  Laboratories in Arkansas, Springborn Laboratories in Ohio,

16  Argus Laboratories in Pennsylvania.  There is a company called

17  White Eagle which does toxicology studies, Calvert

18  Laboratories in New York State as well.  Those are some of the

19  examples of companies that I had actually -- or CROs that I

20  had actually been involved with.

21  Q   All right.  Do you know what I mean when I say

22  early-stage drug development?

23  A   Well, early-stage drug development usually applies to the

24  type of work that is done prior to administering a compound to

25  human beings or at least maybe even into that early portion

1    where what is critical to getting to that point are the data

2    and the toxicology studies.  The idea is to -- from these

3    studies, to make sure that what is going to be administered to

4    humans is going to be safe, that we're not going to find --

5    well, we're not going to do harm to humans.

6    Q    All right.  And how much of your career has been involved

7    with early-stage drug development?

8    A    Essentially all of it.

9    Q    All right.

10             MR. ROSSIER:  Your Honor, at this point I would like

11   to proffer Dr. Szot as an expert in the fields of toxicology,

12   the pharmaceutical industry and early-stage drug development.

13             THE COURT:  Any objection or voir dire?

14             MR. GLITZENSTEIN:  A little bit of voir dire, Your

15   Honor.

16             THE COURT:  Go ahead.

17                   VOIR DIRE EXAMINATION

18   BY MR. GLITZENSTEIN:

19   Q    Good morning, Dr. Szot.  It's good to see you again.

20   A    Good morning.

21   Q    You don't claim to have any legal expertise, do you?

22   A    No, I don't.

23   Q    And that particularly pertains to the construction of

24   confidentiality agreements?

25   A    I have experience in confidentiality agreements.  I have

1    formulated some for my clients and I have signed many for my

2    clients and have looked at confidentiality agreements sent to

3    me from legal departments of the companies that I had worked

4    for to determine if they have covered all the, you know, what

5    it was necessary to conduct studies there.

6    Q    But concerning particular provisions, you don't claim to

7    have any legal expertise beyond what a lawyer looking at a

8    contract would have, correct?

9    A    No.

10   Q    Or even consistent with that, correct?

11   A    I don't claim to be an attorney or have that experience.

12        MR. GLITZENSTEIN:  Your Honor, I have no objection

13   to him being certified as an expert with the caveat that some

14   of the testimony, I believe, is going to address

15   confidentiality agreements.  He obviously is not qualified to

16   be called as an expert on the meaning of construction, and we

17   can explore this further on cross-examination based on his

18   deposition, but that would be our sole objection.

19        The only other point I would make is we do believe

20   there are questions as to reliability based upon the materials

21   that he reviewed, and I do believe that an element of a

22   *Daubert* challenge can include whether an expert's testimony is

23   sufficiently based upon the actual materials available for the

24   expert.  But given that this is a bench trial, my suggestion

25   would be that we explore that through cross-examination rather

1   than at this time and not unduly disrupt the questioning of

2   the witness, but I do want to have that qualification.

3           We do not object to his being certified as an expert

4   as to the pharmaceutical industry or as a toxicologist or as

5   to, I think, the third area.

6           MR. ROSSIER:  Early-stage drug development.

7           MR. GLITZENSTEIN:  Early-stage drug development as a

8   general proposition.

9           THE COURT:  All right.  I'll accept that.  I don't

10  understand fully, though, what the proffer is with regard to

11  declaring him an expert in the pharmaceutical industry.  The

12  testimony so far has certainly allowed him to be qualified as

13  an expert in the field of toxicology, perhaps in early-stage

14  drug development, but I'm not certain how widely you are

15  interpreting expertise in the pharmaceutical industry.  That

16  involves an awful lot of things.  Can you narrow down what

17  your proffer is with regard to pharmaceutical industry?

18          MR. ROSSIER:  Well, with regard to pharmaceutical

19  industry and the relationship between that industry and the

20  retaining of CROs for studies.

21          THE COURT:  All right.  Any objection to that?

22          MR. GLITZENSTEIN:  I appreciate that, Your Honor.

23  As narrowed to that area, we have no objection.

24          THE COURT:  All right.  The request is granted.

25          MR. ROSSIER:  Thank you, Your Honor.

1                    DIRECT EXAMINATION (CONT'D.)

2   BY MR. ROSSIER:

3    Q   All right.  I would like to talk to you a little bit

4   about how you got involved in this particular litigation.

5           When were you first contacted about serving as an

6   expert witness in the case?

7    A   On January 7th I received an e-mail from Mr. Caulfield

8   asking me if I would be interested in providing expertise on

9   the subject of confidentiality agreements.

10   Q   All right.  And how did you respond to that?

11   A   I said yes, but -- well, I said I would be interested,

12  let's put it that way, but I would first like to come down and

13  see what the issues are and look at whatever information they

14  may be able to provide.

15   Q   All right.  And so after that initial conversation, did

16  you end up having a meeting with Mr. Caulfield?

17   A   On January 10th I went to Huntington Laboratory Sciences

18  and was brought into a room which contained a number of

19  documents.  There was a table with about five stacks of

20  single-page documents.  It appeared they were about

21  eight inches high and there were two confidentiality

22  agreements.  There was a Vaughn index.  There was some

23  information related to the activities of animal activist

24  groups and there was a document related to IDA offered by, I

25  guess, a judge asking that they refrain from doing any

1  aggressive tactics, I guess, towards people involved in this

2  task.

3  Q   All right.  And by the time you had this visit at

4  Huntington, had you already been retained as an expert or were

5  you still considering whether to do so?

6  A   I was still considering whether to do so.  I did not want

7  to become involved in a situation where I would be subjected

8  to aggressive behavior by animal rights organizations.  I

9  didn't want my house picketed, I did not want anything else to

10  happen.

11  Q   All right.  And were any concerns you had in that area

12  ultimately resolved to your satisfaction?

13  A   It was resolved by that document.  That was their

14  restricting the activities of IDA.

15  Q   All right.  And so while you were there, did you agree to

16  serve as an expert?

17  A   Yes, I did.

18  Q   All right.  And then in terms of preparing to -- were you

19  told that you would be asked to prepare an expert report?

20  A   Yes.  There was -- I was told there was a short time

21  limit, that the report had to be completed by January 28th.

22  So, I immediately went home, I had sort of semi-retired at

23  that point in time.  I had no other assignments.  I

24  immediately started preparing it.  I gave my first draft, I

25  believe it was January 16th.

1   Q   All right.  And going back to your visit, is that -- with

2   regard to your expert testimony, did you have only that one

3   single visit to Huntington in connection with document review

4   in preparation for your testimony?

5   A   Yes, one visit.

6   Q   And had you ever been to Huntington before?

7   A   Several times before.

8   Q   And in what capacities were those visits?

9   A   Representing clients of mine who were conducting studies

10  at Huntington.

11  Q   And prior to this particular visit to Huntington

12  involving your expert testimony, had you been generally aware

13  of Huntington Life Science?

14  A   Yes.  When I worked for the different companies, the

15  pharmaceutical companies, I believe, on occasion, studies

16  would be conducted at Huntington or we would consider studies

17  as part of the group of CROs where we would -- might want to

18  contract studies.

19  Q   All right.  And I want to focus a little -- in a little

20  more detail on specific documents you reviewed while you were

21  at Huntington, and before I get there, could you -- or

22  estimate about how long were you at Huntington on that visit?

23  A   It was three to four hours.

24  Q   All right.  And focusing specifically on the kinds of

25  different documents you looked at during your visit, I think

1    one of the things you already said was confidentiality

2    agreements, and I think you said two?

3    A    Two.

4    Q    All right.

5    A    I recall.

6    Q    And tell us a little bit about what your review of those

7    documents entailed.

8    A    My purpose there was not to look at each document and

9    determine the significance of every one.  That would have --

10   there were, perhaps, a thousand pages there.  There was a huge

11   amount.  I didn't think I would want to get involved in that.

12        My purpose was to determine what type of data was in

13   question and could that data be harmful to HLS or to anyone

14   else itself.  In looking at the size of the documents, it

15   seemed the best way to go about this was to be to look at what

16   was in the Vaughn index which described the different types of

17   information which were in the documents in question.

18        And I took numbers, I guess what they call Bates

19   numbers from each of these documents and different classes of

20   information, such as veterinary examinations, observations of

21   animals, IACUC-type data, any clinical chemistry data, that

22   type of thing.

23        And then I took a sample of them, and it was just

24   done randomly, perhaps five from each, maybe less in some

25   cases, but probably in most cases four to five, and then took

1    the individual examples -- took out the individual examples,

2    examined them, verified the type of data that was there, made

3    clear in my own mind the type of data that was there, and

4    essentially that was it.

5              I also looked at the -- very cursory look at the

6    information about animal activist groups.  That did not

7    interest me very much, but it was there, looked at the

8    confidentiality agreements.  These were larger documents that

9    were actually contracts with different clients.  I focused on

10   the confidentiality statements.

11             And I think that's about it.

12   Q   All right.  And that's helpful.  Now, let me just sort of

13   identify these by categories.  From what you just testified, I

14   understand some of the documents you looked at were

15   confidentiality agreements, right?

16   A   Right.

17   Q   Some of them was a Vaughn index.

18   A   Correct.

19   Q   Some of them were the subject documents of this

20   litigation, unredacted, presumably; is that correct?

21   A   Correct.

22   Q   All right.  And then you had some material relating to

23   animal activism and court orders, correct?

24   A   That's the rest.

25   Q   All right.  Let's focus on the confidentiality agreement.

1  Let me hand --

2          MR. ROSSIER:  May I approach the witness, Your

3  Honor?

4          THE COURT:  Yes.

5  Q    (BY MR. ROSSIER)  Let me hand you what's been previously

6  marked as Exhibit 5-A and ask you to take a moment and look

7  through that, and as you do so, my question is going to be, can

8  you identify any of those agreements set forth in 5-A as any

9  agreement that you took a look at during your visit to

10  Huntington earlier this year?

11  A    There were two documents that I had recalled looking at,

12  appear to be within the group.  I am not absolutely certain,

13  but yes, they appear to be within this group.

14  Q    Can you identify them?  Is there a page number at the

15  bottom of that exhibit, or can you identify them by a specific

16  reference on the particular document itself?

17  A    Defendant's Exhibit 5-A, is that what you're looking at?

18  Q    Yes, 5-A.  Does your copy of 5-A have page numbers, sir?

19  A    There are page numbers that are associated with the

20  original documents.

21          MR. ROSSIER:  I'm sorry, Your Honor, I think I may

22  have handed the witness the wrong -- we had a version of these

23  exhibits without the page numbers, and we have this.

24          May I approach again, Your Honor?

25          THE COURT:  Yes.

1    Q    (BY MR. ROSSIER)   This is 5-A with the page numbers.   Oh,

2    yeah, you do have the page numbers.   That's what I was looking

3    at.

4    A    I'm sorry.

5         MR. ROSSIER:   Your Honor, I'm not sure would Your

6    Honor like this copy that has page numbers at the bottom or...

7         THE COURT:   Mine has page numbers.

8         MR. ROSSIER:   Yours does not?

9         THE COURT:   It does.

10        MR. ROSSIER:   It does.   Okay.   Thank you, Your

11   Honor.

12   Q    (BY MR. ROSSIER)   So, my question was, looking at this

13   bottom right-hand corner, page number, all the zeros and then a

14   "1," could you identify by those page numbers the documents you

15   recall reviewing?

16   A    The two that I feel most familiar with is -- is a

17   document that is on Page No. 7 -- 007.   The section on

18   "Disclosures, Confidentiality and Use," and on page 40,

19   "Confidentiality and Secrecy Agreement."   Those strike home as

20   being among those that -- the two that I had looked at.

21   Q    All right.   Thank you.   All right.   Now, with regard

22   to --

23        MR. ROSSIER:   May I approach the witness again, Your

24   Honor?

25        THE COURT:   Yes.

1    Q    (BY MR. ROSSIER)  I hand you now what's been marked as

2    Defendant's Exhibit 9 and ask you if you've ever seen that

3    document before.

4    A    Yes, I saw this document, I believe it was on Monday.

5    Q    All right.  And would it be possible for you to review

6    that document by the type of record and description and

7    indicate what, if any, documents you reviewed in that category

8    while you were at Huntington?

9    A    I believe I reviewed examples.  I'm pretty positive I

10   reviewed examples of viability records, necropsy and

11   postmortem records, clinical observation raw data, veterinary

12   treatment requests and IACUC meetings.  There were some

13   meeting -- sorry -- documents pertaining to purchasing of

14   animal cages, miscellaneous records, I guess.  Interim test

15   reports, I'm not quite sure, it may have been there.

16   Q    And do you recall reviewing any final test reports and

17   related records or internal Huntington memoranda?

18   A    There were related Huntington memoranda that was -- I

19   don't know if it was a final test report or if it was part of

20   a protocol.  I think it may have been part of a protocol.  I

21   don't think I remember seeing a final test report.

22   Q    All right.

23   A    There were observation sheets, certainly.

24   Q    All right.  Thank you.

25   A    May I add something?

1    Q    Certainly.

2    A    In the confidentiality agreements, I focused on the

3    confidentiality portions of these agreements primarily because

4    this was a issue in confidentiality, and these agreements are

5    commonly, almost -- well, always a part of an agreement

6    between a client and a CRO and his client, and it seemed

7    important to me to see that these were appropriate full

8    confidentiality agreements.

9    Q    All right.  Thank you.  All right.  Let's talk a little

10   bit about toxicology.  How would you define toxicology, sir?

11   A    Toxicology, an old definition is the study of poisons.  A

12   more obviously better definition now is the study of effects

13   of xenobiotics in humans.  By xenobiotics I mean any substance

14   that is not normally found in a human, and you look for

15   adverse effects that the substances may occur.

16   Q    All right.  And what role does toxicology play in the

17   development of new drugs and new products?

18   A    It's a critical role.  Non-clinical toxicology studies

19   have to be done before any studies can be done in humans.

20   Before an initial dose can be done in humans, a series of

21   studies has to be done to demonstrate the safety of that

22   initial dose, and then long-term toxicology studies have to be

23   done in animals to be sure that there are not going to be any

24   unexpected or chronic effects that may appear in humans, such

25   as carcinogenicity.

1      Studies are also done not only in animals for

2  general toxicity but for very specific effects as reproductive

3  effects, will the compound harm development of the fetus, will

4  the compound have any effect on the male to reproduce, will it

5  have effects on the female to reproduce, will the female be

6  able to deliver young.

7      Another aspect is mutagenicity.  Is there a

8  potential for causing genetic damage?  So these types of

9  studies are all needed in order to progress a compound through

10  clinical trials, and the amount and quality of those studies

11  differ as the clinical trials -- size of the clinical trials

12  increases.

13  Q   All right.  And how complex is a typical toxicology

14  study?

15  A   They are generally complex.  A general toxicology study

16  where you're just looking for a generalized nature of what

17  these compounds -- or yeah, compound can do, will include

18  simple measurements such as observations of behavior, and then

19  those measurements may be more complex with a specific

20  neurobiological test battery that different companies design,

21  and then they could be as simple as collecting food

22  consumption, body weight data.

23      They also get more complex in that hematological

24  measurements are made.  I don't want to list them, but there

25  are a number.  If you want me to I can.

1    Q    That's okay.

2    A    Besides hematological, chemical chemistry measurements,

3    things such as blood sugar, urea nitrogen, enzymes indicative

4    of liver disease, things such as that.  It's probably more

5    extensive than you would see in a physical examination if you

6    went to your physician.  A urine analysis would be collected

7    as well.

8              When the study is completed, all of the animals are

9    sacrificed and organs taken, and the animal -- the organs are

10   examined by a veterinary pathologist, usually a board

11   certified veterinary pathologist to determine what specific

12   effects the compound may have on various tissues.

13             And that's for general toxicology study.  If we get

14   into reproductive toxicology study, there are many parameters

15   that are looked at relative to the type of testing that is

16   done to assure that there is not going to be a potential for

17   reproductive harm.

18             In mutagenicity, there are a series of tests that

19   are done to look at both what is known as point mutations, and

20   this would be so-called Ames Assay that has been in the

21   newspapers frequently, a bacterial mutagenicity assay.

22   Similar type assays in mammalian cells and then an in vivo

23   assay called a micronucleus assay, either done in rats or

24   mice.  They are quite complex and there's quite a large number

25   of types of tests that have to be done.

1  Q   All right.  And how -- how long would one of these

2  typical studies take?

3  A   The studies early in development could last as short as

4  30 days in general toxicology.  As you go on, a

5  carcinogenicity study from initiation of dosing to final

6  report can take three years -- two-and-a-half to three years.

7  The dosing portion would be two years long.

8  Q   All right.  Thank you.  And what is the relationship

9  between doing all this toxicity testing and the final

10  introduction of a new product or a new drug?

11  A   Well, it's critical for approval to market a new drug, as

12  I indicated, critical for approval from the FDA to initiate

13  studies in humans.

14  Q   Drugs have to go through safety and efficacy, and this

15  focuses on the safety aspect?

16  A   Yes.  I think -- well, I shouldn't say "I think."  In the

17  beginning, before you're giving it to humans, safety has to be

18  demonstrated quite clearly, relative to the intended dose

19  that's going to be used in humans.

20          In fact, it dictates the dose that you're going to

21  be used -- going to be used in humans.  Each of the general

22  toxicology studies consists of at least three groups of

23  animals that are going to receive the drug, and a control

24  group.  If there is a vehicle that's unusual, it may also

25  include a vehicle control group.  So there may be five dose

groups.

The numbers of animals can be in say a rodent study, 20 per sex per group, and in a large animal study, say a dog, it would be three to six animals per sex per group.

The object of the study is to identify a dose that causes no effect as well as a high dose that definitely causes toxicity.  The point of causing toxicity is to give the clinician a concept of what to look for in humans in case humans show this type of toxicity.  The point of the low dose is to identify at what appears to be a low dose, and then a fraction of that dose is taken and given to humans as the first single dose.

Q   All right.  Thank you.  Now, with regard to the pharmaceutical industry, generally, do most pharmaceutical companies do this kind of testing themselves?

A   The larger pharmaceutical companies will do most of their testing themselves but frequently will also go to a contract research organization to do testing as well.  The studies are quite large.  Their facilities are probably limited and sometimes they run out of space, and that's a need for a CRO.

Smaller companies sometimes -- well, many times simply don't have the animal facilities to do these types of tests, so the CRO is more or less an extension of their own company, and the virtual companies will work extremely close with CROs in terms of development because they may not even

1    have enough -- well, they may not have a laboratory to really

2    identify well not only the toxicology but the pharmacology of

3    a product.

4    Q    All right.  And when you were testifying a few moments

5    ago with regard to the general nature of these toxicity

6    studies and their length and so forth, is that part of

7    early-stage drug development?

8    A    Yes.

9    Q    All right.  So when pharmaceutical companies or other

10   companies choose a CRO, what do they typically look for?

11   A    Well, there are several things to look for.  One, the --

12   what experience does that CRO have in conducting the study

13   that you want to conduct.  You look for the experience of the

14   senior scientist within that CRO, what is their educational

15   background, how long have they been conducting toxicity

16   studies.

17           You look at the technical staff of the CRO, are they

18   well trained, is there a training program within the CRO.  You

19   look -- you determine whether or not the technical staff is

20   certified by ALAS, the American Association for Laboratory

21   Animal Science.  It's an independent association, and these

22   individuals offer cost work to technical staff and provide

23   them with a certificate that says they have different levels

24   of expertise in dealing with animals in a toxicology study.

25           You look for whether or not the company has been

1    AAALAC certified.  This is A-A-A-L-A-C, Association for

2    Assessment and Accreditation of Laboratory Animal Care.

3    These, again, an independent organization will determine

4    whether or not your procedures in animal room facilities, in

5    laboratory are sufficient to conduct the type of studies that

6    you want.

7         I don't think anyone would go to a laboratory that

8    isn't AAALAC certified nor has technicians that have been --

9    didn't go through the process of AAALAC training, that type of

10   thing.

11        You would ask the company do they have any, I think

12   it was called 1099 forms.  These are forms that an FDA

13   pharmacology reviewer would issue when they inspect the

14   laboratory or inspect a specific group of studies on a

15   compound, and did they find any -- would identify whether or

16   not they found anything wrong with that particular laboratory.

17        These are usually kept at the CRO and usually the

18   CROs are quite proud of them because mostly they don't find

19   anything, but sometimes they do and you want to have that type

20   of information.

21        You look at the facility, is it clean; look at the

22   equipment, is it modern; do the individuals who have control

23   of that equipment, operate that equipment, are they qualified

24   to do that.  Most important, you look for a quality assurance

25   unit.  This is a group that's independent of the scientists in

1   that area and usually report directly to the head of the CRO

2   and they monitor studies to be certain that the studies are

3   conducted according to good laboratory practice regulations,

4   according to SOPs, that nobody is trying to do something or

5   carelessly do something that may compromise the data that they

6   are -- that's being collected.

7          I guess that's it.  There's probably something I

8   have missed, but off the top of my head, I think I've covered

9   most of it.

10  Q    All right.  So once you look for those factors and

11  identify qualified CROs, what's the next step?

12  A    The next step is to determine whether or not a CRO can do

13  this.  In my case, I would tell the client these are the CROs

14  that appear to be capable and can do your work.  There is

15  the -- another point of confidentiality which is part of the

16  subject as well.  I didn't mention it as a criteria only

17  because it's a given.  You don't go to a company that you have

18  any doubts about having -- of keeping the confidence of your

19  study.

20         One of the things you do look for when you're

21  visiting is the archives that each company has.  Are they

22  secure?  Do they keep their written documentation as well as

23  their physical documentation, such as tissues that are

24  collected, in a secure place?  Is it under lock and key?  Who

25  has access to it?  That has to be limited.  That's part of the

1   feeling you would get from maintaining -- maintaining

2   confidentiality.

3           One of the issues that sometimes comes about, you

4   will go into a laboratory and you want to be sure that the

5   current notebooks that in which data is being collected, that

6   they're not just laying around on a table in a room with no

7   one occupying it or with other individuals that can gain

8   access to that room.  Those books should be kept by the

9   technician while they are entering data, and then when they're

10  through, they should be put into a locked cabinet.  It's very

11  important confidentially, it's highly important.

12  Q   Doctor, I don't want to cut you off, but just focusing on

13  that subject matter there, why is the security and

14  confidentiality of the data from the studies and so forth so

15  important?

16  A   Well, the information that a client would give to a CRO

17  is proprietary.  They're telling them sometimes exactly what

18  kind of compound they're developing, the chemical name of that

19  compound.  Almost all of the time you have that information.

20          They're telling them -- giving them information

21  about what their research interests are, where they're -- you

22  could almost derive where their plans are for the future in

23  terms of where they're going, so you don't want your

24  competitors or even the public to generally know this unless

25  you have reason to release it yourself.

1    Q   All right.  And then focusing on the confidentiality

2    agreements you've reviewed over your -- the whole course of

3    your experience, can you generally describe what subject

4    matters they tend to cover?

5    A   In general, it means that the information that the client

6    of the CRO gives you is the CRO's information.  The data that

7    is collected during that toxicology study belongs to the

8    client, not the CRO.  All the tissues, all of the paper that's

9    generated belongs to the client and not the CRO.

10            In fact, part of these agreements include statements

11   that the CRO will maintain these documents for a period of

12   time, usually it's about five years, and then after that time,

13   the CRO contacts the client and asks them whether or not they

14   wish them to have it destroyed or they wish to take that

15   information back to their own laboratories or whether they

16   want to extend the storage, and if they do extend it, then

17   there is an additional fee for extending of the storage.

18   Q   All right.  Thank you.  Now, as I think you're aware,

19   Doctor, this is a Freedom of Information Act case, and have

20   you ever been a requester of Freedom of Information?

21   A   Yes, I have, frequently.

22   Q   And have you ever done that with respect to the Federal

23   Drug Administration?

24   A   With the FDA, that's the only time I have done it.

25   Q   And what kind of information have you been able to

1    receive through that process?

2    A    I usually request it through the client or through the

3    company that I'm working for.  They have ways of doing this.

4    There are also companies, organizations that will obtain this

5    data for you for a fee.  The type of information that you get

6    is the summary document.  It's called a summary basis of

7    approval from the FDA, and that data describes the reasoning

8    behind the pharmacology reviewers for either approving or

9    rejecting a particular compound for marketing.

10          You can't get this information until after a product

11   has been marketed, at least I haven't been able to get it.

12   And in that data are -- is the rationale.  It may discuss

13   issues.  It may discuss issues -- it will discuss issues of

14   toxicology.  There may be some data in it that is summarized.

15   It's not raw data.  There's usually a limited amount of data,

16   but that data is organized in a way to support the position of

17   the pharmacologist.  It's not just simply raw data without --

18   with no underpinnings.  It is raw data -- it's data that has

19   been organized in a way and evaluated so that there is no

20   misinterpretation of what is going on.

21          Obviously, that wouldn't be the case.  The reviewer

22   is trying to make a -- take a position and give them a reason

23   for his position and is using that data for that position.

24   Q    And with regard to these FOIA requests you've personally

25   been involved in, are they typically for drugs that have

1   already been approved, or have you made these requests for

2   drugs that are in the approval process?

3   A    To my knowledge, I don't believe you can obtain that

4   summary base.  It's a summary basis of approval, so

5   essentially it's for drugs that have already been approved.

6   Q    All right.  And with regard to what you are able to

7   obtain, are you ever able to obtain the raw data itself?

8   A    Never.

9   Q    All right.  I think you still have Exhibit No. 9 in front

10  of you, and I think I -- where we left off the last time, I

11  had you -- I asked you some questions about this exhibit.

12  You're indicating those sets of, or categories of documents,

13  let's call it, that you had occasion to review while you were

14  at Huntington in January, and I believe your testimony was

15  that you looked for various categories of documents.

16          I think your testimony was based on the Vaughn

17  index, and then you selected some documents from the various

18  documents that were available.  Could you take us through that

19  and more specifically how you did that whole process.

20  A    Well, these categories are just natural categories in my

21  mind, and as I recall, I had picked them out in a similar way,

22  and I don't quite know what else to say.

23          I saw in the Vaughn index a document that related to

24  veterinary treatment requests, so I looked for other items

25  under veterinary -- or that were described as veterinary

1  treatment requests.  So, on the Vaughn index, items related to

2  IACUC, so I looked for other items within the Vaughn index

3  under IACUC.  It was a random selection.  I went through the

4  whole index but I didn't choose, obviously, every one for each

5  category.

6       Clinical observations, the same thing; necropsy and

7  postmortem examinations, I thought, were very important as

8  well and I looked for those and they were in the Vaughn index.

9       Viability records, I believe, were identified in the

10 Vaughn index and took out those, as well as there were

11 miscellaneous records pertaining to cage purchases.  Let me

12 think.  I don't remember interim test reports.  There may have

13 been -- yes, there were interim test reports but I don't

14 remember final test reports.

15      I don't recall -- yes, there were internal

16 Huntington memoranda.  There may have been one or two as I had

17 seen, and observation sheets, I looked at many of those.

18 Q   All right.  And as you went through these documents, did

19 you make any determination as to whether the documents

20 contained confidential client information?

21 A   I believe they did because they would show observations

22 that were related to reactions to the drugs being tested.

23 That would be very confidential information.

24      They showed information about purchasing

25 requisitions.  That may seem not confidential, but would you

1    have a cage -- purchasing of cages, that's very expensive.

2    Would you have some sort of an agreement with a supplier of

3    cages that puts you at an advantage in terms of price for

4    other people?  Cage design would be also important.

5            Veterinary treatment requests.  These would suggest

6    how often toxicity was observed that was rather significant

7    that would require the attention of a veterinarian.

8            Necropsy and postmortem examination reports are

9    extremely important in terms of these are reports or findings

10   of what was happening in the tissues of the animals that had

11   been given drugs.

12           Viability records, again, a reflection of toxicity.

13   Animals die on toxicity studies.  That happens.  You don't

14   want it to happen, but it happens, and it would reflect again

15   the changes that could be produced by that particular animal.

16           Observation sheets, obviously, these reflect what

17   was seen by the technician in looking at the animals and

18   whether or not there was some strange behavioral effects or

19   other activities or lack of activity.  The fact that the

20   animal is not active, all those things are different pieces of

21   information that would be considered very important to a

22   client and would not want released and could be reflective of

23   what this drug potentially does to animals.

24   Q    All right.  And once you had completed your review, did

25   you develop an opinion with regard to whether public release

1  of any of that information would be likely to cause

2  substantial competitive harm to either Huntington Life Science

3  or its clients?

4  A    Yes, I did.   I thought it would be of harm to Huntington

5  Life Sciences because, for one reason, clients would assume

6  that if this data were made public, that their confidentiality

7  agreement with the CRO had been breached.   It would be harmful

8  to the -- well, if you breach that confidentiality agreement,

9  the likelihood of your going back to that particular CRO is

10  nil.   I don't think you would go back again.   You would not

11  want to take the risk that your information is going out into

12  the public.

13         To the client of the CRO, I believe with that

14  information a -- say Client A is conducting studies at

15  Huntington Research Laboratories and Client B is doing studies

16  in-house, both of these clients -- well, I shouldn't say

17  Client B, but Company B is doing studies in-house.   It is not

18  unusual that in the process of science, one -- someone, maybe

19  in academia, maybe in government, maybe in another company,

20  will discover that a particular series of compounds has

21  activity against a specific disease, and that is published.

22         So, that -- or a particular drug is marketed that

23  seems to be very active in treating a particular disease.

24  This would attract many companies to try to get into the same

25  area of activity, the same therapeutic class of activity.

1            They would then synthesize drugs that are similar to

2     those that are in public demand or have been released to the

3     public, and both sides would start toxicology studies on those

4     classes of drugs.  Classes of drugs sometimes produce

5     characteristic effects on toxicity and they are readily

6     recognizable.

7            Aminoglycoside antibiotics cause cochlear damage and

8     renal damage.  These are old antibiotics but recently I have

9     read where there's renewed interest in developing more

10    aminoglycoside antibiotics because of -- there's a better --

11    they discovered a better mechanism of how they work so people

12    are again interested in that.

13           There's a group of compounds called angiotensin,

14    converting enzyme inhibitors, ACE inhibitors.  These are

15    for -- antihypertensive drugs, and these cause characteristic

16    effects on the kidney, they reduce -- probably reduce blood

17    pressure, they will cause cardiovascular changes but primarily

18    the effect on the kidney is very characteristic.  It causes

19    changes in the juxtaglomerular apparatus of the kidneys.

20           NSAIDs, nonsteroidal inflammatory agents.

21    Analgesics will characteristically cause changes in the gut

22    and also liver, and there are others.

23           But I guess the point is there are, with some

24    compounds or classes of compounds, I should say, specific

25    types of toxicity that are generally recognizable.

1          Now, if this data were released from Huntington and

2    one of these types of compounds perhaps was part of this data,

3    someone in the other company may recognize it and say -- and

4    determine that based on other information, perhaps, perhaps a

5    financial document that the company is going to work on this

6    class of drugs, you know, given to analysts so that it helps

7    them, or from patents, patent documentation contains

8    information on different classes of drugs, but one could put

9    together relatively very easily, including the date from where

10   these documents came from when they were released, one could

11   probably well surmise who is doing what and that that group of

12   compounds or that single compound that's being tested at HLS

13   is probably in this class, which is also being developed by

14   Compound B, that is, by Company B that is working

15   independently.

16         They can then look at this data and say, Gee, look,

17   we have these characteristic effects; this is the same type of

18   compound we are looking at.  What else do they see?  From the

19   sheets there may be information about nothing else or there

20   may be information about liver toxicity that the company at

21   HLS that that particular drug is causing.

22         The independent company could look at their data,

23   and yes we have the same characteristics of toxicity

24   associated with this class but we don't have the liver

25   toxicity, and with that information they could be encouraged

1   to go ahead, or vice versa could happen.

2          The company that's doing independent studies in

3   their own laboratories may have liver toxicity, but the

4   company that conducted studies at HLS may not have any

5   indication of liver toxicity, and with that information, the

6   independent company would decide, "Well, it's not worthwhile

7   continuing to develop our compound.  They may have an

8   advantage over theirs.  Let's go on to the next compound in

9   our series."

10         I should -- what I meant by that, companies that

11  develop compounds in the class, they'll have a molecular

12  entity and they won't stop generally with one.  They'll

13  develop or synthesize as many different types of molecular

14  entities very similar to the original so that there may be a

15  series of compounds that they will test, depending on what

16  happens with the one they start with.

17         They start with the one that they believe is their

18  best guess for being successful, and then if that doesn't work

19  out, they'll go into another one.  I guess my point here is

20  that if someone does studies 10, 15 years ago, that area may

21  be still a viable area because the companies that have the

22  series will still be working on them, and so they may be able

23  to look at the third compound in this series and compare test

24  results that had occurred a couple of years ago and gain some

25  advantage.

1   Q   All right.  Thank you, Doctor.  As I understand what you

2   just testified to, and this is not going to be anywhere near

3   as eloquent what you just said, but in my sort of layman's

4   terms what I would say, at least part of what I heard you

5   saying is that when these drugs are in development, these

6   early-stage development where CROs like Huntington are

7   involved, that there is a characteristic, I don't know,

8   indicator?

9          MR. GLITZENSTEIN:  Your Honor, I object.  It sounds

10  like counsel is testifying and we're getting into a leading

11  question based upon his characterization of his testimony.

12         MR. ROSSIER:  I was just trying to clarify the

13  characteristic indicator aspect of the testimony, and to get

14  there I had to sort of rephrase it, but I can try a different

15  approach if Your Honor prefers.

16         THE COURT:  I think you should.

17  Q   (BY MR. ROSSIER)  All right.  Are there characteristic

18  indicators for various drugs or groups of drugs?

19  A   I thought I had indicated that, and I apologize if I

20  wasn't very clear.  Yes, there are, for some types of drugs,

21  characteristic types of toxicity that are produced, and I

22  believe I had given examples of them.

23  Q   All right.  And is that fairly common or uncommon?

24  A   I don't know if it's common or uncommon, but it occurs

25  with certain compounds.  With other compounds, you don't see

1  this.

2  Q    All right.  I think you addressed a little bit about time

3  frame, and the data here, a lot of the data relates to 1997,

4  as I believe you're familiar.  Is that -- does that make that

5  data less potentially harmful to, you know, in this context as

6  you've described?

7  A    In my opinion, no, because as I indicated to you, two

8  things.  Well, something I didn't indicate.  Drug development

9  takes place over a long period of time, so data that was

10  collected 10 years ago may be still valid to a company that's

11  developing this particular drug because it's still in the

12  testing phase of one form or another.

13          Even carcinogenicity studies, these studies are

14  usually done right before application for a new drug -- well,

15  NDA, a New Drug Application, so they're completed near the end

16  of the process of registration.

17          And as I had indicated, not very clearly, is that

18  the compound that was tested may be the first in a series of

19  similar, similar related to their molecular structure of

20  compounds that might be tested over time, and the

21  characteristics that were observed in the first compound may

22  be carried over through that series or more likely would be

23  carried over through that series.

24          A lot of the toxicology that is characteristic of

25  the compound is related to its pharmacology.  It's therapeutic

1   activity.  It's sort of an exaggerated effect, so you might

2   expect that same type of observation to be carried through

3   through other compounds that are also pharmacologically active

4   being in that same therapeutic class.

5   Q   All right.  Thank you, Doctor.

6          MR. ROSSIER:  May I approach the witness, Your

7   Honor?

8          THE COURT:  Yes.

9   Q   (BY MR. ROSSIER)  I would like to hand you, Doctor, what's

10  been marked as Defendant's Exhibit No. 5 and ask if you can

11  identify that for the record, sir.

12  A   This is the expert report that I had prepared.

13  Q   All right.  And that's the document you described writing

14  in, I believe, January this year?

15  A   Yes.

16  Q   All right.  And if you could turn to page seven of this

17  document, and there is a signature on that page.  Can you

18  identify that?

19  A   That is my signature and the date that I had signed it.

20  Q   All right.  And with regard to the date indicated there,

21  is that the date that you -- Well, tell us how long you had

22  this document and how long you were drafting this document.

23  A   As I had indicated, I started preparing the document the

24  day after I had visited HLS.  I think that was January 10th.

25  The initial draft was prepared and that was submitted on

1  January 16th to Mr. Caulfield at Huntington Life Sciences

2  for comment.  I believe 10 days later -- or not -- couldn't

3  have been 10 days later, it may be less.  I don't remember

4  exactly.  I received commentary from Mr. Caulfield and a

5  request that I add an overall conclusion.

6       I didn't have an overall conclusion.  I thought it

7  was clear, but I guess not.  An overall conclusion to indicate

8  also that I had reviewed documents at HLS, and they may have

9  asked for the date, I don't recall, and also to add a

10  curriculum vitae to the document.  I did not have a curriculum

11  vitae on the document.  I did that and subsequently submitted

12  essentially the document that you have here.  And I don't

13  know, January 16th, or January 25th, somewhere around

14  there, this is the document that was finally submitted.

15  Q    Thank you, sir.  I would ask you to turn to page 3 of

16  Exhibit 5 -- Defendant's Exhibit 5, and focusing in particular

17  on the last paragraph on that page, can you read that

18  paragraph into the record, sir.

19  A    (Reading)  Because of the importance of toxicology

20  studies, there are many factors that most companies consider

21  before placing a study at a CRO.  These factors include the

22  reputation and prior study experience of the CRO, experience

23  and qualification of staff scientists, the equipment of their

24  laboratories, quality of the animal care facility and its

25  certifications, evidence of adherence to Good Laboratory

1    Practices, the presence of an independent Quality Assurance

2    unit, security of the facility and cost of the study.

3    Q    All right.  And was that statement true when you drafted

4    this report in January?

5    A    Yes.

6    Q    And is it still true today?

7    A    It is.

8    Q    All right.  And then on paragraph -- or excuse me, on

9    page 5 of Exhibit 5, can you read that next paragraph, the

10   paragraph that begins at the top of the page, into the record.

11   A    (Reading)  In addition to these factors, without question

12   and included in any contract agreement would be a commitment

13   to confidentiality.  The competitiveness of health care

14   companies and CROs for business is generally fierce.  In order

15   to maintain success and have an advantage over the

16   competition, complete confidentiality of information of study

17   activities within the laboratories is essential.

18   Q    All right.  And was that statement true when you wrote

19   it?

20   A    Yes.

21   Q    Is that true today?

22   A    Yes.

23   Q    All right.  Focusing on the sentence there, "the

24   competitiveness of health care companies and CROs for business

25   is generally fierce," can you explain that?

1    A    Well, there are at least a dozen, perhaps 20 contract

2    research organizations within the United States.  They're

3    scattered within the United States.  There recently, in the

4    past five or so years, similar types of organizations have

5    developed in countries like Brazil, China, India and Russia,

6    and they are very active.  Their presence is known at

7    different society meetings, Society of Toxicology meetings,

8    and all of these companies are competing for business in the

9    pharmaceutical industry or chemical industry or drug device

10   industry.

11          They all want to attract companies or the company

12   business.  They want to be sure that these companies

13   understand their skills and their ability to do their work.

14   They need that information.  It's quite fierce.

15          You are -- you know, when I used to go out there, I

16   was always approached by many individuals from many companies

17   who would ask me how come you haven't given us any studies

18   lately, that type of thing.  Would you like to go to dinner?

19   We're having a little dinner today or something, anything to

20   get me to understand their ability to conduct the study.

21          The fierceness between pharmaceutical companies, I

22   think, is obvious.  As I indicated, if there is a lead for a

23   particular therapeutic compound, say one that reduces blood

24   pressure, other companies will look at that molecule, if it's

25   out there, and try to duplicate it and there'll be several

1    companies doing the same thing at the same time and it's sort

2    of a race to who could find a similar compound, or better yet,

3    a better compound than what is marketed and a race to get to

4    the market first.

5          It's important in pharmaceutical development in that

6    the first one out there is usually the most successful in

7    terms of financial gain.  They usually have the advantage, a

8    marketing advantage.  They get the physicians to be aware of

9    their product and start using them, and then once physicians

10   get aware of their product and start using them, it's hard to

11   wean the physicians away to another product.  So the

12   competition is fierce in both areas.

13   Q   All right.  Thank you.

14         MR. ROSSIER:  Your Honor, I have more questions.  I

15   would just inquire if -- are we planning to take a mid-morning

16   break, and if so, I think this would be an appropriate break

17   in time for me if it is for Your Honor.

18         THE COURT:  I wasn't going to do it for another 10

19   minutes, but if you prefer to do it now...

20         MR. ROSSIER:  If that would be okay.  I think I'm

21   going to transition over to my final round of questions, and I

22   think it would be appropriate if --

23         THE COURT:  Very well.

24         MR. ROSSIER:  Thank you.

25         THE COURT:  We'll be in recess for 10 minutes.

1    THE DEPUTY CLERK:  Court is in recess for 10

2  minutes.

3    (A BRIEF RECESS WAS TAKEN.)

4  Q   (BY MR. ROSSIER)  Dr. Szot, do you still have Exhibit 5,

5  Defendant's Exhibit 5 in front of you, sir?

6  A   Yes, I do.

7  Q   All right.  Thank you.  I would like to direct your

8  attention now to a paragraph on page 4 of Exhibit 5 and ask if

9  you could read it into the record.  It is in the middle of the

10  page, and the report, at least my copy says, "A have also been

11  informed," I assume you meant "I have also been informed"; do

12  you see that?

13  A   Yes, sir.

14  Q   And could you read that into the record, please, sir.

15  A   (Reading)  A, should be "I," have also been informed by

16  Michael Caulfield that an agreement had been reached between

17  IDA and USDA that the information request -- requested does

18  not include sponsor names, individual names, test material

19  identity, protocols, animal husbandry reports, dosage charts,

20  test designs and methods and specific details on study design.

21  Any documents that would be supplied would be redacted of this

22  information.

23  Q   All right, sir.  And based on that information, you do

24  have that understanding with regard to all the information

25  we've been talking about today, that the Plaintiff in the case

1  has agreed that those particular items can be redacted from

2  the information?

3  A   Yes.

4  Q   All right.  With that understanding, do you still have

5  the same concerns you had already expressed with regard to the

6  release of the data?

7  A   Yes, I do.  This does not include observations of the

8  animals, which would be reflective of the toxicity that was

9  produced.  It doesn't include veterinary examinations, which

10  would also be reflective of toxicity or what would be caused

11  by the -- by the test compounds.  Necropsy observations are

12  not in there, and one could gain a great deal of information.

13          One might be able to gain information on dosing

14  schedules, and the group of this information could be put

15  together and one could determine perhaps standard operating

16  procedures that are followed by HLS or specific methods that

17  they have developed in their testing procedures.

18  Q   All right.  Thank you.  Now I'd ask you to turn to page 5

19  of Exhibit 5 that you've been focusing on, your report, and I

20  would ask you to read the paragraph that begins at the top of

21  the page into the record for the release of raw data.

22  A   (Reading)  The release of study raw data information to

23  IDA and it is possible -- and its possible further

24  dissemination to others would cause competitive harm to HLS.

25  It would introduce considerable doubt as to the ability of HLS

1    to maintain a confidentiality agreement.  Maintenance of

2    confidentiality is a major criteria in choosing a CRO.  With

3    certainty, prior and future clients of HLS would choose to

4    place new studies at other CROs where their data would be held

5    confidential.

6    Q    All right.  And based on your understanding of the

7    confidentiality agreements that are used in the field and

8    including the confidentiality agreements you reviewed in

9    connection with your testimony, do you have an opinion as to

10   whether it matters whether the release of the data comes

11   through a breach of that agreement as opposed to a permitted

12   exception under the agreement?

13   A    I don't think it would matter.  I believe that the

14   release of the data, whether it was through a legal means that

15   this data had to be released, or whether it was through some

16   other way, the client would very -- be very much concerned

17   about their data and feel that their data has been

18   compromised.

19          Other people have seen it and that's not what they

20   intended to do and that was not why they went to that

21   particular CRO.  I should mention that one -- when clients ask

22   me where to go, I generally did not include HLS because of the

23   activities that have been focused on them relative by other

24   animal activists groups.  I know their facility had been

25   breached, animals had been taken, their staff had been

1    harassed and that bothered me.  Data had been taken out and I

2    didn't tell people not to go there, but I thought it was part

3    of my obligation as a consultant to them to let them know that

4    there -- this had happened.

5         Whether it would happen again, I had no idea but

6    they should know that was taking place.

7    Q   All right.  And I would direct your attention again still

8    on page 5 of your report, which is Defense Exhibit 5, to the

9    next paragraph after the one you just read, and I would ask if

10   you could read that paragraph into the record, beginning with

11   the word "Although."

12   A   (Reading)  Although the study raw data would be redacted

13   as previously indicated, there are two ways by which the

14   redacted data could be identified as data generated at HLS.

15   One obvious way is that the values and observations could be

16   correlated to identical data in the final reports held by the

17   sponsor and identified by the sponsor as data generated at

18   HLS.

19        (Reading)  The second way is that a general release

20   of study raw data collected by the USDA from a specific time

21   span, i.e. 1997, would alert study sponsors that conducted

22   studies at HLS during that time.  This would likely prompt

23   questions to HLS by study sponsors to determine if the data

24   came from their studies.

25        (Reading)  In either situation, it is likely that

1    companies sponsoring studies at HLS would view this as a

2    violation of confidentiality.  Since confidentiality is a

3    critical part of selection of CROs for the conducting of

4    studies, it is highly likely that HLS would be regarded as a

5    contract facility that cannot maintain confidentiality and

6    consequently would not be employed to conduct further studies.

7    The possible consequence of this is that HLS would be forced

8    to go out of business.

9    Q    All right.  Now, was that paragraph true when you wrote

10   it in January of this year?

11   A    Yes.

12   Q    And is it true today?

13   A    Yes.

14   Q    All right.  Now, the next paragraph as well, sir, you

15   wouldn't mind, if you could read that into the record.  It's a

16   long paragraph.

17   A    (Reading)  In addition to causing harm to HLS, the

18   release of study data could harm companies that sponsored

19   studies at HLS during 1997.  By prior agreement with IDA, the

20   data would not include the sponsor name, test material

21   identity or individual names.  However, the data would come

22   from a specific time period, 1997, in which it is likely that

23   studies may have been conducted with competitive products by

24   more than one company at facilities other than HLS.

25               (Reading)  It is not unusual that more than one

1    company would be developing novel products for the same use

2    simultaneously and independently.  It is conceivable that the

3    characteristics of the measured values and observed reactions

4    to dosing of the product seen in the study raw data generated

5    for a company by HLS could be linked by an astute scientist

6    working for a competitor to similar data that was generated by

7    them in a new product at another facility.

8           (Reading)  New products in the same biological or

9    therapeutic class frequently cause similar characteristics of

10   toxicity.  Excuse me.  This link may suggest, regardless of

11   the specific compound identity, the characteristics of the

12   toxic effects caused by the product which can be compared to

13   those discovered by its own research.

14          (Reading)  Similarities and any slight differences

15   between the data sets can reveal information on the

16   competitor's product that can be used to affect direction or

17   renewal of further research.  New products are sometimes

18   developed over a prolonged time span, sometimes with stops and

19   starts.  Even older data that is almost always useful -- even

20   older data is almost always useful in developing new products.

21   Q    All right.  Thank you, sir.  Now, you focused at the

22   bottom of page 5 in that paragraph on an astute -- what you

23   called someone as an astute scientist looking at this data.

24   Based on your experience in the pharmaceutical industry and

25   your experience with CROs, are there people like that out

1   there?

2   A   Yes.  I would say what I meant by an astute scientist is

3   that someone who is educated, is interested in what he's

4   doing, is interested in the science and any -- if not most

5   senior toxicologists or directors of the toxicology would be

6   considered among that group.  They're well educated, their

7   performance depends on information they could gain, so they're

8   going to be always looking for information that would help

9   them conduct their studies and gain information that would

10   help them identify what is going on with the compounds they're

11   testing.

12   Q   All right.  And based on the data that would be released,

13   the raw data with the limitations that have been agreed to by

14   the parties in the case, is it your opinion that that kind of,

15   you know, that important information can be gleaned from the

16   remaining information in these documents?

17   A   Yes, it is.  I think the observations and necropsy

18   observations, general observations in particular can be used

19   to identify a potential therapeutic class that others would

20   recognize and then could perhaps glean further data from

21   whatever information is there.

22   Q   Thank you, sir.

23         MR. ROSSIER:  Just a moment's indulgence, Your

24   Honor.

25         THE COURT:  Yes.

1        (PAUSE.)

2    Q    (BY MR. ROSSIER)  All right.  Dr. Szot, if you could turn

3    to page, I believe it's 7.  Yeah, page 7 of your report, and

4    under the subheading "Conclusions," could you please read that

5    paragraph into the record, sir.

6    A    (Reading)  Based on my review of the information made

7    available to me and my extensive experience as a toxicologist

8    working for health care industries, it is my opinion that

9    release of redacted study raw data would not allow one to

10   determine if animal abuse had occurred in the research

11   facility.

12        (Reading)  Release of study raw data would cause

13   competitive harm to Huntington Life Sciences and possibly to

14   its clients.  Release of study raw data would indicate to a

15   study sponsor that HLS cannot maintain a confidentiality

16   agreement.  It is not likely that potential study sponsors

17   would conduct studies at a CRO that could not maintain the

18   confidentiality of its study data.

19        (Reading)  It is also possible that with knowledge

20   of approximate study dates and raw data characteristics,

21   competitors of HLS study sponsors may gain information that

22   could adversely affect fair competition between companies.

23   Q    All right.  And is that your opinion -- was that your

24   opinion when you wrote this report in January?

25   A    Yes, it was.

1    Q    And is it still your opinion today?

2    A    Yes, it is.

3    Q    All right.  Focusing on the sentence specifically

4    "release of study raw data would cause competitive harm to

5    Huntington Life Sciences and possibly to its client," can you

6    give any indication of the scope or degree of the harm you

7    would anticipate in that circumstance?

8    A    Well, if I were working for Johnson & Johnson or

9    Schering-Plough where I had worked or for Pfizer and I had

10   found out that this data was released from them, I would never

11   go to HLS again for conducting another study, regardless of

12   the reason why it was released.  It's just something that I

13   would be afraid would happen again, and if important

14   information hadn't been released, the next time extremely

15   important information may have been released.

16   Q    All right.  Thank you, sir.

17          MR. ROSSIER:  The Court's indulgence for just a

18   moment.

19          (PAUSE.)

20          MR. ROSSIER:  No further questions.  Thank you.

21          THE COURT:  All right.  Actually, let me just --

22   before you get up there, let me ask if Mr. Blutstein has any

23   questions.

24          MR. BLUTSTEIN:  I have no questions, Your Honor.

25          THE COURT:  All right.  Go ahead.

1    MR. GLITZENSTEIN:  With the Court's permission.

2  Thank you, Your Honor.

3                         CROSS-EXAMINATION

4  BY MR. GLITZENSTEIN:

5  Q    Good morning again, Mr. Szot.

6  A    Good morning.

7  Q    Did you discuss your testimony with Intervenor's counsel

8  since yesterday?

9  A    Since yesterday, no.

10  Q    Okay.  Have you discussed Mr. Caulfield's testimony with

11  anyone since yesterday?

12  A    No.

13  Q    Now, Mr. Szot -- Dr. Szot, you indicated that you took

14  one trip to Huntington Life Science for the purposes of

15  looking at the documents at issue, correct?

16  A    That's correct.

17  Q    And you indicated that you spent about three or four

18  hours looking at some of the documents; is that correct?

19  A    Correct.

20  Q    And after that document review, you agreed to serve as an

21  expert?

22  A    Yes.

23  Q    And that was when you prepared your expert report?

24  A    Yes.

25  Q    Correct.  And that's the only expert report that you have

1    prepared, correct?

2    A    That's the only one.

3    Q    For the purposes of this case?

4    A    Yes.

5    Q    And so all of the opinions you expressed in that report

6    are based upon that one document review that you did, correct?

7    A    Essentially, yes.

8    Q    And I think I understood you to say that you haven't

9    looked at any of the underlying documents at issue since you

10   agreed to become an expert; is that correct?

11   A    That's correct.

12   Q    It's also correct, is it not, that you looked at a total

13   of about 30 documents?

14   A    Approximately 30, yes.

15   Q    And just by way of background, you have been deposed in

16   connection with this case, correct?

17   A    Yes, I believe it was March 14th.

18   Q    And about what period of time was it that you looked at

19   the documents at issue?

20   A    Between now and when I first looked at them, is that --

21   Q    I'm just saying what was the -- you said March 14th is

22   when the deposition was.  Do you remember the date or the

23   approximate date that you went to Huntington to look at the

24   documents?

25   A    January 10th.

1  Q   Okay.  Would it be fair to assume that your recollection

2  of your document review would have been more accurate when you

3  were deposed than sitting in court today?

4  A   Not necessarily, no.

5  Q   Because your memory tends to get better over the course

6  of time?

7  A   I think memories were prompted by your questions when I

8  was deposed that I didn't think of before the deposition.

9  Q   Okay.  But when you were deposed, you did make an effort

10  to answer the questions as accurately as possible, correct?

11  A   As accurately as possible, yes.

12  Q   Now, when you were deposed, you didn't recall how many

13  documents -- or know how many documents were at issue in this

14  case; is that correct?

15  A   No.  The number that I had come up with, the thousand, if

16  I mention that today, was a number that I had seen in one of

17  the recent documents that was issued to me.

18        I believe it was the pretrial document that was

19  prepared by you, Your Honor, and the term of a thousand

20  documents was in there, and that's where I got the idea of a

21  thousand documents.

22  Q   Are you referring to the pretrial statement?

23  A   Yes.

24  Q   The joint pretrial statement?

25  A   Yes, I believe so.

1    Q    Okay.  So you did read that before testifying?

2    A    I looked through that, yes.

3    Q    Okay.  And who gave you that?

4    A    Counsel for the Defendant.

5    Q    Okay.  And so that's the first time you learned how many

6    documents were actually at issue in the case?

7    A    Yes.  I knew there were a lot of documents, as I had

8    indicated.  There were like four or five stacks eight inches

9    tall, so there were a considerable number of documents.

10   Q    But you didn't know the exact number?

11   A    I did not know the exact number, no.

12   Q    And now you know that it's over a thousand pages of

13   documents, correct?

14   A    That appears to be the case, yes.

15   Q    And so if you looked at about 30 of them, that means you

16   did not look, correct me if my math is wrong, at about

17   97 percent of the documents at issue, correct?

18   A    That's correct, but what I did look at were

19   representatives of the types of documents that were put in

20   there.  I didn't look at the individual ones, but in going

21   through the Vaughn index, I covered a great amount of

22   documents, at least half, if not more, and just selected from

23   those the 30 that I actually pulled from the pile and looked

24   at.

25   Q    I'm not sure I just followed what you said.  You looked

1   at a great number in order to pull the ones that you reviewed?

2   A    Yes.  At the Vaughn index, I went down and looked at the

3   types of documents, the type of information that was revealed

4   in the documents that was described there, and then from the

5   Bates numbers, pulled out those documents from the pile, and

6   it was sort of, if there were, I don't know, six, seven, 20,

7   50 documents on clinical observations, I just took examples of

8   them and stopped there.

9   Q    Right.  So when you say "looked at a great number,"

10  you're referring to a great number of the kinds of documents

11  described in the Vaughn index?

12  A    That's correct.

13  Q    You did not look at all the kinds -- you did not look at

14  representatives of all the kinds of documents described in the

15  Vaughn index, correct?

16  A    I believe I did look at representatives of all the kinds

17  of documents that were in the Vaughn index, but I didn't look

18  at all the documents that were listed in the Vaughn index.

19  Q    Because I thought I understood your testimony this

20  morning to indicate that at least, I think it was for interim

21  reports, you don't recall whether you looked at any of those.

22  A    I don't recall at this moment if I looked at that.

23  Q    So you may not have looked at those, for example?

24  A    I can't answer that.

25  Q    So, you can't say that you looked at representative

1   examples of each category of documents, correct?

2   A   I don't know.  I can't say that.  I may have, and memory

3   is not severing me that, you know, that bright.

4   Q   And in any event, you did look at about 30 documents in

5   total?

6   A   Yes.

7   Q   And so that's about 3 percent of the total documents at

8   issue, correct?

9   A   Correct, right.

10  Q   And I think you said that you figured out which documents

11  to look at based upon the description in the Vaughn index; is

12  that correct?

13  A   That's correct.

14  Q   Okay.  And in doing that, you assumed, did you not, that

15  the Vaughn index correctly and accurately described the kind

16  of document that was at issue, right?

17  A   I did, and those documents that I picked, it was

18  accurate.

19  Q   And then you -- so you satisfied yourself that the

20  document description in the Vaughn index was accurate based

21  upon cross-referencing the 30 you picked with the description

22  in the Vaughn index, right?

23  A   Right.

24  Q   Okay.  If I were to tell you that at least some of the

25  Vaughn index descriptions are inaccurate, would that cause you

1  to question whether or not you looked at a sufficient sample

2  of documents to form a conclusion?

3  A   I'm not sure it would.  The documents description in the

4  Vaughn index, as far as I could tell, was accurate.  If there

5  were inaccuracies, maybe something labeled as observations,

6  clinical observations in the Vaughn index and was actually

7  veterinarian's observations, it wouldn't have mattered to me.

8  So I would --

9  Q   Let me give you another example.  What if a document was

10  described in the Vaughn index as reflecting standard operating

11  procedures, but in fact when you went to look at the document,

12  it didn't have anything in there about standing [sic]

13  operating procedures, would that have resulted in your looking

14  at more documents?

15  A   Probably.

16  Q   And if you went to look at more documents and in fact

17  you've had more documents which reflected or suggested,

18  according to the Vaughn index that they discussed, standard

19  operating procedures, but they did not, would that, for you as

20  a good scientist, result in you expanding the scope of the

21  sample size?

22  A   I may have.  You have to understand, I didn't go to this

23  documentation room to prove that every document in there was

24  exactly the same as the Vaughn index.  I didn't have in mind

25  to question the data in there in terms of what it really

1   meant.

2          My concern was, what kind of information was being

3   asked for, and that was all it was.  I just wanted to know

4   what the nature of the information contained -- was contained

5   in those documents.

6   Q   All right.  But in making that determination, you relied

7   upon 30 documents which in turn was based upon your

8   correlation with descriptions in the Vaughn index, right?

9   A   Right.

10  Q   Okay.  When you were doing your document review, did

11  anyone advise you that a number of the -- another member of

12  the federal bench here in Washington, Judge Oberdorfer, had

13  done an in-camera review of any -- Just let me back up for a

14  second.

15         Do you know what an in-camera review of documents

16  is?

17  A   No.

18  Q   For purposes of discussion, that is a review of documents

19  by the Court, which is not privy to at least one side of the

20  case, but for the purposes of evaluating what's in the

21  documents.  Did anyone advise you that a member of this court,

22  Judge Orberdorfer, had in fact done an in-camera review of

23  some of the documents?

24  A   No.

25  Q   So nobody asked you to look at any such documents that

1   had been looked at by Judge Oberdorfer to verify those

2   particular documents indeed contained the kind of data

3   that you were -- what might be concerned about?

4   A   No.

5   Q   If you had been told that a member of this court had

6   looked at certain of the documents and expressed skepticism

7   about the descriptions of those documents in the Vaughn index,

8   would that have led you as a good scientist to want to look at

9   those documents in order to expand what you had analyzed for

10  coming to your conclusion?

11  A   Probably, but I would be -- I think I would want to

12  verify what a nonscientist described as a discrepancy relative

13  to what a scientist might describe as a discrepancy.

14  Q   Of course you would.  You'd want to look at the documents

15  in order to come to that verification, right?

16  A   Yes.

17  Q   And if in fact there was a discrepancy between your

18  understanding -- excuse me -- if there was a discrepancy

19  between the description in the Vaughn index and what's in the

20  document, based upon the judge's review, would that not also

21  lead you as a good scientist to come to the conclusion that

22  you should look at more documents than simply 30?

23  A   I may have -- if I knew that there was a discrepancy,

24  picked up those documents or specifically looked at those

25  documents to identify the discrepancy and determine what the

1    difference was, but the documents that I did look like -- did

2    look at clearly show the type of data that they contained, and

3    I was satisfied that I knew that the type of information that

4    was present in the disputed documents, I knew what was there.

5    Q    Okay.  But based upon your review of those 30 documents?

6    A    Yes.

7    Q    Okay.  Now, when you looked at those 30 documents, you

8    looked at them in their entirety, correct?

9    A    Yes.

10   Q    In other words, there was nothing redacted from them; is

11   that right?

12   A    As I recall, no, there was nothing redacted.

13   Q    And it's also correct, is it not, that when you did your

14   review of any of the documents, you did not look at them with

15   a knowledge of exactly what would be deleted from them based

16   upon product compounds, protocols, any other information that

17   would be deleted under the parties' understanding in this

18   case, correct?

19   A    No.  I was aware of that because there was a document, I

20   believe, that indicated the agreement between IDA and HLS in

21   terms of what would be redacted, and I had that knowledge and

22   I looked at them.

23   Q    I understand that, but I'm just asking you a more sort of

24   technical question, which is when you actually did your

25   review, you did not do a review of documents with that kind of

1   information physically removed from the documents, did you?

2   A    No.

3   Q    Okay.  And are you aware that there's about 500 pages of

4   documents that have been withheld in their entirety in this

5   case?

6   A    I believe I was aware of that as of yesterday from

7   Exhibit 9.

8   Q    And before yesterday, you were not aware of that; is that

9   correct?

10  A    No.

11  Q    So when you were doing your initial review at Huntington,

12  that is not a piece of information that you were familiar

13  with; is that correct?

14  A    Correct.

15  Q    Okay.  And are you aware that approximately 500 or so

16  documents -- pages of documents have been withheld in part?

17  A    Apparently that's the case, based on Exhibit 9.

18  Q    But you didn't know that before your review of that

19  exhibit, I think you said yesterday?

20  A    That's correct.  Not yesterday, on Monday.

21  Q    I'm sorry, on Monday.  And so you did not know that also

22  when you did your review at Huntington; is that correct?

23  A    That's correct.

24  Q    And so, just to be clear, when you were looking at the

25  documents that had been withheld in part, at Huntington you

1    did not have before you what the documents would look like

2    with the redactions that have already been made in them; is

3    that correct?

4    A    No.  I'm sorry, that's correct.

5    Q    So that is correct.  So you're really not in a position

6    to look at those documents and even know what had already been

7    deleted from the documents and what was being withheld?

8    A    If you recall in my deposition to you, you offered as

9    exhibits certain documents which I assume may have also come

10   from the group, and that those documents contained redacted

11   data, yes.

12   Q    Okay.  But when you did that review at Huntington, before

13   you prepared your report, you did not have that before you,

14   correct?

15   A    No, I did not.

16   Q    Okay.  Now, as a good scientist, Dr. Szot, as a general

17   proposition, it would be a mistake, would it not, to

18   extrapolate general conclusions from a very tiny data set?

19   A    It would be, but the documents that were there and from

20   the representative documents that were there, most of them or

21   many of them were on forms, and I had visited Huntington Life

22   Sciences on numerous occasions before that and as part of

23   monitoring studies and saw the same forms.  I already knew the

24   type of information that these forms generally contain.

25   Q    But just by way of, again, establishing a baseline for

1   how a scientist approaches research, if you were doing a drug

2   test on a hundred animals, say, you wouldn't generally look at

3   three of them in order to come to a scientific conclusion,

4   would you?

5   A   No, but that's a different type of situation.

6   Q   All right.  But that's in approaching, coming to a

7   conclusion, that's a pretty good statement as to how

8   scientists would conduct research, right?

9   A   Of course.

10   Q   And in fact, if you were expecting to come to a certain

11   conclusion in looking at three animals and the data that you

12   did come across suggested a completely different result, again

13   that might warrant expanding your scope of analysis, correct?

14   A   Correct.

15   Q   And you generally wouldn't form conclusions in scientific

16   research based upon four hours of study, would you?

17   A   My conclusions on confidentiality --

18   Q   I'm just asking as a general matter.

19   A   Can I -- let me finish.  -- were already set.  It was

20   inherent within my whole understanding of dealings with CROs

21   and with clients that confidentially is extremely important,

22   and that's what I came to in mind -- that was my mindset when

23   I arrived at HLS.

24        I just looked at the data to see what type of

25   information was in question, was there anything there that

1  suggests I didn't want to get involved in this, that it didn't

2  fit with my mindset, and if -- I don't know if that answers

3  your question but that's the way I approached the problem.

4  Q   I think it does help answer, actually, my question.  And

5  so you're basically going there in order to ratify the mindset

6  that you had going into the meeting with Huntington?

7  A   That's correct.

8  Q   The purpose of an IACUC, and once again that's I-A-C-U-C,

9  is to help prevent abuse of animals and ensure they're

10 properly cared for, right?

11 A   That's correct.

12 Q   And one of the purpose of the IACUCs at various

13 institutions is to create uniformity in basic standards for

14 animal treatment, right?

15 A   Correct.

16 Q   And so for IACUC functioning, at least, there is a value

17 and consistency and uniformity as opposed to uniqueness from

18 one institution to another, correct?

19 A   I suspect that there is a difference.  There are

20 individuals in each IACUC committee at different institutions,

21 and I think that the mindsets of these individuals may differ

22 on certain aspects of what they should be doing, yes.

23 Q   I appreciate that, but in terms of the basic functioning

24 of IACUCs, the function is to ensure that the institution

25 conforms to certain consistent standards that apply throughout

1    the research organization.

2    A    Yes.

3    Q    And if an IACUC is not functioning properly, is it not

4    the case that there is a greater risk of animal abuse or

5    neglect occurring?

6    A    If the IACUC committee is not functioning properly, sure.

7    Q    And IACUC records are maintained, at least in part, in

8    order to establish that the IACUC is functioning properly,

9    correct?

10   A    Repeat that, please.

11   Q    So the -- one of the functions of a institution's

12   maintenance of IACUC records is to ensure that the IACUC is

13   indeed functioning properly in its oversight of compliance

14   with the Animal Welfare Act and regulations, correct?

15   A    I guess it may well be.  I think it's to -- yeah, to

16   keep -- yes.

17   Q    Now, I think you testified this morning that you in fact

18   looked at the IACUC records that are at issue, or at least a

19   sample of them?

20   A    I believe there were samples of them, at least one that I

21   had looked at.

22   Q    Okay.  Did you just say one that you had looked at?

23   A    I don't know.  I don't know the number.  I know there was

24   a sample of them.

25   Q    Okay.  But of the 30 pages, do you know how many of those

1  pages were IACUC records?

2   A   No, I cannot tell you that.

3   Q   Okay.

4        MR. GLITZENSTEIN:  May I approach the witness, Your

5  Honor?

6        THE COURT:  Yes.

7        MR. GLITZENSTEIN:  Your Honor, I am going to be

8  asking some questions consulting Plaintiff's volume of

9  Exhibits 2 through 18, and specifically Exhibit 4, which is a

10  transcript of Dr. Szot's deposition.

11   Q   (BY MR. GLITZENSTEIN)  And Dr. Szot, when I ask you

12  questions about your deposition, obviously feel free to study

13  the part of the transcript that I'm asking about before you

14  answer to satisfy yourself that I'm not taking anything out of

15  context or to make sure that we have an accurate recitation of

16  what your testimony was.

17        If you look over at page 21 of the deposition

18  transcript, lines 2 through 5, do you see that?

19   A   Yes.

20   Q   The question was, (Reading)  And do you know if there are

21  any records pertaining to IACUC at issue in this litigation?

22        And the answer was, (Reading)  I can't remember.

23        So, at least as of your deposition, which was much

24  sooner in time to the review you did of the documents, you

25  couldn't recall whether you had actually looked at any IACUC

1    records; is that correct?

2    A   That's correct.

3    Q   And so, at least as of that time, you were in no position

4    to evaluate whether withholding of the IACUC records in

5    particular was consistent with the mindset that you had going

6    into the review of the documents, correct?

7    A   Probably correct.

8    Q   If I were to tell you that at least some of the IACUC

9    records, as described in the Vaughn index, in fact do not

10   comport with the description of those documents in the Vaughn

11   index, would you, as a good scientist, want to go back and

12   look at more of those IACUC records in order to satisfy

13   yourself that your mindset going in was a valid one?

14   A   No, my mindset going in, I think, was a valid one

15   relative to confidentiality, and it doesn't necessarily have

16   to include IACUC records or exclude IACUC records.

17   Q   Let me ask you about that.  As I understood your

18   testimony this morning, you said that you were principally

19   concerned about the disclosure of what you referred to as raw

20   data, correct?

21   A   Correct.

22   Q   Raw data meaning documents which report in detail on the

23   results of various studies, correct?

24   A   Correct, right.

25   Q   Now, IACUC records, or at least many of them, by their

1   nature, do not focus on raw data; isn't that correct?

2   A   By their nature, no, but I believe someone supplied me

3   with IACUC records, and I think you may have, which described

4   situation -- in my last testimony, yes, which describe

5   situations where methods could be derived from those records

6   as well as data in terms of how the animals would have reacted

7   to a particular drug, or in this case it may have been a

8   device.

9   Q   All right.  So there could be, but the principal purpose

10  of an IACUC document is not to report on raw data, correct?

11  A   Correct.

12  Q   Okay.  And in fact, if you look over at your deposition

13  on page 25, starting on line 7 and continuing through line 14,

14  the question was, (Reading)  So raw data wouldn't include

15  minutes from an IACUC meeting, for example, where they were

16  discussing say concerns that the USDA has raised about the

17  treatment of animals?

18          (Reading)  Answer:  That's not directly -- that

19  doesn't come from the IACUC but the data probably -- I don't

20  know.  Yes, I guess it would not be considered raw data.

21          Do you see that discussion?

22  A   Yeah, I see it.

23  Q   And would that continue to be a fair statement of your

24  views?

25  A   Just let me read it again, please.

1          (PAUSE.)

2     A    It's a question that's very difficult to understand

3     because you're saying, "So raw data wouldn't include minutes

4     from an IACUC meeting," and of course raw data wouldn't

5     include minutes from an IACUC meeting, right.

6     Q    (BY MR. GLITZENSTEIN)   Okay.  So if there are IACUC

7     records which have minutes from meetings discussing compliance

8     with USDA requirements and that sort of thing, that would not

9     generally be considered by you to be at least the raw data that

10    you would be concerned about?

11    A    Probably the IACUC meetings could contain raw data as in

12    the example that you provided me yourself.  It did contain

13    data that described treatment of animals, how surgery was

14    done, and certainly it would have revealed a great deal about

15    the methodology, the standard operating procedures that were

16    done at that particular laboratory.

17    Q    But there could well be segregable portions of IACUC

18    minutes and such that do not contain that kind of raw data,

19    correct?

20    A    There could be, yes.

21    Q    And in fact, you did not look at the IACUC records in

22    this case sufficiently to determine whether all of them at

23    issue do or don't contain those kinds of segregable portions,

24    did you?

25    A    That's correct.

1    Q   So you're in no position to offer an opinion on that

2    particular topic as regards to these particular records; is

3    that correct?

4    A   I don't agree with you, because IACUC data, as you had

5    demonstrated to me, contained information that would be

6    relevant to how the study was conducted, what the response to

7    the animals was.

8           So, although I didn't see those documents in the

9    piles that were there, if they were there, it's conceivable

10   that they contained raw data.

11   Q   And just for purpose of clarity, the IACUC records you're

12   referring to that I showed you, as you may recall, were not

13   the IACUC records at issue in this case; isn't that correct?

14   A   That did not seem to be the case, no.

15   Q   Right.  They were IACUC records from an entirely

16   unrelated facility; isn't that correct?

17   A   That is correct, yes, sir.

18   Q   And is it not also correct that those IACUC records, and

19   we can go through the exercise, revealed far more information

20   on those documents than have been revealed on many of the

21   IACUC records at issue in this case?

22   A   I don't know.  As you indicated, I didn't look at those

23   records.

24           MR. GLITZENSTEIN:  May I approach the witness, Your

25   Honor?

1          THE COURT:  Yes.  Just for counsel's information,

2   once you get permission to approach the first time with that

3   particular witness, you can just keep going back up without

4   asking.

5          MR. GLITZENSTEIN:  I appreciate that, Your Honor.

6          THE COURT:  All right.

7          THE WITNESS:  Do you want to take this back?

8          MR. GLITZENSTEIN:  Why don't you keep that one for

9   now.

10          Your Honor, I'm going to ask him some questions

11   about Plaintiff's Exhibit 1, which is again the whole set of

12   documents at issue in the case, and this is again the one with

13   the various colored stickers that we have.

14          MR. ROSSIER:  Your Honor, just a brief objection.  I

15   don't think he meant all the documents at issue in the case.

16   The redacted documents.

17          MR. GLITZENSTEIN:  I stand corrected, the redacted

18   documents at issue.

19   Q    (BY MR. GLITZENSTEIN)  And Dr. Szot, if I could ask you

20   to take a look at what's behind the tab in Plaintiff's

21   Exhibit 1-A, and start with LSR245 and just take a look at --

22   if you could just leaf through some of the documents and

23   indicate whether or not these documents look to you, at least,

24   like the kinds of IACUC records that you're generally familiar

25   with.

1          (PAUSE.)

2     A    Yes.

3     Q    (BY MR. GLITZENSTEIN)   Okay.   Now, starting at LSR245,

4     looking down at the middle of that page, under II. B. where it

5     says, "Review of facility inspection," just to be clear, when

6     you're referring to minutes of meetings or that sort of thing, I

7     mean, this is the kind of document that would reflect an IACUC's

8     activities as recorded in minutes or memorandum, correct?

9     A    Right.

10    Q    Okay.   And looking down at the middle of that page, if

11    you see a phrase that says, "II. B., Review of facility

12    inspection," it says, quote, The results of the inspection

13    held today are attached.   The facility was found to be

14    acceptable with minor deficiencies.

15          You wouldn't regard that as reflecting any raw data,

16    would you?

17    A    No.   It would provide information in terms of perhaps how

18    often facility inspections occurred and how often the IACUC

19    meeting met.

20    Q    It doesn't reflect any standard operating procedures or

21    that sort of thing?

22    A    Well, if it -- if this --

23    Q    I'm talking about standard operating procedures of the

24    customers.

25    A    Of the customers.

1    Q    Correct.

2    A    Clients of CRO.

3    Q    Right.

4    A    No.

5    Q    Okay.  And in fact, the purpose is to report about what

6    Huntington is doing for its Animal Welfare Act compliance,

7    correct?

8    A    Yes.

9    Q    And in fact, is it not the case, based upon your

10   familiarity with most of the confidentiality agreements, that

11   the clients of the research organizations essentially contract

12   with Huntington to ensure compliance with Animal Welfare Act

13   standards both on behalf of Huntington and on behalf of the

14   clients in connection with the particular study that's being

15   undertaken?

16   A    Yes.

17   Q    If you look down to where it says C. 1. and there is a

18   blacked out space that says, "Training."

19   A    Yes.

20   Q    Okay.  Information about training would not likely to be

21   raw data, in the sense that you used it before, that is,

22   reporting on results of animal research, correct?

23   A    That's correct, but it would provide information on the

24   capabilities of the people within that organization.

25   Q    Right.  Presumably the capabilities to ensure compliance

1    with the Animal Welfare Act, correct?

2    A    Yes, and it would also give information on perhaps

3    standard operating procedures, how often does training take

4    place.

5    Q    Standard operating procedures of Huntington?

6    A    Of Huntington, yes.

7    Q    It wouldn't say anything about the standard operating

8    procedures of the clients, correct?

9    A    No.

10   Q    If you look over at page -- the next page, LSR246, where

11   it says, "Adequate Veterinary Care" at the bottom; do you see

12   that?

13   A    Yes, sir.

14   Q    It's a little hard to read, but it says, (reading)  The

15   IACUC felt that our current veterinary practices provided for

16   adequate veterinary care.

17          Do you see that?

18   A    Yes.

19   Q    Okay.  Now, that doesn't reveal anything about the

20   standard operating procedures of the customers, does it?

21   A    Not the customer, not the client, no.

22   Q    And in addition, that doesn't qualify as raw data as you

23   used the term, does it?

24   A    Not in the client's perspective, no.

25   Q    And let me be clear about this, again, because you use

1    the phrase "raw data," as I understood it, in a very

2    particular way this morning.  And just to be clear about this,

3    the way you used it was it's data reporting on the results of

4    studies being performed on behalf of a client, correct?

5    A    Correct.

6    Q    Okay.  If I were to tell you that the Vaughn index

7    referred to information in these pages and said that there was

8    no information that could be released from them without

9    divulging standard operating procedures or protocols, would

10   that cause you to have some concern about the accuracy of the

11   Vaughn index?

12   A    No.  I --

13   Q    Let me make sure you understand my question.

14   A    Yes.

15   Q    I said if the Vaughn index led you to believe that there

16   was no information on these documents that could be disclosed

17   without revealing standard operating procedures or protocols,

18   that would lead you to have concerns about the accuracy of the

19   Vaughn index, correct?

20   A    Please repeat that, because --

21   Q    Let me try to be clearer.  Do you understand, because you

22   were asked about the Freedom of Information Act issues, and I

23   know that you're not a lawyer, but was it made clear to you

24   when you were doing your document review that there was an

25   obligation on behalf of the Government to release what it

1    referred to as segregable portions of documents which do not

2    themselves disclose any confidential information within the

3    meaning that we've been discussing?

4    A    Yes.

5    Q    Okay.  If you read a Vaughn index description and it

6    suggested that there was nothing in these two pages that could

7    be disclosed without revealing standard operating procedures,

8    protocols or raw data, as you use the term, when in fact

9    you've just, I believe, acknowledged that there is some

10   information that falls in that category, would it cause you to

11   have concerns about the accuracy of the Vaughn index?

12   A    Yes.

13   Q    Okay.  Dr. Szot, if you could flip over to what is marked

14   within that first set of documents, which again is Plaintiff's

15   Exhibit 1-A, to what is marked with an orange sticker.

16              MR. GLITZENSTEIN:  And for the record, Your Honor,

17   that is also LSR2133.

18   Q    (BY MR. GLITZENSTEIN)  And ask you to look, Dr. Szot, at

19   LSR2133.  Do you see that reference on the document?

20   A    Yes, I do.

21   Q    Okay.  It's at the bottom right-hand corner, a little bit

22   higher up, and then extends over to the next page, LSR2134.

23   Do you see that?

24   A    Yes.

25   Q    Do you see that that entire document has essentially been

1  blacked out?

2  A   Yes.

3  Q   Okay.  And if you look over at 2134, you see that that is

4  a September 18th, 1996 document, correct?

5  A   Correct.

6  Q   So this is a document that's more than 12 years old,

7  right?  I mean, based upon your review, assuming that that's

8  accurate?

9  A   That is, yes.

10  Q   And it also indicates that it is a document prepared for

11  the IACUC, right, on page 2134?

12  A   If this is part of an IACUC document, I guess it was

13  prepared for IACUC, yes.

14  Q   And with regard to this particular document, you have no

15  idea whether there's any information in here that could be

16  segregated out and released without divulging standard

17  operating procedures, protocols or raw data, correct?

18  A   That appears to be correct, yes.

19  Q   And if you look over at LSR2135, which is the next

20  document over, another memorandum, and then 2136, same kind of

21  information, has a September '96 date and an IACUC reference,

22  correct?

23  A   Yes.

24  Q   Okay.  And once again, the entire discussion has been

25  blacked out, correct?

1    A    Yes.

2    Q    Okay.  And once again, you would have to give the same

3    answer as the one you just gave, which is that based upon your

4    personal review and your familiarity with that particular

5    document, you have no idea whether there is any information

6    that could be divulged without revealing standard operating

7    procedures, protocols or raw data, correct?

8    A    That's correct.

9    Q    Okay.  Same answer if you go over to 2139 and 2140?

10   A    Correct.

11   Q    Okay.  And let me just, again, to go back for a moment.

12   I know that you were not told that Judge Oberdorfer had look

13   at any documents in-camera, but if in fact you had been told

14   that Judge Oberdorfer looked at these documents in-camera and

15   expressed skepticism about whether there was any information

16   that could be disclosed, would that not have led you, as a

17   good scientist and a careful person, to have at least ensured

18   that you look at these documents in order to ensure that the

19   Vaughn index description of them was accurate and there was

20   nothing that could be disclosed from them?

21   A    I would have looked at them, but I remember in my mindset

22   it related to confidentiality and the fact that even if these

23   documents, as they were redacted, were released, I believe

24   that the companies that did work during this time would have

25   the feeling that confidentiality had been breached.

1    Q    All right.  So, let me make sure I understand that

2    answer.  So, basically your general concern about maintaining

3    confidentiality would have continued to be the same, right?

4    A    Yes.

5    Q    Regardless of what was in the documents?

6    A    Correct.

7    Q    Okay.  And then finally, on this set, if you could look

8    over at LSR20231.

9    A    What was the number again?

10   Q    I'm sorry, it's 2231.  It's actually the next page over

11   from the ones we were, I think, just talking about, and it's

12   two pages from the end of that set.

13          And if you look down under II., "Agenda Items,"

14   under D., you see that there is a phrase, or two words say,

15   "Primate Enrichment."

16   A    I see that.

17   Q    Do you know anything about requirements for primate

18   enrichment at research organizations?

19   A    There are requirements for primate enrichment based on

20   the Animal Welfare Act, as I believe.  I can't detail when

21   exactly those went into the regulations, but significant

22   descriptions of how animals should be housed and what

23   opportunity they should have to interact with physical objects

24   in their cages or animals in adjacent cages.

25   Q    Okay.  Are you familiar or have you ever looked at the

1   AW -- the USDA's report of violations in connection with the

2   investigation that was done of Huntington in the '97/'98 time

3   frame?

4   A   No, I did not.

5   Q   Okay.  So you haven't looked at that in connection with

6   review of any of these documents?

7   A   No.

8   Q   Okay.  And so you have no idea what's in that report?

9   A   No.

10  Q   Okay.

11          MR. GLITZENSTEIN:  Your Honor, also, for the record,

12  what I kept referring to a notice of violations, I just want

13  to assure Intervenors that I certainly did not mean anything

14  by that.  That was my slip of the tongue.

15          MR. ROSSIER:  I accept that explanation.

16          MR. GLITZENSTEIN:  I'll try to do better today, but

17  nothing was intended by that.

18  Q   (BY MR. GLITZENSTEIN)  If you knew that one of the items

19  referred to in the report of violations referred to

20  inadequacies in primate enrichment at Huntington, would you

21  conclude from that that there may be some items in the IACUC

22  records that may bear upon that allegation?

23  A   Yes.

24  Q   Okay.  And in particular, would you conclude from that

25  that a reference specifically to primate enrichment that's

1  been blacked out here might have some relevance to that USDA

2  investigation?

3   A   It may, and if there was an allegation of inappropriate

4  methods taken for animal enrichment, I would imagine it would

5  describe what changes had taken place to be in compliance with

6  it.

7   Q   So, for all you know, that's what this paragraph refers

8  to?

9   A   I don't know what it refers to.

10   Q   You don't know.  Okay.  But you have no basis for saying

11  that it has anything to do with protocols or standard

12  operating procedures or raw data, that particular paragraph,

13  do you?

14   A   No.

15   Q   Now, I may have missed it this morning, but you went

16  through the list of documents that you now believe that you

17  looked at.  I don't recall your referring to one set of

18  documents, which are the USDA investigatory records, and maybe

19  I missed it, but did you make a reference to that?

20   A   I don't believe I saw USDA investigatory records.

21   Q   Are you now aware that one set of the documents that's at

22  issue in this case are in fact records that were prepared by

23  USDA regarding the investigation?

24   A   At the time that I had reviewed the documents at HLS on

25  what is it, January 10th, I wasn't aware of that.  More

1    recently, I believe counsel for the Defense sent me

2    information from various legal documents.  I don't know what

3    they were called, but may have contained statements.

4          I think you were trying to introduce certain things,

5    Exhibit A, Exhibit B, I just don't remember them.  I didn't

6    think they were appropriate to what I was doing.

7    Q    I appreciate your answer, but again, the sole question

8    that I'm asking --

9    A    Go ahead.

10   Q    -- is whether at the time you looked at documents, before

11   you prepared your report, your expert report, you do not

12   believe, as I understand your testimony, that you looked at

13   any USDA investigatory records, correct?

14   A    Correct.

15   Q    So that would be another category that you probably did

16   not look at?

17   A    Correct.

18   Q    Okay.  And so you have absolutely no basis for saying

19   whether those USDA-generated records contain any additional

20   information that could be disclosed without revealing

21   protocols or standard operating procedures or raw data,

22   correct, if you didn't look at them?

23   A    If I didn't look at them, no, but if I -- I'm sure that

24   they did contain data.  It would be hard to believe that they

25   would write a document on deficiencies and did not contain

 1  data that would be considered related to observations or

 2  procedures in a particular setting.

 3  Q   Again, let me be clear about my question.

 4  A   Sure.

 5  Q   My question was not whether or not you would infer that

 6  they may contain some data.  My question is a more specific

 7  one, which is that you cannot sit here today and say that

 8  there is no information in those reports that has been

 9  withheld from Plaintiffs that does not contain standard

10  operating procedures, protocols or raw data, correct?

11  A   Specifically, no.

12  Q   Okay.  Dr. Szot, let me ask you with regard to this, your

13  testimony and your report, with regard to your overall

14  mindset, I think, as you talked about and the purpose of your

15  testimony, the central purpose of your testimony and your

16  report was not to address the issue of reverse engineering; is

17  that correct?

18  A   Specifically, no.  It was confidentiality, but that would

19  have included the concept that release of certain types of

20  data can be reversed engineered to find out additional

21  information.  That would be one of the reasons why I am so

22  much concerned about release of confidential data.

23  Q   Okay.  If you could take a look -- if you get back before

24  you --

25          MR. GLITZENSTEIN:  Referring back to the deposition

1   again, Your Honor.  That's once again Plaintiff's Exhibit 4 in

2   that volume that includes Exhibits 2 through 18.

3   Q    (BY MR. GLITZENSTEIN)  And let me ask you to look

4   particularly over at page 12, beginning at line 21, and

5   continuing up to line 6 on page 13, and the question was,

6   (Reading)  Did he, and that's referring to Mr. Caulfield --

7            and just before I ask about this particular

8   questioning, it is the case that Mr. Caulfield was your

9   principal contact at Huntington, right, with regard to your

10  providing testimony?

11  A    Yes.

12  Q    And the question was, (Reading)  Did Mr. Caulfield ask

13  you to reach any particular conclusions?"

14            And then (Reading)  No.

15            (Reading)  Question:  Did he ask you to testify

16  about whether disclosing the records would allow HLS's

17  competitors to reverse engineer HLS's proprietary information?

18            (Reading)  Answer:  No.

19            (Reading)  Question:  You're not offering testimony

20  on that issue?

21            (Reading)  Answer:  It's -- no, I don't think so.

22            Do you see that?

23  A    That's correct.

24  Q    Okay.  And in fact, consistent, I think, with what you

25  testified, you understood the overall purpose of your

1   testimony to be to talk about the interest and confidentiality

2   as a whole, correct?

3   A   Right.

4   Q   Okay.  And in fact, over at page 6 of your testimony and

5   the questioning, if you look over at line 14 continuing

6   through line 21, your -- you say, (Reading)  The purpose is to

7   testify relative to the importance of confidentiality

8   agreements between Contract Research Organizations, which I'll

9   call CROs and their clients.

10              (Reading)  Question:  Is that the only purpose?

11              (Reading)  Answer:  That is the only purpose I was

12  asked to testify for, yes.

13  A   Yes.

14  Q   Okay.  And so that was your understanding going into the

15  preparation of your expert report and when you were answering

16  the deposition questions, right?

17  A   Yes.

18  Q   Okay.  Now, just so we understand when you talk about the

19  need for maintaining confidentiality, that interest that

20  you're describing relates not to how competitors will use

21  particular information but how customers will react to a

22  breach of confidentiality, correct?

23  A   Please repeat that.

24  Q   Okay.  In terms of the interest, and I'm not talking at

25  this point about how competitors can try to glean information

1   from the data.  We'll get to that.

2   A    Competitors like who?

3   Q    Excuse me?

4   A    Whose competitors?  HLS's competitors or --

5   Q    I think your testimony, as I understood it, focused on

6   competitors of the clients, correct?

7   A    In part, yes.

8   Q    Okay.  And just to be clear, at this point, what I just

9   want to make sure I understand is when you talk about the

10  interest in maintaining confidentiality --

11  A    Uh-huh.

12  Q    -- and potentially breaching confidentiality agreements,

13  as a general matter, your principal concern -- your principal

14  concern there is not how -- with regard to that issue, is not

15  how competitors will use the information but simply how

16  clients will respond to what they perceive as a breach of

17  confidentiality for almost any reason, correct?

18  A    Correct.

19  Q    And with regard to how clients make decisions about

20  retaining research organizations, I think that you gave a list

21  in your testimony this morning, I counted at least 10 factors,

22  and I want to make sure that this is an accurate one, and you

23  said they would look for, in deciding whether to select a

24  particular research organization, experience; secondly, the

25  experience of senior scientists; thirdly, the technical staff;

1    fourth, whether certified by, I think it was ALAS; fifth,

2    whether it is AAALAC certified, which is a separate

3    certification entity.

4    A    Sure.

5    Q    Sixth, were there inspections of their 1099 forms; seven,

6    whether they maintained a clean facility; eight, whether it's

7    a modern facility; nine, whether or not there are people

8    qualified to run the facility; and ten, what you identified as

9    the most important, I think was your phrase, was whether or

10   not there was a Quality Assurance unit that monitors the

11   studies according to Good Laboratory Practices; is that

12   correct?

13   A    Correct.

14   Q    Okay.  So all those factors go into a client's

15   determination about where to place a particular study,

16   correct?

17   A    Yes.

18   Q    And so if any one of those factors is problematic or

19   stronger for one CRO or another, that would influence the

20   decision, correct?

21   A    Yes.

22   Q    Okay.  Are there any other factors that you can think of

23   that would -- and we're going to get to confidentiality in a

24   second, but other than confidentiality, are there any other

25   factors that would influence the selection of a research

1   organization?

2   A   I believe I listed most of them.  I'm sure there are

3   others.

4   Q   All right.  Do you recall, on your deposition, that you

5   mentioned costs as a factor?

6   A   Costs.

7   Q   So that would be No. 11?

8   A   Quality of the reports that they produce.

9   Q   Okay.  So that would be No. 12?

10  A   The types of and how they collect data, their computer

11  systems, is it in electronic form of data collection or is it

12  all done by hand.

13  Q   Okay.

14  A   How do they handle this data.  I believe I also mentioned

15  the security of their archives, who has access to them.

16  Q   Okay.  I think I'm up to about 15, but I'm not trying to

17  make sure my count is correct but simply to make sure that we

18  have -- would another factor be financial soundness of the

19  organization?

20  A   The perceived financial soundness, yes.

21  Q   Another factor be whether they finished their studies on

22  time?

23  A   Yes.

24  Q   So I think we're up to 17 or 18.  And their general

25  reputation in the field, would that be an important factor?

1    A    Yes.

2    Q    Okay.  And whether they have expertise in the particular

3    study area that's being undertaken?

4    A    That would be a factor.

5    Q    Okay.  And that would be a factor because it is the case,

6    is it not, that although there are a number of these CROs, as

7    you discussed before, in fact, they specialized to one degree

8    or another, or at least some of them do, in particular kinds

9    of animal research, correct?

10   A    Some may do that, yes.

11   Q    Okay.  So for particular studies, the field of

12   competition is actually reduced by virtue of who has a

13   particular kind of expertise, correct?

14   A    To a degree.

15   Q    Okay.  But that would certainly be an important factor

16   going into your informed advice about what CRO to use,

17   correct?

18   A    It would be.

19   Q    Any other factors that you can think of?

20   A    I think we've covered the gamut.  There may be others,

21   but I can't think of any at this moment.

22   Q    Actually, turn back to your deposition and ask you to

23   take a look at page --

24   A    Please tell me what book we're looking at.

25   Q    I'm sorry, it's again it's Plaintiff's Exhibit 4.  It's

1    in the volume that says, "Exhibits 2 through 18."  And it's

2    Exhibit 4 within that volume, and I'd ask you to take a look

3    at page 35 of your deposition, and specifically focus on lines

4    13 through 19.

5         And actually the question we're leading into that

6    was, "Anything else?" after you had gone through various items

7    that would influence a decision.  Your answer is, (Reading)

8    Location.  The quality of the scientist, whether or not they

9    have adequate quality assurance-type programs, how well they

10   take care of their animals.

11        Then you go on to say, (reading)  The facility

12   itself is very important to me, is it clean, et cetera.

13        And then if you could also take a look over at page

14   43.

15        THE COURT:  Okay.  Was there a question there?

16        MR. GLITZENSTEIN:  No.  It's actually going to be a

17   question on both of these references.

18   Q   (BY MR. GLITZENSTEIN)  I'm sorry, it's actually at page

19   42, and line 13 through 15, and the question again talking about

20   a comprehensive list, and you say, quote, Do they have animal

21   care facilities that are appropriate, do they have adequate

22   laboratory space?

23        Do you see those?

24   A   Yes.

25   Q   So with regard to both of those references to your

1   deposition testimony, is it also the case that animal care and

2   maintenance is a factor that is -- influences the choice of a

3   particular research organization?

4   A   It is an important factor, yes.

5   Q   If it's an important factor, but you actually did not

6   mention that factor both when you were asked by Intervenor's

7   counsel and when I asked you to expand on the list, correct?

8   A   I don't remember, but since you're telling me I didn't,

9   perhaps I didn't.

10   Q   I didn't hear it.

11   A   A long list of factors, obviously.

12   Q   Now, in determining whether to use a research

13   organization and looking at that particular factor, care for

14   animals and maintenance of animal facilities, is it not the

15   case that one of the things that would be looked at by a

16   potential client is whether or not the USDA had itself

17   articulated concerns about animal care and maintenance?

18   A   Yes, it would be.

19   Q   And in fact, if there were a report of violations which

20   listed a number of such concerns, that would be something that

21   would be taken into account in making a decision on using a

22   particular research organization, correct?

23   A   It would be.

24   Q   Okay.  Now, with regard to the loss of confidentiality

25   and that overall concern, it is the case here, is it not, that

1  there already has been some loss of confidentiality with

2  regard to the particular records that relate to the 1997/1998

3  USDA investigation?

4  A   I don't know how to answer that.  I'm not quite sure.

5  Q   Let me try to be clear about my question.  You were just,

6  for example, looking at the IACUC documents.  It's the case,

7  is it not, that some of those IACUC documents have now been

8  disclosed, right?

9  A   Yes.

10  Q   Okay.  And since 500 pages have been withheld in part,

11  not in full, it is the case, is it not, that a number of other

12  documents have, in fact, been disclosed at least to some

13  degree, correct?

14  A   I can't answer that.  I don't know.

15  Q   But you don't know?

16  A   No.

17  Q   Okay.  And you said you haven't read, for example, the

18  report of violations which discusses the investigation done by

19  USDA and their -- their allegations of Animal Welfare Act

20  violations, correct?

21  A   No.

22  Q   Okay.  And you said you also have not read the USDA

23  investigatory records in order to glean what they either do

24  provide or don't provide with regard to the investigation that

25  occurred, correct?

1   A   Correct.

2   Q   Okay.  Assuming that those documents do provide some

3   information about the investigation that was undertaken, and

4   again, keeping in mind the general mindset that you had talked

5   about with regard to confidentiality, it is the case, is it

6   not, that there has already been some loss of confidentiality

7   with regard to the events occurring in the 1997/1998 time

8   frame?

9   A   I am not sure what you're getting at, but if you are

10  referring to the fact that those documents were seen by me, so

11  is that not a loss of confidentiality, I don't agree with you

12  because I have a confidentiality agreement essentially with

13  everyone that I do business with.

14  Q   That's actually not what I mean.  What I mean is -- I

15  apologize for not being clearer.  If you're aware that those

16  documents had already been released in response to the Freedom

17  of Information Act request at issue in this case.

18  A   Yes.

19  Q   And again, maybe I should just back up for a moment.

20  What we're talking about here is the potential impact of a

21  ruling by the Court that some additional materials have to be

22  disclosed in response to the Freedom of Information Act

23  request that's pending in this case, correct?

24  A   Right.

25  Q   So when we talk about loss of confidentiality, to be more

1   particular about it, that's the kind of loss of

2   confidentiality that's at issue here, correct?

3   A   Yes.

4   Q   All right.  And so assuming that there have in fact been

5   already released some documents in response to the Freedom of

6   Information Act request, talking to some degree about the

7   investigations that took place and USDA's assessment of those

8   investigations, there has already been some loss of

9   confidentiality with regard to those materials as a whole,

10  correct?

11          MR. ROSSIER:  Can I object here, Your Honor, please.

12  As I understand the question, there was a reference made to

13  the internal USDA investigatory memoranda.  My chart indicates

14  those have been withheld in part, released in part.  This

15  witness has testified he hasn't seen those.

16          There's also a reference to a report of violations.

17  His testimony is he hasn't seen it.  I think it's unfair to

18  ask this witness to speculate with regard to two sets of

19  documents he hasn't seen.

20          THE COURT:  Overruled.

21  Q   (BY MR. GLITZENSTEIN)  Should I rephrase -- ask the

22  question again, or do you remember it?

23  A   I'll try and remember it.  It would seem that the release

24  of those documents through a FOI request would absolve HLS of

25  the legality of their not meeting their confidentiality

1    agreement, at least the legality, but I don't believe that

2    that would make any client feel comfortable that that

3    information hasn't been possibly been released about studies

4    that they have conducted there.

5            I think any release of that data, regardless of

6    whether it was done through an inadvertent means not related

7    to HLS or what, would still be viewed by a client as you gave

8    somebody our data potentially and we don't like that.

9    Q    So I understand your answer, then you're answering my

10   question by basically saying that it's correct that clients

11   would already have perceived that there was some loss of

12   confidentiality?

13   A    Correct.

14   Q    Okay.  And so, in terms of your opinion, the question

15   would really ultimately be what incremental effect, since

16   there has already been some loss of confidentiality with

17   regard to this set of materials, what incremental effect some

18   additional disclosure would have on top of that prior

19   disclosure, correct?

20   A    Would you repeat that, please.

21   Q    Yes.  So since I think you just acknowledged that there

22   has already been some loss of confidentiality with respect to

23   the materials as a whole, your overall concern about

24   confidentiality maintenance would have to focus on some

25   incremental effect on confidentiality concerns using, as a

1    baseline, what has already been disclosed, correct?

2    A    If you are implying that there is concern that additional

3    data may be released, yes, in part, but also the fact that

4    some information has been released would concern a client that

5    something happened here that confidentiality may have been

6    breached.  They would concern themselves about that.

7    Q    So that concern is already there, correct?

8    A    That concern is there, yes.

9    Q    I mean, and just to be clear, it's there based upon what

10   has previously been disclosed, correct?

11   A    Please repeat that.

12   Q    You said it's there -- the concern is there based upon

13   what's previously been disclosed, correct?

14   A    Yes.

15   Q    Let's take a look at the confidentiality agreements

16   themselves, and I think that -- do you still have the

17   Intervenor's set of exhibits?

18   A    Yes, 5-A.

19   Q    All right.

20         MR. GLITZENSTEIN:  Again, Your Honor, that is in the

21   white volume from Intervenor's and Exhibit 5-A.

22   Q    (BY MR. GLITZENSTEIN)  And now, again, just so we are

23   clear, I think you testified that when you went over to

24   Huntington, you looked at a set of confidentiality agreements,

25   correct?

1    A    Correct.

2    Q    Okay.  But is it not the case that in fact you only

3    looked at two confidentiality agreements when you went to

4    Huntington?

5    A    That's my recollection of what I looked at, too.

6    Q    And when you were deposed, you said that that's what you

7    had looked at, correct?

8    A    Correct.

9    Q    And so you don't know, of this set of confidentiality

10   agreements, which particular two that you looked at, correct?

11   A    I cannot say that with absolutely certainty, no.

12   Q    Okay.  And you also can't say with any certainty, can

13   you, that these particular confidentiality agreements even

14   pertain to the specific studies discussed in the documents at

15   issue, can you?

16   A    No.

17   Q    So you can't be relying upon these for proving anything

18   about confidentiality of these particular documents, can you?

19   A    No.  Obviously, no.

20   Q    And it is the case, is it not, that even with regard to

21   these documents represented as -- representative -- Let me try

22   that again.

23            Even with regard to these documents that are

24   represented to be reflective of confidentiality agreements as

25   a whole, they make particular provision for disclosing

1  materials as a result of legal process, correct?

2  A   Please repeat that.

3  Q   Is it not the case that these confidentiality agreements

4  on which you've relied do make provision for the release of

5  any materials obtained by Huntington from a client as a result

6  of legal process?

7  A   Yes.

8  Q   So if they are released as a result of legal process or

9  order from a court, that would not be a violation of the

10  confidentiality agreement, correct?

11  A   My understanding of it is no.  I think, though, that --

12  Q   Well, I want to make sure I -- when you say "no," you

13  mean it would not be a violation, correct?

14  A   It would not be a violation, no.  I believe that the

15  usual agreements, including the confidentiality agreements,

16  also include information and these may also do that to

17  indicate that if there is a government agency that arrives at

18  the facility and requests release of information that the --

19  there's an obligation on the CRO or the company to notify the

20  client whose data they're requesting that this is happening

21  and give the client a chance to respond and to see if there is

22  any way that they could prevent this release, I assume.

23  Q   I appreciate that, but let's take a look at a particular

24  example.  Could you look at what's designated as page No. 15

25  within that set of materials.

1    A    Yes.

2    Q    And actually, just to be -- make sure we're operating on

3    the same wavelength here.  It goes over from page 2 to page 3,

4    and starting on page 2 there's a paragraph --

5              THE COURT:  Which page number referencing are you

6    using?

7              MR. GLITZENSTEIN:  I'm sorry, Your Honor.  I'm

8    talking about the designated pages 14 through 15, and it's

9    pages 2 through 3 of that particular document.

10   Q    (BY MR. GLITZENSTEIN)  And so starting on page 14 of

11   the -- as designated at the bottom right-hand corner, there is

12   a large paragraph -- the largest paragraph near the bottom

13   where it says, "HLS shall treat information as confidential."

14             Do you see that, Dr. Szot?

15   A    Yes.

16   Q    Okay.  And then going down towards the bottom, it says,

17   "The foregoing restrictions on disclosure and use shall not

18   apply to, and it's blacked out, information or information

19   which," and then going over to the next page on 3 there's a

20   little Roman numeral iv, and it says, quote, is required by

21   applicable law, regulations or legal process to be disclosed,

22   close quote.  Do you see that?

23   A    Yes.

24   Q    And so that refers to any legal process, correct?

25   A    It would be my understanding, yes.

1    Q    Not just USDA investigations, right?

2    A    Correct.

3              THE COURT:  Do you know how much more you'll have?

4              MR. GLITZENSTEIN:  I would say at least another hour

5    or so, Your Honor.

6              THE COURT:  All right.  We've reached the lunch

7    break point, but if you want to proceed right now with some

8    more questions before we break for lunch, I'll let you do

9    that.

10             MR. GLITZENSTEIN:  I'm perfectly happy to break

11   now.

12             THE COURT:  All right.  We'll break for lunch and be

13   back at 1:30.

14             (A LUNCH BREAK WAS TAKEN.)

15             MR. GLITZENSTEIN:  Court's permission.

16   Q    (BY MR. GLITZENSTEIN)  Dr. Szot, I think when we broke we

17   were talking about the confidentiality agreements, and my

18   understanding of your testimony, and correct me if I'm wrong,

19   is that the reference in one of the agreements to the

20   disclosure of information through legal process would

21   encompass any kind of legal process, including, for example,

22   Freedom of Information Act lawsuit, correct?

23   A    Right.

24   Q    And it's a fair assumption, since these are

25   representatives, the kind of confidentiality agreements that

1   are used by Huntington and throughout the industry that that

2   kind of language would be common in confidentiality

3   agreements, correct?

4   A   Yes.

5   Q   If you could look back at your expert report, which is

6   Exhibit 5 in the white binder and Intervenor's exhibits, and

7   you were asked by Intervenor's counsel to quote a paragraph on

8   page 5.

9   A   I can't find it.  Excuse me.

10  Q   I'm sorry.  Do you still have the white binder?

11  A   The white binder?

12  Q   Yeah, it's the binder with Intervenor's exhibits.  I

13  don't know if --

14  A   Oh, Exhibit 5.  I'm sorry, I was looking through the

15  books thinking that --

16  Q   I didn't realize you didn't have the binder itself.

17          If you look at page 5 of your expert report, the

18  first full paragraph you were asked to quote, once again says,

19  (Reading)  The release of study raw data information IDA and

20  its possible further dissemination to others would cause

21  competitive harm to HLS.  It would introduce considerable

22  doubt as to the ability of HLS to maintain a confidentiality

23  agreement.

24          And I'd just ask you about that part of it.  There

25  again, the confidentiality agreements that you're talking

1   about are the same ones, or at least the kind of documents

2   that are in Exhibit 5-A, correct?

3   A   Correct.

4   Q   And if in fact there were an order by a court to release

5   certain materials under the Freedom of Information Act, and

6   therefore the language about legal process coming -- that

7   would come into play, HLS could not, under those

8   circumstances, be accused of not maintaining a confidentiality

9   agreement, could it?

10  A   Legally, no.

11  Q   Now, if I could ask you to take a look at another part of

12  the confidentiality agreement materials we've been talking

13  about.  And particularly look at page 30 of the -- this is

14  Exhibit 5-A.  If you see that paragraph 8.  Can you read what

15  that paragraph says.

16  A   (Reading)  The obligations of recipient under this

17  agreement shall survive the term of a period of 10 years.

18  Q   Okay.  So for this agreement, there is a 10-year time

19  period during which that agreement was operative, right?

20  A   It appears that way, yes.

21  Q   Okay.  And once again, the data that we're referring to

22  in this case all come from the 1996/'97 time frame; is that

23  right?

24  A   Yes.

25  Q   Okay.  If you take a look back at page 38 -- excuse me --

1   forward to page 38, can you read paragraph 5 on that page.

2   A   (Reading)  Term, period.  This agreement shall remain in

3   effect for a period of, blank, from the date of execution of

4   this agreement.

5   Q   Okay.  And when we were doing the deposition, do you

6   recall whether these agreements were redacted?  Do you recall

7   when you reviewed these agreements and we talked about them at

8   the deposition, there were redactions on the agreements,

9   correct?

10  A   I honestly don't recall.

11  Q   Do you have any idea who did the redactions on the

12  agreements?

13  A   No.

14  Q   But you don't know whether you've seen the agreements in

15  full or not; is that the case?

16  A   I can't say with certainty that these are the ones that I

17  saw when I visited HLS, but they appear to be similar, if not

18  the same.

19          MR. GLITZENSTEIN:  Your Honor, may I approach the

20  witness?

21          THE COURT:  Yes.

22          MR. GLITZENSTEIN:  Your Honor, this is an additional

23  exhibit.  I would ask it be marked as a Plaintiff's exhibit.

24  I got one copy for the clerk and one copy for Your Honor.

25          THE COURT:  You're marking it as Exhibit what?

1         MR. GLITZENSTEIN:  I believe that on Plaintiff's

2    exhibits we're up to I believe 30, Your Honor.

3         THE COURT:  Is there a 29?

4         MR. GLITZENSTEIN:  There is a 29.  Our current

5    exhibits run from 19 through 29.

6         THE DEPUTY CLERK:  Is this Exhibit 30?

7         MR. GLITZENSTEIN:  30.  And let me just explain what

8    29 is in the volume, so there is no confusion.  29 is simply

9    another set of the same materials already in Plaintiff's

10   exhibits.  It was broken down by dates of when certain

11   documents were disclosed, so there's no new material in 29

12   from what is contained in other exhibits, but 30 would be what

13   we would ask to identify this exhibit as.

14        MR. ROSSIER:  And is this -- if I could just

15   inquire, Your Honor.  I mean, is this outside of the pretrial

16   agreed --

17        THE COURT:  If counsel want to confer, you may.  Go

18   ahead.

19        (PAUSE.)

20        MR. GLITZENSTEIN:  Thank you, Your Honor.

21   Q    (BY MR. GLITZENSTEIN)  Okay.  Dr. Szot, if you could take

22   a look at page 38 of what we've just marked as Plaintiff's

23   Exhibit 30 --

24        THE COURT:  For our list, what does this exhibit

25   purport to be?

1           MR. GLITZENSTEIN:  This exhibit purports to be, Your

2    Honor, the same set of confidentiality agreements that are

3    listed in Plaintiff's Exhibit 5-A, and for the record and

4    hopefully without contradiction, what happened was that we

5    were given a set of these confidentiality agreements at the

6    time that Dr. Szot was deposed, and we did our deposition

7    based upon these agreements with various materials redacted.

8           After the deposition we asked if we could, that is

9    Plaintiff asked if we --

10          THE COURT:  Actually, I'm not sure if I should be

11   hearing this with the witness on the stand because I don't

12   know what you're going to ask him.  I just wanted to have a

13   description that we can put on our witness list of the

14   document.

15          If there is a need for you to describe in some

16   detail what this is and how it came about, I don't mind you

17   coming to the bench, but I don't know if it's something that

18   the witness ought to be hearing.

19          MR. GLITZENSTEIN:  I think what I can simply say,

20   and hopefully this will be sufficient, is to describe it as

21   less heavily redacted as confidentiality agreements.  They

22   were provided to Plaintiff.

23          MR. ROSSIER:  I wasn't personally involved, Your

24   Honor.  Alex Menendez from my office was, I believe, but

25   that's my understanding, as well, of the sequence of events.

1            THE COURT:  All right.

2            MR. GLITZENSTEIN:  Thank you, Your Honor.

3    Q    (BY MR. GLITZENSTEIN)  Dr. Szot, if you can take a look

4    at paragraph 5 in the set of materials.

5    A    Yes.

6    Q    And just for the record, does this appear to be the same

7    page as what is page 38 in Exhibit 5-A?  You might want to

8    make sure I spoke correctly.  I'm actually looking at page 38

9    in what's been marked Plaintiff's Exhibit 30, the document I

10   just handed to you.

11   A    It appears to be the same.

12   Q    If you look at paragraph 5, could you read that paragraph

13   in the document I just handed you.

14           THE COURT:  May I ask you to hold off for just a

15   moment.

16           MR. GLITZENSTEIN:  Yes, Your Honor.

17           (PAUSE.)

18           THE COURT:  Okay.  We're ready.  Let me ask you to

19   tell me what page and exhibit you're making reference to now.

20           MR. GLITZENSTEIN:  Yes, Your Honor.  I'm actually

21   asking the witness to look at Plaintiff's Exhibit 30, the one

22   we just marked, and page 38.

23           THE COURT:  Okay.

24           MR. GLITZENSTEIN:  And my question to the witness is

25   simply a request to read paragraph 5 on that page.

1  A   (Reading)  Term, period.  This agreement shall remain in

2  effect for a period of five years from the date of execution

3  of this agreement.

4  Q   (BY MR. GLITZENSTEIN)  And again, that is the phrase that

5  was removed from paragraph 5 in the copy that you reviewed at

6  Huntington, correct?

7  A   That's true.

8  Q   If you look over at page 50 of Plaintiff's Exhibit 5-A --

9  excuse me -- Intervenor's Exhibit 5-A, if you take a look at

10  paragraph 22 and read the first sentence of that paragraph.

11  A   (Reading)  This agreement shall continue in effect for a

12  period of blank.  I assume it looks -- a partial word looks

13  from the date of acceptance thereof and shall thereafter

14  continue in effect until blank after either party gives to the

15  other written notice of its intent to terminate this

16  agreement.

17  Q   And if you can now take a look at what's been marked as

18  Plaintiff's Exhibit 30, the less heavily redacted document,

19  and take a look at the same page 50 and paragraph 22.

20  A   Yes.

21  Q   And read the same sentence.

22  A   (Reading)  This agreement shall continue in effect for a

23  period of 10 years from the date of acceptance hereof and

24  shall thereafter continue in effect until six months after

25  either party gives to the other written notice of its intent

1    to terminate this agreement.

2    Q    Now, I think your testimony again, Dr. Szot, is that you

3    don't know which of these particular agreements apply to the

4    records at issue in this case; is that correct?

5    A    Correct.

6    Q    And once again, all the data, your understanding is,

7    applies to the 1996/1997 time frame, correct?

8    A    Correct.

9    Q    Let me make sure I understand the testimony from this

10   morning, particularly in this light.  In the context of

11   confidentiality, I understood your testimony to be that even

12   if there's not a actual breach of an agreement, there's still

13   an importance in confidentiality; is that correct?

14   A    Yes.

15   Q    Okay.  So, from that standpoint, it doesn't even matter

16   what the agreements say or don't say, right?  There is this

17   overall interest in confidentiality that from your standpoint

18   has to be respected no matter what the agreements say?

19   A    That's generally the case, yes.

20   Q    And the particular terms of the agreement then don't

21   really make any difference to that argument, do they?

22   A    Well, they make a difference relative to the legality of

23   the situation, but in terms of relating to confidence, we're

24   dealing between businesses, I think there is a feeling that

25   things may be compromised.

1   Q    Okay.  But once again, your actual expert report, which

2   you said you concurred with, did specifically refer to the

3   importance of maintaining a confidentiality agreement,

4   correct?

5   A    Correct.

6   Q    And that is referring to these agreements, is it not?

7   A    Yes.

8   Q    Dr. Szot, I think your testimony referred to the time it

9   takes to bring a product onto the market after there has been

10  pre-clinical testing, correct?

11  A    Yes.

12  Q    And in your deposition, you indicated, and correct me if

13  I'm wrong, that it takes about 8 to 10 years to do that,

14  correct?

15  A    For a specific drug, yes.

16  Q    But that's sort of the average time period?

17  A    It used to be.  It may be longer now.

18  Q    And so if we're using at least an average along those

19  lines, then products that were being tested back in the

20  1997/1996 time frame, is it fair to assume that they may well

21  be either on the market or not going to be on the market?

22  A    Some of them, yes, but others may have, as I indicated in

23  my expert report, it's sometimes a stop-and-start-type

24  situation in developing the product.  They may have stopped

25  for a number of years and then restarted.

1    Q    That's sometimes the case?

2    A    Yes.

3    Q    And it could in fact be the case that a number of these

4    products have been abandoned by the companies that were

5    testing them, correct?

6    A    It could be, yes.

7    Q    And in terms of products that are on the market or may

8    not be on the market, you don't know, do you, which particular

9    products were being tested for these studies?

10   A    No.

11   Q    Now, in terms of looking at the documents and coming to

12   some sort of conclusion about what products were being tested

13   and deriving that kind of information, I believe your

14   testimony was that although Plaintiff has agreed to the

15   removal of all product identities, all standard operating

16   procedures, all protocols, all company identities, that it's

17   still possible, in some circumstances, to derive useful

18   information and that that would be true in the case of drugs

19   that have -- what I think you refer to as characteristic

20   responses, correct?

21   A    Correct.

22   Q    By characteristic responses, I understood your testimony

23   to mean, if not unique, unusual physiological responses that

24   would be associated with a particular substance, right?

25   A    Correct.

1    Q    And you drew a contrast, if I understood your testimony,

2    with drugs that would not have such characteristic responses,

3    correct?

4    A    I suggested that there would be drugs without

5    characteristic responses, yes.

6    Q    So some are and some aren't?

7    A    Yes.

8    Q    Okay.  For the ones that don't have characteristic

9    responses, you would view those differently from a competitive

10   injury standard -- standpoint than ones that do, correct?

11   A    A competitive injury standard between who?

12   Q    Well, again, at this point I'm focusing on your testimony

13   about being able to glean information that would be useful to

14   a competitor of one of the client entities.

15   A    I think you're correct, yes.

16   Q    And just so we are clear on what examples of

17   non-characteristic or not unusual responses would be in your

18   deposition, you refer to something called sinus arrhythmia as

19   being a symptom that could be caused by many different kinds

20   of substances, correct?

21   A    True.

22   Q    And what is that again?

23   A    A unusual heartbeat.

24   Q    And we actually had some discussion about something

25   called a necrotic skin flap, as you may recall.

1  A   Vaguely, yes.

2  Q   And I believe you agree that that also was not indicative

3  of any particular substance, correct?

4  A   Not that of one I'm aware of.

5  Q   Okay.  And would it not also be the case that blood

6  pressure going up or down would be a fairly usual

7  physiological response?

8  A   Standing alone, yes.

9  Q   And how about something called an anaphylactic response?

10  A   Obviously it characterizes a type of toxicity that this

11  compound may cause.  It's an allergin, but if it's -- I

12  couldn't associate it with a specific class of compounds, no.

13  Q   How about if it was an anaphylactic response that's

14  merely associated with a vehicle.  And let me back up for a

15  second.

16       There's a distinction, is there not, between a

17  vehicle for administering a drug and the substance that's

18  being tested itself?

19  A   Yes.

20  Q   What is the difference?

21  A   Well, the vehicle is the material that the drug is put in

22  as a carrier, and that is used to deliver the drug substance

23  to the animal.

24  Q   And the vehicles can be very common substances like water

25  or saline or that sort of thing, correct?

1    A    Yes.  The vehicle depends on the test substance and

2    solubility and suspendibility in the vehicle, yes.

3    Q    And so if a animal is having an anaphylactic response to

4    a vehicle administered in the study, that wouldn't tell you

5    anything about the particular substance being studied, would

6    it, in and of itself?

7    A    Yes.  In and of itself, probably not.

8    Q    And once again, you don't know which drugs were being

9    tested during this time frame that are at issue here?

10   A    No, I do not.

11            MR. GLITZENSTEIN:  With the Court's permission.

12            THE WITNESS:  Your Honor, may I put this up here?

13            THE COURT:  Certainly.

14   Q    (BY MR. GLITZENSTEIN)  Dr. Szot, if there were questions

15   about the reliability of certain tests that had been conducted,

16   that's the kind of information that a competitor would be less

17   likely to rely upon, correct?

18   A    What do you mean by reliability?  Scientific reliability

19   or what?  I'm not quite sure.

20   Q    About whether or not the -- Let me give you an example.

21            If there were questions about whether the test was

22   conducted in accordance with the prescribed protocol, that's

23   something that the competitor would be less likely to rely

24   upon, correct?

25   A    If the test were conducted in compliance to the protocol

1   and under GLP regulations, things like that, that would be a

2   very important or very reliable study or test.

3   Q    But if there are concerns that it was not performed in

4   that fashion, then it would be of less value to a competitor,

5   correct?

6   A    Correct.

7   Q    Okay.  Could you look at -- this is within Plaintiff's

8   Exhibit 1, big volume that has the documents you looked at

9   before and take a look at 1-E.  And if you take a look at what

10  is at LSR0001, which is the first page of that document.

11  A    I see it.

12  Q    Okay.  And actually, could you read that document in its

13  entirety, obviously, excluding the parts that are blacked out,

14  I would appreciate that.  Read it slowly for the court

15  reporter, please.

16  A    Do you want me to read the heading, too?

17  Q    You can just start with the text.

18  A    (Reading)  Enclosed is information obtained during the

19  records review at Huntington Life Sciences that may be of

20  interest to the FDA and/or EPA.  The studies were to be

21  conducted in compliance with Good Laboratory Practice

22  Regulations.

23          (Reading)  Blank Facility documents question the

24  validity of the study data and give contradictory conclusions

25  regarding the blank effects of the test material.

1          And then there are six lines that are blanked out,

2    and then the next paragraph starts with a blank, and the

3    sentence, (Reading)  Study was terminated by the sponsor

4    before the surgical procedure to fracture the foreleg of the

5    dogs was conducted.  However, dogs were accepted for the study

6    that should have been considered unsuitable for the study and

7    were dosed with the test material.

8          (Reading)  The dogs were found by the veterinarian

9    to have foot problems, have a fearful disposition and not to

10   be the weight range specified in the study protocol.

11         (Reading)  The above three studies are examples of

12   what was observed when reviewing the study records provided by

13   Huntington Life Sciences.  These documents raised concerns

14   regarding the quality and reliability of the test results from

15   this facility.

16   Q    Okay.  So this document, which is one of the USDA

17   investigatory records, is it not reasonable to characterize it

18   as raising concerns about the reliability of at least some of

19   the tests as to which the documents relate?

20   A    Raises questions about the reliability of the study that

21   was -- would have been conducted, yes.

22   Q    All right.  And based upon your testimony a moment ago,

23   competitors would take that into account in deciding whether

24   or not to rely upon any data from studies as to which such

25   questions had been raised, correct?

1    A    Generally correct, but I think it would depend on the

2    circumstances.  They would certainly ask questions to clarify

3    what went on.

4    Q    But it would surely raise a red flag, would it not?

5    A    It would stimulate a response from other competitors of

6    the clients.

7    Q    And it's the case, is it not, that there is sometimes at

8    least an overlap between concerns that relate to compliance

9    with Animal Welfare Act violations and concerns that relate to

10   the validity of test results that are submitted to the Food &

11   Drug Administration?

12   A    In my experience, I'm not aware of them.  I could imagine

13   it may be.

14   Q    But as one example of such a thing, is it not the case

15   that if a protocol is not being followed for how to select and

16   use animals in a test subject, that could raise questions both

17   as to AWA violations and submission of materials to the FDA?

18   A    It can.  The significance of it would depend on the

19   violation and the deviation from the protocol.  It's not

20   unusual during the course of the study for a quality assurance

21   unit to go through the conduct of the study, the procedures

22   that are used and to report protocol deviations during the

23   conduct of the study.

24           This is not unusual at all, and these protocol

25   deviations are identified by the QA unit and they're also

1  included in the final report, wherever these deviations have

2  occurred.  And it's been my experience, I'd say 80 percent to

3  nearly 100 percent of studies have some degree of protocol

4  deviation.  Nothing is exactly perfect.

5  Q   If you take a look at page 6 of your report, which is in

6  Exhibit 5 of the Intervenor's exhibits again.  And look over

7  at page 6 in the second full paragraph from the top.  Could

8  you read that statement?

9  A   (Reading)  The intention of IDA is to determine --

10  Q   Actually no, I meant the paragraph under that one.

11  A   (Reading)  Laboratory animals occasionally injure

12  themselves as a result of their activities within their cages

13  or can be accidentally injured during handling.  Activities --

14  activity that can be affected by the product being tested.

15  Some products may induce increased activity or enhance

16  aggressiveness and thereby enhance the possibility of

17  accidental injury.

18          (Reading)  Some products may exacerbate a minor

19  effect of accidental injury resulting in observations such as

20  excessive bruising or bleeding, as examples.  Without knowing

21  the identity of the product being tested and its potential

22  biological effects, these types of injuries might be wrongly

23  attributed to animal abuse.  Consequently, observations of

24  product induced toxicity and possible animal abuse may not be

25  distinguished with confidence.

1  Q    So a product induced -- Let me just ask you.  Do you

2  stand by that statement?

3  A    Yes, I do.

4  Q    Okay.  So if it's the case that a product induced

5  toxicity and possible animal abuse may not be distinguished

6  with confidence --

7  A    That's correct.

8  Q    -- does it not necessarily suggest that a competitive

9  reading of the document, should it be able to get them, would

10  have exactly the issue confronting them that you just

11  identified in this paragraph, that is, they themselves would

12  be called upon to distinguish toxicity from potential animal

13  abuse?

14  A    That's correct.

15  Q    Okay.

16  A    But a competitor would be drawn to this information based

17  on other information that it had derived from the literature,

18  from news articles and the timing of when these studies were

19  conducted.

20  Q    But in terms of that concern or issue that you raise in

21  that paragraph, would that not be exacerbated in a situation

22  where a particular research organization was accused by USDA

23  of engaging in substantial violations of the Animal Welfare

24  Act?

25  A    Could you repeat that, please, because I'm not sure I

1    followed you.

2    Q    As I understand the statement in your report and what you

3    just said.

4    A    Yes.

5    Q    It may be difficult to distinguish observations of

6    product induced toxicity from possible animal abuse.

7    A    Correct.

8    Q    And my question is, in a particular situation in which

9    during the very same time frame that the studies were going on

10   there were allegations of violations of the Animal Welfare Act

11   that related to such things, as we just discussed a moment ago

12   in the document that you read from 1-E, would it not be even

13   more difficult or especially difficult in that situation to

14   distinguish between observations of product induced toxicity

15   and possible animal abuse?

16   A    Not quite sure how to answer you.  I think the first part

17   of your question is true.  If you did not know the nature of

18   the substance being tested, if you didn't -- couldn't identify

19   it at least in this therapeutic class, you couldn't

20   distinguish between injury that may have been caused by abuse

21   or injury that may have resulted from dosing with the product.

22          But if you had that information, if you could

23   determine that a specific class of compounds was being tested

24   at that time, there is that -- that missing piece of

25   information is then available and it's more likely that you

1   could, you know, get a good estimate that this was caused by

2   the product itself.

3   Q    If you knew what the compound was.

4   A    If you knew what the compound was, the compound class,

5   yes.

6   Q    I think we're getting all circuitous because the question

7   is whether the observations of effects on animals itself would

8   be crucial information in coming to that determination.  And

9   so my question is, once again, if in fact there's a difficulty

10  in distinguishing between drug related effects and

11  observations based on animal mistreatment, that would at least

12  lesson the value to competitors if they knew that there were

13  those kind of concerns, correct?

14  A    If those effects were comparable to effects that might

15  occur due to animal abuse, yes.

16  Q    And in fact, the example used here is animal abuse

17  relating to, for example, excessive bruising or bleeding is

18  one example of abuse?

19  A    Yes.

20  Q    If animals have been deprived of food or water, would

21  that be another example of a kind of observation that might be

22  difficult to distinguish between animal treatment and a drug

23  related effect?

24  A    If they were deprived, that would mean human intervention

25  and the animals were not being taken care of properly, if

1   that's what you mean.  That has nothing to do with either the

2   drug, but the conduct of the study.  I don't think anyone

3   would deprive animals of food or water in conducting a study.

4   Q   Are you aware that one of the allegations by USDA here is

5   that in fact primates were deprived of water for a period of

6   time and had physiological reactions to that?

7   A   I wasn't aware of that.  The only time one might deprive

8   an animal of water is during the collection of urine for urine

9   analysis.  That might be a short period of time, usually eight

10  to 12 hours so that urine could be collected uncontaminated by

11  water that comes from the source of the water for the animal.

12  Q   Some of the more common reactions that you referred to

13  before, blood pressure changes, allergic responses and that

14  sort of thing, if those occurred as a result of animal

15  mistreatment, then it really wouldn't tell you anything at all

16  about the drug being tested, correct?

17  A   Well, I don't know of any blood pressure changes or

18  anything occurring because of animal mistreatment, but I think

19  generally what you're saying is correct.

20  Q   Okay.  Generally being that there could be physiological

21  reactions to mistreatment that could be reflected in some of

22  the documents that are maintained about the animals, correct?

23  A   That would be a very big issue, and I think that's why

24  people monitor their studies.  If there is any indication of

25  animal abuse, one has to suspect the value of the study.  And

1    if there is any indication, after the report is written to the

2    FDA, I think the FDA would also be concerned and question the

3    validity of the study.

4    Q    And a competitor would be less likely to rely upon it

5    under those circumstances, correct?

6    A    Depends.  It's possible and it's possible not.

7    Q    Again, on this topic on paragraph -- excuse me -- on page

8    5 of your report, the paragraph at the bottom, all the way to

9    the last sentence, you say, again, (Reading)  It is

10   conceivable that the characteristics of the measured values

11   and observed reactions to dosing of the product seen in the

12   study raw data generated for a company by HLS could be linked

13   by an astute scientist working for a competitor to similar

14   data that was generated by them on a new product at another

15   facility.

16            Right?

17   A    Yes.

18   Q    And you stand by that characterization of your opinion?

19   A    Yes.

20   Q    And the conceivability is based upon, just so I

21   understand it, first the competitor obtaining the information

22   if it's disclosed in this case?

23   A    Considering the raw data, yes.

24   Q    Second, there being a characteristic as opposed to a

25   usual response, correct?

1   A    Correct.

2   Q    And third, there being a study taking place, at that

3   point, X number of years later, that the data would actually

4   be relevant to, correct?

5   A    Correct.

6   Q    And once again, you don't know what substances are

7   actually being tested as to these particular studies?

8   A    No, I don't.

9   Q    Okay.

10           MR. GLITZENSTEIN:  Can I have just one minute, Your

11  Honor?

12           THE COURT:  Yes.

13           (PAUSE.)

14  Q    (BY MR. GLITZENSTEIN)  Dr. Szot, I think this morning one

15  of the categories of records that you said you did look at were

16  necropsy records; is that right?

17  A    Yes.

18  Q    Could you take a look over to your deposition transcript

19  which again is Exhibit 4.  That's Plaintiff's Exhibit 4 in the

20  black volume.

21  A    Volume 1 or 2?

22  Q    This is in the one that has the volume with 2 through 18.

23  It's not the one with the little colored stickers.  It's the

24  other one, the other black volume, if you still have that one.

25           And if you look over at page 142 and beginning at

1  line 16 and continuing through 19, the question is, (Reading)

2  And did you review any of the necropsy reports that are at

3  issue in this case?

4         And your answer was, (Reading)  I don't recall

5  seeing necropsy reports.  I may have.  I just don't recall.

6         So at that point, you had no recollection of

7  actually looking at those kind of documents, correct?

8  A   At that point, no, but I also said I may have.  I just

9  didn't recall at that point.

10  Q   And, since that time, you've recalled having looked at

11  them?

12  A   Yes.  There were necropsy data there, yes.

13  Q   Any particular reason you -- couple of months after you

14  looked at documents that you couldn't remember and now in

15  December you can?

16  A   No particular reason, other than the fact we went through

17  the exercise and that prompted a lot of memories afterwards.

18  Q   Okay.  And I think you said that necropsy reports are

19  reports that talk about the condition of the animal at death

20  and describe the condition of the animal at death?

21  A   Correct.

22  Q   And so, once again, if animal conditions relating to

23  abuse or mistreatment are reflected in those reports, that's

24  something that would not tell you about any kind of drug

25  related response, right?

1    A    Repeat that again, please.

2    Q    If the necropsy reports describe animals that have passed

3    away because of mistreatment or abuse, that wouldn't tell you

4    anything about a drug related response, correct?

5    A    If they were identified as abused, that would not help

6    with the drug, yes.

7    Q    Well, in fact, even if they weren't identified as abuse

8    but that's why they passed away, that you would not be able to

9    discern anything about the drug related response, that was

10   correct, right?

11   A    Why would you not?  I'm sorry.  If there were necropsy

12   observations suggesting different targets that were injured, I

13   would assume that it had to do with the drug unless the

14   pathologist that did the necropsy identified them as potential

15   abuse.

16   Q    But what if they weren't identified as potential abuse

17   but subsequently it was determined that the animals were kept

18   in a environment that was not conducive to their well-being?

19   A    It depends on the environment and the type of

20   observation, obviously.

21   Q    So, but that is a possibility, at least?

22   A    Vague, yeah, possibility.

23   Q    And again, in terms of any kind of necropsy data, just

24   like the other observation information, the value of it would

25   be -- depend upon whether or not responses are characteristic

1  of a particular drug, right?

2  A    No.  I mean, you're taking my idea of certain therapeutic

3  classes as being characteristic and applying it to everything

4  that I say, and that's not what I had meant to say.  There may

5  be observations, but they're not characteristic of any

6  particular therapeutic class, but they're indicative of

7  toxicity, toxicity that was caused by the drug.

8  Q    All right.  But the value of that would depend upon being

9  able to discern what the drug that was involved was, correct?

10  A    The value to someone else, probably, yes.

11            MR. GLITZENSTEIN:  I have nothing further, Your

12  Honor.

13            THE COURT:  All right.  Anything else?

14            MR. ROSSIER:  Brief redirect.

15                         REDIRECT EXAMINATION

16  BY MR. ROSSIER:

17  Q    Good afternoon.

18  A    Good afternoon.

19  Q    All right.  I just have a few areas I wanted to touch on

20  that came up during the course of the cross-examination.

21            The first one had to do with the line of

22  questioning, I think, that was before lunch, and it mentioned

23  or discussed the fact that there has been a release of

24  redacted documents that number approximately 500.  I believe

25  you were shown some of them.

1   A   Yes.

2   Q   And then there were the approximately 500 unreleased --

3   A   Correct.

4   Q   -- in full.  And the question had to do with the

5   differential between the impact that already may be out there

6   based on the 500 or so that have been released in part and

7   your estimate of the potential impact from any further

8   disclosure.  Do you remember that --

9   A   Vaguely.

10   Q   -- set of questions?  And I just wanted to get your

11   understanding of the relative relationship between the two.

12   In other words, can you quantify in any way the impact on the

13   pharmaceutical community and the contract research

14   organization community, compare -- comparing what has been

15   released already -- and I understand you have limited

16   knowledge about that -- and the kind of information that we've

17   been talking about as continuing to be not released to the

18   Plaintiff in this case?

19   A   It's difficult for me to respond because I don't know

20   what hasn't been released.  I don't know if you're talking

21   about releasing it in a redacted form or unredacted form.  I

22   have no idea what's in there.

23          So the impact is going to likely be at least the

24   same impact as what has possibly been released or worse.  I

25   don't know.

1   Q    Okay.  I just wanted to see if you could add some further

2   definition to that.  Thank you.

3        Again, I believe a question before lunch, during

4   cross-examination, had to do with the number of documents you

5   looked at.  I think you estimated about 30 --

6   A    Correct.

7   Q    -- out of a thousand, and sort of getting data on three

8   animals.  I think the question related to if you just took a

9   sample of three out of a hundred animals, isn't that the same

10  as you getting three out of a hundred -- reviewing three out

11  of a hundred pieces of paper.

12       And I just wanted to -- if you want to explain if

13  there are any differences between those two kinds of

14  relationships, I wanted to give you an opportunity to do so.

15  A    Well, I'm not sure I understand your question, but I

16  looked at three representing a class of type of information, a

17  group of information, and in many cases those classes of

18  information were recorded on standard forms that are used by

19  HLS.

20       The data that was there reflected, you know, the

21  form, what you would expect there to be in those forms, and I

22  can have no reason to believe, based on that plus my

23  experience in monitoring studies at HLS, that all of the other

24  data in those forms would be of the same type of data.  I

25  don't know exactly what it was, but I'm sure -- but I know it

1    would be the same type.

2         It may be clinical data, clinical observations,

3    necropsy observations, veterinarian's observations, that type

4    of thing.  I have no reason to doubt that that wouldn't be the

5    case; otherwise, the sheets wouldn't be there.

6    Q    Thank you.  And then again, another question on cross

7    talked about you going into that document review.  I think the

8    phrase that was used, ratify a mindset, and I just wondered,

9    what did you mean by, if you recall that testimony, ratify a

10   mindset?

11   A    Did I say that?

12   Q    I don't know whether it was in the question or the

13   answer, but I think that phrase was utilized.

14   A    Well, my mindset before when I was first asked to comment

15   on confidentiality, I had a mindset on confidentiality and its

16   importance.  I mean, throughout 30 years, it was a very

17   significant factor in dealing with the outside when you worked

18   in the pharmaceutical industry or with other companies or with

19   CROs, and that was, you know, something you learned over many,

20   many years.

21        That's what I came with.  And the information that

22   was in the documents that I had looked at, the 30 documents

23   that I had looked at, I felt that if that information would be

24   released, that would violate this concept of confidentiality

25   that I came with.

1    Q    Thank you.  All right.  During cross you were then asked

2    some questions, I'm not sure whether it was before or after,

3    but you were also asked questions with regard to IACUC records

4    generally, and I believe asked some questions with regard to

5    redactions that were made on the IACUC records themselves.  Do

6    you recall those questions?

7    A    Vaguely.

8    Q    Yes.  And I'm going to ask you to make an assumption with

9    me and assume that the redacted information in the IACUC

10   records is by and large raw data, raw data relating to one or

11   more of these various studies.

12          And if that assumption is true, do you have an

13   opinion about the potential impact of releasing those IACUC

14   records, unredacted versus redacted, with the raw data

15   removed -- the raw data redacted?

16   A    I would have a very great concern if those IACUC records

17   are released without redacted data, yes.

18   Q    All right.

19   A    If that's the question.

20   Q    Yes.

21          MR. ROSSIER:  No further questions.  Thank you,

22   Doctor.

23          THE COURT:  All right.  Thank you very much.  You

24   may be excused.

25          Let me ask counsel to gather the binders from up

1   here.

2            MR. ROSSIER:  Your Honor, the Court's indulgence.  I

3   believe Dr. Szot has a train to catch.  With the Court's

4   permission, may Dr. Szot be released?

5            THE COURT:  Actually I just did excuse him.

6            MR. ROSSIER:  Oh, you excused him.

7            THE COURT:  I heard no objection to my excusing him.

8            MR. GLITZENSTEIN:  No problem.

9            MR. ROSSIER:  You're free to go, Dr. Szot.  Thank

10  you very much.

11           THE COURT:  All right.  Do you have any other

12  evidence?

13           MR. ROSSIER:  Yes, Your Honor.  Just with regard to

14  the exhibits.  Do we have the exhibit list?  I would like to

15  move the admission of the Defendant's exhibits at this time.

16           THE COURT:  All right.  We'll assume that those that

17  had been offered at the pretrial and have not been precluded

18  can be admitted.

19           Any other evidence from the Defendants or

20  Defendant-Intervenors?

21           MR. ROSSIER:  No other witnesses; no other evidence.

22  I know there was a designation of deposition transcripts.  I

23  know you talked to him about it.  I don't know if you plan to

24  formally introduce those.

25           THE COURT:  I'm just asking about Defense side.

1        MR. ROSSIER:  Yes, I'm sorry.  So with those

2   admitted exhibits, Your Honor, we rest.

3        THE COURT:  All right.

4        MR. GLITZENSTEIN:  Your Honor, I think the only

5   Plaintiff's exhibits that had been discussed at the pretrial

6   conference was the PETA complaint, which we are happy not to

7   move into evidence and avoid going through that again.  And I

8   don't believe there was any objection made to any of the other

9   Plaintiff's documents at that time.

10        As to deposition designations, what we've done is,

11   for the convenience of the Court, highlighted on the

12   deposition transcript that Your Honor has, those portions that

13   we've designated, and obviously, to save the Court's time,

14   rather than read those, simply those are all portions of Dr.

15   Szot's deposition that we'd rely upon as admissions, and if

16   there's no objection, obviously any cross-designation that

17   Intervenor would want to rely upon, we have no objection to,

18   but we've moved those to be admitted for that purpose.

19        THE COURT:  You are moving in the Plaintiff's

20   designations of Dr. Szot's -- Dr. Szot's deposition transcript

21   excerpts alone or all of the rest of the list of exhibits?

22        MR. GLITZENSTEIN:  All of the listed exhibits,

23   including those designations of the deposition.

24        THE COURT:  All right.  And I guess the only one

25   that -- couple that are up in the air.  29 wasn't on your list

1    initially, but if there is no objection to 29 coming in.

2         MR. ROSSIER:  No, Your Honor.

3         THE COURT:  And 30 had not been listed before, but I

4    understand there's an agreement on that.

5         MR. ROSSIER:  There is an agreement, yes, sir.

6         THE COURT:  All right.  So those will come in.  The

7    only other one, I think, was 27 as to which I reserved but was

8    leaning against admitting it, I think.  Are you still looking

9    to move that in?

10        MR. GLITZENSTEIN:  I believe 27 was the USDA press

11   release.  To make life easier, we'll withdraw that one, Your

12   Honor.

13        THE COURT:  All right.  Any other evidence?  From

14   the Plaintiff?

15        MR. GLITZENSTEIN:  No, Your Honor.

16        MR. ROSSIER:  Your Honor, if I could be heard

17   briefly on the counter-designation.  I believe you have in

18   front of you your designation.  We have highlighted -- and

19   Liz, can you describe the colors in here?

20        THE COURT:  Let me invite you to the microphone,

21   please.

22        MR. ROSSIER:  Sorry.  Thank you.  Can you just

23   explain how you've counter-designated?

24        MS. KIDDER:  Yes.  The Plaintiff's designations are

25   in yellow highlighting, and Intervenor's counter-designations

1  are in blue.  I've also written next to beginning of the

2  Plaintiff's designations the line numbers for Intervenor's

3  counter-designations.

4       THE COURT:  So this is a supplement to the pretrial

5  statement, some written document you're going to hand me?

6       MR. ROSSIER:  Yes, Your Honor, if you would permit

7  us to do so, and perhaps it would be appropriate to put an

8  exhibit label on it, or whatever is appropriate for

9  recordkeeping purposes.

10       THE COURT:  All right.  Mr. Glitzenstein.

11       MR. GLITZENSTEIN:  Your Honor, I do believe they

12  were supposed to provide these counter-designations at the

13  time of pretrial and we have not had a chance to look at these

14  yet, so I probably spoke a little too quickly.  I was assuming

15  they would only be counter-designations that would be regarded

16  as necessary to make particular testimony complete, but having

17  looked through this, it appears that there are sort of some

18  sections that seem to be independent from any of the

19  designations that we made.

20       So I'm a little bit reluctant to agree to all of

21  these designations since they were not identified at the time

22  of the pretrial statement, which is when, under the Court's

23  order, they were supposed to be designated.

24       THE COURT:  When did you first get them?

25       MR. GLITZENSTEIN:  This moment, Your Honor.

1          MR. ROSSIER:  Your Honor, I understood that that was

2    not something that had to happen at the pretrial stage.  I

3    apologize for my misunderstanding.

4          We have attempted to do here what counsel has

5    indicated, that is, to put into context what he's designated.

6    These are not our own affirmative designations, but we have --

7    and I apologize for my mistake -- we have attempted, and most

8    of them are spatially related to his designated, but I'll take

9    the Court's, you know -- whatever the Court would wish to do

10   at this point.

11         THE COURT:  Mr. Glitzenstein, I'll give you a chance

12   to review those and I'll give you a date by which I'd hear

13   from you with regard to any objections.

14         I'd ask that you confer first about any objections

15   and then submit whatever the result of that conference might

16   be by way of which counter-designations you don't object to,

17   which ones you do object to and what the basis might be

18   remaining for those objections.

19         MR. ROSSIER:  Thank you, Your Honor.

20         THE COURT:  I'll obviously leave the record open

21   until you-all can have that conference and you can submit to

22   me the results of that.

23         How much time will you need to review and confer?

24         MR. GLITZENSTEIN:  I would imagine being able to do

25   that by Monday.

1          MR. ROSSIER:  Absolutely.

2          THE COURT:  You said Monday?

3          MR. GLITZENSTEIN:  This coming Monday, if it's not a

4    problem.

5          THE COURT:  All right.  That's the 22nd?

6          MR. GLITZENSTEIN:  I don't have a calendar right in

7    front of me, but I think that's correct, Your Honor.

8          MR. ROSSIER:  That's agreeable.

9          THE COURT:  All right.  Let me ask you-all to do

10   that by the 22nd.  What I'd expect you to do then is to file

11   a joint status report reflecting Plaintiff's positions about

12   the Intervenor-Defendant's Counter-designations, same thing

13   with respect to any responses then by the -- by the Defendants

14   and Intervenor-Defendants, and I guess I'll just rule in some

15   way, probably on paper.

16         But I'll leave the record open for purposes of that

17   issue, but I'll entertain closing arguments from you,

18   notwithstanding.

19         MR. ROSSIER:  Thank you, Your Honor.

20         THE COURT:  Just so I know, how much time will you

21   need for your closing?

22         MR. ROSSIER:  That's a good question.  Let me see.

23   I would suggest a total of, if it's not pushing the Court too

24   far, 20 minutes, perhaps 15, and then reserving five for

25   rebuttal.

 1          THE COURT:  20 minutes, 15 and then five.  Tell me

 2   what that means.

 3          MR. ROSSIER:  20 minutes in total.  Fifteen, say,

 4   since we're essentially in the position of the Plaintiff with

 5   the burden of proof, I wanted to reserve five for rebuttal.

 6          THE COURT:  That's fine.

 7          MR. ROSSIER:  Thank you, Your Honor.  At long last I

 8   think we have an end in sight in this lengthy litigation.  The

 9   issue presented by this case at this point is a

10   straightforward one, and that is whether the remaining

11   documents, both the redacted portions of approximately 500

12   pages and the fully withheld 500 pages, the release of those

13   would likely cause substantial competitive harm to my client,

14   Huntington Life Science.

15          You've heard testimony today, both from a gentleman

16   who's worked inside Huntington day-by-day for 12 years,

17   intimately familiar with the operations, the client base, what

18   they do, and the importance of confidentiality to the

19   business, to the ability to get new business, the ability to

20   try to grow the business, he testified yesterday that the

21   release of this information, in his opinion, in his lay

22   opinion would likely cause significant harm based on the

23   breach or the inability to keep faith with the confidentiality

24   agreements.

25          So, the confidential nature of this relationship,

1   the confidential nature of the relationship of Huntington Life

2   Science with its clients is crucial, and Mr. Caulfield

3   testified about that.

4        And today you also heard from Dr. Szot, intimately

5   familiar with the pharmaceutical industry and this kind of

6   testing, this early-stage drug testing.  He, too, talked about

7   how important confidentiality of study data is, even 10 years

8   later.

9        And yes, this data has been around for awhile, but

10  in this industry, being 10 years old doesn't mean it's

11  harmless.  And so I think you have before you credible,

12  competent testimony both from a hands-on real world person

13  living in this business as well as a very qualified expert

14  saying essentially the same thing.  This is going to hurt.

15  This is going to hurt Huntington.

16       Now, putting that in context, it occurs to me, well,

17  one might say, "Well, how is confidentiality so important in

18  this business?"  Well, I'm a lawyer.  Confidentiality is very

19  important in my business.  My wife is a therapist.

20  Confidentiality is important to her.  Keeping a secret.  It's

21  all about the ability to keep a secret for very different

22  reasons, obviously, in the three different industries,

23  Therapy, law, and drug testing, but the secret is essential to

24  being able to do the business.

25       And if my client is deprived of these secrets

1   through this action, it will suffer substantial competitive

2   harm, and I believe the testimony has shown that.

3           THE COURT:  Crystallize what the harm is.  Do I

4   understand that the harm is potential customers will not in

5   the future retain HLS or L -- HLS?  Is that what the harm is?

6           MR. ROSSIER:  That's one aspect.  That's definitely

7   one aspect.  There is also the current customers, the

8   customers who own this data saying, "My data is out there.

9   You promised to keep it confidential."

10          And this isn't about, as I'm sure your judge knows,

11  the legal fine print of the various agreements.  It's about

12  the real world impact from the release of this data, the real

13  world impact.

14          THE COURT:  So the real world harm is future

15  customers may not retain HLS as a CRO, current customers whose

16  data is included in the documents will lose faith in HLS and

17  not use HLS in the future.

18          MR. ROSSIER:  Yes, sir.

19          THE COURT:  It's essentially a loss of customer

20  base.

21          MR. ROSSIER:  Yes.

22          THE COURT:  All right.  And potential future loss of

23  customer base.

24          MR. ROSSIER:  Yes.

25          THE COURT:  All right.  What is the legal authority

1   for that being the proper measure of competitive harm under

2   this standard?

3          MR. ROSSIER:  I think, going back to one of the

4   early cases in this circuit, the *National Parks* case that did

5   the thorough examination of the legislative history and

6   focused on, I think it used the phrase of "typically

7   confidential"; some of the Senate reports and House reports,

8   "customarily confidential," I think the focus of that was that

9   the general approach of Congress on this was looking for

10  customarily confidential information.  You have that here.

11         When you get past *National Parks* through all the

12  developments to critical mass, you then have further

13  refinement along the way, but the fundamental test at its

14  heart is the likelihood of damage to the competitive abilities

15  of the company.

16         And I understand in this case it's a little

17  different than other CROs getting this data and then using it

18  to harm Huntington, and that gets into the study protocols and

19  some of the additional material that has been redacted and

20  then that is -- has been withheld.

21         But that -- this case isn't limited to that, and in

22  terms of volume, much more the redactions have to do with the

23  first category I mentioned.  And I guess in answer to Your

24  Honor's question, I think with this particular kind of

25  industry, with the real need for the secret being one step

1    above the tier where CROs are, I think it's appropriate to

2    apply applicable precedent to be able to say that that will

3    harm them just like their competitors, their direct

4    competitors, other CROs would harm them.

5           So, we would submit that that, in this industry, at

6    least, is an appropriate analysis, given the current circuit

7    precedent.

8           THE COURT:  Suppose the Freedom of Information Act

9    request that came in to the Government asked for documents and

10    the responsive documents were produced, information suggesting

11    that HLS had scientists who had lousy backgrounds, who were

12    incompetent, who drank on the job, who plagiarized and all

13    kinds of other bad things that I'm inventing, purely

14    inventing.

15           MR. ROSSIER:  Uh-huh.

16           THE COURT:  And that word got out.  Pharmaceutical

17    companies, presumably, would become aware of some of this

18    information suggesting that the scientists just weren't up to

19    snuff.  That presumably would hurt and harm HLS competitively.

20           MR. ROSSIER:  Correct.

21           THE COURT:  All right.  And that presumably would

22    just ruin their reputation, at least harm their reputation,

23    yes?

24           MR. ROSSIER:  Correct.

25           THE COURT:  Isn't the precedent clear that that kind

1    of reputation harm information is not the kind of injury that

2    the test requires me to look at with regard to the likelihood

3    of substantial competitive harm?

4              MR. ROSSIER:  Right.  I agree.  I agree.

5              THE COURT:  And so how is the harm you've

6    articulated with potential release of these documents

7    substantially different from the kind of harm that might

8    result from information that could damage a reputation that is

9    not the proper measure of harm under the cases?

10             MR. ROSSIER:  The distinction I would make is the

11   difference here is that this is the normal routine operation

12   of the business.  That is an abnormal situation where you have

13   scientists, for example, not doing their job, you know, doing

14   the kind of things that you describe and, you know, I guess

15   sort of in the category of embarrassing, embarrassing

16   information.

17             The thing that makes this data confidential has

18   nothing to do with being embarrassed.  It's confidential data,

19   and I get back to the core of the statute where Exemption 4 is

20   about confidential information.

21             So, when you pull back from the various precedents

22   that talk about concerns about merely reputational injury, I

23   understand that to really be talking about things that, you

24   know, you'd like to keep a secret because it's embarrassing,

25   sort of red-faced kind of information.  That's not what this

1    is at all.

2           This is routine data day-in/day-out data, and under

3    what Congress passed, Exemption 4, there's a protection for

4    confidential data.  That's at the core of the protection, as I

5    read it.

6           Similarly, this is an Animal Welfare Act situation,

7    too.  The APHIS activities were all under the Animal Welfare

8    Act, as the Court is well aware.  That Act protects

9    confidentiality, I would submit, essentially in the same

10   manner that the FOIA Act does.  Both times Congress acted with

11   regard to each statute.  They recognized that confidential

12   information should not be disclosed, and I think it's

13   particularly of import in this case because it's the

14   intersection of those two distinct statutes passed by two

15   different Congresses at two different times, but what's the

16   commonality?

17          They recognize the importance of the protection of

18   the confidential information.  And I understand this court is

19   bound by applicable circuit precedent, of course, and we have

20   put on evidence that satisfies that circuit precedent.  But my

21   client's view is that this competitive harm test is

22   inconsistent with the basic language of FOIA, of Exemption 4,

23   because it doesn't talk about competitive harm.

24          It talks about confidential information.  And I

25   would submit the case law that goes significantly past that

1    and focuses more on the competitive harm than the confidential

2    information is a significant advancement past where Congress

3    was.

4              THE COURT:  If it was the D.C. circuit that made

5    that advancement, what are you suggesting I do?

6              MR. ROSSIER:  I understand you are bound by the D.C.

7    circuit.  I am simply articulating my client's view of the

8    appropriate test.  And without regard to voluntary, just even

9    mandatory, we didn't think the competitive harm test is an

10   appropriate test, but you're bound by that.

11             I fully respect that and understand that, and we

12   comply with the comparative -- or the competitive harm test

13   here and we've put on very significant evidence directly on

14   that point.  But my point here is in applying applicable

15   circuit precedent, I think it's appropriate to go back to the

16   beginning and what those folks in Congress actually wrote into

17   the law.  They wrote into the law confidential.  That's the

18   word they used.  They wrote into the Animal Welfare Act,

19   confidential.  That's the word they used.  And so, therefore,

20   it's very distinctly different in an industry that the

21   testimony has shown is really built on the ability to keep the

22   data confidential.

23             They want -- their clients want to patent these

24   drugs.  Their clients want to keep their competitors from

25   having access and -- excuse me -- Dr. Szot, I think, was very

1    descriptive of the kind of competition in that industry and

2    the crucial importance of confidentiality.  So I think it's

3    certainly not the kind of reputation that is a deep dirt

4    darty -- deep dirt dirty --

5            THE COURT:  Easy for you to say.

6            (LAUGHTER.)

7            MR. ROSSIER:  I'm sorry, Your Honor.  Deep dirk --

8            THE COURT:  Deep dark dirty.

9            MR. ROSSIER:  Thank you.  Deep dark dirty secret

10   they're trying to hide.  It's the core of their business, and

11   therefore, we submit that the evidence shows that they have

12   established that.

13           When you look back at what Michael Caulfield talked

14   about yesterday and the various categories on, what is it,

15   Exhibit 9, our Exhibit 9, data, data, data.  Now, that's not

16   how I think of it.  I think, you know, veteran treatment --

17   veterinarian treatment records and various observations and so

18   forth, but that's not how this business works.

19           Everything, all the recorded data on those animals,

20   as they're going through the testing, is data for the study.

21   So I think it's important to bear in mind that, you know, this

22   idea of reputation and embarrassing information versus the

23   core of their business, so much of what is in dispute is at

24   the core of their business.

25           And let me point out one additional significant

1    piece of information that the evidence was developed on but I

2    want to tie the connection just so the Court is aware.

3          I believe it's Plaintiff's 26, the document that

4    counsel talked about, notice of violations, and I popped up a

5    few times and said no, it's report of violations.  The reason

6    I was making a major deal of it was the fact that we only saw

7    it, Huntington only saw about it in the Freedom of Information

8    Act after it had already been released, and that's based on

9    what Michael Caulfield testified to yesterday, and we have a

10   stipulation in the record as to when the release took place

11   and there was no submitter notice provided.

12         So, with regard to the various categories in that

13   document where my anticipation is counsel says, this is out,

14   this is out, my point for my client is we never had a chance

15   to say anything about that.  That was not with submitter's

16   permission.

17         So with regard to that whole area, the data, the I

18   think he referred to the animal numbers and various other

19   data, raw data from these studies, my client never had an

20   opportunity to comment on, and I think it's important for the

21   Court to understand that important piece of information.

22         And I think it's also important to look at all the

23   testimony over the last two days in the context of the image

24   of the industry that that testimony presents.  You heard

25   testimony about the high security, about, I think

1   Mr. Caulfield mentioned, about escorting one client through

2   certain designated parts of the facility so that client

3   wasn't -- didn't have access to the data being developed for

4   some other client in another part of the facility.  Keeping

5   the books.  I believe one of the two testified to keeping the

6   books with the particular lab technician or whatever so that

7   it wasn't generally open and available to others.

8          So I think this, in terms of other FOIA litigation

9   and other -- other kind of industries that have FOIA interests

10  at stake, I think this industry and the importance of

11  confidentiality to it, I think, plays a significant role and

12  should play a significant role in your decision.

13         And with that, I'm not sure what my time is, but I'd

14  like to reserve the balance for rebuttal.

15         THE COURT:  Well, let me ask you a couple of

16  additional questions.  Think back to the cross-examination of

17  Mr. Caulfield where on at least one occasion counsel drew an

18  admission that the description in the column of the Vaughn

19  index was inaccurate with respect to what deletion -- the

20  basis for a deletion.

21         I believe one example had to do with the amount of

22  money that might have been spent on constructing paired

23  housing cages, or something having to do with paired housing,

24  that the description in the Vaughn index just wasn't accurate.

25         What have you shown with regard to that, or have you

1  conceded that that's some information that needs to be

2  unredacted or released?

3          MR. ROSSIER:  Thank you, Your Honor.  That's an

4  excellent question.  There are two different areas of that if

5  I could address them separately.  One is with regard to

6  accuracy of the Vaughn index, and yes, counsel for Plaintiff

7  did point out areas where it was inaccurate.

8          The Vaughn index was made at a time, I believe,

9  prior to the most recent disclosure, so I don't know if some

10  of that relates to that.  The other -- the rest of that is

11  that some of it was simply inaccurate.  It was a mistake.  You

12  know, that -- that is --

13         THE COURT:  Well, help me.  What was the mistake?

14  The deletion or the description?

15         MR. ROSSIER:  I believe some of the descriptions

16  just didn't fit with the documents, and he pointed out various

17  of the descriptions that did not meet with the document

18  being -- I mean, in every case it was a document that was

19  partially received.

20         THE COURT:  All right.  So, how have you carried

21  your burden of showing that the deletions corresponding to

22  those inaccurate descriptions are properly justified under 4?

23         MR. ROSSIER:  Can I take a moment to think about

24  that?

25         THE COURT:  Yes.

1          MR. ROSSIER:  The other matter that I believe Your

2     Honor was addressing was the statements by Mr. Caulfield with

3     regard to, I think, the pricing of cages in some, and I

4     believe he ultimately indicated that he could not justify that

5     with the passage of time.  I think there are six documents

6     that just had the price deletion, and we are prepared to

7     concede on that issue.

8          THE COURT:  Well, that's a beginning.

9          MR. ROSSIER:  Yeah.

10          THE COURT:  In my quick review of the thousand pages

11    or so that are at issue here with respect to deletions in

12    total or deletions in part, it appears that there are well

13    over, I don't know, 10,000 lines of text that have been

14    redacted, and that's not even a scientific number.  It's

15    probably more than that, but if you take conservatively 500

16    pages -- a thousand documents total, multiply it by a few

17    lines per, you come up with a whole lot of lines of text

18    deleted.

19          How have you carried your burden with respect to

20    those more than 10,000 individual lines of text deleted to

21    justify the deletions as properly deleted or redacted under

22    Exemption 4?

23          MR. ROSSIER:  All right.  I think I can do that

24    in part -- I'm sorry, Your Honor.  May I get a book so I can

25    read from...

1          THE COURT:  Yes.

2          MR. ROSSIER:  Thank you.

3          (PAUSE.)

4          MR. ROSSIER:  I know there are a lot of deletions

5   and a lot of documents to review, but I believe, for example,

6   with regard to those deletions in 1-C, the testimony with

7   regard to the few examples that were addressed during

8   cross-examination --

9          THE COURT:  Before you continue, I forgive --

10  forgive me for interrupting you.  I want to make sure I put to

11  you a refined question.

12          How have you carried your burden of justifying under

13  Section 4 -- or Exemption 4, all of those deletions but

14  particularly carry your burden of showing that there is

15  nothing in there that can be reasonably segregable?

16          I should have added that in as really the focus of

17  part of what I was asking, so that's the complete question.

18  The burden not only to -- it's either to justify the complete

19  set of deletions in thousands and thousands of lines of text,

20  but also to show that there is anything in there that's

21  reasonably segregable that can be released from that which

22  can't be released, how have you carried that burden?

23          MR. ROSSIER:  Well, our argument, Your Honor, is

24  that the nature of the deletions in each case is raw data or

25  confidential information that would reveal confidential

1   information of Huntington itself, some -- something either not

2   the protocol itself but something that would reveal a

3   protocol, would reveal confidential information of Huntington.

4           THE COURT:  I understand your position and your

5   argument.  My question is how have you proven that?

6           MR. ROSSIER:  I think --

7           THE COURT:  Now, there's a difference between saying

8   it, concluding it, characterizing it, versus proving it.  How

9   have you proven that these things are totally not segregable?

10  How has that happened here?

11          MR. ROSSIER:  The -- how has that happened here?

12  Again, I think the documents that were reviewed, based on the

13  testimony that you heard from Mr. Caulfield, combined with the

14  Vaughn index that is not, obviously, 100 percent accurate but

15  is -- you know, is still, you know, the basic description and

16  largely accurate, show that what redactions were made were for

17  the items -- only for the items that we have specified.

18          THE COURT:  Well, let's recount briefly the history.

19  We went through, I think, two rounds of summary judgment.  One

20  round found against you.

21          After that, this latest Vaughn index came out.  I

22  think my history is right.  That round came out against you.

23          To rely then upon the same Vaughn index about which

24  Judge Oberdorfer has already fairly explicitly opined, I think

25  everyone will agree will simply not be enough and that this

1    trial would have required far more than simply reliance upon

2    that, simply repeating characterizations of what is contained

3    within the deleted text and actual proof that either all of it

4    is fitting within Exemption 4 and is completely not segregable

5    out with things that can be let out.

6         How have we moved on the evidence record in these

7    last two days from where we were in the two prior rounds of

8    summary judgment with regard to your carrying your burden on

9    establishing impossibility of segregability?

10        MR. ROSSIER:  I guess I would say that I think there

11   has been segregation in the redacted documents, and I guess

12   the way I see it, is that sufficient, or should there be

13   further segregation, should there be additional deletions.

14   That's just the way I see it.

15        With regard to carrying our burden in this case,

16   what I saw our burden in this case as being is dealing with

17   the competitive harm test and establishing that with regard to

18   the general categories of information on Exhibit 9, that we

19   needed to bring in expert testimony, which we did, and lay

20   testimony, which we did, to handle the burden with regard to

21   that test, and that's what we have in good faith attempted to

22   do.

23        THE COURT:  All right.  You had wanted to reserve

24   your time.  If you have nothing else, I'll invite

25   Mr. Glitzenstein.

1          MR. ROSSIER:  Thank you, Your Honor.

2          THE COURT:  Actually, let me just -- How much time

3   do you need at this point?

4          MR. GLITZENSTEIN:  Your Honor, I would ask for 15

5   minutes, Your Honor.  10, 15 minutes.

6          THE COURT:  The choice is this, I was originally

7   going to take our midafternoon break right now for 10 minutes.

8   We can do that or we can give you your 15 minutes now and then

9   take a break after that.

10         It might be better letting everybody take their --

11  I'm seeing a head shake.  We're going to take our 10-minute

12  break right now and come back in 10 minutes.

13         MR. GLITZENSTEIN:  Thank you, Your Honor.

14         MR. ROSSIER:  Thank you.

15         THE COURT:  All right.

16         THE DEPUTY CLERK:  All rise.  This honorable court

17  stands in recess for 10 minutes.

18              (A BRIEF RECESS WAS TAKEN.)

19         THE COURT:  I actually neglected to ask

20  Mr. Blutstein if you wanted to close.  Did you have any

21  closing argument?

22         MR. BLUTSTEIN:  No, thank you, Your Honor.

23         THE COURT:  All right.  Mr. Glitzenstein, you may

24  close.

25         MR. GLITZENSTEIN:  Thank you, Your Honor.  I

1  appreciate Your Honor's patience during the last

2  day-and-a-half.  It may not have been the most scintillating

3  trial in the world, but we do believe that there are important

4  principles at stake as there often are in Freedom of

5  Information Act cases.

6        And as Your Honor has already, I think, suggested,

7  obviously the Court is not writing on a blank slate, either

8  from the standpoint of circuit precedent as a whole or from

9  the standpoint of this court's own long involvement with this

10 particular case.  And I do believe that it is important to

11 place the case within the context of those, that precedent and

12 those proceedings.

13       First of all, I would say that I found Intervenor's

14 counsel to be actually remarkably candid in his

15 characterization of Intervenor's position.  It's a candid

16 answer.  It just doesn't happen to be the one that fits within

17 circuit precedent, and the candid answer was we believe that

18 these documents are confidential because we believe they're

19 confidential and our customers will not want us to release

20 this kind of information.  That's enough.

21       What that ignores, Your Honor, is the evolution of

22 precedent in this circuit, and particularly why we have a

23 *National Parks* test, the one that applies here, and on the

24 other hand, a critical mass test.  And particularly given

25 counsel's reference to *National Parks* initially and the

1   legislative history, it might be actually a little valuable to

2   explain exactly how, and Your Honor may already know this, but

3   I think it's quite instructive.

4        The *National Parks* test established the obligation

5   to withhold under Exemption 4, proving not merely

6   confidentiality and that documents are customarily viewed as

7   confidential, but rather establish the competitive injury test

8   which applies to this day to involuntarily submitted

9   documents.  And as you know under that test and as set forth

10  by the Court itself in several of the opinions, including the

11  most recent one on November 21st, Documentary 92, that test

12  requires demonstrating that competitors will use the

13  information in a manner that will harm the position of a

14  business submitter.

15       What happened in critical mass was that the

16  Government argued that that should no longer be the test.  The

17  Government argued that instead the *National Parks* test should

18  be replaced with exactly what Intervenor just articulated,

19  which is a general confidentiality test.

20       Is it regarded as confidential information within

21  the industry as a whole or by that particular submitter?  And

22  what the D.C. circuit said en banc was we are not going to

23  replace the *National Parks* test for involuntarily submitted

24  documents.  But for the critical mass test, which applies to

25  voluntarily submitted documents, we will now articulate a new

1     approach in which confidential or customarily secretive

2     documents can be withheld basically for that reason alone.

3          So, essentially, what's happening is that counsel is

4     attempting to basically apply the fit -- I should say, fit a

5     square peg into a round hole.  He's trying to take the test

6     that applies to voluntarily submitted materials and imply them

7     to a situation where there are, at least as we are approaching

8     this case, materials submitted involuntarily, and that simply

9     does not comport with the circuit precedent.  And if counsel

10    at some point wants to argue to the D.C. circuit that they

11    should overrule *National Parks* in its entirety, obviously they

12    are free to do that, but I think it should go without saying

13    that that is not the appropriate precedent that the Court

14    should apply at this stage.

15         With regard to -- and the only other thing I would

16    say about that, Your Honor, is that on page 4 of your most

17    recent ruling, in terms of focusing precisely on what the

18    likelihood of substantial competitive injury means, you made

19    quite clear that all of the case law applying *National Parks*

20    does require a demonstration of actual competitive injury from

21    the use of information by competitors, rather than any general

22    interest in confidentiality or even a concern about how

23    customers will react to whatever the disclosure is.

24         And I would say, without going into too much detail

25    in response to the statement made by counsel, that here we

1   have nothing like the embarrassing situation in Your Honor's

2   hypothetical.  Obviously, Plaintiffs have a different view of

3   it.  It is our view that a lot of these materials, in fact,

4   the vast majority of them relate directly to the USDA

5   investigation, and that is of great concern here and there is

6   enormous public interest in obtaining access to those kinds of

7   materials.

8          But we obviously do not believe the Court needs to

9   get into any of that in order to conclude that a generalized

10  concern with confidentiality and any reaction to a loss of

11  confidentiality is not the kind of interest that is ultimately

12  a basis for an exemption for claim under *National Parks*.

13         Let me pick up for a moment on what Your Honor was

14  asking about the Vaughn index and the segregability problem.

15  It has been our view, as Your Honor knows, for a long time, as

16  articulated by Your Honor at 2004, that that is what this case

17  is about, at least at this stage of the game.  We have for

18  many years said, delete information, standard operating

19  procedures, protocols, customer names that in fact would

20  involve an enormous problem, and Your Honor prescribed a

21  particular approach to dealing with the segregability issue.

22         Your Honor said produce a Vaughn index that

23  addresses segregability and which correlates portions of

24  withheld documents to particular exemption claims and

25  rationales.

1          I think we have what has become clear as a rather

2     extraordinary situation where the Government not only failed

3     to comply with Your Honor's mandate, but it produced something

4     even worse than that.  It produced an inaccurate Vaughn index,

5     which we've had witnesses acknowledge on the stand.

6          And so one of the questions that I think, obviously,

7     the Court must and will grapple with, what do you do when the

8     basic document that's used by the Government in order to meet

9     its burden, and ultimately it is the Government's burden in

10    a -- any FOIA case, including an Exemption 4 case, produces an

11    inaccurate Vaughn index which does not respond to the Court's

12    demand for a segregability analysis, what is the Court to do

13    with a situation like that?

14         We believe that at the very least it creates a

15    circumstance in which the Court should find that there has not

16    been the burden of proof met, unless there was some other

17    comparable substitute for a Vaughn index provided.  And in

18    this case, I think it is rather clear that we have had no such

19    thing.  Even assuming that Intervenors could, on their own and

20    without the Government rectifying its own, I think, frankly,

21    substandard and admittedly inaccurate Vaughn index, even if in

22    theory that burden could be carried by an Intervenor as

23    opposed to the agency itself, certainly has not been done in

24    this case.

25         Mr. Caulfield testified, and he is not an expert, as

1   Your Honor knows, is not authorized to make any expert

2   predictions, he hasn't even looked at all the records for

3   several years, let alone engaged in this kind of a detailed

4   segregability analysis.

5           And let me just say as an aside, Your Honor did this

6   rough calculation of the number of lines deleted from the

7   documents you have before you.  Of course, we also have the

8   500 pages deleted in full as to which there has not been a

9   single sentence disclosed.  So, obviously, if anything, there

10  is an equal if not greater concern on segregability with

11  regard to those.

12          As for Dr. Szot, he looked at a total of 30 pages of

13  documents before providing his testimony, and he testified

14  that he relied upon an inaccurate Vaughn index in deciding

15  which documents to look at, and more, frankly, surprising to

16  me, he did not even look at the IACUC records that Judge

17  Oberdorfer looked at in-camera and therefore he's in no

18  position whatsoever to opine as to whether Judge Oberdorfer's

19  skepticism about the withholding of those documents is correct

20  or not.

21          So, we would say, at a bare minimum, those records,

22  which Dr. Szot, in his deposition, at least, could not even

23  recall looking at any of those, would have to be disclosed,

24  and the USDA investigatory records, which he says he did not

25  look at at all and therefore can provide no testimony about

1    any release of those materials, we think, obviously also need

2    to be disclosed.

3            If I can make one other point about this

4    confidentiality argument.

5            THE COURT:  Before you do, since you're on a roll

6    with regard to identifying specific documents you will

7    ultimately be asking me to order released, you've identified,

8    I think, two of the categories from the Vaughn index.  Quite a

9    few are left.

10           What will I see from you -- or I can't ask you to

11   say what I'll see from the other side, but if you are right,

12   what will I see from you with regard to the remaining dozen or

13   more categories from that index, and you know, how will I --

14   how will I see it?

15           MR. GLITZENSTEIN:  Your Honor, we will include that.

16   I'm assuming that we will be submitting proposed findings and

17   conclusions?

18           THE COURT:  Right.

19           MR. GLITZENSTEIN:  And what we had intended to do is

20   to submit as part of our proposed findings and conclusions not

21   simply a cursory "and therefore Plaintiff wins."  We

22   understand this case is more complicated than that.

23           What we intend to include within that is a detailed

24   suggestion for remedial approach to this case which approaches

25   the segregability issue within the context that it's currently

1   in.

2        THE COURT:  How are you going to approach, for

3   example, the issue about the primate enrichment deletions?  I

4   believe the testimony was the primate enrichment deletions

5   were deleted because the information that would have been

6   contained in that text is something that would have codified

7   the standard operating procedures that you have agreed you're

8   not entitled to get.  All you have agreed, you're not going to

9   ask for.

10       How are you going to handle something like that?

11       MR. GLITZENSTEIN:  Your Honor, one thing I would say

12  is the devil is always in the details, so we're going to --

13  certainly going to take our best crack at it, but with that, I

14  don't mean to be flippant.  I understood the testimony to be

15  that since nobody knew in that particular paragraph that was

16  their surmise, and I think the way that we can handle

17  something like that is to have a remedial order that says,

18  basically we're objecting to this overall confidentiality

19  rationale and that you --

20       THE COURT:  I'm sorry to interrupt you again, but I

21  think the testimony from Mr. Caulfield was a little bit more

22  than that with regard at least to primate enrichment

23  deletions.  I believe he was of the view that the primate

24  enrichment information that gets put in those reports and

25  those sections does indeed reflect standard operating

1   procedures that are codified within the practices of the

2   company and that necessarily, even though he might not have

3   been able to talk about that specific page, which I think was

4   2231 from your Exhibit 1-A, I think he said he was familiar

5   with what goes in that kind of a section of the report.

6        So I'm not sure that -- it may not be that he had to

7   have specifically seen page 2231 in full before testifying

8   here today if I credit his testimony that he knows what goes

9   in that section of that report.

10       MR. GLITZENSTEIN:  Right.  And I think Your Honor --

11  and again we'll be addressing this.  If you look at other of

12  those IACUC documents which quote primate enrichment, some of

13  them simply said things like we need to address USDA's

14  concerns about primate enrichment, and one of the documents

15  referred to the dollar figure that would be spent on double

16  housing of primates.

17       So, I don't mean to disagree on that particular

18  testimony, but I understood him to be saying that some of our

19  characterizations of primate enrichment may reflect standard

20  operating procedures, and I think he acknowledged that some of

21  them do not.  But in order to answer your question, I guess

22  what I would suggest is the following.  It seems to me that a

23  remedial order can be -- can be crafted in which Your Honor

24  instructs Intervenor, I think necessarily including the

25  Government's involvement, since they are the ultimate agency

1   that is responsible for the records, and orders a

2   segregability review and provision of information and repeats

3   basically what Plaintiffs have said, that if particular

4   information does in fact involve standard operating

5   procedures, trade -- other kinds of information that

6   Plaintiffs have indicated were not interested in, then those

7   can be withheld subject to some kind of an exploitation of

8   what is going on and I think an opportunity for Plaintiff, if

9   we are skeptical of a particular deletion, to provide Your

10  Honor with some submission on that so there can be some ground

11  truthing, which I believe, particularly in light of this case,

12  would be the least that we would be entitled to under those

13  circumstances.

14          THE COURT:  Well, can you tell me now or do you

15  expect to be telling me later how that proposed remedial order

16  is going to differ in substance from what I directed four

17  years ago?

18          MR. GLITZENSTEIN:  Yes, Your Honor.  I think that --

19  I think part of the reason would be that we probably all

20  benefited from more familiarity with the documents in frankly

21  going through this proceeding.  I mean, my sense from looking

22  at it four years ago is that at that point, at least, before

23  we had a Vaughn index of any kind, we were really dealing with

24  a much more, by definition, general characterization of the

25  materials.

1          And I think Your Honor's ruling, as I read it, was

2     not so much focused on go forward and release, you know, these

3     particular kinds of records; rather it was, I don't have any

4     segregability assessment here at all, go produce a Vaughn

5     index that at least tells me what kind of documents I have and

6     attempts to go through the segregability review.

7          Now, we don't -- we haven't received that document,

8     unfortunately, but I think, frankly, we do have the benefit of

9     at least a more nuanced understanding of what these materials

10    are, and I think one thing that we're going to take a crack at

11    in our proposed findings is providing the Court with more of a

12    blueprint, from our standpoint, about how to parse it out and

13    do that segregability obligation in a way that gives the

14    Plaintiffs that which is legitimately releasable while

15    withholding that which legitimately we have -- and even more

16    legitimately, Plaintiffs have for a year said we're not

17    interested in obtaining.

18         And let me just give you one example, Your Honor, if

19    I could.

20         THE COURT:  Before you do that, my ultimate -- I'm

21    trying to think of the end game here.  I'm trying to compare

22    whether this is essentially going to result in giving the

23    Government another shot at complying with the order four years

24    ago and then having challenges to what they have done come

25    back and result in perhaps another round of, I don't know what

1  you'd call it, posttrial summary judgments or some other round

2  of challenges again.

3       MR. GLITZENSTEIN:  Right.

4       THE COURT:  Or whether we are at the point of

5  saying, every chance has been given, it's a put-up or shut-up,

6  this is it, go do it, so that there is no other -- second

7  round or third round or fourth round or fifth round of here is

8  what we're going to produce, this we're going to withhold, I

9  challenge that, bring it back to court and we go through

10  another round of sort of a mini-trial after a trial.

11       Maybe I'm thinking out loud too soon about too many

12  end-game details before you've had a chance to actually give

13  me your best judgment about how this can reach the end point,

14  but what can you tell me about your general view about the

15  shape this proceeding is going to take after we leave this

16  courtroom?

17       MR. GLITZENSTEIN:  Your Honor, I do think that one

18  option that's available to the Court is to craft an order

19  which, again, not entirely but obviously to some degree says

20  what you said in 2004, but obviously now strengthened by the

21  fact that we've had more years pass, the Government hasn't

22  undertaken that burden and provides, I think, instructions as

23  to going out and doing a segregability analysis consistent

24  with the law.

25       One, I think, option available to the Court is that

1    if Your Honor is to issue such a ruling, which I believe would

2    be at least a partial grant of summary judgment for Plaintiff

3    on that issue, and instructs the parties as the initial step

4    to address themselves how to carry that out and make an effort

5    amongst the parties to undertake such a analysis.

6         As Your Honor knows, this is a case that has been

7    through mediation, so it's not as if the parties have never

8    tried, but speaking for myself personally, it strikes me as

9    the kind of case and with Your Honor's ruling, might be more

10   even so the kind of case where we can make significant

11   headway, with the Court's guidance, as to how to go about that

12   analysis and therefore alleviate and minimize the burden on

13   the Court.

14        And I think one of the problems that we've had in

15   this case, quite frankly, has been really crystallized by this

16   proceeding, which is that Intervenor, and I don't accuse him

17   of bad faith, they obviously believe this fervently, believes

18   that any documents that they have that they don't want to

19   disclose, that should be the end of it.

20        And it's a general interest in confidentiality, and

21   I think that that has to some degree overwhelmed opportunities

22   to reach a more nuanced and, frankly, from my standpoint,

23   pragmatic resolution.  And again, I don't want to pre-ordain

24   what ruling the Court might issue, but if the Court were to

25   reject that sort of broad-based argument and say we do have

1   this segregability burden and you can only withhold

2   information where there really is this -- this genuine risk of

3   release of that kind of confidential information, go back with

4   those kinds of instructions and come to some resolution if you

5   can.

6          I think there is at least a reasonable prospect, and

7   we can see whether or not our compatriots agree with that of

8   reaching such a resolution, and if there isn't, I think we

9   would probably be in the position of at least having

10  substantially narrowed -- and again I can just speak on behalf

11  of my client, but having gone through this exercise again of

12  going through these documents and given the passage of time, I

13  think at the very least we would be able to come to that kind

14  of a process and say, "Look, we're extremely interested in the

15  IACUC records as we always have been, but some of these

16  categories, you know, whether you've done a perfect

17  segregability or not, you know, that's something we can

18  probably move on from."

19         So I guess my suggestion would be that Your Honor

20  consider a process where you provide that kind of guidance, we

21  have an opportunity to address it amongst ourselves and then

22  we would report back to the Court.  And you know, I think one

23  of the things that has obviously been done before and could

24  conceivably be done again, at least in terms of holding this

25  over the parties' head is the prospect of in-camera review.

1          Now, we certainly do not want to burden the Court

2     with looking through a thousand pages of documents, especially

3     since one member of the Court has already looked through a

4     substantial number and expressed some concerns.  But again, I

5     think if in fact there are places we get to in this process

6     that I'm suggesting where there is a disagreement, it may be a

7     disagreement which by that point is focused on a very discrete

8     number of documents where we say, yes, we really are very

9     interested in those; other side's position is under no

10    circumstances are we willing to give up on those, we may be

11    able to -- I suspect we'll be able to refine that to a point

12    where we would really have a much smaller number of documents

13    remaining at issue.  And at that point an in-camera review

14    might be the easiest way for Your Honor to address the

15    situation just to make sure that a description in fact

16    comports with the document.

17         And again, since this is a case where we've had

18    situations where that's not so, we believe that it would be

19    appropriate.  But again, I understand we're all sort of

20    thinking out loud to some degree, but I do think that there's

21    a practical process that could be used that really has not

22    been tried before, at least with the Court's sort of

23    over-arching view on some of these issues being set forth in

24    light of what the Court has heard and learned about the

25    records at issue.

1          I had a couple of more points about the particular

2    arguments, but I know I've taken a lot of the Court's time and

3    I don't want to belabor these matters unless the Court has any

4    further questions for me.

5          THE COURT:  Well, I took up some of your time by

6    hitting you with some of my questions.  If you wanted to

7    complete that, go ahead.

8          MR. GLITZENSTEIN:  I really do appreciate that, Your

9    Honor.  Just a couple of very quick points.  Even if

10   confidentiality, as a whole, could be deemed to be an

11   appropriate basis for withholding, as Your Honor knows, our

12   secondary argument is that in fact there seems to be an

13   admission that there would not even be a violation of the

14   confidentiality agreements because they particularly provide

15   for disclosure, as a matter of law, and in fact some of the

16   terms of the agreements appear to have already expired.

17         And in addition to that, I believe I heard

18   Dr. Szot's testimony to be that there has already been a

19   significant compromise of confidentiality and really could not

20   opine as to what releasing particularly the kinds of

21   segregable portions we're talking about, having some enormous

22   effect upon customer interest, particularly in light of the

23   many, many factors that Dr. Szot talked about as to how these

24   customers make decisions.

25         As for the particular concern of releasing

1   information and a competitor's use, this is a situation which

2   I think that Intervenor has gone to the confidentiality

3   argument because it is such a difficult argument on the

4   alternative ground.  Dr. Szot's testimony, as set forth in his

5   own report, is basically conjectural as to the impact and the

6   ability of discerning anything from the kinds of materials

7   that we're talking about.

8          He talked about possibility.  He talked about

9   essentially, on its face, speculation.  And I think the most

10  important fact that I would simply add in that regard with

11  respect to this ability to engage in reverse engineering, a

12  subject on which he said at his deposition he would not even

13  opine, he drew a distinction between characteristic responses

14  and ordinary responses, or more usual responses, and

15  acknowledged that with things that are not characteristic

16  responses to a drug, then it would be far more difficult for

17  any competitor who happened to get the information and

18  happened 12 years later to be doing a study that was relevant

19  to that information to draw any conclusions from that, but he

20  could not even say whether or not the substances at issue here

21  are characteristic or non-characteristic, which one would

22  think would be critical to even advancing that argument as to

23  any of the information.

24         Now, that's actually, I think, a good place for me

25  to end because I think it ties back into your question about

1  the remedial order, because I do think that, one, even

2  assuming the validity of that concern, I think it can easily

3  be dealt with -- I shouldn't say anything could be easily be

4  dealt with in this case.  It could, I think, arguably be dealt

5  with through a remedial order that would say that if any of

6  these substances involve these kinds of, you know,

7  characteristic responses and you claim that any release of a

8  particular document would result in that characteristic as

9  opposed to ordinary response, then withhold the document on

10  that basis, segregate out all the other material, release it,

11  we can then see it and what their explanation is, and if we

12  look at it and say, okay, we don't care, then that's the end

13  of it.

14       If we look at it and think there's some kind of a

15  pretext there, then of course if we can't work it out with

16  them, there will be an opportunity again to submit what I

17  think would be a finite number of documents or concerns to the

18  Court's attention.

19       So I think actually focusing on that allows us to

20  think through a little bit more how a remedial approach might

21  work in the situation that we have here.  And with that, Your

22  Honor, I do appreciate the time that Your Honor has given us.

23       THE COURT:  All right.  Mr. Rossier.

24       MR. ROSSIER:  Thank you, Your Honor.  Before I get

25  into the heart of a hopefully -- what will hopefully be brief

1  rebuttal, I would indicate my interest, and I'm not sure I can

2  speak for the Government, but if he differs with me I trust

3  he'll so notify the Court, but the idea that has been

4  expressed that at some appropriate time for the parties to

5  again take another shot at mediating the matter.

6       We did go through it before.  It wasn't successful.

7  But I think, you know, anyone sitting in this room the last

8  two days, there were quite a bit of information and maybe

9  further understanding of both sides' positions, so I'm in

10 favor of that.  I assume the Government is as well, so I just

11 wanted to indicate that that's -- that's my client's point of

12 view.

13      I would also suggest on the issue of the Vaughn

14 index and the mistakes in the Vaughn index that a reprocessing

15 of that index is in order, and I certainly, on behalf of the

16 Intervenor, would support that.

17      I think, you know, the core of the case is raw data

18 from studies.  Raw data from studies.  I can't swear to it

19 being 80 percent, but I think it's a good working assumption

20 that 80 percent of the information relates to what Michael

21 Caulfield would call raw data.

22      I appreciate what counsel said about what I said,

23 but I was trying to say, and I probably didn't articulate it

24 well, two different things.  One, we think the existing D.C.

25 circuit framework for the approach in these kind of cases is

1    inconsistent with the statute, but that was the minor point.

2          The major point was that I think the competitive

3    harm analysis is appropriately informed by the core statutory

4    language.  That says confidential.  I'm a little dumbfounded

5    by the whole idea, "Oh, that's just confidentiality?"  Isn't

6    that what Congress enacted as a key word in Exemption 4?

7    Confidential?  I don't think it can be a minor point, and I

8    think when you have the testimony you have here today, very

9    learned Dr. Szot in terms of these kind of studies,

10   early-stage drug development and you hear the kind of

11   importance of that confidentiality, I think that informs the

12   analysis on competitive harm.

13         And I think this industry competitor in a

14   competitive industry of CROs, the testimony is uncontradicted

15   on that, a determination of whether the raw data is releasable

16   or not releasable is a crucial ruling.

17         Now, having said that, when the mediation comes,

18   whether it's good to have the mediation before the Court makes

19   that final determination or not, I mean, I'm not -- I haven't

20   given much thought to, but I do think that this case, with the

21   problems with the Vaughn index, with the various other

22   problems that I addressed in the -- you know, you asked

23   questions about on the original closing, those are all

24   significant and important, and I know they are, but I also

25   think what's a significant part of this dispute is the raw

1    data in this test, and this evidence, I think, has

2    convincingly shown that that -- release of all of that in this

3    case is likely to cause substantial competitive harm to my

4    client.   That's, you know, a very important part of this case.

5            Now, when Your Honor makes that decision and what

6    the best timing of all that is, I understand, is open for some

7    further thought.   In closing, however, I think the last two

8    days of testimony have demonstrated that, yes, it's

9    confidential, but we've demonstrated much more.   And while

10   Dr. Szot doesn't think of it as reverse engineering, again

11   he's a scientist, I'm not, but when he talked about the astute

12   scientist, when he talked about the characteristic indicators,

13   to me that's at least what I think of reverse engineering,

14   someone else can look at that data, that raw data that doesn't

15   mean a thing to me and say, "Oh, look, this is the kind of

16   thing that happens in these other anti-hypertension drugs,"

17   and therefore it really takes a sophisticated eye to look at

18   words on a piece of paper and understand how they can be used.

19           And therefore, I would submit that Your Honor find

20   ultimately at the appropriate time that the release of the

21   test data would cause Huntington substantial competitive harm.

22           Thank you, Your Honor.

23           THE COURT:   All right.   Thank you.   Both sides seem

24   to suggest that at some point there may be some opportunity

25   for seeing if there is something that can be worked out, and I

1    appreciate those suggestions.

2            Certainly before trial I try to posture a case --

3    position the case so that the parties spend as much of their

4    resources trying to work things out before spending a lot of

5    time on motions and papers and research and writing and

6    billing client hours on things like that, and I still think

7    that's a valuable approach pretrial.

8            Posttrial, I want to go ahead and set this up to

9    have you submit your proposed findings of fact and conclusions

10   of law.  This isn't pretrial anymore, and I want to move this

11   forward to that point.  So I want to set up a schedule for

12   having the parties submit the proposed findings and

13   conclusions.

14           I don't think that there is a need, as sometimes

15   there is in summary judgment pleading, to make it seriatim.  I

16   think it ought to be simultaneous, so I'm going to invite your

17   suggestions about the amount of time you'll need to be able to

18   draft your proposed findings and conclusions and file them.

19           I suspect that after that has been done and after I

20   get a chance to get those and see them, I will invite any

21   proposals you may have that might have come to your mind after

22   having drafted your proposals, seen them, seen each other's

23   and then see if -- before an ultimate opinion is written, you

24   see room for trying to, as you say, work something out that

25   might obviate the need for a more sweeping set of findings and

1  an opinion, but I want to posture this so that I'm ready to go

2  ahead and rule if for some reason the efforts to try to work

3  things out either are not ones that you continue to suggest

4  after you've drafted your proposals or you try them and they

5  just don't work again.

6          So let me invite from both sides your

7  recommendations about the amount of time I should give you to

8  draft your proposed findings of fact and conclusions of law

9  and proposed order.

10          MR. ROSSIER:  You want to go first?

11          MR. GLITZENSTEIN:  Your Honor, we were going to

12  suggest 30 days.

13          MR. ROSSIER:  We were going to suggest 30 days.

14          THE COURT:  All right.  That's fine.  Have you taken

15  into consideration the holiday period in the winter?

16          MR. ROSSIER:  Yes, Your Honor, and that's why I was

17  tempted to say 45.  I think with the holidays, you know, we're

18  probably -- if Your Honor is comfortable with 45, I think 45

19  would be easier, and you know, maybe 30 -- 30 more -- closer

20  to -- 35 working days because I have travel plans for the

21  holidays.

22          THE COURT:  Well, I mean, 30 is sort of a magic

23  number that always tends to sound right, but in a posttrial

24  setting when you're talking about proposed findings and

25  conclusions that may rely upon the need for transcripts and

1    coordination with the court reporter, that in conjunction with

2    the possibility that you-all may have plans to try to relax a

3    little over the holidays is the only reason I asked if you're

4    asserting contemplating all of those things that will have to

5    go into the picture.

6              I'm happy with 30 if you can do it.

7              MR. GLITZENSTEIN:  Your Honor, 30 -- from

8    Plaintiff's standpoint and given our particular schedule, it's

9    not going to make much difference whether we get 30 or 45.  On

10   the other hand, if there's a -- a big problem for the other

11   side, as a matter of courtesy, we would extend that.

12             MR. ROSSIER:  Thank you.

13             MR. GLITZENSTEIN:  I mean, we would go with 30 left

14   to our own devices, but if it's -- if the Court has no

15   particular concerns about it and it's of great value to

16   Intervenor, there would be no objection to us.

17             THE COURT:  All right.  I'll go ahead and then -- I

18   didn't bring my calendar, but 30 days from today is somewhere

19   around January 17th.  I don't know what day of the week that

20   is.

21             MR. ROSSIER:  Your Honor, what I was trying to say

22   was 45 might be better for me, 45 days, and I believe counsel

23   was indicating that he would defer.  I'm sorry to jump in like

24   that, but I thought that's what I heard him saying on the 45

25   rather than the 30.

1          MR. GLITZENSTEIN:  I may have misspoke.  I was

2    saying 30 would be what we were proposing, but if 45 is just

3    better for Intervenor's schedule and the Court has no problem

4    with it, then we're happy to accede to the 45 days.

5          THE COURT:  All right.  We're looking at I guess at

6    the end of January.  Mr. Dales, do you have a --

7          THE DEPUTY CLERK:  Judge, that's what I'm looking

8    for.

9          THE COURT:  Counsel, do you have a January calendar?

10   I didn't bring mine.

11         MR. ROSSIER:  I have 2009.  January 31st is a

12   Saturday, so we have Friday, January 30th.

13         THE COURT:  Why don't we set January 30th as the

14   deadline for the parties to file proposed findings of fact and

15   conclusions of law accompanied by a proposed order.

16         I'd also suggest, however, that that be your

17   deadline by which you submit -- Well, let me back up.

18         I think you ought to take 10 days after that.  I

19   don't know if that would be February 9th or so.  Take 10

20   days after that as a deadline by which I'd ask you to file a

21   joint status report concerning any recommendations you have

22   about mediation or any other kind of alternative dispute

23   resolution.

24         That will give you a full 10 days to be able to look

25   at each other's filings, confer about where you might be able

1  to narrow down some conflicts, read some agreement on some

2  things and what the remaining disputes might be to see if it

3  makes sense to go through some additional round of ADR in some

4  way, or if it just is a -- is a gap that can't be breached and

5  I just need to rule.

6      And if you think that it's worth another shot at

7  trying to work things out, let me know how you propose that

8  that be done.  It could just be lawyer-to-lawyer discussions.

9  I suspect you-all are talking really about having a neutral or

10 a mediator or something, but put whatever form of ADR you

11 think would be recommended.

12     So we'll have the January 30th date be the

13 deadline for the proposed findings and conclusions, and the

14 February -- what's 10 days after that?

15     MR. ROSSIER:  February 9th, Monday.

16     THE COURT:  February 9th for your joint status

17 report and proposed order regarding any ADR.

18     Anything else we should take up today?

19     MR. GLITZENSTEIN:  Your Honor, could I just make one

20 point just so we're not misunderstood.  I don't think we are.

21 But we're always happy to talk to the other side and see if

22 there is some way of getting to a resolution, and we'll

23 certainly do that in good faith.

24     What I was suggesting before was that a discussion

25 that the parties would have after a ruling by the Court, based

1    upon past experience, would likely to be more fruitful.

2    Again, without pre-ordaining what any ruling might be, we've

3    tried mediation in the past without further guidance from the

4    Court and even with further guidance from the Court, and so

5    with the process I was suggesting was Your Honor address the

6    issues as they currently stand.  We obviously will take a

7    crack at submitting a detailed remedial order, and what I was

8    suggesting was that that build within it a process for the

9    parties to then discuss some of these issues within the

10   context of Your Honor's ruling.

11          Now, having said that, I'm also perfectly happy to

12   accept the other side's suggestion that we take our own effort

13   in the meantime while we're making these submissions to the

14   Court.  I didn't want there to be any doubt about the

15   suggestion that at least we had made on Plaintiff's side.

16          THE COURT:  You certainly will not be precluded in

17   submitting your proposing findings and conclusions in draft

18   order.  I'm drafting an order that builds precisely that in,

19   that the order produces a ruling, it also requires some

20   follow-up.  So you can always submit that in the proposal that

21   you submit.

22          MR. GLITZENSTEIN:  Thank you, Your Honor.

23          MR. ROSSIER:  Thank you, Your Honor.

24          THE COURT:  Anything else we should take up today?

25          MR. ROSSIER:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  Let me thank both counsel

2    for a well tried case, and I look forward to your submissions.

3          MR. GLITZENSTEIN:  Thank you, Your Honor.

4          THE COURT:  All right.

5          (PROCEEDINGS END AT 3:36 P.M.)

6                         *-*-*-*

7

8

9                   **CERTIFICATE OF REPORTER**

10         I, Catalina Kerr, certify that the foregoing is a

11   correct transcript from the record of proceedings in the

12   above-entitled matter.

13

14

15

16   _____    _____

     Catalina Kerr                      Date
17

18

19

20

21

22

23

24

25