UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                  )
IN DEFENSE OF ANIMALS,            )
                                  )
        Plaintiff,                )
                                  )
        v.                        )    Civil Action No. 02-557 (RWR)
                                  )
UNITED STATES DEPARTMENT          )
OF AGRICULTURE, <u>et. al.</u>,   )
                                  )
        Defendants.               )
_____ )

<u>**MEMORANDUM OPINION**</u>

Plaintiff In Defense of Animals ("IDA") brought this action against the United States Department of Agriculture ("USDA") seeking to compel the disclosure of records relating to the USDA's investigation of Huntingdon Life Sciences, Inc. ("HLS") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Life Sciences Research, Inc. ("LSR"), the parent company of HLS, later intervened as a defendant in this action.  At trial, the defendants carried the burden to prove that information contained in the 1017 pages of agency records remaining in issue had been properly withheld under FOIA Exemption 4 exempting release of records that would cause substantial competitive harm to HLS. Because the defendants have not carried their burden to demonstrate that the records at issue were properly withheld under Exemption 4, with all reasonably segregable material disclosed, judgment will be entered for the plaintiff.

-2-

BACKGROUND FINDINGS OF FACT

IDA, an animal protection organization, brought this FOIA action against the USDA seeking the disclosure of records concerning the USDA's investigation of HLS, a contract research organization ("CRO") with a registered research facility located in New Jersey that is regulated by the USDA under the Animal Welfare Act ("AWA").  IDA submitted a FOIA request to the USDA requesting "all records relating to the agency's investigation of HLS."  (Stip. Facts ¶ 17.)  In response, the USDA released thirty-one pages to IDA, including a report of violation, the administrative complaint against HLS and the consent decision and order.  (Id. ¶ 18.)  IDA brought this action to compel the USDA to provide IDA with additional records responsive to their FOIA request.  (Id. ¶ 19.)  The USDA informed IDA that it had identified 2778 pages of responsive records, of which it released 228 pages in full; released 146 pages in part, with personal information withheld under FOIA Exemption 6; withheld 19 pages in full and one page in part under FOIA Exemption 5, and sent 2384 pages to HLS to obtain HLS' views as to whether such records were exempt from disclosure under FOIA Exemption 4.  (Id. ¶ 21.)

During the course of litigation, the parties reduced the number of documents at issue and narrowed the scope of issues for trial.  The USDA released additional documents to IDA.  IDA "agreed to forgo test protocols and protocol amendments; animal

-3-

tracking and assessment records; the identification of any compound or product; and the identity of any customer of HLS; and dosing charts."[1]  (<u>Id.</u> ¶ 25.)  The parties filed cross-motions for summary judgment which were denied without prejudice because the defendants failed to provide an adequate <u>Vaughn</u> index[2] or other evidence upon which the court could assess whether the information withheld was properly exempted.  The defendants were ordered to prepare "a comprehensive <u>Vaughn</u> index describing the documents withheld (and to the extent necessary, portions thereof), the reasons for nondisclosure, and the reasons for non-segregability."  (Mem. Op. & Order at 2, 34 (Sept. 28, 2004).) The defendants provided a <u>Vaughn</u> index to IDA and the parties renewed their cross-motions for summary judgment.

     After in camera review of a sampling of these documents at issue, Judge Oberdorfer denied the parties' renewed cross-motions

_____

     [1]In addition, IDA also agreed before trial not to seek information withheld under Exemptions 5, 6, and 7(C).  (Stip. Facts ¶ 38(f).)

     [2]A <u>Vaughn</u> index, which derives its name from <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), describes with specificity the documents withheld or redacted and the proffered justification for the nondisclosure.  <u>Id.</u> at 826-27.  It "usually consists of a detailed affidavit, the purpose of which is to 'permit the court system effectively and efficiently to evaluate the factual nature of disputed information.'"  <u>John Doe Agency v. John Doe Corp.</u>, 493 U.S. 146, 149 n.2 (1989) (quoting <u>Vaughn</u>, 484 F.2d at 826).  At the least, the agency must provide an examining court with sufficient detail to permit <u>de novo</u> review of the agency's explanations.  <u>See</u> <u>Judicial Watch, Inc. v. U.S. Postal Serv.</u>, 297 F. Supp. 2d 252, 257 (D.D.C. 2004).

for summary judgment, concluding that there was a disputed
material fact as to whether disclosure of documents withheld
under FOIA Exemption 4 would cause substantial competitive harm
to HLS.  In Def. of Animals v. USDA, 501 F. Supp. 2d 1, 8 (D.D.C.
2007).  He advised the parties that "[a] trial on the merits
would be greatly facilitated by expert testimony on the ability
of competitors to reverse engineer proprietary information from
the disputed documents, as well as the likelihood of effective
advantage to a competitor from the redacted data."  Id.

     FOIA Exemption 4 prevents disclosure of "trade secrets and
commercial or financial information obtained from a person and
privileged or confidential[.]"  5 U.S.C. § 552(b)(4).  Remaining
at issue in this case are 1017 pages of agency records created
before or during 1998 that relate to seven animal studies
conducted at HLS.  (Stip. Facts ¶¶ 39-40.)  The USDA has withheld
503 pages in full and 514 pages in part under Exemption 4.  (Id.
¶ 36.)  The 1017 pages are grouped into the following eleven
categories: (1) Institutional Animal Care and Use Committee
("IACUC") records (56 pages withheld in part); (2) HLS memoranda
(33 pages withheld in full and 7 pages withheld in part); (3)
USDA investigatory memoranda (27 pages withheld in part); (4)
necropsy and postmortem examination reports (23 pages withheld in
full); (5) viability records (58 pages withheld in full and 397
pages withheld in part); (6) veterinary treatment requests and

logs (94 pages withheld in full and 20 pages withheld in part);
(7) observation sheets (28 pages withheld in full); (8)
miscellaneous records pertaining to animal cages (7 pages
withheld in part); (9) final test reports and related records
(124 pages withheld in full); (10) clinical observation reports
(121 pages withheld in full); and (11) interim test reports (22
pages withheld in full).  (Id.)

The parties conducted a two-day trial.  LSR called as
witnesses Michael Caulfield, the General Manager of HLS, and
Dr. Robert Szot, an expert in the fields of toxicology, early-
stage drug development, and the relationship between the
pharmaceutical industry and CROs.

## LEGAL FRAMEWORK

FOIA requires each federal agency to make available for
public perusal government records unless the requested documents
fall under one of nine categories of exemptions. 5 U.S.C.
§§ 552(a)-(b).  FOIA exemptions "must be narrowly construed" and
"the burden is on the agency to sustain its action."  John Doe
Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (internal
quotation marks omitted); 5 U.S.C. § 552(a)(4)(B).

A.   Exemption 4

FOIA Exemption 4 prevents disclosure of "trade secrets and
commercial or financial information obtained from a person and
privileged or confidential[.]"  5 U.S.C. § 552(b)(4).  The

parties have previously agreed that trade secret protection does not apply in this case and that the information withheld under Exemption 4 is "commercial" and "obtained from a person."  In Def. of Animals, 501 F. Supp. 2d at 6.  The remaining question, then, is whether the withheld commercial information is "confidential."[3]

In the District of Columbia Circuit, commercial information is "confidential" under Exemption 4 if "disclosure would either '(1) . . . impair the Government's ability to obtain necessary information in the future; or (2) . . . cause substantial harm to the competitive position of the person from whom it was obtained.'"  Pub. Citizen Health Research Group v. FDA, 704 F.2d 1280, 1290-91 (D.C. Cir. 1983) (alteration in original) (quoting Nat'l Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974) (footnote omitted)).  Where the government obtains information involuntarily, disclosure does not impair the government's ability to obtain similar information in the future. See Nat'l Parks, 498 F.2d at 770.  In this case, the defendants, conceding that the documents at issue were obtained involuntarily, allege that the records are properly withheld under the second prong of the National Parks test because

---

[3]The defendants do not contend such information is "privileged."  (See USDA's Mem. in Support of Its Renewed Mot. for Summ. J. at 4.)

-7-

disclosure of the information withheld would cause substantial

harm to HLS's competitive position.[4]

The type of competitive injury covered under Exemption 4 is

limited to "that which may flow from competitors' use of the

released information[.]"  Ctr. to Prevent Handgun Violence v.

U.S. Dep't of the Treasury, 981 F. Supp. 20, 23 (D.D.C. 1997)

(emphasis in original) (rejecting the Bureau of Alcohol, Tobacco,

and Firearms' argument that releasing reports would subject

licensed gun dealers to "unwarranted criticism and harassment" as

irrelevant to the competitive harm analysis); see Worthington

Compressors, Inc. v. Costle, 662 F.2d 45, 51-52 (D.C. Cir. 1981)

(inquiring "whether release of the requested information, given

its commercial value to competitors and the cost of acquiring it

through other means," will create a "windfall for competitors"

that puts the disclosing entity at a commercial disadvantage).

As the court of appeals has explained:

> "[t]he important point for competitive harm in the FOIA
> context . . . is that it be limited to harm flowing
> from the affirmative use of proprietary information by
> competitors.  Competitive harm should not be taken to

---

[4]On the eve of trial, after more than four years of
litigation and two rounds of summary judgment where it conceded
that the USDA obtained the documents at issue involuntarily, LSR
attempted to argue for the first time that the documents at issue
were disclosed voluntarily to the USDA and are properly withheld
under the first part of the National Parks test on the basis that
disclosure "would impair the Government's ability to obtain
necessary information in the future."  LSR was judicially
estopped from raising this untimely argument that was clearly
inconsistent with the position it maintained for years.  See In
Def. of Animals v. USDA, 589 F. Supp. 2d 41, 43 (D.D.C. 2008).

-8-

> mean simply any injury to competitive position, as
> might flow from customer or employee disgruntlement or
> from the embarrassing publicity attendant upon public
> revelations concerning, for example, illegal or
> unethical payments to government officials or
> violations of civil rights, environmental or safety
> laws."

Pub. Citizen Health Research Group, 704 F.2d at 1291 n.30

(quoting Mark Q. Connelly, Secrets and Smokescreens: A Legal and

Economic Analysis of Government Disclosures of Business Data,

1981 Wis. L. Rev. 207, 235-36 (emphasis and alteration in

original)).

To satisfy Exemption 4, an agency need not prove "actual

competitive harm" but must show (1) actual competition and (2)

the "likelihood of substantial competitive injury." Id. at 1291

(internal citation omitted).  While "the court need not conduct a

sophisticated economic analysis of the likely effects of

disclosure, [c]onclusory and generalized allegations of

substantial competitive harm . . . cannot support an agency's

decision to withhold requested documents." Id. (internal

citation omitted); see Founding Church of Scientology of Wash.,

D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 830 (D.C. Cir.

1979) (finding an agency's "conclusory and generalized

allegations of exemptions" insufficient to support summary

judgment for the agency (internal quotation marks omitted)).

"The defendant must show exactly who [is likely to be] injured by

the release of [the] information and explain the concrete

-9-

injury." <u>Delta Ltd. v. U.S. Customs & Border Protection Bureau</u>,
393 F. Supp. 2d 15, 19 (D.D.C. 2005).

    B.   <u>Segregability</u>

    In addition to establishing that information is properly
withheld under the claimed FOIA exemption, an agency seeking to
withhold information bears the burden of establishing that all
reasonably segregable non-exempt portions of records are
disclosed. <u>Keys v. Dep't of Homeland Sec.</u>, 510 F. Supp. 2d 121,
130 (D.D.C. 2007) ("The burden is on the agency to adequately
demonstrate that all reasonably segregable, non-exempt material
was disclosed.")  Because "[t]he focus of the FOIA is
information, not documents . . . non-exempt portions of a
document must be disclosed unless they are inextricably
intertwined with exempt portions." <u>Mead Data Central, Inc. v.
U.S. Dep't of the Air Force</u>, 566 F.2d 242, 260 (D.C. Cir. 1977);
<u>see</u> 5 U.S.C. § 552(b) (stating that an agency must disclose
"[a]ny reasonably segregable portion of a record . . . after
deletion of the portions which are exempt.").  "[A]n agency
cannot justify withholding an entire document simply by showing
that it contains some exempt material." <u>Mead Data Central</u>, 566
F.2d at 260.  Instead, an agency must provide "a detailed
justification" that "describe[s] what proportion of the

-10-

information in a document is non-exempt and how that material is

dispersed throughout the document."[5]  Id. at 261.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.   SUBSTANTIAL COMPETITIVE HARM

     A.   Findings of fact

     The defendants presented the testimony of two witnesses,

Caulfield and Szot, to explain why the records at issue are being

properly withheld under Exemption 4.

          1.   Caulfield testimony

     Caulfield, HLS's General Manager, testified that he had

general familiarity with all the categories of documents being

withheld in full or withheld in part.  He testified that he had

been involved in HLS's determinations and communications with the

USDA as to what records should be withheld from disclosure.

(Trial Tr. Day 1 ("Day 1 Tr."), 87:18-24, Dec. 16, 2008.)  On

cross-examination, however, Caulfield clarified that while "he

was very familiar with the categories of documents[,]" he had

"not looked at [all of] the documents themselves for some

significant period of time."  (Day 1 Tr. 90:10-13.)  He stated

that he reviewed only "certain documents" in preparation for

---

[5]A court may also consider "the information content of the
non-exempt material which a FOIA plaintiff seeks to have
segregated and disclosed" and "may decline to order an agency to
commit significant time and resources to the separation of
disjointed words, phrases, or even sentences which taken
separately or together have minimal or no information content."
Id. at 261 n.55.

-11-

trial.  (Day 1 Tr. 90:16-19.)  As background, Caulfield testified that the majority of HLS's business consists of "pre-clinical safety assessment" or "toxicology" work for customers in the pharmaceutical and biotech sectors.  He explained that such research "largely rel[ies] on animal tests to determine whether a drug is safe to proceed into clinical trials" using human subjects.  (Day 1 Tr. 23:2-6, 16-20, 22.)

For the specific categories of documents at issue, Caulfield described the withheld one hundred and twenty-one pages of clinical observation reports as containing data documenting "detailed physical observation[s]" of animals "that are on active tests" that are collected to determine the effect of the dose level of the drug given to the animal.  (Day 1 Tr. 48:5-7, 18-24.)  Regarding the pages of veterinary treatment requests and logs withheld in full and in part, Caulfield explained that they contain "documentation of a specific effect that was seen in an animal, whether it be drug related or [otherwise], a recommended treatment, and in some cases, follow-up observations and additional treatments."  (Day 1 Tr. 46:22-47:1.)  Caulfield testified that the raw data found in these types of documents are used by HLS's toxicologists to create reports for clients for future submission to the FDA.  (Day 1 Tr. 49:16-24.)  In addition, Caulfield testified that the necropsy and postmortem examination reports withheld in full contain data about an animal

at the time of death, and such reports "enable [HLS] to ascertain [the] gross microscopic effects that a drug may have actually had on an animal . . . [which] in many cases [are] not evident through the detailed weekly physical exams." (Day 1 Tr. 50:7-21.) Similarly, Caulfield testified that the documents categorized as "viability records," which contain twice-a-day observations of the effects of drugs on animals in a study, are also "considered raw data." (Day 1 Tr. 52:4-15.) He stated that HLS considers all of the raw data contained in these documents to be confidential according to company policy. (Day 1 Tr. 51:12-14; 53:2-4.)

Regarding the twenty-two pages of interim test reports withheld in full, Caulfield testified that the reports are HLS's product that it produces to customers and that such reports "contain the full range of assessments, evaluations and analysis on the toxic profile of a given compound." (Day 1 Tr. 55:21-25.) He continued to explain that the reports

> contain individual data for respective animals, group
> effects, statistical evaluations and a section called
> Materials and Methods, which generally specifies the
> methods that [HLS] employed, the equipment that [they]
> used, the statistical regimens [they] undertook, the
> software that generated and reported the data that's
> contained within that report and any other specifics of
> the study that the client might deem relevant.

(Day 1 Tr. 55:25-56:7.) Caulfield testified that the one hundred twenty-four pages of final test reports and related records withheld in full are similar to interim test reports insofar as

-13-

what information they contain and are also produced to HLS
clients.  (Day 1 Tr. 57:3-8.)  He further testified that the
twenty-eight pages of observation sheets at issue contain
"observations of animals in [a] study over a specified interval
of time," including body weight and food consumption data, to
demonstrate the effect of a particular drug.  (Day 1 Tr. 58:24-
59:4.)

    In addition, for the twenty-seven pages of internal USDA
Investigatory Memoranda withheld in part, Caulfield testified
that the portions withheld were "essentially a USDA discussion of
a variety of toxic effects that were either derived from [HLS's]
study records or [that the USDA] had seen during their on-site
visitations to [HLS's] laboratory in 1997."  (Day 1 Tr. 54:21-
24.)  For the documents categorized as internal HLS memoranda,
Caulfield stated that the pages and portions withheld from these
documents "contain discussions either with internal HLS
scientists or in some instances with [HLS] customers on the
effects of the test compound that were seen in [HLS's]
studies[.]"  (Day 1 Tr. 57:25-58:4.)  In addition, Caulfield
recalled that the redacted portions of the fifty-six pages of
IACUC records were "minutes discussing, or program reviews
discussing particular protocols[.]"  (Day 1 Tr. 59:17-20.)
Finally, Caulfield testified that information withheld from the
seven pages categorized as miscellaneous records pertaining to

-14-

animal cages relate to a proprietary design created by HLS for primate caging.  (Day 1 Tr. 53:20-24.)  He recalled that the information redacted was "design schematics and drawings of the like."  (Day 1 Tr. 53:24-25.)

Caulfield testified that he represented HLS in its discussions with the USDA as to what information should be redacted from the pages at issue in this case.  (Day 1 Tr. 87:18-24.)  He stated that during his conversations with the USDA about releasing the records at issue, "his primary concern at the time was that [they] not release records that were reflective of the effects of drugs or any of the particulars . . . that were under the auspices of the confidentiality agreement."  (Day 1 Tr. 88:2-7.)  Caulfield testified that he believed that all of the records at issue, except for the miscellaneous records pertaining to animal cages and some IACUC records, would contain information about HLS's standard operating procedures ("SOPs").[6]  He explained that SOPs "drive how [data] are collected," and are required by the Federal Good Laboratory Practice Regulations "to ensure the quality and integrity of the data."  (Day 1 Tr. 74:4-10.)  He stated that HLS "do[es] not share them with any of [their] competitors or any other third parties," except for regulators and sometimes clients.  (Day 1 Tr. 75:10-11.)

---

[6]Caulfield made no attempt to specify which of the withheld IACUC records at issue did or did not contain information about HLS's SOPs.

-15-

Caulfield further testified that it was his opinion based on his previous experience writing or approving HLS's standard operating procedures and fielding regulatory inspections by the FDA assessing HLS' procedures that the withheld records are "susceptible to a reverse engineering" of HLS's SOPs.[7]  (Day 1 Tr. 77:5-22.)

    2.   Szot testimony

Szot testifying as an expert in toxicology, early-stage drug development, and "the relationship between [the pharmaceutical industry] and the retaining of CROs for studies,"  (Trial Tr. Day 2 ("Day 2 Tr."), 20:9-24, Dec. 17, 2008), stated that the purpose for which he was retained and of his testimony was to discuss his views on confidentiality.  (See Day 2 Tr. 95:18-22.) Szot testified that his concerns about confidentiality included whether HLS's customers would perceive disclosure of information as a breach of confidentiality, and "the concept that release of certain types of data can be reverse engineered to find out additional information[,]" but clarified that reverse engineering was not the "central purpose" of his testimony.  (Day 2 Tr. 95:12-22, 98:8-18.)  He testified that in preparation for his testimony, he had a single visit to HLS that lasted approximately

---

[7]Caulfield, designated only as a lay witness, could not and did not offer any expert opinion testimony as to how the information in the records at issue could be reverse engineered by competitors in relevant industries to recreate HLS's SOPs.

three to four hours at which he had an opportunity to view the
documents at issue in their unredacted form before preparing his
expert report.  (Day 2 Tr. 23:1-5, 21-23.)  Szot stated that his
purpose during his visit "was not to look at each document and
determine the significance of every one," but rather "to
determine what type of data was in question and could that data
be harmful to HLS or to anyone else."  (Day 2 Tr. 24:8-14.)  He
testified that he used the descriptions of the documents
contained in the Vaughn index to create a random sample of
documents that included approximately four to five documents from
the different categories of documents for a total of
approximately thirty documents, and examined these documents in
their unredacted form to form his opinions.  (See Day 2 Tr.
24:14-25:4; 67:2-8; 72:7-12.)  Szot recalled "review[ing]
examples of viability records, necropsy and postmortem records,
clinical observation raw data, veterinary treatment requests and
IACUC meetings."  (Day 2 Tr. 28:9-12.)  He also recalled seeing
some "documents pertaining to purchasing of animal cages [and]
miscellaneous records."  (Day 2 Tr. 28:12-14.)  Szot could not
recall reviewing interim or final test reports but did remember
some Huntingdon memoranda.  (Day 2 Tr. 28:14-21.)  He also
reviewed some of HLS's confidential agreements with its
customers.  (See Day 2 Tr. 29:2-8.)  Upon cross-examination, Szot

-17-

denied reviewing any USDA investigatory records.  (Day 2 Tr. 93:20.)

Szot opined that nonclinical toxicology studies, such as those done by HLS, play a "critical role" in drug development because such studies are a necessary precursor to any studies using human subjects.  (Day 2 Tr. 29:16-25.)  He testified that toxicology studies vary by length and complexity, and may take up to three years, but such studies are "critical for approval from the FDA to initiate studies in humans."  (Day 2 Tr. 31:15-32:13.) With respect to HLS's competitive market, Szot testified that both large and small pharmaceutical companies might use a CRO for their toxicology studies.  (Day 2 Tr. 33:16-34:3.)  He testified that competition among the CROs that provide toxicology services is "fierce."  Szot estimated that there are at least 20 CROs in the United States and noted that in the past five years, similar entities have emerged in countries like Brazil, China, India, Russia that are active in the marketplace.  (Day 2 Tr. 52:1-10.) He also opined that there is fierce competition among the pharmaceutical companies to be the first to get a product to market because "the first one out there is usually the most successful in terms of financial gain."  (Day 2 Tr. 53:5-7.)  He posited that the first company to market a drug can "get the physicians to be aware of their product," and once physicians

begin using a product, "its hard to wean [them] away to another product."  (Day 2 Tr. 53:7-12.)

Szot explained that a company choosing a CRO typically considers, among other things, the CRO's previous experience in conducting the study to be commissioned; the experience and qualifications of the CRO's senior scientist; the qualifications of the CRO's technical staff, including how they are trained and whether they are certified; whether the CRO has been appropriately certified; the CRO's facilities; and the CRO's quality assurance unit, the independent group of scientists that monitors the CRO's studies to ensure they are conducted according to good laboratory practices.  (Day 2 Tr. 34:9-36:6.)  Szot also testified that a potential customer looks for a CRO that can ensure the confidentiality of a client's study.  (Day 2 Tr. 36:14-37:11.)  He explained that confidentiality is important to a customer because "the information a client would give to a CRO is proprietary" and might include, for example, the kind of compound being developed and its chemical name, or information about the client's research goals and plans for the future. (Day 2 Tr. 37:16-25.)

Moreover, Szot testified that based on his review of the records he selected, he concluded that release "would be of harm to [HLS] because, for one reason, clients would assume that if this data were made public, that their confidentiality agreement

with the CRO had been breached[,]" and it would be unlikely that "potential study sponsors would conduct studies at a CRO that could not maintain the confidentiality of its study data." (Day 2 Tr. 43:4-12; 61:12-18.)  He stated that if he were working for a pharmaceutical company and he discovered that data was released from HLS, he "would never go to HLS again for conducting another study, regardless of the reason why it was released." (Day 2 Tr. 62:8-12.)

In addition, Szot testified that he believed the records at issue contain confidential information because they "would show observations that were related to reactions to the drugs being tested."  (Day 2 Tr. 41:21-23.)  Specifically, he opined that veterinary treatment requests "would suggest how often toxicity was observed that was rather significant [and] require attention of a veterinarian."  (Day 2 Tr. 42:5-7.)  Similarly, viability records would be "a reflection of toxicity."  (Day 2 Tr. 42:12.) He testified that necropsy and postmortem examination reports would show "what was happening in the tissues of the animals that had been given drugs" and observation sheets would "reflect what was seen by the technician in looking at the animals . . . and could be reflective of what [a] drug potentially does to animals."  (Day 2 Tr. 42:8-11, 16-23.)  Szot explained that certain classes of drugs produce "characteristic effects on toxicity [that] are readily recognizable."  (Day 2 Tr. 44:4-25.)

-20-

He testified that because certain compounds have "specific types
of toxicity" that are recognizable as a sign of that compound, if
data on toxicity were released, it would be possible for persons
using other information such as a company's financial documents
or patent-related documents, to determine what compound or group
of compounds are being tested.  (Day 2 Tr. 44:23-45:15.)  He
further testified a competitor engaged in its own toxicology
study producing similar results might use the information it
could gather about what compounds were being tested to determine
whether to continue its own efforts or alter its strategy.
(Day 2 Tr. 45:16-46:25.)  Szot suggested that "astute
scientist[s]," such as senior toxicologists or directors of
toxicology in the pharmaceutical industry are "always looking for
information that would help them identify what is going on with
compounds that they're testing."  (Day 2 Tr. 60:2-11.)  Thus, he
concluded that "[i]t is . . . possible that with knowledge of
approximate study dates and raw data characteristics, competitors
of HLS study sponsors may gain information that could adversely
affect fair competition between the companies."  (Day 2 Tr.
61:19-22.)

     Szot also explained that on the other hand, there are other
compounds that do not produce signature toxicology results.
(Day 2 Tr. 47:24-48:1.)  He identified an unusual heartbeat, a
necrotic skin flap, and increased or decreased blood pressure as

examples of nonunique symptoms that could be caused by different kinds of substances.  (Day 2 Tr. 123:16-124:8.)  Similarly, Szot conceded that data revealing that an animal had an "anaphylactic response" standing alone wouldn't reveal information about a particular compound being tested.  (Day 2 Tr. 125:3-7.) Importantly, Szot conceded on cross-examination that he did not know what drugs were being tested by HLS during the time frame covered by the records at issue.  (Day 2 Tr. 125:8-10.)

Regarding the usefulness of data over time, Szot explained that companies generally develop and study a "series of compounds" with "many different types of molecular entities very similar to the original" that they begin with and such development may last a number of years.  (Day 2 Tr. 46:10-16.) Szot also testified that on average, it takes eight to ten years from the pre-clinical testing stage for a drug to reach the market, although it could be longer.  (Day 2 Tr. 121:12-17.)  He opined that because of the length of toxicology studies and the considerable time it takes for a drug to reach the market, even information about a study done ten or fifteen years ago may still provide an advantage to competitors still developing compounds in the same series.  (See Day 2 Tr. 46:17-25; 48:7-12.)

3.  Findings

The defendants have established at least three reasons why they believe the withheld records should not be disclosed to IDA.

-22-

One reason both witnesses identified as to why the records at
issue should not be disclosed is that HLS's customers would
perceive disclosure of the records at issue as a breach of HLS's
agreements with its customers to keep their toxicology studies
confidential. In addition, Caulfield's testimony established
that another possible reason the withheld records should not be
disclosed is that the records may contain information about HLS's
SOPs, and HLS has an interest in preventing disclosure of
information about its SOPs to its competitors because competitors
could arguably use such information to their advantage when
managing their own SOPs. However, Caulfield's explanation of
SOPs reveals that the Federal Good Laboratory Practice
Regulations are "very specific and particular in terms of what
[any company's] SOPs need to contain in order to ensure the
quality and integrity of the data" it collects. (Day 1 Tr. 74:4-
9.) Thus, while certain portions of a company's SOPs, if
revealed, might be capable of providing an advantage to a
competitor, certain portions of a company's SOPs necessarily will
be reflective only of procedures required by the applicable
regulations. Caulfield's testimony offers no explanation as to
whether the records at issue would reveal SOPs unique to HLS that
might provide a competitive advantage or would reveal SOPs that
were merely reflective of procedures required under the federal
regulations.

-23-

A third reason offered by the defendants in support of nondisclosure is that some of the data contained in the withheld records, with the exception of the miscellaneous records relating to animal cages, might reveal the compounds being studied by HLS at the time the records were created.  Szot's undisputed testimony established that some toxicology data can, in certain circumstances, identify the particular compound or series of compounds being tested, and a competitor engaged in similar toxicology research might be able to use such information to decide whether to continue, abandon, or modify its own research efforts.  (See Day 2 Tr. 44:23-46:25.)  On the other hand, Szot's undisputed testimony also established that certain symptoms and observations are common for numerous compounds or attributable to other causes beyond a reaction to a particular compound, and are not unique to a single or limited number of compounds.  As a result, some research data or recorded observations might not help a competitor seeking a competitive advantage.  (See Day 2 Tr. 123:4-125:1.)  Szot did not opine whether the particular data withheld in this case are data that could be used to identify certain compounds or if they are benign data that would not inform a competitor about the specific compound studied. Furthermore, Caulfield testified that it was his understanding that "all observations have been deleted from [the] documents [at issue], other than those relating to animals escaping their cages

-24-

or getting injured in connection with their cages[,]" and
acknowledged that it was outside his area of expertise to
determine which observations might be unique to drugs being
tested and which observations were not unique to any single drug
or limited group of compounds.  (See Day 1 Tr. 177:2-178:10.)
Accordingly, neither Caulfield nor Szot established that the
particular data withheld in this case are data from which
competitors could identify specific drugs being tested, rather
than data recording nonunique symptoms.

Moreover, when identifying the possible harms that may flow
from the release of the records at issue, neither Caulfield nor
Szot correlated the potential harms he identified to specific
withheld records.  Although both Caulfield and Szot testified
that customers' perceptions of HLS's ability to keep its research
confidential was an important factor in their assessments of
whether the records at issue should not be disclosed, neither
identified which records, if released, would be harmful to HLS's
competitive position solely because the information released
could be used by HLS's or its customers' competitors to gain
advantage in the toxicology, pharmaceutical or CRO industries.

B.   Conclusions of law

The defendants bore the burden at trial of establishing that
HLS or its clients face actual competition and that there is a
likelihood that HLS or its clients would suffer a substantial

competitive injury if the information withheld is released
because the information could be used by their competitors for
commercial gain.  See Pub. Citizen Health Research Group, 704
F.2d at 1291.  The defendants have carried their burden of
demonstrating that there is actual competition in the contract
research business among CROs that provide toxicology research to
secure study sponsors, and there is actual competition in the
pharmaceutical industry to be the first to get a particular type
of drug to market.  The undisputed testimony of both Caulfield
and Szot attested to the presence of multiple CROs competing
against HLS to provide research services to pharmaceutical
clients, and pressure among pharmaceutical clients to be the
first to market a new drug.

On the other hand, the defendants have not carried their
burden with respect to whether the disclosure of the withheld
information in the 1017 pages at issue in this case has a
likelihood of causing substantial competitive injury to HLS or
its clients.  As the court of appeals has instructed, the
competitive harm that matters is a competitor's affirmative use
of proprietary information that could reap a commercial windfall
for the competitor, rather than the harm caused by a customer or
other third party's negative reaction to disclosure.  See id.;
Worthington Compressors, Inc., 662 F.2d at 51-52.  Thus, the
defendants' evidence that HLS would suffer harm by release of the

records at issue because their customers or potential customers would perceive disclosure as a breach of HLS's confidentiality agreements with HLS's customers does not satisfy their burden under Exemption 4 in this case.

With respect to the defendants' evidence that competitors could use the withheld records to identify HLS's SOPs or the compounds being tested, the defendants' evidence provides no more than the "[c]onclusory and generalized allegations" that the court of appeals has rejected as insufficient to sustain a claimed exemption from disclosure.  Pub. Citizen Health Research Group, 704 F.2d at 1291.  While Caulfield's and Szot's testimony established that there are at least two potential ways competitors might be able to use information likely to be found in the records at issue, neither related competitors' potential uses of information to the specific records at issue with sufficient detail to establish by a preponderance of the evidence that competitors of HLS or its clients are likely to use the particular records at issue to cause substantial harm to HLS or its clients.  Szot, having reviewed only approximately 30 of the 1017 pages at issue, made only general statements as to the kind of information he found in the samples he reviewed, concluded that the kind of data he reviewed might be able to be used by competitors, but also conceded that some data would reveal benign results from which competitors could not draw specific

conclusions.  Szot's generalized opinions, unaccompanied by any
assessment of the likelihood that the particular information
withheld from each of the 1017 pages at issue are data that
competitors would be able to use for commercial advantage, rather
than benign data, are an insufficient basis upon which to
conclude that there is a likelihood of substantial competitive
injury in this case.  Similarly, Caulfield's testimony that a
competitor might be able to recreate HLS's SOPs was merely a
generalized assertion lacking any explanations that suggest that
the withheld records implicated unique SOPs, rather than
procedures required by regulation.  Caulfield, testifying as a
lay witness, was not qualified to and did not opine on the
likelihood that competitors in the toxicology, pharmaceutical, or
CRO industries could use the information contained in the
withheld records.

In addition, Caulfield's and Szot's testimony reveals that
they reviewed the records at issue with the belief that the
documents at issue should be withheld from release to prevent
negative customer reaction.  There is no evidence suggesting that
either witness analyzed the documents to ascertain whether the
records withheld could be withheld for the sole purpose of
preventing competitors' use of the information for commercial
advantage.  As a result, neither Caulfield nor Szot established a
likelihood that disclosure would cause a competitive harm.  Thus,

while the defendants have carried their burden of showing that
HLS and its clients experienced actual competition, they have not
shown that there is a likelihood that release of the particular
information withheld in this case would cause HLS or its clients
to suffer a substantial competitive injury.

## II.  SEGREGABILITY OF NONEXEMPT INFORMATION

Judge Oberdorfer found in 2007 that the Vaughn index is
devoid of any segregability analysis.  See In Defense of Animals,
501 F. Supp. 2d at 3.  At trial, the defendants introduced no
other evidence on the issue of segregability.  Neither
Caulfield's nor Szot's testimony spoke to the specifics of
individual documents.

Caulfield's testimony established that at the time he was
involved in deciding which records were to be withheld in this
case, his redaction decisions were made not solely to prevent the
release of information that competitors could use to their
commercial advantage.  He admitted that preventing the release of
information that HLS's customers viewed as confidential was a
consideration in his discussions with the USDA as to which
records should be withheld.  Caulfield offered no testimony
suggesting he ever reviewed the documents at issue again for the
purpose of examining whether the information withheld could

actually be used by HLS's or its clients' competitors to gain a commercial advantage over HLS or its clients.[8]

He further testified that at present, "he was very familiar with the categories of documents[,]" but he had "not looked at the documents themselves for some significant period of time." (Day 1 Tr. 90:10-13.)  He said that he looked at "certain documents" in preparation for trial, but it had been "some number of years" since he had reviewed all of the documents.  (Day 1 Tr. 90:16-19.)  He further testified that he "had little or no involvement in the <u>Vaughn</u> index and [had] not studied it," and could not testify as to whether the <u>Vaughn</u> index prepared accurately reflects HLS and the USDA's "joint understanding" of what materials could be released to IDA.  (Day 1 Tr. 88:21-25.) Caulfield offered no testimony that he ever examined the records at issue for the purpose of determining whether only that information which could be used by competitors for commercial advantage had been redacted and that all other information reasonably segregated from information that could be used by competitors had been appropriately released.  Accordingly, Caulfield's testimony does not provide any evidence on the issue of segregability.

Similarly, Szot did not offer any testimony on the issue of segregability.  Szot expressly conceded that he could not "say

---

[8]Nor did the defendants establish that Caulfield would be qualified to give such an opinion.

-30-

that there is no information in [the USDA reports] that has been
withheld from the plaintiffs that does not contain standard
operating procedures, protocols, or raw data[.]" (Day 2 Tr. 95:5-
11.)  He testified that he looked at unredacted versions of the
documents at issue (Day 2 Tr. 25:19-21), and he admitted on
cross-examination that he did not look at the documents "with a
knowledge of exactly what would be deleted from them" and did not
know at the time he was reviewing his sample of documents that
approximately five hundred pages of documents were withheld from
disclosure in their entirety.  (Day 2 Tr. 72:13-18; 73:3-14;
73:25-74:4.)  Because Szot, by his own admission, did not view
the records at issue for the purpose of assessing whether the
withheld portions were limited to information that could be used
by HLS's competitors for commercial advantage, his testimony
provides defendants no support on the question of segregability.

     B.   Conclusions of law

     None of the testimony or other evidence admitted at trial
provides any analysis as to whether all information that could
not be used by HLS's or its clients' competitors for commercial
advantage has been reasonably segregated from any of the 1017
pages.  The defendants have failed to carry their burden of
establishing that all reasonably segregable nonexempt information
has been disclosed with respect to any of the 1017 pages at
issue.  Because the defendants have entirely failed to carry

-31-

their burden on segregability, there is no basis upon which to conclude that any of the records at issue have been properly withheld under Exemption 4.  Thus, judgment will be entered for the plaintiff and the USDA will be ordered to release the records that have been withheld in full or in part.

CONCLUSION

The defendants failed to carry their burden of proving that there is a likelihood that the information withheld from the 1017 pages at issue, if released, could be used by competitors for their commercial advantage and that all reasonably segregable nonexempts portions of the records at issue have been disclosed. Because the defendants have failed to justify the withholding of the records at issue under Exemption 4, judgment will be entered for IDA and the USDA will be ordered to disclose all 1017 pages remaining at issue in this case.  Since IDA has voluntarily agreed to forego certain information that may be contained in the withheld records, the USDA will be permitted to redact the information that IDA has voluntarily agreed to forego.  A final judgment accompanies this Memorandum Opinion directing how disclosure shall occur.

SIGNED this 18th day of September, 2009.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge